IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSE ANDREU,  )  <br>  )  <br>      Plaintiff,  )  <br>  )  Case No. 07 C 06132  <br>v.  )  <br>  )  Judge Der-Yeghiayan  <br>UNITED PARCEL SERVICE, INC.,  )  <br>  )  <br>      Defendant.  )  | |

**DEFENDANT UNITED PARCEL SERVICE'S
RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL FACTS**

Defendant United Parcel Service, Inc. ("UPS"), pursuant to Local Rule 56.1 of the Northern District of Illinois, submits its statement of uncontested material facts in support of its Motion for Summary Judgment.

**Parties and Jurisdiction**[1]

1.  Plaintiff Jose Andreu ("Andreu" or "Plaintiff") is a resident of Cook County, Illinois. (Complaint ¶ 2).

2.  Defendant UPS is an Ohio corporation registered and licensed to do business in Illinois with its principal place of business in Atlanta, Georgia. (Complaint ¶ 3; Memorandum of Clarification of UPS's Principal Place of Business, p. 1).

3.  The Court has jurisdiction over Andreu's claims pursuant to 28 U.S.C. § 1332 and/or 28 U.S.C. § 1367. (UPS's Notice of Removal ¶ 3).

---

[1] "Dep. pp. __" represents cites to depositions. "Decl. ¶ __" represents cites to declarations. Documents cited in UPS' Statement of Uncontested Materials Facts may be found in the Appendix filed separately herewith.

4. The Court is the proper venue for Andreu's claims because Andreu resides in and was employed by UPS within this judicial district and the events complained of are alleged to have occurred within this judicial district. (Complaint ¶¶ 2, 4).

### Andreu's Employment With UPS

5. Andreu was hired by UPS in 1996 and initially worked as a part-time loader on the air dock. (Andreu Dep. p. 11).

6. At all relevant times Andreu was a member of Teamsters Local 705 ("Local 705" or "the Union"). (Andreu Dep. p. 19).

7. At all relevant times, Andreu's employment with UPS was governed by a collective bargaining agreement (the "CBA" or "collective bargaining agreement") entered into between UPS and Local 705. (Andreu Dep. pp. 19, 20; Haefke Decl. ¶ 3).

8. From 1996 to 2003 Andreu worked as a part-time air driver delivering Next Day Air packages. (Andreu Dep. pp. 11, 12).

9. From 2003 until his separation from employment on March 4, 2005, Andreu worked as a swing or vacation package car driver. (Andreu Dep. pp. 12, 13, 25).

10. As a swing or vacation driver, Andreu did not have a regular route but rather would fill in for drivers on vacation, on disability, on workers' compensation leave or otherwise not at work. (Andreu Dep. pp. 25, 26).

11. Andreu's duties as a UPS package car driver included the delivery and pick-up of packages and Next Day Air documents. (Andreu Dep. p. 33).

### "Notice of Termination" Discipline Procedure in Collective Bargaining Agreement

12. For most employee offenses which may result in termination of employment, the collective bargaining agreement between UPS and Local 705 provides a procedure for an

employee to continue working until his status is resolved by UPS and the Union provided through the grievance procedure (Haefke Decl. ¶ 4).

13. Usually the Union files a grievance over an employee being put on "Notice of Termination," which initiates discussions between UPS and the Union to resolve the grievance. (Haefke Decl. ¶ 5).

14. In many instances, an employee on "Notice of Termination" is returned to work by an agreement of UPS and the Union after a grievance is filed on his/her behalf, with discipline such as a warning or an unpaid temporary suspension from work rather than a termination of employment. (Haefke Decl. ¶ 7).

15. If UPS and the Union do not agree on a lesser penalty at a lower level hearing, the normal practice is for the grievance to proceed to resolution, first at the joint Union-UPS Grievance Committee meeting (the Panel), and if not resolved there, possibly to arbitration by an outside arbitrator. (Haefke Decl. ¶ 8).

16. In cases in which the Union declines to file a timely grievance, the normal procedure is for UPS to impose the discipline noticed shortly after the 15 day time limit for filing a grievance has passed. (Haefke Decl. ¶ 11).

17. Prior to the circumstances involving Plaintiff Andreu, UPS had never allowed an untimely grievance over a "Notice of Termination" to go forward. (Haefke Decl. ¶ 17).

### Andreu Lies About His Workload

18. On February 9, 2005, Andreu was assigned the Route 59 route on the south and east sides of Aurora, Illinois. (Andreu Dep. pp. 90-91).

19. That afternoon, Andreu was contacted by UPS through an ODS, or text message through his DIAD (the Delivery Information Acquisition Device that is carried by all UPS

package car drivers), and told to "break your route and go pick up Bernina ASAP." (Andreu Dep. pp. 95-96; Bast Dep. p. 19). Andreu understood this message meant he should "stop doing what you are doing and go and get the pick-up." (Andreu Dep. p. 97).

20. Because of the need to satisfy customers about priority pick-ups, it is common for drivers to be told to "break off route" to handle a priority pick-up. (Snyder Decl. ¶ 2; Bast Decl. ¶ 2; Ziltz Decl. ¶ 3). Drivers are expected to follow these directions like any other direct work-related instructions. (Snyder Decl. ¶ 3; Bast Decl. ¶ 3; Haefke Decl. ¶ 19; Ziltz Decl. ¶ 4).

21. Instead of following this specific instruction, Andreu responded through the DIAD that he wanted to take lunch and he had a lot of stops left. (Andreu Dep. p. 97).

22. Andreu thereupon received a second ODS message asking how many stops he had left. (Andreu Dep. p. 98).

23. Andreu called the Center around 4 p.m. and said he had approximately sixty (60) stops remaining on his vehicle and that breaking the route would put him behind and he would return late to the building. (Andreu Dep. pp. 98-99; Bast Dep. pp. 31, 34).

24. The Bernina pick-up was time-sensitive and needed to be completed by 4:30 p.m. (Bast Dep. p. 23).

25. Andreu had done the pick-up at Bernina before. (Andreu Dep. p. 95).

26. UPS OMS Cheryl Bast informed Supervisor David Ziltz that at 4:00 p.m. Andreu claimed he had sixty (60) stops remaining on his package car and didn't want to make the Bernina pick-up. (Bast Dep. pp. 34-36; Ziltz Dep. pp. 131-32).

27. Andreu was again told by Bast by ODS message at about 4:15 p.m. to break off his route and go to Bernina and meet with Ziltz there. This time, Andreu did as he was told. (Andreu Dep. p. 101; Bast Dep. pp. 36-37).

28.  Ziltz was waiting for Andreu when he arrived at Bernina; Andreu claims he arrived at 4:45 p.m.  (Andreu Dep. pp. 103, 105).

29.  Ziltz checked Andreu's package car and found he had only about twenty (20) stops remaining.  (Ziltz Dep. p. 135).

30.  Ziltz told Andreu that Andreu had been untruthful about the number of package deliveries Andreu had left (60 rather than 20) when he was told to "break off route" and go ASAP to Bernina and that he would be called into the office the next day and would be fired for lying about the number of packages.  (Andreu Dep. p. 105; Ziltz Dep. pp. 135-36).

31.  Ziltz does not have the authority to unilaterally discharge employees.  (Haefke Decl. ¶ 22).

32.  Ziltz informed then UPS Aurora Center Manager Kerry Snyder ("Snyder") of this untruthfulness incident with Andreu.  (Ziltz Dep. p. 139; Snyder Dep. pp. 185, 214-15).

33.  Bast drafted a note summarizing her communications with Andreu concerning the Bernina pick-up and this was also given to Kerry Snyder.  (Bast Dep. pp. 15, 38; Snyder Dep. Ex. 4; Snyder Dep. p. 112).

### **Andreu Is Put On Notice Of Termination**

34.  On the morning of February 10, 2005, Union Steward Pam Treadwell got Andreu and took him to Snyder's office where the three of them met.  (Snyder Dep. p. 213; Andreu Dep. pp. 112-113).

35.  During the February 10, 2005 meeting, Snyder asked Andreu to explain what happened on February 9, 2005.  Andreu told his story, including admitting he had claimed he had "about 60" stops remaining.  (Andreu Dep. pp. 98, 116; Snyder Decl. ¶ 4).

36. After he had heard everything, Snyder told Andreu he was on notice of termination for this untruthful attempt to avoid a work instruction. (Andreu Dep. p. 116; Snyder Dep. pp. 219-20).

37. Snyder could have terminated Andreu immediately as the collective bargaining agreement between UPS and Local 705 lists "dishonesty" as a cardinal offense subject to termination on the first offense without need for progressive discipline. (Haefke Decl. ¶ 9).

### The Union Fails To File A Grievance So Andreu's "Notice of Termination" Becomes Final

38. The collective bargaining agreement requires that grievances challenging disciplinary action be filed with the Company within fifteen (15) days of the imposition of the disciplinary action. (Haefke Decl. ¶ 10).

39. No grievance was filed with UPS within fifteen (15) days of Andreu's Notice of Termination. (Snyder Dep. pp. 265, 267).

40. When the Union had not yet filed a grievance over twenty (20) days after Andreu was placed on notice of termination, Snyder met with Andreu and Union Steward Rick Cantu on March 4, 2005 and terminated Andreu's employment. (Snyder Dep. pp. 210-11; Andreu Dep. p. 129).

41. Union Business Agent Emmanuelson tried to give Snyder a grievance after Andreu was terminated but Snyder declined to accept it. (Snyder Dep. pp. 267-69).

42. Union Business Agent Emmanuelson also tried to get District Labor Relations Manager Tom Haefke to accept a late grievance on Andreu's behalf but Haefke declined to accept it. (Haefke Decl. ¶ 12).

43. Local 705's standard grievance form has a place for a UPS manager's signature signifying he/she received a timely grievance. (Haefke Decl. ¶ 20).

44. The grievance the Union purported to submit on behalf of Andreu has no signature of a UPS manager. (Haefke Decl. ¶ 21).

45. Snyder testified that, had a grievance been timely filed, he would have been willing to have taken Andreu off the notice of termination and the termination reduced to a suspension. (Snyder Dep pp. 256-57).

**UPS Agrees to Process Untimely Grievance Over Andreu's Termination**

46. After being asked by the Union on several occasions to have the matter of Andreu's termination heard by the joint UPS/Local 705 grievance panel (regardless of no timely grievance filing), in March 2006 UPS agreed the Union could bring the matter to the joint UPS/Local 705 grievance panel. (Haefke Decl. ¶¶ 13, 14).

47. At the March 15, 2006 grievance panel hearing under the collective bargaining agreement between representatives of the Union and UPS, UPS took the position that the grievance should be denied because it was not timely filed. The grievance was thereupon "deadlocked" by the grievance panel, meaning it was slated for hearing by an independent arbitrator, both as to the issue of untimely filing of the claimed grievance and, depending on how that issue was resolved, final adjudication by the arbitrator, pursuant to the parties' collective bargaining agreement. (Haefke Decl. ¶ 15).

48. An arbitration hearing to resolve the issue of UPS's grounds for terminating Andreu's employment was scheduled for June 13, 2007, before Arbitrator Paul F. Gerhart, but was delayed at Andreu's request. (Haefke Decl. ¶ 16).

**Andreu Had Unrelated Back Incident**

49. On January 24, 2005, Andreu was assigned to the Route 59 route on the south and east side of Aurora, Illinois. (Andreu Dep. pp. 51, 52).

50. At his first delivery stop on January 24, 2005, Andreu called his UPS work facility on his cell phone and reported that he heard his back crack and felt a sharp pain while handling a package. (Andreu Dep. pp. 54-57).

51. According to Andreu, Amanda (last name and position unknown) told him to do his Next Day Air deliveries (which are light) and then call back so a supervisor could meet with him. (Andreu Dep. pp. 57-60).

52. Andreu made no claim that performing these Next Day Air deliveries made him uncomfortable. (Ziltz Decl. ¶ 2).

53. After doing his Next Day Air deliveries, Andreu called back and talked to Safety Supervisor Jill Schmidt who told him to wait where he was for a supervisor. (Andreu Dep. pp. 60-61).

54. UPS On Car Supervisor Dave Ziltz ("Ziltz") met Andreu out on his route. (Andreu Dep. p. 62; Ziltz Dep. p. 48).

55. Andreu told Ziltz that he could not complete his route by himself but he could drive; Ziltz got UPS employee Mike Ballu to assist Andreu the rest of the day by delivering the packages while Andreu drove the UPS vehicle. (Andreu Dep. p. 64).

56. Ziltz told Andreu to come to Ziltz's office at the end of the day so they could report the back incident to UPS's workers' compensation carrier and also told Andreu to see a doctor first thing the next day. (Andreu Dep. p. 65).

57. After he completed his route that day, Andreu went to Ziltz's office where, according to Andreu, Ziltz called UPS' workers' compensation liability carrier, Liberty Mutual, and reported Andreu's back incident; Andreu was thereupon given a workers' compensation claim number. (Andreu Dep. p. 68).

58. On the next morning, January 25, 2005, Andreu was treated by Dr Tesmond at the Addison clinic. (Andreu Dep. pp. 78-80).

59. Andreu was diagnosed as having a back strain and was told to use ice and take Advil as directed. Andreu was not issued any work restrictions. (Andreu Dep. p. 81; Andreu Dep. Ex. 7).

60. Andreu continued to receive treatment through February 9, 2005, but was not given any medical restrictions on his work during this time period. (Andreu Dep. p. 85).

Dated: January 7, 2008                                      Respectfully submitted,

                                                                   UNITED PARCEL SERVICE, INC.

                                                                   By: /s/ *D. Scott Watson*
                                                                        One of Its Attorneys

John A. Klages (ARDC #06196781)
D. Scott Watson (ARDC # 06230488)
Ellen M. Girard (ARDC #06276507)
Quarles & Brady LLP
500 West Madison, Suite 3700
Chicago, IL 60661
312/715-5000
312/715-5155 (fax)
DSW@quarles.com

**CERTIFICATE OF SERVICE**

  The undersigned attorney certifies that on January 7, 2008, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

    Timothy J. Coffey
    The Coffey Law Office, P.C.
    1403 East Forest Avenue
    Wheaton, Illinois  60187
    Email: tcofflaw@sbcglobal.net


        /s/ *D. Scott Watson*