**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE ANDREU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07 C 06132 |
| v. | ) | |
| | ) | Judge Der-Yeghiayan |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX OF EXHIBITS TO**
**DEFENDANT UNITED PARCEL SERVICE'S**
**RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL FACTS**

**(Part 1)**

Bast Declaration

Haefke Declaration

Snyder Declaration

Ziltz Declaration

Andreu Deposition Excerpts (Dep. Ex. 7)

DATED:  January 7, 2008          UNITED PARCEL SERVICE, INC.

By:   _/s/ D. Scott Watson_
              One of Its Attorneys

John A. Klages, #06196781
D. Scott Watson, #06230488
Gary R. Clark, #06271092
Quarles & Brady LLP
500 West Madison Street, Suite 3700
Chicago, IL  60661-2511

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on January 7, 2008, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

> Timothy J. Coffey
> The Coffey Law Office, P.C.
> 1403 East Forest Avenue
> Wheaton, Illinois  60187
> Email: tcofflaw@sbcglobal.net

> /s/ D. Scott Watson

## BAST DECLARATION

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSE ANDREU, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 07 C 0473 |
| v. | ) |
| | ) Judge Der-Yeghiayan |
| UNITED PARCEL SERVICE, INC., | ) |
| | ) |
| Defendant. | ) |

## DECLARATION OF CHERYL BAST

I, Cheryl Bast, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.  I have been employed by UPS for seventeen years.  In 2005, I was an Operations Management Specialist in the Aurora Center in UPS's Addition, Illinois facility.

2.  Because of the need to satisfy customers about priority pick-ups, it is common for drivers to be told to "break off route" to handle a priority pick-up.

3.  UPS package car drivers are expected to follow directions such as "break off route" like any other work-related instructions.

4.  At no time on February 9, 2005 did I tell Andreu he could "forget about" the Bernina pick-up.  I'm not aware of anyone who told him that and I'm not aware of any other supervisor who was aware of the situation.

5.  At no time did Andreu claim to me that his alleged back condition or his potential claim for worker's compensation benefits because of his alleged back condition had anything to do with his initial refusal to follow instructions to "break off ASAP" his route to make the priority pick-up, or his dishonesty about the number

of deliveries he had left (claiming "about 60" when it was only 20) when he received those "break off route ASAP" instructions.

QBACTIVE\920018.00936\1247778.1

FURTHER DECLARANT SAYETH NOT.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  December 20 , 2007

Cheryl Bast

**<u>HAEFKE DECLARATION</u>**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JOSE ANDREU,                                    )
                                                )
                    Plaintiff,                  )
                                                )    Case No. 07 C 0473
v.                                              )
                                                )    Judge Der-Yeghiayan
UNITED PARCEL SERVICE, INC.,                    )
                                                )
                    Defendant.                  )

## DECLARATION OF TOM HAEFKE

I, Tom Haefke, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.      I have been employed by UPS since October 1, 1973.  Since December, 2002, I have been the Labor Relations Manager for UPS's North Illinois District.

2.      My duties as the District Labor Relations Manager include the interpretation and enforcement of the various relevant collective bargaining agreements.

3.      At all relevant times, Jose Andreu's employment with UPS was governed by a collective bargaining agreement between UPS and Teamsters Local 705.

4.      For most employee offenses which may result in termination of employment, the collective bargaining agreement between UPS and Local 705 provides a procedure for an employee to continue working until his status is resolved by UPS and the Union through the provided grievance procedure.

5.      Usually, the Union files a grievance over an employee being put on "Notice of Termination" which initiates discussions between UPS and the Union to resolve the grievance.

6.    When a UPS employee is put on notice of termination, the employee continues to work until the grievance process is completed (assuming a grievance is timely filed) or the employee again commits the same offense that resulted in the notice of termination.

7.    In many instances, an employee on "Notice of Termination" is returned to work by an agreement of UPS and the Union after a grievance is filed on his/her behalf, with discipline such as an unpaid temporary suspension from work rather than a termination of employment.

8.    If UPS and the Union do not agree on a lesser penalty at a lower level hearing, the normal practice is for the grievance to proceed to resolution, first at the joint Union-UPS Grievance Committee meeting (the Panel), and if not resolved there, possibly to arbitration by an outside arbitrator.

9.    Snyder could have terminated Andreu immediately as Article 54 of the collective bargaining agreement between UPS and Local 705 lists "dishonesty" as a cardinal offense subject to termination on the first offense without need for progressive discipline.

10.    The collective bargaining agreement requires that grievances challenging disciplinary action be filed with the Company within fifteen (15) days of the imposition of the disciplinary action. Attached as Exhibit A is a true and accurate copy of Article 7 of the current collective bargaining agreement between UPS and the Union.

11.    If a grievance is not timely filed challenging a notice of termination, the normal procedure is for UPS to impose the discipline noticed shortly after the 15 day time limit for filing a grievance has passed.

12.    Union Business Agent Ken Emmanuelson tried to get me to accept a grievance on Andreu's behalf after Andreu's termination, but I refused to accept it.

13.    Teamsters Local705 attempted several times to bring the Andreu matter before the joint UPS/Local 705 grievance panel, but I refused as there was no basis to bring it before the panel.

14.    In order to put the matter to rest, I allowed Local 705 to put the Andreu matter on the agenda for the March 2006 joint UPS/Local 705 panel.

15.    At the March 15, 2006 joint UPS/Local 705 grievance panel, UPS took the position that the grievance should be denied as it was not timely filed. The grievance was thereupon "deadlocked" by the grievance panel, meaning it was slated for hearing by an independent arbitrator, both as to the issue of untimely filing of the claimed grievance and, depending on how that issue was resolved, final adjudication by the arbitrator, pursuant to the parties' collective bargaining agreement.

16.    An arbitration hearing to resolve the matter was scheduled for June 13, 2007, before Arbitrator Paul F. Gerhart, but was delayed at Andreu's request.

17.    Prior to the circumstances involving Plaintiff Andreu, UPS had never allowed an untimely grievance over a "Notice of Termination" to go forward.

18.    Depending on the severity of an employee's misbehavior problem, UPS at times issues a "Notice of Termination" with the expectation that, if a grievance is filed,

QBACTIVE\920018.00936\1246292.1

the employee may have his termination reduced to a warning or other discipline (such as a suspension without pay for a specific period of time) through negotiations with the Union.

19.     Because of the need to satisfy customers about priority pick-ups, it is common for drivers to be told to "break off route" to handle a priority pick-up. Drivers are expected to follow these directions like any other work-related instructions.

20.     The standard grievance form used by Local 705 has a place for a UPS manager's signature signifying he/she received a timely grievance.

21.     The grievance the Union purported to submit on behalf of Andreu has no signature of a UPS manager in the appropriate place. A true and accurate copy of the grievance form is attached as Exhibit B.

22.     UPS full-time supervisors such as David Ziltz do not have the authority to unilaterally discharge employees.

- 4 -

FURTHER DECLARANT SAYETH NOT.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: December 28 , 2007          _____
                                                           Tom Haefke

**EXHIBIT A**

# TEAMSTER LOCAL 705
# UNITED PARCEL SERVICE
# AGREEMENT



## For the Period
## August 1, 2002 to July 31, 2008

2. Trainers shall be paid a $.50 per hour training premium for each hour spent training.

Drivers training helpers, in accordance with Supplemental Agreements, and two (2) on the car rides for the purpose of route knowledge shall not be entitled to the training premium.

3. The parties shall establish a National Training Committee. The Committee shall be empowered to hear and resolve any disputes that may arise over these issues. Unresolved disputes will be subject to the National Master Grievance Committee.

4. Each Supplemental area shall meet and agree or continue existing agreements on the details of the application of this agreement in their area in accordance with Supplemental language. Other issues left for resolution at this level include, but are not limited to, the minimum qualifications for trainers, if any, the number of hours to be worked by the trainer, and the application of Supplemental language concerning compensation for work performed in higher classifications. Disputes shall be resolved in accordance with paragraph 3.

5. Trainer selection and assignments to on the job training will be done in accordance with supplemental seniority provisions, providing the trainers have the necessary qualifications and skills for the job.

6. The training records that a Teamster represented trainer can be required to complete for drivers, are those previously agreed to by the parties. If the Employer wishes to amend these forms, it will first meet and agree with the National Training Committee. Such agreement will not be unreasonably withheld. No training record or verbal report by the trainer will be relied upon to discipline any employee or to evaluate any seniority employee's performance.

7. If a trainer is removed from the qualified list by the Employer, that employee and the Local Union shall have access to the grievance procedure. If the Union establishes that the removal was not for just cause, the grievant shall be reinstated.

8. No trainer shall be required to train in any method which violates the Collective Bargaining Agreement.

9. Teamster represented trainers will not be permitted to perform or recommend disciplinary action.

10. Teamster represented trainers will not be required to make decisions or recommendations regarding the attainment of seniority by their trainees. The decision as to whether a trainee attains seniority will be made solely by UPS management.

12

11. Employees to be retrained, after qualifying in their classification, and seniority employees scheduled for safety rides, may request that a non-bargaining unit employee perform that training, in lieu of a Teamster represented trainer. Such requests will be honored.

12. Trainers will not be held liable for auto accidents incurred by the trainee.

ARTICLE 7. LOCAL AND AREA GRIEVANCE MACHINERY

Except in cases involving cardinal infractions, as outlined in Article 54 of this Agreement, an employee to be discharged or suspended shall be allowed to remain on the job, without loss of pay unless and until the discharge or suspension is sustained under the grievance procedure. The Union agrees it will not unreasonably delay the processing of such cases.

Section 1.

Differences between the Employer and the Union as to the application or interpretation of any of the provisions of this Agreement, including the question of whether an employee has been disciplined or discharged for just cause, shall be settled by the following grievance and arbitration procedure.

1. a) The Employee shall discuss any issues or complaints with a supervisor.

b) The Union Steward or Business Agent shall discuss any issues or complaints with the appropriate supervisor or manager.

2. If the Employee's issue or complaint is not resolved in step 1(a), the Employee shall discuss the issue or complaint with his/her steward and the appropriate supervisor or manager.

3. If the parties fail to agree on the dispute or issue the steward shall promptly submit a written grievance to the Employer with a copy to the Business Agent within thirty (30) calendar days of the occurrence or knowledge of the occurrence. Grievances relating solely to discharge or discipline shall be filed within fifteen (15) calendar days of the notice of discipline.

4. Failure to follow the above procedure may result in the dismissal of the grievance.

5. Unresolved grievances may be submitted to the 705/UPS Grievance Committee. The 705/UPS Grievance Committee shall consist of an equal number of members selected by the Employer and the Union.

6. Failure to achieve a resolution resulting in a deadlock at the 705/UPS Grievance Committee may result in the grievance being submitted to arbitration by the Union.

13

7. Notwithstanding the forgoing, any case deadlocked by the 705/UPS Grievance Committee that involves the application or interpretation of language that is the same as in the National Master Agreement shall be submitted to the appropriate National Grievance Committee for resolution upon approval of the 705/UPS Grievance Committee Chairs.

8. The Union shall have up to sixty (60) calendar days to notify the Company by letter or other mutually agreeable means of its intent to arbitrate.

9. The Company and the Union shall select from a list of five (5) names to be furnished by the Federal Mediation and Conciliation Service or American Arbitration Association, at the Union's request, from which list the Employer and the Union shall each strike two (2) different names, and the person whose name remains shall be designated as the arbitrator.

10. The fees and expenses of the arbitration shall be borne by the loser.

All decisions of the 705/UPS Grievance Committee and or arbitrator shall be final and no strike or lockout shall occur except as is hereinafter provided. Nothing herein shall authorize the arbitrator to alter the terms and conditions of the agreement or make a new Agreement.

Upon failure of the Employer to meet with the Union to adjust a grievance when requested to do so, or to appoint members of the Grievance Committee or to strike names from the list, or his / her designee shall meet within seventy-two (72) hours to attempt to resolve the dispute. Failing to agree, the Union at its discretion shall be permitted all legal and economic recourse (including the right to strike) in support or enforcement of its demands notwithstanding anything to the contrary contained in this Agreement. The action taken by the Union in recourse or enforcement of Agreement. The action taken by the Union in recourse or enforcement of its right shall not be arbitrable nor reviewable by any tribunal. Grievance and arbitration proceedings on behalf of an employee respecting his/her grievance may be invoked by the Union when in their opinion they deem it justified.

## Section 2.

Should a Certified Public Accountant designated by the Union certify in writing specifically that the Employer is violating the wage scale, hours of work, vacations, applicable Health and Welfare provisions or Pension provisions or working conditions or other terms or conditions of employment based upon the payroll records, time cards and/or sheets, audited by him, or if Employer refuses to produce such records for audit as provided in this Agreement, then the grievance procedure shall have no application to such facts and circumstances and the Union shall be permitted all legal and economic recourse including the right to strike notwithstanding anything to the contrary contained in this Agreement.

## Section 3.

The legal recourse reserved to the Union in this Agreement shall be cumulative with and not exclusive of any other remedy, economic or legal, available to it. The Union may (in addition to pursuing other remedies) sue the Employer or in the Union's own behalf or in behalf of any aggrieved employee for specific performance of this Agreement, injunctive relief, recovery of dues, wages, vacations or other benefits or any other legal redress, and the Employer hereby expressly waives the right to object to the Union being party plaintiff in such an action. In pursuing the aforesaid legal remedies, the Union shall have the right to recover all reasonable costs and attorney's fees.

All monetary grievance settlements shall be submitted by separate check payable to the grievant or grievants and a copy of the same sent to the Local Union for their records. Such settlements shall be paid within ten (10) working days of settlement.

## ARTICLE 8. NATIONAL GRIEVANCE PROCEDURE

### Section 1.

All grievances and/or questions of interpretation arising under the provisions of this National Master Agreement shall be resolved in the following manner:

Deadlocked cases involving only National Master language may be submitted to the National Master Panel for decisions. Those deadlocked cases which cannot be decided by a lower panel because of disagreement over the interpretation of National Master language may be submitted to the National Master Panel for interpretation. Requests for interpretations with no factual master agreement case to be decided will be heard by the Master Panel by mutual agreement of the Co-Chairpersons. Interpretations rendered on factual cases by the National Grievance Committee will be sent back to the lower panel to be used to resolve the factual case.

The Committee shall be composed of an equal number of Employer and Union representatives. The National Grievance Committee shall meet upon call of the Chairman of either the Employer or Union representatives on the National Grievance Committee. The National Grievance Committee shall adopt rules of procedure which may include the reference of disputed matters to subcommittees for investigation and report with the final decision or approval, however, to be made by the National Grievance Committee. If the National Grievance Committee resolves any dispute by a majority vote of those present and voting, such decision shall be final and binding upon all parties.

14

15

0  123

**<u>EXHIBIT B</u>**

FROM Robin Potter & Assoc.    (TUE) JAN 17 2006 15:49/ST.68435552 P  2

Case 1:07-cv-06132    Document 18    Filed 01/30/2008    Page 18 of 51

# TEAMSTERS LOCAL UNION № 705  GRIEVANCE FORM    GRIEVANCE № 11462

## PLEASE USE A BALL POINT PEN AND PRESS FIRMLY

| FOR    OFFICE    USE    ONLY | GRIEVANT TO COMPLETE |
|---|---|

<table>
<tr><td colspan="4">Case №</td><td>CONTRACT: UPS / 705</td></tr>
<tr><td>YEAR</td><td>MONTH</td><td>EMPLOYER#</td><td>GRIEVANCE#</td><td>VIOLATION OF:</td></tr>
<tr><td colspan="4">ISSUE: (Check One)  Discharge/Discipline ☐.  Past Practice ☐<br>Contract Issue ☐    Other ☐</td><td>PRINCIPAL ARTICLE: 54/7<br><br>SECTION:</td></tr>
</table>

| | |
|---|---|
| Grievant's Name: (Print) Jose Andrew | Employer and Terminal: UPS Addison (Access Cert |
| Soc. Sec. № 1056 | Employer Contact: Kerry    (Supervisor) |
| Address: 7831 W. Rascher | Job Title: Driver    Date Hired: |
| City, ST, Zip Chicago, IL 60656 | Steward: Treadwell |
| Phones: Home: (670) 4254 5862 | Union Rep: K. Engnusson |
| Work: (773) 631  2306  Cell | Date: 2/10/05 |

## INSTRUCTIONS
1. Completed grievance forms should be forwarded to and processed by the Steward or Union Rep.
2. Statement of the grievance should be clear and understandable.    (Use Additional Sheets If Necessary)

CHECK ONE    ☒ STATEMENT OF GRIEVANCE    ☐ REBUTTAL TO A WARNING LETTER

The Employer has violated Article(s) 54 / 7 ......    Section(s) ............

and all relevant past practices and any and all other applicable articles of the contract when on 2/9/05 (Date)

Kerry put Jose on Notice of termination due to his not working as directed and being dishonest when asked about doing a pick up and how many stops he had left and what time he would be in.

## RESOLUTION REQUIRED.
That the contract be enforced, all affected parties be made whole, and Jose is to be put in file as a verble warning and nothing in his file in writing

<table>
<tr><td>Grievance</td><td>Date</td><td>Disposition.</td><td>Union Rep. Signature</td><td>Employer Rep. Signature</td></tr>
<tr><td>Step 1</td><td>2/10/05</td><td>met with Kerry, Jose: put on notice of termination pending investigation</td><td>Treadwell</td><td></td></tr>
<tr><td>Step 2</td><td></td><td></td><td></td><td></td></tr>
<tr><td>Step 3</td><td></td><td></td><td></td><td></td></tr>
<tr><td>Step 4</td><td></td><td></td><td></td><td></td></tr>
<tr><td>Step 5</td><td></td><td></td><td></td><td></td></tr>
</table>

## RESOLUTION OF GRIEVANCE.

For the Union _____ /__/__    For the Employer: _____ /__/__
        (Signature)    (Date)            (Signature)    (Date)
        Please Print                        Please Print

LOCAL 705 COPY

Andrew    EXHIBIT  9
FOR I.D.  8/28/07   1.26M

UPS 0128

**SNYDER DECLARATION**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JOSE ANDREU,                                      )
                                                  )
                    Plaintiff,                    )
                                                  )    Case No. 07 C 0473
v.                                                )
                                                  )    Judge Der-Yeghiayan
UNITED PARCEL SERVICE, INC.,                      )
                                                  )
                    Defendant.                    )

## <u>DECLARATION OF KERRY SNYDER</u>

I, Kerry Snyder, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.   I have been employed by UPS since 1984. In 2005, I was the Business Manager for the Aurora Center in UPS's Addison, Illinois facility.

2.   Because of the need to satisfy customers about priority pick-ups, it is common for drivers to be told to "break off route" to handle a priority pick-up.

3.   UPS package car drivers are expected to follow directions such as "break off route" like any other work-related instructions.

4.   At no time did Andreu claim to me that his alleged back condition or his potential claim for worker's compensation because of his back condition had anything to do with his initial refusal to follow instructions to "break off ASAP" his route to make the priority pick-up, or his dishonesty about the number of deliveries he had left (claiming he had "about 60" when it was only 20) when he received those "break off route ASAP" instructions.

FURTHER DECLARANT SAYETH NOT.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  December *20th*, 2007

*Kerry Snyder*
Kerry Snyder

- 2 -

**ZILTZ DECLARATION**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSE ANDREU,                          )
                                      )
                    Plaintiff,        )
                                      )    Case No. 07 C 0473
v.                                    )
                                      )    Judge Der-Yeghiayan
UNITED PARCEL SERVICE, INC.,          )
                                      )
                    Defendant.        )

## DECLARATION OF DAVID ZILTZ

I, David Ziltz, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I have been employed by UPS since 1984. In 2005 I was a full-time On-Car Supervisor in the Aurora Center in UPS's Addison, Illinois facility.

2. Andreu did not claim that doing his Next Day Air deliveries on January 24, 2005 made him uncomfortable.

3. Because of the need to satisfy customers about priority pick-ups, it is common for drivers to be told to "break off route" to handle a priority pick-up.

4. UPS package car drivers are expected to follow directions like "break off route" like any other work-related directions.

5. At no time on February 9, 2005 did I tell Andreu to "forget about" the Bernina pick-up nor do I know of anyone else who did or of another supervisor who knew abut the situation.

6. At no time did Andreu claim that his alleged back condition or his potential claim for worker's compensation because of his alleged back condition had anything to

do with his initial refusal to follow instructions to "break off ASAP' his route to make the priority pick-up, or his untruthfulness about the number of deliveries he had left (claiming "about 60" when it was only 20) when he received those "break off route ASAP" instructions.

FURTHER DECLARANT SAYETH NOT.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  December _20_, 2007

David Ziltz

**ANDREU DEPOSITION EXCERPTS (DEP. EX. 7)**

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF ILLINOIS
 3               EASTERN DIVISION
 4   JOSE ANDREU,            )
 5        Plaintiff,        )
 6   -vs-              ) No. 07 C 00473
 7   UNITED PARCEL SERVICE, INC.,  )
 8        Defendant.     )
 9
10        The deposition of JOSE ANDREU, called for
11   examination, taken pursuant to the Federal Rules
12   of Civil Procedure of the United States District
13   Courts pertaining to the taking of depositions,
14   taken before ZONA B. MILLER, a Notary Public
15   within and for the County of Lake, State of
16   Illinois, and a Certified Shorthand Reporter of
17   said state, at Suite 3700, 500 West Madison
18   Street, Chicago, Illinois, on the 28th day of
19   August, A.D. 2007, at 10:00 a.m.
20
21
22
23
24
```

**Page 2**

```
 1   PRESENT:
 2   THE COFFEY LAW OFFICE, P.C.,
 3   (1403 East Forest Avenue,
 4   Wheaton, Illinois 60187,
 5   630-534-6300), by:
 6   MR. TIMOTHY J. COFFEY,
 7        appeared on behalf of the Plaintiff;
 8
 9   QUARLES & BRADY,
10   (Citicorp Center,
11   500 West Madison Street, Suite 3700,
12   Chicago, Illinois 60661), by:
13   MR. D. SCOTT WATSON,
14        appeared on behalf of the Defendant.
15
16
17
18
19
20
21
22
23   REPORTED BY: ZONA B. MILLER, C.S.R.
24      CERTIFICATE NO. 84-0428.
```

**Page 3**

```
 1        (WHEREUPON, the witness was duly
 2   sworn.)
 3        MR. WATSON: This is the deposition of
 4   Jose Andreu taken pursuant to the Federal Rules of
 5   Civil Procedure and in accordance with the notice
 6   of deposition issued to counsel of record.
 7             JOSE ANDREU,
 8   called as a witness herein, having been first duly
 9   sworn, was examined and testified as follows:
10             EXAMINATION
11   BY MR. WATSON:
12        Q.  Mr. Andreu, we have met. My name is
13   Scott Watson, the attorney for UPS. I'm going to
14   be asking you some questions today. And I always
15   like to start with some introductory questions
16   just to sort of set some ground rules for the
17   deposition.
18        Have you ever given a deposition
19   before?
20        A.  No.
21        Q.  I know you've seen several as part of
22   this case. But just so everything is clear to
23   you, will you wait until each question is
24   completed before you give your response, okay?
```

**Page 4**

```
 1        A.  Okay.
 2        Q.  And will you give your responses out
 3   loud as opposed to a nod of the head or a shrug of
 4   the shoulders or some other gesture?
 5        A.  Okay.
 6        Q.  And we'd like that because our court
 7   reporter can't write a shake of the head, a shrug
 8   of the shoulders.
 9        A.  I understand.
10        Q.  Thank you. If your answer to a
11   question is yes or no, will you say yes or no as
12   opposed to uh-huh or uh-uh or something like that?
13        A.  Yes.
14        Q.  And again, it just makes it easier on
15   our court reporter.
16        A.  Okay.
17        Q.  If I ask a question or use words you
18   don't understand, will you let me know?
19        A.  Yes.
20        Q.  And I'll be glad to rephrase or restate
21   a question. But you do understand if you answer a
22   question, it's going to be assumed that you
23   understood the question. Do you understand that?
24        A.  Okay.
```

1 (Pages 1 to 4)

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

Page 9

1 there, if you remember?
2    A.   I remember moving in 1991, went to
3 Wells Fargo.
4    Q.   Wells Fargo, which branch or facility?
5    A.   It was right here on Madison. I can't
6 remember the address, but Racine and Madison,
7 right on the corner. And I was a driver guard.
8    Q.   You were what, sir?
9    A.   Driver guard.
10    Q.   Driver guard?
11    A.   Hm-hmm. Yes.
12    Q.   That started in 1991, you believe?
13    A.   Yes.
14    Q.   Until when?
15    A.   I was there 'til 2000, I think.
16    Q.   What was your next non-UPS position?
17    A.   Bedford Motors.
18    Q.   What did you do at Bedford Motors, sir?
19    A.   I was a truck driver.
20    Q.   And you worked at Bedford Motors from
21 when to when?
22    A.   'Til '03.
23    Q.   Did you start there in 2000 when you
24 left Wells Fargo?

Page 10

1    A.   Not right away.
2    Q.   Were either of the positions at Wells
3 Fargo or Bedford Motors, were they unionized
4 positions?
5    A.   No.
6    Q.   After Bedford Motors, sir, what was
7 your next non-UPS position?
8    A.   That's it.
9    Q.   That's it?
10    MR. WATSON: I'll ask this be marked Andreu
11 Exhibit 1.
12    (WHEREUPON, a certain document was
13    marked Andreu Deposition Exhibit No.
14    1, for identification, as of
15    8/28/07.)
16 BY MR. WATSON:
17    Q.   I'll ask you to take a look at that.
18 And my first question simply is going to be do you
19 recognize it?
20    A.   Yes.
21    Q.   What is this document, sir?
22    A.   I don't know how to describe.
23    Q.   Let me just, hopefully, make it simple.
24 Is this the complaint that was filed by you and

Page 11

1 your attorney to initiate this action?
2    A.   Yes.
3    Q.   Did you review this with your attorney
4 before responding to the court?
5    A.   Yes.
6    Q.   If I could ask you to turn to the
7 second page in Paragraph 7, according to Paragraph
8 7 of your complaint, you began working for UPS in
9 1996, is that correct?
10    A.   Yes.
11    Q.   Kind of as we did a moment ago with the
12 positions you had outside of UPS, I'd like to ask
13 you about the different positions you had within
14 UPS from 1996 until your termination in 2005.
15 What was your first job with UPS?
16    A.   Loading --
17    Q.   Were you --
18    A.   -- on the air dock.
19    Q.   Was that a part-time position, sir?
20    A.   Yes.
21    Q.   And was it a unionized position? Were
22 you a member of Teamsters Local 705?
23    A.   Yes.
24    Q.   And how long were you a loader on the

Page 12

1 air dock, sir?
2    A.   Two months.
3    Q.   What was your next position?
4    A.   Air driver.
5    Q.   Was that also a part-time position?
6    A.   Yes.
7    Q.   And that was also a unionized position,
8 correct?
9    A.   Yes.
10    Q.   And how long were you an air driver?
11    A.   'Til I went full time in '03.
12    Q.   So from sometime in 1996 until '03,
13 approximately seven years?
14    A.   Yes.
15    Q.   What did you do as an air driver?
16    A.   Delivery of package early morning.
17    Q.   When you say you were an air driver and
18 delivered early morning, were these the next-day
19 air packages that UPS delivers?
20    A.   Yes.
21    Q.   You said a moment ago that you became
22 full time in 2003. In what position, sir?
23    A.   Package car driver.
24    Q.   And was that the position you had

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

Page 13

1 throughout the remainder of your employment with
2 UPS?
3    A.   Yes.
4    Q.   Let me go back very briefly to when you
5 were a loader on the air dock. When you were an
6 air driver, were you assigned to a particular
7 center or area of the facility?
8    A.   That center is separate from the other
9 centers. It's called the Air Center.
10    Q.   Do you remember who the center manager
11 was at the Air Center -- or I probably should say
12 center managers during the time you were an air
13 driver?
14    A.   No, sir.
15    Q.   How about any of your full-time
16 supervisors?
17    A.   Ginger. I don't know last name. I
18 can't remember last name.
19    Q.   Anybody else?
20    A.   No.
21    Q.   Then you became a full-time package car
22 driver in 2003. Were you assigned to a center
23 then?
24    A.   Yes.

Page 14

1    Q.   And which center, sir?
2    A.   The Aurora Center.
3    Q.   The Aurora Center?
4       Now, when you worked as a loader, did
5 that involve moving packages?
6    A.   Yes.
7    Q.   Loading packages. Did you load them
8 into the brown package cars?
9    A.   Containers.
10    Q.   In the containers?
11    A.   Yes.
12    Q.   Oh, yeah. That's right. You were on
13 the air dock, correct?
14    A.   Yes.
15    Q.   Did you receive training at UPS in how
16 to safely handle those packages?
17    A.   Yes.
18    Q.   Is that the only time you received
19 training in safely handling packages is when you
20 were working on the air dock in 1996 or did you
21 receive that kind of training from time to time?
22    A.   From time to time.
23    Q.   If you would, Mr. Andreu, keep the
24 complaint in front of you because that's the

Page 15

1 document we're going to use throughout the
2 deposition. But I'm going to show you what we'll
3 mark as Andreu Exhibit 2.
4       (WHEREUPON, a certain document was
5       marked Andreu Deposition
6       Exhibit No. 2, for
7       identification, as of 8/28/07.)
8 BY MR. WATSON:
9    Q.   Mr. Andreu, I've handed you Andreu
10 Exhibit 2. Do you recognize this document, sir?
11    A.   Yes.
12    Q.   And what is this?
13    A.   Honesty In Employment.
14    Q.   Is this UPS' Honesty In Employment
15 policy, if you know?
16    A.   I don't know.
17    Q.   There at the bottom of this document --
18 well, strike that.
19       It does say Honesty In Employment at
20 the top, correct?
21    A.   Yes.
22    Q.   Do you have any reason to believe it's
23 not UPS' Honesty In Employment policy?
24    A.   No.

Page 16

1    Q.   Now, at the bottom of this document,
2 sir, there's a line that says Employee's
3 Signature, and it looks like a signature above
4 that. Is that your signature?
5    A.   Yes.
6    Q.   And to the left of the signature
7 there's a section for the date, and it says
8 09/16/96. Do you see that, sir?
9    A.   Yes.
10    Q.   Do you believe that you signed this
11 document on or about that date?
12    A.   Yes.
13    Q.   Sir, if you would look at Paragraph 8
14 of your complaint, I think you've already stated
15 this in your testimony, but it basically says
16 starting in 2003 you began working the position of
17 package car driver, correct?
18    A.   Yes.
19    Q.   And you've already testified that prior
20 to becoming a package car driver you were an air
21 driver. What's the primary difference between the
22 two, air driver and package car driver?
23    A.   Part time -- one was part time, one was
24 full time.

4 (Pages 13 to 16)

Page 17

1　Q.　The air driver position was part time?
2　A.　Part time.
3　Q.　Were there any other differences?
4　A.　With part time, you work four or five
5　hours. You delivering 10 or 20 stops. Full time
6　you delivering a lot more than that. You work
7　full day.
8　Q.　·Were there any other differences
9　between the air driver position and the package
10　car position?
11　A.　The hours. I used to start at 8:00
12　'til whatever.
13　Q.　Was that as an air driver?
14　A.　And full time. Air driver I start five
15　in the morning, sometimes 'til nine in the
16　morning.
17　Q.　Was there any difference in the vehicle
18　that you drove?
19　A.　Bigger truck.
20　Q.　Which one had the bigger truck?
21　A.　Full time. Totally different.
22　Q.　The positions were totally different?
23　A.　Totally different.
24　Q.　Did you use a DIAD as an air driver?

Page 18

1　A.　Yes.
2　Q.　And were there differences in the type
3　of packages that were delivered?
4　A.　The air driver, mostly envelopes and
5　small packages. Full time delivering all kinds of
6　packages; small, big, over a hundred pounds.
7　Q.　Was this considered a promotion to go
8　from part-time air driver to full-time package car
9　driver?
10　MR. COFFEY: I'll just object to the form of
11　the question.
12　You can answer if you can.
13　BY THE WITNESS:
14　A.　When I went to UPS, I went to them
15　with -- wanted to work there forever, get a
16　full-time to support my family. And I waited
17　seven years to go full time. So I don't know if
18　it's considered a promotion or just I wait for my
19　time to go full time.
20　Q.　Okay. Well, you went from a part-time
21　position to a full-time position, correct?
22　A.　Yes.
23　Q.　Was it more money on an hourly basis?
24　A.　Yes.

Page 19

1　Q.　So that the hourly rate was higher?
2　A.　Not right away. I waited two years to
3　get a raise.
4　Q.　The wages for both the air driver
5　position and the package car driver position are
6　set by the Collective Bargaining Agreement,
7　correct?
8　A.　Can you repeat the question?
9　Q.　Sure. I'll just ask a couple of
10　lead-up questions.
11　You were a member of the Teamsters
12　Local Union 705 when you worked for UPS, correct?
13　A.　Yes.
14　Q.　And that union represented you and
15　other people who worked at UPS, is that correct?
16　A.　Yes.
17　Q.　Was there a Collective Bargaining
18　Agreement, a contract between the Teamsters and
19　UPS, if you know?
20　A.　I guess.
21　Q.　Have you ever seen a copy of the
22　Collective Bargaining Agreement that was in effect
23　while you worked at UPS?
24　A.　Yes.

Page 20

1　Q.　Do you know if that contract actually
2　set the hourly rates for the various positions of
3　the people that Local 705 represented?
4　A.　Yes.
5　Q.　And do you believe or have reason to
6　believe that that contract set the position, set
7　the hourly rate for you when you were an air
8　driver?
9　A.　Yes.
10　Q.　And also when you were a package car
11　driver?
12　A.　Yes.
13　Q.　You couldn't -- strike that.
14　You didn't negotiate your own hourly
15　rate with UPS, did you?
16　A.　No.
17　Q.　And you said a moment ago, Mr. Andreu,
18　that you waited seven years for your time. Were
19　there any -- strike that.
20　Let me ask you this. How did you go
21　from air driver to package car driver? What was
22　the process?
23　A.　I remember Alex was the boss at the air
24　dock. And he asked me do I want to go driving,

5 (Pages 17 to 20)

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

Page 25

1  understanding you.
2  BY THE WITNESS:
3      A.  They called it five seeing habits.
4  BY MR. WATSON:
5      Q.  Five seeing habits?
6      A.  Yes.
7      Q.  Anything else?
8      A.  I don't remember.
9      Q.  Did you receive any additional training
10  at this point in time about the handling of
11  packages in addition to just how to make a
12  delivery?
13      A.  Don't remember.
14      Q.  Now, when you became a UPS package car
15  driver, you were what's known as a swing or a
16  vacation driver, is that correct?
17      A.  Yes.
18      Q.  What term do you use?  I've heard both.
19      A.  Both.
20      Q.  You've heard both, too?
21      A.  Yes.
22      Q.  I just want us to be consistent.  What
23  is a swing or a vacation driver at UPS?
24      A.  Somebody call in sick and you cover

Page 26

1  their route.  Somebody goes on vacation, the swing
2  driver covers their route.
3      Q.  Or somebody is on some other kind of
4  leave, correct?
5      A.  Yes.
6      Q.  So as a swing or vacation driver, you
7  did not have a regular route that you drove every
8  day, is that correct?
9      A.  Yes.
10      Q.  And just so we're clear, yes as in you
11  did not have a regular route?
12      A.  I did not have a regular route.
13      Q.  Thank you.
14          In fact, drivers who do have an
15  everyday route, those are known as -- strike that.
16          Drivers that do have a daily route,
17  they bid for that route based on seniority, is
18  that correct?
19      A.  Yes.
20      Q.  Once you became a package car driver,
21  did you usually drive five days a week?
22      A.  Yes.
23      Q.  What would you do if you didn't
24  drive -- well, strike that.

Page 27

1          Was there ever a time when you -- there
2  wasn't a route for you to drive?
3      A.  Not that I remember.
4      Q.  During the time that you were a UPS
5  package car driver, Mr. Andreu, or as a swing
6  driver, how would you find out -- you drove every
7  day.  How would you find out what route you were
8  driving every day?
9      A.  In the morning you show up and
10  sometimes they tell you right away, sometimes you
11  waited by the waiting room, and they go and get
12  you and say you going to do this route.
13      Q.  And that route could change literally
14  on a daily basis?
15      A.  Yes.
16      Q.  If you recall, how many routes were
17  there, regular routes in the Aurora Center during
18  the time you worked there?
19      A.  Can you repeat the question?
20      Q.  Sure.  I apologize.  I didn't say that
21  very well.
22          How many total routes were there in the
23  Aurora Center during the time that you worked
24  there, if you recall?  And it can be an

Page 28

1  approximation.
2      A.  No idea.
3      Q.  No idea?  How about this question?  Do
4  you have any idea how many different routes you
5  yourself drove?
6      A.  About 20.
7      Q.  Was there any person in particular who
8  would tell you what route you were going to drive
9  or did that change on a daily basis, also?
10      A.  When I first started, it was
11  Steve Morenzi.
12      Q.  And what was -- Morenzi?
13      A.  Steve Morenzi.
14      Q.  What was his position?
15      A.  Supervisor.
16      Q.  You said that is the person who told
17  you when you first started.  Did that change?
18      A.  Yes.
19      Q.  Who did it change to, sir?
20      A.  Can you repeat the question?
21      Q.  Sure.  I just wanted to know who would
22  tell you what route to take.
23      A.  Mr. Ziltz.
24      Q.  I'm sorry?

7 (Pages 25 to 28)

Page 33

1      A.   I'm not sure.
2      Q.   What were your duties as a UPS package
3  car driver?
4      A.   My duties were delivering packages and
5  pick up packages.
6      Q.   Anything else?
7      A.   Not that I remember.
8      Q.   That's basically what UPS as a company
9  does, correct; it delivers packages and it picks
10  up packages?
11      A.   Yes.
12      Q.   And if you know, this is a service that
13  UPS provides?
14      A.   Can you repeat the question, please?
15      Q.   Sure.  And if you know, this is the
16  service that UPS provides, correct?
17      A.   Yes.
18      Q.   And UPS charges its customers for that
19  service?
20      A.   Yes.
21      Q.   When you were a package car driver in
22  the Aurora Center, let's talk about what a normal
23  day would be.  About what time did you start in
24  the morning?

Page 34

1      A.   8:00.
2      Q.   What would be the first thing that you
3  would do?
4      A.   Ask what route I was going to do.
5      Q.   And would you -- when you first started
6  would you initially ask Steve Morenzi that?
7      A.   Yes.
8      Q.   And then later you would later ask
9  Dave Ziltz?
10      A.   Yes.
11      Q.   Was there anybody else you would ask
12  about your route?
13      A.   Sometimes Melissa --
14      Q.   Del Dotto?
15      A.   Yes.
16      Q.   This is a question I should have asked
17  you a little while ago, and I didn't.
18          As a vacation or swing driver that was
19  assigned to a particular driver group, did you
20  ever drive routes that were generally part of the
21  other driver groups?
22      A.   Yes.
23      Q.   So you start work at eight, you ask
24  what route you're going to do, either Mr. Morenzi,

Page 35

1  Mr. Ziltz or Melissa Del Dotto, what would happen
2  next?
3      A.   Once they assign the route, I go and
4  set up the next-day airs, that they have to be
5  delivered before 10:00, set those up, get them
6  ready for delivery.
7      Q.   What do you mean by set them up?
8      A.   By stop.  Look at the map, see which
9  stop I was going to make first, which one was the
10  first stop, next stop and on and on.
11      Q.   And where would you find these next-day
12  airs that you had to set up?
13      A.   Right next to the truck.  They assign
14  you a route, they give you a truck number.
15      Q.   So you would go to the vehicle that you
16  were to drive that day and you would set up your
17  next-day airs?
18      A.   Yes.
19      Q.   And by set them up, basically look at
20  the map and put them in the order that you're
21  going to deliver them?
22      A.   Yes.
23      Q.   What would you do next?
24      A.   When they -- they tell us we can leave

Page 36

1  when they were done loading the trucks.  We go and
2  start making deliveries.
3      Q.   So you couldn't leave until you were
4  released?
5      A.   Yes.
6      Q.   I know that probably changed timewise.
7      A.   Every day.
8      Q.   About when?
9      A.   8:45, 9:00.
10      Q.   And after leaving the facility, what
11  would you do?
12      A.   Start making deliveries.
13      Q.   And would you deliver the next-day airs
14  first?
15      A.   Always.
16      Q.   And I think you said those had to be
17  delivered by, is it 10:30?
18      A.   Before 10:30.
19      Q.   Before 10:30.  So you would start with
20  the next-day air packages?
21      A.   First, yes.
22      Q.   After delivering the next-day air
23  packages, what would you do?
24      A.   Go on the truck and set up my first 20

9 (Pages 33 to 36)

Page 49

1 when Mr. Mendez was injured?
2    A.  No.
3    Q.  Do you remember how Mr. Mendez was
4 injured?
5    A.  No.
6    Q.  Do you remember if Mr. Mendez was
7 working at UPS in March of 2005?
8    A.  Yes.
9    Q.  Did you see him at work around that
10 time?
11   A.  Yes.
12   Q.  Had he been injured prior to that?
13   A.  Yes.
14   Q.  When he was injured, did he actually
15 miss work?
16   A.  I don't know.
17   Q.  I think I asked this, but I can't
18 remember for sure.  Do you remember how Mr. Mendez
19 injured himself?
20   A.  No, I don't.
21   Q.  Back to your complaint for a moment,
22 Mr. Andreu.  You claim in Paragraph 9 of your
23 complaint that you injured your back on
24 January 24 -- I'll start over.

Page 50

1       You claim in Paragraph 9 of your
2 complaint that you injured your back on
3 January 24, 2005, is that correct?
4    A.  Yes.
5    Q.  I'd like to go through that day, if we
6 could.  Do you remember what time you arrived at
7 work that day?
8    A.  Around 7:30.
9    Q.  And was that your regular arrival
10 time?
11   A.  Yes.
12   Q.  And were you assigned a route that day?
13   A.  Yes.
14   Q.  Do you remember who told you what route
15 you were assigned?
16   A.  Mr. Dave Ziltz.
17   Q.  Mr. Dave Ziltz?
18   A.  Yes.
19   Q.  Do you remember what route you were
20 assigned to?
21   A.  They call it Geneva route.
22   Q.  Could you briefly describe that route?
23   A.  That is part of the Geneva, South
24 Geneva.  And I was on my way, halfway there, when

Page 51

1 I got the message saying that pull over and wait
2 because I was going to get transferred to Route
3 59.
4    Q.  Okay.  So you were told initially you
5 were going to go the Geneva route?
6    A.  In the morning.
7    Q.  You prepared for that route.  You set
8 up the next-day airs, that kind of thing?
9    A.  Yes.
10   Q.  And you were driving towards the route
11 when you got the message to pull over and wait,
12 you were being transferred to another route?
13   A.  Yes.
14   Q.  Who contacted you and told you to pull
15 over?
16   A.  I don't know.
17   Q.  How did you get the message?
18   A.  Through the DIAD board.
19   Q.  Now, I'd asked you a moment ago to
20 describe the Geneva route.  And I think you said
21 it was part of South Geneva.  Was it an industrial
22 route, a residential route, a combination?
23   A.  Combination.
24   Q.  Combination of what, sir?

Page 52

1    A.  Industrial route and residential.
2    Q.  And you indicated that you were pulled
3 over and told you were being transferred to Route
4 59.  Route 59, could you describe that for us?
5    A.  Route 59, that's the west and south
6 of -- I'm sorry, east side of Aurora and south.
7    Q.  Do you know why this route change
8 occurred?
9    A.  I don't know.
10   Q.  So you pull over.  What happens?
11   A.  I pull over and wait for the other
12 driver to arrive with Route 59 truck.  We switch
13 trucks and I went on.
14   Q.  Did you give this other driver your
15 truck and he took yours?
16   A.  Yes.
17   Q.  You took yours, he took yours?
18   A.  Yes.
19   Q.  You exchanged trucks.  Who was the
20 other driver?
21   A.  I believe his name is Murio Montgomery.
22   Q.  Montgomery?
23   A.  Yes.  M-u-r-i-o.
24   Q.  I'd like to take you back a little bit,

13 (Pages 49 to 52)

Page 53

1 Mr. Andreu. The Geneva route that you were
2 initially assigned to, had you driven that route
3 before?
4    A. Yes.
5    Q. Had you driven the Route 59 route
6 before?
7    A. Yes.
8    Q. About how many times prior to that day
9 had you driven the Geneva route?
10    A. I don't recall.
11    Q. Would it be fair to say more than 10?
12    A. Yes.
13    Q. How many times prior to that day had
14 you driven the Route 59 route?
15    A. Many times.
16    Q. Is it fair to say you had more
17 experience on the Route 59 route than the Geneva
18 route?
19    A. I don't know.
20    Q. Possibly, but you're not sure?
21    A. Not sure.
22    Q. Now, before leaving that day and before
23 the exchange of trucks and all that, had you
24 spoken to anyone about being assigned to the

Page 54

1 Geneva route?
2    A. I don't remember.
3    Q. Did you talk to anyone about being
4 unhappy about being assigned to the Geneva route?
5    A. I don't remember.
6    Q. So you make the exchange with
7 Mr. Montgomery. You take his vehicle, he takes
8 yours. You drive towards your various routes.
9 You towards the Route 59 route and him towards the
10 Geneva route. What happens?
11    A. I got to my first stop. And I opened
12 the door. The truck was full to the top. And
13 this large package fall down. And I hold it like
14 that (indicating). And I push it up and --
15    Q. I'm sorry. Were you done, sir?
16    A. No. I thought you say --
17    Q. I stopped myself. I apologize.
18    A. I push it up. And I heard my back
19 crack and I felt pain, sharp pain. I call in. I
20 call in the center. They told me to wait for a
21 supervisor to come over.
22    Q. If I could stop you just for one
23 second. I just have some questions about what
24 you've already told us.

Page 55

1    You say you opened the door. Which
2 door did you open, the door at the back of the
3 vehicle?
4    A. They call overhead door the back of the
5 vehicle.
6    Q. So you got out of the package car, went
7 around to the back of it and opened the, I think
8 what most of us would think was the main doors of
9 the package area?
10    A. This opens up.
11    Q. It opens from the bottom and it slides
12 up, correct?
13    A. Yes.
14    Q. Okay.
15    A. And the truck was full of packages,
16 full to the top. So the package was right on top
17 of -- on top of the truck.
18    Q. When you say it was on top, this
19 package, was it on a shelf, was it on other
20 packages, if you know?
21    A. Yes, on top of the other packages.
22 They pile packages like this (indicating).
23    Q. And I think you said this was your
24 first stop of the day, correct?

Page 56

1    A. Yes.
2    Q. Where was this?
3    A. I don't remember.
4    Q. Were you about to make an air delivery?
5    A. Yes.
6    Q. Had you done any setup of any of your
7 air deliveries or any of your packages yet?
8    A. No.
9    Q. Mr. Andreu, when you were describing
10 what happened to us, I think you made a gesture,
11 and I don't think you described it. I think you
12 indicated that the package fell, and I think you
13 said you stopped it and you held your arms up in
14 the air and your hands were above your head, is
15 that correct?
16    A. (No response).
17    Q. You stopped the package above your
18 head?
19    A. Yes.
20    Q. And did you feel the -- again, correct
21 me if I'm wrong. I thought you said you heard
22 your back crack and felt a sharp pain. Is that
23 when you pushed the package back?
24    A. When I pushed it back, yes.

14 (Pages 53 to 56)

Page 57

1    Q.    Were you standing on the ground or were
2    you standing on part of the vehicle?
3    A.    On the ground.
4    Q.    And thank you, sir.  I just wanted to
5    make sure we had that information.
6    You indicated that you called in to the
7    center and were told to wait for a supervisor,
8    correct?
9    A.    They said, "Make the airs and then
10   we'll" -- "call us back.  Let us know where you
11   are so you can meet the supervisor."
12   Q.    Let's, again, maybe back up just a
13   moment.  If you would look at paragraph 10 of your
14   complaint.  Do you see where I'm referring to,
15   sir?  Paragraph 10.  Paragraph 10 reads:
16   "He immediately called into UPS and
17   reported the work accident and his resulting back
18   injuries."
19   Is that correct?
20   A.    Yes.
21   Q.    I'll just kind of step back to this.
22   Did you do that?  Did you call UPS immediately?
23   A.    Yes.
24   Q.    Who did you call?

Page 58

1    A.    I don't remember who I talked to.
2    Q.    Did you call a direct number or general
3    number?  Strike that.
4    Did you call the Aurora Center?
5    A.    Yes.
6    Q.    And you don't remember who you spoke
7    to?
8    A.    I believe her name is Amanda.
9    Q.    Do you remember Amanda's position?
10   A.    No.
11   Q.    How did you call in, sir?  Did you call
12   in from a phone booth, did you go to somebody's
13   house, a cell phone?
14   A.    A phone.
15   Q.    Excuse me, sir?
16   A.    A phone.
17   Q.    A phone?
18   A.    Yes.
19   Q.    But --
20   A.    My cell phone.
21   Q.    Your cell phone.  Okay.
22   A.    Yes.
23   Q.    Do you remember what time of morning
24   this was?  And I'm assuming it was morning, since

Page 59

1    it was your first stop.
2    A.    I don't remember exactly.
3    Q.    Now, I bring you back to where you were
4    a moment ago.  You believe you spoke to Amanda?
5    A.    Yes.
6    Q.    And I may not have asked this.  Do you
7    know what Amanda's position was with UPS?
8    A.    I don't know.
9    Q.    And I apologize.  I couldn't remember
10   if I asked you.
11   What did you say to her and what did
12   she say to you?
13   A.    I told her exactly what I just said.
14   Q.    As in you described what happened as
15   you described it to us today?
16   A.    Yes.
17   Q.    And did she respond?
18   A.    Yes.
19   Q.    And how did she respond?
20   A.    She said, "Do the airs and call us back
21   so the supervisor can meet you."
22   Q.    So she told you to do the air packages?
23   A.    Yes.
24   Q.    How many air packages did you have that

Page 60

1    morning, if you remember?
2    A.    I don't remember.
3    Q.    Did you respond to her when she told
4    you to do the airs and call us back?
5    A.    I was talking to her on the phone.
6    Q.    I understand that.  What did you say to
7    her?
8    A.    I did what she told me to do.
9    Q.    But did you say anything else to her
10   after she told you to do the airs and call them
11   back?
12   A.    Don't remember.
13   Q.    Do you remember anything else about the
14   conversation, either anything else you said or
15   anything else that this person Amanda may have
16   said?
17   A.    No.
18   Q.    So I think you've already indicated you
19   then went and did the airs, correct?
20   A.    Right.
21   Q.    Any idea of how long that took you?
22   A.    I don't remember exactly.
23   Q.    When you completed the airs, did you
24   call back in to the center?

15 (Pages 57 to 60)

Page 61

1    A.   Yes.
2    Q.   And who did you talk to this time?
3    A.   I believe at that time I talked to
4 Jill Schmidt.
5    Q.   Tell us about that conversation.
6    A.   She was aware of the situation. She
7 told me to sit down and wait for a supervisor.
8    Q.   Did you tell her where you were?
9    A.   Yes.
10   Q.   Is there anything else that you told
11 Miss Schmidt?
12   A.   Not that I recall. I might, I might
13 not.
14   Q.   Do you recall anything that she told
15 you?
16   A.   No.
17   Q.   So did you, in fact, sit down and wait
18 for a supervisor?
19   A.   Yes.
20   Q.   If we look at paragraph 11 of the
21 complaint, sir, at the bottom of page 3 -- excuse
22 me -- page 2 it says:
23       "Later in the day on January 24th,
24 2005, one of Jose's supervisors, Dave Ziltz, met

Page 62

1 Jose out on his route."
2       Was Dave Ziltz the supervisor that came
3 out and met you on the route --
4    A.   Yes.
5    Q.   -- as indicated in your complaint?
6       Later in the day, about how long did
7 you wait, if you recall?
8    A.   I don't recall. Maybe 45 minutes, an
9 hour.
10   Q.   Do you remember what time -- I know you
11 said 45 minutes to an hour wait. Do you remember
12 what time Mr. Ziltz arrived?
13   A.   I don't remember exactly.
14   Q.   Approximately?
15   A.   No. I can't recall.
16   Q.   Was this before noon, afternoon?
17   A.   Before noon.
18   Q.   Do you know if you delivered all the
19 next-day airs before 10:30 that day or if some
20 were late?
21   A.   Some were late.
22   Q.   What did you do while you waited for
23 Mr. Ziltz?
24   A.   I sorted out the truck.

Page 63

1    Q.   I'm sorry?
2    A.   The packages.
3    Q.   Is that what you were referring to
4 earlier as setting them up?
5    A.   Yes.
6    Q.   At some point Mr. Ziltz arrives,
7 correct?
8    A.   Yes.
9    Q.   Now, you indicate in your complaint
10 that:
11       "Upon meeting Jose out on his route,
12 Mr. Ziltz stated to Jose that he believed Jose was
13 lying about the work accident and/or related
14 injuries, and faking his pain."
15       Correct? That's what the complaint,
16 says, correct?
17   A.   Yes. He come over and he started
18 yelling at me. He said, "Mr. Andreu, you lying.
19 You don't want to work." He said, "The girls in
20 the office don't believe you, and I don't believe
21 you either." He said, "You screwed up for the
22 rest of the" -- "for the other drivers when
23 somebody else get hurts." You screw up," he said.
24   Q.   Anything else?

Page 64

1    A.   He went on and on.
2    Q.   What did he go on and on saying?
3    A.   Saying that I did not want to work,
4 that I was lazy, I didn't want to do the route and
5 that I was lying about getting hurt.
6    Q.   Anything else?
7    A.   It might be more. I can't remember
8 right now.
9    Q.   Anything that could refresh your
10 recollection?
11   A.   I can't remember.
12   Q.   How did you respond to him?
13   A.   I told him that I wasn't lying and that
14 I was hurt and that I was in pain. And he asked
15 me if I can do the route all by myself, and I told
16 him no. So he call Mike Ballu at that time. He
17 came over and he went out with me to complete the
18 route. I was driving, he was making deliveries.
19   Q.   Did you tell Mr. Ziltz that you
20 couldn't do the route at all or that you wanted to
21 go get medical treatment at that time?
22   A.   He asked me if I can drive. And I told
23 him, "Yes, I can. I can drive. I think I can
24 drive." He asked me to drive Mike Ballu because

16 (Pages 61 to 64)

Page 65

1  he -- Mike Ballu did not know the route, to drive
2  the route, and the end of the day, come to my
3  office so we can report it to workmen's comp, and
4  tomorrow morning, first thing, you go see the
5  doctor. That's what I recall he tell me.
6      Q.  But my question was did you tell him
7  that you couldn't work or that you needed medical
8  assistance at that point in time?
9      MR. COFFEY:  Well, objection, form of the
10  question.
11      Answer if you can.
12  BY MR. WATSON:
13      Q.  Do you need me to rephrase the
14  question?
15      A.  I do what he told me to do.
16      Q.  I understand that, sir. I'll break it
17  down. Did you tell him you couldn't work?
18      A.  No, I didn't.
19      Q.  Did you tell him you needed immediate
20  medical assistance?
21      A.  No, I didn't. He asked me if I can
22  drive the route.
23      Q.  And you did complete the route that day
24  with Mr. Ballu, correct?

Page 66

1      A.  Yes.
2      Q.  You driving and Mr. Ballu doing the
3  deliveries?
4      A.  Yes.
5      Q.  You indicated a moment ago that
6  Mr. Ziltz told you to come to his office at the
7  end of the day.
8      A.  Yes, to report the accident.
9      Q.  What time did you finish up that
10  evening?
11      A.  I don't remember exactly, but it was
12  late.
13      Q.  After seven --
14      A.  Seven, because I was feeling worse, the
15  pain was worse, and I wanted to go to the clinic,
16  but it was closed.
17      Q.  Anytime during the day did you call in
18  and say I'm feeling worse, I need to go to the
19  doctor, I need to go to the clinic?
20      A.  No, I didn't.
21      Q.  We'll identify what I think you're
22  referring to as the clinic here in a few minutes,
23  I believe. But do you remember what time it
24  closed?

Page 67

1      A.  I believe it close at seven.
2      Q.  And we'll get back to what happened
3  when you went back to the facility here in a
4  second. But did you -- that night after leaving
5  UPS, did you go to an emergency room or other
6  health care provider that evening?
7      A.  No.
8      Q.  Mr. Andreu, you indicated that
9  Mr. Ziltz asked you to come to his office, is that
10  correct --
11      A.  Yes.
12      Q.  -- when you got in that evening?
13      A.  Yes.
14      Q.  Did you, in fact, do that?
15      A.  Yes.
16      Q.  Do you remember when that was?
17      A.  The 24th.
18      Q.  On January 24th, 2005?
19      A.  Yes.
20      Q.  What time of day?
21      A.  What time?
22      Q.  Yes, sir.
23      A.  After we finish the route. And it was,
24  I don't know, 7:30, 8:00.

Page 68

1      Q.  So you went to Mr. Ziltz' office. Was
2  he there?
3      A.  Yes.
4      Q.  Tell us what happened.
5      A.  Again, he ask me what happened. I told
6  him. He was on the computer typing. And he ask
7  me -- I believe he ask me my age, Social Security,
8  all those questions. And he call it in at -- oh.
9  He reported it by phone.
10      Q.  When you say he reported it by phone --
11      A.  He reported it by phone to workmen's
12  comp.
13      Q.  Would it be Liberty Mutual?
14      A.  Yes.
15      Q.  And if you know, is Liberty Mutual UPS'
16  worker's compensation carrier at the time?
17      A.  Yes. And they talked to me at the end
18  on the phone and they gave me a claim number.
19      Q.  When you say "they," who's they?
20      A.  Liberty Mutual. I can't remember the
21  person I talk to..
22      Q.  And were you given that claim number in
23  order to go to the doctor the next morning?
24      MR. COFFEY:  Object to the form of the

17 (Pages 65 to 68)

Page 77

1  PRESENT:
2      THE COFFEY LAW OFFICE, P.C.,
3      (1403 East Forest Avenue,
4      Wheaton, Illinois  60187,
5      630-534-6300), by:
6      MR. TIMOTHY J. COFFEY,
7          appeared on behalf of the Plaintiff;
8
9      QUARLES & BRADY,
10     (Citicorp Center,
11     500 West Madison Street, Suite 3700,
12     Chicago, Illinois  60661), by:
13     MR. D. SCOTT WATSON,
14         appeared on behalf of the Defendant.
15
16
17
18
19
20
21
22
23     REPORTED BY:  ZONA B. MILLER, C.S.R.
24

Page 78

1          JOSE ANDREU,
2  called as a witness herein, having been previously
3  duly sworn and having testified, was examined and
4  testified further as follows:
5          EXAMINATION (Resumed)
6  BY MR. WATSON:
7      Q.   Mr. Andreu, if you would look at
8  paragraph 14 of your complaint, please.  Look at
9  page 3.  Paragraph 14 indicates that you were
10 examined on January 25, 2005 by UPS' physician,
11 Dr. Anthony Tesmond, in connection with the
12 injuries sustained from the work accident; is that
13 correct, sir?
14     A.   Yes.
15     Q.   Now, my first question is:  You state
16 that Dr. Tesmond is UPS' physician.  What's your
17 basis for that?
18     A.   UPS call -- they say, "Go to the
19 clinic.  See our doctor."
20     Q.   "Go to the clinic.  See our doctor."
21 Do you know if Dr. Tesmond is a UPS employee?
22     A.   I have no idea.
23     Q.   And I believe you already testified to
24 this, but let me make sure.  This is the first

Page 79

1  time you had seen a doctor with regard to your
2  January 24, 2005 injuries, correct?
3      A.   Yes.
4      Q.   You hadn't seen anybody the night
5  before?
6      A.   No.
7      Q.   Let me show you what we'll mark as
8  Andreu Exhibit 7.
9          (WHEREUPON, a certain document was
10         marked Andreu Deposition
11         Exhibit No. 7, for
12         identification, as of 8/28/07.)
13 BY MR. WATSON:
14     Q.   Mr. Andreu, do you recognize this?
15     A.   Yes.
16     Q.   What is this document, sir?
17     A.   Not exactly sure, but I got a copy; one
18 copy for me and one copy for Mr. Snyder,
19 Kerri Snyder.
20     Q.   When you say you got a copy, is this a
21 document you received from Dr. Tesmond at the
22 clinic on January 25, 2005?
23     A.   Yes.
24     Q.   Now, if you look at the -- by the way.

Page 80

1  I will just go ahead and ask this.  Do you
2  remember the name of the clinic?
3      A.   I believe they call Addison Clinic.
4      Q.   Do you remember where it is?
5      A.   Not exactly address, but is on Grace
6  Street, Grace Avenue.
7      Q.   Gray?  Oh, Grace?
8      A.   Grace.
9      Q.   If you look at the top right-hand
10 corner of this document, sir, it indicates a time
11 in at 7:33.  Is that a.m.?
12     A.   Yes.
13     Q.   So you went in the morning before what
14 would be your normal work shift, correct?
15     A.   Yes.
16     Q.   Now, as I look down a little further on
17 this document, there's a section that says
18 Diagnosis.  Do you see where I'm referring to?
19 About two-thirds of the way down the page, sir.
20     MR. COFFEY:  Diagnosis, Scott?
21     MR. WATSON:  Yes.
22 BY THE WITNESS:
23     A.   Yes.
24 BY MR. WATSON:

20 (Pages 77 to 80)

Page 81

1      Q.   And as I read this, I just want to make
2   sure we're on the same page, that diagnosis was a
3   low back strain?
4      A.   That's what they put in there.
5      Q.   And under Additional Comments -- I'll
6   read this. And I know it's doctor's writing, so
7   it's tough for all of us. But as I read this it
8   says, "Ice or Advil as directed." Do you read
9   that differently?
10     A.   No.
11     Q.   And towards the top of the page,
12  actually, about a quarter of the way down where it
13  says Disability Status, the box or line for None
14  is marked, correct?
15     A.   Yes.
16     Q.   So you weren't given any work
17  restrictions upon this initial visit?
18     A.   No.
19     Q.   And did you -- you said you were given
20  a copy for you and one for Kerri Snyder. Did you
21  give Mr. Snyder his copy?
22     A.   Yes.
23     Q.   Did you give it to him directly?
24     A.   Yes.

Page 82

1      Q.   Now, Mr. Andreu, according to paragraph
2   15 of your complaint, it indicates that you missed
3   work on January 25 and 26; that you didn't work
4   those days; is that correct?
5      A.   I believe so. It was recommended by
6   the doctor.
7      Q.   Is it recommended by the doctor,
8   though? Is that recommendation anywhere on this
9   form?
10     A.   Yes, the verbal.
11     Q.   Excuse me?
12     A.   Verbal. He said take couple of days
13  off and ice it out.
14     THE COURT REPORTER:  I'm sorry?
15  BY THE WITNESS:
16     A.   Ice it out.
17  BY MR. WATSON:
18     Q.   Take a couple of days off and ice it
19  out?
20     A.   Yes.
21     MR. COFFEY:  Was your final word "verbal"?
22  Just "verbal," is that what you said?
23  BY THE WITNESS:
24     A.   Yes.

Page 83

1   BY MR. WATSON:
2      Q.   The question, though, is is it
3   indicated anywhere on the form?
4      A.   No.
5      Q.   That's why I wanted to make sure.
6          He said take a couple of days off, ice
7   it out. And did he indicate that you could return
8   to work on January 27th or -- I see as the next
9   appointment January 27th. And I believe that was
10  the next day you actually worked.
11     A.   I don't remember.
12     Q.   You do -- strike that.
13         Well, let's look at paragraph 16 of
14  your complaint.
15         "Upon returning to work January 27th,
16  2005, Jose advised Dave Ziltz that he was still
17  experiencing back pain from the injuries he
18  sustained from the work accident."
19         Would you agree that's what paragraph
20  16 says, sir?
21     A.   Yes.
22     Q.   So you did return to work on
23  January 27th --
24     A.   Yes.

Page 84

1      Q.   -- 2005?
2      A.   Yes.
3      Q.   Now, on that date you didn't have
4   anything from a doctor saying that you couldn't
5   work, is that correct?
6      A.   I don't remember.
7      Q.   In fact -- well, in fact, you did work?
8      A.   Yes.
9      Q.   But you don't remember if you had
10  anything from a doctor that said you couldn't
11  work?
12     A.   I don't remember.
13     Q.   Do you recall having anything from a
14  doctor that in any way restricted your ability to
15  work?
16     A.   No, I don't remember.
17     Q.   You'd agree that the document that we
18  looked at that's Exhibit 7 in no way restricted
19  your return to work on January 27th or restricted
20  what you could do at work, is that correct?
21     A.   Yes.
22     Q.   Now, you indicate, Mr. Andreu, in
23  paragraph 16 that you advised Mr. Ziltz that
24  you're still experiencing pain, but you didn't

21 (Pages 81 to 84)

Page 85

1  tell Mr. Ziltz you couldn't do the job as a
2  package car driver, did you?
3      A.   No, I didn't.
4      Q.   And you'd been at this point in time a
5  package car driver for some period of time, maybe
6  a couple of years, year and a half, so you knew
7  what the job entailed, correct?
8      A.   Yes.
9      Q.   If we look at paragraph 17, you
10 indicate that in January and February 2005 you
11 were examined several additional times by
12 Dr. Tesmond and/or other physicians in his office
13 in connection with the injuries he sustained from
14 the work accident, correct?
15     A.   Yes.
16     Q.   Right now, I'm just interested in any
17 of those visits prior to February 9th of 2005.
18 Did any of those visits result in any doctor's
19 orders or doctor's restrictions indicating that
20 you couldn't work or you could only work with
21 specific restrictions?
22     A.   No.  He said take Advil four times a
23 day and just keep working.  And he ask me if I put
24 you on light duty, you not going to make overtime.

Page 86

1  And I tell him that's correct.
2      Q.   Who is "he," the doctor?
3      A.   Doctor.
4      Q.   Dr. Tesmond?
5      A.   Right.
6      Q.   Did you see Dr. Tesmond each time prior
7  to --
8      A.   No.
9      Q.   Do you remember what other doctor you
10 may have seen?
11     A.   I can't remember.
12     Q.   If you would look at Exhibit 7 again, I
13 think there's a list of doctors here.  Do any of
14 those names ring a bell?
15     A.   No.
16     Q.   Mr. Andreu, I'm going to ask you to
17 look up on the page 3 of your complaint under
18 paragraph 12.  In paragraph 12 you claim that
19 Mr. Ziltz repeated his assertions, I believe, that
20 you were lying about the work incident and faking
21 your pain, is that correct?  That's essentially
22 what paragraph 12 says?
23     A.   Yes.
24     Q.   Please identify every time you claim

Page 87

1  this happened.
2      A.   It happen on February 9.  After that, I
3  don't remember exactly the date, but I was put on
4  light duty at that time.  And I was in the
5  building.  And he was telling Melissa Del Dotto
6  that I didn't want to work and I was faking the
7  pain.
8      Q.   You said February 9th.  And then when
9  did this happen when you were on light duty?
10     A.   I don't remember exactly the date, but
11 it was in between -- between after February 9 and
12 March 4.
13     Q.   After February 9, but before March 4?
14     A.   Yes.  At one time he approach me when
15 the -- they had the results from the MRI.  And he
16 approach me.  And he approach me every time he
17 know I was around.  And he ask me what was my
18 excuse now if you -- that the results came
19 negative, if I was going to go back to work or if
20 I was going to sit in the office and answer the
21 phone.  And this was between after February 9 and
22 before March 4.
23     Q.   Do you know when that date was?
24     A.   I have -- I can't remember the date.

Page 88

1      Q.   Do you remember when the MRI came back?
2      A.   No, I don't remember.
3      Q.   Any other occasions?
4      A.   It might be more.  I can't remember
5  right now.
6      Q.   Were there any occasions between
7  January 24, 2005 and February 9, 2005; any in
8  between in that time frame?
9      A.   Not that I remember right now.
10     Q.   Anything that would refresh your
11 recollection?
12     A.   No.
13     Q.   For any of these occasions, I think you
14 said he was telling Melissa Del Dotto on one
15 occasion.  On the other -- well, where were he and
16 Melissa?
17     A.   They were in the building let's say by
18 the dock where they load the trucks --
19     THE COURT REPORTER:  I'm sorry?
20 BY THE WITNESS:
21     A.   -- or by the belt.
22 BY MR. WATSON:
23     Q.   Excuse me?
24     A.   They call it a dock or belt where the

22 (Pages 85 to 88)

Page 89

1   packages come.
2       Q.  Do you remember what time of day it
3   was?
4       A.  It was early, because it was right
5   after all the trucks left.
6       Q.  Was anyone else present?
7       A.  I don't remember.
8       Q.  Did you say anything to either
9   Mr. Ziltz or Miss Del Dotto?
10      A.  No, sir.
11      Q.  Now, this other occasion you mentioned
12  that he approached you and no one was around,
13  where were you when he approached you?
14      A.  I was close to the office where they
15  have the phones.
16      Q.  Close to the office where they have the
17  forms?
18      A.  The phones.
19      Q.  Oh, the phones?
20      A.  Yes, where they answer the phones.
21      Q.  Is that the office where they had the
22  phones in the Aurora Center?
23      A.  Yes.
24      Q.  Was this in an office, a hallway?

Page 90

1       A.  Hallway.
2       Q.  What time of day was it?
3       A.  I don't remember.
4       Q.  Morning, afternoon?
5       A.  Afternoon.
6       Q.  Anyone else present?
7       A.  No.
8       Q.  Did you respond in any way?
9       A.  I said that, well, what was the
10  problem? That if you didn't like me, what was --
11  that I was hurt pretty bad and I couldn't -- at
12  that point, I was on sitting and lifting
13  restrictions. And sitting no more than 20 minutes
14  and lifting no more than 5 pounds. And I asked
15  him what was the problem. And he got mad, and he
16  turn around and left.
17      Q.  Was there anything else to that
18  conversation?
19      A.  It might be. I don't remember.
20      Q.  Anything that would refresh your
21  recollection?
22      A.  Not right now.
23      Q.  You mentioned February 9 a second ago.
24  Let's go ahead and talk about February 9,

Page 91

1   Mr. Andreu. Were you working for United Parcel
2   Service on that day?
3       A.  Yes.
4       Q.  And what route were you assigned to,
5   sir?
6       A.  Route 59.
7       Q.  Route 59?
8       A.  Yes.
9       Q.  Is that the same Route 59 that we
10  discussed with regard to January 24th?
11      A.  Yes.
12      Q.  And this was a route I think you
13  testified earlier you had done several times
14  previously, correct?
15      A.  Many times.
16      Q.  And who assigned you the route that
17  day?
18      A.  Mr. Ziltz.
19      Q.  You probably should clarify something.
20  When you say that Mr. Ziltz assigned you the
21  route, does that mean he told you to do that
22  route?
23      A.  Yes.
24      Q.  Do you know who actually made the

Page 92

1   decision as to who would do which route that day?
2       A.  I have no idea.
3       Q.  And that would also be the same answer
4   for previous times when I asked you about who
5   assigned routes?
6       A.  Right.
7       Q.  And you were okay to work as a package
8   car driver that day, correct?
9       A.  Yes.
10      Q.  You weren't working under any
11  restrictions at that point in time?
12      A.  I was taking Advil four times a day
13  and...
14      Q.  When you left the UPS facility that
15  day, do you remember how many packages you had on
16  your vehicle approximately?
17      A.  No idea.
18      Q.  About how many stops?
19      A.  You can't count the stops in the
20  morning. The truck is full. You can't even walk
21  in there.
22      Q.  Just so this is clear to other people
23  who may eventually read this transcript, I think
24  people understand how many packages. In UPS

23 (Pages 89 to 92)

Page 93

1   language, what's a stop?
2       A.   A stop is --
3       MR. COFFEY: I'll just object to the form of
4   the question.
5           Answer if you can.
6   BY THE WITNESS:
7       A.   Let's say I got a delivery for you.
8   This one stop I got to make and complete.
9   BY MR. WATSON:
10      Q.   So if you came to deliver to this
11  office, this would be a stop?
12      A.   Yes.
13      Q.   And it's one stop regardless of whether
14  there's one package or a hundred packages that
15  you're delivering to this particular --
16      A.   Yes.
17      Q.   -- address, correct?
18      A.   Yes.
19      Q.   On that particular day, Mr. Andreu, did
20  you receive any additional packages after you left
21  in the morning? Was there a meet point at some
22  time during the day where you received some
23  additional packages?
24      A.   Yes.

Page 94

1       Q.   Do you remember about what time that
2   was?
3       A.   After 12 -- maybe for between 12:30 and
4   1:30. I'm not sure.
5       Q.   Was your vehicle full when you left?
6       A.   In the morning, yes.
7       Q.   And when you left that morning, at the
8   time you left, did you have any scheduled pickups
9   on that particular route that day?
10      A.   About five call tags.
11      Q.   And again, what's a call tag?
12      A.   A call tag is they give you a label
13  with the address and you go pick up the package at
14  that address. And when you pick up the package
15  you put it on the package and you scan it and make
16  a stop complete.
17      Q.   And again, are call tags kind of an
18  everyday thing?
19      A.   Yes.
20      Q.   I hadn't asked you this earlier. Route
21  59, could you describe where it is geographically,
22  where it goes to?
23      A.   Is on the east side of Aurora and south
24  side.

Page 95

1       Q.   And you were contacted by UPS that day
2   to do a pickup at Bernina?
3       A.   Yes.
4       Q.   What is Bernina?
5       A.   Is the name of a company.
6       Q.   Do you know what they do there?
7       A.   I have no idea.
8       Q.   Had you ever made a pickup at Bernina
9   before?
10      A.   Yes.
11      Q.   About how many times?
12      A.   I don't remember.
13      Q.   More than five?
14      A.   I don't remember.
15      Q.   No idea, just you made it before?
16      A.   Yes.
17      Q.   It could be one, it could be 20 times
18  before?
19      A.   I don't remember exactly how many
20  times.
21      Q.   Do you remember approximately how many
22  times?
23      A.   No.
24      Q.   When were you contacted about making

Page 96

1   this pickup at Bernina?
2       A.   I believe it was around 3:00.
3       Q.   And what do you base that on?
4       A.   I'm sorry?
5       Q.   What do you base that on?
6       A.   At that time I had not taken lunch and
7   I was hungry. I was planning to go and take
8   lunch.
9       Q.   Anything else?
10      A.   Not that I can remember.
11      Q.   Excuse me, sir?
12      A.   I don't remember.
13      Q.   So you were contacted by UPS to make
14  this pickup. Do you remember who contacted you?
15      A.   No idea.
16      Q.   How were you contacted?
17      A.   Through the DIAD board.
18      Q.   What's called an ODS message?
19      A.   ODS message, yes.
20      Q.   And what did the message say?
21      A.   Break your route and go pick up Bernina
22  ASAP.
23      Q.   Break your route and go pick up Bernina
24  ASAP?

24 (Pages 93 to 96)

Page 97

1     A.   Yes.
2     Q.   Do you remember if Bernina was a
3  time-sensitive pickup?
4     A.   I don't know.
5     Q.   What does break your route mean?
6     A.   I guess it's stop doing what you doing
7  and go and get the pickup.
8     Q.   How about ASAP?
9     A.   As soon as possible, I believe.
10    Q.   So you got that message through an ODS
11 text message, correct?
12    A.   Yes.
13    Q.   Did you respond?
14    A.   Yes.
15    Q.   And how did you respond?
16    A.   That I wanted to take lunch.  That at
17 that time I hadn't taken lunch yet and I had a lot
18 of stops left.
19    Q.   Anything else?
20    A.   Then I got another text message.
21    Q.   Let's talk about this one first, your
22 response.  You said you wanted to take lunch and
23 that you had a lot of stops left.  Did you
24 actually say a lot of stops?

Page 98

1     A.   Yes.
2     Q.   You didn't say a number?
3     A.   Yeah.
4     Q.   Are you sure about that?
5     A.   Yes.
6     Q.   Did you testify differently in your
7  unemployment hearing?
8     A.   I got another text message saying about
9  how many stops you got.
10    Q.   So that was the next text message?
11    A.   Yeah.
12    Q.   Okay.
13    A.   And I said I got 60 stops.
14    Q.   Did your -- let me take them one at a
15 time.  The message from UPS asked -- did it just
16 ask how many stops you have left?
17    A.   I don't remember exactly.
18    Q.   You're not sure if it said anything
19 else?
20    A.   No, I'm not sure.
21    Q.   Your response, did it just say about 60
22 stops left or did it say something else?
23    A.   That I wanted to take a lunch and that
24 breaking the route was going to take me -- put me

Page 99

1  behind and I was going to come back late to the
2  building.
3     Q.   And those are your recollections of the
4  exact words of your response?
5     A.   I think so.
6     Q.   So you think so.  You're not positive.
7  But the best of your recollection, that's your
8  response?
9     A.   Yes.
10    Q.   Did you say late to the building or did
11 you say a time?
12    A.   I think I say around 8:00.
13    Q.   But you're not sure?
14    A.   I'm not sure.
15    Q.   Did your response say anything else?
16    A.   I don't remember.
17    Q.   Did you get any additional messages in
18 any form from UPS?
19    A.   At one point I call in.
20    Q.   Okay.  Was that point the next message
21 or --
22    A.   Yes.
23    Q.   Before you had heard back from UPS?
24    A.   Yes.

Page 100

1     Q.   You call in?
2     A.   Yes.
3     Q.   When did you call in?
4     A.   In between all these messages; call in
5  and I explain.
6     Q.   But do you remember what time you
7  called in?
8     A.   No, I don't remember.
9     Q.   So you call in.  Who did you talk to?
10    A.   I don't remember who I talk to.  At
11 that time I got -- the person I talked to say,
12 "Forget about it.  Somebody else going to pick it
13 up."
14    Q.   But you don't know who this person is?
15    A.   No.
16    Q.   Was there anything else in that
17 conversation?
18    A.   Not that I remember.
19    Q.   And you say you called -- I'm sorry.
20    A.   It might be some.  I can't remember
21 right now.
22    Q.   You say you called in.  Did you call in
23 on your cell phone?
24    A.   Yes.

25 (Pages 97 to 100)

|  | Page 101 |
|---|---|
| 1 | Q. Were there any additional messages, |
| 2 | either phone conversations, ODS messages? |
| 3 | A. No, 'til much later. Said I got an ODS |
| 4 | saying that go and meet Mr. David Ziltz at |
| 5 | Bernina. |
| 6 | Q. You said this was another ODS message? |
| 7 | A. This was the last one. |
| 8 | Q. You said this was not until much later. |
| 9 | How much later? |
| 10 | A. Might be around 4:20. |
| 11 | Q. 4:20 p.m.? |
| 12 | A. Yes. |
| 13 | Q. Did you respond to that message? |
| 14 | A. I don't recall. |
| 15 | Q. About how much time are you claiming |
| 16 | was between the phone call where you called in and |
| 17 | the message you say you got at 4:20? |
| 18 | A. I don't recall. |
| 19 | Q. Can you approximate it? |
| 20 | A. No. I can't remember. |
| 21 | Q. What did you do after you called in? |
| 22 | Did you take lunch? |
| 23 | A. No. |
| 24 | Q. So what did you do? |

|  | Page 102 |
|---|---|
| 1 | A. I was making deliveries. |
| 2 | Q. I want to make sure I understand this. |
| 3 | You had ODS'd -- you had text messaged back that |
| 4 | you wanted to take lunch when you were first asked |
| 5 | about the Bernina pickup. You called and were |
| 6 | told you don't have to make it and you didn't take |
| 7 | your lunch? |
| 8 | A. No. |
| 9 | Q. Why not? |
| 10 | A. There was no place around that area |
| 11 | where I was. |
| 12 | Q. Where were you? |
| 13 | A. In Aurora, south Aurora. |
| 14 | Q. Do you remember what street, what |
| 15 | addresses? |
| 16 | A. No. I don't remember. |
| 17 | Q. How long were you entitled to for |
| 18 | lunch? |
| 19 | A. I believe an hour or 45 minutes' lunch, |
| 20 | half an hour. I have 15-minute breaks. |
| 21 | Q. We've gotten three different times. Do |
| 22 | you remember which it was? |
| 23 | A. We're entitled to an hour. |
| 24 | Q. Is it an hour all at one time or is it |

|  | Page 103 |
|---|---|
| 1 | an hour of breaks during the day? |
| 2 | A. That's what I explain. I believe 15 |
| 3 | minutes' break or 15-minute break and 45 minutes' |
| 4 | lunch. |
| 5 | Q. So a total of an hour, but it could be |
| 6 | broken up into some segments? |
| 7 | A. Yes. |
| 8 | Q. So when you get this ODS message that |
| 9 | you claim you got at 4:20, what did you do? |
| 10 | A. I went to Bernina and meet Mr. Ziltz. |
| 11 | Q. You went straight there? |
| 12 | A. Yes. |
| 13 | Q. What time did you get there? |
| 14 | A. I believe it was 4:45, something like |
| 15 | that. |
| 16 | Q. So, again, just to make sure I |
| 17 | understand your testimony on this, you don't know |
| 18 | who you were getting these ODS messages from? |
| 19 | A. No. |
| 20 | Q. And you don't know who you talked to |
| 21 | when you called in? |
| 22 | A. No, I don't. |
| 23 | Q. Was that the only phone call you made |
| 24 | with regard to this series of conversations, this |

|  | Page 104 |
|---|---|
| 1 | series of messages? |
| 2 | A. I think so. |
| 3 | Q. Is it possible you called in a second |
| 4 | time? |
| 5 | A. I'm not sure. |
| 6 | Q. When you say -- we already talked about |
| 7 | the initial messages. When you say you got the |
| 8 | last ODS message at 4:20 p.m., how do you know |
| 9 | what time it was? |
| 10 | A. I'm not sure. |
| 11 | Q. When you say you arrived at Bernina |
| 12 | about 4:45 or so, how do you know the time? |
| 13 | A. I'm not sure. |
| 14 | Q. Did you prepare any notes or memoranda |
| 15 | or any kind of diary entries or anything right |
| 16 | around February 9, 2005 that would have listed any |
| 17 | of these times? |
| 18 | A. I don't remember. |
| 19 | Q. Have you given all of your documents |
| 20 | that you're aware of in this case to your |
| 21 | attorney? |
| 22 | A. I think so. |
| 23 | Q. Is there anything that you're not sure |
| 24 | that you may not have given him? |

26 (Pages 101 to 104)

Page 105

1    A.   I believe I hand all the documents.
2    Q.   You believe you gave all your documents
3  to your attorney?
4    A.   Yeah, I believe so.
5    Q.   Now, you indicated that you believe you
6  got to Bernina around 4:45?
7    A.   Yes.
8    Q.   What happened when you got there?
9    A.   Mr. Ziltz was there. And he get out of
10 his truck. He approach my truck, the truck that I
11 was driving. He got in the truck and asked me for
12 the key to open the overhead door. He open the
13 overhead door. And by that time he was screaming
14 out of control saying that I was lying again and
15 that I lie before and that I was going to get
16 fired the next day. He told me, "You going to be
17 called into the office tomorrow morning and you
18 going to get fired because you lied to me." And I
19 was just sitting there in my seat. He was really
20 loud.
21   Q.   Did he say what you were lying about?
22   A.   He told me that I was lying about the
23 number of packages.
24   Q.   You were lying about the number of

Page 106

1  packages...
2    A.   In the truck.
3    Q.   How many packages were in the truck at
4  the time?
5    A.   I don't know.
6    Q.   Do you know about?
7    A.   I don't know.
8    Q.   Do you know what Mr. Ziltz had been
9  told about how many packages you had claimed
10 earlier?
11   A.   I don't know what they been told.
12   Q.   You don't even know who you had
13 communicated with at UPS --
14   A.   No.
15   Q.   -- correct?
16       Where did this happen? Where did --
17 you say in Paragraph 21 that Mr. Ziltz met you on
18 your route. Where did he meet you, at Bernina?
19   A.   Bernina.
20   Q.   Was anybody else there?
21   A.   No.
22   Q.   When he said these things to you, how
23 did you respond?
24   A.   I didn't say anything. I was sitting

Page 107

1  in the driver's seat.
2    Q.   Was anything else said?
3    A.   Other than he stated that I was going
4  to get fired and he was very loud, I had no chance
5  to explain myself. At that time, I didn't take
6  lunch and I had few on-call air pickups to do,
7  also, and then make deliveries that they were
8  throwing in that truck that were going to another
9  route.
10   Q.   My question was how did you respond?
11 You didn't say anything? Is that your response?
12   A.   I didn't say anything.
13   Q.   Did he say anything else?
14   A.   Maybe some more. I can't remember
15 right now.
16   Q.   Did you complete the pickup at Bernina?
17   A.   Yes.
18   Q.   So according to your testimony today
19 and your complaint, Mr. Ziltz told you you would
20 be fired?
21   A.   Yes.
22   Q.   Did he actually say fired?
23   A.   Fired.
24   Q.   He didn't say notice of termination

Page 108

1  or --
2    A.   Fired.
3    Q.   What time did you return to the
4  facility that evening?
5    A.   I'm not exactly sure. 7:30. Around
6  7:30. I'm not sure.
7    Q.   Were you able to pick -- to complete
8  these additional deliveries and pickups that you
9  mentioned a moment ago?
10   A.   Yes.
11   Q.   And that included the Bernina pickup?
12   A.   Yes.
13   Q.   Did you take lunch?
14   A.   I took 15 minutes' break at the end of
15 the route about.
16   MR. WATSON:  Mark this 8.
17       (WHEREUPON, a certain document was
18       marked Andreu Deposition
19       Exhibit No. 8, for
20       identification, as of 8/28/07.)
21 BY MR. WATSON:
22   Q.   Mr. Andreu, I have handed you what we
23 have marked as Andreu Exhibit 8. I'll ask you to
24 review it and let me know when you've had a chance

27 (Pages 105 to 108)

Page 109

1    to do so. Do you recognize this document, sir?
2        A.  Yes.
3        Q.  What is this?
4        A.  I wrote it myself.
5        Q.  This is an -- I'll call it a note that
6    you drafted?
7        A.  Yes.
8        Q.  Is that in your handwriting?
9        A.  Yes.
10       Q.  When did you prepare this, sir?
11       A.  After February 9. I can't remember
12   exact date.
13       Q.  Did you prepare this at the same time
14   that you prepared the similar note that we looked
15   at earlier?
16       MR. COFFEY:  Exhibit 6?
17       MR. WATSON:  I think that's right. I just
18   haven't spotted it yet.
19   BY MR. WATSON:
20       Q.  Yes, Exhibit 6.
21       A.  I'm not sure.
22       Q.  You're not sure if you did it at the
23   same time?
24       A.  I'm not sure.

Page 110

1        Q.  And if I recall correctly, all you knew
2    about Exhibit 6 is that you had drafted it
3    sometime after February 9, and you really were not
4    sure at all how much after, is that correct?
5        A.  Yes.
6        Q.  Did you draft Exhibit 8 at the request
7    of Pam Treadwell as you did Exhibit 6?
8        A.  Yes.
9        Q.  Did you give a copy of it to
10   Pam Treadwell or Cantu?
11       A.  I believe so.
12       Q.  But again, do you remember when you
13   actually gave it to them?
14       A.  I can't remember.
15       Q.  Again, you don't remember if it was a
16   couple of days after February 9th, several days
17   after February 9th?
18       A.  I don't remember.
19       Q.  Now, in your note here in the last two
20   lines: "He told a driver I was going to get fired
21   soon." What driver?
22       A.  Mr. Mendez.
23       Q.  And who is the he? Who is it who told
24   the driver you were going to get fired soon?

Page 111

1        A.  Mr. David Ziltz.
2        Q.  When did Mr. Ziltz allegedly tell
3    Mr. Mendez that you were going to get fired soon?
4        A.  I don't remember exactly. I had one
5    conversation with Mr. Mendez after January 24 and
6    after February 9, I had talked to him again.
7        Q.  Now, I'm not sure I understand that.
8    You say you had a conversation with Mr. Mendez
9    after January 24th and then you had a second
10   conversation with him after February 9th?
11       A.  Yes.
12       Q.  Which of these -- during which of these
13   conversations are you claiming that he told you
14   that Mr. Ziltz said you were going to get fired
15   soon?
16       A.  I don't remember.
17       Q.  You don't remember which one of those
18   conversations he supposedly said that?
19       A.  No.
20       Q.  So it could have been after February
21   9th?
22       A.  I don't remember.
23       Q.  Were you present when Mr. Ziltz
24   supposedly said this to Mr. Mendez?

Page 112

1        A.  No.
2        Q.  This is something that Mr. Mendez
3    supposedly told you?
4        A.  Yes.
5        Q.  Now, you claim that Mr. Ziltz told
6    you -- I just want to make sure I get this
7    right -- told you to go to the -- that you'd be
8    called in the office the next day; something along
9    those lines?
10       A.  Yes.
11       Q.  Were you called into the office the
12   next day?
13       A.  Yes.
14       Q.  Who called you into the office?
15       A.  Pam Treadwell came to look for me. And
16   she said, "They want to talk to you in the
17   office."
18       Q.  Did she say who they were?
19       A.  She say, "Mr. Kerri Snyder want to talk
20   to you in the office."
21       Q.  And who is Kerri Snider?
22       A.  Kerri Snyder, he was the -- I not
23   exactly sure what his title. He was Mr. David
24   Ziltz' boss.

28 (Pages 109 to 112)

Page 113

1    Q.   Does it sound right to say that Kerri
2  Manager was the business manager of the Aurora
3  Center, sometimes called the center manager?
4    A.   Center manager.  I guess so.
5    Q.   But you don't know for sure?
6    A.   I'm not sure.
7    Q.   So Miss Treadwell told you you needed
8  to go to the office?
9    A.   Yes.
10   Q.   And she was a union steward, correct?
11   A.   Yes.
12   Q.   And she was not a member of UPS
13 management that you know of?
14   A.   Correct.
15   Q.   I should say if you know.
16   A.   No, she was a union steward.
17   Q.   When did Miss Treadwell tell you this?
18   A.   The next day.  Sometime in the morning
19 between 8 and 10.  I don't remember exactly the
20 time.
21   Q.   When you say the next day, the day
22 after February 9th?
23   A.   Yes.
24   Q.   So sometime on February 10 --

Page 114

1    A.   Yes.
2    Q.   -- in the morning?
3    A.   Yes.
4    Q.   Before Miss Treadwell came to tell you
5  that you needed to go to the office to talk to
6  Mr. Snyder, had you spoken to her about the events
7  of the day before?
8    A.   No.
9    Q.   Did you have any conversation -- strike
10 that.  Let me ask it this way.
11        Miss Treadwell comes and finds you.
12 Where does she find you?
13   A.   I don't remember exactly where it was.
14 I was in the building, but don't remember exactly
15 where.
16   Q.   When you say "in the building," you
17 mean the building in Addison, Illinois?
18   A.   In the Aurora Center.
19   Q.   You're in the Aurora Center, which is
20 part of UPS' Addison building, correct?
21   A.   Yes.
22   Q.   So she finds you somewhere in the
23 Aurora Center?
24   A.   Yes.

Page 115

1    Q.   And she says, "You need to come and see
2  Kerri Snyder"?
3    A.   Yes.  And we walk together to the
4  office.
5    Q.   Did you have any conversation with her
6  on the way -- on that trip to the office?
7    A.   Very -- I don't remember.
8    Q.   How long a walk was it from wherever
9  she met you to the office?
10   A.   I don't remember.
11   Q.   A minute?  A minute walk?
12   A.   I don't remember.
13   Q.   Is it possible it was shorter?
14   A.   I don't know.
15   Q.   Is it possible -- you just don't know?
16 It could have been any amount of time; a short
17 amount of time --
18   A.   I don't remember.
19   Q.   So you go with Miss Treadwell to
20 Mr. Snyder's office?
21   A.   Yes.
22   Q.   Who's there?
23   A.   Mr. Snyder.
24   Q.   Anyone else?

Page 116

1    A.   No.
2    Q.   Does Miss Treadwell accompany you to
3  the meeting?
4    A.   Yes.
5    Q.   And what happens?
6    A.   Mr. Kerri Snyder ask me what happened
7  the night before, the day before.  I told him what
8  happened.  And he put me on notice of termination.
9    Q.   When you say that Mr. Snyder asked you
10 what happened the day before and you told him what
11 happened, what all did you tell him?
12   A.   I told him exactly what happens.
13   Q.   As you described it here today?
14   A.   Yes.
15   Q.   Did you feel you got the chance to tell
16 him everything?
17   A.   Yes.
18   Q.   And you told him that Dave Ziltz had
19 yelled at you and called you a liar?
20   A.   Yes.
21   .Q.   And after you had a chance to tell
22 Mr. Snyder everything he told you, you were being
23 on notice of termination, correct?
24   A.   Yes.

29 (Pages 113 to 116)

Page 129

1    A.   I don't know.
2    Q.   Mr. Andreu, if you would look at
3  paragraph 23 of your complaint also on page 4, it
4  states that Kerri Snyder told you your employment
5  was terminated effective immediately for being
6  dishonest on February 9, 2005, and that occurred
7  on March 4, 2005.  Do you recall that?
8    A.   Yes.
9    Q.   Did you have a meeting with Mr. Snyder
10  on March 4, 2005?
11    A.   Yes.
12    Q.   Where was that meeting?
13    A.   In his office.
14    Q.   Mr. Snyder's office?
15    A.   Yes.
16    Q.   Who attended that meeting?
17    A.   Rick Cantu and Steve Morenzi.
18    Q.   Mr. Cantu is your union representative?
19    A.   Yes.
20    Q.   And Steve Morenzi, is he another UPS
21  supervisor?
22    A.   Yes.
23    Q.   About what time was that meeting?
24    A.   Early morning.

Page 130

1    Q.   First thing?
2    A.   8:30 or so.
3    Q.   And how did you know you had to meet
4  with Mr. Snyder on March 4th?
5    A.   I was scanning packages on one of the
6  trucks.  And Rick Cantu came over to the truck and
7  he was, "You going to get fired today, but don't
8  worry about it.  We going to get your job back."
9       And he said to follow him to Kerri's
10  office.  We went to the office, and Kerri was
11  there by himself, and then they call Mr. Morenzi
12  in.  And Kerri Snyder told me that I was being
13  terminated, to turn in my I.D., and he ask
14  Steve Morenzi to walk me out of the building.
15    Q.   Did anybody else say anything else?
16    A.   No.
17    Q.   Did Mr. Snyder say anything else?
18    A.   I don't remember.
19    Q.   Did you say anything?
20    A.   No.
21    Q.   Was there any talk about a grievance?
22    A.   No.
23    Q.   Did Mr. Cantu say anything?
24    A.   When we were walking, he say, "Don't

Page 131

1  worry.  Just go and take care of yourself and we
2  get you your job back.
3    Q.   That's what Mr. Cantu said to you?
4    A.   Yes.
5    Q.   And this was after you left the
6  meeting?
7    A.   Before the meeting.
8    Q.   Oh, before the meeting.  Okay.
9       Did Mr. Cantu say anything during the
10  meeting with Mr. Snyder?
11    A.   No.
12    Q.   Did Mr. Cantu say anything to you after
13  the meeting with Mr. Snyder?
14    A.   No.  They walk me out of the building.
15    Q.   After March 4th, did you have any
16  conversations with Ken Emanuelson of Teamsters
17  Local 705 about your termination?
18    A.   Yes.
19    Q.   How many times did you speak with
20  Mr. Emanuelson?
21    A.   I can't recall.  Many times.
22    Q.   Many times?
23    A.   Yes.
24    Q.   Let me back that up.  Did you speak

Page 132

1  with Mr. Emanuelson about being on notice of
2  termination anytime between February 10th, 2005
3  and March 4th, 2005?
4    A.   I don't remember.
5    Q.   Did you have any conversations with
6  Mr. Cantu, Rick Cantu, between February 10th, 2005
7  and March 4, 2005 about being -- about the notice
8  of termination?
9    A.   I don't remember.
10    Q.   Anything that would refresh your
11  recollection?
12    A.   I may have one conversation.
13    Q.   When was that conversation?
14    A.   I don't remember.
15    Q.   Do you remember where that conversation
16  was?
17    A.   By the ice machine.
18    Q.   The ice machine in the Addison
19  facility?
20    A.   In the Addison facility.
21    Q.   What was that conversation about?
22    A.   I don't remember exactly what it was.
23    Q.   Anyone else present?
24    A.   No.

33 (Pages 129 to 132)

Page 169

1    Q.   Was this equipment purchased since the
2  beginning of the company or did you have it prior
3  to?
4    A.   What there was purchased, one truck and
5  one machine at the beginning of -- yeah.
6    Q.   When you --
7    A.   When we started the company.
8    Q.   Okay. When you started the company,
9  you purchased one truck and one machine?
10   A.   Yes.
11   Q.   What kind of machine?
12   A.   It's called a chipper.
13   Q.   And the other equipment has been
14 purchased subsequently?
15   A.   Little by little. One at a time. I'm
16 sorry.
17   Q.   Your counsel asked you questions about
18 the DIAD board at times and how those times on the
19 DIAD board influenced your recollections. But all
20 you have are those recollections, correct? You
21 don't have any memos or anything from that time
22 that states you got that first contact from UPS at
23 3:00 p.m., is that correct?
24   A.   Correct.

Page 170

1    MR. WATSON:  Nothing further.
2    MR. COFFEY:  Nothing further from me.
3    MR. WATSON:  Are you reserving signature?
4    MR. COFFEY:  I'll reserve signature.
5        FURTHER DEPONENT SAITH NOT.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 171

1        IN THE UNITED STATES DISTRICT COURT
2        NORTHERN DISTRICT OF ILLINOIS
3            EASTERN DIVISION
4  JOSE ANDREU,          )
5        Plaintiff,      )
6    vs.              )No. 07 C 00473
7  UNITED PARCEL SERVICE )
8        Defendant.      )
9        I hereby certify that I have read the
10 foregoing transcript of my deposition given at the
11 time and place aforesaid, consisting of Pages 1 to
12 170, inclusive, and I do again subscribe and make
13 oath that the same is a true, correct and complete
14 transcript of my deposition so given as aforesaid,
15 and includes changes, if any, so made by me.
16
17        JOSE ANDREU
18
19
20 SUBSCRIBED AND SWORN TO
21 before me this      day
22 of        , A.D. 200 .
23
24    Notary Public

Page 172

1  STATE OF ILLINOIS  )
2               ) SS:
3  COUNTY OF L A K E  )
4    I, ZONA B. MILLER, a Notary Public within
5  and for the County of Lake, State of Illinois, and
6  a Certified Shorthand Reporter of said state, do
7  hereby certify:
8        That previous to the commencement of
9  the examination of the witness, the witness was
10 duly sworn to testify the whole truth concerning
11 the matters herein;
12       That the foregoing deposition
13 transcript was reported stenographically by me,
14 was thereafter reduced to typewriting under my
15 personal direction and constitutes a true record
16 of the testimony given and the proceedings had;
17       That the said deposition was taken
18 before me at the time and place specified;
19       That I am not a relative or employee or
20 attorney or counsel, nor a relative or employee of
21 such attorney or counsel for any of the parties
22 hereto, nor interested directly or indirectly in
23 the outcome of this action.
24       IN WITNESS WHEREOF, I do hereunto set

43 (Pages 169 to 172)

Page 173

1   my hand and affix my seal of office at Chicago,
2   Illinois, this 10th day of September, 2007.
3
4        Notary Public, Lake County,
5        Illinois.
6        My commission expires May 1, 2010.
7
8
9   C.S.R. Certificate No. 84-0428.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 174

1         I N D E X
2   WITNESS          EXAMINATION
3   JOSE ANDREU
4     By Mr. Watson       3, 168
5     By Mr. Coffey       159
6
7        E X H I B I T S
8   NUMBER          MARKED
9   Andreu Deposition Exhibit
10   No. 1         10
11   No. 2         15
12   No. 3         42
13   No. 4         44
14   No. 5         70
15   No. 6         72
16   No. 7         79
17   No. 8       108
18   No. 9       122
19   No. 10      123
20   No. 11      139
21   No. 12      140
22   No. 13      148
23   No. 14      156
24   No. 15      157

44 (Pages 173 to 174)

FOR I.D. 8/26/07    1 28M

Jan 26 05 08:14a                                                    p.3

FIRST VISIT          RECHECK

PATIENT DISABILITY INFORMATION

PT NAME Andrew Jose                   DATE: 1 25 05

COMPANY NAME: UPS                     TIME IN: 733
                                      TIME OUT: 8 20

ADDISON MEDICAL CENTER               ANTHONY G. TESMOND, D.O.
501 S. GRACE STREET                  ADRIENNE BAKSINSKI, D.O.
ADDISON, IL 60101                    STEVEN HEADLEY, D.O.
630-543-4040  FAX 630-543-1050       TED SUCHY, D.O.

DISABILITY STATUS:

TOTAL_____    PARTIAL_____         NONE  X          DISCHARGED_____

NO_____   LIMITED_____

___LIFTING OVER___ LBS.              ___DRIVING
___STOOPING OR BENDING               ___WORK INVOLVING RAPID
___STRENUOUS LABOR                       ACTION OR DECISION MAKING
___OVERHEAD REACHING                 ___CLERICAL WORK ONLY
___CLIMBING STAIRS/LADDERS           ___SIT DOWN WORK ONLY
___REPETITIVE PUSHING/PULLING        ___GROUND LEVEL WORK ONLY
___PROLONGED STANDING/WALKING        ___AVOID CONTACT WITH_____
___OPERATING ON/NEAR MACHINERY       ___CONTINUE MEDICATION

NO USE OF_____        LIMITED USE OF_____

RIGHT_____            LEFT_____

HAND_____    ARM_____      FOOT_____      LEG_____

DIAGNOSIS:  Low Back Strain

                                     _____ D.O./M.D.

ADDITIONAL COMMENTS: Rx OTC Advil -
as direct

NEXT PHYSICIANS APPT:              PHYSICAL THERAPY APPT:
    1/27/05    Will call to        DATE:_____
(OR SOONER IF NEEDED) schedule     TIME:_____
                      time
        PLEASE RETURN THIS FORM TO YOUR SUPERVISOR

                                                    UPS 0144