**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE ANDREU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07 C 06132 |
| v. | ) | |
| | ) | Judge Der-Yeghiayan |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX OF EXHIBITS TO**
**DEFENDANT UNITED PARCEL SERVICE'S**
**RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL FACTS**

**(Part 2)**

Bast Deposition Excerpts

Snyder Deposition Excerpts (Dep. Ex. 4)

Ziltz Deposition Excerpts

Notice of Removal

Defendant United Parcel Service's Memorandum of Clarification
of UPS's Principal Place of Business

DATED:  January 7, 2008

UNITED PARCEL SERVICE, INC.

By:  _/s/ D. Scott Watson_
     One of Its Attorneys

John A. Klages, #06196781
D. Scott Watson, #06230488
Gary R. Clark, #06271092
Quarles & Brady LLP
500 West Madison Street, Suite 3700
Chicago, IL  60661-2511

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney certifies that on January 7, 2008, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

> Timothy J. Coffey
> The Coffey Law Office, P.C.
> 1403 East Forest Avenue
> Wheaton, Illinois  60187
> Email: tcofflaw@sbcglobal.net

> */s/ D. Scott Watson*

<u>**BAST DEPOSITION EXCERPTS**</u>

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


JOSE ANDREU,                          )
                                      )
            Plaintiff,                )
                                      )
      -vs-                            )   No.   07 C 0473
                                      )
UNITED PARCEL SERVICE, INC.,          )
                                      )
            Defendant.                )


          The deposition of CHERYL BAST, called by

the Plaintiff, for examination, taken pursuant to

notice and pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken

before Tamara Manganiello, Registered Professional

Reporter and Notary Public, at Suite 850, 29 South

LaSalle Street, Chicago, Illinois, on the 26th day

of July, A.D., 2007, commencing at 8:41 a.m.

1   A.   I'm not sure what you mean.

2   Q.   Okay.  There comes a time during every

3   day I'm certain that either a driver needs help from

4   another driver or there are these additional

5   pick-ups during the day that you're going to have to

6   take one driver off his or her assigned route --

7   A.   Right.

8   Q.   -- and get them over to a different

9   spot.

10  A.   Uh-huh.

11  Q.   Do you have or does anybody give you a

12  list or anything that you can rely on to say, well,

13  this driver has some flexibility or has a lighter

14  load today, he might be able to help?

15  A.   No.  Usually, I will just -- I'll ask

16  a driver that's close in the area can you do such

17  and such, they'll tell me yes or no, and then, you

18  know, I'll go from there.

19  Q.   Okay.  And what if the driver says no?

20  A.   Then I'll try another driver.  And if

21  I can't get anybody to do it, then I'll call my

22  supervisor.

23  Q.   And who is your supervisor?

24  A.   Well, there's three full-time

Page 14

1   supervisors and then my center manager.

2   Q.   Who's the three full-time supervisors?

3   A.   Right now, Dave Ziltz, Jerry Howard

4   and Julio Robles.

5   Q.   Jerry Howard?

6   A.   Uh-huh.

7   Q.   What about back in '05?

8   A.   Dave Ziltz, Melissa Del Dotto.  I

9   don't remember who else was there then.

10  Q.   Okay.  Dave Ziltz was a full-time

11  supervisor back in '05 and he is presently?

12  A.   Yes.

13  Q.   Did you do anything to prepare for

14  today's deposition?

15  A.   No.

16  Q.   Did you review any documents?

17  A.   Just my write-up that I had written on

18  February 9th.

19        MR. COFFEY:  We'll mark this as

20  Exhibit No. 1.

21           (Document marked as

22            Bast Exhibit No. 1

23            for identification,

24            07/26/07.)

Page 15

1   BY MR. COFFEY:

2   Q.   Showing you what is marked as

3   Exhibit 1, is this Exhibit 1 what you're referring

4   to?

5   A.   Yes.

6   Q.   So this is a document you reviewed

7   recently?

8   A.   Yes.

9   Q.   When did you review it?

10  A.   Tuesday.

11  Q.   Why did you review it?

12  A.   Just to refresh my memory.

13  Q.   Any other documents that you reviewed

14  for the deposition here today?

15  A.   No.

16  Q.   Did you have any discussions prior to

17  coming here today about Mr. Andreu, this particular

18  document, Exhibit No. 1 --

19  A.   No.

20  Q.   -- to prepare for the deposition?

21  A.   Uh-huh.

22  Q.   Did you talk to Mr. Ziltz at all to

23  prepare for the deposition?

24  A.   No.

Page 16

1   Q.   When was the last time you talked to

2   Mr. Ziltz about Mr. Andreu and/or the events of

3   February 9th?

4   A.   This morning.

5   Q.   Okay.  And who was present?

6   A.   Our attorney.

7   Q.   What about prior to this morning when

8   your attorney was not present?

9   A.   No, I didn't talk to him about it.

10  Q.   Okay.  You were involved in an

11  unemployment hearing over the phone probably in the

12  early part of '06.  Do you recall that?

13  A.   Yes.

14  Q.   And you gave some testimony at that

15  time over the phone, correct?

16  A.   Uh-huh.

17  Q.   Did you have any discussions with

18  Mr. Ziltz before or after that testimony about the

19  events of February 9th?

20  A.   I did not.

21        MR. WATSON:  If I could, you need to

22  give your answers either yes or no.  An uh-uh

23  is really hard on the court reporter.  And I

24  apologize for interrupting.

Page 17

5 (Pages 14 to 17)

1  the DIAD board text messages that we're talking
2  about with respect to Mr. Andreu on February 9th?
3      A.    There's no way to retrieve them that I
4  know of.
5      Q.    Did you ever try?
6      A.    I don't think there's a way.  Once
7  it's gone, it's gone.
8      Q.    I understand your opinion.  Did you
9  ever try?
10     A.    No.
11     Q.    Okay.  Did anybody ever ask you?
12     A.    No.
13     Q.    Kerry Snyder?  Dave Ziltz?  At any
14  time did anybody ever ask you?
15         MR. WATSON:  Objection, asked and
16         answered.
17  BY THE WITNESS:
18     A.    No.
19  BY MR. COFFEY:
20     Q.    From time to time, your counsel might
21  object and he'll instruct you and then I'm just
22  either going to rephrase the question or if I don't
23  rephrase the question, I'll just continue looking
24  for the answer.

Page 22

1      A.    It could have been someone at Bernina.
2  It could have been another driver.  I really -- I
3  don't remember.
4      Q.    You don't remember who called you to
5  alert you to this pick-up?
6      A.    Right.
7      Q.    Was it an -- I'm assuming this is an
8  unscheduled pick-up that comes up during the day?
9      A.    Well, it's a scheduled daily pick-up
10  and the regular driver wasn't able to get the
11  pick-up, so I had to dispatch someone else to go get
12  the pick-up.
13     Q.    And was it your decision to choose
14  Mr. Andreu?
15     A.    Yes, it was.
16     Q.    Did you have a discussion prior
17  thereto with Dave Ziltz --
18     A.    No.
19     Q.    -- about who should make this pick-up?
20     A.    No.  I normally go to the route that I
21  chose because that's the route that would usually
22  get that pick-up.  If I have to cover it, that route
23  that he was on that day is the route that gets that
24  pick-up.

Page 24

1          So you send a text message.  What
2  time did you send that text message through the DIAD
3  about a pick-up at Bernina?
4      A.    Shortly before 4:00.
5      Q.    How do you know that?
6      A.    Because their pick-up needs to be made
7  at 4:30 and he had called me back, it was around
8  4:00, so I had to send the message to him before he
9  could call me back and that was around 4:00.
10     Q.    Just because their pick-up needs to be
11  made at 4:30, is that what --
12     A.    Yeah.
13     Q.    -- you're getting at?
14     A.    I had received a call that we needed
15  to cover the pick-up, and that was around 4:00, so
16  then I sent him a message.
17     Q.    You got a call from who that you
18  needed to cover a pick-up?
19     A.    I can't remember who it was that
20  called me.  I just remember receiving some calls
21  saying that we needed to cover the pick-up at
22  Bernina.
23     Q.    Would that have been a supervisor's
24  call or of somebody at Bernina?

Page 23

1      Q.    The route that Jose was on that day?
2      A.    Yes.
3      Q.    Did you know anything about the extent
4  of the pick-up, like how many packages needed to be
5  picked up, how heavy the packages were?
6      A.    Normally, they're a large shipper.
7  That day, I don't know.  I don't remember if they
8  had said they had a lot or not, but they're normally
9  on a daily basis a large shipper.
10     Q.    What's that mean?
11     A.    Four, five skids.  It's not just like
12  one or two packages.
13     Q.    Okay.  At the time that you, I guess,
14  made the decision that Mr. Andreu would be -- you
15  would request this of Mr. Andreu, were you aware
16  that he had been injured January 24th of '05, just a
17  couple of weeks prior?
18     A.    No, I wasn't aware of it.
19     Q.    Were you aware that he was
20  suffering -- that he had had a back injury and was
21  suffering pain from that injury?
22     A.    No, I was not aware of it.
23     Q.    Did you -- no information from
24  Mr. Ziltz or Mr. Snyder that we had an injured

Page 25

7 (Pages 22 to 25)

1    A.    I don't know it offhand.
2    Q.    How about Coveny?
3    A.    I don't know it offhand.
4    Q.    Okay. Did you talk to, text,
5    communicate to either of these drivers that day
6    about making this pick-up?
7    A.    No.
8    Q.    Any reason why not?
9    A.    Because after I talked to Jose, I
10   called Dave and Dave said he doesn't have any
11   pick-ups, tell him he needs to go over there.
12   Q.    Okay.
13   A.    The other drivers have pick-ups.
14   Q.    And this is Dave Ziltz?
15   A.    Yes.
16   Q.    When you're talking to Dave -- well,
17   we'll get into your conversation with Dave Ziltz a
18   little bit more.
19         So you say shortly before 4:00 you
20   get notified that a pick-up needs to be made at
21   Bernina?
22   A.    Yes.
23   Q.    Is that Bernina?
24   A.    Bernina, B-E-R-N-I-N-A.

                                              Page 30

1    Q.    Okay. How do you know shortly before
2    4:00?
3    A.    Because I remember I had talked to
4    Jose around 4:00 o'clock, so I had to be notified
5    that the pick-up needed to be covered in order to
6    send him a message.
7    Q.    When you say you talked to Jose, this
8    is when he calls you back?
9    A.    Correct.
10   Q.    You say it's around 4:00 o'clock?
11   A.    Yes.
12   Q.    What range are we looking at in your
13   memory?
14   A.    Maybe five to 4:00, five after 4:00.
15   Between that time.
16   Q.    So maybe 3:55 to 4:05?
17   A.    Yes.
18   Q.    And how do you know that?
19   A.    Because that's what time it was.
20   Q.    Did you write this --
21   A.    I do remember it was -- I remember
22   looking at the clock at about ten after that because I
23   was thinking who am I going to get to cover this,
24   because I know the other drivers in that area at

                                              Page 31

1    that time have pick-ups, as well. And I do remember
2    looking at the clock and it was about 4:10.
3    Q.    Other than we see as Exhibit No. 1,
4    did you make any notes of any of this, any of the
5    times that we're going to be discussing here, any of
6    the times you've already discussed?
7    A.    No. This is it.
8    Q.    So you text messaged and Mr. Andreu
9    then calls back. And this is a telephone call?
10   A.    Yes.
11   Q.    And you get this at your office
12   telephone?
13   A.    Yes.
14   Q.    Where do you receive this at?
15   A.    Yes. The office phone.
16   Q.    What number is that office phone?
17   A.    There is multiple lines in there.
18   Whatever line is free, it will just go to the next
19   line.
20   Q.    If I wanted to call that number back
21   on February 9th, '05, what number would I dial?
22   A.    Well, the drivers have an 800 number
23   to call. I don't know if he called that 800 number,
24   which would, you know, still go into the office or

                                              Page 32

1    if he -- I don't know. I don't know what number he
2    called. There's multiple lines.
3    Q.    Are there more than two numbers that
4    can possibly be called?
5    A.    Uh-huh.
6    Q.    Okay. So you get a call from him.
7    What is said and by who?
8    A.    When I answer the phone, you know, I
9    told him I need him to go to Bernina. He's like, I
10   can't go to Bernina, I have too many stops left, I'm
11   not going to get done until about 9:00 o'clock
12   tonight. And I said okay, well, you know, we really
13   need help there, are you sure you can't go there?
14   No, I can't, I have too many stops. And I said
15   okay. And then at that point, you know, I tried to
16   think, well, who can go there now. And then --
17         MR. WATSON: You were asked about the
18   conversation. Answer the question, please.
19   BY MR. COFFEY:
20   Q.    Anything else said in the conversation
21   with Mr. Andreu?
22   A.    No. I just asked him if he can go
23   there. He said he couldn't.
24   Q.    Well, he said more than that, right?

                                              Page 33

1    A.    Well, he said he had 60 stops left and
2  he wouldn't be able to go there.
3    Q.    Did he say too many or did he give you
4  a number?
5    A.    He said 60 stops.
6    Q.    In the phone conversation?
7    A.    Yes.  Because I told him -- I did tell
8  him if you have 60 stops left, you can do 20 an hour
9  and you'll be done by 7:00.
10    Q.    Anything else in the phone conversation
11  with Mr. Andreu?
12    A.    I believe that was it.
13    Q.    What is your next communication with
14  either Mr. Andreu or Mr. Ziltz or whoever it might
15  have been with concerning this pick-up?
16    A.    I called Dave.
17    Q.    Okay.  Did you call or text Gorski,
18  Coveny?
19    A.    No.
20    Q.    Why not?
21    A.    Because I knew they wouldn't be able
22  to get it because they have pick-ups as well at that
23  time.
24    Q.    Okay.  So you called Dave Ziltz?

Page 34

1    A.    Yes.
2    Q.    And is that on the phone?
3    A.    Yes.
4    Q.    Where is Mr. Ziltz at at this point in
5  the day?
6    A.    I believe he was in Aurora.
7    Q.    What's he doing?
8    A.    If I remember correctly, there was a
9  driver that was injured and he was relieving him.
10    Q.    So he's out on a route delivering
11  packages, correct?
12    A.    I guess, yes.
13    Q.    Is that what he was doing?
14    A.    I believe so.
15    Q.    Okay.  And you called him on what, his
16  cell phone?
17    A.    Yes.
18    Q.    Is this a company-issued cell phone or
19  is it a personal cell phone, if you know?
20    A.    I don't know.
21    Q.    Okay.  And what time was that call?
22    A.    Shortly after 4:00.
23    Q.    Do you know what time the call was?
24    A.    Not exactly.

Page 35

1    Q.    Do you have any documents, notes,
2  anything that would help you refresh your
3  recollection as to what time that call was?
4    A.    No, I don't.
5    Q.    And what was said in your telephone
6  conversation with Mr. Ziltz then?
7    A.    I told him I sent a message to Andreu
8  and he wouldn't be able to -- you know, he called me
9  back, he said he had 60 stops left, that he wouldn't
10  be able to go help at Bernina and he told me he
11  wouldn't be done until 9:00 o'clock tonight.
12        And he said tell him he needs to
13  go to Bernina now, and that was the end of our
14  conversation.  I said okay.
15    Q.    Okay.  What did you do after that?
16    A.    I sent the message to Jose saying I
17  need him to go to Bernina right now.
18    Q.    And what kind of message was this?
19    A.    That was a text message.
20    Q.    Through the DIAD?
21    A.    Yes.
22    Q.    Is there any record of this
23  anywhere --
24    A.    No.

Page 36

1    Q.    -- as to what time?
2    A.    No.
3    Q.    Were you ever asked to see if you can
4  get a record from the DIAD system or any other
5  system, computer system to verify what time your --
6    A.    No.
7    Q.    -- second text message would have
8  been?
9    A.    No.
10    Q.    What time was it?
11    A.    That was probably about between
12  quarter after and 20 after 4:00.
13    Q.    Probably?
14    A.    I didn't look at the clock.
15    Q.    How do we know what time it was?
16    A.    Well, I know it was between 4:00 and
17  4:30.
18    Q.    How?
19    A.    Because at 4:30 Dave called me and I
20  remember I looked at the -- well, that was about --
21  it was at 4:42 when Dave called me.
22    Q.    Was it 4:30 or 4:42?
23    A.    It was 4:42.
24    Q.    How do you know that?

Page 37

10 (Pages 34 to 37)

1    A.    Because that I wrote down.
2    Q.    From looking at your memo, huh?
3    A.    No, I didn't.  I didn't look at it,
4  but I do remember that.
5    Q.    Well, you said 4:30, then you looked
6  at your memo, then you said 4:42, correct?
7    A.    I didn't look at the memo.  But I did
8  say 4:30 first.  But it was 4:42.
9    Q.    How did you make the move from 4:30
10  to 4:42?
11    A.    Because that's what time it was.  I do
12  remember when Dave called I looked at the clock and
13  it was at 4:42.
14    Q.    When did you write this memo, Exhibit
15  No. 1?
16    A.    Shortly before 5:00.
17    Q.    At the end of your day?
18    A.    Yes.
19    Q.    Okay.  Now, you text message back to
20  Mr. Andreu on his route.  What was the content of
21  the message?
22    A.    I need you to go to Bernina now.
23    Q.    Anything else?
24    A.    No.

Page 38

1    Q.    What about Mr. Ziltz?
2    A.    When he called me back, he told me
3  that he met up with Jose at Bernina.
4    Q.    And what did he tell you?  Is this a
5  phone conversation?
6    A.    This is a phone conversation.
7    Q.    Okay.  What did he tell you?
8    A.    He said that he has 20 stops left.
9    Q.    And did he say about 20 or 20?  What
10  did he say?
11    A.    About 20.
12    Q.    Did he say less than 20?
13    A.    No.  He said about 20.
14    Q.    What else was said in your phone
15  conversation then?
16    A.    I said okay, well, you know, I said he
17  told me that he had 60 stops left.  He's like, no,
18  he has about 20.  And I said okay.
19    Q.    Well, he told you he had 60 stops left
20  sometime before?
21    A.    Yeah, about a half hour before that he
22  told me he wouldn't get 60 -- you know, 40 stops off
23  in a half hour.
24    Q.    Let's get back to the 60 stops.  I

Page 40

1    Q.    And what is your next communication
2  with Mr. Andreu?
3    A.    I don't remember what he said.  It was
4  either yes or request acknowledged and accepted.
5    Q.    Did he say no again?
6    A.    No.
7    Q.    How did he communicate this to you?
8    A.    Through the DIAD board.
9    Q.    So you received a text message back
10  then?
11    A.    Yes.
12    Q.    Are you guessing or is this a fact?
13    A.    I know I received a message back
14  because I always make my messages response required.
15    Q.    Okay.  But you're just not certain
16  what it was?
17    A.    It was request acknowledged and
18  accepted or yes.
19    Q.    So he didn't give you any other
20  stories at that point?  It was yes?
21    A.    Correct.
22    Q.    Okay.  What is your next communication
23  with Mr. Andreu?
24    A.    That would be it.

Page 39

1  mean, did Mr. Andreu indicate to you that he had
2  counted the packages?
3    A.    He told me he had 60 stops left.
4    Q.    Did he tell you he counted the
5  packages?
6    A.    He just said he had 60 stops left.
7    Q.    Did you ask him are you sure, why
8  don't you count the packages, take a look?
9    A.    No.  I just figured he would know how
10  many stops he has left.
11    Q.    And Mr. Ziltz's comment and statement
12  to you was, no, he has about 20?
13    A.    Yes.
14    Q.    And did Mr. Ziltz tell you he counted
15  the packages?
16    A.    Yes.  He said he went through his
17  truck and he has about 20 stops left.
18    Q.    Okay.  Well, went through the truck --
19    A.    Yeah.
20    Q.    -- is different than I counted the
21  packages, correct?
22    A.    (Witness nodding.)
23    Q.    So do you know as you sit here right
24  now whether he counted the packages or not?

Page 41

11 (Pages 38 to 41)

1    when he left?

2        A.    No.

3        Q.    Do you have any idea how many he

4    delivered during that day, how many stops he made?

5        A.    No.

6        Q.    Nobody ever asked you to look into

7    that?

8        A.    No.

9        MR. COFFEY: I don't have anything

10   else, Counsel.

11       MR. WATSON: I don't think I have

12   anything. Just let me take a look.

13       (Brief pause.)

14       MR. WATSON: I have nothing. We'll

15   reserve signature.

16       AND FURTHER DEPONENT SAITH NAUGHT...

17

18

19

20

21

22

23

24

Page 70

---

1                    WITNESS ERRATA SHEET  Page #1

2    JOSE ANDREU,              )

3        Plaintiff,           )

4    -vs-             ) No.  07 C 0473

5    UNITED PARCEL SERVICE, INC.,    )

6        Defendant.           )

7    I wish to make the following changes for the

8    following reasons:

9    Page    Line

          ____    Change: _____

10        ____    Reason: _____

11        ____    Change: _____

          ____    Reason: _____

12

          ____    Change: _____

13        ____    Reason: _____

14        ____    Change: _____

          ____    Reason: _____

15

          ____    Change: _____

16        ____    Reason: _____

17        ____    Change: _____

          ____    Reason: _____

18

          ____    Change: _____

19        ____    Reason: _____

20        ____    Change: _____

          ____    Reason: _____

21

          ____    Change: _____

22        ____    Reason: _____

23

24   (Signed) _____

Page 72

---

1        IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3    JOSE ANDREU,              )
                              )
4        Plaintiff,           )
                              )
5    -vs-             ) No.  07 C 0473
                              )
6    UNITED PARCEL SERVICE, INC.,    )
                              )
7        Defendant.           )

8        I hereby certify that I have read

9    the foregoing transcript of my deposition given on
     July 26th, 2007, at the time and place aforesaid,

10   consisting of Pages 1 through 70, inclusive, and I
     do again subscribe and make an oath that the same is

11   a true, correct and complete transcript of my
     deposition so given as aforesaid.

12

          please check one:

13

14        _____  I have submitted errata sheet(s)

15        _____  No corrections were noted

16   _____
     CHERYL BAST
17

18   SUBSCRIBED AND SWORN TO

19   before me this ____ day
     of _____, A.D., 2007.

20   _____

21   Notary Public

22

23

24

Page 71

---

1    STATE OF ILLINOIS  )
                        )  SS.
2    COUNTY OF W I L L  )

3

4        I, Tamara Manganiello, a notary public

5    within and for the County of Will and State of

6    Illinois, do hereby certify that heretofore, to-wit,

7    on the 26th day of July, A.D., 2007, personally

8    appeared before me at Suite 850, 29 South LaSalle

9    Street, in the City of Chicago, County of Cook and

10   State of Illinois, CHERYL BAST, a witness, called by

11   the Plaintiff in a certain cause now pending and

12   undetermined, wherein JOSE ANDREU is the plaintiff

13   and UNITED PARCEL SERVICE, INC., is the defendant.

14       I further certify that the said

15   witness, CHERYL BAST, was by me first duly sworn to

16   testify the truth, the whole truth and nothing but

17   the truth in the cause aforesaid; that the testimony

18   then given by her was by me reduced to writing by

19   means of shorthand in the presence of said witness

20   and afterwards transcribed upon a computer, and the

21   foregoing is a true and correct transcript of the

22   testimony so given by her as aforesaid.

23       I further certify that the reading and

24   signing of said deposition was reserved by the

Page 73

19 (Pages 70 to 73)

```
 1   witness.
 2          I further certify that the taking of the
 3   deposition was pursuant to notice, and that there
 4   were present at the taking of the deposition the
 5   aforementioned parties.
 6          I further certify that I am not counsel
 7   for nor in any way related to any of the parties to
 8   this suit, nor am I in any way interested in the
 9   outcome thereof.
10          In testimony whereof I have hereunto set
11   my hand and affixed my notarial seal this 21st of
12   August, A.D., 2007.
13
14          _____
            TAMARA MANGANIELLO, RPR
15          Illinois License No. 084-004560
16
17
18
19
20
21
22
23
24
```

Page 74

**SNYDER DEPOSITION EXCERPTS (DEP. EX. 4)**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


JOSE ANDREU,               )
                           )
          Plaintiff,       )
                           )
     vs.                   ) No. 07 C 0473
                           )
UNITED PARCEL SERVICE, INC.)
                           )
          Defendant.       )


      The deposition of KERRY SNYDER called by
the Plaintiff for examination pursuant to notice and
pursuant to the Federal Rules of Civil Procedure for
the United States District Courts pertaining to the
taking of depositions, taken before Denise Andras,
Certified Shorthand Reporter and Notary Public
within and for the County of Cook and State of
Illinois at 29 South LaSalle, Illinois, on the 11th
day of July, A. D., 2007.

91bb9cf6-35dc-4cac-a300-f2feb09c3d38

Page 110

1  making?
2      A.  I really don't remember.  I mean, -- I
3  don't know if they contacted me a couple months ago
4  or something and said that we were going to be, you
5  know, having to give depositions or, you know, I
6  really don't remember when that came about.
7      Q.  How did you become aware that that was
8  a claim that he was making, Mr. Andreu was making?
9      A.  I believe I received an e-mail stating
10  that they were requesting any documentation filed
11  with regard to this matter.
12      Q.  And who was that e-mail from?
13      A.  I believe Marilynn Richie, HR.
14      Q.  And this was just recently, last
15  couple of months?
16      A.  I believe so, yes.
17      Q.  And prior to that, did you have any
18  involvement after his termination, and let's just
19  say the termination after the last day he worked
20  there, which was early March of '05, did you have
21  any involvement in investigating the facts and
22  circumstances around why he was removed, terminated?
23      A.  No.
24      Q.  Since you have become aware or were

Page 111

1  made aware that he at least is claiming the
2  termination was because of his worker's comp
3  benefits and that he sought them, have you done any
4  investigation into that claim?
5      A.  No.
6      Q.  Have you relooked at any documents
7  concerning you putting him on notice of termination
8  or the allegations that were made against him that
9  he was dishonest?
10      A.  Yes.
11      Q.  What have you done?
12      MR. WATSON:  Just so it's clear, this
13      doesn't include conversations that you've had
14      with me, your counsel.
15      THE WITNESS:  Okay.
16  BY THE WITNESS:
17      A.  Looked at a document that Cheryl Bast
18  had written to Dave Ziltz.
19      (Document marked as
20      Exhibit No. 4 for
21      identification.)
22  BY MR. COFFEY:
23      Q.  Showing you Exhibit No. 4, is this the
24  document that you are referring to that Cheryl Bast

Page 112

1  wrote to Dave Ziltz?
2      A.  Yes.
3      Q.  And you reviewed this how long ago?
4      A.  I don't know.  Probably yesterday I
5  believe.
6      Q.  Before yesterday when was the time
7  before that that you had seen this document?
8      A.  The time before I had seen the
9  document was when it was, the date when it was
10  generated.
11      Q.  Well, it bears a date of February 9,
12  2005.  You looked at it yesterday and you are
13  telling me you haven't looked at it since February
14  9, 2005?
15      A.  I don't know that there are any times
16  in between there.  I don't remember those.
17      Q.  Let's just get it straight.  You
18  looked at it yesterday, correct?
19      A.  Yes.
20      Q.  And you looked at it you believe on
21  February 9, 2005?
22      A.  Yes.
23      Q.  And you are not sure if you looked at
24  it at any time in between those two dates?

Page 113

1      A.  Correct.
2      Q.  Now, yesterday where did you look at
3  it?
4      MR. WATSON:  He can answer where.
5      This is with me, but again, don't reveal
6      about any conversations that we discussed.
7  BY MR. COFFEY:
8      Q.  So yesterday you were at your
9  attorney's office and you looked at the document; is
10  that correct?
11      A.  Yes.
12      MR. WATSON:  I'm just going to
13      indicate, you weren't at my office.
14      THE WITNESS:  Correct.
15  BY MR. COFFEY:
16      Q.  How did you receive this document
17  yesterday that you were able to look at it?
18      A.  How did I receive the document
19  yesterday to look at it?
20      Q.  Yes.
21      A.  I'm trying to think.  I'm trying to
22  remember if I actually, if he had actually given it
23  to me or if I had a copy of the document.  I believe
24  I had a copy of the document, yes.

29 (Pages 110 to 113)

91bb9cf6-35dc-4cac-a300-f2feb09c3d38

Page 182

1    A.    Yes.
2    Q.    Per the DIAD, whatever is in the DIAD?
3    A.    Any driver assigned to your center,
4  yes.
5    Q.    And the DIAD has information about the
6  time of every pick-up and every delivery?
7    A.    Yes.
8    Q.    And the number of packages, correct?
9    A.    Yes.
10   Q.    At any particular time during the day?
11   A.    It has information that was recorded
12 by the driver at that particular time increment,
13 when they made a delivery, how many packages they
14 delivered or when they made a pickup, how many
15 packages they picked up.
16   Q.    What about when the driver drives out
17 of the building in the morning, in terms of how many
18 packages that driver has on the truck, where can you
19 access and get ahold of that information?
20   A.    Well, you can do that as of now with
21 the technology we have now.  In 2005 at this time
22 frame, no, you couldn't.
23   Q.    So when you were Aurora center
24 manager, your various drivers are leaving the

Page 183

1  building, they could have one package, they could
2  have a hundred packages, you don't know and there's
3  no way for you to find out?
4    A.    That's correct.
5    Q.    But you can tell how many packages
6  were delivered or picked up through the DIAD
7  throughout the day, correct?
8    A.    Yes.
9    Q.    What about when the trucks come in at
10 night, is there anybody counting packages?  Is there
11 any way to determine what's left on the truck?
12   A.    Not on a regular basis.
13   Q.    You'd have to go and physically count
14 it for them?
15   A.    You do -- yes, you had to do a
16 physical count on them.
17   Q.    With respect to Mr. Andreu's
18 information from February 9, 2005, did you ever go
19 to the DCS machine and request that information or
20 obtain that information about his deliveries, his --
21   A.    No.
22   Q.    -- what he did that day?
23   A.    No.
24   Q.    Or the timing of any particular

Page 184

1  deliveries?
2    A.    No.
3    Q.    Any information -- did you ever go and
4  get any information on what he was doing in terms of
5  delivering packages on February 9, 2005 from the
6  DIAD board?
7    A.    No.
8    Q.    Do you know if anybody did?
9    A.    No, I don't know.
10   Q.    Did you ever ask anybody to get that
11 information?
12   A.    No, I don't remember.
13   Q.    You don't remember if you asked
14 anybody?
15   A.    Don't remember if I asked anybody.
16   Q.    Prior to putting him on notice of
17 termination, on February 10, 2005, was it a concern
18 to you what his DIAD board showed for the previous
19 day?
20   A.    I'm sorry, could you restate the
21 question?
22   Q.    You agree with me that there is an
23 allegation that he was dishonest on February 9,
24 2005, right?

Page 185

1    A.    Yes.
2    Q.    And you become aware of that when?
3    A.    On February 9th.
4    Q.    And the next day you put him on notice
5  of termination, correct?
6    A.    Yes.
7    Q.    At any point in time are you curious,
8  concerned about what his DIAD board had shown
9  between those two points of time; you become aware,
10 you put him on notice of termination?
11   A.    No.
12   Q.    Why not?
13   A.    Because I had eyewitness account from
14 the on-road supervisor.
15   Q.    Mr. Ziltz?
16   A.    Yes.
17   Q.    Eyewitness accounts of what?
18   A.    Packages that were in Jose Andreu's
19 car.
20   Q.    How long have you known Mr. Ziltz?
21   A.    January 2, 2005.
22   Q.    Had you ever worked with him before
23 that?
24   A.    No.

47 (Pages 182 to 185)

91bb9cf6-35dc-4cac-a300-f2feb09c3d38

Page 210

1  final incident," and your answer, No. 1, "Final
2  incident, Jose lied to full-time," is that right?
3  "FT, full-time, to supervisor Dave Ziltz on
4  2-9-05." That's it; that's the answer we are
5  talking about in terms of Jose, correct?
6      A.   Yes.
7      Q.   Is there anything else, any other
8  factor that played a part in your decision to put
9  him on notice of -- decision to put him on notice of
10 termination on February 9th and then to terminate
11 him on March 4, 2005; is there anything else that
12 played into that decision?
13     A.   No.
14     Q.   It was, you lied to Dave Ziltz on
15 February 9, 2005, correct?
16     A.   Yes.
17     Q.   What about you admitted lying to Dave
18 Ziltz on February 9, 2005, did that play a part in
19 your decision?
20     A.   I don't remember. I don't remember if
21 it did or not.
22     Q.   In other words, if you take away the
23 admission part, is he still getting fired on March
24 4, 2005?

Page 211

1      A.   Yes.
2      Q.   You are still firing him, right?
3      A.   Yes.
4      Q.   When did you decide to fire him on
5  March 4, 2005?
6      A.   After the 15-day grace period that
7  they have, allowed to grieve the disciplinary
8  action.
9      Q.   So 15 days would be from the 10th of
10 February, right?
11     A.   Correct.
12     Q.   So the 25th of the February, correct?
13     A.   My understanding is it's 15 working
14 days is what we allowed him.
15     Q.   Doesn't the grievance procedure say 15
16 calendar days?
17     A.   It says 15 calendar days. I allowed
18 him 15 working days.
19     Q.   Was there some hesitation -- you are
20 telling me you didn't make this decision until after
21 the 15 days past, whatever calendar, working days,
22 you didn't decide you were going to fire him?
23 Didn't you decide you were going to fire him on
24 February 10th when you put him on notice of

Page 212

1  termination?
2      A.   No, I had not.
3      Q.   What were you going to do with him?
4      A.   Well, this was a serious issue that I
5  felt could be resolved or addressed through the
6  grievance procedures.
7      Q.   How was it going to be resolved or
8  addressed?
9      A.   Just like some of the past cases that
10 employees who were put on cardinal infractions were
11 put on notice of termination or terminated and
12 brought back with a suspension or reduced charge.
13     Q.   Employees that admit to lying?
14     A.   Randy Parker, an example.
15     Q.   So the 15 days pass, you terminate him
16 pursuant to the notice of termination, correct?
17     A.   Correct.
18     Q.   But the only incident is, as you say,
19 was Jose lied to full-time supervisor Dave Ziltz on
20 February 9, 2005, right?
21     A.   Yes.
22     Q.   And you discharge him, correct?
23     A.   Yes.
24     Q.   Who else was in attendance of this

Page 213

1  meeting on February 10, 2005?
2      A.   On-car supervisor Dave Ziltz and
3  union representation was Pam Tredwell.
4      Q.   What did Ms. Tredwell say in the
5  meeting?
6      A.   I don't remember exactly what she
7  said.
8      Q.   Do you remember the meeting? Do you
9  have a recollection of meeting?
10     A.   Yes, I remember the meeting. I don't
11 remember the specific conversations.
12     Q.   Where was the meeting at?
13     A.   In my office.
14     Q.   On February 10th?
15     A.   Yes.
16     Q.   What time of day?
17     A.   Approximately 8:25, the driver's start
18 time.
19     Q.   So early, first thing in the morning?
20     A.   Yes.
21     Q.   And you had gotten your information on
22 February 9th?
23     A.   Yes.
24     Q.   About the lie that supposedly didn't

Page 214

1  happen on February 9th, correct?
2      A.  Yes.
3      Q.  So what do you do between being told
4  there was a lie at the meeting at 8:25 in the
5  morning, do you do any type of investigation into
6  the alleged lie?
7      A.  I review the incident with Dave
8  Ziltz.
9      Q.  And when did you do that?
10     A.  That same night.
11     Q.  Of the 9th?
12     A.  Correct.
13     Q.  Who was present?
14     A.  I don't remember.  I believe it was
15  just Dave and myself.
16     Q.  This is after Dave, he was out
17  delivering packages that day, apparently this is
18  after he's bringing his truck back, and so it's in
19  the evening?
20     A.  Yes.
21     Q.  Did you talk to him on the phone
22  during the day at all, on the phone during the day
23  about the incident?
24     A.  I don't remember specifically.

Page 215

1      Q.  But you recall a meeting where you are
2  getting your information from Dave Ziltz where he
3  comes back with his truck on the evening of February
4  9th?
5      A.  Yes.
6      Q.  Where was that at?
7      A.  That was in my office.
8      Q.  And you and Mr. Ziltz -- nobody else
9  present?
10     A.  Yes, I don't remember anybody else.
11     Q.  What was said by Mr. Ziltz?
12     A.  He just recapped the incident.
13     Q.  Do you remember anything specific or
14  have a specific recollection with anything
15  Mr. Ziltz said in this meeting?
16     A.  Just that he went out there to look
17  into Jose -- went out there and met up with Jose
18  Andreu and he had, like at that point in time, I
19  thought he said he had less than 20 stops left.
20     Q.  And you think that's what he said or
21  that's what he said?
22     A.  I am not a hundred percent sure.
23     Q.  So you don't specifically remember but
24  that's your belief?

Page 216

1      A.  Yes.
2      Q.  What did Mr. Ziltz say about how he
3  determined that there were less than 20 stops left?
4      A.  I don't remember.
5      Q.  Did Mr. Ziltz at any time ever tell
6  you I counted each package, each stop in that truck,
7  and there were less than 20 or more than 20 or any
8  particular number?
9      A.  I'm trying to remember the specifics
10  on that.  I mean, if I remember correctly, Dave
11  Ziltz stated that he had counted like 13 or 15
12  stops in the car.
13     Q.  Did he say he counted every stop in
14  the car or did he just say I counted 13 or 15 stops
15  in the car?
16     A.  He said that's all the stops that he
17  had left.
18     Q.  Did he tell you what time it was that
19  he was counting these packages?
20     A.  I don't remember the exact time.
21     Q.  Do you remember if he told you a time
22  is the question?
23     A.  Approximate time was like 4:20.
24     Q.  Now you remember, you are remembering

Page 217

1  this come out of Mr. Ziltz's mouth?  You remember
2  that time coming out of his mouth?
3      A.  No.
4      Q.  You don't remember any time coming out
5  of his mouth, do you?
6      A.  No, I don't remember the time.
7      Q.  Because if you remember that, and you
8  can't remember Jose admitting to lying the next day?
9          MR. WATSON:  I am going to object to
10     the badgering, Counsel.
11         MR. COFFEY:  Strike that.
12  BY MR. COFFEY:
13     Q.  So you recall Dave Ziltz saying
14  something about he counted some packages on the
15  truck; is that your recollection?
16     A.  Yes.
17         MR. WATSON:  Asked and answered.
18  BY MR. COFFEY:
19     Q.  What else was said?
20     A.  I don't remember.
21     Q.  What did you say?
22     A.  I can't recall a hundred percent what
23  I said at that time.
24     Q.  Did you ask any questions?

91bb9cf6-35dc-4cac-a300-f2feb09c3d38

Page 218

1    A.    I can't recall the questions that I
2  asked, but, yes, we had a discussion.
3    Q.    Did you discuss the fact that this was
4  the guy that was injured on January 24th or claimed
5  to have been injured on January 24th?
6    A.    No, not that I remember.
7    Q.    Did you have that in your mind though
8  when it came up, hey, Jose Andreu, something going
9  on with packages, this is the guy that was injured
10 on January 24th or thereabouts?
11   A.    No.
12   Q.    But you clearly knew that that was the
13 case, right, that he had an injury or alleged injury
14 on January 24th, right?
15   A.    Yes.
16   Q.    And you knew that that had been
17 reported to Liberty Mutual, that the training had
18 occurred?
19        MR. WATSON:  Objection, asked and
20 answered.
21 BY MR. COFFEY:
22   Q.    You had known that for a while,
23 correct?
24   A.    Yes.

Page 219

1    Q.    What else is said in your meeting with
2  Mr. Ziltz on the evening of February 9th?
3    A.    I don't remember.
4    Q.    When do you make the decision that you
5  are going to have a meeting the following morning
6  and put him on notice of termination?
7    A.    I believe it was at this meeting.
8    Q.    When you are talking to Mr. Ziltz?
9    A.    Yes.
10   Q.    The notice of termination, that's what
11 you conclude, correct?
12   A.    Not necessarily at that -- not
13 necessarily like that.
14   Q.    Okay, I don't want to put words in
15 your mouth. How did you conclude -- you said at
16 this meeting you made your decision to put him on
17 notice of termination?
18   A.    At this meeting Dave Ziltz presents
19 the facts. I've only got one side of the story, and
20 I don't have Jose Andreu's side of the story until
21 we meet on the 10th.
22   Q.    Okay. So it's your testimony that you
23 don't decide to put him on notice of termination
24 until you meet with Jose Andreu on the 10th in the

Page 220

1  morning?
2    A.    Correct.
3    Q.    So in the meeting on the 10th you make
4  the decision to put him on notice of termination?
5    A.    Correct.
6    Q.    Not before?
7    A.    No, not before.
8    Q.    What else do you do prior to the
9  meeting on the 10th to look into the situation,
10 investigate the situation?
11   A.    I don't remember doing anything else.
12   Q.    During the day Ms. Bast had been in
13 your office, and you had your exchange with her that
14 we talked about, correct?
15   A.    Yes.
16   Q.    Then at night Mr. Ziltz comes in and
17 you have your talk with him that we've already
18 talked about, correct?
19   A.    Yes.
20   Q.    What else, if anything, any other
21 discussion, any other information, that you have
22 prior to going into your meeting on February 10th in
23 the morning?
24   A.    I don't know if there's any other -- I

Page 221

1  don't remember any other information.
2    Q.    Did Mr. Ziltz tell you about
3  communications -- let me back up.
4        What was the lie? What did Ziltz
5  tell you the lie was?
6    A.    I mean, I don't remember that
7  conversation specifically, the whole conversation
8  that night. I just know the circumstances that were
9  leading up to it.
10   Q.    So as you sit here, do you know what
11 the lie was or allegedly was?
12   A.    Yes, that Jose -- that Mr. Andreu had
13 responded that he had 60 stops left when the reality
14 was that he did not have 60 stops left.
15   Q.    And you must have known that on
16 February 10th going into the meeting, right?
17   A.    Based off of what Cheryl Bast and Dave
18 Ziltz had just informed me.
19   Q.    Maybe you are missing a piece of
20 puzzle. What did Cheryl Bast tell you about the
21 lie, the alleged lie?
22   A.    I believe she came back into the
23 office later on and said that Dave had met up with
24 him, and he didn't have 60 stops left and he was

Page 254

1    A.    Yes.
2    Q.    All that?
3    A.    Yes.
4    Q.    And the time it has to be done by?
5    A.    I am not sure if it has a time
6  indicated in that, but there is the information on
7  selecting raters and setting up your QPR's.
8    Q.    Now, in this particular document, I
9  don't see any -- Mr. Dunn is your boss during 2005
10 and most of 2006, right?
11   A.    Yes.
12   Q.    Did he provide to you any written
13 comments about what he thought of your performance
14 in any of the criteria listed in Exhibits 10 or 11
15 or any other criteria that he made up himself?
16   A.    No.
17   Q.    No written comments from your boss?
18   A.    No.
19   Q.    Any written comments from any of the
20 co-employees, either the ones listed in Exhibits 10
21 and 11 or any other co-employees?
22   A.    No.
23   Q.    Did you submit any written comments or
24 rebuttals to any of the things that Mr. Dunn or the

Page 255

1  other raters had to say?
2    A.    No.
3    Q.    Is that common?  Is that allowed?  Two
4  questions, I'm sorry.  Is it standard?  Have you
5  ever done that before?
6    A.    No.
7    Q.    Is it allowed to do that?
8    A.    I haven't seen -- I haven't seen
9  anybody or heard of anybody doing that.
10   Q.    In either of these two reviews, 10 or
11 11, you've read them fully, correct, maybe not today
12 but at the time that you read them, right?
13   A.    Yes.
14   Q.    Do you recall you taking issue or
15 having any conversations with anybody about
16 something that was -- about a rating you received
17 that you had a question about or didn't like?
18   A.    No.
19   Q.    You were satisfied with these two?
20   A.    Yes.
21   Q.    Is there anything, sir -- I know a lot
22 of this stuff we talked and was somewhat history --
23 is there anything that has come to you over the
24 course of the deposition that you would like to

Page 256

1  offer as a, you know, either answering a prior
2  question or giving me more information that would
3  reflect on a prior answer that you've given; is
4  there anything else that you'd like to offer?
5    A.    Yes.
6    Q.    What's that?
7    A.    I'm just -- I'm confident that I made
8  the right decision based off the facts presented,
9  that Jose Andreu had indeed lied to Dave Ziltz or
10 lied to Cheryl Bast, and I'm confident that the
11 course of action was correct.  And I was confident
12 as well that this is a very serious issue that could
13 have been addressed under the grievance process, and
14 had it been addressed under the grievance process
15 properly by the union and the employee, it would
16 have been resolved in a different outcome than this.
17   Q.    So your position is had there been a
18 timely grievance filed, this 15-day period we talked
19 about, you're confident it would have been
20 resolved -- say that again?
21   A.    I'm confident that it would have been
22 resolved through the grievance process.
23   Q.    How resolved?
24   A.    Well, one, that the grievance process

Page 257

1  run its course of action; but, two, as I've seen it
2  historical (sic), that I've had other employees that
3  are on Notice of Termination that have been reduced
4  to suspensions and have returned to work.
5    Q.    Do you believe that's what would have
6  happened if this would have run its course and the
7  grievance would have been filed on time?  Assuming
8  it wasn't, I don't know.
9    A.    Yes, I do.
10   Q.    What makes you think that?
11   A.    Because I skipped the first couple
12 steps of the disciplinary process and went to Notice
13 of Termination.  Cardinal sin would be something you
14 automatically terminate someone for.  You don't put
15 them on Notice of Termination.  You are terminated.
16 He failed their dishonesty clause which falls under
17 the class of a cardinal sin.
18   Q.    Article 54?
19   A.    Right.  So he should have been
20 terminated.  I put him on Notice of Termination.
21 And had they grieved it, it would have came that I
22 had not followed the progressive discipline process,
23 and we would have been able to discuss this.
24   Q.    You don't have to follow progressive

65 (Pages 254 to 257)

91bb9cf6-35dc-4cac-a300-f2feb09c3d38

Page 262

1    Q.    Did it surprise you that they failed
2  to file in this case?
3    A.    Yes.
4    Q.    Were you aware that they fail to file
5  a grievance from the 2/10 meeting up?
6    A.    Yes.
7    Q.    The union steward who was representing
8  Mr. Andreu, at the February 10, 2005 meeting was Pam
9  Tredwell, correct?
10   A.    Yes.
11   Q.    Was she the regular union steward for
12 the Aurora center?
13   A.    There's two designated union stewards
14 for the center, Rick Cantu and Pam Tredwell. Rick
15 Cantu is not recognized as being above her, but Rick
16 Cantu handled most of the grievance procedures.
17   Q.    Did you come to understand that
18 sometime after March 4, 2005, after Mr. Andreu was
19 actually terminated, that Ms. Tredwell ceased to be
20 a union steward for teamsters Local 705?
21   A.    Yes, I was aware of that.
22        MR. WATSON:  I don't have anything
23   else.
24

Page 263

1        RE-DIRECT EXAMINATION
2  BY MR. COFFEY:
3    Q.    I'm just going to mark this. I'll
4  give you a copy.
5             (Document marked as
6              Exhibit No. 12 for
7              identification.)
8  BY MR. COFFEY:
9    Q.    Mr. Snyder, I'm showing you what's
10 been marked as Exhibit No. 12, Local Union number
11 705 grievance form, grievance number. Have you seen
12 this document before?
13   A.    No.
14   Q.    This is the first time you've seen it?
15   A.    I'm sorry, what's that?
16   Q.    Is this the first time you are seeing
17 it?
18   A.    Yes.
19   Q.    Is it news to you that Mr. Andreu
20 filled out a grievance form or somebody did on his
21 behalf from the union and filed a grievance?
22   A.    Yes.
23   Q.    That's brand new news to you?
24   A.    Yes.

Page 264

1    Q.    Are you telling me that you were not
2  aware that there is in fact up until June of this
3  year, there was an arbitration process going on
4  between Mr. Andreu and the union on the one hand and
5  UPS on the other hand concerning the grievance of
6  the notice suspension you put him on?
7    A.    No.
8    Q.    This is all news to you?
9    A.    Yes.
10   Q.    It's your testimony there was no
11 grievance filed on the day you terminated him March
12 4, correct?
13   A.    Yes.
14   Q.    Do you recognize in the disposition
15 section of Exhibit 12 there is a step one, that has
16 a date of 2-10-05 some writing, "Met with Kerry.
17 Jose put on Notice of Termination pending
18 investigation. Looks like the union rep signature
19 Tredwell. Do you recognize the union rep's
20 signature?
21   A.    I recognize the name, but I don't know
22 what her signature looks like.
23   Q.    What's the name?
24   A.    It says Tredwell.

Page 265

1    Q.    I'm talking about what's under the
2  employee rep signature?
3    A.    It looks like "RTS."
4    Q.    What is that?
5    A.    That's an acronym for refused to sign.
6    Q.    Whose writing is that?
7    A.    I don't know.
8    Q.    Did Ms. Tredwell present you with this
9  grievance at some point in time, at any point in
10 time and you refused to sign?
11   A.    No.
12   Q.    Had you become aware, that
13 Ms. Tredwell had submitted a grievance, be it late
14 or be it on time and somebody refused to sign it?
15   A.    No.
16   Q.    It's your testimony that you weren't
17 aware that there was any grievance presented at all?
18   A.    That's correct, no grievance was
19 presented at all.
20   Q.    Are you saying that as a matter of
21 fact or you just don't know?
22   A.    I'm saying no grievance was presented
23 to me at all.
24   Q.    To you?

67 (Pages 262 to 265)

91bb9cf6-35dc-4cac-a300-f2feb09c3d38

Page 266

1    A.    Yes.
2    Q.    And your testimony was that you
3   weren't aware that Jose had appeared before the
4   joint grievance panel back in 2006 over a grievance
5   concerning the Notice of Termination?
6    A.    No, I was not aware of that.
7    Q.    Or that there was an arbitration that
8   was scheduled to take place in June of '07
9   concerning the Notice of Termination?
10    A.    No, I was not aware of that.
11    Q.    Nobody told you that you might have to
12   give testimony in an arbitration for Jose Andreu's
13   grievance?
14    A.    No.
15    Q.    Brand new news to you today, all of
16   this?
17    A.    Yes.
18    Q.    You have never seen a copy of
19   grievance 114622 on behalf of Jose before?
20    A.    No, I have not.
21        MR. COFFEY:  That's all I have.
22        MR. WATSON:  Just a couple questions
23    following up on that.
24

Page 267

1        RECROSS-EXAMINATION
2   BY MR. WATSON:
3    Q.    After March 4, 2005, a union business
4   agent Ken Emanuelson tried to give you a grievance,
5   correct?
6    A.    Yes.
7    Q.    Do you know if it was this grievance
8   that we have in front of us that counsel has marked
9   as Exhibit 12?
10    A.    I didn't see it.  He had it in his
11   hand.  He tried to give it to me.  He was on the
12   other side of the desk, and I refused to accept it
13   because it had passed the grace period, the 15-day
14   grace period, and it had already -- I mean, I wasn't
15   going to accept an untimely grievance.
16    Q.    This was after March 4, 2005?
17    A.    Yes.
18    Q.    Mr. Andreu had already been let go?
19    A.    Yes.
20    Q.    So it could have been this?  It may
21   not have been, but at that point in time you didn't
22   accept it; correct?
23    A.    That's correct.
24    Q.    And Mr. Emanuelson tried to get you to

Page 268

1   take it?
2    A.    Correct.  As a matter of fact, he got
3   very irate and upset when he tried to give it to me,
4   and I didn't accept it.
5        MR. WATSON:  Nothing further.
6        FURTHER RE-DIRECT EXAMINATION
7   BY MR. COFFEY:
8    Q.    When was this that Mr. Emanuelson tried
9   to give it to you?  How far after March 4, 2005?
10    A.    Shortly after that, within the next
11   two to four subsequent weeks.
12    Q.    And this is a conversation between you
13   and Mr. Emanuelson?
14    A.    Yes.
15    Q.    Where at?
16    A.    In my office.
17    Q.    What was said and by whom?
18    A.    He said -- Mr. Emanuelson had the
19   grievance in his hand, he said I need you to accept
20   this grievance.  I asked him what it was for.  He
21   said it was for Jose Andreu.  I said I'm not going
22   to accept it, it's untimely.  And he responded that,
23   somewhat to the extent that you can't refuse to
24   accept a grievance, and then he got all irate about

Page 269

1   it and very clearly because he was red in the face
2   and angry saying, I've never been refused, no one
3   has ever refused to accept a grievance from me.
4    Q.    Why exactly did you refuse to accept
5   it?
6    A.    Because it was untimely.  It was way
7   past the grace period.
8    Q.    Did you talk to anybody subsequent to
9   this conversation, Mr. Dunn or Mr. Hefke or anybody
10   at UPS and at least advise them that Ken Emanuelson
11   showed up he wanted me to accept a grievance, I
12   said, no; did you tell them of that?
13    A.    I don't recall exactly.
14    Q.    You don't know if you did or not?
15    A.    If anybody, I would have called
16   Mr. Hefke and informed him that I had had this
17   encounter with Mr. Emanuelson.
18    Q.    You are not sure, correct?
19    A.    I'm not a hundred percent sure.
20    Q.    But you are sure you didn't talk to
21   anybody to before you made the decision not to
22   accept it, correct?
23    A.    That's correct.
24    Q.    He asked you to accept it, you said,

L.A. REPORTING (312) 419-9292

91bb9cf6-35dc-4cac-a300-f2feb09c3d38

Page 274

1  we tried to give it to you or anything or any
2  indication that it was left in the office or
3  anything.  It was like the first time he was
4  presenting it.
5       Q.    What were his words though?  Did he
6  make any indication verbally that, in fact this is
7  the first time we're presenting the grievance or was
8  there just silence, here is the grievance?
9       A.    I think I remember saying that Pam had
10  given this to me, wanted me to give it to you, but I
11  forgot about it, some kind of thing like that.
12       Q.    Are you sure?
13       A.    Yes.
14       Q.    Like an admission, huh?
15       A.    Yes, something like that.
16       Q.    He admitted it was late, huh?
17       A.    Yes.
18       Q.    And you remember that?
19       A.    Yes.
20       MR. COFFEY:  Okay, thanks.
21       MR. WATSON:  Nothing further.  We'll
22  reserve.
23       DEPONENT FURTHER SAITH NAUGHT
24

Page 275

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION
3
   JOSE ANDREU,           )
4                          )
        Plaintiff,   )
5                          )
   vs.                     ) No. 07 C 0473
6                          )
   UNITED PARCEL SERVICE, INC.)
7                          )
        Defendant.    )
8
9       This is to certify that I have read the
10  transcript of my deposition taken in the
11  above-entitled cause by Denise A. Andras, Certified
12  Shorthand Reporter, on the 11th day of July, 2007,
13  and that the foregoing transcript accurately states
14  the questions asked and the answers given by me,
15  with the changes made on the errata sheets, if any,
16  attached hereto.
17  Number of errata sheets submitted: ____
18
19          KERRY SNYDER
   SUBSCRIBED and sworn to
20  before me this ____ day of
   _____, 2007.
21
22  Notary Public
23
24

Page 276

1  CASE: ANDREU VS. UPS
2  DATE TAKEN: 7/11/07
3  DEPONENT: KERRY SNYDER
4  PAGE    LINE      ERRATA SHEET
5  ____    ____CHANGE:_____
6  ____    ____REASON:_____
7  ____    ____CHANGE:_____
8  ____    ____REASON:_____
9  ____    ____CHANGE:_____
10  ____    ____REASON:_____
11  ____    ____CHANGE:_____
12  ____    ____REASON:_____
13  ____    ____CHANGE:_____
14  ____    ____REASON:_____
15  ____    ____CHANGE:_____
16  ____    ____REASON:_____
17  ____    ____CHANGE:_____
18  ____    ____REASON:_____
19  ____    ____CHANGE:_____
20  ____    ____REASON:_____
21  ____    ____CHANGE:_____
22  ____    ____REASON:_____
23  (SIGNED)_____    DATE____
24  Reporter:  Denise A. Andras, CSR, RPR

Page 277

1  STATE OF ILLINOIS )
               ) SS:
2  COUNTY OF C O O K )
3       I, Denise A. Andras, a Notary Public within
4  and for the County of Cook and State of Illinois,
5  and a Certified Shorthand Reporter of said state, do
6  hereby certify that heretofore, to-wit, on the 11th
7  day of July, 2007, KERRY SNYDER personally appeared
8  before me at 29 South LaSalle Street, in the City of
9  Chicago, in the County of Cook and State of
10  Illinois, a witness in a certain cause now pending
11  and undetermined, wherein Jose Andreu is the
12  Plaintiff and UPS is the Defendant.
13       I further certify that the said witness was
14  first duly sworn to testify the truth, the whole
15  truth and nothing but the truth in the cause
16  aforesaid; that the testimony then given by said
17  witness was reported stenographically by me, in the
18  presence of said witness, and afterwards reduced to
19  typewriting by Computer-Aided Transcription, and the
20  foregoing is a true and correct transcript of the
21  testimony so given by said witness as aforesaid.
22       I further certify that the signature of the
23  witness to the foregoing deposition was not waived
24  by agreement of counsel for the respective parties;

70  (Pages 274 to 277)

91bb9cf6-35dc-4cac-a300-f2feb09c3d38

Page 278

1   and that I am not counsel for nor in any way related
2   to any of the parties to this suit nor am I in any
3   way interested in the outcome thereof.
4        In witness whereof, I have hereunto set my
5   hand and affixed my notarial seal this _____ day of
6   _____, 2007.
7
8
9   _____
    Notary Public, Cook County, Illinois
10  C.S.R. License No. 084-003437
11
12
13
14
15
16
17
18
19
20
21
22
23
24

L.A. REPORTING (312) 419-9292

February 9, 2005


To: Dave Ziltz
From : Cheryl Bast

RE: Jose Andreu


We asked Jose Andreu to make a pick up at Bernina. He called at 16:00 to ask if we wanted him to break off of his route to go get it. I told him yes. He then stated that he had 60 stops left and he would not be done until 9:00pm. I told him that if he were to do 20 stops an hour that he should be done by 7. He said he was 20 minutes from Bernina and this would take up quite a bit of time.

At 16:42 I received a call from Dave Ziltz he had just met Jose at Bernina. Dave counted the stops in his truck and he only had 20 stops left.

**EXHIBIT**

Snyder #4
7/11/07    DH

UPS 0001

**ZILTZ DEPOSITION EXCERPTS**

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


JOSE ANDREU,                      )
                                  )
            Plaintiff,            )
                                  )
      -vs-                        )   No.  07 C 0473
                                  )
UNITED PARCEL SERVICE, INC.,      )
                                  )
            Defendant.            )


        The deposition of DAVID ZILTZ, called by

the Plaintiff, for examination, taken pursuant to

notice and pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken

before Tamara Manganiello, Registered Professional

Reporter and Notary Public, at Suite 850, 29 South

LaSalle Street, Chicago, Illinois, on the 26th day

of July, A.D., 2007, commencing at 11:04 a.m.

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 46

1    Q.    Did you have any issues at all with
2  Mr. Andreu when he was a driver in the Aurora
3  center?  And we'll leave out the events of February
4  9th here for a second.
5    A.    No.
6    Q.    Okay.  You're aware that he got hurt
7  January 24th, 2005?
8    A.    Yes.
9    Q.    He claimed he got hurt while he was
10 out on his route, right?
11   A.    Yes.
12   Q.    Okay.  Did you have any involvement in
13 reporting the injury or involvement in training
14 Mr. Andreu after the injury?
15   A.    The involvement I had is I responded
16 to the injury, the investigation.
17   Q.    Okay.  So you were involved in some
18 sort of investigation?
19   A.    Correct.
20   Q.    Was this the day of the injury, which,
21 again, was January 24th, '05, or sometime
22 thereafter?
23   A.    Yes.  On the 24th.
24   Q.    So on the 24th you were involved in an

Page 47

1  investigation into the injury?
2    A.    Yes.
3    Q.    What did you do on the 24th to
4  investigate Mr. Andreu's injury?
5    A.    I was available, so I went to where he
6  was and had him show me what happened.
7    Q.    How did you become aware that he had
8  an injury?
9    A.    He called the office.
10   Q.    Was there any delay between the injury
11 and the time he called?
12   A.    I don't recall.
13   Q.    Do you know what time he was injured
14 during the day?
15   A.    It was morning.
16   Q.    Do you know what time you went -- you
17 physically went out to his truck then?
18   A.    Yes.
19   Q.    Do you know what time you arrived at
20 his truck?
21   A.    No.
22   Q.    Was it morning?  Was it afternoon?
23   A.    Morning.
24   Q.    So within the morning he gets injured,

Page 48

1  he notifies the center?
2    A.    Yes.
3    Q.    You get notified by the center?
4    A.    Yes.
5    Q.    And then you go to his truck?
6    A.    Yes.
7    Q.    And what happens when you get to his
8  truck?
9    A.    He shows me -- I asked him what
10 happened and he showed me how a package had fallen
11 out and he tried to stop it and he showed me that.
12   Q.    Did he demonstrate the package
13 falling?
14   A.    Yeah, he demonstrated.  Not exactly
15 falling, but how it happened.
16   Q.    What did he say to you?
17   A.    He said it was sliding out.  The truck
18 was full, it was sliding out and he put his hands up
19 to stop it.
20   Q.    Was anybody else present?
21   A.    No.
22   Q.    Where was this at?
23   A.    I believe it was at Meijers on Route
24 59.

Page 49

1    Q.    Okay.  And what did you say to him?
2    A.    I don't recall.
3    Q.    Did you indicate at all that you had
4  any doubts about the injury?
5    A.    Yes.
6    Q.    What did you say?
7    A.    I don't know.
8    Q.    Do you have a specific recollection of
9  anything else said?
10   A.    No.
11   Q.    Okay.  Do you have a general
12 recollection of anything else said in this
13 conversation?
14   A.    Well, I had doubts.
15   Q.    Okay.  When did you first have doubts?
16   A.    When I first was told by the office
17 that he was injured, that he was calling in that he
18 hurt himself.
19   Q.    Okay.  And why did you have doubts
20 when the office first called you?
21   A.    Jose was adamant that he did not want
22 to do this route this morning -- that morning.
23   Q.    And that was the morning of the day he
24 got hurt?

13  (Pages 46 to 49)

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 130

1    A.    Correct.
2    Q.    What time of day was this?
3    A.    Approximately 4:00.
4    Q.    Okay. And your response to her was
5    what?
6    A.    To have Jose pick it up.
7    Q.    Why Jose?
8    A.    Because it's an excess route. It has
9    no pick-ups assigned to it.
10   Q.    Didn't he have another pick-up earlier
11   that day?
12   A.    Maybe a residential pick-up. But that
13   type of route is designed to take work off the other
14   routes when they're too heavy, does not have a
15   pick-up route, so when we have to disburse it, we
16   don't have to disburse pick-ups.
17   Q.    When that route is not too heavy; is
18   that right?
19   A.    Yes.
20   Q.    Well, if it's 190 stops that he, in
21   fact, did that day, that's certainly well within the
22   average of that route, right?
23   A.    Correct.
24   Q.    Is it on the high side of the average

Page 131

1    of that route?
2    A.    Yeah. High side.
3    Q.    It's a full day, right?
4    A.    Yeah, it is a full day.
5    Q.    Okay. So you select Jose to go to
6    Bernina essentially, correct?
7    A.    Right.
8    Q.    That's your decision, correct?
9    A.    Correct.
10   Q.    Okay. And you communicate that
11   decision to Cheryl Bast?
12   A.    Yes.
13   Q.    Okay. What else is said in that
14   conversation?
15   A.    That was the end of the conversation.
16   Q.    Okay. Do you have any other
17   conversations with Cheryl after that?
18   A.    She called me back and --
19   Q.    How much time elapsed between these
20   two calls?
21   A.    Ten minutes, 15 minutes.
22   Q.    Okay. She calls you on the phone?
23   A.    Yes.
24   Q.    Is this your cell phone?

Page 132

1    A.    This is my cell phone.
2    Q.    Your personal cell phone?
3    A.    Yes.
4    Q.    Do you still have the same number
5    today?
6    A.    I believe so.
7    Q.    Do you still have the same carrier?
8    A.    Yes.
9    Q.    Who is your carrier?
10   A.    My carrier is T-Mobile. I think it
11   was Voice Stream back then. I'm not positive. They
12   switched.
13   Q.    What's your number?
14   A.    (630) 788-9478.
15   Q.    Okay. So ten, 15 minutes later Cheryl
16   calls back?
17   A.    Yes.
18   Q.    And what does she say?
19   A.    She said to me that Jose cannot get
20   the pick-up or he claims he cannot get the pick-up,
21   he has 60 stops left. And if he has to go to
22   Bernina, he won't be done and into the building
23   until 9:00 o'clock.
24   Q.    What do you say?

Page 133

1    A.    At that point and seeing his truck
2    earlier, I found that hard to believe. So I said
3    send him to the pick-up now. I was on the route
4    across the street. And she sent him there and I was
5    waiting out in front of the pick-up on the street.
6    Q.    So you had already gotten to
7    Bernina --
8    A.    Yes.
9    Q.    -- by the time he shows up?
10   A.    Oh, yes.
11   Q.    How much time elapses between your
12   call with Cheryl and the time you meet Jose?
13   A.    Ten, 15 minutes max.
14   Q.    Do you have any notes of this in terms
15   of the times of that day?
16   A.    I do not.
17   Q.    Did you write them down at all that
18   day?
19   A.    No.
20   Q.    Have you ever written them down?
21   A.    No.
22   Q.    So your ten to 15 minutes is your best
23   estimate as you sit here today?
24   A.    Yes.

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 134

1    Q.    Same with the time that elapsed
2  between calls from Cheryl?
3    A.    Yes.
4    Q.    That's just your best estimate today?
5    A.    Best estimate based on our commitment
6  to that customer and what time we had to be there.
7    Q.    But you have no other notes or
8  documents, you didn't document the times of any of
9  these events this day, correct?
10    A.    No.
11    Q.    That's correct, right?
12    A.    That's correct.
13    Q.    Okay. So she calls you back, she
14  says -- I'm sorry, I'm kind of going back a little
15  bit to that last telephone conversation with Cheryl
16  Bast -- Jose can't make the pick-up, 60 stops left.
17  How does that call end? What do you say to her?
18    A.    I said send him there now.
19    Q.    Okay.
20    A.    And she must have messaged him to send
21  him there.
22    Q.    And then you meet him there?
23    A.    Yes.
24    Q.    And what do you do when you meet him

Page 135

1  there?
2    A.    I had him open up his bulkhead door,
3  which is the door behind the driver, and I counted
4  the packages in his car.
5    Q.    You physically counted each and every
6  package?
7    A.    I counted like this (indicating). I
8  looked at the shelf and counted like that.
9    Q.    Okay. So you didn't go through each
10  package, move it aside, one, two?
11    A.    Did not.
12    Q.    Your standing by the driver's seat?
13    A.    I went into the bulk area.
14    Q.    What's the bulk area?
15    A.    Went into the back of the package car.
16    Q.    And you're counting with your finger?
17    A.    Yes.
18    Q.    Okay. And what happens next?
19    A.    I counted about 20 packages. I asked
20  Jose where the 60 packages were, the 60 stops. I
21  shared my frustrations with him with everything
22  going on in the area, a person getting hurt, a
23  person needing help, we need to pitch together, this
24  and that. I don't recall my exact words at that

Page 136

1  point, if I mentioned dishonesty to him, but very
2  well could have. It was a dishonest act. It's in
3  the contract. I don't know. I don't recall words.
4  And at that point I told him to make the pick-up,
5  finish his work and get back into the building and
6  went on.
7    Q.    Okay. Let's take those one at a time.
8  So about 20 packages is what you counted?
9    A.    Yes.
10    Q.    Could have been a little more? Could
11  have been a little less actually?
12    A.    Yes.
13    Q.    Did you ask Jose at that time about
14  his -- you just heard from Cheryl this 60 package
15  thing, right? You heard that through Cheryl Bast?
16    A.    Yes.
17    Q.    Jose never told you 60 packages --
18    A.    No.
19    Q.    -- correct? Okay.
20        So did you then ask Jose -- did
21  you say something about 60 packages to Jose?
22    A.    I said where are the 60 stops you told
23  Cheryl you had?
24    Q.    What does he say?

Page 137

1    A.    I don't recall.
2    Q.    Did he ever do anything to acknowledge
3  he, in fact, told her that?
4    A.    I don't recall.
5    Q.    So you don't know if he did or didn't?
6    A.    Correct.
7    Q.    Do you recall anything he says during
8  this time that you're out there at the truck?
9    A.    No.
10    Q.    Did you mention his accident or injury
11  on February 9th when you were out there at his
12  truck?
13    A.    I don't recall.
14    Q.    Did you say anything along the lines
15  of you lied to me about the accident and injury or
16  back about the injury and now I don't believe you
17  with respect to this?
18    A.    No.
19    Q.    But you're not sure if you mentioned
20  the injury at all?
21    A.    No. I wouldn't have.
22    Q.    Well, why wouldn't you?
23    A.    It's a different issue.
24    Q.    Well, you're out at the truck, you've

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 138

1  got a possible situation where Mr. Andreu has
2  misrepresented packages, correct?
3      A.   Correct.
4      Q.   You know that, right?
5      A.   Correct.
6      Q.   You know you have doubts over an
7  accident that he claims to have had, correct?
8      A.   I had doubts.
9      Q.   You had doubts.  At the time you were
10 counting packages it's not only "I don't know if
11 he's misrepresented packages", it's "I think he's
12 misrepresented an accident that he had", correct?
13     A.   No.
14     Q.   Why not?
15     A.   Because I was dealing with the
16 situation where he misrepresented the packages in
17 the package car.
18     Q.   I understand.  But you're telling me
19 nowhere in your head is the fact that this is not --
20 you know, two weeks ago this guy said he had an
21 accident and I kind of had doubts about that?
22     A.   No.
23     Q.   You don't even think that?
24     A.   No.

Page 139

1      Q.   Okay.  Do you mention the injuries or
2  faking injuries or accident --
3      A.   No.
4      Q.   -- at your time out at his truck?
5      A.   No.
6      Q.   You're sure?
7      A.   Positive.
8      Q.   What else is said at the time on his
9  truck on February 9th?
10     A.   I just told him to make the pick-up,
11 finish his work and go in.
12     Q.   Do you have any further conversations
13 -- strike that.
14          Do you have any conversations with
15 Kerry Snyder on February 9th about the Jose Andreu
16 situation?
17     A.   I'm sure I did.
18     Q.   Do you recall any?
19     A.   I probably called him right away and
20 explained the situation to him.
21     Q.   You don't know if you did?
22     A.   I'm sure I did.
23     Q.   Okay.  This is a phone conversation
24 now?

Page 140

1      A.   Phone conversation.
2      Q.   Okay.  Right after you get out of
3  Mr. Andreu's truck?
4      A.   Yes.
5      Q.   Are you still on the site at Bernina?
6      A.   I was out in front of Bernina.
7      Q.   And what was said and by who?
8      A.   I would have told Kerry about the
9  situation, what transpired, what was said, that
10 there was not 60 stops in his car.
11     Q.   Okay.  What did he say?
12     A.   I don't recall.
13     Q.   Now, again, you're saying you would
14 have told him?
15     A.   Yes.
16     Q.   Did you tell him?
17     A.   I report, you know, to my immediate
18 manager.  I don't -- you know, I have to report to
19 him what's going on because he makes the decisions.
20 You know, the immediate manager does all that.
21     Q.   I understand.
22     A.   So I call Kerry, Kerry, this is what
23 happened, this is what's going on.  I don't recall
24 what he said.

Page 141

1      Q.   Okay.  But you are sure as you sit
2  here that you had a telephone call to Kerry Snyder
3  after the incident with Mr. Andreu where you
4  described the incident to him?
5      A.   Yes.
6      Q.   Correct?
7      A.   Correct.
8      Q.   Okay.  Did you have any further
9  conversations with Kerry Snyder that day,
10 February 9th?
11     A.   I don't recall.
12     Q.   Did you talk to him -- were you at the
13 meeting on February 10th when Mr. Andreu was put on
14 notice of termination?
15     A.   I don't recall.
16     Q.   You don't know if you were there or
17 not?
18     A.   No.
19     Q.   Did you know he was put on notice of
20 termination on February 10th?
21     A.   Yes.
22     Q.   Because of this incident, correct?
23     A.   Yes.
24     Q.   Did Mr. Snyder tell you he met with

Page 198

```
 1      IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
 2              EASTERN DIVISION
 3   JOSE ANDREU,            )
                             )
 4        Plaintiff,         )
                             )
 5      -vs-                 ) No. 07 C 0473
                             )
 6   UNITED PARCEL SERVICE, INC., )
                             )
 7        Defendant.         )
 8         I hereby certify that I have read
 9   the foregoing transcript of my deposition given on
     July 26th, 2007, at the time and place aforesaid,
10   consisting of Pages 1 through 197, inclusive, and I
     do again subscribe and make an oath that the same is
11   a true, correct and complete transcript of my
     deposition so given as aforesaid.
12
          please check one:
13
          _____ I have submitted errata sheet(s)
14        _____ No corrections were noted
15
16        _____
          DAVID ZILTZ
17
18
     SUBSCRIBED AND SWORN TO
19   before me this ____ day
     of _____, A.D., 2007.
20
          _____
21   Notary Public
22
23
24
```

Page 199

```
 1          WITNESS ERRATA SHEET Page #1
 2
     JOSE ANDREU,            )
 3                          )
          Plaintiff,         )
 4                          )
        -vs-                 ) No. 07 C 0473
 5                          )
     UNITED PARCEL SERVICE, INC., )
 6                          )
          Defendant.         )
 7
          I wish to make the following changes for the
 8   following reasons:
 9   Page   Line
              _____ Change: _____
10   ___  ___ Reason: _____
11             _____ Change: _____
              Reason: _____
12
              _____ Change: _____
13   ___  ___ Reason: _____
14             _____ Change: _____
              Reason: _____
15
              _____ Change: _____
16   ___  ___ Reason: _____
17             _____ Change: _____
              Reason: _____
18
              _____ Change: _____
19   ___  ___ Reason: _____
20             _____ Change: _____
              Reason: _____
21
              _____ Change: _____
22   ___  ___ Reason: _____
23
24   (Signed) _____
```

Page 200

```
 1   STATE OF ILLINOIS  )
                        ) SS.
 2   COUNTY OF W I L L  )
 3
 4       I, Tamara Manganiello, a notary public
 5   within and for the County of Will and State of
 6   Illinois, do hereby certify that heretofore, to-wit,
 7   on the 26th day of July, A.D., 2007, personally
 8   appeared before me at Suite 850, 29 South LaSalle
 9   Street, in the City of Chicago, County of Cook and
10   State of Illinois, DAVID ZILTZ, a witness, called by
11   the Plaintiff in a certain cause now pending and
12   undetermined, wherein JOSE ANDREU is the plaintiff
13   and UNITED PARCEL SERVICE, INC., is the defendant.
14       I further certify that the said witness,
15   DAVID ZILTZ, was by me first duly sworn to testify
16   the truth, the whole truth and nothing but the truth
17   in the cause aforesaid; that the testimony then
18   given by him was by me reduced to writing by means
19   of shorthand in the presence of said witness and
20   afterwards transcribed upon a computer, and the
21   foregoing is a true and correct transcript of the
22   testimony so given by him as aforesaid.
23       I further certify that the reading and
24   signing of said deposition was reserved by the
```

Page 201

```
 1   witness.
 2       I further certify that the taking of the
 3   deposition was pursuant to notice, and that there
 4   were present at the taking of the deposition the
 5   aforementioned parties.
 6       I further certify that I am not counsel
 7   for nor in any way related to any of the parties to
 8   this suit, nor am I in any way interested in the
 9   outcome thereof.
10       In testimony whereof I have hereunto set
11   my hand and affixed my notarial seal this 21st of
12   August, A.D., 2007.
13
14
          _____
15   TAMARA MANGANIELLO, RPR
     Illinois License No. 084-004560
16
17
18
19
20
21
22
23
24
```

# NOTICE OF REMOVAL

**FILED**

OCT 3 0 2007

OCT. 30, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

*JH*

JOSE ANDREU,

        Plaintiff,

    v.

UNITED PARCEL SERVICE, INC.,

        Defendant.

**07CV6132**
**JUDGE DER YEGHIAYAN**
**MAG. JUDGE MASON**

)
)

### NOTICE OF REMOVAL

Pursuant to 28 U.S.C. Sections 1332(a), 1441(a) and (b) and 1446, Defendant United

Parcel Service ("UPS") hereby removes the subject action from the Circuit Court of the

Eighteenth Judicial District, County of DuPage, Illinois, to the United States District Court for

the Northern District of Illinois, Eastern Division, on the following grounds:

    1.     Plaintiff Jose Andreu ("Andreu") served UPS's attorney of record with a copy of

the Complaint via U.S. Mail on or about October 18, 2007. A copy of the Complaint is attached

hereto as Exhibit A. Andreu filed the Complaint in the Circuit Court of the Eighteenth Judicial

District, County of DuPage, Illinois on or about October 15, 2007. No other process, pleadings

or orders have been served on UPS in this matter.[1]

    2.     Andreu's complaint alleges retaliatory discharge in violation of the Illinois

Worker's Compensation Act, 820 ILCS 305/1 *et seq.*

---

[1] This matter was originally captioned Case No. 07 C 00473 in the U.S. District Court for the Northern District of
Illinois and assigned to Judge Der-Yeghiayan and originally consisted of the ongoing Illinois state law worker's
compensation retaliation matter and a dismissed federal claim brought pursuant to COBRA. On September 25,
2007, the Plaintiff sought leave to file an amended complaint without the COBRA claim and based on supplemental
jurisdiction. On September 28, 2007, Judge Der-Yeghiayan declined to exercise supplemental jurisdiction over the
remaining claim and dismissed the retaliation claim without prejudice. Plaintiff filed an agreed motion for
reconsideration on October 1, 2007 stating that the matter should be retained on the basis of diversity jurisdiction.
Judge Der-Yeghiayan denied the motion for reconsideration on October 10, 2007.

QBCHI\920018.00936\546806.1

3.      This Court has original jurisdiction in this civil action pursuant to 28 U.S.C. § 1332(a).  UPS is entitled to remove this suit because of diversity of citizenship.  Andreu is a citizen of the State of Illinois.  (Complaint ¶ 2).  UPS is an Ohio corporation (Complaint ¶ 3) with its home office in Atlanta, Georgia, therefore UPS is a citizen of Ohio and Georgia.

4.      The amount in controversy exceeds $75,000.00.  Plaintiff is seeking lost wages in his suit.  (Complaint p. 6).  During the pendency of this matter before Judge Der-Yeghiayan (as referenced in footnote 1), Plaintiff served UPS with his Rule 26(a)(1) Initial Disclosures dated April 27, 2007.  In his Initial Disclosures, Plaintiff stated he had lost and sought to recover approximately $95,000.00 in lost wages.  A true and accurate copy of Plaintiff's Rule 26(a)(1) Initial Disclosures is attached as Exhibit B.

5.      Removal to this Court is proper because the Northern District of Illinois embraces the Circuit Court of the Eighteenth Judicial District, County of DuPage, where this action was filed.

6.      Contemporaneous with the filing of this Notice of Removal, UPS has given the Circuit Court of the Eighteenth Judicial District, County of DuPage, Illinois written notice of same in the form attached to this Notice as Exhibit C.

WHEREFORE, Defendant United Parcel Service removes the subject action from the

Circuit Court of the Eighteenth Judicial District, County of DuPage, Illinois to this United States

District Court.

DATED:　October 30, 2007

UNITED PARCEL SERVICE, INC.

By: _____
　　　One of Its Attorneys

John A. Klages, #06196781
D. Scott Watson, #06230488
Gary R. Clark, #06271092
Ellen M. Girard, #06276507
Quarles & Brady LLP
500 West Madison Street, Suite 3700
Chicago, IL 60661-2511
312/715-5000

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that he caused a copy of the foregoing

United Parcel Service's NOTICE OF REMOVAL to be served upon the below-listed counsel, by

U.S. mail, properly addressed and prepaid, and deposited in the U.S. Mail at 500 W. Madison

Street, Chicago, Illinois, before the hour of 5:00 p.m. this 30th day of October, 2007:

> Timothy J. Coffey
> The Coffey Law Office, P.C.
> 1403 East Forest Avenue
> Wheaton, Illinois 60187
> Email: tcofflaw@sbcglobal.net

D. Scott Watson

# DEFENDANT UNITED PARCEL SERVICE'S MEMORANDUM OF CLARIFICATION OF UPS'S PRINCIPAL PLACE OF BUSINESS

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE ANDREU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07 C 06132 |
| v. | ) | |
| | ) | Judge Der-Yeghiayan |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT UNITED PARCEL SERVICE'S
MEMORANDUM OF CLARIFICATION OF
UPS'S PRINCIPAL PLACE OF BUSINESS**

Defendant United Parcel Service ("UPS") submits this Memorandum of Clarification of UPS's Principal Place of Business requested by this Court and states as follows:

On or about October 30, 2007, UPS filed its Notice of Removal of this action from the Circuit Court of the Eighteenth Judicial District, County of DuPage, Illinois to this United States District Court. In paragraph 3 of its Notice of Removal, UPS referred to itself as "an Ohio corporation (Complaint ¶ 3) with its home office in Atlanta, Georgia, therefore UPS is a citizen of Ohio and Georgia."

In recognition of the requirements of diversity jurisdiction recognized by the U.S. Court of Appeals for the Seventh Circuit, UPS should have further identified Atlanta, Georgia as its principal place of business and does so now.

WHEREFORE, Defendant United Parcel Service clarifies its previous filings by affirmatively stating that its principal place of business is Atlanta, Georgia.

DATED:  December 6, 2007                    UNITED PARCEL SERVICE, INC.


                                           By:  /s/ D. Scott Watson
                                                One of Its Attorneys

John A. Klages, #06196781
D. Scott Watson, #06230488
Gary R. Clark, #06271092
Ellen M. Girard, #06276507
Quarles & Brady LLP
500 West Madison Street, Suite 3700
Chicago, IL  60661-2511
312/715-5000


### CERTIFICATE OF SERVICE

     The undersigned attorney certifies that on December 6, 2007, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

                    Timothy J. Coffey
                    The Coffey Law Office, P.C.
                    1403 East Forest Avenue
                    Wheaton, Illinois  60187
                    Email: tcofflaw@sbcglobal.net


                         /s/ D. Scott Watson