JAN 0 7 2008

**FILED**

JAN - 7 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE ANDREU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07 C 06132 |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | Judge Samuel Der-Yeghiayan |
| | ) | |
| Defendant. | ) | Magistrate Judge Mason |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, Jose Andreu ("Jose"), by and through his attorneys, THE COFFEY LAW OFFICE, P.C., and pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully move this Honorable Court for summary judgment against Defendant United Parcel Service, Inc. ("UPS") on its "failure to mitigate" affirmative defense, and in support thereof states as follows.

### Relevant Substantive Facts

Jose began his employment with UPS in or around September 1996. ¶6.[1] Starting in 2003, Jose began working for UPS in the position of package driver. In this position, among other duties, he reported each work day to UPS's Addison, Illinois facility and delivered parcels in UPS's vehicles, departing from and returning to the Addison facility each work day. ¶7.

---

[1]All fact citations are to the corresponding paragraph(s) of Plaintiff's Local Rule 56.1 Statement of Material Facts filed concurrently with this supporting Memorandum of Law.

MemoSuppMotionforPartSJ.wpd
January 7, 2008/tjc

On or about January 24, 2005, Jose injured his back at work while on his assigned route delivering packages. ¶ 8.   He immediately called into UPS and reported the work accident and his resulting back injuries. ¶ 9. Later that day, Jose's Supervisor, David Ziltz, reported Jose's accident and injury to UPS's workers' compensation insurance carrier. ¶ 10.

On February 9, 2005, Jose's supervisor Dave Ziltz met Jose while he was on his route delivering packages. Upon his arrival at Jose's truck, Mr. Ziltz was angry and yelling at Jose. Mr. Ziltz accused Jose of lying about the number of packages and/or stops he had left for the day in an earlier communication Jose had with the Addison facility. Dave Ziltz told Jose he would be fired. ¶12.  On or about February 11, 2005, Jose informed his superiors that he could no longer perform his duties due to the pain he was experiencing from the work accident and related injuries. He subsequently missed several days of work, and continued to receive medical treatment.   ¶ 13.  Upon his return to work on February 17, 2005, UPS placed Jose on light duty work, or as UPS refers to it, "temporary alternative work" ("TAW"). ¶ 14. Following his February 17, 2005, return to work, up until the time he was terminated on March 4, 2005, Jose worked 40 hours per week in his temporary alternative work assignment. ¶ 15.

On March 4, 2005, Kerri Snyder, told Jose that his employment with UPS was terminated effective immediately for allegedly being dishonest on February 9, 2005. ¶ 16. Following his March 4, 2005, termination, Jose started looking through the paper for work that was within his medical restrictions, and telephoning prospective employers in search of work that was within his medical restrictions. ¶ 17.  In October 2005, Jose was released by his physician to return to work full duty.  ¶ 18.  During the period following his March

2005 termination up until he was medically released to work full duty in October 2005, Jose made at least five attempts to contact, and/or contacts with prospective employers per week. ¶ 19. Following his October 2005 full, duty medical release, Jose continued looking through the paper for jobs comparable to his former position as package car driver at UPS, and telephoning prospective employers. ¶ 20. Jose estimated that during the period November 2005 to late January 2006, he telephoned at least three or four prospective employers each day. ¶ 21.

One such call and job inquiry was in November 2005 to his cousin Vincente who owned a small trucking business. Vincente needed a driver with a CDL Class A license which Jose did not have. Jose looked into the requirements and costs for obtaining such a license, but it was too expensive for him. ¶ 22.

During the period from late January 2006 through June 2006, Jose made at least five contacts with prospective employers per week. ¶ 23. One of Jose's job contacts was with Bedford Motors, a company that had previously employed him. Bedford Motors offered him a position as truck driver contingent upon him passing a physical. In February 2006, Jose underwent and passed the requested physical. Despite passing the physical, Bedford Motors rescinded its job offer and has refused to hire Jose. ¶ 24.

Since July 2006, Jose has worked full-time as a tree trimmer for J&J Tree Service Company ("J&J"). ¶ 25. J&J is an Illinois corporation. Jose is the President and one-half owner of J&J. His brother, Jorge Andreu owns the other half of J&J. ¶ 26. J&J provides various tree and brush related services including, but not limited to, planting, trimming and removal. ¶ 27. In 2006, Jose received $15,000 from J&J Tree Service Company as and for wages. ¶ 28.

For the year 2006, it first full year of operations, J&J Tree Service Company earned revenue of $123,882. ¶ 29. For the year 2007, Jose estimates that J&J earned gross revenue of approximately $160,000. ¶ 30. In late 2005, J&J purchased equipment worth approximately $33,500 for use in operations. ¶ 31. In 2006, J&J purchased equipment worth approximately $42,000 for use in operations. ¶ 32. In 2007, J&J purchased equipment worth approximately $50,000 for use in its operations. ¶ 33.

### Relevant Procedural Facts

On November 9, 2007, UPS filed its Answer and Affirmative Defense to Plaintiff's Complaint. As and for its sole affirmative defense, Defendant alleged as follows:

> Plaintiff is barred from recovery because he has failed to exercise reasonable efforts to mitigate his alleged damages. ¶ 34.

On June 19, 2007, UPS served its Amended Disclosures Pursuant to Rule 26(a)(1). ¶ 35. In its Amended Rule 26(a)(1) disclosures, UPS identified Jimmy Millard, Tom Haefke and Marilyn Ritchie as individuals who have "information regarding UPS's policies and procedures." ¶ 36. In its Amended Rule 26(a)(1) disclosures, UPS identified Randy Dunn, Dave Ziltz, and Kerry Snyder as individuals who have "information concerning Andreu's termination." ¶ 37. Nowhere in its Amended Rule 26(a)(1) disclosures did UPS identify any individuals who had information concerning Mr. Andreu's search for work following UPS's termination of his employment. ¶ 38. Similarly, nowhere in its Amended Rule 26(a)(1) disclosures did UPS identify any individuals who had information concerning the availability of employment comparable to the work that Mr. Andreu had performed for UPS prior to UPS's termination of his employment. ¶ 39. Lastly, in its Amended Rule 26(a)(1) disclosures, UPS did not identify any individuals who had information concerning the

likelihood that Mr. Andreu would have found comparable employment elsewhere following UPS's termination of his employment.  ¶ 40.

In its Amended Rule 26(a)(1) disclosures, UPS identified the following documents as ones it may use to support its claims or defenses in this matter: "See documents Bates-stamped UPS 0042-UPS 00128 produced by UPS (documents Bates-stamped UPS 0001-UPS 0041 were previously produced)." ¶ 41.  Not one of these documents concerned or related to Mr. Andreu's search for work following its termination of his employment.  ¶ 42. Similarly, none of these documents concerned the availability of employment comparable to the work that Mr. Andreu had performed for UPS prior to its termination of his employment.  ¶ 43.  Lastly, none of these documents concerned the likelihood that Mr. Andreu would have found comparable employment elsewhere following its termination of his employment.  ¶ 44.  To date, UPS has not supplemented its Amended Rule 26(a)(1) disclosures.  ¶ 45.

On June 14, 2007, this Court ordered that "Defendant's expert disclosure and reports shall be served by 07/30/07."  ¶ 46.  To date, UPS has not disclosed any expert witnesses or reports.  ¶ 47.  To date, UPS has not identified any individuals or witnesses who have or may have information concerning Jose's search for work following UPS's termination of his employment, the availability of employment comparable to the work that Jose had performed for UPS prior to its termination of his employment, or the likelihood that Jose would have found comparable employment elsewhere following its termination of his employment.  ¶ 48.

On May 9, 2007, Jose served his First Request for Production of Documents pursuant to Rule 34 on UPS. ¶ 49.  Request No. 17 of Jose's First Request for Production

of Documents requested UPS produce "[a]ll documents which [it] contends support or relate to any affirmative defense it has plead or intends to plead in the future in response to the allegations contained in the Complaint." ¶ 50.

On June 19, 2007, UPS served its Objections and Responses to Plaintiff's First Request for Production of Documents. ¶ 51. As and for its response to Request No. 17 of Jose's First Request to Produce, UPS stated as follows:

> UPS objects to Request No. 17 as vague, overbroad, unduly burdensome, not reasonably limited in time and/or scope, and not reasonably calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding these objections and without waving same, see produced documents Bates-stamped UPS 0001 - UPS 0801. ¶ 52.

The documents produced by UPS in this matter bates-stamped UPS 0001 - UPS 0801 do not contain any information concerning Jose's search for work following UPS's termination of his employment. ¶ 53. Similarly, UPS documents bates-stamped UPS 0001 - UPS 0801 do not contain any information concerning the availability of employment comparable to the work that Jose had performed for UPS prior to its termination of his employment. ¶ 54. Lastly, these documents do not contain any information concerning the likelihood that Jose would have found comparable employment elsewhere following its termination of his employment. ¶ 55. To date, UPS has not supplemented its response to Request No. 17 of Jose's First Request to Produce. ¶ 56.

UPS to date has not produced any documents that contain information concerning Jose's search for work following UPS's termination of his employment, the availability of employment comparable to the work that Jose had performed for UPS prior to its termination of his employment, or the likelihood that Jose would have found comparable employment elsewhere following its termination of his employment. ¶ 57.

### Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986), quoting Fed. R. Civ. Pro. 56( c). While this Court draws inferences from the record in the light most favorable to the non-moving party, it is not required to draw every conceivable inference, but rather only those that are reasonable. *De Valk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987). The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather he must go beyond the pleadings and support his contentions with proper documentary evidence. *Celotex,* 477 U.S. at 324.

The plain language of Rule 56( c) mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. "In such a situation there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

### Argument

I.    **UPS Cannot as a Matter of Law Show that Jose Failed to Mitigate His Damages**

In order to prevail on its failure to mitigate defense, UPS must prove both that Jose was not reasonably diligent in seeking comparable employment, and that with the exercise

of reasonable diligence there was a reasonable chance that he would have found comparable employment. See *EEOC v. Ilona of Hungary, Inc*, 108 F.3d 1569, 1581 (7th Cir. 1997), citing *Hutchinson v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994), and *EEOC v. Gurnee Inn*, 9134 F.2d 815, 818 (7th Cir. 1990). UPS as a matter of law cannot satisfy its burden of proving either of the two prongs of its failure to mitigate defense. It has failed to identify or produce any documents that support either Jose's lack of reasonable diligence, or the availability of comparable jobs in the relevant geographical area. It has similarly failed to identify any witness, whether lay or expert, who has information that would support either prongs of its asserted failure to mitigate defense. It has completely failed to produce any evidence that comparable positions were, or even may have been available in the relevant geographical area.

To the contrary, the only evidence in the record (i.e., Jose's testimony and documents he produced) bearing on this issue fully supports a finding that following UPS's illegal termination of his employment, Jose was reasonably diligent in seeking comparable work, and was at all times "ready, willing and available to accept employment." See *Hanna v. American Motors Corp.*, 724 F.2d 1300, 1308 (7th Cir. 1984). Given the complete lack of probative evidence, there can be no triable of issue of fact with respect to UPS's asserted failure to mitigate defense. This Court should therefore follow the mandate of Rule 56 and enter summary judgment against UPS on this issue.

## II.     Jose was Reasonably Diligent in Seeking Comparable Employment.

After UPS terminated his employment, Jose was obligated to exercise "reasonable diligence" in seeking new, comparable employment. Jose is not held to the highest standard of diligence under this mitigation duty. See *EEOC v. Custom Cos.*, 2007 U.S.

Dist. LEXIS 16691, *46 (N.D. Ill. March 8, 2007) (J. Leinenweber) ("While the court agrees with Defendants that Kennedy could have been more diligent in seeking work, she was reasonably so.")  Jose was not obliged to "go into another line of work, accept a demotion, or take a demeaning position."  *Ford Motor Co. V. EEOC*, 458 U.S. 219, 231, 102 S. Ct. 3057 (1982).  Neither was he compelled to be successful in finding new employment. Jose's burden can most accurately be described as one requiring an "honest, good faith effort."  *Smith v. Great American Restaurants, Inc.*, 969 F.2d 430, 438 (7th Cir. 1992).

Our Circuit, in fact, has long held that reasonable diligence in seeking comparable employment entails such basic actions as "check[ing] want ads, register[ing] with employment agencies, and discuss[ing] employment opportunities with friends and acquaintances."  See *Sprogis v. United Airlines, Inc.*, 517 F.2d 387, 392 (7th Cir. 1975) (holding that plaintiff's application for one job and procurement of another, temporary position during a two-year period constituted "reasonable diligence" in attempting to find alternative employment); see also *Orzel v. City of Wauwatosa Fire Dept.*, 697 F.2d 743, 756 (7th Cir. 1983) (holding that plaintiff, formerly assistant chief of defendant fire department, did not fail to mitigate damages where during a two-year period he worked as a temporary census taker, applied for another position but did not get hired, and placed his name on file at the state job service).  Here, Jose repeatedly and consistently took these measures and more in his search for alternative employment.  However, as this Court well knows, it is not Jose's obligation to prove he was reasonably diligent.  Rather, it is UPS's duty to show that Jose failed to take these, or other reasonable steps in order to search for comparable work.  See *Wheeler v. Snyder Buick*, 794 F.2d 1228, 1234-35 (7th Cir. 1986) (affirming the district court's finding that plaintiff exercised reasonable diligence

where defendant did not show that plaintiff failed to take basic steps to find work, and plaintiff contended that she had in fact answered want ads and applied for various positions).

After UPS terminated his employment on March 4, 2005, Jose started looking through the want ads for work that was within his medical restrictions, and telephoning prospective employers. From the time of his termination up until he was medically released to work full duty in October 2005, Jose made at least five attempts to contact and/or contacts with prospective employers per week. Following his October 2005 full duty medical release, Jose continued to look through the paper for jobs comparable to his former position as package car driver at UPS, and telephoning prospective employers. Jose estimated that during the period November 2005 to late January 2006, he telephoned at least three or four prospective employers each day.

One such call and job inquiry was in November 2005 to his cousin Vincente who owned a small trucking business. Vincente needed a driver with a CDL Class A license which Jose did not have. Jose looked into the requirements and costs for obtaining such a license, but it was too expensive for him.

During the period from late January 2006 through June 2006, Jose made at least five contacts with prospective employers per week. One of Jose's job contacts was with Bedford Motors, a company that had previously employed him. Bedford Motors offered him a position as truck driver contingent upon him passing a physical. In February 2006, Jose underwent and passed the requested physical. Despite passing the physical, Bedford Motors rescinded its job offer and has refused to hire Jose.

Since July 2006, Jose has worked full-time as a tree trimmer for J&J Tree Service

Company ("J&J"). J&J is an Illinois corporation. Jose is the President and one-half owner of J&J. His brother, Jorge Andreu owns the other half of J&J. J&J provides various tree and brush related services including, but not limited to, planting, trimming and removal. In 2006, Jose received $15,000 from J&J Tree Service Company as and for wages.

J&J is an ongoing business earning not insignificant revenue for a start-up company. In 2006, it first full year of operations, J&J earned revenue of $123,882. In 2007, Jose estimates that J&J earned revenue of approximately $160,000. J&J has prudently reinvested a significant amount of its revenue into the purchase of the machinery and equipment necessary to properly complete its work. In late 2005, J&J purchased equipment worth approximately $33,500 for use in operations. In 2006 and 2007, J&J purchased equipment worth approximately $42,000 and $50,000, respectively, for use in operations.

UPS fares no better should it attempt to assert that Jose failed to mitigate his damages by deciding to work full-time for J&J. "Self-employment can constitute employment for purposes of mitigating damages as long as the self-employment was a reasonable alternative to finding other comparable employment." Smith v. Great American Restaurants, Inc., 969 F.2d 430, 438 (7th Cir.; 1992). Here again, UPS has no evidence to create a triable issue that Jose's decision was anything other than reasonable. On the contrary, it was entirely reasonable for Jose to commence full-time work for J&J in July 2006 after nearly 16 months of having no success finding comparable work. J&J has now completed its second full year in business. It increased its gross revenue from 2006 to 2007, and has purchased the equipment necessary to continue to grow and compete in the tree services market. In short, J&J is a legitimate Illinois corporation with bright

prospects for future growth.

Overall, the evidence in the record overwhelmingly shows that Jose was reasonably diligent in seeking comparable work, and was at all times "ready, willing and available to accept employment." See *Hanna v. American Motors Corp.*, 724 F.2d 1300, 1308 (7th Cir. 1984). UPS has no evidence to the contrary. As such, UPS has clearly failed as a matter of law to meet its burden. See *Sprogis*, 517 F.2d at 392-93 (affirming defendant's failure to meet its burden where "[t]he record does not really disclose whether plaintiff engaged in these activities [(i.e., checking want ads, registering with employment agencies, or discussing opportunities with friends and acquaintances)] and it was defendant's burden to show that plaintiff neglected to take the normal steps in securing employment.") Accordingly, there are no triable issues of fact, and this Court should enter summary judgment against UPS on its asserted failure to mitigate defense. See *Gaddy v. Abex Corp.*, 884 F.2d 312, 318-19 (7th Cir. 1989) (affirming the lower court's ruling that defendant failed to meet its burden of showing a lack of reasonable diligence where although defendant was able to show that plaintiff failed to follow up on a possible job opportunity, attended cosmetology school for 9 months and received 6 months of data processing training, but never attempted to find work in either of those areas, it "failed to produce any evidence to indicate that Gaddy suspended her efforts to search for work.").

III.   **There Is No Evidence That Comparable Employment was Available  that Jose Could Have Procured Through Reasonable Diligence**

UPS has failed to identify or produce any documentary evidence, yet alone probative evidence, concerning the availability of comparable employment in the relevant geographical area. It also failed to identify any lay or expert witness who has knowledge of the relevant job market and/or availability of comparable jobs in the area. "Where an employer fails to produce evidence concerning the availability of comparable employment, it fails to carry its burden on the mitigation defense." *Overton v. Reilly*, 1993 U.S. Dist. LEXIS 20890, *18 (N.D.Ill. August 13, 1992) (J. Conlon), citing *EEOC v. Gurnee Inn Corp.*, 914 F2d 815, 818-19 (7th Cir. 1990). Therefore, for this reason alone, this Court should enter summary judgment against UPS. See *EEOC v. Custom Cos.*, 2007 U.S. Dist. LEXIS 16691, *46 (N.D. Ill. March 8, 2007) (J. Leinenweber) (rejecting defendant's assertion that the court should adopt a presumption of availability where plaintiff did little to no job search).

In *Overton*, the court noted that the only evidence produced by defendant relating to the availability of comparable work was testimony that 57.3% of the individuals seeking assistance from DORS in the relevant area found employment within 18 months. *Overton* at *18. Judge Conlon astutely found that such evidence was not probative because it failed to address "the availability of comparable jobs." After ruling that the defendant offered no probative evidence on the availability of comparable employment, Judge Conlon declined to even address the defendants lack of reasonable diligence arguments. As Judge Conlon stated in *Overton*, "[e]mployers must demonstrate the availability of comparable   employment--in   addition   to   reasonable   efforts   at   seeking

employment–because it would be senseless to require 'reasonable efforts' when the efforts would be futile due to the unavailability of comparable positions." *Overton* at *18.

Similar to *Overton*, the Seventh Circuit has consistently held employers to a strict burden of specifically showing that asserted jobs were indeed both available and comparable. In *N.L.R.B. v. Nickey Chevrolet Sales, Inc.*, 493 F.2d 103, 108 (7th Cir. 1974), the court concluded that the NLRB trial examiner clearly erred by  "in ultimate effect, impos[ing] on [the employee] the burden of proving his efforts were reasonable."  The respondent in *Nickey*, unlike UPS here, was able to produce some evidence regarding available jobs.  It showed that there were in excess of 500 new and used car dealers in the relevant geographical area that the employee ostensibly may have been able to obtain employment with.  The court, however, pointed out that respondent "offered no testimony as to business conditions during the period or other evidence tending to show that jobs were available for a salesman, or that the lack of opportunity with the dealers to whom [the respondent] applied was not representative [of the overall market]."  The court concluded that "given the efforts [the employee] was shown to have made, and in the absence of proof bearing at least generally on the availability fo suitable employment in the area, . . . the respondent did not discharge its burden of proof."  *Id.*

Additionally, in *Hannah v. American Motors*, 724 F.2d 1300, 1309 (7th Cir. 1984), the court determined that the lower court committed clear error in finding that comparable work was available in the plaintiff's geographical area.  There, the defendant was able to show that the plaintiff enrolled in college and quit two jobs subsequent to the defendant's refusal to rehire him.  The defendant, however, offered no evidence to show that jobs existed

which were comparable in "'pay, status, and other factors to the position'" at defendant. *Id.*

Here, unlike the defendants in *Overton*, *Nickey* and *Hannah* who at least presented some evidence regarding the availability of jobs, UPS has absolutely no evidence to offer on this issue.    Summary judgment is therefore mandated by Rule 56 regardless of this Court's ruling as to Jose's reasonable diligence.

## Conclusion

Based on aforementioned facts, legal authority and arguments, there are no triable issues of fact with respect to UPS's asserted failure to mitigate defense. This Court should accordingly enter partial summary judgment against UPS on this issue.

Respectfully submitted,
Plaintiff, JOSE ANDREU,

By:

Timothy J. Coffey
THE COFFEY LAW OFFICE, P.C.
Attorneys for JOSE ANDREU
1403 E. Forest Avenue
Wheaton, IL  60187
(630) 534-6300