IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSE ANDREU, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 07 C 6132 |
| | ) |
| UNITED PARCEL SERVICE, INC., | ) Judge Samuel Der-Yeghiayan |
| | ) |
| Defendant. | ) Magistrate Judge Mason |

FILED
JAN 07 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## PLAINTIFF'S LOCAL RULE 56.1(a)(3) STATEMENT OF MATERIAL FACTS IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, JOSE ANDREU, by and through his attorneys, THE COFFEY LAW OFFICE, P.C., states as follows as and for his Local Rule 56.1(a)(3) Statement of Material Facts in support of his Motion for Partial Summary Judgment.

1. Plaintiff, Jose Andreu (hereafter "Jose"), is an individual residing at all relevant times in Chicago, Illinois, County of Cook. Ex. 1, Ans. Compl. ¶ 2.

2. Defendant, United Parcel Service, Inc. (hereafter "UPS"), is an Ohio corporation registered and licensed to do business in Illinois, and having its principal place of business in Atlanta, Georgia. Ex. 1, Ans. Compl. ¶ 3; Ex. 2, Not. Removal ¶ 3; Ex. 3, UPS's Princ. Place Bus. Memo.

3. The amount in controversy in this matter is in excess of $75,000. Ex. 2, Not. Removal ¶ 4.

4. This Court has diversity jurisdiction over Jose's Illinois common law retaliatory discharge claim pursuant to 28 U.S.C. § 1332(a). Ex. 2, Not. Removal ¶ 3; Ex. 3, UPS's Princ. Place Bus. Memo.

5. Venue is proper in this Court in that UPS's illegal acts complained of herein took place within this Court's geographical jurisdictional boundaries at UPS's Addison, Illinois facility. Ex. 1, Ans. Compl. ¶ 4; Ex. 2, Not. Removal ¶ 5.

6. Jose began his employment with UPS in or around September 1996. Ex. 1, Ans. Compl. ¶ 5; Ex. 4, Andreu Dep. Trans. p. 11.

7. Starting in 2003, Jose began working for UPS in the position of package driver. In this position, among other duties, he reported each work day to UPS' Addison, Illinois facility and delivered parcels in UPS' vehicles, departing from and returning to the Addison facility each work day. Ex. 1, Ans. Compl. ¶ 6; Ex. 4, Andreu Dep. Trans. p. 12.

8. On or about January 24, 2005, Jose injured his back at work while on his assigned route delivering packages. Ex. 1, Ans. Compl. ¶ 7; Ex. 4, Andreu Dep. Trans. pp. 49-50.

9. He immediately called into UPS and reported the work accident and his resulting back injuries. Ex. 1, Ans. Compl. ¶ 8; Ex. 4, Andreu Dep. Trans. pp. 57-60.

10. On January 24, 2005, upon Jose's return to UPS's Addison facility at the end of his work day, he sat down with his supervisor, Mr. Dave Ziltz, and observed Mr. Ziltz type the work accident and related injury information into a computer. He also observed and listened as Mr. Ziltz called UPS's workers' compensation insurance carrier, Liberty Mutual, and reported the work accident and related

injuries. Ex. 1, Ans. Compl. ¶ 11.

11. In January, February and early March 2005, Jose sought and received medical treatment in connection with the injuries he sustained from the January 24, 2005, work accident. Ex. 1, Ans. Compl. ¶¶ 12, 15, 16, 17, and 18.

12. On or about February 9, 2005, Dave Ziltz met Jose while he was on his route delivering packages. Upon his arrival at Jose's truck, Mr. Ziltz was angry and yelling at Jose. Mr. Ziltz accused Jose of lying about the number of packages and/or stops he had left for the day in an earlier communication Jose had with the Addison facility. Dave Ziltz told Jose he would be fired. Ex. 1, Ans. Compl. ¶ 19.

13. On or about February 11, 2005, Jose informed his superiors that he could no longer perform his duties due to the pain he was experiencing from the work accident and related injuries. He subsequently missed several days of work, and continued to receive medical treatment. Ex. 1, Ans. Compl. ¶ 20.

14. Upon his return to work on February 17, 2005, UPS placed Jose on light duty work, or as UPS refers to it, "temporary alternative work" ("TAW"). Ex. 1, Ans. Compl. ¶ 20; Ex. 4, Andreu Dep. Trans. p. 126.

15. Following his February 17, 2005, return to work, up until the time he was terminated on March 4, 2005, Jose worked 40 hours per week in his temporary alternative work assignment. Ex. 4, Andreu Dep. Trans. pp. 126-128.

16. On March 4, 2005, Kerri Snyder, told Jose that his employment with UPS was terminated effective immediately for allegedly being dishonest on February 9, 2005. Ex. 1, Ans. Compl. ¶ 21.

17. Following his termination Jose started to looking through the paper for work that was within his medical restrictions, and telephoning prospective employers in search of work that was within his medical restrictions. Ex. 5, Andreu Decl. ¶ 3.

18. In October 2005, Jose was released by his physician to return to work full duty. Ex. 4, Andreu Dep. Trans. p. 160.

19. During the period following his March 2005 termination up until he was medically released to work full duty in October 2005, Jose made at least five attempts to contact, and/or contacts with prospective employers per week. Ex. 5, Andreu Decl. ¶ 4.

20. Following his October 2005 full, duty medical release, Jose began looking through the paper for jobs comparable to his former position as package car driver at UPS, and telephoning prospective employers. Ex. 4, Andreu Dep. Trans. pp. 160-161.

21. Jose estimated that during the period November 2005 to late January 2006, he telephoned at least three or four prospective employers each day. Ex. 4, Andreu Dep. Trans. pp. 161-162.

22. One such call and job inquiry was in November 2005 to his cousin Vincente who owned a small trucking business. Vincente needed a driver with a CDL Class A license which Jose did not have. Jose looked into the requirements and costs for obtaining such a license, but it was too expensive for him. Ex. 4, Andreu Dep. Trans. p. 161.

23. During the period from late January 2006 through June 2006, Jose made at least five contacts with prospective employers per week. Ex. 4, J. Andreu Dep. Trans. pp. 157-158, Dep. Ex. 15; Ex. 5, Andreu Decl. ¶ 6.

24. One of Jose's job contacts was with Bedford Motors, a company that had previously employed him. Bedford Motors offered him a position as truck driver contingent upon him passing a physical. In February 2006, Jose underwent and passed the requested physical. Despite passing the physical, Bedford Motors rescinded its job offer and has refused to hire Jose. Ex. 5, Andreu Decl. ¶ 5; Ex. 6, P000259 - 269.

25. Since July 2006, Jose has worked full-time as a tree trimmer for J&J Tree Service Company ("J&J"). Ex. 4, Andreu Dep. Trans. p. 152; Ex. 5, Andreu Decl. ¶ 7.

26. J&J is an Illinois corporation. Jose is the President and one-half owner of J&J. His brother, Jorge Andreu owns the other half of J&J. Ex. 5, Andreu Decl. ¶ 7; Ex. 7, P000350-375.

27. J&J provides various tree and brush related services including, but not limited to, planting, trimming and removal. Ex. 4, Andreu Dep. Trans. pp. 153-154.

28. In 2006, Jose received $15,000 from J&J Tree Service Company as and for wages. Ex. 4, Andreu Dep. Trans. p. 155.

29. For the year 2006, it first full year of operations, J&J Tree Service Company earned revenue of $123,882. Ex. 5, Andreu Decl. ¶ 7; Ex. 7, P000359.

30. For the year 2007, Jose estimates that J&J earned gross revenue of approximately $160,000. Ex. 5, Andreu Decl. ¶ 9.

31. In late 2005, J&J purchased equipment worth approximately $33,500 for use in operations. Ex. 4, Andreu Dep. Trans. pp. 162, 168-69; Ex. 5, Andreu Decl. ¶ 10; Ex. 7, P000371.

32. In 2006, J&J purchased equipment worth approximately $42,000 for use in operations. Ex. 4, Andreu Dep. Trans. pp. 162, 168-69; Ex. 5, Andreu Decl. ¶ 11; Ex. 7, P000371.

33. In 2007, J&J purchased equipment worth approximately $50,000 for use in its operations. Ex. 5, Andreu Decl. ¶ 12.

34. On November 9, 2007, UPS filed its Answer and Affirmative Defense to Plaintiff's Complaint. As and for its sole affirmative defense, Defendant alleged as follows:

    Plaintiff is barred from recovery because he has failed to exercise reasonable efforts to mitigate his alleged damages.

    Ex. 1, Ans. Compl. ¶ 2.

35. On June 19, 2007, UPS served its Amended Disclosures Pursuant to Rule 26(a)(1). Ex. 8, UPS R26(a)(1) Discs.

36. In its Amended Rule 26(a)(1) disclosures, UPS identified Jimmy Millard, Tom Haefke and Marilyn Ritchie as individuals who have "information regarding UPS's policies and procedures." Ex. 8, UPS R26(a)(1)26 Discs. ¶ A.

37. In its Amended Rule 26(a)(1) disclosures, UPS identified Randy Dunn, Dave Ziltz, and Kerry Snyder as individuals who have "information concerning Andreu's termination." Ex. 8, UPS R26(a)(1) Discs. ¶ A.

38. In its Amended Rule 26(a)(1) disclosures, UPS did not identify any individuals who had information concerning Jose's search for work following UPS's termination of his employment. Ex. 8, UPS R26(a)(1) Discs. ¶ A.

39. In its Amended Rule 26(a)(1) disclosures, UPS did not identify any individuals who had information concerning the availability of employment comparable to the work that Jose had performed for UPS prior to UPS's termination of his employment. Ex. 8, UPS R26(a)(1) Discs. ¶ A.

40. In its Amended Rule 26(a)(1) disclosures, UPS did not identify any individuals who had information concerning the likelihood that Jose would have found comparable employment elsewhere following UPS's termination of his employment. Ex. 8, UPS R26(a)(1) Discs. ¶ A.

41. In its Amended Rule 26(a)(1) disclosures, UPS identified the following documents as ones it may use to support its claims or defenses in this matter: "See documents Bates-stamped UPS 00042-UPS 00128 produced by UPS (documents Bates-stamped UPS 0001-UPS 00041 were previously produced)." Ex. 8, UPS R26(a)(1) Discs. ¶ B.

42. In its Amended Rule 26(a)(1) disclosures, UPS did not identify any documents concerning Jose's search for work following its termination of his employment. Ex. 8, UPS R26(a)(1) Discs. ¶ B.

43. In its Amended Rule 26(a)(1) disclosures, UPS did not identify any documents concerning the availability of employment comparable to the work that Jose had performed for UPS prior to its termination of his employment. Ex. 8, UPS R26(a)(1) Discs. ¶ B.

44. In its Amended Rule 26(a)(1) disclosures, UPS did not identify any documents concerning the likelihood that Jose would have found comparable employment elsewhere following its termination of his employment. Ex. 8, UPS R26(a)(1) Discs. ¶ B.

45. To date, UPS has not supplemented its Amended Rule 26(a)(1) disclosures served on June 19, 2007.

46. On June 14, 2007, this Court ordered that "Defendant's expert disclosure and reports shall be served by 07/30/07." Ex. 9, 06/14/07 Ct. Order.

47. To date, UPS has not disclosed any expert witnesses or reports.

48. To date, UPS has not identified any individuals or witnesses who have or may have information concerning Jose's search for work following UPS's termination of his employment, the availability of employment comparable to the work that Jose had performed for UPS prior to its termination of his employment, or the likelihood that Jose would have found comparable employment elsewhere following its termination of his employment.

49. On May 9, 2007, Jose served his First Request for Production of Documents pursuant to Rule 34 on UPS. Ex. 10, Andreu 1st RTP.

50. Request No. 17 of Jose's First Request for Production of Documents requested that UPS produce "[a]ll documents which [it] contends support or relate to any affirmative defense it has plead or intends to plead in the future in response to the allegations contained in the Complaint." Ex. 10, Andreu 1st RTP ¶ 17.

51. On June 19, 2007, UPS served its Objections and Responses to Plaintiff's First Request for Production of Documents. Ex. 11, UPS Resp. 1st RTP.

52. As and for its response to Request No. 17 of Jose's First Request to Produce, UPS stated as follows:

    > UPS objects to Request No. 17 as vague, overbroad, unduly burdensome, not reasonably limited in time and/or scope, and not reasonably calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding these objections and without waving same, see produced documents Bates-stamped UPS 0001 - UPS 0801.

    Ex. 11, UPS Resp. 1st RTP.

53. The documents produced by UPS in this matter Bates-stamped UPS 0001 - UPS 0801 do not contain any information concerning Jose's search for work following UPS's March 4, 2005, termination of his employment.[1]

54. The documents produced by UPS in this matter Bates-stamped UPS 0001 - UPS 0801 do not contain any information concerning the availability of employment comparable to the work that Jose had performed for UPS prior to its March 4, 2005, termination of his employment.[1]

55. The documents produced by UPS in this matter Bates-stamped UPS 0001 - UPS 0801 do not contain any information concerning the likelihood that Jose would have found comparable employment elsewhere following its termination of his employment.[1]

---

[1] Plaintiff is in possession of copies of UPS documents Bates-stamped UPS 0001 to UPS 0801, and can provide copies to the Court should it decide that it is necessary to review one or more of these documents in order to decide the instant Motion. Plaintiff assumes that as part of its response, Defendant will provide the Court with copies of any such documents it believes pertain to its failure to mitigate affirmative defense.

56. To date, UPS has not supplemented its response to Request No. 17 of Jose's First Request to Produce.

57. To date, UPS has not produced any documents that contain information concerning Jose's search for work following UPS's termination of his employment, the availability of employment comparable to the work that Jose had performed for UPS prior to its termination of his employment, or the likelihood that Jose would have found comparable employment elsewhere following its termination of his employment.

Date: January 7, 2008

Respectfully Submitted,
Plaintiff, JOSE ANDREU,

By: _____
Timothy J. Coffey
THE COFFEY LAW OFFICE, P.C.
Attorneys for JOSE ANDREU
1403 E. Forest Avenue
Wheaton, IL 60187
(630) 534-6300