**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JOSE ANDREU, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 07 C 06132 |
| v. | ) |
| | ) Judge Der-Yeghiayan |
| UNITED PARCEL SERVICE, INC., | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT UNITED PARCEL SERVICE'S**
**AMENDED MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

**Introductory Summary**

Defendant United Parcel Service, Inc. ("UPS") submits this Memorandum of Law in Support of its Motion for Summary Judgment pursuant to Fed. R. Civ. P. Rule 56 and Local Rule 56.1 as to all claims herein by Plaintiff Jose Andreu (formerly a package car driver for UPS) that he was unlawfully discharged under Illinois law in retaliation for filing a workers' compensation claim, *because it is undisputed that*:

1.    On February 10, 2005, Andreu was placed on "Notice of Termination" by UPS for his untruthfulness the previous workday in grossly overstating the size of his undelivered workload to try and avoid having to make a time-consuming priority service call to an off-route customer;

2.    "Notice of Termination" is a labor contract procedure under which an employee who has engaged in misconduct continues working pending negotiations between UPS and his Union as to his penalty,

which may be discipline short of termination, if his Union files a timely grievance on his behalf;

3. Upon his Union's failure to file a timely grievance on his behalf, UPS considered Andreu's employment terminated, pursuant to the normal process when the Union does not file a timely grievance on behalf of an employee on "Notice of Termination";

4. There is no evidence that Andreu's claimed workers' compensation issues had anything to do with the motivation or circumstances of his discipline for untruthfulness and the termination of his employment upon his Union not filing a timely grievance on his behalf, and, alternatively;

5. The entire circumstances of Andreu's discipline for untruthfulness and eventual termination are pending before an arbitrator for binding decision pursuant to the mandatory provisions of the collective bargaining agreement applicable to Andreu's employment with UPS for the arbitrator to interpret the agreement to decide, *inter alia*, whether or not UPS was contractually justified in considering Andreu terminated upon his Union's failure to timely file a grievance over Andreu's being put on "Notice of Termination."

Accordingly, no evidence supports this Complaint; furthermore, this Court would need to supplant the role of the arbitrator and itself interpret the collective bargaining agreement to decide the legitimacy of Andreu's legal claim here over his discharge, and such judicial

2

nullification of an arbitrator's authority is preempted by § 301 of the National Labor Relations Act.

**A.    Material Uncontested Facts**

**1.    Andreu Is Put On "Notice Of Termination" – Not Discharged**

From 2002 through the rest of his employment, Andreu worked as a "swing" or vacation package car driver filling in for regular drivers to deliver Next Day Air documents and overland UPS packages to customers, as well as pick up their shipments. (U.F. ¶¶ 8, 11). On February 9, 2005, Andreu was delivering a route in south and east Aurora. (U.F. ¶ 18). Late that afternoon, he was notified by text message to "break off his route ASAP" to make a pick-up at a customer named "Bernina." (U.F. ¶ 19). Andreu balked, claiming he had a large load of sixty (60) delivery stops remaining on his package car. (U.F. ¶ 26). He was again instructed to make the pick-up. (U.F. ¶ 27). UPS OMS Cheryl Bast prepared a memo which states that, at 4:00 p.m., Andreu again claimed he did not want to make the pick-up because he had about sixty (60) stops left on his package car and was already running late. (U.F. ¶¶ 26, 33). Despite his protests about the extent of his remaining deliveries, UPS determined that Andreu was the appropriate person to make the Bernina pick-up and again ordered him there ASAP. (U.F. ¶ 27). He then acknowledged he would do the pick-up. (U.F. ¶ 27).

UPS's commitment to priority handling for customers often requires this kind of work direction to drivers, many times inconveniencing them. But it is part of the job. Drivers don't have the luxury of conveniencing themselves rather than the customer. (U.F. ¶ 20).

Andreu arrived at Bernina between 4:42 and 4:45 p.m. (U.F. ¶¶ 26, 28). On-Car Supervisor David Ziltz was waiting for him, looked into Andreu's package car and found he had only twenty stops remaining rather than the "about 60" Andreu had claimed in order to try and

3

avoid this unscheduled, time-consuming, off-route pick-up. (U.F. ¶ 29). Ziltz told Andreu he had lied and would be fired. (U.F. ¶ 30). Ziltz does not have authority to discharge employees. (U.F. ¶ 31). But he reported the incident to his superior, Center Manager Kerry Snyder. (U.F. ¶ 32).

On February 10, 2005, Andreu and his Union Steward met with UPS Center Manager Snyder. (U.F. ¶ 34). Snyder asked Andreu to tell him what happened on the day before. (U.F. ¶ 35). *Andreu did not deny he had claimed he had "about sixty" stops left, nor did he deny Ziltz had accurately counted that he had only twenty (20) stops left.* (U.F. ¶ 35). Based on the information he had, including Supervisor Bast's memo stating Andreu claimed at about 4:00 p.m. he had "about sixty" stops still left, and Andreu's admission to that effect, Snyder did not discharge Andreu outright. Rather, he put Andreu on Notice of Termination for lying about the number of stops he had left to avoid the inconvenience of going off-route to do the Bernina pick-up. (U.F. ¶¶ 36, 37).

Under provisions of the collective bargaining agreement between IBT Local 705 and UPS applicable to Andreu, an employee put on Notice of Termination continues to work while the issues as to his misconduct and any other relevant issues go through the contractual grievance process if the Union files a timely grievance. (U.F. ¶ 12).

Depending on the severity of an employee's misbehavior problem, UPS at times issues a Notice of Termination with the expectation that, if a grievance is filed, the employee may have his termination reduced to a warning or other discipline (such as a suspension without pay for a specific period of time) through negotiations with the Union to resolve the grievance. (U.F. ¶¶ 13, 14).

Snyder had a contractual option to terminate Andreu *immediately* if he had chosen.  The Collective Bargaining Agreement provides that "dishonesty" is a "cardinal offense" allowing for immediate discharge without prior warning or the negotiation process as to an employee's status (while he remains at work) initiated by putting him on "Notice of Termination."  (U.F. ¶ 37).  But rather than immediately discharge Andreu for "dishonesty," Synder chose the less punitive route.  (U.F. ¶ 36).  If the Union had filed a grievance, Synder would have been willing to agree to a discipline for Andreu short of termination.  (U.F. ¶ 45).

## 2.    No Timely Grievance Filed – So Employment Termination Occurs

The collective bargaining agreement requires grievances to contest disciplinary action to be filed within fifteen (15) days of the alleged infraction.  (U.F. ¶ 38).  For reasons that are not clear or of record here, the Union failed to submit a grievance challenging the Notice of Termination within the allotted fifteen (15) days and so, pursuant to the collective bargaining agreement, Andreu was terminated on March 4, 2005.  (U.F. ¶¶ 39, 40).

Independent evidence confirming that no grievance was timely filed is that the grievance form eventually submitted by the Union after the fifteen (15) days had run, which had a place for the UPS Manager to sign, acknowledging receipt of a timely filed grievance, *had no such signature*.  (U.F. ¶¶ 43, 44).  The signature line for the Manager's signature is blank.  (U.F. ¶ 44).  The parties' standard practice is that when the Union presents the Manager with a timely grievance, the Manager signs a copy and gives it back to the Union to confirm a timely filing.  (U.F. ¶ 20).  *No copy signed by a UPS Manager exists here.*  And there is no evidence the Union protested or challenged Manager Synder's refusal to sign the grievance acknowledging timely receipt.  Had it been timely submitted, the Union would certainly have challenged the UPS Manager's refusal to sign.

5

Although Snyder was willing to negotiate Andreu's status down to discipline short of termination (such as some time off without pay), those discussions would be initiated by a Union grievance filed on his behalf. But that never happened – a grievance was not timely filed. So Andreu's termination occurred upon, and because of, the fact that fifteen (15) days had passed without a grievance. (U.F. ¶ 40). This was pursuant to standard practice that if no timely grievance is filed over a "Notice of Termination," the employee would thereupon be terminated. (U.F. ¶ 16). There is no case in which an employee on "Notice of Termination" was not terminated if no timely grievance was filed on his behalf. (U.F. ¶ 17).

### 3.   UPS Agrees To Process Untimely Grievance

In spite of the post-deadline submission of the grievance, after discussions with the Union, UPS agreed without prejudice that the grievance, including all issues of timeliness, would be processed by the Union and UPS under the parties' collective bargaining agreement. (U.F. ¶ 47). Accordingly the grievance, including the timeliness issue and the question of whether or not UPS has a contractual right to consider an employee on "Notice of Termination" automatically discharged upon the Union's failure to timely file a grievance over his Notice of Termination, is currently pending before Arbitrator Paul F. Gerhart for final and binding decision. (U.F. ¶¶ 47, 48).

### 4.   Andreu's Unrelated Back Incident

Andreu claimed he had injured his back on January 24, 2005 while restacking a package in his delivery load. (U.F. ¶ 50). He was able to drive and agreed voluntarily to finish the deliveries that day with the help of a co-worker. (U.F. ¶ 55). His immediate supervisor, David Ziltz, had Andreu come to Ziltz's office after work that evening to report the incident to UPS's workers' compensation insurance carrier. (U.F. ¶ 56). Andreu was thereupon treated by a doctor

6

for his claim of back pain with Advil, but he was not given any work restrictions, and he continued without interruption thereafter as a UPS package car driver. (U.F. ¶¶ 58-60).

There is no evidence of any causal connection between Andreu's back incident/workers compensation claim and the circumstances of his discipline for untruthfulness and the termination of his employment upon his Union not filing a timely grievance on his behalf.

## B.    Argument

### 1.    There Is No Causal Connection Between Andreu's Workers' Compensation Claim And His Termination

The undisputed causal chain of events ending in Andreu's discharge had nothing to do with his workers' compensation claim for a sore back. That causal chain was simply and solely this: wanting to avoid lengthening his workday on February 9, 2005 by following directions to go "off route" for a priority pick-up, Andreu initially declined to do so. To justify his initial resistance to do so, he lied by grossly overstating the number of regular delivery stops he had left. No way could the honest count of twenty (20) packages have sprung from the "about sixty" Andreu claimed. Caught in the lie on a wrong-headed effort to suit his personal convenience over a customer's need, he was interviewed by his manager and put on Notice of Termination under the collective bargaining agreement over this untruthfulness. When his Union failed to file a timely grievance (they had 15 days), his Notice of Termination merged into a termination – unlucky for Andreu because a timely grievance could have resulted in the Union and the Company working out a punishment for him short of termination.

There is no evidence that *any* of this had *anything* to do with Andreu's workers' compensation claim. Andreu has produced no evidence that his sore back/workers compensation claim had anything to do with his untruthful count to try and avoid having to make the off-route

priority pick-up – or his Union's failure to file a timely grievance – or anything else relating to his termination.

To satisfy the essential element of causality, "[A] plaintiff must demonstrate that the employer would not have taken the adverse action "but for" the protected expression." Radke v. Taco Bell Corp., No. 01 C 5072, 2002 WL 449049, at *3 (N.D. Ill. 2002), citing Johnson v. University of Wisconsin Eau-Claire, 70 F.3d 469 (7th Cir. 1995). In other words, the plaintiff must "affirmatively show that the discharge was primarily in retaliation for his exercise of a protected [workers' compensation] right." Roger v. Yellow Freight Systems, Inc., 21 F.3d 146, 149 (7th Cir. 1994). A plaintiff cannot withstand summary judgment without offering proof beyond his own self-serving testimony of a causal link between the exercise of his rights and the defendant's decision to terminate. See, e.g., Taffe v. Illinois Department of Employment Security, 299 F.Supp.2d 858, 873 (N.D. Ill. 2002). Here Andreu cannot show any evidence of a "causal link" between his filing of a workers' compensation claim and his eventual termination.

**2.    UPS Had Valid Non-Pretextual Reasons For Putting Andreu On Notice Of Termination**

The same undisputed facts which show the absence of a causal connection between Andreu's workers compensation claim and his discharge *also* are valid, non-pretextual reasons for UPS taking the action that Andreu claims is retaliatory, thus defeating Andreu's claim under authority of decision law such as Hartlein v. Illinois Power Co., 151 Ill.2d 142, 163, 601 N.E.2d 720, 730 (1992).

As noted above, the undisputed sequence of events leading to Andreu's termination was: Andreu was put on Notice of Termination because UPS Manager Synder, who made the decision to put Andreu on Notice of Termination, reasonably believed Andreu was being untruthful by claiming a bogus "high count" of the number of stops left on his package car in an attempt to get

out of making a priority customer pick-up he was told to go "off route" to do. Andreu told UPS OMS Bast that he had approximately sixty (60) stops remaining on his vehicle. Bast communicated this information to Supervisor Ziltz, who met Andreu about 4:45 p.m. (at the Bernina priority pick-up location, after Andreu finally followed the reiteration of the order to go there) and counted his remaining packages – twenty (20). Bast further told Ziltz and Center Manager Kerry Snyder (the manager to whom Bast and Ziltz reported, and the decision-maker here) that Andreu claimed at around 4:00 p.m. he had sixty (60) stops on his vehicle. *And Andreu admitted to Snyder that he had claimed he had "about sixty" stops left when a count shortly thereafter showed only twenty (20).* So to Snyder this was a straightforward case of a driver getting caught lying to suit his personal convenience and avoid performing an assigned work task – without care for the customer's need.

Working for a company whose reputation is built on customer *service* – United Parcel *Service* – Andreu had to know his effort at conning his supervisors to avoid personal inconvenience at customer expense would end badly. Being put on Notice of Termination for this was pretty predictable. And there is no evidence – nor could there be – that it had anything to do with his workers' compensation claim status, or that UPS's reaction to this misconduct was a "pretext" hiding a malevolent motive.

3.    **Andreu's Notice Of Termination Becomes A
Discharge Caused Ultimately By His Union**

The statute and common law under which Andreu sues protects him from "discharge in retaliation" for making a workers' compensation claim. Critical to his action are two elements: (1) an employer's *discharge* of an employee; and (2) *retaliatory motivation* for that *discharge*.[1] Hartlein, at 160. As to the *discharge*, if Andreu's Union had filed a timely grievance, it is not at all clear that he would have lost his job over his untruthfulness incident. Some "notices of termination" are converted to lesser penalties by negotiations between the Union and UPS, *and this likely would have been one of those cases, according to the decision-maker, Manager Synder*. But Andreu had some bad luck. His Union did not file a timely grievance – so, UPS management believed that, *as a matter of standard practice under the parties' collective bargaining agreement*, his Notice of Termination became final  – without a push and pull process between the Union and UPS over his status – after the time for filing a grievance had elapsed without a grievance. The Union's failure to timely step up for Andreu was not UPS's fault – and this Union failure was what immediately caused Andreu's discharge. Bad luck/Union inaction intervened here to cause the *discharge*.  Synder had not "discharged" Andreu by initiating the process normally involving Union-Company negotiations by putting him on "Notice of Termination," which allowed Andreu to stay at his normal job until his status was resolved.

Further evidence of the fact that Synder did not "discharge" Andreu is the fact that the collective bargaining agreement provided a basis for Synder to have discharged Andreu on February 10 if that was what he had intended. *The collective bargaining agreement provides a*

---

[1] There is no evidence that the described motive – Andreu's misconduct – was pretextual, as briefed above (pp. 8-9).

*basis for immediate discharge without prior warning or other preliminary negotiations with the Union.* It lists "dishonesty" as a "cardinal" infraction that allows for *immediate discharge* without prior warnings or other preliminary negotiations with the Union.

Certainly, Andreu's untruthfulness about his workload was "dishonesty" on his part. *Why would Synder not have discharged Andreu outright for "dishonesty" over this incident if his latent motive was the unlawful one of discharging Andreu because of his workers compensation claim?* There is no answer to this question that would allow a finder of fact to conclude that Synder discharged Andreu. The undisputed fact is that the Union's inaction on Andreu's behalf immediately caused his discharge; the action of Synder did not.

4.    **Preemption – Andreu's Legal Claims Here Require Interpretation Of The Collective Bargaining Agreement And Are Thus Preempted by the NLRA**

To prevent the risk of *inconsistent results* from variations in state law being overlaid on collective bargaining relationships having *uniformity* under federal law, the Supreme Court has invariably applied the principle that a state law claim is preempted if that action hinges upon the interpretation and meaning of the collective bargaining agreement. (Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399, 405-6, 108 S.Ct. 1877-1881; Allis-Chalmers Corp. v. Lueck, 471 U.S. 220, 105 S.Ct. 1916; Teamsters v. Lucas Flour Co., 369 U.S. 95, 103-04, 82 S.Ct. 571, 576-77.) So, if the resolution of a state law claim cannot be made without an interpretation of the collective bargaining agreement, the claim is "inexorably intertwined" with the agreement and preempted under § 301 of the National Labor Relations Act. (Lingle, 486 U.S. 407-10; Caterpillar Inc. v. Williams, 482 U.S. 386, 107 S.Ct. 24-25.) *To be "independent" of a collective bargaining agreement, and thus not preempted, the resolution of a state law claim*

***must turn on purely factual questions not touching upon the terms of the collective bargaining
agreement.*** (Lingle, 486 U.S. 407-10.)

As straightforward sounding as is this broad principle of preemption of all claims
involving collective bargaining agreement interpretation (that is, protection of the contract
arbitration process from replacement by a Court), the devil is in the detail. In the normal course,
an arbitrator has to interpret a collective bargaining agreement every time he/she rules a
discharge is, or is not, for "just cause." And if a discharge is ruled by an arbitrator as being for
"just cause," wouldn't it automatically constitute a "valid, non-pretextual" reason for discharge,
precluding, as a matter of law, a finding for a plaintiff that his discharge was – contrariwise –
retaliatory for his workers' compensation claim? How could simple logic lead to any other
conclusion? And if a Court can hear the same facts as the arbitrator and be licensed to conclude
that a discharge ruled by an arbitrator as being for "just cause" can be still viewed as retaliatory,
the arbitrator's decision will have been rendered null and void. What meaning would remain,
then, in the standard collective bargaining provision that an arbitrator's decision is "final and
binding?" Wouldn't such a contrary Court decision totally eviscerate that contractual provision?

Lingle does not answer these questions directly, although the Supreme Court assures in
Lingle that:

> Today's decision should make clear that interpretation of
> collective-bargaining agreements remains firmly in the arbitral
> realm; judges can determine questions of state law involving labor-
> management relations only if such questions do not require
> construing collective-bargaining agreements.

Lingle at 441.

Since here an arbitrator has already been chosen to rule on UPS's claim that Andreu's
discharge was caused by his Union's failure to timely file a grievance over Andreu's earlier

discipline, and since this and other contractual interpretation issues bear on the legitimacy of Andreu's discharge, this dispute is preempted under Lingle. The scenario here simply does not allow a Court to perform the surgical separation of the state law issue from interpretation of the collective bargaining agreement that Lingle requires to justify the Court's proceeding to trump arbitration.

A recent preemption case in the Seventh Circuit, Kimbro v. PepsiCo, Inc., 215 F.3d 723 (7th Cir. 2000), of precedential significance here, involved a state law tortious interference claim by an employee (like Andreu's state law claim) over his discharge. In addition to his state court claims in the District Court, that plaintiff also alleged in arbitration that he was entitled under the collective bargaining agreement not to be fired (similar to Andreu's basic claim) for what he called a minor, first-time transgression, i.e. violating a third party customer's "no grazing" rule by eating a cookie without paying for it. Id. at 725. The Seventh Circuit held that § 301 preempted this Court claim because "the trier of fact would have had to decide whether [the plaintiff] had a contractual right not to be fired for 'grazing' . . . an issue that depends on whether grazing is good cause for termination, within the meaning of the contract."

Similarly here, the arbitrator hearing Andreu's grievance is going to have to decide the "just cause" issue by interpreting the collective bargaining agreement as to UPS's claimed right to consider Andreu automatically discharged upon the Union's failure to timely file a grievance over the "Notice of Termination" – a contractual procedure under which Andreu kept working after issuance of his Notice of Termination, pending grievance resolution. The arbitrator will have to decide, *inter alia*: did or did not UPS have a contractual right to consider Andreu automatically terminated once the time for filing a grievance had passed *without* a grievance? Did UPS have appropriate contractual grounds for issuing the "Notice of Termination" in the

13

first place?  Was Andreu's termination for "just cause"?  Are there mitigating circumstances under the collective bargaining agreement?  Bottom line here – the Court as a trier of facts would be wading through a thicket of contract interpretation issues now before an arbitrator.

This is precisely what the 7th Circuit said in <u>Kimbro</u> that the Court was not to do, as a matter of NLRA preemption, in light of <u>Lueck</u> and <u>Lingle</u>.  Just as it was up to an arbitrator in <u>Kimbro</u> to decide whether "grazing" constituted a contractual ground for "just cause" dismissal, preempting Court intervention, here, an arbitrator needs to decide whether UPS had contractual "just cause" grounds for converting Andreu's Notice of Termination into a discharge from employment, in light of the nature of this misconduct and the issue of untimely grievance filing. *This* is even more of a mare's nest of contractual interpretation than the arbitrator was faced with in <u>Kimbro</u>, meaning this case is even more clearly a case for NLRA preemption than was <u>Kimbro</u>.

And as recently as this year, the 7th Circuit rearticulated the general principle, clearly applicable here, that:

> . . . if it is necessary to interpret express or implied terms of a
> CBA, a state court claim is completely preempted by § 301 . . .

<u>Shales v. Meyer Material Company</u>, 06C3380 (Jan. 11, 2007), citing <u>Atchley v. Heritage Cable</u> <u>Vision Associates</u>, 101 F.3rd 495, 499 (7th Cir. 1966).  (Copy attached as Ex. A).

The web of contract interpretation issues here cries out for a "final and binding" arbitration not, in effect, judicial ouster of the arbitrator the contractual parties have chosen to interpret their contract.  He should be allowed to make a "final and binding" decision on these contract interpretation issues.

## CONCLUSION

UPS is entitled to summary judgment as there is no evidence of causal connection between Andreu's exercising his rights under the Illinois Workers' Compensation Act and the termination of his employment upon his Union's failure to timely file a grievance on his behalf after a UPS manager had put in motion a process to resolve his status short of termination upon a timely grievance filing, and identified, undisputed, non-pretextual reasons justified Andreu's termination. Further and alternatively, Andreu and his Union have appropriately put Andreu's claims over losing his job in "final and binding" arbitration under the applicable collective bargaining agreement. The resolution of those arbitration issues are critical to Andreu's claims here in Court as well, they involve several contract interpretation issues the arbitrator should decide, and, accordingly, § 301 NLRA preemption should apply.


Dated: January 10, 2008                    Respectfully submitted,

                                           UNITED PARCEL SERVICE, INC.

                                           By: /s/ D. Scott Watson
                                               One of Its Attorneys

John A. Klages (ARDC #06196781)
D. Scott Watson (ARDC # 06230488)
Ellen M. Girard (ARDC #06276507)
Quarles & Brady LLP
500 West Madison, Suite 3700
Chicago, IL 60661
312/715-5000
312/715-5155 (fax)
dsw@quarles.com

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on January 10, 2008, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Timothy J. Coffey
The Coffey Law Office, P.C.
1403 East Forest Avenue
Wheaton, Illinois 60187
Email: tcofflaw@sbcglobal.net

/s/ D. Scott Watson

QBACTIVE\920018.00936\6040973.1

EXHIBIT A

**Loislaw Federal District Court Opinions**

SHALES v. MEYER MATERIAL COMPANY (N.D.Ill. 1-11-2007)

JAMES SHALES, Plaintiff, v. MEYER MATERIAL COMPANY, Defendant.

No. 06 C 3380.

United States District Court, N.D. Illinois, Eastern Division.

January 11, 2007

### MEMORANDUM, OPINION AND ORDER

WAYNE ANDERSEN, District Judge

This case is before the Court on the motion of Plaintiff James Shales to remand this case to the Circuit Court of Kane County, Illinois. For the following reasons, the motion to remand is denied.

### BACKGROUND

On May 22, 2006, Plaintiff filed a complaint against Defendant Meyer Material Company ("Defendant") in the Circuit Court for the 16th Judicial Circuit, Kane County, Illinois. The Complaint alleges that Defendant discharged Plaintiff from employment in retaliation for his filing of two workers' compensation claims. The Complaint also alleges that Defendant failed to re-hire Plaintiff pursuant to his right to return to work under the seniority provisions of the collective bargaining agreement between Defendant and Plaintiff's union, International Brotherhood of Teamsters, Local 330. Complaint, ¶¶ 7, 17-19. The Complaint seeks an injunction to restore Plaintiff to his former job because Defendant allegedly violated the terms of the collective bargaining agreement. Complaint, ¶ 19. Finally, the Complaint contains a breach of contract count alleging that Defendant's actions in denying Plaintiff the right to return to work violate the terms of the collective bargaining agreement and the public policy of the State of
**Page 2**
Illinois. Complaint, ¶ 19.

Plaintiff asserts in his Complaint that, at all relevant times, there was a collective bargaining agreement in effect governing Plaintiff's employment between Plaintiff's union, Teamsters Local 330, and Defendant. Complaint, ¶ 7. That agreement contains the following provision, which Plaintiff quotes in his Complaint:

In the case of proven sickness or injury, an employee shall be continued on the seniority list for a period of two years, except employees having one or more years of continuous service shall be continued on the seniority list for a period of five years (5) years; provided, however, that he must report for availability for work within seven (7) days after the termination of such proven disability or sickness.

Complaint, ¶ 7.

Plaintiff also alleges in his Complaint that he suffered an injury while working for Defendant, subsequently underwent a program of vocational rehabilitation, and eventually accepted new employment in August of 2005 with School District 95 as a school bus driver. Complaint, ¶¶ 2-6. Following his acceptance of new employment, Defendant discharged Plaintiff on August 22, 2005. Complaint, ¶ 10. Plaintiff further alleges that in early 2006, he sought to return to Defendant "in accordance with [inter alia] . . . [his] contractual rights under the collective bargaining agreement. . . ." Complaint, ¶ 14. Defendant denied Plaintiff's request to return. Complaint, ¶ 15.

Premised on the contractual provision quoted above, Plaintiff claims, among other things, as follows:

19. The actions of Defendant MEYER MATERIAL COMPANY, in denying [Plaintiff] the right to return to work violate[d] the terms of the collective bargaining agreement . . . as set forth above.

Complaint, ¶ 19.
**Page 3**

Defendant removed the case to this Court asserting federal question jurisdiction over the subject matter of the Complaint. Defendant argues that the adjudication of Plaintiff's claims will require the application and interpretation of the terms of the collective bargaining agreement governing Plaintiff's employment and, thus, § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), confers jurisdiction upon this Court.

Plaintiff has filed a motion to remand this case back to the Circuit Court of Kane County, Illinois. Plaintiff's sole argument in support of the motion to remand is that "[t]he instant case is not a case in which Local 130 [sic] is a party nor is there any other basis for federal jurisdiction contained in defendant's notice of removal or in plaintiff's complaint." Remand Motion, ¶ 14.

**DISCUSSION**

A defendant may remove a case to federal court if there is federal subject matter jurisdiction. 28 U.S.C. § 1441(a). The party seeking removal has the burden of establishing federal jurisdiction. *Doe v. Allied-Signal, Inc.*, 985 F.2d 908, 911 (7th Cir. 1993). If the district court lacks subject matter jurisdiction, the action must be remanded to state court pursuant to 28 U.S.C. § 1447(c),

I. The Plain Language of § 301 Does Not Require a Labor Union to be a Party

Plaintiff argues that in order for federal jurisdiction to exist in this case, the Plaintiff's union, Teamsters Local 330, must be a party to the action. Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, states as follows:

§ 185. Suits by and against labor organizations.

(a) Venue, amount, and citizenship. Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without

**Page 4**

regard to the citizenship of the parties.

29 U.S.C. § 185(a).

As the plain language of § 301 demonstrates, the statute does not provide jurisdiction for suits only *between* labor unions and employers. Rather, it provides federal jurisdiction for "[s]uits for *violation of contracts* between an employer and a labor organization," 29 U.S.C. § 185(a) (emphasis added). In this case, Plaintiff has specifically asserted that there is a collective bargaining agreement in effect between his labor union, Teamsters Local 330, and Defendant which governed Plaintiff's employment with Defendant. Complaint, ¶ 7. Moreover, by his own admission, Plaintiff acknowledges that this is an action for "violat[ion] [of] the terms of the collective bargaining agreement." Complaint, ¶ 19. In his remand motion, Plaintiff further asserts that Defendant violated the terms of the labor agreement by arguing: "When Plaintiffs rehabilitation progressed far enough to return to work for defendant, he sought to return to work *pursuit [sic] to the terms of the collective bargaining agreement.*" Plaintiff's Motion to Remand, ¶ 11 (emphasis added), As a simple review of Plaintiff's own words and the plain language of § 301 demonstrates, jurisdiction is proper under § 301 because, when this case is stripped to its essential elements, Plaintiff's case is a suit for violation of a contract between an employer and a labor organization. See 29 U.S.C. § 185(a).

B. Case Law Dictates That a Labor Union Need Not Be a Party for Proper § 301 Jurisdiction Since the Only Requirement is That a Labor Agreement's Provisions Be at Issue

In addition to the provisions of § 301, case law also supports the premise that the presence of Teamsters Local 330 as a party is not necessary to establish federal jurisdiction. *See, e.g., Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202 (1985) (labor union not a party and court held that Plaintiff's state law tort claims were preempted by § 301). Rather, where the "heart of the

**Page 5**

[state law] complaint [is] a . . . clause in the collective bargaining agreement, that complaint arises under federal law." *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 394 (1987). As the Seventh Circuit has stated "if it is necessary to interpret express or implied terms of the CBA [collective bargaining agreement], a state law claim is completely preempted by § 301, the claim is deemed federal in nature from its inception, and the complaint is deemed one that a defendant can remove." *Atchley v. Heritage Cable Vision Associates,* 101 F.3d 495, 499 (7th Cir. 1996).

In this case, Plaintiff has alleged in his Complaint that he

had a right to return to work following his termination
"pursu[ant] to the terms of the collective bargaining agreement."
Complaint, ¶ 14. Plaintiff further alleges in the Complaint that
"in denying [Plaintiff] the right to return to work [Defendant]
violate[d] the terms of the collective bargaining agreement."
Complaint, ¶ 19. The rights Plaintiff seeks to enforce emanate
directly from the collective bargaining agreement; indeed, he
quotes the exact language of the agreement. See Complaint, ¶ 7.

In *Lingle v. Norge Division of Magic Chef, Inc.*, a case cited
by Plaintiff, the United States Supreme Court held that
retaliatory discharge actions under Illinois law are not always
preempted by § 301. *Lingle*, 486 U.S. 399, 403 (1988). However, in
that case, the Court held that a retaliatory discharge claim is
not preempted only "as long as the state-law claim can be
resolved without interpreting the agreement itself" *Lingle,*
486 U.S. at 410. After *Lingle,* the Seventh Circuit has recognized
that a retaliatory discharge claim under Illinois law may still
be preempted when, as in this case, the claim alleges a breach of
the collective bargaining agreement and requires interpretation
of contractual terms. *See Marzuki v. AT & T Technologies,*
878 F.2d 203, 206 (7th Cir. 1989).

In the instant case, Plaintiff has explicitly alleged that
Defendant violated the collective
**Page 6**
bargaining agreement by retaliating against him and failing to
re-hire him. Complaint, ¶ 19. Such claims cannot be resolved
without interpretation of the agreement because Plaintiff is
admittedly trying to enforce the provisions of that agreement.
Complaint, ¶ 19. Thus, Plaintiff's case requires the Court to
analyze the seniority provisions of the contract to determine
what, if any, rights Plaintiff had to return to work. This is
exactly the type of contract interpretation that Section 301
requires the federal courts to make. Thus, the statute and case
law compel federal jurisdiction in this case.

<u>**CONCLUSION**</u>

For the foregoing reasons, we deny the motion of Plaintiff,
James Shales, to remand this case to the Circuit Court of Kane
County, Illinois (#10). This case is set for status February 8,
2007 at 9:00 a.m.

It is so ordered.

Copyright © 2007 Loislaw.com, Inc. All Rights Reserved