## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| JOSE ANDREU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07 C 06132 |
| v. | ) | |
| | ) | Judge Der-Yeghiayan |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## APPENDIX OF EXHIBITS
## TO
## DEFENDANT UNITED PARCEL SERVICE'S
## RULE 56.1(b) (3) STATEMENT OF ADDITIONAL
## UNCONTESTED MATERIAL FACTS

Haefke Declaration

Andreu Deposition Excerpts

Snyder Deposition Excerpts

DATED:  January 28, 2008              UNITED PARCEL SERVICE, INC.

By:     /s/ D. Scott Watson
                        One of Its Attorneys

John A. Klages, #06196781
D. Scott Watson, #06230488
Gary R. Clark, #06271092
Quarles & Brady LLP
500 West Madison Street, Suite 3700
Chicago, IL  60661-2511

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on January 28, 2008, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Timothy J. Coffey
The Coffey Law Office, P.C.
1403 East Forest Avenue
Wheaton, Illinois 60187
Email: tcofflaw@sbcglobal.net

/s/ *D. Scott Watson*

# DECLARATION OF TOM HAEFKE

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE ANDREU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07 C 06132 |
| v. | ) | |
| | ) | Judge Der-Yeghiayan |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>DECLARATION OF TOM HAEFKE</u>

I, Tom Haefke, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.    I have been employed by UPS since October 1, 1973.  Since December, 2002, I have been the Labor Relations Manager for UPS's North Illinois District.

2.    My duties as the District Labor Relations Manager include the interpretation and enforcement of the various relevant collective bargaining agreements.

3.    At all relevant times, Jose Andreu's employment with UPS was governed by a collective bargaining agreement between UPS and Teamsters Local 705.

4.    For most employee offenses which may result in termination of employment, the collective bargaining agreement between UPS and Local 705 provides a procedure for an employee to continue working until his status is resolved by UPS and the Union through the provided grievance procedure.

5.    Usually, the Union files a grievance over an employee being put on "Notice of Termination" which initiates discussions between UPS and the Union to resolve the grievance.

6.    When a UPS employee is put on notice of termination, the employee continues to work until the grievance process is completed (assuming a grievance is timely filed) or the employee again commits the same offense that resulted in the notice of termination.

7.    In many instances, an employee on "Notice of Termination" is returned to work by an agreement of UPS and the Union after a grievance is filed on his/her behalf, with discipline such as an unpaid temporary suspension from work rather than a termination of employment.

8.    If UPS and the Union do not agree on a lesser penalty at a lower level hearing, the normal practice is for the grievance to proceed to resolution, first at the joint Union-UPS Grievance Committee meeting (the Panel), and if not resolved there, possibly to arbitration by an outside arbitrator.

9.    Snyder could have terminated Andreu immediately as Article 54 of the collective bargaining agreement between UPS and Local 705 lists "dishonesty" as a cardinal offense subject to termination on the first offense without need for progressive discipline.

10.    The collective bargaining agreement requires that grievances challenging disciplinary action be filed with the Company within fifteen (15) days of the imposition of the disciplinary action.  Attached as Exhibit A is a true and accurate copy of Article 7 of the current collective bargaining agreement between UPS and the Union.

11.    If a grievance is not timely filed challenging a notice of termination, the normal procedure is for UPS to impose the discipline noticed shortly after the 15 day time limit for filing a grievance has passed.

12.    Depending on the severity of an employee's misbehavior problem, UPS at times issues a "Notice of Termination" with the expectation that, if a grievance is filed, the employee may have his termination reduced to a warning or other discipline (such as a suspension without pay for a specific period of time) through negotiations with the Union.

13.    Local 705 Business Agent Ken Emmanuelson tried to get me to accept a late grievance on Andreu's behalf but I declined to accept it.

14.    Local 705's standard grievance form has a place for a UPS manager's signature signifying he/she received a timely grievance.

15.    The grievance the Union purported to submit on behalf of Andreu has no signature of a UPS manager. A true and correct copy of the grievance form is attached hereto as Exhibit B.

- 3 -

FURTHER DECLARANT SAYETH NOT.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: January 25, 2008

Tom Haefke

**<u>EXHIBIT A</u>**

# TEAMSTER LOCAL 705
# UNITED PARCEL SERVICE
# AGREEMENT



**For the Period**
**August 1, 2002 to July 31, 2008**

2. Trainers shall be paid a $.50 per hour training premium for each hour spent training.

Drivers training helpers, in accordance with Supplemental Agreements, and two (2) on the car rides for the purpose of route knowledge shall not be entitled to the training premium.

3. The parties shall establish a National Training Committee. The Committee shall be empowered to hear and resolve any disputes that may arise over these issues. Unresolved disputes will be subject to the National Master Grievance Committee.

4. Each Supplemental area shall meet and agree or continue existing agreements on the details of the application of this agreement in their area in accordance with Supplemental language. Other issues left for resolution at this level include, but are not limited to, the minimum qualifications for trainers, if any, the number of hours to be worked by the trainer, and the application of Supplemental language concerning compensation for work performed in higher classifications. Disputes shall be resolved in accordance with paragraph 3.

5. Trainer selection and assignments to on the job training will be done in accordance with supplemental seniority provisions, providing the trainers have the necessary qualifications and skills for the job.

6. The training records that a Teamster represented trainer can be required to complete for drivers, are those previously agreed to by the parties. If the Employer wishes to amend these forms, it will first meet and agree with the National Training Committee. Such agreement will not be unreasonably withheld. No training record or verbal report by the trainer will be relied upon to discipline any employee or to evaluate any seniority employee's performance.

7. If a trainer is removed from the qualified list by the Employer, that employee and the Local Union shall have access to the grievance procedure. If the Union establishes that the removal was not for just cause, the grievant shall be reinstated.

8. No trainer shall be required to train in any method which violates the Collective Bargaining Agreement.

9. Teamster represented trainers will not be permitted to perform or recommend disciplinary action.

10. Teamster represented trainers will not be required to make decisions or recommendations regarding the attainment of seniority, by their trainees. The decision as to whether a trainee attains seniority will be made solely by UPS management.

12

11. Employees to be retrained, after qualifying in their classification, and seniority employees scheduled for safety rides, may request that a non-bargaining unit employee perform that training, in lieu of a Teamster represented trainer. Such requests will be honored.

12. Trainers will not be held liable for auto accidents incurred by the trainee.

ARTICLE 7. LOCAL AND AREA GRIEVANCE MACHINERY

Except in cases involving cardinal infractions, as outlined in Article 54 of this Agreement, an employee to be discharged or suspended shall be allowed to remain on the job, without loss of pay unless and until the discharge or suspension is sustained under the grievance procedure. The Union agrees it will not unreasonably delay the processing of such cases.

Section 1.

Differences between the Employer and the Union as to the application or interpretation of any of the provisions of this Agreement, including the question of whether an employee has been disciplined or discharged for just cause, shall be settled by the following grievance and arbitration procedure.

1. a) The Employee shall discuss any issues or complaints with a supervisor.

b) The Union Steward or Business Agent shall discuss any issues or complaints with the appropriate supervisor or manager.

2. If the Employee's issue or complaint is not resolved in step 1(a), the Employee shall discuss the issue or complaint with his/her steward and the appropriate supervisor or manager.

3. If the parties fail to agree on the dispute or issue the steward shall promptly submit a written grievance to the Employer with a copy to the Business Agent within thirty (30) calendar days of the occurrence or knowledge of the occurrence. Grievances relating solely to discharge or discipline shall be filed within fifteen (15) calendar days of the notice of discipline.

4. Failure to follow the above procedure may result in the dismissal of the grievance.

5. Unresolved grievances may be submitted to the 705/UPS Grievance Committee. The 705/UPS Grievance Committee shall consist of an equal number of members selected by the Employer and the Union.

6. Failure to achieve a resolution resulting in a deadlock at the 705/UPS Grievance Committee may result in the grievance being submitted to arbitration by the Union.

13

Section 3.

The legal recourse reserved to the Union in this Agreement shall be cumulative with and not exclusive of any other remedy, economic or legal, available to it. The Union may (in addition to pursuing other remedies) sue the Employer in the Union's own behalf or in behalf of any aggrieved employee for specific performance of this Agreement, injunctive relief, recovery of dues, wages, vacations or other benefits or any other legal redress, and the Employer hereby expressly waives the right to object to the Union being party plaintiff in such an action. In pursuing the aforesaid legal remedies, the Union shall have the right to recover all reasonable costs and attorney's fees.

All monetary grievance settlements shall be submitted by separate check payable to the grievant or grievants and a copy of the same sent to the Local Union for their records. Such settlements shall be paid within ten (10) working days of settlement.

ARTICLE 8. NATIONAL GRIEVANCE PROCEDURE

Section 1.

All grievances and/or questions of interpretation arising under the provisions of this National Master Agreement shall be resolved in the following manner:

Deadlocked cases involving only National Master language may be submitted to the National Master Panel for decisions. Those deadlocked cases which cannot be decided by a lower panel because of disagreement over the interpretation of National Master language may be submitted to the Master Panel for interpretation. Requests for interpretations with no factual Master Panel for interpretation. Requests for interpretations with no factual case to be decided will be heard by the Master Panel by mutual agreement of the Co-Chairpersons. Interpretations rendered on factual cases by the National Grievance Committee will be sent back to the lower panel to be used to resolve the factual case.

The Committee shall be composed of an equal number of Employer and Union representatives. The National Grievance Committee shall meet upon call of the Chairman of either the Employer or Union representatives on the National Grievance Committee. The National Grievance Committee shall adopt rules of procedure which may include the reference of disputed matters to subcommittees for investigation and report with the final decision or approval, however, to be made by the National Grievance Committee. If the National Grievance Committee resolves any dispute by a majority vote of those present and voting, such decision shall be final and binding upon all parties.

15

7. Notwithstanding the forgoing, any case deadlocked by the 705/UPS Grievance Committee that involves the application or interpretation of language that is the same as in the National Master Agreement shall be submitted to the appropriate National Grievance Committee for resolution upon approval of the 705/UPS Grievance Committee Chairs.

8. The Union shall have up to sixty (60) calendar days to notify the Company by letter or other mutually agreeable means of its intent to arbitrate.

9. The Company and the Union shall select from a list of five (5) names to be furnished by the Federal Mediation and Conciliation Service or American Arbitration Association, at the Union's request, from which list the Employer and the Union shall each strike two (2) different names, and the person whose name remains shall be designated as the arbitrator.

10. The fees and expenses of the arbitration shall be borne by the loser.

All decisions of the 705/UPS Grievance Committee and or arbitrator shall be final and no strike or lockout shall occur except as is hereinafter provided. Nothing herein shall authorize the arbitrator to alter the terms and conditions of the agreement or make a new Agreement.

Upon failure of the Employer to meet with the Union to adjust a grievance when requested to do so, or to appoint members of the Grievance Committee or to strike names from the list, or failure to comply with any final decision, then the Principal Officer or his / her designee shall Company Regional Labor Relations Manager or his / her designee shall meet within seventy-two (72) hours to attempt to resolve the dispute. Failing to agree, the Union at its discretion shall be permitted all legal and economic recourse (including the right to strike) in support of enforcement of of its demands notwithstanding anything to the contrary contained in this Agreement. The action taken by the Union in recourse or enforcement of its right shall not be arbitrable nor reviewable by any tribunal. Grievance and arbitration proceedings on behalf of an employee respecting his/her grievance may be invoked by the Union when in their opinion they deem it justified.

Section 2.

Should a Certified Public Accountant designated by the Union certify in writing specifically that the Employer is violating the wage scale, hours of work, vacations, applicable Health and Welfare provisions or Pension provisions or working conditions or other terms or conditions of employment based upon the payroll records, time cards and/or sheets, audited by him, or if Employer refuses to produce such records for audit as provided in this Agreement, then the grievance procedure shall have no application to such facts and circumstances and the Union shall be permitted all legal and economic recourse including the right to strike notwithstanding anything to the contrary contained in this Agreement.

14

**<u>EXHIBIT B</u>**

FROM Robin Potter & Assoc.    (TUE)JAN 17 2006 17:49/ST. 17:49/No. 6810254559 P 2

Case 1:07-cv-06132    Document 28-2    Filed 01/30/2008    Page 13 of 39

## TEAMSTERS LOCAL UNION Nº 705  GRIEVANCE FORM    GRIEVANCE Nº 11462

### PLEASE USE A BALL POINT PEN AND PRESS FIRMLY

| FOR OFFICE USE ONLY | | | | GRIEVANT TO COMPLETE |
|---|---|---|---|---|

FOR OFFICE USE ONLY

| Case Nº | | | | CONTRACT: UPS / 705 |
| YEAR | MONTH | EMPLOYER# | GRIEVANCE# | VIOLATION OF: |
| | | | | PRINCIPAL ARTICLE: 54/7 |
| ISSUE: (Check One) | Discharge/Discipline ☐ | Past Practice ☐ | | SECTION: |
| | Contract Issue ☐ | Other ☐ | | |

| Grievant's Name: (Print) Jose Andrew | Employer and Terminal: UPS Addison (Access Cent. |
| Soc. Sec. Nº 1056 | Employer Contact: Kerry (illegible) |
| Address: 7831 W. Rascher | Job Title: Driver   Date Hired: |
| City, ST., Zip Chicago, IL 60656 | Steward: Treadwell |
| Phones: Home(670) 254 5862 | Union Rep: K. Emgnyliso N |
| Work (773) 631 2306 Cell | Date: 2/10/05 |

### INSTRUCTIONS
1. Completed grievance forms should be forwarded to and processed by the Steward or Union Rep.
2. Statement of the grievance should be clear and understandable.    (Use Additional Sheets If Necessary)

CHECK ONE    ☒ STATEMENT OF GRIEVANCE    ☐ REBUTTAL TO A WARNING LETTER

The Employer has violated Article(s) 54 / 7 . . . . . . . . . . . . Section(s) _____

and all relevant past practices and any and all other applicable articles of the contract when on, 2/9/05 (Date)

~~their~~ Kerry put Jose on Notice of termination due to his not working
as directed and being dishonest when asked about doing a pick 3
and how many stops he had left and what time he would be
in.

### RESOLUTION REQUIRED.
That the contract be enforced, all affected parties be made whole, and, Jose is to be put in file as a
verble warning and nothing in his file in writing

| Grievance | Date | Disposition | Union Rep. Signature | Employer Rep. Signature |
|---|---|---|---|---|
| Step 1 | 8/10/05 | met with Kerry, sess: Put on notice of termination pending investigation | headwell | |
| Step 2 | | | | |
| Step 3 | | | | |
| Step 4 | | | | |
| Step 5 | | | | |

### RESOLUTION OF GRIEVANCE.

For the Union _____ ___/___/___    For the Employer: _____ ___/___/___
            (Signature)      (Date)                    (Signature)      (Date)
         Please Print                              Please Print

LOCAL 705 COPY

Andrew    EXHIBIT  9
FOR I.D. 8/28/07  1 ZEM

UPS 0128

**ANDREU DEPOSITION EXCERPTS**

1              IN THE UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF ILLINOIS

3                      EASTERN DIVISION

4    JOSE ANDREU,                    )

5                  Plaintiff,        )

6       -vs-                         )   No. 07 C 00473

7    UNITED PARCEL SERVICE, INC.,    )

8                  Defendant.        )

9

10          The deposition of JOSE ANDREU, called for

11   examination, taken pursuant to the Federal Rules

12   of Civil Procedure of the United States District

13   Courts pertaining to the taking of depositions,

14   taken before ZONA B. MILLER, a Notary Public

15   within and for the County of Lake, State of

16   Illinois, and a Certified Shorthand Reporter of

17   said state, at Suite 3700, 500 West Madison

18   Street, Chicago, Illinois, on the 28th day of

19   August, A.D. 2007, at 10:00 a.m.

20

21

22

23

24                                    ORIGINAL

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

1      Q.    So that the hourly rate was higher?

2      A.    Not right away.  I waited two years to

3   get a raise.

4      Q.    The wages for both the air driver

5   position and the package car driver position are

6   set by the Collective Bargaining Agreement,

7   correct?

8      A.    Can you repeat the question?

9      Q.    Sure.  I'll just ask a couple of

10  lead-up questions.

11           You were a member of the Teamsters

12  Local Union 705 when you worked for UPS, correct?

13     A.    Yes.

14     Q.    And that union represented you and

15  other people who worked at UPS, is that correct?

16     A.    Yes.

17     Q.    Was there a Collective Bargaining

18  Agreement, a contract between the Teamsters and

19  UPS, if you know?

20     A.    I guess.

21     Q.    Have you ever seen a copy of the

22  Collective Bargaining Agreement that was in effect

23  while you worked at UPS?

24     A.    Yes.

1      Q.    Do you know if that contract actually
2   set the hourly rates for the various positions of
3   the people that Local 705 represented?
4      A.    Yes.
5      Q.    And do you believe or have reason to
6   believe that that contract set the position, set
7   the hourly rate for you when you were an air
8   driver?
9      A.    Yes.
10     Q.    And also when you were a package car
11  driver?
12     A.    Yes.
13     Q.    You couldn't -- strike that.
14           You didn't negotiate your own hourly
15  rate with UPS, did you?
16     A.    No.
17     Q.    And you said a moment ago, Mr. Andreu,
18  that you waited seven years for your time.  Were
19  there any -- strike that.
20           Let me ask you this.  How did you go
21  from air driver to package car driver?  What was
22  the process?
23     A.    I remember Alex was the boss at the air
24  dock.  And he asked me do I want to go driving,

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

1      A.    Yes.

2      Q.    You didn't say a number?

3      A.    Yeah.

4      Q.    Are you sure about that?

5      A.    Yes.

6      Q.    Did you testify differently in your

7   unemployment hearing?

8      A.    I got another text message saying about

9   how many stops you got.

10     Q.    So that was the next text message?

11     A.    Yeah.

12     Q.    Okay.

13     A.    And I said I got 60 stops.

14     Q.    Did your -- let me take them one at a

15   time.  The message from UPS asked -- did it just

16   ask how many stops you have left?

17     A.    I don't remember exactly.

18     Q.    You're not sure if it said anything

19   else?

20     A.    No, I'm not sure.

21     Q.    Your response, did it just say about 60

22   stops left or did it say something else?

23     A.    That I wanted to take a lunch and that

24   breaking the route was going to take me -- put me

1      A.    No.

2      Q.    This is something that Mr. Mendez

3 supposedly told you?

4      A.    Yes.

5      Q.    Now, you claim that Mr. Ziltz told

6 you -- I just want to make sure I get this

7 right -- told you to go to the -- that you'd be

8 called in the office the next day; something along

9 those lines?

10      A.    Yes.

11      Q.    Were you called into the office the

12 next day?

13      A.    Yes.

14      Q.    Who called you into the office?

15      A.    Pam Treadwell came to look for me.  And

16 she said, "They want to talk to you in the

17 office."

18      Q.    Did she say who they were?

19      A.    She say, "Mr. Kerri Snyder want to talk

20 to you in the office."

21      Q.    And who is Kerri Snider?

22      A.    Kerri Snyder, he was the -- I not

23 exactly sure what his title.  He was Mr. David

24 Ziltz' boss.

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

1          Q.    Does it sound right to say that Kerri

2    Manager was the business manager of the Aurora

3    Center, sometimes called the center manager?

4          A.    Center manager.  I guess so.

5          Q.    But you don't know for sure?

6          A.    I'm not sure.

7          Q.    So Miss Treadwell told you you needed

8    to go to the office?

9          A.    Yes.

10         Q.    And she was a union steward, correct?

11         A.    Yes.

12         Q.    And she was not a member of UPS

13   management that you know of?

14         A.    Correct.

15         Q.    I should say if you know.

16         A.    No, she was a union steward.

17         Q.    When did Miss Treadwell tell you this?

18         A.    The next day.  Sometime in the morning

19   between 8 and 10.  I don't remember exactly the

20   time.

21         Q.    When you say the next day, the day

22   after February 9th?

23         A.    Yes.

24         Q.    So sometime on February 10 --

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

1   A. No.

2   Q. Does Miss Treadwell accompany you to

3 the meeting?

4   A. Yes.

5   Q. And what happens?

6   A. Mr. Kerri Snyder ask me what happened

7 the night before, the day before.  I told him what

8 happened.  And he put me on notice of termination.

9   Q. When you say that Mr. Snyder asked you

10 what happened the day before and you told him what

11 happened, what all did you tell him?

12   A. I told him exactly what happens.

13   Q. As you described it here today?

14   A. Yes.

15   Q. Did you feel you got the chance to tell

16 him everything?

17   A. Yes.

18   Q. And you told him that Dave Ziltz had

19 yelled at you and called you a liar?

20   A. Yes.

21   Q. And after you had a chance to tell

22 Mr. Snyder everything he told you, you were being

23 on notice of termination, correct?

24   A. Yes.

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

1          A.    I don't know.

2          Q.    Mr. Andreu, if you would look at

3    paragraph 23 of your complaint also on page 4, it

4    states that Kerri Snyder told you your employment

5    was terminated effective immediately for being

6    dishonest on February 9, 2005, and that occurred

7    on March 4, 2005.  Do you recall that?

8          A.    Yes.

9          Q.    Did you have a meeting with Mr. Snyder

10   on March 4, 2005?

11         A.    Yes.

12         Q.    Where was that meeting?

13         A.    In his office.

14         Q.    Mr. Snyder's office?

15         A.    Yes.

16         Q.    Who attended that meeting?

17         A.    Rick Cantu and Steve Morenzi.

18         Q.    Mr. Cantu is your union representative?

19         A.    Yes.

20         Q.    And Steve Morenzi, is he another UPS

21   supervisor?

22         A.    Yes.

23         Q.    About what time was that meeting?

24         A.    Early morning.

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

```
 1   STATE OF ILLINOIS   )

 2                       )  SS:

 3   COUNTY OF L A K E   )

 4           I, ZONA B. MILLER, a Notary Public within

 5   and for the County of Lake, State of Illinois, and

 6   a Certified Shorthand Reporter of said state, do

 7   hereby certify:

 8           That previous to the commencement of

 9   the examination of the witness, the witness was

10   duly sworn to testify the whole truth concerning

11   the matters herein;

12           That the foregoing deposition

13   transcript was reported stenographically by me,

14   was thereafter reduced to typewriting under my

15   personal direction and constitutes a true record

16   of the testimony given and the proceedings had;

17           That the said deposition was taken

18   before me at the time and place specified;

19           That I am not a relative or employee or

20   attorney or counsel, nor a relative or employee of

21   such attorney or counsel for any of the parties

22   hereto, nor interested directly or indirectly in

23   the outcome of this action.

24           IN WITNESS WHEREOF, I do hereunto set
```

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

1   my hand and affix my seal of office at Chicago,

2   Illinois, this 10th day of September, 2007.

3

4                    Notary Public, Lake County,

5                    Illinois.

6                    My commission expires May 1, 2010.

7

8

9   C.S.R. Certificate No. 84-0428.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**SNYDER DEPOSITION EXCERPTS**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


JOSE ANDREU,                    )
                               )
          Plaintiff,           )
                               )
     vs.                       ) No. 07 C 0473
                               )
UNITED PARCEL SERVICE, INC.)
                               )
          Defendant.           )


          The deposition of KERRY SNYDER called by
the Plaintiff for examination pursuant to notice and
pursuant to the Federal Rules of Civil Procedure for
the United States District Courts pertaining to the
taking of depositions, taken before Denise Andras,
Certified Shorthand Reporter and Notary Public
within and for the County of Cook and State of
Illinois at 29 South LaSalle, Illinois, on the 11th
day of July, A. D., 2007.

1  final incident," and your answer, No. 1, "Final

2  incident, Jose lied to full-time," is that right?

3  "FT, full-time, to supervisor Dave Zeiltz on

4  2-9-05."  That's it; that's the answer we are

5  talking about in terms of Jose, correct?

6       A.    Yes.

7       Q.    Is there anything else, any other

8  factor that played a part in your decision to put

9  him on notice of -- decision to put him on notice of

10  termination on February 9th and then to terminate

11  him on March 4, 2005; is there anything else that

12  played into that decision?

13       A.    No.

14       Q.    It was, you lied to Dave Zeiltz on

15  February 9, 2005, correct?

16       A.    Yes.

17       Q.    What about you admitted lying to Dave

18  Zeiltz on February 9, 2005, did that play a part in

19  your decision?

20       A.    I don't remember.  I don't remember if

21  it did or not.

22       Q.    In other words, if you take away the

23  admission part, is he still getting fired on March

24  4, 2005?

Page 211

1    A.    Yes.

2    Q.    You are still firing him, right?

3    A.    Yes.

4    Q.    When did you decide to fire him on

5  March 4, 2005?

6    A.    After the 15-day grace period that

7  they have, allowed to grieve the disciplinary

8  action.

9    Q.    So 15 days would be from the 10th of

10  February, right?

11    A.    Correct.

12    Q.    So the 25th of the February, correct?

13    A.    My understanding is it's 15 working

14  days is what we allowed him.

15    Q.    Doesn't the grievance procedure say 15

16  calendar days?

17    A.    It says 15 calendar days.  I allowed

18  him 15 working days.

19    Q.    Was there some hesitation -- you are

20  telling me you didn't make this decision until after

21  the 15 days past, whatever calendar, working days,

22  you didn't decide you were going to fire him?

23  Didn't you decide you were going to fire him on

24  February 10th when you put him on notice of

1   meeting on February 10, 2005?

2          A.      On-car supervisor Dave Zeiltz and

3   union representation was Pam Tredwell.

4          Q.      What did Ms. Tredwell say in the

5   meeting?

6          A.      I don't remember exactly what she

7   said.

8          Q.      Do you remember the meeting?  Do you

9   have a recollection of meeting?

10         A.      Yes, I remember the meeting.  I don't

11  remember the specific conversations.

12         Q.      Where was the meeting at?

13         A.      In my office.

14         Q.      On February 10th?

15         A.      Yes.

16         Q.      What time of day?

17         A.      Approximately 8:25, the driver's start

18  time.

19         Q.      So early, first thing in the morning?

20         A.      Yes.

21         Q.      And you had gotten your information on

22  February 9th?

23         A.      Yes.

24         Q.      About the lie that supposedly didn't

Page 219

1    Q.    What else is said in your meeting with
2    Mr. Zeiltz on the evening of February 9th?
3    A.    I don't remember.
4    Q.    When do you make the decision that you
5    are going to have a meeting the following morning
6    and put him on notice of termination?
7    A.    I believe it was at this meeting.
8    Q.    When you are talking to Mr. Zeiltz?
9    A.    Yes.
10    Q.    The notice of termination, that's what
11    you conclude, correct?
12    A.    Not necessarily at that -- not
13    necessarily like that.
14    Q.    Okay, I don't want to put words in
15    your mouth.  How did you conclude -- you said at
16    this meeting you made your decision to put him on
17    notice of termination?
18    A.    At this meeting Dave Zeiltz presents
19    the facts.  I've only got one side of the story, and
20    I don't have Jose Andreu's side of the story until
21    we meet on the 10th.
22    Q.    Okay.  So it's your testimony that you
23    don't decide to put him on notice of termination
24    until you meet with Jose Andreu on the 10th in the

6fd3b8bb-a5e2-4bc6-80f1-b607fbef2233

1   morning?

2          A.     Correct.

3          Q.     So in the meeting on the 10th you make

4   the decision to put him on notice of termination?

5          A.     Correct.

6          Q.     Not before?

7          A.     No, not before.

8          Q.     What else do you do prior to the

9   meeting on the 10th to look into the situation,

10  investigate the situation?

11         A.     I don't remember doing anything else.

12         Q.     During the day Ms. Bess had been in

13  your office, and you had your exchange with her that

14  we talked about, correct?

15         A.     Yes.

16         Q.     Then at night Mr. Zeiltz comes in and

17  you have your talk with him that we've already

18  talked about, correct?

19         A.     Yes.

20         Q.     What else, if anything, any other

21  discussion, any other information, that you have

22  prior to going into your meeting on February 10th in

23  the morning?

24         A.     I don't know if there's any other -- I

1    offer as a, you know, either answering a prior

2    question or giving me more information that would

3    reflect on a prior answer that you've given; is

4    there anything else that you'd like to offer?

5         A.    Yes.

6         Q.    What's that?

7         A.    I'm just -- I'm confident that I made

8    the right decision based off the facts presented,

9    that Jose Andreu had indeed lied to Dave Zeiltz or

10   lied to Cheryl Bess, and I'm confident that the

11   course of action was correct.  And I was confident

12   as well that this is a very serious issue that could

13   have been addressed under the grievance process, and

14   had it been addressed under the grievance process

15   properly by the union and the employee, it would

16   have been resolved in a different outcome than this.

17        Q.    So your position is had there been a

18   timely grievance filed, this 15-day period we talked

19   about, you're confident it would have been

20   resolved -- say that again?

21        A.    I'm confident that it would have been

22   resolved through the grievance process.

23        Q.    How resolved?

24        A.    Well, one, that the grievance process

Page 257

1    run its course of action; but, two, as I've seen it

2    historical (sic), that I've had other employees that

3    are on Notice of Termination that have been reduced

4    to suspensions and have returned to work.

5         Q.    Do you believe that's what would have

6    happened if this would have run its course and the

7    grievance would have been filed on time?  Assuming

8    it wasn't, I don't know.

9         A.    Yes, I do.

10        Q.    What makes you think that?

11        A.    Because I skipped the first couple

12   steps of the disciplinary process and went to Notice

13   of Termination.  Cardinal sin would be something you

14   automatically terminate someone for.  You don't put

15   them on Notice of Termination.  You are terminated.

16   He failed that dishonesty clause which falls under

17   the class of a cardinal sin.

18        Q.    Article 54?

19        A.    Right.  So he should have been

20   terminated.  I put him on Notice of Termination.

21   And had they grieved it, it would have came that I

22   had not followed the progressive discipline process,

23   and we would have been able to discuss this.

24        Q.    You don't have to follow progressive

1        Q.      I'm talking about what's under the

2   employee rep signature?

3        A.      It looks like "RTS."

4        Q.      What is that?

5        A.      That's an acronym for refused to sign.

6        Q.      Whose writing is that?

7        A.      I don't know.

8        Q.      Did Ms. Tredwell present you with this

9   grievance at some point in time, at any point in

10  time and you refused to sign?

11       A.      No.

12       Q.      Had you become aware, that

13  Ms. Tredwell had submitted a grievance, be it late

14  or be it on time and somebody refused to sign it?

15       A.      No.

16       Q.      It's your testimony that you weren't

17  aware that there was any grievance presented at all?

18       A.      That's correct, no grievance was

19  presented at all.

20       Q.      Are you saying that as a matter of

21  fact or you just don't know?

22       A.      I'm saying no grievance was presented

23  to me at all.

24       Q.      To you?

1      RECROSS-EXAMINATION

2  BY MR. WATSON:

3          Q.      After March 4, 2005, a union business

4  agent Ken Magnuson tried to give you a grievance,

5  correct?

6          A.      Yes.

7          Q.      Do you know if it was this grievance

8  that we have in front of us that counsel has marked

9  as Exhibit 12?

10         A.      I didn't see it.  He had it in his

11  hand.  He tried to give it to me.  He was on the

12  other side of the desk, and I refused to accept it

13  because it had passed the grace period, the 15-day

14  grace period, and it had already -- I mean, I wasn't

15  going to accept an untimely grievance.

16         Q.      This was after March 4, 2005?

17         A.      Yes.

18         Q.      Mr. Andreu had already been let go?

19         A.      Yes.

20         Q.      So it could have been this?  It may

21  not have been, but at that point in time you didn't

22  accept it; correct?

23         A.      That's correct.

24         Q.      And Mr. Magnuson tried to get you to

1  take it?

2      A.      Correct.  As a matter of fact, he got

3  very irate and upset when he tried to give it to me,

4  and I didn't accept it.

5          MR. WATSON:  Nothing further.

6          FURTHER RE-DIRECT EXAMINATION

7  BY MR. COFFEY:

8      Q.      When was this that Mr. Magnuson tried

9  to give it to you?  How far after March 4, 2005?

10     A.      Shortly after that, within the next

11  two to four subsequent weeks.

12     Q.      And this is a conversation between you

13  and Mr. Magnuson?

14     A.      Yes.

15     Q.      Where at?

16     A.      In my office.

17     Q.      What was said and by whom?

18     A.      He said -- Mr. Magnuson had the

19  grievance in his hand, he said I need you to accept

20  this grievance.  I asked him what it was for.  He

21  said it was for Jose Andreu.  I said I'm not going

22  to accept it, it's untimely.  And he responded that,

23  somewhat to the extent that you can't refuse to

24  accept a grievance, and then he got all irate about

Page 269

1  it and very clearly because he was red in the face

2  and angry saying, I've never been refused, no one

3  has ever refused to accept a grievance from me.

4       Q.     Why exactly did you refuse to accept

5  it?

6       A.     Because it was untimely.  It was way

7  past the grace period.

8       Q.     Did you talk to anybody subsequent to

9  this conversation, Mr. Dunn or Mr. Hefke or anybody

10 at UPS and at least advise them that Ken Magnuson

11 showed up he wanted me to accept a grievance, I

12 said, no; did you tell them of this?

13      A.     I don't recall exactly.

14      Q.     You don't know if you did or not?

15      A.     If anybody, I would have called

16 Mr. Hefke and informed him that I had had this

17 encounter with Mr. Magnuson.

18      Q.     You are not sure, correct?

19      A.     I'm not a hundred percent sure.

20      Q.     But you are sure you didn't talk to

21 anybody to before you made the decision not to

22 accept it, correct?

23      A.     That's correct.

24      Q.     He asked you to accept it, you said,

Page 277

1  STATE OF ILLINOIS    )
                        )   SS:
2  COUNTY OF C O O K    )

3          I, Denise A. Andras, a Notary Public within

4  and for the County of Cook and State of Illinois,

5  and a Certified Shorthand Reporter of said state, do

6  hereby certify that heretofore, to-wit, on the 11th

7  day of July, 2007, KERRY SNYDER personally appeared

8  before me at 29 South LaSalle Street, in the City of

9  Chicago, in the County of Cook and State of

10  Illinois, a witness in a certain cause now pending

11  and undetermined, wherein Jose Andreu is the

12  Plaintiff and UPS is the Defendant.

13          I further certify that the said witness was

14  first duly sworn to testify the truth, the whole

15  truth and nothing but the truth in the cause

16  aforesaid; that the testimony then given by said

17  witness was reported stenographically by me, in the

18  presence of said witness, and afterwards reduced to

19  typewriting by Computer-Aided Transcription, and the

20  foregoing is a true and correct transcript of the

21  testimony so given by said witness as aforesaid.

22          I further certify that the signature of the

23  witness to the foregoing deposition was not waived

24  by agreement of counsel for the respective parties;

Page 278

1   and that I am not counsel for nor in any way related

2   to any of the parties to this suit nor am I in any

3   way interested in the outcome thereof.

4          In witness whereof, I have hereunto set my

5   hand and affixed my notarial seal this _____ day of

6   _____, 2007.

7

8

9   _____
    Notary Public, Cook County, Illinois
10  C.S.R. License No. 084-003437

11

12

13

14

15

16

17

18

19

20

21

22

23

24