**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE ANDREU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07 C 06132 |
| v. | ) | |
| | ) | Judge Der-Yeghiayan |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX OF EXHIBITS**
**TO**
**DEFENDANT UNITED PARCEL SERVICE'S**
**RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1(a)(3)**
**STATEMENT OF MATERIAL FACTS**

Del Dotto Deposition Excerpts

Snyder Deposition Excerpts

Ziltz Deposition Excerpts

Answer and Affirmative Defenses to Complaint

DATED:  January 28, 2008                UNITED PARCEL SERVICE, INC.

By: ___/s/ D. Scott Watson_____
    One of Its Attorneys

John A. Klages, #06196781
D. Scott Watson, #06230488
Gary R. Clark, #06271092
Quarles & Brady LLP
500 West Madison Street, Suite 3700
Chicago, IL  60661-2511

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on January 28, 2008, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Timothy J. Coffey
The Coffey Law Office, P.C.
1403 East Forest Avenue
Wheaton, Illinois 60187
Email: tcofflaw@sbcglobal.net

/s/ D. Scott Watson

**DEL DOTTO DEPOSITION EXCERPTS**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSE ANDREU,                    )
                               )
              Plaintiff,        )
                               )
         vs.                   ) No. 07 C 0473
                               )
UNITED PARCEL SERVICE, INC.,    )
                               )
              Defendant.        )


    The deposition of MELISSA DEL DOTTO, called by

the Plaintiff for examination, taken pursuant to the

Federal Rules of Civil Procedure of the United States

District Courts pertaining to the taking of

depositions, taken before MARGARET R. BEDDARD, a

Notary Public within and for the County of Kane,

State of Illinois, and a Certified Shorthand Reporter

of said state, at Suite 850, 29 South LaSalle Street,

Chicago, Illinois, on the 31st day of July, A.D.

2007, at 10:53 a.m.

7b341489-37aa-4b03-bb56-7c7e3b20cb7e

1    what the lawsuit is about?

2         A.    Just this summary here.

3         Q.    Exhibit No. 1?

4         A.    Yes.

5         Q.    Exhibit No. 1 is entitled Injury

6    Investigation Summary; is that correct?

7         A.    Yes.

8         Q.    Did you recognize Exhibit No. 1?

9         A.    Yes.

10        Q.    And you saw it today?  You recognized it?

11        A.    Yes.

12        Q.    What did you recognize about it?  What is

13   it?

14        A.    It's an injury prevention report that we do

15   on a driver after they get injured.

16        Q.    Okay.  And is this -- Am I correct in

17   saying Exhibit No. 1 -- In terms of the information

18   that we see here about Mr. Andreu, is this

19   information that you input into the computer and into

20   this report?

21        A.    Yes.

22        Q.    So this is your work, what we see as

23   Exhibit No. 1?

24        A.    Yes.

1  there.  I don't remember if somebody did that on that

2  particular day, if they went out there to see if he

3  was okay.  But we are just made aware of it.

4      Q.   Okay.  What happens next with respect to

5  you and his claimed injury?

6      A.   When they would get back, if they could

7  finish the route, they would call the injury in to

8  the reporting hotline.

9      Q.   And you believe Mr. Andreu called the

10  injury in, right?

11      A.   Yes.

12      Q.   And that's how Jill Schmidt is telling you

13  about it, right?

14      A.   Yes.

15      Q.   So Jill Schmidt tells you about it.  Then

16  what do you do with respect to Jose and his injury?

17      A.   We call it in at night.  But I do not know

18  if I was there that particular evening.  It usually

19  could be a full-time sup that calls it in or a

20  part-time sup.

21      Q.   At this point in time, January 24, 2005,

22  what were your work hours?

23      A.   It varies.  I usually start at 7:00 in the

24  morning.  I could leave anywhere between 4:00 to 7:00

1  STATE OF ILLINOIS )
                     )  SS:
2  COUNTY OF K A N E )

3      I, MARGARET R. BEDDARD, a Notary Public

4  within and for the County of Kane, State of Illinois,

5  and a Certified Shorthand Reporter of said state, do

6  hereby certify:

7      That previous to the commencement of the

8  examination of the witness, the witness was duly

9  sworn to testify the whole truth concerning the

10 matters herein;

11     That the foregoing deposition was reported

12 stenographically by me, was thereafter reduced to a

13 printed transcript by me, and constitutes a true

14 record of the testimony given and the proceedings

15 had;

16     That the said deposition was taken before me

17 at the time and place specified;

18     That the reading and signing by the witness

19 of the deposition transcript was agreed upon as

20 stated herein;

21     That I am not a relative or employee or

22 attorney or counsel, nor a relative or employee of

23 such attorney or counsel for any of the parties

24 hereto, nor interested directly or indirectly in the

1  outcome of this action.

2          IN WITNESS WHEREOF, I do hereunto set my

3  hand and affix my seal of office at Chicago,

4  Illinois, this _____ day of August, 2007.

5

6

7

8          _____

           Notary Public, Kane County, Illinois
9          My commission expires July 29, 2007

10 CSR Certificate No. 84-3565

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**SNYDER DEPOSITION EXCERPTS**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


JOSE ANDREU,                    )
                               )
          Plaintiff,           )
                               )
     vs.                       ) No. 07 C 0473
                               )
UNITED PARCEL SERVICE, INC.)
                               )
          Defendant.           )


  The deposition of KERRY SNYDER called by
the Plaintiff for examination pursuant to notice and
pursuant to the Federal Rules of Civil Procedure for
the United States District Courts pertaining to the
taking of depositions, taken before Denise Andras,
Certified Shorthand Reporter and Notary Public
within and for the County of Cook and State of
Illinois at 29 South LaSalle, Illinois, on the 11th
day of July, A. D., 2007.

Page 219

1    Q.    What else is said in your meeting with
2  Mr. Zeiltz on the evening of February 9th?
3    A.    I don't remember.
4    Q.    When do you make the decision that you
5  are going to have a meeting the following morning
6  and put him on notice of termination?
7    A.    I believe it was at this meeting.
8    Q.    When you are talking to Mr. Zeiltz?
9    A.    Yes.
10    Q.    The notice of termination, that's what
11  you conclude, correct?
12    A.    Not necessarily at that -- not
13  necessarily like that.
14    Q.    Okay, I don't want to put words in
15  your mouth.  How did you conclude -- you said at
16  this meeting you made your decision to put him on
17  notice of termination?
18    A.    At this meeting Dave Zeiltz presents
19  the facts.  I've only got one side of the story, and
20  I don't have Jose Andreu's side of the story until
21  we meet on the 10th.
22    Q.    Okay.  So it's your testimony that you
23  don't decide to put him on notice of termination
24  until you meet with Jose Andreu on the 10th in the

Page 220

morning?

A.    Correct.

Q.    So in the meeting on the 10th you make the decision to put him on notice of termination?

A.    Correct.

Q.    Not before?

A.    No, not before.

Q.    What else do you do prior to the meeting on the 10th to look into the situation, investigate the situation?

A.    I don't remember doing anything else.

Q.    During the day Ms. Bess had been in your office, and you had your exchange with her that we talked about, correct?

A.    Yes.

Q.    Then at night Mr. Zeiltz comes in and you have your talk with him that we've already talked about, correct?

A.    Yes.

Q.    What else, if anything, any other discussion, any other information, that you have prior to going into your meeting on February 10th in the morning?

A.    I don't know if there's any other -- I

1     Q.     I'm talking about what's under the

2  employee rep signature?

3     A.     It looks like "RTS."

4     Q.     What is that?

5     A.     That's an acronym for refused to sign.

6     Q.     Whose writing is that?

7     A.     I don't know.

8     Q.     Did Ms. Tredwell present you with this

9  grievance at some point in time, at any point in

10 time and you refused to sign?

11    A.     No.

12    Q.     Had you become aware, that

13 Ms. Tredwell had submitted a grievance, be it late

14 or be it on time and somebody refused to sign it?

15    A.     No.

16    Q.     It's your testimony that you weren't

17 aware that there was any grievance presented at all?

18    A.     That's correct, no grievance was

19 presented at all.

20    Q.     Are you saying that as a matter of

21 fact or you just don't know?

22    A.     I'm saying no grievance was presented

23 to me at all.

24    Q.     To you?

1                    RECROSS-EXAMINATION

2    BY MR. WATSON:

3         Q.     After March 4, 2005, a union business

4    agent Ken Magnuson tried to give you a grievance,

5    correct?

6         A.     Yes.

7         Q.     Do you know if it was this grievance

8    that we have in front of us that counsel has marked

9    as Exhibit 12?

10        A.     I didn't see it.  He had it in his

11   hand.  He tried to give it to me.  He was on the

12   other side of the desk, and I refused to accept it

13   because it had passed the grace period, the 15-day

14   grace period, and it had already -- I mean, I wasn't

15   going to accept an untimely grievance.

16        Q.     This was after March 4, 2005?

17        A.     Yes.

18        Q.     Mr. Andreu had already been let go?

19        A.     Yes.

20        Q.     So it could have been this?  It may

21   not have been, but at that point in time you didn't

22   accept it; correct?

23        A.     That's correct.

24        Q.     And Mr. Magnuson tried to get you to

1  STATE OF ILLINOIS  )
                         )  SS:
2  COUNTY OF C O O K  )

3        I, Denise A. Andras, a Notary Public within

4  and for the County of Cook and State of Illinois,

5  and a Certified Shorthand Reporter of said state, do

6  hereby certify that heretofore, to-wit, on the 11th

7  day of July, 2007, KERRY SNYDER personally appeared

8  before me at 29 South LaSalle Street, in the City of

9  Chicago, in the County of Cook and State of

10  Illinois, a witness in a certain cause now pending

11  and undetermined, wherein Jose Andreu is the

12  Plaintiff and UPS is the Defendant.

13        I further certify that the said witness was

14  first duly sworn to testify the truth, the whole

15  truth and nothing but the truth in the cause

16  aforesaid; that the testimony then given by said

17  witness was reported stenographically by me, in the

18  presence of said witness, and afterwards reduced to

19  typewriting by Computer-Aided Transcription, and the

20  foregoing is a true and correct transcript of the

21  testimony so given by said witness as aforesaid.

22        I further certify that the signature of the

23  witness to the foregoing deposition was not waived

24  by agreement of counsel for the respective parties;

Page 278

1    and that I am not counsel for nor in any way related

2    to any of the parties to this suit nor am I in any

3    way interested in the outcome thereof.

4          In witness whereof, I have hereunto set my

5    hand and affixed my notarial seal this _____ day of

6    _____, 2007.

7

8

9    _____

     Notary Public, Cook County, Illinois
10   C.S.R. License No. 084-003437

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**ZILTZ DEPOSITION EXCERPTS**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


JOSE ANDREU,                    )
                               )
            Plaintiff,         )
                               )
      -vs-                     )   No.  07 C 0473
                               )
UNITED PARCEL SERVICE, INC.,   )
                               )
            Defendant.         )


     The deposition of DAVID ZILTZ, called by

the Plaintiff, for examination, taken pursuant to

notice and pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken

before Tamara Manganiello, Registered Professional

Reporter and Notary Public, at Suite 850, 29 South

LaSalle Street, Chicago, Illinois, on the 26th day

of July, A.D., 2007, commencing at 11:04 a.m.

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 58

1    conversations with Mr. Andreu that day?

2        A.    I don't know.

3        Q.    Was there any type of report that was

4    completed as a result of the injury or the

5    accident --

6        A.    Injury prevention report.

7        Q.    -- that he's claiming?  What is it

8    called?

9        A.    It's called an injury prevention

10   report.

11       Q.    And is that something you completed?

12       A.    No.

13       Q.    Did you complete any type of report

14   that day on January 24th concerning the claimed

15   accident?  You have your doubts, but the claimed

16   accident?

17       A.    No.  I don't think so.

18       Q.    Were you involved at all in reporting

19   this accident to Liberty Mutual, the workers' comp

20   carrier?

21       A.    No.

22       Q.    When an accident such as this --

23       A.    I don't recall.

24       Q.    So you may have?

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 59

1      A.      May have.

2      Q.      When a driver under your supervision

3  reports an accident, is there not a form that needs

4  to be completed that details the report, at least --

5      A.      Yes.

6      Q.      -- the alleged accident?

7      A.      Yes.

8      Q.      And did that happen on this occasion?

9      A.      Yes.

10     Q.      And who did that?

11     A.      I believe Melissa.  The other

12  supervisor filled that out.

13     Q.      And are you referring to the injury

14  prevention?

15     A.      Yes.

16     Q.      What is it, the injury prevention --

17     A.      Prevention report.

18     Q.      At the end of the shift on

19  January 24th, '05, did you have any conversations

20  with Mr. Andreu when he came back into the Addison

21  facility with his truck?

22     A.      I don't know.

23     Q.      Not sure if you did or not?

24     A.      No.  Don't know.

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

1    Q.    Same with the time that elapsed

2  between calls from Cheryl?

3    A.    Yes.

4    Q.    That's just your best estimate today?

5    A.    Best estimate based on our commitment

6  to that customer and what time we had to be there.

7    Q.    But you have no other notes or

8  documents, you didn't document the times of any of

9  these events this day, correct?

10    A.    No.

11    Q.    That's correct, right?

12    A.    That's correct.

13    Q.    Okay.  So she calls you back, she

14  says -- I'm sorry, I'm kind of going back a little

15  bit to that last telephone conversation with Cheryl

16  Bast -- Jose can't make the pick-up, 60 stops left.

17  How does that call end?  What do you say to her?

18    A.    I said send him there now.

19    Q.    Okay.

20    A.    And she must have messaged him to send

21  him there.

22    Q.    And then you meet him there?

23    A.    Yes.

24    Q.    And what do you do when you meet him

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 135

1    there?

2         A.      I had him open up his bulkhead door,

3    which is the door behind the driver, and I counted

4    the packages in his car.

5         Q.      You physically counted each and every

6    package?

7         A.      I counted like this (indicating).  I

8    looked at the shelf and counted like that.

9         Q.      Okay.  So you didn't go through each

10   package, move it aside, one, two?

11        A.      Did not.

12        Q.      Your standing by the driver's seat?

13        A.      I went into the bulk area.

14        Q.      What's the bulk area?

15        A.      Went into the back of the package car.

16        Q.      And you're counting with your finger?

17        A.      Yes.

18        Q.      Okay.  And what happens next?

19        A.      I counted about 20 packages.  I asked

20   Jose where the 60 packages were, the 60 stops.  I

21   shared my frustrations with him with everything

22   going on in the area, a person getting hurt, a

23   person needing help, we need to pitch together, this

24   and that.  I don't recall my exact words at that

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 136

1   point, if I mentioned dishonesty to him, but very

2   well could have.  It was a dishonest act.  It's in

3   the contract.  I don't know.  I don't recall words.

4   And at that point I told him to make the pick-up,

5   finish his work and get back into the building and

6   went on.

7           Q.     Okay.  Let's take those one at a time.

8   So about 20 packages is what you counted?

9           A.     Yes.

10          Q.     Could have been a little more?  Could

11  have been a little less actually?

12          A.     Yes.

13          Q.     Did you ask Jose at that time about

14  his -- you just heard from Cheryl this 60 package

15  thing, right?  You heard that through Cheryl Bast?

16          A.     Yes.

17          Q.     Jose never told you 60 packages --

18          A.     No.

19          Q.     -- correct?  Okay.

20                 So did you then ask Jose -- did

21  you say something about 60 packages to Jose?

22          A.     I said where are the 60 stops you told

23  Cheryl you had?

24          Q.     What does he say?

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 200

1    STATE OF ILLINOIS    )
                          )   SS.
2    COUNTY OF W I L L    )

3

4           I, Tamara Manganiello, a notary public

5    within and for the County of Will and State of

6    Illinois, do hereby certify that heretofore, to-wit,

7    on the 26th day of July, A.D., 2007, personally

8    appeared before me at Suite 850, 29 South LaSalle

9    Street, in the City of Chicago, County of Cook and

10   State of Illinois, DAVID ZILTZ, a witness, called by

11   the Plaintiff in a certain cause now pending and

12   undetermined, wherein JOSE ANDREU is the plaintiff

13   and UNITED PARCEL SERVICE, INC., is the defendant.

14          I further certify that the said witness,

15   DAVID ZILTZ, was by me first duly sworn to testify

16   the truth, the whole truth and nothing but the truth

17   in the cause aforesaid; that the testimony then

18   given by him was by me reduced to writing by means

19   of shorthand in the presence of said witness and

20   afterwards transcribed upon a computer, and the

21   foregoing is a true and correct transcript of the

22   testimony so given by him as aforesaid.

23          I further certify that the reading and

24   signing of said deposition was reserved by the

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 201

1  witness.

2         I further certify that the taking of the

3  deposition was pursuant to notice, and that there

4  were present at the taking of the deposition the

5  aforementioned parties.

6         I further certify that I am not counsel

7  for nor in any way related to any of the parties to

8  this suit, nor am I in any way interested in the

9  outcome thereof.

10         In testimony whereof I have hereunto set

11  my hand and affixed my notarial seal this 21st of

12  August, A.D., 2007.

13

14
                    _____
15                  TAMARA MANGANIELLO, RPR
                    Illinois License No. 084-004560
16

17

18

19

20

21

22

23

24

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

**ANSWER AND AFFIRMATIVE
DEFENSES TO COMPLAINT**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JOSE ANDREU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07 C 06132 |
| v. | ) | |
| | ) | Judge Der-Yeghiayan |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ANSWER AND AFFIRMATIVE DEFENSE TO COMPLAINT

Defendant United Parcel Service, Inc. ("UPS") submits its Answer and Affirmative Defenses to the Complaint filed by Plaintiff Jose Andreu ("Andreu" or "Plaintiff") and states as follows:

**Nature of Case**

1.      Plaintiff brings this action against Defendant to recover damages proximately caused by Defendant's illegal retaliatory discharge in violation of the Illinois Worker's Compensation Act, 820 ILCS 305/1 et seq., and the common law and public policy of the State of Illinois.

**Answer:**      UPS admits that Plaintiff brings this action to recover damages allegedly and proximately caused by UPS's alleged illegal retaliatory discharge in violation of the Illinois Worker's Compensation Act, 820 ILCS 305/1 et seq., and the common law and public policy of the State of Illinois, but denies that it violated any law, regulation, statute or rule with regard to Plaintiff.

**The Parties**

2.      Plaintiff, Jose Andreu (hereafter "Jose"), is an individual residing at all relevant times in Chicago, Illinois, County of Cook.

**Answer:**      UPS admits the allegations of Paragraph 2.

QBCHI\920018.00936\550135.1

3.    Defendant, United Parcel Service, Inc. (hereafter "UPS"), is an Ohio corporation registered and licensed to do business in Illinois.

**Answer:**    UPS admits that it is an Ohio corporation registered and licensed to do business in

Illinois, but denies the remaining allegations of Paragraph 3. UPS further denies that it violated any

law, regulation, statute or rule with regard to Plaintiff.

4.    Venue is proper in this Court in that Defendant's illegal acts complained of herein took place within this Court's geographical jurisdictional boundaries at UPS' Addison, Illinois facility.

**Answer:**    UPS admits that venue is proper in the U.S. District Court for the Northern District of

Illinois.

### Facts Common to all Counts

5.    Jose began his employment with UPS in or around September, 1996.

**Answer:**    UPS admits the allegations of Paragraph 5.

6.    Starting in 2003, Jose began working for UPS in the position of package driver. In this position, among other duties, he reported each work day to UPS' Addison, Illinois facility and delivered parcels in UPS' vehicles, departing from and returning to the Addison facility each work day.

**Answer:**    UPS admits the allegations of Paragraph 6. Answering further, Plaintiff was a swing

or vacation package car driver which means Plaintiff did not have a regular route but rather filled in

where needed.

7.    On or about January 24, 2005, Jose injured his back at work while on his assigned route delivering packages (hereafter the "work accident").

**Answer:**    UPS is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 7 and therefore denies same.  Answering further, Plaintiff contacted UPS while on his route on or about January 24, 2005, and said he had injured himself.

8.    He immediately called into UPS and reported the work accident and his resulting back injuries.

**Answer:**    UPS is without knowledge or information sufficient to form a belief as to the truth of whether Plaintiff immediately called into UPS and therefore denies same.    UPS admits the remaining allegations of Paragraph 8.

9.    Later in the day on January 24, 2005, one of Jose's superiors, Dave Ziltz, met Jose out on his route.  Upon meeting Jose out on his route, Mr. Ziltz stated to Jose that he believed Jose was lying about the work accident and/or related injuries, and faking his pain.

**Answer:**    UPS admits that Supervisor Davie Ziltz met Plaintiff on his route on January 24, 2005 and that the meeting occurred after Plaintiff had called UPS.  UPS denies the remaining allegations of Paragraph 9.

10.    At various times subsequent to January 24, 2005, Mr. Ziltz repeated his assertions and belief that Jose was lying about the work accident and/or related injuries, and faking his pain.

**Answer:**    UPS denies the allegations of Paragraph 10.

11.    Also on January 24, 2005, upon Jose's return to UPS' Addison facility at the end of his work day, he sat down with Mr. Ziltz and observed Mr. Ziltz type the work accident and related injury information into a computer.  He also observed and listened as Mr. Ziltz called UPS' worked (sic) compensation insurance carrier, Liberty Mutual, and reported the work accident and related injuries.

**Answer:**    UPS is without knowledge or information sufficient to form a belief as to the truth of what Plaintiff observed and/or listened to and therefore denies same.  UPS admits that on or about

January 24 or 25, 2005, a work accident report was filled out and the incident was reported to Liberty

Mutual, UPS worker's compensation insurance carrier.

12.     On January 25, 2005, Jose was examined by UPS' physician, Dr. Anthony Tesmond, in connection with the injuries he sustained from the work accident.

**Answer:**     UPS denies that a Dr. Anthony Tesmond is a "UPS physician", but admits that

Plaintiff was examined by a Dr. Tesmond on or about January 25, 2005 in connection with his

claimed injuries.

13.     Following the work accident, Jose missed work on January 25th and 26th.

**Answer:**     UPS denies that Plaintiff did not work for UPS on January 25 or 26, 2005.

14.     Upon returning to work on January 27, 2005, Jose advised Dave Ziltz that he was still experiencing back pain from the injuries he sustained from the work accident.

**Answer:**     UPS admits the allegations of Paragraph 14.

15.     In January and February 2005, Jose was examined several additional times by Dr. Tesmond and/or other physicians in his office in connection with the injuries he sustained from the work accident.

**Answer:**     UPS is without knowledge or information sufficient to form a belief as to the truth of

who examined Plaintiff or whether he was examined "several times" in the stated time period and

therefore denies same.  UPS admits that Plaintiff was examined during the stated time frame.

16.     Dr. Tesmond and/or his office notified UPS and/or its workers' compensation insurer of each and every occasion that Jose received medical treatment in connection with the injuries he sustained from the work accident.

**Answer:**     UPS is without knowledge or information sufficient to form a belief as to the truth of

the allegations of Paragraph 18 and therefore denies same.

17.    In February and early March 2005, Jose sought and received additional medical treatment from his own physicians in connection with the injuries he sustained from the work accident.

**Answer:**    UPS is without knowledge or information sufficient to form a belief as to whether

Plaintiff sought and received additional medical treatment and therefore denies same.   Answering

further, it is UPS's understanding that Plaintiff returned for treatment beginning February 10, 2005

after previously being released to full duty work.

18.    In February and early March 2005, Jose's physicians notified UPS and, in some instances, Jose's direct supervisors, of Jose's ongoing treatment for the injuries he sustained from the work accident, his prognosis and/or ability to return to work.

**Answer:**    UPS admits that on occasion after February 9, 2005, it received notes from physicians

concerning Plaintiff's condition.

19.    On or about February 9, 2005, Dave Ziltz met Jose while he was on his route delivering packages.  Upon his arrival at Jose's truck, Mr. Ziltz was angry and yelling at Jose.  Mr. Ziltz accused Jose of lying about the number of packages and/or stops he had left for the day in an earlier communication Jose had with the Addison facility.  Dave Ziltz told Jose he would be fired.

**Answer:**    UPS admits that Ziltz met Plaintiff while Plaintiff was on his route on February 9,

2005.  UPS denies the remaining allegations of Paragraph 19.  Answering further, in response to a

request for him to pick up a package, Plaintiff had contacted the UPS facility around 4:00 p.m. and

claimed he still had sixty stops to make and would not be done until 9:00 p.m.  Ziltz, who was

driving a route that day due to a shortage of drivers, arrived to assist Plaintiff at 4:42 p.m. and found

only about 20 packages on Plaintiff's vehicle.  Ziltz informed Plaintiff he was being placed on notice

of termination for dishonesty.

20.    On or about February 11, 2005, Jose informed his superiors that he could no longer perform his duties due to the pain he was experiencing from the work accident and related injuries.

He subsequently missed several days of work, and continued to receive medical treatment. He returned to work on or about February 17, 2005.

**Answer:**    UPS admits that Plaintiff informed his supervisors that he would not drive, that he missed several days of work, and that he returned to work on or about February 17, 2005. UPS is without knowledge or information sufficient to form a belief as to whether Plaintiff continued to receive medical treatment and therefore denies same. UPS denies the remaining allegations of Paragraph 20.

21.    On March 4, 2005, Jose's superior, Kerri Snyder, told Jose that his employment with UPS was terminated effective immediately for alleged (sic) being dishonest on February 9, 2005. Mr. Snyder then asked another supervisor who was present to escort Jose off of the premises.

**Answer:**    UPS admits the allegations Paragraph 21. Answering further, Plaintiff did not timely submit a grievance pursuant to the applicable collective bargaining agreement challenging his termination.

22.    At all relevant times, Jose's performance met or exceeded UPS' legitimate expectations. Jose was not dishonest on February 9, 2005, and did nothing to legitimately warrant the termination of his employment.

**Answer:**    UPS denies the allegations of Paragraph 22.

## UPS TERMINATED JOSE'S EMPLOYMENT IN RETALIATION FOR HIS PROTECTED ACTIVITIES IN VIOLATION OF THE ILLINOIS WORKERS' COMPENSATION ACT, COMMON LAW AND PUBLIC POLICY

23.    Jose's reporting the work accident and related injuries to UPS on January 24, 2005, and seeking medical treatment for such injuries commencing on January 25, 2006 (sic); and continuing through the day UPS terminated his employment (i.e., March 4, 2005), all as described above, are activities protected by the by the Illinois Worker's Compensation Act, 820 ILCS 305/1 *et seq.* (the "Act").

**Answer:**    The allegations of Paragraph 23 require legal conclusions and UPS therefore denies same. UPS admits that reporting a work accident and related injuries and seeking medical treatment

for work-related injuries are activities protected by the by the Illinois Worker's Compensation Act, 820 ILCS 305/1 *et seq.*

24.     UPS was aware of Jose's protected activities under the Act as described above at the time it decided to terminate his employment.

**Answer:**     UPS was aware that Plaintiff had submitted a worker's compensation claim and was receiving treatment at the time of his termination but denies that said claim or treatment played any part in Plaintiff's termination.

25.     Jose's protected activities under the Act were a motivating factor behind UPS' decision to terminate his employment.

**Answer:**     UPS denies the allegations of Paragraph 25.

26.     As such, UPS' termination of Jose's employment on March 4, 2005, was causally related to his protected activities under the Act.

**Answer:**     UPS denies the allegations of Paragraph 26.

27.     UPS's termination of Jose was therefore an illegal retaliatory discharge in contravention of Illinois public policy as stated and set forth in the Act.

**Answer:**     UPS denies the allegations of Paragraph 27.

28.     As a direct and proximate result of UPS' illegal termination of his employment, Jose has suffered a loss of income in the form of wages and prospective retirement benefits, social security and other employment benefits, emotional pain, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, and he is expected to incur future damages.

**Answer:**     UPS denies the allegations of Paragraph 28.

29.     The above described conduct by UPS was wilful and wanton, and with reckless disregard and indifference to the law and the public policy of Illinois, and to Jose's rights. UPS should therefore be subject to punitive damages as an example to deter others from engaging in conduct of this kind.

**Answer:**    UPS denies the allegations of Paragraph 29.


## Affirmative Defense

Plaintiff is barred from recovery because he has failed to exercise reasonable efforts to mitigate his alleged damages.


Dated: November 9, 2007                    UNITED PARCEL SERVICE, INC.

                                           By: /s/ D. Scott Watson
                                               One of Its Attorneys

John A. Klages (ARDC #06196781)
D. Scott Watson (ARDC # 06230488)
Ellen M. Girard (ARDC #06276507)
Meghan E. Riley (ARDC #06288548)
Quarles & Brady LLP
500 West Madison, Suite 3700
Chicago, IL 60661
312/715-5000
312/715-5155 (fax)

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on November 9, 2007, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Timothy J. Coffey
The Coffey Law Office, P.C.
1403 East Forest Avenue
Wheaton, Illinois  60187
Email: tcofflaw@sbcglobal.net

/s/ D. Scott Watson