**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE ANDREU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07 C 06132 |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | Judge Samuel Der-Yeghiayan |
| | ) | |
| Defendant. | ) | Magistrate Judge Mason |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Relevant Facts**

On March 24, 2005, UPS manager and decision-maker Kerry Snyder terminated Jose's employment ending his stellar, nearly 10-year career, not to mention his little piece of the American dream.   An excellent, hard-working and dedicated employee, Jose was accused of lying about the number of packages he had on his truck on February 9, 2005. The only apparent motive being what must have been Jose's new-found desire to avoid work.  He had worked significant amounts of overtime in 2004 and 2005 to date, and received numerous production bonuses for his extra efforts.  ¶ 1-5.[1]  He had a sparkling clean employment record without a hint of any attempt to shirk or avoid work.  ¶¶ 1-3. Then, he was injured at work on January 24, 2005.

Within minutes of being injured, Jose called into UPS and reported the work

---

[1]Unless otherwise noted, all fact citations are to the corresponding paragraph(s) of Plaintiff's Local Rule 56.1(b)(3)( c) Statement of Additional Facts Requiring Denial of Defendant's Motion for Summary Judgment filed concurrently herewith.

MemoOpposeSJMotion.wpd
January 28, 2008/tjc

accident and his resulting back injuries.   See UPS agreed fact ¶ 50.  As soon as Jose's

supervisor Dave Ziltz learned that Jose reported being injured, he immediately doubted

that the accident occurred.  ¶ 9.  Later in the day on January 24th, Ziltz went out to meet

Jose on his route.  Ziltz immediately started yelling at Jose, accusing him of lying about

getting hurt and stating to Jose that he did not believe him. ¶ 10.  Ziltz continued to believe

that Jose was lying about the accident and his related injuries up until he learned that Jose

was placed on medical work restrictions.  ¶ 13.  It was not until February 17, 2005, that

Jose was placed on medical restrictions after being out of work for the preceding few days

and receiving medical treatment due to the pain he was experiencing from the injuries he

sustained in his January 24th work accident.  ¶ 14.

Sixteen days after he was injured, on February 9, 2005, Ziltz decided that Jose

needed to make an off-route, unscheduled pick up at customer Bernina.  ¶¶ 18-19.  Other

drivers were available, possibly closer by, but he chose Jose.  ¶ 22.  At approximately 3

p.m., Jose received a text message through his DIAD board asking him to break off his

route and go make an unscheduled pick-up at Bernina.   ¶ 31.  He promptly responded,

received a reply, and then responded again.  In his second response, Jose estimated that

he had approximately 60 stops left.  ¶ 32.   When he received and responded to the

Bernina text messages, Jose was looking directly at the time as displayed on his DIAD

board. ¶ 33.  Jose thereafter called into the Aurora Center and was told to disregard the

prior text message requesting that he make the additional pick up at Bernina.   ¶ 34. He

continued on his route.

At approximately 4:20 p.m., Jose received another text message.  This message

directed him to go meet Ziltz at Bernina.  He then went straight to Bernina as instructed.

¶ 35.  Jose arrived at Bernina, and Ziltz approached his truck.  Upon stepping into Jose's truck, Ziltz was screaming and out of control saying that Jose was lying again, had lied to him before, and was going to get fired the next day.   He then asked Jose for the key to the inside overhead door, opened the door and entered cargo area of his truck.  He continued to accuse Jose of lying and saying that he would be fired the next day. ¶ 36.  Ziltz did not physically count each package on Jose's truck.   He admitted that there could have been more than 20 packages on Jose's truck when he met Jose at Bernina. ¶ 37.  At no point did Jose see or hear Ziltz count the packages that were in the cargo area of his truck.  At no point did Ziltz say he counted 20 packages or any other number of packages.  At no point did Ziltz mention anything about Jose previously representing to the office that he had 60 stops or packages left in his car.  ¶ 38.  The following day, February 10, 2005, manager Snyder called Jose into his office and placed him on notice of termination.  On March 4, 2005, Snyder terminated Jose's employment because of his alleged February 9, 2005, lie.

## Argument

**I.**    **Decision-Maker Dave Ziltz's Immediate, Unfounded and Sustained Belief That Jose Faked His Accident Is Direct Evidence of Retaliatory Motive**

It is illegal for an employer to fire "an employee on the basis of a dispute about the extent or duration of a compensable injury." *Clark v. Owens-Brockway Glass Container*, 297 Il. App. 3d 694, 699 (5th Dist. 1998).  Further, direct evidence is that which, "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption," and usually takes the form of an acknowledgment of discriminatory intent by the employer. *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 723 (7th Cir. 1998) (quoting *Hunt-Holiday v. Metropolitan Water Reclamation Dist. of Greater*

*Chicago*, 104 F.3d 1004, 1010 (7th Cir. 1997).

Here, sight, or Jose, unseen, joint decision-maker Dave Ziltz admitted that he immediately concluded that Jose was lying about his work accident and related injuries. ¶ 9. Ziltz moreover admitted that he harbored such unfounded doubts up until he first learned that a doctor had placed Jose on work restrictions. ¶ 13. It is undisputed that Jose was not placed on medical work restrictions until his return to work on February 17, 2005. ¶ 14. Accordingly, on February 9, 2005, when Ziltz selected Jose over other drivers to make the unscheduled, off-route pick-up at Bernina, and then later provided the linchpin piece of information regarding Jose's alleged lie to his boss Kerry Snyder (i.e., that he counted only had 13 to 15 stops in Jose's truck (see response to UPS alleged fact ¶ 29)), he admittedly was operating under the illegal, retaliatory belief that Jose faked his January 24, 2005, accident and related injuries. See ¶¶ 18-22. Even before looking to see how many packages Jose had left on his truck on February 9, 2005, Ziltz screamed at Jose that he was lying again and had lied to him before, referring to Jose's work accident. ¶ 36. Lastly, shortly after February 9th, Ziltz told co-supervisor Melissa Del Dotto that he believed Jose was faking his injury. ¶ 16. A jury therefore will have no need to infer or presume in order to reasonably conclude that Ziltz made the contested decisions out of retaliatory animus.

Should this Court determine that Ziltz's belief that Jose faked his accident falls short of direct evidence of retaliatory animus, it would still constitute very strong indirect evidence of retaliatory intent that alone makes summary judgment improper. *Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994); see also *Pryor v. Seyfarth, Shaw et al.*, 212 F.3d 976, 980 (7th Cir. 2000). Ziltz's personal anger toward Jose derived from his

baseless belief that Jose faked his accident, by itself raises a triable issue of fact for the jury.  See *Roth v. Godiva Chocolatier, Inc.*, 2008 U.S.Dist. LEXIS 1488, *10-12 (N.D.Ill. 01/07/08) (J. Hibbler) (denying summary judgment for employer on plaintiff's workers' comp retaliation claim in part based on evidence that the decision-maker "became hostile and repeatedly accused [plainitff] of fabricating the injury," allowing a jury to reasonably conclude that the termination decision "was an outgrowth of the acrimony surrounding her workers' compensation claim.") Further, Ziltz's personal animus generates several material issues of genuine fact for a jury to decide.

First, why did Ziltz select Jose for the Bernina pick-up but for a retaliatory intent to set him up?  Bernina, Ziltz admitted, was not even on Jose's route that day.  It was on co-driver Laura Martinez's route.  ¶ 22.  Jose was driving a 170 to 200 stop route.  Ms. Martinez, a much lighter 117 to 130 stop route.  ¶ 22.  Ms. Martinez has not sought workers' comp benefits.  ¶ 23.  See *Czubak v. Icee USA Corp.*, 197 U.S. Dist. LEXIS 11966, *10-12 (N.D.Ill. 08/13/97) (J. Holderman) (denying summary judgment for employer on plaintiff's workers' comp retaliation claim in part based on evidence that the claimed insubordination involved a task that may not have been plaintiff's responsibility).  For that matter, Why didn't Ziltz do the pick-up himself?  He was driving a route that averaged only 109 stops. ¶ 22. Moreover, since we know that Ziltz immediately infected Manager Snyder with his retaliatory belief that Jose faked his accident (¶ 15), material issues of fact exist with respect to whether Snyder's insistence that Jose make the Bernina pick-up was likewise the product of retaliatory animus.  See *Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994) ("summary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information

or other input that may have affected the adverse employment decisions.")

Snyder admitted that he sidestepped normal procedure when he told Cheryl Bast that Jose needed to make the Bernina pick-up. ¶¶ 25-8. Per Snyder, although a listing of driver's on specially assigned no, or light pick-up routes was readily available to him, he neglected to check and see if Jose was on the list prior to telling Bast Jose need to go to Bernina. ¶¶ 27-8. Snyder further neglected to get any details on why Jose reported he could not make the stop, or about the stop itself. ¶ 26. As UPS insists, the Bernina pick-up was "time sensitive." See ¶ 24 of UPS's Stmt. of Facts. It therefore makes no sense that the center manager would fail to gather the basic facts necessary to ensure the driver who could provide the most efficient service was assigned the job. Snyder moreover knew that Jose claimed to have been injured on the job just 16 days earlier. He knew the CBA required him to consider Jose's physical condition in making such decisions. ¶ 29. Yet, he entirely failed to even ask about the number or weight of the Bernina packages. Why would a very capable, decorated manager fail to perform such basic aspects of his job? A jury could very easily determine the answer is retaliatory animus.

Lastly, it was Ziltz who provided the linchpin piece of information regarding Jose's alleged lie when he reported to Snyder that there were only 13 to 15 packages left on Jose's truck at the time he met Jose at Bernina. He was screaming and out of control as soon as he entered Jose's truck. ¶ 36. Even before he looked into Jose's cargo area to check the number of packages, he was yelling that Jose was lying to him again and had lied to him before. ¶ 36. Ziltz admittedly didn't even physically count the packages. He admitted that there could have been more than 20 packages left on Jose's truck. ¶ 37. Again, Ziltz can have his claimed legitimate motive, whatever it may be. A jury, however,

could very reasonably conclude that he was waiting, biding his time for "pretextual evidence of misconduct to provide a figleaf for [his] retaliatory action," and that his decisions on February 9th, along with those of his infected boss Snyder, were calculated to create an opportunity to get rid of Jose, whom he believed faked a work accident. See *Pryor*, 212 F.3d at 980. This Court should accordingly deny UPS's motion on this basis alone. See *Hobbs v. Peoplesoft, Inc.*, 2000 U.S. Dist. LEXIS 17087, *6-10 (N.D.Ill. 11/22/00) (J. Gottshcall) (denying employer's motion for judgment on plaintiff's worker's comp retaliation claim where several e-mails between joint decision-makers "demonstrate[d] a clear concern with . . . the effects of [plaintiff's] injury," and were "sufficient to permit the inference that Peoplesoft was irritated with Hobbs, at least in part because of her [workers' comp] claim.").

II. **Additionally, an Abundance of Circumstantial Evidence Undeniably Ties Jose's Workers' Compensation Claim to UPS's Termination of His Employment**

In addition to the ample evidence of Ziltz's personal animus and both his and Snyder's failure to follow normal procedures as set forth above, this case has many of the classic, circumstantial hallmarks of causation and pretext -- i.e., suspicious timing, shifting explanations, post-termination padding of the file, knowingly lying about the sequence of material events, differing treatment of similarly situated employees, and other evidence which would allow a jury to reasonably infer retaliation. See *Roth v. Godiva Chocolatier, Inc.*, 2008 U.S.Dist. LEXIS 1488, *10-12, 16-17 (N.D.Ill. 01/07/08) (J. Hibbler).

First and foremost, there is no dispute that the alleged basis for UPS's termination of Jose's employment occurred arose within 16 days of his January 24th work accident and injuries, and related claim for workers' comp benefits. Prior thereto, it is again without

dispute that Jose was an excellent employee with a clean work history.  ¶¶ 1-5.  The only possible benefit to Jose from lying about the number of packages on his truck as UPS claims he did, would be to get out of work.   He in fact had already met with Ziltz per Ziltz's request earlier in the day on February 9th to pick up additional packages for delivery.  ¶ 24. Further, Jose was an employee, however, with no prior instances of dishonesty or other alleged misconduct designed to avoid work over a nearly 10-year career.  ¶¶ 1-3.  Quite the opposite, Jose regularly worked overtime and received production bonuses, and was paid well for it.  ¶¶ 4-5.  In light of his of this stellar work record, the short, 16-day gap between his workers' comp claim and the alleged basis for UPS's termination, raise an inference of retaliatory causation.  See *Lang v. Illinois Dept. of Children and Servs.*, 361 F.3d 416, 419-21 (7th Cir. 2003) (vacating district court's grant of summary judgment for employer in Title VII retaliation claim primarily on plaintiff's flawless work record, short time lapse, and evidence of being set-up to fail.)

Next, decision-maker Snyder admitted that he was informed of Jose's January 24th work accident and injuries the following day by supervisor Melissa Del Dotto.  ¶ 8.  Despite this, on March 24, 2005, 42 days after he placed Jose of notice of termination, Snyder wrote a memo to his boss Randy Dunn wherein he stated he that Jose did not report his work accident until the day after Snyder placed him on notice of termination.   ¶¶ 40-1. Snyder could not explain why he made such a knowingly false statement.  ¶ 41.  The significance of this lie is of course huge.  If it were true, it would have allowed Snyder to claim his February 10th adverse action could not have been motivated by retaliatory animus because he did not learn of Jose's protected activity until February 11th.  Additionally, this memo reeks because Dunn never asked Snyder to prepare it, and did not recall ever

seeing it until the day before his deposition in this matter.  ¶ 43.  Lastly, although Snyder has known about this significant false statement for quite a while now, he has done nothing to correct it.  ¶ 42.

The knowingly false March 24, 2005, memo was not the end of Snyder padding the file through historical manipulation.  He was at it again on February 2, 2006.  On that day, he received an e-mail asking him several rather straightforward questions regarding Jose's termination in connection with an upcoming unemployment compensation hearing.  ¶ 44. In response to one question asking whether Jose admitted to the infractions either verbally or in writing, Snyder wrote, "[y]es, he admitted to lying."  ¶ 44.  Nowhere in the record is there even the slightest hint  that Jose made any such admission.  He steadfastly denies it. ¶ 88.   At his deposition Snyder admitted that he did not remember Jose admitting to lying to him.  ¶ 45.   With absolutely no shred factual support for such a whopper, all Snyder could say at his deposition when asked why he would claim for the first time over a year later that Jose admitted to lying, was"[b]ecause at the time [the e-mail] was generated I remembered it, but at this point in time I do not remember it."  ¶ 45.

Further showing Snyder's penchant for dishonesty is the fact that he did not mention such a powerfully important admission in his March 24, 2005, memo to his boss.  ¶ 46. There can be no summary judgment in light of such whole cloth fabrications by a decision-maker.  A jury would not only very easily conclude that Snyder statements were materially false, but they could also reasonably decide Snyder purposely lied to embellish his case, and mask his true retaliatory motive.  The problems with, and issues created from, Snyder's dirty hand in this termination do not stop there, however.

On the evening of February 9, 2005, Snyder received Ziltz's recap Jose's alleged

lie that day.  Snyder thereafter did nothing to investigate the alleged lie.  ¶¶ 55-7.  Jose's DIAD board and DIAD reports stored in the "DIAD room," were readily available for Snyder to check and determine precisely the number of packages Jose started the day with, delivered and picked up during the day, as well as the times.  The DIAD information would have also revealed when the various text messages of the preceding day were sent and received.  From this information, he could have easily verified, or negated the accuracy of Ziltz's report that Jose was dishonest.  He, as well as Ziltz, neglected to check any of this information, or take any other steps to investigate.  He simply took Ziltz at his word, and based thereon, placed Jose on notice of termination the following morning.

This lack of investigation is not only striking given the relative ease of verifying Ziltz's claims, it is also at odds with the manner in which Snyder normally handled such allegations leveled against similarly situated workers who did not seek non-workers' comp benefits.  ¶¶ 63-80.

Package car drivers Al Petkov, Courtney Stevens and Dave Rodriguez, were all accused of committing "cardinal infractions" under Article 54 of the CBA while under Snyder's management.  ¶¶ 63-74.  These workers did not file any workers' comp claims while under Snyder's supervision.  ¶¶ 67, 72, 74.

Petkov was accused of lying about the number of 70+ pound packages he picked up.  Snyder physically weighed each package on Petkov's truck and compared the weights to what Petkov recorded in his DIAD board.  The result per Snyder was gross dishonesty.  ¶¶ 65-6.  Despite this, Snyder agreed to reduce Petkov's termination to a suspension because Petkov had a clean performance record with no prior instances of alleged dishonesty.  Snyder was not aware if Petkov at any point sought workers' comp benefits.

¶ 67.

Here, Snyder not only admittedly failed to check DIAD information, he did not even attempt to determine if Jose had any past alleged instances of dishonesty as an UPS employee. He in fact testified that he could not remember whether it would have mattered to him if Jose in fact did not have any prior instances of alleged dishonesty. ¶ 69. Yet, he stated that In instances of alleged dishonesty, he agrees that whether an accused employee has had one or more similar allegations against him in the past bears upon what level of discipline is appropriate in the current instance, and/or whether he would be willing to reduce the severity of the discipline he initially meted out. ¶ 68.

Snyder terminated Courtney Stevens on October 4, 2006 for alleged dishonesty, but then returned him to work five days later. He did this even though Stevens had been accused of dishonesty on at least two other occasions. ¶¶ 70-1. Similarly, five days after Snyder terminated Dave Rodriguez for rolling a truck on its side, he agreed to return him to work. In that case, per Snyder, Rodriguez admitted the infraction. ¶ 73. Snyder again determined that Rodriguez had a clean disciplinary history with no prior unsafe driving incidents. ¶ 73.

Driver Anna Brickley (dishonesty), and employees Brian Slay (dishonesty) and Deanna Reynolds (failure to report an accident) were all also terminated by Snyder while working under his supervision. After one day, Snyder reinstated Brickley and Snyder and/or Ziltz reinstated Reynolds. Slay was likewise returned to work after a period of suspension. ¶¶ 75-80.

Lastly, the undisputed fact that both Snyder and Ziltz received greater pay raises for the year 2005 by keeping workers' comp costs to a minimum should not be lost on this

Court.   They moreover selected one another to rate their respective performance in 2005.
Snyder approved Ziltz's performance evaluation.  Snyder received an above average pay
raise based on his 2005 performance which was pi part due to decreasing workers comp
costs in his center as compare to 2004.   ¶¶ 81-7.   Taken together the other strong
circumstantial evidence of retaliation set forth above, particularly given Ziltz's belief that
Jose faked his accident and therefore his workers; comp claim, a jury can reasonably
believe that this incentive to minimize workers' comp claims played a role Jose's
termination.

## II.    UPS Desperately, and in Vain, Tries to Pass the Buck to Local 705

UPS tries desperately and in vain to pass the buck for Jose's termination to Local
705.  The Union, however, indisputably had no involvement in the February 9, 2005,
shenanigans of Zilitz and Snyder.  "'Cause' is defined as 'something that precedes and
brings about and effect or a result.'"  *Clark v. Owens-Brockway Glass Container*, 297
Ill.App.3d 694, 698 (5th Dist. 1998), quoting Black's Law Dictionary 221 (6th ed. 1990).
'When a first cause produces a second cause that produces a result, the first cause is the
cause of that result.'"  *Clark v. Owens-Brockway Glass Container*, 297 Ill.App.3d 694, 698
(5th Dist. 1998), quoting *Bocian v. Industrial Comm'n*, 282 Ill.App.3d 519, 527 (1996).   The
trumped-up and fabricated actions of Ziltz and Snyder on February 9, 2005, not anything
the Union did or failed to do, caused Jose's termination.  Moreover, UPS could have
returned Jose to work at any time.  UPS's implication that there was some requirement that
the Union file a grievance before it could return Jose to work is not only without factual or
legal basis, it is a slap in the face to a formerly dedicated and loyal worker.

The only relevance that UPS's belabored arguments about what the Union did or

failed to do for Jose, or what may or may not have happened to Jose's grievance, has to

this case is that, once again, Snyder lied and treated non-workers' comp employees better

than Jose.  ¶¶ 47-54.  Snyder claims the Union did not submit Jose's grievance until weeks

after the termination.  Ken Emanuelson, Jose's Union representative says he submitted

it two days prior to the termination.  They both agree that Snyder refused to accept Jose's

grievance.  ¶ 50-1.  On March 2, 2005, Snyder did in fact sign off on the grievances of

Hiram Guyton and Anthony Blackman, both of whom were accused of infractions just as

serious as dishonesty.[2]  ¶ 50.  Neither of these workers had filed workers' comp claims.

Both are still working for UPS.  ¶ 52.   At the same time he rejected Jose's grievance.  A

jury could decide that this was one more indicium of retaliatory animus.

## IV.    UPS Waived its § 301 Preemption Argument

UPS for the first time in this litigation raises a § 301 preemption argument.  In total,

UPS has filed three separate answers in this case – its original answer filed 03/28/07, an

amended answer filed 06/07/07, and its present answer filed after it removed this case

back before this Court filed 11/09/07 (See Ex. 12).  While UPS raised various affirmative

defenses in each of these answers, it failed to and has not until just now raised a

§ 301 preemption defense.  Moreover, the factual bases of the belatedly asserted defense

were peculiarly within the knowledge of UPS and its counsel at all times during the

pendency of this case.  It has no legitimate excuse for its failure to raise this defense

properly.  Jose will suffer undue prejudice should this Court allow UPS to avoid Rule 8 and

---

[2] Package car driver Guyton was accused of making a sex remark to a customer. Snyder returned him back to work with only a verbal warning.   Driver Blackman was accused of not having a valid drivers' license.  Snyder reduced his termination to a suspension.

MemoOpposeSJMotion.wpd
January 28, 2008/tjc

assert this defense now.  He would have geared discovery toward defending himself against such a claim had he been notified of it.  He very well would have moved to dismiss it under Rules 12 and/or 56 had it been plead properly.  This court should therefore rule that UPS has waived this defense.  See *McKinnon v. Kwong Wah Restaurant*, 83 F.3d 498, 505 (1st Cir. 1996)

## IV.     Illinois Workers' Compensation Retaliatory Discharge Claims are not Pre-empted by Federal Labor Laws

Should this Court allow UPS to proceed on its belated § 301 preemption argument, it should summarily dismiss it.  As our Circuit made very clear in *Bettis v. Oscar Mayer Foods Corp.*, 878 F.2d 192, 195-98 (7th Cir. 1989), following the Supreme Court's decision in *Lingle v. Norge Division of Magic Chefs, Inc.*, 486 U.S. 399, 108 S. Ct. 1877) (1988), the elements of a Illinois workers' compensation retaliatory discharge claim can be evaluated without interpreting a collective bargaining agreement.  UPS presents no argument to distinguish *Bettis* or *Lingle*, and no cogent argument why this case is somehow different from the normal workers' comp retaliation case wherein the purely factual questions of the conduct of the primary actors and the motivation of the employer is at issue.

Here, there is no need to construe any term of the CBA, and UPS fails to show otherwise.  Its argument is solely based on a case that did not even involve a workers' compensation  retaliatory discharge claim, *Kimbro v. PepsiCo., Inc.*, 215 F.3d 723 (7th Cir. 2000).  The interference with contract/expectancy claim in *Kimbro* has nothing in common with the claim in this case, and UPS feigned argument to the contrary should be summarily rejected.   Moreover, UPS's claims that this matter was set for arbitration and that an arbitrator has been selected are meaningless.  Even if this case has already proceeded

to arbitration and a ruling was in hand, there would be no *res judicata* effect.  See *Beckman*

*v. Freemann United Coal Mining Co.*, 123 Ill.2d 281 (Ill. 1988).  This Court should therefore

summarily dismiss UPS's § 301 preemption argument.

### Conclusion

Based on aforementioned facts, legal authority and arguments, there are numerous

genuine issues of material fact with respect to whether UPS terminated Jose's employment

because he filed a workers' compensation claim.  This Court should accordingly deny

UPS's motion for summary judgment and set this matter for trial.

Respectfully submitted,
Plaintiff, JOSE ANDREU,


By:    /s/ Timothy J. Coffey
       Timothy J. Coffey
       THE COFFEY LAW OFFICE, P.C.
       Attorneys for JOSE ANDREU
       1403 E. Forest Avenue
       Wheaton, IL  60187
       (630) 534-6300
