**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE ANDREU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07 C 6132 |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | Judge Samuel Der-Yeghiayan |
| | ) | |
| Defendant. | ) | Magistrate Judge Mason |

**PLAINTIFF'S LOCAL RULE 56.1(b)(3) RESPONSE TO DEFENDANT'S RULE 56.1
STATEMENT OF ALLEGEDLY UNCONTESTED MATERIAL FACTS**

Plaintiff, JOSE ANDREU, by and through his attorneys, THE COFFEY LAW

OFFICE, P.C., states as follows as and for his Local Rule 56.1(b)(3) Response to

Defendant UPS's Rule 56.1 Statement of Allegedly Uncontested Material Facts.

1.     Plaintiff Jose Andreu ("Andreu" or "Plaintiff") is a resident of Cook County,

Illinois. (Complaint ¶ 2).

**Response:**   Agree.

2.     Defendant UPS is an Ohio corporation registered and licensed to do

business in Illinois with its principal place of business in Atlanta, Georgia. (Complaint ¶

3; Memorandum of Clarification of UPS's Principal Place of Business, p. 1).

**Response:**   Agree.

3.     The Court has jurisdiction over Andreu's claims pursuant to 28 U.S.C. §

1332 and/or 28 U.S.C. § 1367. (UPS's Notice of Removal ¶ 3).

**Response:**   Agree.

1

4.    The Court is the proper venue for Andreu's claims because Andreu resides in and was employed by UPS within this judicial district and the events complained of are alleged to have occurred within this judicial district. (Complaint ¶¶ 2, 4).

**Response:**    Agree.

5.    Andreu was hired by UPS in 1996 and initially worked as a part-time loader on the air dock. (Andreu Dep. p. 11).

**Response:**    Agree.

6.    At all relevant times Andreu was a member of Teamsters Local 705 ("Local 705 or "the Union"). (Andreu Dep. p. 19).

**Response:**    Agree.

7.    At all relevant times, Andreu's employment with UPS was governed by a collective bargaining agreement (the "CBA" or "collective bargaining agreement") entered into between UPS and Local 705. (Andreu Dep. pp. 19, 20; Haefke Decl. ¶ 3).

**Response:**    Agree.

8.    From 1996 to 2003 Andreu worked as a part-time air driver delivering Next Day Air packages. (Andreu Dep. pp. 11, 12).

**Response:**    Agree.

9.    From 2003 until his separation from employment on March 4, 2005, Andreu worked as a swing or vacation package car driver. (Andreu Dep. pp. 12, 13, 25).

**Response:**  Disagree with UPS's characterization of its termination of Mr. Andreu's employment as a "separation."  Otherwise, agree.

10.     As a swing or vacation driver, Andreu did not have a regular route but rather would fill in for drivers on vacation, on disability, on workers' compensation leave or otherwise not at work. (Andreu Dep. pp. 25, 26).

**Response:**  Agree.

11.     Andreu's duties as a UPS package car driver included the delivery and pick-up of packages and Next Day Air documents. (Andreu Dep. p. 33).

**Response:**  Agree.

12.     For most employee offenses which may result in termination of employment, the collective bargaining agreement between UPS and Local 705 provides a procedure for an employee to continue working until his status is resolved by UPS and the Union provided through the grievance procedure (Haefke Decl. ¶ 4).

**Response:**  Plaintiff objects to this purported evidence on the grounds that neither the CBA nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr. Tom Haefke had knowledge of and that UPS may use to support its claims or defenses in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1).  See Ex. 1, UPS Amd. R26(a)(1) Discls.  This purported evidence should also be excluded as UPS disclosed no expert witnesses, and Mr. Haefke's proposed testimony is technical and/or specialized knowledge based on his experience, training and/or education, and thus is expert testimony under FRE 702.

Plaintiff also objects on the grounds that this purported fact is ambiguous and vague in its use of the term "most employee offenses."  Lastly, the purported fact is not

relevant to this action, and any slight relevance is substantially outweighed by the

danger of unfair prejudice, confusion of issues, or misleading the jury, or by

considerations of undue delay, waste of time, or needless presentation of cumulative

evidence.  See FRE 401 and 403.  Subject to and without waiving his objections,

Plaintiff responds that he is without sufficient information to either agree or disagree

with the truth of this purported fact.

13.    Usually the Union files a grievance over an employee being put on "Notice

of Termination," which initiates discussions between UPS and the Union to resolve the

grievance. (Haefke Decl. ¶ 5).

**Response:**    Plaintiff objects to this purported fact on the grounds that neither the

Union's "usual" procedures nor the CBA, or the grievance procedures thereunder were

disclosed by UPS as subjects that Mr. Tom Haefke had knowledge of and that UPS

may use to support its claims or defenses in violation of UPS's obligations under Fed.

R. Civ. P. 26(a)(1).  See Ex. 1, UPS Amd. R26(a)(1) Discls.  This purported evidence

should also be excluded as UPS disclosed no expert witnesses, and Mr. Haefke's

proposed testimony is technical and/or specialized knowledge based on his experience,

training and/or education, and thus is expert testimony under FRE 702.

Plaintiff also objects on the grounds that this purported fact is ambiguous and

vague in its use of the term "usually."  Lastly, the purported fact is not relevant to this

action, and any slight relevance is substantially outweighed by the danger of unfair

prejudice, confusion of issues, or misleading the jury, or by considerations of undue

delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401

and 403.  Subject to and without waiving his objections, Plaintiff disagrees with the truth

4

of this purported fact, and affirmatively states that discussions to resolve grievances are initiated by the Union raising the complaint verbally with the appropriate UPS supervisor or manager, not by written grievance.  See Ex. 2, Local 705-UPS CBA, Art. 7, Sec 1, p. 13.

14.    In many instances, an employee on "Notice of Termination" is returned to work by an agreement of UPS and the Union after a grievance is filed on his/her behalf, with discipline such as a warning or an unpaid temporary suspension from work rather than a termination of employment. (Haefke Decl. ¶ 7).

**Response:**    Plaintiff objects to this purported fact on the grounds that neither the CBA nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr. Tom Haefke had knowledge of and that UPS may use to support its claims or defenses in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1).  See Ex. 1, UPS Amd. R26(a)(1) Discls.   This purported evidence should also be excluded as UPS disclosed no expert witnesses, and Mr. Haefke's proposed testimony is technical and/or specialized knowledge based on his experience, training and/or education, and thus is expert testimony under FRE 702.

Plaintiff also objects on the grounds that this purported fact is ambiguous and vague in its use of the term "[i]n many instances."  Lastly, the purported fact is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401 and 403.  Subject to and without waiving his objections, Plaintiff responds that he is without sufficient information to either agree or disagree

5

with the truth of this purported fact.

15.     If UPS and the Union do not agree on a lesser penalty at a lower level

hearing, the normal practice is for the grievance to proceed to resolution, first at the

joint Union-UPS Grievance Committee meeting (the Panel), and if not resolved there,

possibly to arbitration by an outside arbitrator. (Haefke Decl. ¶ 8).

**Response:**   Plaintiff objects to this purported fact on the grounds that neither the CBA

nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr.

Tom Haefke had knowledge of and that UPS may use to support its claims or defenses

in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1).  See Ex. 1, UPS Amd.

R26(a)(1) Discls.  This purported evidence should also be excluded as UPS disclosed

no expert witnesses, and Mr. Haefke's proposed testimony is technical and/or

specialized knowledge based on his experience, training and/or education, and thus is

expert testimony under FRE 702.

Plaintiff also objects on the grounds that this purported fact is ambiguous and

vague in its use of the term "the normal practice."  Lastly, the purported fact is not

relevant to this action, and any slight relevance is substantially outweighed by the

danger of unfair prejudice, confusion of issues, or misleading the jury, or by

considerations of undue delay, waste of time, or needless presentation of cumulative

evidence.  See FRE 401 and 403.  Subject to and without waiving his objections,

Plaintiff responds that he is without sufficient information to either agree or disagree

with the truth of this purported fact.

6

16.    In cases in which the Union declines to file a timely grievance, the normal procedure is for UPS to impose the discipline noticed shortly after the 15 day time limit for filing a grievance has passed. (Haefke Decl. ¶ 11).

**Response:** Plaintiff objects to this purported fact on the grounds that neither the CBA nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr. Tom Haefke had knowledge of and that UPS may use to support its claims or defenses in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1). See Ex. 1, UPS Amd. R26(a)(1) Discls. This purported evidence should also be excluded as UPS disclosed no expert witnesses, and Mr. Haefke's proposed testimony is technical and/or specialized knowledge based on his experience, training and/or education, and thus is expert testimony under FRE 702.

Plaintiff also objects on the grounds that this purported fact is ambiguous and vague in its use of the term "the normal procedure." Lastly, the purported fact is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See FRE 401 and 403. Subject to and without waiving his objections, Plaintiff responds that he is without sufficient information to either agree or disagree or deny the truth of this purported fact.

17.    Prior to the circumstances involving Plaintiff Andreu, UPS had never allowed an untimely grievance over a "Notice of Termination" to go forward. (Haefke Decl. ¶ 17).

**Response:**  Plaintiff objects to this purported fact on the grounds that neither the CBA

nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr.

Tom Haefke had knowledge of and that UPS may use to support its claims or defenses

in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1).  See Ex. 1, UPS Amd.

R26(a)(1) Discls.  This purported evidence should also be excluded as UPS disclosed

no expert witnesses, and Mr. Haefke's proposed testimony is technical and/or

specialized knowledge based on his experience, training and/or education, and thus is

expert testimony under FRE 702.

Plaintiff also objects on the grounds that this purported fact is ambiguous and

vague in its use of the term "untimely."  Lastly, the purported fact is not relevant to this

action, and any slight relevance is substantially outweighed by the danger of unfair

prejudice, confusion of issues, or misleading the jury, or by considerations of undue

delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401

and 403.  Subject to and without waiving his objections, Plaintiff responds that he is

without sufficient information to either agree or disagree with the truth of this purported

fact.

18.     On February 9, 2005, Andreu was assigned the Route 59 route on the

south and east sides of Aurora, Illinois. (Andreu Dep. pp. 90-9 1).

**Response:**  Agree.

19.     That afternoon, Andreu was contacted by UPS through an ODS, or text

message through his DIAD (the Delivery Information Acquisition Device that is carried

by all UPS package car drivers), and told to "break your route and go pick up Bernina

ASAP." (Andreu Dep. pp. 95-96; Bast Dep. p. 19).   Andreu understood this message

meant he should "stop doing what you are doing and go and get the pick-up." (Andreu Dep. p. 97).

**Response:**  Plaintiff objects to this purported fact.  UPS has never taken the position that any part of the reason for its termination of Jose' employment was insubordination or refusal to obey a work order.  This purported fact is therefore not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401 and 403.  Subject to and without waiving his objections, Plaintiff agrees.

20.    Because of the need to satisfy customers about priority pick-ups, it is common for drivers to be told to break off route to handle a priority pick-up. (Snyder Decl.  2; Bast Decl. ¶ 2; Ziltz Decl. ¶ 3). Drivers are expected to follow these directions like any other direct work-related instructions. (Snyder Decl. ¶ 3; Bast Decl. ¶ 3; Haefke Decl. ¶ 19; Ziltz Decl. ¶ 4).

**Response:**  Plaintiff objects to this purported fact.  UPS has never taken the position that any part of the reason for its termination of Jose' employment was insubordination or refusal to obey a work order.  This purported fact is therefore not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401 and 403.  Subject to and without waiving his objections, Plaintiff agrees.

21.     Instead of following this specific instruction, Andreu responded through the DIAD that he wanted to take lunch and he had a lot of stops left. (Andreu Dep. p. 97).

**Response:**   Plaintiff objects to this purported fact.  UPS has never taken the position that any part of the reason for its termination of Jose' employment was insubordination or refusal to obey a work order.  This purported fact is therefore not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401 and 403.  Subject to and without waiving his objections, Plaintiff agrees.

22.     Andreu thereupon received a second ODS message asking how many stops he had left. (Andreu Dep. p. 98).

**Response:**   Agree.

23.     Andreu called the Center around 4 p.m. and said he had approximately sixty (60) stops remaining on his vehicle and that breaking the route would put him behind and he would return late to the building. (Andreu Dep. pp. 98-99; Bast Dep. pp. 31, 34).

**Response:**   Disagree in part.  This call did not take place "around 4 p.m." as UPS contends.  See ¶¶ 31-33, below.

24.     The Bernina pick-up was time-sensitive and needed to be completed by 4:30 p.m. (Bast Dep. p. 23).

**Response:**  Plaintiff objects to this purported fact on the grounds that it is not relevant

to this action, and any slight relevance is substantially outweighed by the danger of

unfair prejudice, confusion of issues, or misleading the jury, or by considerations of

undue delay, waste of time, or needless presentation of cumulative evidence.  See FRE

401 and 403.  Subject to and without waiving his objections, Plaintiff responds that he is

without sufficient information to either agree or disagree with the truth of this purported

fact.

25.    Andreu had done the pick-up at Bernina before. (Andreu Dep. p. 95).

**Response:**  Agree.

26.    UPS OMS Cheryl Bast informed Supervisor David Ziltz that at 4:00 p.m.

Andreu claimed he had sixty (60) stops remaining on his package car and didn't want to

make the Bernina pick-up. (Bast Dep. pp. 34-36; Ziltz Dep. pp. 131-32).

**Response:**  Disagree.  Andreu told Bast that he had about 60 stops left at about 3

p.m., not 4 p.m. as UPS contends.  This is a material factual dispute. See ¶¶ 31-33,

below.

Additionally, neither Ziltz nor Bast testified that Jose stated he "didn't want to

make the Bernina pick-up" as UPS contends.  Bast testified that Jose stated to her he

"can't go to Bernina," (Ex. 3, Bast Dep. p. 33, line 10), "couldn't" go (p. 33, lines 22-3),

and then "wouldn't be able to go there," (p. 34, lines 1-2)  She further testified that she

told Ziltz that Jose stated he "wouldn't be able to" (p. 36, lines 7-11) make the Bernina

stop.  Ziltz testified that Bast told him that Jose told her "he cannot get the pick-up."  Ex.

4, Ziltz Dep. p. 132.  Lastly, the pages of Bast's and Ziltz's deposition pages cited by

UPS do no support the purported fact.

11

27.    Andreu was again told by Bast by ODS message at about 4:15 p.m. to break off his route and go to Bernina and meet with Ziltz there. This time, Andreu did as he was told. (Andreu Dep. p. 101; Bast Dep. pp. 36-37).

**Response:**    Disagree in part.  It was about 4:20 when Jose received the text message to go and meet Ziltz at Bernina.   Further, while UPS's purported fact is ambiguous on this point, this is the first and only work order that Jose received directing him to meet Ziltz at Bernina.  Ex. 5, Andreu Dep. P. 101.

28.    Ziltz was waiting for Andreu when he arrived at Bernina; Andreu claims he arrived at 4:45 p.m. (Andreu Dep. pp. 103, 105).

**Response:**    Agree.

29.    Ziltz checked Andreu′s package car and found he had only about twenty (20) stops remaining. (Ziltz Dep. p. 135).

**Response:**    Disagree.  See  ¶¶ 35-37, below.  Also, the testimony of Zilltz and Snyder materially differs on this point.  Snyder testified that Ziltz told him that he counted 13 to 15 stops in Jose's truck.  Ex. 6, Snyder Dep. p. 216.

30.    Ziltz told Andreu that Andreu had been untruthful about the number of package deliveries Andreu had left (60 rather than 20) when he was told to "break off route" and go ASAP to Bernina and that he would be called into the office the next day and would be fired for lying about the number of packages. (Andreu Dep. p. 105; Ziltz Dep. pp. 135-36).

**Response:**    Disagree in part.  See ¶¶ 35-37, below.

31.    Ziltz does not have the authority to unilaterally discharge employees. (Haefke Decl. ¶ 22).

**Response:**    Disagree.   Snyder testified that "in some capacities supervisors have termination authority."  With respect to Ziltz in the Aurora Center when Snyder was his manager, Snyder affirmed that Ziltz had authority to terminate, but stated that "out of courtesy he would, we would review it."  Ex. 6, Snyder Dep. pp. 246-7.

32.    Ziltz informed then UPS Aurora Center Manager Kerry Snyder ("Snyder") of this untruthfulness incident with Andreu. (Ziltz Dep. p. 139; Snyder Dep. pp. 185, 214-15).

**Response:**    Agree.

33.    Bast drafted a note summarizing her communications with Andreu concerning the Bernina pick-up and this was also given to Kerry Snyder. (Bast Dep. pp. 15, 38; Snyder Dep. Ex. 4; Snyder Dep. p. 112).

**Response:**    Agree.

34.    On the morning of February 10, 2005, Union Steward Pam Treadwell got Andreu and took him to Snyder's office where the three of them met. (Snyder Dep. p. 213; Andreu Dep. pp. 112-113).

**Response:**    Disagree in part.  Snyder twice testified that Ziltz was also at the February 10, 2005, meeting in his office.   Ex. 6, Snyder Dep. pp. 212-13, 242.  He also wrote in his March 24, 2005, memo to his boss, Randy Dunn, that Ziltz was present at this meeting.   See Ex. 6, Snyder Dep. Ex. 5, Snyder 03/24/05 Memo.

35.    During the February 10, 2005 meeting, Snyder asked Andreu to explain what happened on February 9, 2005. Andreu told his story, including admitting he had claimed he had "about 60" stops remaining. (Andreu Dep. pp. 98, 116; Snyder Decl. ¶ 4).

13

**Response:**    Plaintiff objects to the purported fact on the grounds that it is vague,

ambiguous and, as written, mischaracterizes the record.  As Jose stated in his

deposition, on February 10, 2005, he told Snyder that at about 3 p.m. on the preceding

day he stated to Cheryl Bast that he had about 60 stops remaining on his truck.  Jose

has never varied from this statement, whether at his deposition or elsewhere.  Ex. 5,

Andreu Dep. pp. 95-96, 116.   There is thus no "admission"–at least not one against

Jose's interest.  What there is, however, is a material factual dispute with Jose saying

this communication with Bast took place at about 3 p.m., on the one hand, and Bast

saying it took place at about 4:10 p.m., on the other.  See ¶¶ 31-33, below.  Ex. 3, Bast

Dep. pp. 32-4.

36.    After he had heard everything, Snyder told Andreu he was on notice of

termination for this untruthful attempt to avoid a work instruction. (Andreu Dep. p. 116;

Snyder Dep. pp.  219-20).

**Response:**    Disagree in part.  Nowhere on the cited pages do either Jose or Snyder

testify that the February 10, 2005, notice of termination was due to an "untruthful

attempt to avoid a work instruction."   See ¶¶ 58-61, below, for other shifting variations

of UPS's alleged reasons for terminating Jose's employment.

37.    Snyder could have terminated Andreu immediately as the CBA between

UPS and Local 705 lists "dishonesty" as a cardinal offense subject to termination on the

first offense without need for progressive discipline. (Haefke Decl. ¶ 9).

**Response:**    Plaintiff objects to this purported fact on the grounds that neither the CBA

nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr.

Tom Haefke had knowledge of and that UPS may use to support its claims or defenses

in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1).  See Ex. 1, UPS Amd. R26(a)(1) Discls.  This purported evidence should also be excluded because  UPS failed to disclose a single expert witness, and Mr. Haefke's proposed testimony is technical and/or specialized knowledge based on his experience, training and/or education, and thus is expert testimony under FRE 702.

Plaintiff also objects to this purported fact on the grounds that it is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401 and 403.  Subject to and without waiving his objections, Plaintiff agrees.

38.    The CBA requires that grievances challenging disciplinary action be filed with the Company within fifteen (15) days of the imposition of the disciplinary action. (Haefke Decl. ¶ 10).

**Response:**   Plaintiff objects to this purported fact on the grounds that neither the CBA nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr. Tom Haefke had knowledge of and that UPS may use to support its claims or defenses in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1).  See Ex. 1, UPS Amd. R26(a)(1) Discls.  This purported evidence should also be excluded because UPS failed to disclose a single expert witness, and Mr. Haefke's proposed testimony is technical and/or specialized knowledge based on his experience, training and/or education, and thus is expert testimony under FRE 702.

Plaintiff also objects to this purported fact on the grounds that it is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair

prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401 and 403.  Subject to and without waiving his objections, Plaintiff agrees.

39.    No grievance was filed with UPS within fifteen (15) days of Andreu's Notice of Termination. (Snyder Dep. pp. 265, 267).

**Response:**    Plaintiff also objects to this purported fact on the grounds that it is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401 and 403.  Subject to and without waiving his objections, Plaintiff disagrees.  See ¶¶ 46-53, below.

40.    When the Union had not yet filed a grievance over twenty (20) days after Andreu was placed on notice of termination, Snyder met with Andreu and Union Steward Rick Cantu on March 4, 2005 and terminated Andreu's employment. (Snyder Dep. pp. 210-11; Andreu Dep. p. 129).

**Response:**    Plaintiff also objects to the "grievance" part of this purported fact on the grounds that it is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401 and 403.  Subject to and without waiving his objections, Plaintiff disagrees in part.  See ¶¶ 46-53, below.

41.    Union Business Agent Emmanuelson [(sic)] tried to give Snyder a grievance after Andreu was terminated but Snyder declined to accept it. (Snyder Dep.

16

pp. 267-69).

**Response:**   Plaintiff also objects to this purported fact on the grounds that it is not

relevant to this action, and any slight relevance is substantially outweighed by the

danger of unfair prejudice, confusion of issues, or misleading the jury, or by

considerations of undue delay, waste of time, or needless presentation of cumulative

evidence.  See FRE 401 and 403.  Subject to and without waiving his objections,

Plaintiff disagrees in part.  See ¶¶ 46-53, below.

42.    Union Business Agent Emmanuelson [(sic)] also tried to get District Labor

Relations Manager Tom Haefke to accept a late grievance on Andreu's behalf but

Haefke declined to accept it. (Haefke Decl. ¶ 12).

**Response:**   Plaintiff objects to this purported fact on the grounds that neither the CBA

nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr.

Tom Haefke had knowledge of and that UPS may use to support its claims or defenses

in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1).  See Ex. 1, UPS Amd.

R26(a)(1) Discls.

Plaintiff also objects to this purported fact on the grounds that it is not relevant to

this action, and any slight relevance is substantially outweighed by the danger of unfair

prejudice, confusion of issues, or misleading the jury, or by considerations of undue

delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401

and 403.  Subject to and without waiving his objections, Plaintiff disagrees in part.  As

explained below, the grievance was not "late."  See ¶¶ 46-53, below.

43.    Local 705's standard grievance form has a place for a UPS manager's

signature signifying he/she received a timely grievance. (Haefke Decl. ¶ 20).

17

**<u>Response:</u>**    Plaintiff objects to this purported fact on the grounds that neither the CBA

nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr.

Tom Haefke had knowledge of and that UPS may use to support its claims or defenses

in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1).  See Ex. 1, UPS Amd.

R26(a)(1) Discls.

Plaintiff also objects to this purported fact on the grounds that it is not relevant to

this action, and any slight relevance is substantially outweighed by the danger of unfair

prejudice, confusion of issues, or misleading the jury, or by considerations of undue

delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401

and 403.  Subject to and without waiving his objections, Plaintiff agrees that the

standard grievance form has a line for managers to sign, but disagrees that signatures

on this line necessarily indicate that the grievance was "timely."   See ¶¶ 46-53, below.

44.    The grievance the Union purported to submit on behalf of Andreu has no

signature of a UPS manager. (Haefke Decl. ¶ 21).

**<u>Response:</u>**  Disagree in part.   As explained below, Union Representative Ken

Emanuelson in fact submitted Jose's grievance to Manager Kerry Snyder on March 2,

2005.  See ¶ 46-53, below.

45.    Snyder testified that, had a grievance been timely filed, he would have

been willing to have taken Andreu off the notice of termination and the termination

reduced to a suspension. (Snyder Dep. pp. 256-57).

**<u>Response:</u>**    Disagree.  As explained below, Union Representative Ken Emanuelson in

fact submitted a timely grievance on Jose's behalf, but Snyder refused to accept it.

See ¶ 46-53, below.

46.    After being asked by the Union on several occasions to have the matter of Andreu's termination heard by the joint UPS/Local 705 grievance panel (regardless of no timely grievance filing), in March 2006 UPS agreed the Union could bring the matter to the joint UPS/Local 705 grievance panel. (Haefke Decl. ¶¶11, 13, 14).

**Response:**    Plaintiff objects to this purported fact on the grounds that neither the CBA nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr. Tom Haefke had knowledge of and that UPS may use to support its claims or defenses in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1).  See Ex. 1, UPS Amd. R26(a)(1) Discls.

Plaintiff also objects to this purported fact on the grounds that it is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401 and 403.  Subject to and without waiving his objections, Plaintiff responds that he is without sufficient information to either agree or disagree with the truth of this purported fact.

47.    At the March 15, 2006 grievance panel hearing under the CBA between representatives of the Union and UPS, UPS took the position that the grievance should be denied because it was not timely filed. The grievance was thereupon "deadlocked" by the grievance panel, meaning it was slated for hearing by an independent arbitrator, both as to the issue of untimely filing of the claimed grievance and, depending on how that issue was resolved, final adjudication by the arbitrator, pursuant to the parties' CBA. (Haefke Decl. ¶ 15).

**Response:**    Plaintiff objects to this purported fact on the grounds that neither the CBA

nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr.

Tom Haefke had knowledge of and that UPS may use to support its claims or defenses

in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1).  See Ex. 1, UPS Amd.

R26(a)(1) Discls.

Plaintiff also objects to this purported fact on the grounds that it is not relevant to

this action, and any slight relevance is substantially outweighed by the danger of unfair

prejudice, confusion of issues, or misleading the jury, or by considerations of undue

delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401

and 403.  Subject to and without waiving his objections, Plaintiff responds that he is

without sufficient information to either agree or disagree with the truth of this purported

fact.

48.    An arbitration hearing to resolve the issue of UPS's grounds for

terminating Andreu's employment was scheduled for June 13, 2007, before Arbitrator

Paul F. Gerhart, but was delayed at Andreu's request. (Haefke Decl. ¶ 16).

**Response:**    Plaintiff objects to this purported fact on the grounds that neither the CBA

nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr.

Tom Haefke had knowledge of and that UPS may use to support its claims or defenses

in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1).  See Ex. 1, UPS Amd.

R26(a)(1) Discls.

Plaintiff also objects to this purported fact on the grounds that it is not relevant to

this action, and any slight relevance is substantially outweighed by the danger of unfair

prejudice, confusion of issues, or misleading the jury, or by considerations of undue

delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401

and 403.  Subject to and without waiving his objections, Plaintiff states that he first

became aware of the scheduled June 13, 2007, arbitration hearing date on May 14,

2007, and that he was not consulted in advance regarding the setting of this date.  He

agrees that he requested to continue this date.

49.    On January 24, 2005, Andreu was assigned to the Route 59 route on the

south and east side of Aurora, Illinois. (Andreu Dep. pp. 51, 52).

**Response:**    Agree.

50.    At his first delivery stop on January 24, 2005, Andreu called his UPS work

facility on his cell phone and reported that he heard his back crack and felt a sharp pain

while handling a package. (Andreu Dep. pp. 54-57).

**Response:**    Agree.

51.    According to Andreu, Amanda (last name and position unknown) told him

to do his Next Day Air deliveries (which are light) and then call back so a supervisor

could meet with him. (Andreu Dep. pp. 57-60).

**Response:**    Agree.

52.    Andreu made no claim that performing these Next Day Air deliveries

made him uncomfortable. (Ziltz Decl. ¶ 2).

**Response:**    Plaintiff objects to Par. 2 of Ziltz's declaration on the grounds that he

clearly lacks foundation to state definitely that Mr. Andreu never at any time, from the

time of his injury to date, stated he felt "uncomfortable," or any other comparable

adjective, when delivering the next day airs.  Subject to and without waiving his

objection, Plaintiff agrees.

21

53.    After doing his Next Day Air deliveries, Andreu called back and talked to Safety Supervisor Jill Schmidt who told him to wait where he was for a supervisor. (Andreu Dep. pp. 60-61).

**Response:**    Agree.

54.    UPS On Car Supervisor Dave Ziltz ("Ziltz") met Andreu out on his route. (Andreu Dep. p. 62; Ziltz Dep. p. 48).

**Response:**    Agree.

55.    Andreu told Ziltz that he could not complete his route by himself but he could drive; Ziltz got UPS employee Mike Ballu to assist Andreu the rest of the day by delivering the packages while Andreu drove the UPS vehicle. (Andreu Dep. p. 64).

**Response:**    Agree.

56.    Ziltz told Andreu to come to Ziltz's office at the end of the day so they could report the back incident to UPS's workers' compensation carrier and also told Andreu to see a doctor first thing the next day. (Andreu Dep. p. 65).

**Response:**    Agree.

57.    After he completed his route that day, Andreu went to Ziltz's office where, according to Andreu, Ziltz called UPS' workers' compensation liability carrier, Liberty Mutual, and reported Andreu's back incident; Andreu was thereupon given a workers' compensation claim number. (Andreu Dep. p. 68).

**Response:**    Agree.

58.    On the next morning, January 25, 2005, Andreu was treated by Dr. Tesmond at the Addison clinic. (Andreu Dep. pp. 78-80).

**Response:**    Agree.

22

59.    Andreu was diagnosed as having a back strain and was told to use ice and take Advil as directed. Andreu was not issued any work restrictions. (Andreu Dep. p. 81; Andreu Dep. Ex. 7).

**Response:**   Agree.

60.    Andreu continued to receive treatment through February 9, 2005, but was not given any medical restrictions on his work during this time period. (Andreu Dep. p. 85).

**Response:**   Agree.

**PLAINTIFF'S LOCAL RULE 56.1(b)(3)( c) STATEMENT OF ADDITIONAL FACTS
REQUIRING DENIAL OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, JOSE ANDREU ("Jose"), by and through his attorneys, THE COFFEY

LAW OFFICE, P.C., states as follows as and for his Local Rule 56.1(b)(3)( c) Statement

of Additional Facts that Require this Court to Deny Defendant's Motion for Summary

Judgment.

**Jose Was an Excellent, Dedicated Employee**

1.     Prior to the alleged events of February 9, 2005, UPS did not issue any form of

performance discipline, or job warnings to Jose during his entire career at UPS dating

back to 1996.   Ex. 8, Andreu Decl. ¶ 3; Ex. 9, Andreu UPS Pers. File, UPS 0001-0041.

2.     Prior to the alleged events of February 9, 2005, Jose's supervisor Dave Ziltz had

no issues with Jose's work performance.  Ex. 4, Ziltz Dep. pp. 45-6.

3.     Prior to the alleged events of February 9, 2005, Ziltz had no knowledge of Jose

trying to shirk his work responsibilities, skimp out of work, cut or leave work early, or any

other ploy to avoid work or lessen the number of hours he worked.  Ex. 4, Ziltz Dep. p.

171-2.

4.     During 2004, Jose worked overtime every week with the exception of the week

he took vacation.  Excluding his vacation week and another week omitted for some

unknown reason by UPS's payroll report (the week ended August 28th), in 2004, Jose

worked an average of 7.6 hours of overtime per week.  In addition to his regular and

overtime earnings, Jose also earned production bonuses in 24 of these 50 weeks.  Ex.

10, Andreu UPS Payroll History Report, UPS 0674-0691.

5.     During January and the first week of February 2005, Jose again worked over

time every week, averaging 7 overtime hours per week.  Jose also earned production

bonuses in 3 of these 5 weeks.  Ex. 9, Andreu UPS Payroll History Report, UPS 0703-

05.

**Jose Injures His Back at Work**

6.      As he was requested to do when he initially reported his work accident and

injuries on the morning of January 24, 2005, Jose telephoned back into the Aurora

Center a short time later and spoke to Safety Supervisor Jill Schmidt.  Ex. 5, Andreu

Dep. pp. 60-1.

7.      Following this telephone conversation, Ms. Schmidt went to Aurora Center

Manager Kerry Snyder's office and told him that Jose had reported the injury.  Because

she worked to only 12:30 p.m., Ms. Schmidt reminded Snyder to have one of the

supervisors help Jose call in the injury to the worker's compensation carrier when he

returned to the center after he completed his route.  Snyder told Ms. Schmidt that he

would.  Ex. 11, Schmidt Dep. pp. 16-20.

8.      Contrary to Ms. Schmidt's testimony, Snyder testified that he first became aware

of Jose's January 24th work accident and injuries not that day from Ms. Schmidt, but the

following day from Supervisor Melissa Del Dotto.  Ex. 6, Snyder Dep. pp. 153-5.

**Supervisor/Decision-Maker Dave Ziltz Immediately and Baselessly Concludes**
**That Jose is Lying About his Work Injury**

9.      As soon as Ziltz learned that Jose reported being injured in a work accident on

the morning of January 24, 2005, he immediately doubted the truthfulness of Jose's

claim.  Ex. 4, Ziltz Dep. pp. 48, 52-3.  As Ziltz stated, he doubted "[t]hat the incident

happened."  Id. at p. 54.

**Decision-Maker Ziltz's Unfounded Doubts Fester and Boil Over in an Angry Outburst Towards Jose**

10.    Later in the day on January 24, 2005, Ziltz met Jose out on his route.  Ziltz immediately started yelling at Jose, accusing him of lying about his accident and injuries.  Ziltz stated to Jose that he was "lying about getting hurt," was "lazy,"  that "the girls in the office don't believe you, and I don't believe you either," and that he "screwed up for the rest of the drivers when somebody else gets hurt."  Ex. 11, Ans. Compl. ¶ 9; Ex. 5, Andreu Dep. pp. 63-4.

11.    Ziltz admitted that when he arrived at Jose's truck on January 24, 2005, he expressed his doubts to Jose about the truthfulness of Jose's claimed accident and injuries.  Ex. 4, Ziltz Dep. p. 53.

12.    While Ziltz could not recall the exact words he used to express his doubts to Jose, he admitted that he may have accused Jose of "faking" the accident and/or injuries.  Ex. 4, Ziltz Dep. p. 55.

13.    After meeting Jose at his truck on January 24, 2005, and questioning him about the claimed accident and injuries, Ziltz continued to doubt the truthfulness of Jose's claimed accident and injuries.  Ex. 4, Ziltz Dep. p. 55.   Ziltz admitted that his doubts in fact continued up until he first learned that a doctor had placed Jose on work restrictions.   Ex. 4, Ziltz Dep. p. 96.

14.    Jose was not placed on medical work restrictions until he returned to work on February 17, 2005, after being out of work the preceding few days and receiving medical treatment due to the pain he was experiencing from the injuries he sustained in his January 24, 2005, work accident.   Ex. 13, Turner Pain Ctr. Docs. P000241-47; Ex.

8, Andreu Decl. ¶ 8.

## Decision-Maker Ziltz Spreads His Baseless Belief That Jose Lied About His Work Injury

15.     Immediately after meeting Jose out on his route on January 24, 2005, Ziltz

telephoned his boss, Aurora Center Manager Kerry Snyder, and, among other things,

told Snyder that he doubted the truthfulness of Jose's claimed accident and/or injuries.

Ex. 4, Ziltz Dep. pp. 61-3.

16.     Shortly after February 9, 2005, Jose heard Ziltz tell his co-supervisor Melissa Del

Dotto that he believed Jose was faking his injury.  Ex. 14, Andreu Supp'l. Resp. to UPS

1st Ints., p. 4.

17.     Supervisor Del Dotto confirmed that Dave Ziltz told her that he did not believe

Jose was in fact injured at work on January 24, 2005.  Ex. 15, Del Dotto Dep. pp. 37-40.

While in her direct examination at her deposition in this matter Ms. Del Dotto testified

that Ziltz made this statement to her after February 9, 2005, during cross-exam by

UPS's attorney, she changed her recollection, and stated Ziltz made this comment to

her a couple of days after Jose claimed to have been injured on January 24, 2005.  Ex.

15, Del Dotto Dep. pp. 73-4.

## Decision-Maker Ziltz Picks Jose To Make an Unscheduled Pick-Up at Bernina

18.     Dave Ziltz testified that at approximately 4:00 p.m. on February 9, 2005, he was

out in a truck delivering packages when he received a call from Cheryl Bast in the

Aurora Center.  In that call, Bast advised him for the first time that there was a "need to

cover Bernina."  He then instructed Bast to "have Jose pick up Bernina."  Ex. 4, Ziltz

Dep. pp. 126-30.

19.    Ziltz was very clear that in this initial call he decided that Jose should make the Bernina pick-up and that he communicated that decision to Bast.  Ex. 4, Ziltz Dep. p. 131.

20.    Ten or fifteen minutes after this initial call from Bast, she called Ziltz again and, for the first time, stated to him that Jose told her he could not get the Bernina pick-up, and had 60 stops left.  Ex. 4, Ziltz Dep. pp. 131-32.

21.    In the normal course within the Aurora Center in 2005, it was the responsibility of the package car supervisors to decide which driver to send to make additional, unscheduled package pick-ups.  Ex.  15, Del Dotto Dep. pp. 24-26.

22.    On February 9, 2005, there were approximately 4 different routes within the South Aurora area where Bernina is located.  Ex. 4, Ziltz Dep. p. 127.  Laura Martinez was driving the route that the Bernina pick up was on.  Id. at p. 126.  Ms. Martinez's route averaged 117 to 130 stops per day.  Id. at p. 129.   Ziltz was driving another route that averaged 109 stops.  Jose was driving a third route that averaged 170 to 200 stops.  Lastly, another driver whose name Ziltz could not recall was driving Tom Gorski's usual route which averaged 160 to 210 stops.  Id. at pp. 127-8.

23.    Ms. Martinez did not file any workers' compensation claims while under the supervision of Snyder.  Ex. 16, UPS Ans. to 1st Ints., Int. No. 4, p. 3.; Ex. 17, UPS Suppl. Int. Ans., pp. 1-4.

24.    Earlier in the day on February 9, 2005, Jose met Ziltz at a meet point per Ziltz's request.  Once there, as Mr. Ziltz requested, Jose loaded additional packages onto his truck.  Ex. 4, Ziltz Dep. pp. 123-5.

**Decision-Maker Snyder Side-Steps Normal Practice to Ensure Jose is Ordered to Make the Bernina Pick-Up**

25.     On February 9, 2005, Cheryl Bast entered Kerry's Snyder's office and reported to him that Jose told her he could not make the Bernina pick up because he had too much work, and would be out late.  Snyder, having absolutely no knowledge about the particulars of the Bernina pick-up or the status of Jose's workload, told Bast that Jose needed to make the pick up.  Ex. 6, Snyder Dep. pp. 119-23.

26.     Prior to deciding that Jose was the driver who needed to make the Bernina pick-up and instructing Bast as such, Snyder didn't even bother to ask Bast about the details of why Jose claimed he could not make the Bernina pick-up, or about any of the details of the Bernina pick-up itself (i.e., number of packages, weight of packages, amount of time it would take, etc.).  Ex. 6, Snyder Dep. pp. 122-23.

27.     Snyder testified that he decided Jose needed to make the Bernina pick up because Jose was driving a specially allocated route that day that had no pick-ups so he could be available to make unscheduled pick-ups such as Bernina.  Snyder stated that it was the practice in the Aurora Center to dispatch 10% of the routes  without pick-ups or with very few pick-ups so these drivers have flexibility to meet a customers' needs or to assist other drivers.   Ex. 6, Snyder Dep. pp. 124-26.

28.     Prior to deciding that Jose was the driver who needed to make the Bernina pick-up, however, Snyder failed to check the route coverage list or to otherwise determine if Jose was in fact driving one of the no, or light pick-up routes that day.  He admitted though that whether Jose was on such a route should have been a consideration in deciding whether he was the best driver to be assigned the Bernina pick-up.   Ex. 6,

Snyder Dep. pp. 126-27.

29.    The CBA required UPS to "treat employees with dignity and respect at all times, which shall include, but not limited to, giving due consideration to the age and physical condition of the employee." Ex. 2, CBA, Art. 37 p. 85. Snyder is familiar with this section of the CBA. Ex. 6, Snyder Dep. p. 173. Snyder in fact has applied this section with respect to an older driver to whom Snyder assigns routes with lighter deliveries, less stops, stuff that's less physical." Id. at p. 174-5. Though Snyder knew Jose claimed to have hurt his back at work on January 24, 2005, he does not remember taking such claimed injury into consideration in assigning Jose work. Id. at p.175-6.

**Decision-Maker Ziltz Sets Up Jose, Then Fabricates Jose's Alleged Lie**

30.    The DIAD board that Jose used in his job as a package car driver displayed the time of day directly on its face. Ex. 5, Andreu Dep. p. 166.

31.    On February 9, 2005, at approximately 3 p.m., Jose received a text message through his DIAD board from the Aurora Center asking him to break off his route and go make an unscheduled pick-up at Bernina. Ex. 5, Andreu Dep. pp. 95-6.

32.    He promptly responded, received a reply, and then responded again. In his second response, Jose estimated that he had approximately 60 stops left. Ex. 7, Andreu Ans. to 1st Ints., Ans. to Int. No. 7, p. 8.

33.    When he received and responded to the Bernina text messages, Jose was looking directly at the time as displayed on his DIAD board. Ex. 5, Andreu Dep. p. 166.

34.    Jose thereafter called into the Aurora Center and was told to disregard the prior text message requesting that he make the additional pick up at Bernina. Ex. 5, Andreu Dep. p. 100.

35.    At approximately 4:20 p.m., Jose received another text message.  This message directed him to go meet Dave Ziltz at Bernina.  He then went straight to Bernina as instructed.    Ex. 5, Andreu Dep. pp. 101-103.

36.    Jose arrived at Bernina, and Ziltz approached his truck.  Upon stepping into Jose's truck, Ziltz was screaming and out of control saying that Jose was lying again, had lied to him before, and was going to get fired the next day .  Ex. 5, Andreu Dep. p. 105; Ex. 8, Andreu Decl. ¶ 4.  He then asked Jose for the key to the inside overhead door, opened the door and entered cargo area of his truck.  He continued to accuse Jose of lying and saying that he would be fired the next day.   Ex. 8, Andreu Decl. ¶ 4.

37.    Ziltz did not physically count each package on Jose's truck.   He admitted that there could have been more than 20 packages on Jose's truck when he met Jose at Bernina.  Ex. 4, Ziltz Dep. p. 135-6.

38.    At no point did Jose see or hear Ziltz count the packages that were in the cargo area of his truck.  At no point did Ziltz say he counted 20 packages or any other number of packages.  At no point did Ziltz mention Cheryl Bast, or anything about Jose telling her he had 60 stops or packages left in his car.  Ex. 8, Andreu Decl. ¶ 4.

39.    In her entire 6 ½ year career as an on-road package car supervisor, Melissa Del Dotto, Ziltz's co-supervisor, only went out to a driver's truck to determine the number of stops he had remaining on a couple of occasions, and she only did this in order to make a decision whether the driver needed help.  She has never visited a driver out on a route for the purpose of verifying whether a driver was being truthful about the number of packages he had in his truck.  Ex. 15, Del Dotto Dep. pp. 9, 10, 43.

**Decision-Maker Kerry Snyder Intentionally Post-Dates the Day Jose Reported His Work Injury**

40.     On March 24, 2005, Snyder decided to document the February 10, 2005, meeting whereat he placed Jose on notice of termination in a memo to his boss, Addison Division Manager Randall Dunn.  Ex. 6, Snyder Dep. pp. 230-1, Dep. Ex. 5, Snyder 03/24/05 Memo.

41.     In his memo, although he knew it was false, Snyder wrote that Jose did not report his January 24, 2005, work accident until the day after the February 10, 2005, meeting.  Snyder testified that he did not know why he made such a false statement. Ex. 6, Snyder Dep. p. 233, Dep. Ex. 5, Snyder 03/24/05 Memo.

42.     Although he has known about this false statement since sometime before his July 11, 2007, deposition in this matter, Snyder has done nothing to correct it.  Ex. 6, Snyder Dep. p. 235.

43.     Mr. Dunn did not request that Snyder write his March 24, 2005, memo, or otherwise document his version of the events surrounding Jose's termination.    Ex. 18, Dunn Dep. pp. 111-13.  Mr. Dunn in fact did not recall ever receiving Snyder's March 24, 2005, memo addressed to him.  As far as he could recall, his review of this memo the day preceding his July 25, 2007, deposition in this matter, was the first time he had ever seen it.   Ex. 18, Dunn Dep. pp. 56-7, 111.

**Almost a Year Later, Decision-Maker Snyder Juices Up His Weak Case Against Jose**

44.    On February 2, 2006, Kerry Snyder wrote an e-mail to a Ms. Donna Piwowar in connection with Jose's claim for unemployment compensation responding to several questions she had concerning Jose's termination.  In response to Ms. Piwowar asking whether Jose admitted to the infractions either verbally or in writing, Snyder wrote, "[y]es, he admitted to lying."  Ex. 6, Snyder Dep. pp. 198-9, Dep. Ex. 9, Snyder 02/02/06 E-Mail.

45.    At his deposition, Snyder stated, "I don't remember [Jose] admitting to me that he lied."  When asked why then he would tell Ms. Piwowar that Jose did indeed admit to lying, Snyder stated, "[b]ecause at the time [the e-mail] was generated I remembered it, but at this point in time I do not remember it."  Ex. 6, Snyder Dep. p. 199.

46.    In his March 24, 2005, memo to his boss, Snyder neglected to mention his allegation that Jose "admitted to lying."  Ex. 6, Snyder Dep. Ex. 5, Snyder 03/24/05 Memo.

**Decision-Maker Snyder Intentionally Rejects Jose's Grievance Yet Simultaneously Accepts Two Other Comparable Grievances**

47.    On Wednesday, March 2, 2005, Ken Emanuelson, Jose's Union representative, met with Kerry Snyder in his office for the purpose of submitting Jose's grievance and along with the grievances of two other employees, Mr. Guyton and Mr. Blackman, both of whom also worked under Snyder's management authority in the Aurora Center.   Ex. 19, Emanuelson Decl. ¶ 5.

48.    All three grievances concerned discipline that was imposed on February 9 or 10, 2005.  In all three cases, a Step 1 grievance meeting was held on February 9 or 10,

2005.  Local 705 Union steward Pamela Treadwell met with Snyder about Jose and Mr. Guyton on February 10, 2005.  Treadwell met with Ziltz about Mr. Blackman on February 9, 2005.  Ex. 19, Emanuelson Decl. ¶ 6.

49.    One or two weeks before their March 2, 2005 meeting, Emanuelson telephoned Snyder and asked to schedule a meeting with him about all three grievances.  In that telephone conversation, Snyder agreed to meet with Emanuelson about the three grievances on March 2, 2005, which was the earliest date they were both available. Snyder did not say anything to Emanuelson at that time about any of the grievances allegedly being "untimely."  Ex.  19, Emanuelson Decl. ¶ 9.

50.    On March 2, 2005, in Snyder's office, Emanuelson handed the three grievance forms to him.  Snyder looked at them.  He accepted the grievance forms for Guyton and Blackman, and signed off on resolutions of their grievances returning them both to work.  He  then stated that he would not accept Jose's grievance because, as he said, it was "untimely."   He handed Jose's grievance back to Emanuelson.  Emanuelson disagreed with Snyder, and stated that all three grievances arose on February 9 or 10, 2005, so if he believed that Jose's grievance was untimely, he must also feel the other two which he had accepted were also untimely.  Snyder responded by reiterating that Jose's grievance was untimely, and that he would not accept it.  Snyder refused to sign Jose's grievance.  Ex. 19, Emanuelson Decl. ¶ 10.

51.    To date, Snyder has not given Emanuelson any reason why on March 2, 2005, he accepted the Guyton and Blackman grievances, but refused to accept Jose's grievance.  Ex. 19, Emanuelson Decl. ¶ 11.

52.    Both Guyton and Blackman still presently work for UPS at its Addison, Illinois

34

facility.  Ex.  19, Emanuelson Decl. ¶ 12.  Neither Guyton nor Blackman filed workers'

compensation claims while under the supervision of Snyder.  Ex. 16, UPS Ans. to 1st

Ints., Int. No. 4, p. 3.; Ex. 17, UPS Suppl. Int. Ans., pp. 1-4.

53.     UPS stated under oath in response to interrogatories that it took "no disciplinary

action" against Guyton, and that it was "unaware if a grievance was filed" by the Union

on his behalf.  Ex. 20, UPS Ans. to 2nd Ints., p. 5.

54.     On February 10, 2005, Snyder took Guyton out of service for alleged sexual

harassment.  Ex. 19, Emanuelson Decl. ¶ 6.

**Manager Snyder Unjustifiably, and Without Any Legitimate Investigation, Places
Jose on Notice of Termination**

55.     On the evening of February 9, 2005, Dave Ziltz met with Kerry Snyder and

"recapped the [Jose] incident" of that day.  Ex. 6, Snyder Dep. pp. 214-15.  Other than

meeting with Ziltz and getting his side of the story, Snyder did nothing in terms of

investigating the allegation that Jose had lied about the number of packages on his

truck prior to placing him on notice of termination on the morning of February 10, 2005.

Id. at p. 220.

56.     Snyder made no effort to look at the information available through Jose's DIAD

Board and/or the DIAD system on order to determine the times of the various text

messages between Jose and Cheryl Bast, or the number of packages delivered and/or

pick-up by Jose throughout the day.  Ex. 6, Snyder Dep. p. 223.  Snyder made no effort

to look into whether Jose had any past instances of alleged dishonesty or other

infractions.  Id. at pp. 223-24.

57.     While Snyder had received a copy of a short memo that Cheryl Bast allegedly wrote to Dave Ziltz on February 9, 2005, concerning her involvement with Jose that day, he does not investigate any of the allegations she stated therein.   Ex. 6, Snyder Dep. p. 229.

58.     As part of his duties as a package car supervisor, Ziltz looks at information derived from the driver's DIAD boards on an almost daily basis.   Ex. 4, Ziltz Dep. p. 116.  This information is stored on computer in the DIAD room.  Id. at 196.  He does not believe, however, that  he looked at Jose's DIAD board or information therefrom in an effort to determine if Jose in fact misrepresented the number of packages in his car on February 9, 2005.  He is not aware whether anyone looked, or attempted to look, at Jose's DIAD information.  Id. at p. 120.

**Defendant Offers Shifting Reasons For Jose's Termination**

59.     In February 2005, in a morning meeting in his office Snyder stated to package car supervisors Melissa Del Dotto and Ziltz that Jose had been terminated "for not working – as an integrity issue of lying." Ex. 15, Del Dotto Dep. pp. 34-35.

60.     In February 2005, Safety Supervisor Jill Schmidt sought out both Ziltz and Snyder to ascertain why Jose was no longer at work.  Both Ziltz and Snyder told her that Mr. Andreu was terminated because he was dishonest.  Neither Ziltz nor Snyder said anything to Ms. Schmidt about a grievance being filed or not being filed as a reason why Jose was terminated.  Ex. 11, Schmidt Dep. pp. 54-59.

61.     Ziltz stated that Jose was terminated "due to a grievance not being presented." Ex. 4, Ziltz Dep. p. 177.

62.    In Ms. Donna Piwowar's February 2, 2006, e-mail to Snyder in connection with Jose's claim for unemployment compensation, she asked him to "[p]lease explain the final incident, including the date, specific details if what occurred and how his actions were discovered."  Snyder replied to Ms. Piwowar as follows: "Final incident - Jose Andreu lied to FT supervisor Dave Ziltz on 2/9/05."  No where in his reply e-mail did Snyder mention any alleged failure to file a grievance subsequent to February 9, 2005, as an alleged reason or cause for the termination.  Ex. 6, Snyder Dep. Ex. 9, Snyder 02/02/06 E-Mail.

**Similarly Situated Employees Not Fired After Allegedly Committing Comparable Offenses**

63.    Under Article 54 of the CBA, similar to dishonesty, drinking or under the influence, possession or use of drugs, gross negligence, carrying unauthorized passengers, failure to report an accident, a runaway accident sexual harassment and fighting on the job are all "cardinal infractions" subjecting the offender to immediate termination.  Ex. 2, CBA, Art. 54, pp. 123-24.

64.    Within the April to June 2007 time frame, Ziltz became aware that Aurora Center air driver Dave Dill allegedly had an unauthorized passenger in his truck.  Ziltz ordered Mr. Dill to telephone the office.  When Mr. Dill called in, Ziltz told him that if he had anyone else in the car, he needed to get them out now.   While Mr. Dill was out of work for some time thereafter, he was back working as of July 26, 2007.  Ex. 4, Ziltz Dep. pp. 190-2.

65.    When Snyder was Manager of UPS's Joliet Center from May 2001 to May 2002, a package car driver who was under his authority, Al Petkov, was accused of being dishonest in that he was allegedly taking credit for picking up 70 plus pound packages when he in fact was not.  Ex. 6, Snyder Dep. pp. 24, 66-7.

66.    Once he was notified of the allegation, Snyder along with a supervisor, physically conducted an audit of Mr. Petkov's truck which included individually weighing each package and comparing the weights to what Mr. Petkov had recorded on his DIAD board.  Ex. 6, Snyder Dep. p 67.  Snyder determined that Mr. Petkov had actually picked up and/or delivered only 2 or 3 over 70 pound packages as opposed to the 100 plus he had recorded.  Id.

67.    Snyder, in collaboration with Mr. Tom Haefke, agreed to reduce Mr. Petkov's termination to a suspension because of the fact that he had a clean performance history with no other instances of alleged dishonesty.  Ex. 6, Snyder Dep. pp. 69-70. Snyder is not aware of Mr. Petkov seeking worker's compensation benefits at any point in his career with UPS.  Id. at pp. 90-1.

68.    In instances of alleged dishonesty, Snyder agrees that whether an accused employee has had one or more similar allegations against him in the past bears upon what level of discipline is appropriate in the current instance, and/or whether he would be willing to reduce the severity of the discipline he initially meted out.   Ex. 6, Snyder Dep. p. 73.

69.    Snyder could not remember whether he ever attempted to determine if Jose had any past alleged instances of dishonesty as a UPS employee.   Ex. 6, Snyder Dep. pp. 72-3.  Snyder could not remember whether it would have mattered to him if Jose in fact

38

did not have any prior instances of alleged dishonesty.  Id.

70.    Courtney Stevens, a package car driver working out of the Aurora center during Snyder's tenure, was terminated by Snyder on October 4, 2006, for alleged dishonesty in violation of Article 54 of the CBA.  Five days later, on October 9, 2006, UPS returned Mr. Stevens back to work.  Ex. 6, Snyder Dep. pp. 101-04, Dep. Ex. 3, Stevens' Grievance.

71.    On at least two other occasions, Mr. Stevens was similarly terminated for alleged dishonest acts but then returned back to work.  His alleged dishonesty included saying he was at a particular location when he was not, sheeting packages as closed when they were open, delivering next day air parcels late and claiming the customer was not in.  Ex. 18, Dunn Dep. pp. 158-60; Dunn Dep. Ex. 7, Stevens' Grievance.

72.    Mr. Stevens did not file any workers' compensation claims while under the supervision of Snyder.  Ex. 16, UPS Ans. to 1st Ints., Int. No. 4, p. 3.; Ex. 17, UPS Suppl. Int. Ans., pp. 1-4.  As of July 26, 2007, Mr. Stevens was still employed by UPS as a package car driver.  Ex. 4, Ziltz Dep. p. 167.

73.    In January 2007, package car driver Dave Rodriguez rolled a package car on its side.  This type of accident is a "cardinal sin" under Article 54 of the CBA.  Snyder, his manager at the time, terminated Mr. Rodriguez.  The matter was investigated during which Mr. Rodriguez admitted to driving too fast for conditions.  Approximately 5 days after the incident, Snyder agreed to reduce the termination to a suspension based on the fact that Mr. Rodriguez had a clean disciplinary history with no prior unsafe driving or serious misconduct incidents.  Ex. 6, Snyder Dep. pp. 91-5.

74.    In making his decision, Snyder sought out information about Mr. Rodriguez's employment history because he believed it was important.  Mr. Rodriguez had not sought workers' compensation benefits as far as Snyder was aware.  Ex. 6, Snyder Dep. pp. 91-5.

75.    On April 21, 2006, package car driver Anna Brickley was terminated by Kerry Snyder for alleged dishonesty in violation of Article 54.  She was accused of taking credit for pick-up stops she was not making.  After one day, Snyder reduced the termination to a suspension.  Ex. 20, UPS Ans. to 2nd Ints., p. 4.

76.    Ms. Brickley did not file any workers' compensation claims while under the supervision of Snyder.  Ex. 16, UPS Ans. to 1st Ints., Int. No. 4, p. 3.; Ex.  17, UPS Suppl. Int. Ans., pp. 1-4.

77.    On or about October 27, 2005, Snyder and/or Ziltz placed Brian Slay on notice of termination for alleged dishonesty ion violation of Article 54.  He was accused of falsifying doctor's notes.   Snyder and/or Ziltz subsequently reduced the termination to a warning. Ex. 20, UPS Ans. to 2nd Ints., p. 4.

78.    Mr. Slay did not file any workers' compensation claims while under the supervision of Snyder.  Ex. 16, UPS Ans. to 1st Ints., Int. No. 4, p. 3.; Ex. 17, UPS Suppl. Int. Ans., pp. 1-4.

79.    On or about July 15, 2005, Snyder and/or Ziltz terminated Deanna Reynolds for alleged failure to report an accident.  After one day, Snyder and/or Ziltz reduced the termination to a suspension.  Ex. 20, UPS Ans. to 2nd Ints., p. 5.

80.    Mr. Reynolds did not file any workers' compensation claims while under the supervision of Snyder.  Ex. 16, UPS Ans. to 1st Ints., Int. No. 4, p. 3.; Ex. 17, UPS

Suppl. Int. Ans., pp. 1-4.

**Decision-Makers Snyder and Ziltz Received Greater Pay Raises by Keeping
Workers' Compensation Claims and Costs to a Minimum**

81.    As one of his "critical skills raters" for his 2005 "Quality Performance Review"

("QPR"), Snyder selected Ziltz.   Ex. 6, Snyder Dep. p. 252-53, Dep. Ex. 10, Snyder

2005 QPR.

82.    During 2005, Snyder's boss, Randall Dunn, monitored workers' compensation

costs in the Aurora Center for purposes of rating Snyder's performance.   Ex. 18, Dunn

Dep. pp. 143-4.   Similarly, in his year-end 2005 QPR, "workmans comp cost" is one

numerical rating that comprised Snyder's "2005 Final Score."  The greater the workers'

comp costs in his center during the year, the lower his numerical rating for that

category, and consequently the lower his final score, and ultimately his pay raise.  Ex.

18, Dunn Dep. pp. 143-5.

83.    For 2005, Snyder received a 76.39 final score, which in the words of Dunn

equated to "a very good [pay] increase that year."  Dunn stated that Snyder received

close to a 5% pay increase for 2005, "which is higher than average."  This was in part

due to a decrease in workers' comp costs in his center in 2005 as compared to 2004.

Ex. 18, Dunn Dep. p. 146.

84.     For the year 2005, one of Snyder's performance goals was to decrease workers' compensation costs.  Ex. 18, Dunn Dep. p. 149.  Dunn and Snyder would review Aurora Center workers' compensation reports and costs at least monthly.  Id. at pp. 28-9.  One or more of these reports listed names of Aurora Center workers who had file workers' comp claims, along with medical costs, length of time on workers comp, and general information about the employee.  Id. at pp. 26-7.

85.     As one of his "critical skills raters" for his 2005 QPR, Ziltz selected Snyder.  Snyder also approved Ziltz's 2005 QPR.  Ex. 4, Ziltz Dep. p. 35-6, Dep. Ex. 2, Ziltz 2005 QPR, p. UPS 1117.

86.     Similar to Snyder, one of the categories in which Ziltz received a numerical performance rating in 2005 was "workmans comp cost."   Ex. 4, Ziltz Dep. pp. 40-1, Dep. Ex. 2, Ziltz 2005 QPR, p. UPS 1114.  Ziltz, however, claimed that he is not kept informed of such costs during the year.  He stated that he can tell whether he is meeting his goal on workers' comp cost "[b]y the injuries we have in the center."  As a supervisor, he explained, the employees report their injuries to him.  Id. at pp. 41-2.

87.     Ziltz understood that the lower the workers' comp costs were in 2005 in the Aurora center, the greater his rating would be in that category, and, all else being equal, the greater his final score would be, and the greater his final score, the greater his pay raise.  Ex. 4, Ziltz Dep. pp. 72-3.

88.    Jose did not lie about the number of packages I had in my truck on February 9,

2005, and he has ever admitted to Kerry Snyder, or anyone for that matter that he in

fact told such a lie on that day.  Ex. 8, Andreu Decl.¶ 5.

Date:  January 28, 2008

Respectfully Submitted,
Plaintiff, JOSE ANDREU,


By::____/s/ Timothy J. Coffey_____
        Timothy J. Coffey
        THE COFFEY LAW OFFICE, P.C.
        Attorneys for JOSE ANDREU
        1403 E. Forest Avenue
        Wheaton, IL  60187
        (630) 534-6300