

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JOSE ANDREU,                              )
                                          )
                    Plaintiff,            )
                                          )
v.                                        )    Case No. 07 C 6132
                                          )
UNITED PARCEL SERVICE, INC.,              )    Judge Samuel Der-Yeghiayan
                                          )
                    Defendant.            )    Magistrate Judge Mason

---

### PLAINTIFF'S EXHIBITS IN OPPOSITION TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Exhibit 1    UPS's Amended Rule 26(a)(1) Disclosures

Exhibit 2    Local 705-UPS Collective Bargaining Agreement Excerpts

Exhibit 3    Cheryl Bast Deposition Excerpts

Exhibit 4    Dave Ziltz Deposition Excerpts

        Deposition Exhibit 2, Ziltz 2005 Quality Performance Review

Exhibit 5    Jose Andreu Deposition Excerpts

Exhibit 6    Kerry Snyder Deposition Excerpts

        Deposition Exhibit 3, Stevens' Grievance

        Deposition Exhibit 5, Snyder 03/24/05 Memo

        Deposition Exhibit 9, Snyder 02/02/06 E-Mail

        Deposition Exhibit 10, Snyder 2005 Quality Performance Review

Exhibit 7    Jose Andreu's Answers to UPS First Interrogatories

Exhibit 8    Jose Andreu Declaration

1

Exhibit 9      Jose Andreu UPS Personnel File, UPS 0001 - 0041

Exhibit 10     Jose Andreu UPS Payroll History Report, UPS 0674 - 0705

Exhibit 11     Jill Schmidt Deposition Excerpts

Exhibit 12     UPS's Answer and Affirmative Defense to Complaint

Exhibit 13     Turner Pain Center Documents, P000241-47.

Exhibit 14     Jose Andreu's Supplemental Response to UPS First Interrogatories

Exhibit 15     Melissa Del Dotto Deposition Excerpts

Exhibit 16     UPS Objections and Answers to Plaintiff's First Set of Interrogatories

Exhibit 17     UPS Supplemental Interrogatory Answers

Exhibit 18     Randall Dunn Deposition Excerpts

               Deposition Exhibit 7, Stevens' Grievance

Exhibit 19     Kenneth Emanuelson Declaration

               Exhibit 1, Jose Andreu Grievance

               Exhibit 2, Hiram Guyton Grievance

               Exhibit 3, Anthony Blackman Grievance

Exhibit 20     UPS Objections and Answers to Plaintiff's Second Set of Interrogatories

Date:  January 28, 2008

                         Respectfully Submitted,
                         Plaintiff, JOSE ANDREU,


                         By::____/s/ Timothy J. Coffey_____
                              Timothy J. Coffey
                              THE COFFEY LAW OFFICE, P.C.
                              Attorneys for JOSE ANDREU
                              1403 E. Forest Avenue
                              Wheaton, IL  60187
                              (630) 534-6300

                         2

**Exhibit 1**

**UPS's Amended Rule 26(a)(1) Disclosures**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JOSE ANDREU,                                    )
                                                )
                    Plaintiff,                  )
                                                )    Case No. 07 C 0473
v.                                              )
                                                )    Judge Der-Yeghiayan
UNITED PARCEL SERVICE, INC.,                    )
                                                )
                    Defendant.                  )

**DEFENDANT UNITED PARCEL SERVICE'S
AMENDED DISCLOSURES PURSUANT TO RULE 26(a)(1)**

Defendant United Parcel Service ("UPS") submits its mandatory disclosures pursuant to

Fed. R. Civ. P. 26(a)(1) as follows:

Initial Disclosures. Except to the extent otherwise stipulated or directed by order or local

rule, a party shall, without awaiting a discovery request, provide to the other parties:

    (A)    the name and, if known, the address and telephone number of each individual
likely to have discoverable information that the disclosing party may use to
support its claims or defenses, unless solely for impeachment, identifying the
subjects of the information:

    **RESPONSE:**  Jimmy Millard
    United Parcel Service
    150 South Lombard Road
    Addison, IL 60101-3020

    Has information regarding UPS's policies and procedures.

    Tom Haefke
    United Parcel Service
    150 South Lombard Road
    Addison, IL 60101-3020

    Has information regarding UPS's policies and procedures.

Marilyn Ritchie
United Parcel Service
150 South Lombard Road
Addison, IL  60101-3020

Has information regarding UPS's policies and procedures.

Randy Dunn
United Parcel Service
150 South Lombard Road
Addison, IL  60101-3020

Has information concerning Andreu's termination.

David Ziltz
United Parcel Service
150 South Lombard Road
Addison, IL  60101-3020

Has information concerning Andreu's termination.

James Karr
United Parcel Service
55 Glenlake Parkway, NE
Atlanta, GA  30328

Has information concerning Andreu's COBRA notification.

Kerry Snyder
United Parcel Service
1800 East 1st Avenue
Milan, IL  61264

Has information concerning Andreu's termination.

(B)    a copy of, or a description by category and location of all documents, data
       compilations, and tangible things in the possession, custody or control of the party
       and that the disclosing party may use to support its claims or defenses, unless
       solely for impeachment;

       **RESPONSE:** See documents Bates-stamped UPS 0042-UPS 00128 produced by
       UPS (documents Bates-stamped UPS 0001-UPS 0041 were previously produced).

(C)    a computation of any category of damages claimed by the disclosing party,
       making available for inspection and copying as under Rule 34 the documents or
       other evidentiary material, not privileged or protected from disclosure, on which

such computation is based, including materials bearing on the nature and extent of injuries suffered;

**RESPONSE:** Not applicable.

(D)    for inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

**RESPONSE:** Not applicable.

DATED: June 19, 2007

UNITED PARCEL SERVICE

By: _____
One of its Attorneys

D. Scott Watson, #06230488
Ellen M. Girard, #6276507
Quarles & Brady LLP
500 West Madison Street, Suite 3700
Chicago, IL 60661-2511
(312) 715-5000

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that he caused a copy of the

foregoing United Parcel Service's Amended Disclosures Pursuant to Fed.R.Civ.P.

26(a)(1) to be served upon:

> Timothy J. Coffey
> The Coffey Law Office, P.C.
> 1403 East Forest Avenue
> Wheaton, Illinois 60187
> tcofflaw@sbcglobal.net

by depositing a copy of same in the U.S. Mail chute at 500 W. Madison Street, Chicago,

Illinois, before the hour of 4:00 p.m. this 19th day of June, 2007.

_____
D. Scott Watson

**Exhibit 2**

**Local 705-UPS Collective Bargaining Agreement Excerpts**

# TEAMSTER LOCAL 705 UNITED PARCEL SERVICE AGREEMENT



For the Period
August 1, 2002 to July 31, 2008

UPS 0042

2. Trainers shall be paid a $.50 per hour training premium for each hour spent training.

Drivers training helpers, in accordance with Supplemental Agreements, and two (2) on the car rides for the purpose of route knowledge shall not be entitled to the training premium.

3. The parties shall establish a National Training Committee. The Committee shall be empowered to hear and resolve any disputes that may arise over these issues. Unresolved disputes will be subject to the National Master Grievance Committee.

4. Each Supplemental area shall meet and agree or continue existing agreements on the details of the application of this agreement in their area in accordance with Supplemental language. Other issues left for resolution at this level include, but are not limited to, the minimum qualifications for trainers, if any, the number of hours to be worked by the trainer, and the application of Supplemental language concerning compensation for work performed in higher classifications. Disputes shall be resolved in accordance with paragraph 3.

5. Trainer selection and assignments to on the job training will be done in accordance with supplemental seniority provisions, providing the trainers have the necessary qualifications and skills for the job.

6. The training records that a Teamster represented trainer can be required to complete for drivers, are those previously agreed to by the parties. If the Employer wishes to amend these forms, it will first meet and agree with the National Training Committee. Such agreement will not be unreasonably withheld. No training record or verbal report by the trainer will be relied upon to discipline any employee or to evaluate any seniority employee's performance.

7. If a trainer is removed from the qualified list by the Employer, that seniority employee and the Local Union shall have access to the grievance procedure. If the Union establishes that the removal was not for just cause, the grievant shall be reinstated.

8. No trainer shall be required to train in any method which violates the Collective Bargaining Agreement.

9. Teamster represented trainers will not be permitted to perform or recommend disciplinary action.

10. Teamster represented trainers will not be required to make decisions or recommendations regarding the attainment of seniority, by their trainees. The decision as to whether a trainee attains seniority will be made solely by UPS management.

11. Employees to be retrained, after qualifying in their classification, and seniority employees scheduled for safety rides, may request that a non-bargaining unit employee perform that training, in lieu of a Teamster represented trainer. Such requests will be honored.

12. Trainers will not be held liable for auto accidents incurred by the trainee.

## ARTICLE 7. LOCAL AND AREA GRIEVANCE MACHINERY

Except in cases involving cardinal infractions, as outlined in Article 54 of this Agreement, an employee to be discharged or suspended shall be allowed to remain on the job, without loss of pay unless and until the discharge or suspension is sustained under the grievance procedure. The Union agrees it will not unreasonably delay the processing of such cases.

**Section 1.**

Differences between the Employer and the Union as to the application or interpretation of any of the provisions of this Agreement, including the question of whether an employee has been disciplined or discharged for just cause, shall be settled by the following grievance and arbitration procedure.

1.  a) The Employee shall discuss any issues or complaints with a supervisor.

    b) The Union Steward or Business Agent shall discuss any issues or complaints with the appropriate supervisor or manager.

2. If the Employee's issue or complaint is not resolved in step 1(a), the Employee shall discuss the issue or complaint with his/her steward and the appropriate supervisor or manager.

3. If the parties fail to agree on the dispute or issue the steward shall promptly submit a written grievance to the Employer with a copy to the Business Agent within thirty (30) calendar days of the occurrence or knowledge of the occurrence. Grievances relating solely to discharge or discipline shall be filed within fifteen (15) calendar days of the notice of discipline.

4. Failure to follow the above procedure may result in the dismissal of the grievance.

5. Unresolved grievances may be submitted to the 705/UPS Grievance Committee. The 705/UPS Grievance Committee shall consist of an equal number of members selected by the Employer and the Union.

6. Failure to achieve a resolution resulting in a deadlock at the 705/UPS Grievance Committee may result in the grievance being submitted to arbitration by the Union.

UPS 0053

4. Any required logbooks.

The Employer or its agent must maintain for five years records pertaining to the calibration of each EBT used in alcohol testing, including records of the results of external calibration checks.

## Section 4.16 Release of Alcohol Testing Information

The Breath Alcohol Technician (BAT) shall inform the employee before testing that the Employer will be notified if the confirmatory test is greater than 0.02, since the employee will be removed from service and considered medically unqualified to drive under DOT agency rules and regulations.

When a grievance is filed as a result of a positive test the Employer shall obtain records relating to the alcohol test. Upon receiving the records, the Employer shall provide copies to the appropriate official of the Union, by the end of the following business day after receiving the documents from the laboratory or the MRO, as applicable, provided that the employee has executed written consent authorizing release to the Union, a copy of which must be provided to the Employer.

## Section 4.17 Paid For Time.

Testing - the employee will be paid their regular straight time hourly rate of pay in the following manner:

1. For all time at the testing site.

2. (a) If the testing site is reasonably en route between the employee's home and the center, and the employee is going to or from work, pay for travel time one way between the center and the testing site or the testing site to the center; or

(b) For travel time both ways between the center and the testing site only if the testing site is not reasonably enroute between the employee's home and the employee's center.

When an employee is on the clock and a random alcohol test is taken any time during the employee's shift, and the shift ends after eight (8) hours, the employee shall be paid time and one-half for all time past the eight (8) hours.

Provisions in Supplements, Riders and Addenda that are superior shall prevail.

## ARTICLE 36. NON-DISCRIMINATION

The Employer and the Union agree not to discriminate against any individual with respect to hiring, compensation, terms or conditions of employment because of such individual's race, color, religion, sex, national origin, handicap, veteran status or age in violation of any federal or state

law, or engage in any other discriminatory acts prohibited by law, nor will they limit, segregate or classify employees in any way to deprive any individual employees of employment opportunities because of race, color, religion, sex, national origin, handicap, veteran status or age in violation of any federal or state law, or engage in any other discriminatory acts prohibited by law. This Article also covers employees with a qualified disability under the Americans with Disabilities Act.

## ARTICLE 37. MANAGEMENT-EMPLOYEE RELATIONS

### Section 1.

a) The parties agree that the principle of a fair day's work for a fair day's pay shall be observed at all times and employees shall perform their duties in a manner that best represents the Employer's interest. The Employer shall not in any way intimidate, harass, coerce or overtly supervise any employee in the performance of his or her duties. The Employer will treat employees with dignity and respect at all times, which shall include, but not be limited to, giving due consideration to the age and physical condition of the employee. Employees will also treat each other as well as the Employer with dignity and respect.

No employee shall be disciplined for exceeding personal time based on data received from the DIAD / IVIS or other information technology.

b) It is the policy of the Employer to cooperate with a package car driver who desires to be relieved of overtime, subject to the understanding that such package car driver will complete his/her assignment and subject to the provisions below. Any package car driver who desires to be relieved from overtime on a particular day or days shall submit a request in writing at least twenty-four (24) hours in advance. The Center Manager and the Steward shall process such requests based on seniority. The Employer shall allow a minimum of ten percent (10%) of the package car drivers worked in any center off on a daily basis. No package car driver will be granted more than two (2) requests per month. It is understood that to accomplish the above the Employer may need to provide an earlier start time. It is further understood that the Employer is not obligated to let more than one (1) driver in a loop off at one time. Such requests shall not be submitted during the months of November and December.

c) The Employer shall make a reasonable effort to reduce Package car drivers' workdays below 9.5 hours per day where requested. If a review indicates that progress is not being made in the reduction of assigned hours of work, the following language shall apply, except in the months of November and December:

Drivers shall have the right to file a grievance if the Employer has continually worked a driver more than 9.5 hours per day for any three (3) days in a workweek. If a grievance under this provision (or a Grievance under any excessive overtime provision of a Supplement, Rider or Addendum) cannot be resolved at the local level, the Union may docket the

UPS 0089

vacations from December 26th through the week ending Friday, the day after Thanksgiving. The employee shall be ready to pick when asked, at the rate of 25% per week in seniority order. If not ready, the employee will be passed over and pick what is available when ready.

c. With the exception of Delivery Information Employees where the prohibition is in effect from the third (3rd) Monday in January to the third (3rd) Monday in March.

d. Any employee who is eligible for a full vacation, and who resigns or whose services are terminated due to circumstances over which he/she has no control, shall receive pay for the number of weeks vacation as set forth in subsection (b) for his/her then completed years of service. Any such regular full time employee, with more than one (1) year of service who resigns or whose services are terminated due to circumstances over which he/she has no control shall receive prorated pay for the number of weeks vacation as set forth in this Article for his/her then completed years of service.

Prorated pay shall be computed on a percentage basis by dividing the number of straight time hours worked into 1,260 as illustrated below:

| | |
|---|---|
| 125 hours | 10% of full vacation |
| 250 hours | 20% of full vacation |
| 312 hours | 25% of full vacation |
| 625 hours | 50% of full vacation |
| 937 hours | 75% of full vacation |
| 1,250 hours | 100% of full vacation |

Any full time employee who displaces a part time employee shall have those hours counted towards his/her pay for a full time vacation.

e. If a holiday falls during an employee's vacation, he/she shall indicate at the time of selecting said week which of the following options he/she wishes:

1) Take eight (8) hours pay in lieu of the holiday to be paid with the vacation.

2) The Friday prior to starting vacation off as the paid holiday, or the last scheduled work day for those employees on an alternate work week schedule, as defined in Article 46, Section 1 (b).

3) The Monday following vacation off as the paid holiday, or the first scheduled work day for those employees on an alternate work week schedule, as defined in Article 46, Section 1 (b).

4) Hold the paid holiday and use as an additional optional holiday. Note: The Friday before and the Monday after a week with a holiday in it will be restricted to only one person each day and assigned to those looking to

exercise that option by seniority. The locking in of these two (2) days supersedes any option request days.

5) Unused option days will be paid in full the first week of December each year.

The Employer will schedule fifteen percent (15%) of the Employees by classification off on vacation from the Monday after Easter, up to and including the week in which Labor Day falls and a minimum of five percent (5%) off the remaining months. Optional weeks are not to be differentiated from regular vacation weeks in selection.

Section 2. Vacation Pay

On the payday immediately preceding an employee's vacation he/she shall be entitled to vacation pay computed on the basis of fifty (50) hours per week at the current year's hourly rate.

ARTICLE 53. SPECIAL VACATIONS

In lieu of three (3) days sick leave, Day after Thanksgiving holiday and employee's holiday set forth in Article 5 of 1976-1979 contract, plus an additional sick day in 1979, employees will receive fifty (50) hours of vacation pay. (To be eligible, employees must have acquired seniority and be on the payroll by May 1st of any year. Part time employees receive twenty-five (25) hours.)

The option week of vacation is not subject to the pro-rata provision of Article 52. An employee must be actively on the payroll at the time this week is scheduled and taken.

Special vacation week consisting of fifty (50) hours can be picked at the same time the vacation is picked or at any time during the year. If the special vacation is not taken by the end of vacation period, fifty (50) straight time hours will be paid. (Part time employees receive twenty-five (25) hours.)

Employees (full time or part time) may take pay in lieu of time off for optional week. Employees must indicate preference at time of vacation selection.

ARTICLE 54. DISCHARGE AND SUSPENSION

The Employer shall not discharge or suspend any employee without just cause. No employee shall be suspended or discharged without first being verbally warned and the warning being documented, except for the following offenses:

UPS 0108

(a) Dishonesty;

(b) Drinking of or under the influence of alcoholic beverages or narcotics during the workday;

(c) Personal possession or the use of drugs, marijuana or L.S.D. during the work day;

(d) Gross negligence resulting in a serious accident as defined in Article 18.

(e) The carrying of unauthorized passengers while on the job;

(f) Failure to report an accident;

(g) A runaway accident;

(h) Sexual harassment;

(i) Fighting on the job.

The warning notice, as herein provided, shall have no force or effect for a period of more than nine (9) months from the date of said warning notice. Warning notices or file write-ups beyond the nine (9) month period set forth above, will not be considered in the grievance procedure.

## ARTICLE 55. MISCELLANEOUS

### Section 1.

The provisions of this Agreement shall apply to all accretions to the bargaining unit including but not limited to newly established or acquired terminals, consolidations of terminals, etc.

This provision shall not apply to wholly-owned and wholly independently operated subsidiaries which are not under contract with the Union. "Wholly independently operated" means, among other things, that there shall be no interchange of freight, equipment or personnel, or common use, in whole or in part of equipment, terminals, property, personnel or state or ICC rights.

The exception set forth above shall not apply to accretions to the collective bargaining unit.

### Section 2. Incentive Plans-Bonus

The Employer shall not put into effect any new plan of an economic nature affecting employees (such as incentive plans, sick leave schedules, piece rate plans, etc.) without first checking with and securing the approval of the Union. There will be no newly implemented incentive plans unless approved by the affected employees and the Union. Current plans will

remain in effect unless the Union decides to terminate the plan after voting the employees in the affected Center.

### Section 3. Employees Not Required to Buy or Lease Equipment.

The Employer shall not require, as a condition of continued employment, that an employee shall purchase any truck, tractor-trailer or vehicular equipment, or that an employee purchase or acquire any proprietary or other interest or obligation in the business.

### Section 4.

Green checks will be in envelopes.

### Section 5.

All temporary personnel will wear their company identifying badges while on company property.

### Section 6.

Prior to any Change of Operation in Local 705 jurisdiction, the Company and the Union will meet to resolve all issues.

### Section 7.

Once an Employee's Social Security number is on file with the Employer, the employee will only be required to write his/her last four (4) digits of the Social Security number on sign in sheets at the Employer's guard shack.

### Section 8.

It is understood that all unsettled grievances and/ or issues will be heard at the UPS/705 Panel before it is referred to any other party. Neither party will unreasonably deny a grievance being sent to the National Committee and/or local arbitration, after review by the Co-Chairs.

### Section 9. Local 705 / UPS Chicago Districts Mission Statement

Notwithstanding any contractual provision elsewhere in this Agreement, in an effort to further develop and increase volume and customer confidence in the Local 705 / UPS Districts operating areas, it is understood Teamsters Local 705, it's Agents, and members may take a pro-active role in supporting and promoting participation in any and all company initiated volume development activities.

UPS 0109

**Exhibit 3**

**Cheryl Bast Deposition Excerpts**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSE ANDREU,                              )
                                          )
            Plaintiff,                    )
                                          )
        -vs-                              )    No.   07 C 0473
                                          )
UNITED PARCEL SERVICE, INC.,              )
                                          )
            Defendant.                    )

        The deposition of CHERYL BAST, called by
the Plaintiff, for examination, taken pursuant to
notice and pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken
before Tamara Manganiello, Registered Professional
Reporter and Notary Public, at Suite 850, 29 South
LaSalle Street, Chicago, Illinois, on the 26th day
of July, A.D., 2007, commencing at 8:41 a.m.

**Page 2**

1  APPEARANCES:
2  THE COFFEY LAW OFFICE, P.C.,
   1403 East Forest Avenue
3  Wheaton, Illinois 60187
   (630) 462-3901
4  BY: MR. TIMOTHY J. COFFEY,
5      Appeared on behalf of the Plaintiff;
6  QUARLES & BRADY, L.L.P.,
   500 West Madison Street
7  Suite 3700
   Chicago, Illinois 60661
8  (312) 715-5149
   BY: MR. D. SCOTT WATSON,
9
       Appeared on behalf of the Defendant.
10
11  ALSO PRESENT:
11  MR. JOSE ANDREU
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 3**

1              INDEX
2  THE WITNESS: CHERYL BAST
                    PAGES
3
   Direct Examination By Mr. Coffey ............ 4
4
5
6          EXHIBITS
7                    PAGES
8  Bast Exhibit No. 1............................. 15
   Bast Exhibit No. 2............................. 57
9  Bast Exhibit No. 3............................. 58
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 4**

1          (Witness sworn.)
2  WHEREUPON:
3          CHERYL BAST
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6          DIRECT EXAMINATION
7          By Mr. Coffey
8      Q.   Could you please state and spell your
9  full name, please?
10     A.   Cheryl, C-H-E-R-Y-L, Leigh, L-E-I-G-H,
11  Bast, B-A-S-T.
12     Q.   Ms. Bast, my name is Tim Coffey. I'm
13  an attorney for Mr. Jose Andreu. And he has filed a
14  lawsuit against UPS. We're here to take your
15  deposition today. Do you understand that?
16     A.   Yes.
17     Q.   Okay. Have you ever given your
18  deposition before?
19     A.   No.
20     Q.   All right. I'm going to ask a series
21  of questions and you're sworn under oath to give me
22  honest answers. And Tamara here is going to take
23  down all of my questions and all of your answers.
24  Okay?

**Page 5**

1      A.   Uh-huh.
2      Q.   So your answers have to be, to the
3  extent you can remember this, verbal. So yes or no
4  as opposed to uh-huhs and shakes of the head. Okay?
5      A.   Okay.
6      Q.   All right. If there's ever a question
7  I ask that you don't understand, you're going to
8  have to let me know. All right?
9      A.   Okay.
10     Q.   And I'll restate it, rephrase it until
11  you understand it. All right?
12     A.   Yes.
13     Q.   Okay. If you don't do that, the
14  record is going to simply read my question, your
15  answer with no indication that you had any
16  misunderstanding. Okay?
17     A.   Okay.
18     Q.   If you need to take a break at any
19  point in time, feel free to just let us know. All
20  right?
21     A.   Sure.
22     Q.   Have you ever given any sworn
23  testimony, testified in any kind of trial or any
24  kind -- you said no depositions?

2 (Pages 2 to 5)

1    A.    I don't know it offhand.
2    Q.    How about Coveny?
3    A.    I don't know it offhand.
4    Q.    Okay. Did you talk to, text,
5  communicate to either of these drivers that day
6  about making this pick-up?
7    A.    No.
8    Q.    Any reason why not?
9    A.    Because after I talked to Jose, I
10  called Dave and Dave said he doesn't have any
11  pick-ups, tell him he needs to go over there.
12    Q.    Okay.
13    A.    The other drivers have pick-ups.
14    Q.    And this is Dave Ziltz?
15    A.    Yes.
16    Q.    When you're talking to Dave -- well,
17  we'll get into your conversation with Dave Ziltz a
18  little bit more.
19          So you say shortly before 4:00 you
20  get notified that a pick-up needs to be made at
21  Bernina?
22    A.    Yes.
23    Q.    Is that Bernina?
24    A.    Bernina, B-E-R-N-I-N-A.

Page 30

1    Q.    Okay. How do you know shortly before
2  4:00?
3    A.    Because I remember I had talked to
4  Jose around 4:00 o'clock, so I had to be notified
5  that the pick-up needed to be covered in order to
6  send him a message.
7    Q.    When you say you talked to Jose, this
8  is when he calls you back?
9    A.    Correct.
10    Q.    You say it's around 4:00 o'clock?
11    A.    Yes.
12    Q.    What range are we looking at in your
13  memory?
14    A.    Maybe five to 4:00, five after 4:00.
15  Between that time.
16    Q.    So maybe 3:55 to 4:05?
17    A.    Yes.
18    Q.    And how do you know that?
19    A.    Because that's what time it was.
20    Q.    Did you write this --
21    A.    I do remember it was -- I remember
22  looking at the clock at about ten after because I
23  was thinking about how am I going to get to cover this,
24  because I know the other drivers in that area at

Page 31

1  that time have pick-ups, as well. And I do remember
2  looking at the clock and it was about 4:10.
3    Q.    Other than we see as Exhibit No. 1,
4  did you make any notes of any of this, any of the
5  times that we're going to be discussing here, any of
6  the times you've already discussed?
7    A.    No. This is it.
8    Q.    So you text messaged and Mr. Andreu
9  then calls back. And this is a telephone call?
10    A.    Yes.
11    Q.    And you get this at your office
12  telephone?
13    A.    Yes.
14    Q.    Where do you receive this at?
15    A.    Yes. The office phone.
16    Q.    What number is that office phone?
17    A.    There is multiple lines in there.
18  Whatever line is free, it will just go to the next
19  line.
20    Q.    If I wanted to call that number back
21  on February 9th, '05, what number would I dial?
22    A.    Well, the drivers have an 800 number
23  to call. I don't know if he called that 800 number
24  which would, you know, still go into the office or

Page 32

1  if he -- I don't know. I don't know what number he
2  called. There's multiple lines.
3    Q.    Are there more than two numbers that
4  can possibly be called?
5    A.    Uh-huh.
6    Q.    Okay. So you get a call from him.
7  What is said and by who?
8    A.    When I answer the phone, you know, I
9  told him I need him to go to Bernina. He's like, I
10  can't go to Bernina, I have too many stops left, I'm
11  not going to get done until about 9:00 o'clock
12  tonight. And I said okay, well, you know, we really
13  need help there, are you sure you can't go there?
14  No, I can't, I have too many stops. And I said
15  okay. And then at that point, you know, I tried to
16  think, well, who can go there now. And then --
17          MR. WATSON: You were asked about the
18  conversation. Answer the question, please.
19  BY MR. COFFEY:
20    Q.    Anything else said in the conversation
21  with Mr. Andreu?
22    A.    No. I just asked him if he can go
23  there. He said he couldn't.
24    Q.    Well, he said more than that, right?

Page 33

9 (Pages 30 to 33)

1    A.    Well, he said he had 60 stops left and
2    he wouldn't be able to go there.
3    Q.    Did he say too many or did he give you
4    a number?
5    A.    He said 60 stops.
6    Q.    In the phone conversation?
7    A.    Yes.  Because I told him -- I did tell
8    him if you have 60 stops left, you can do 20 an hour
9    and you'll be done by 7:00.
10    Q.    Anything else in the phone conversation
11    with Mr. Andreu?
12    A.    I believe that was it.
13    Q.    What is your next communication with
14    either Mr. Andreu or Mr. Ziltz or whoever it might
15    have been with concerning this pick-up?
16    A.    I called Dave.
17    Q.    Okay.  Did you call or text Gorski,
18    Coveny?
19    A.    No.
20    Q.    Why not?
21    A.    Because I knew they wouldn't be able
22    to get it because they have pick-ups as well at that
23    time.
24    Q.    Okay.  So you called Dave Ziltz?

Page 34

1    Q.    Do you have any documents, notes,
2    anything that would help you refresh your
3    recollection as to what time that call was?
4    A.    No, I don't.
5    Q.    And what was said in your telephone
6    conversation with Mr. Ziltz then?
7    A.    I told him I sent a message to Andreu
8    and he wouldn't be able to -- you know, he called me
9    back, he said he had 60 stops left, that he wouldn't
10    be able to go help at Bernina and he told me he
11    wouldn't be done until 9:00 o'clock tonight.
12        And he said tell him he needs to
13    go to Bernina now, and that was the end of our
14    conversation.  I said okay.
15    Q.    Okay.  What did you do after that?
16    A.    I sent the message to Jose saying I
17    need him to go to Bernina right now.
18    Q.    And what kind of message was this?
19    A.    That was a text message.
20    Q.    Through the DIAD?
21    A.    Yes.
22    Q.    Is there any record of this
23    anywhere --
24    A.    No.

Page 36

1    A.    Yes.
2    Q.    And is that on the phone?
3    A.    Yes.
4    Q.    Where is Mr. Ziltz at at this point in
5    the day?
6    A.    I believe he was in Aurora.
7    Q.    What's he doing?
8    A.    If I remember correctly, there was a
9    driver that was injured and he was relieving him.
10    Q.    So he's out on a route delivering
11    packages, correct?
12    A.    I guess, yes.
13    Q.    Is that what he was doing?
14    A.    I believe so.
15    Q.    Okay.  And you called him on what, his
16    cell phone?
17    A.    Yes.
18    Q.    Is this a company-issued cell phone or
19    is it a personal cell phone, if you know?
20    A.    I don't know.
21    Q.    Okay.  And what time was that call?
22    A.    Shortly after 4:00.
23    Q.    Do you know what time the call was?
24    A.    Not exactly.

Page 35

1    Q.    -- as to what time?
2    A.    No.
3    Q.    Were you ever asked to see if you can
4    get a record from the DIAD system or any other
5    system, computer system to verify what time your --
6    A.    No.
7    Q.    -- second text message would have
8    been?
9    A.    No.
10    Q.    What time was it?
11    A.    That was probably about between
12    quarter after and 20 after 4:00.
13    Q.    Probably?
14    A.    I didn't look at the clock.
15    Q.    How do we know what time it was?
16    A.    Well, I know it was between 4:00 and
17    4:30.
18    Q.    How?
19    A.    Because at 4:30 Dave called me and I
20    remember I looked at the -- well, that was about --
21    it was at 4:42 when Dave called me.
22    Q.    Was it 4:30 or 4:42?
23    A.    It was 4:42.
24    Q.    How do you know that?

Page 37

10 (Pages 34 to 37)

**Exhibit 4**

**Dave Ziltz Deposition Excerpts**

**Deposition Exhibit 2, Ziltz 2005 Quality Performance Review**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSE ANDREU,                          )
                                      )
            Plaintiff,                )
                                      )
      -vs-                            )    No.   07 C 0473
                                      )
UNITED PARCEL SERVICE, INC.,          )
                                      )
            Defendant.                )

            The deposition of DAVID ZILTZ, called by

the Plaintiff, for examination, taken pursuant to

notice and pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken

before Tamara Manganiello, Registered Professional

Reporter and Notary Public, at Suite 850, 29 South

LaSalle Street, Chicago, Illinois, on the 26th day

of July, A.D., 2007, commencing at 11:04 a.m.

APPEARANCES:

1
2    THE COFFEY LAW OFFICE, P.C.,
        1403 East Forest Avenue
3    Wheaton, Illinois 60187
        (630) 462-3901
4    BY: MR. TIMOTHY J. COFFEY,
5        Appeared on behalf of the Plaintiff;
6    QUARLES & BRADY, L.L.P.,
        500 West Madison Street
7    Suite 3700
        Chicago, Illinois 60661
8    (312) 715-5149
        BY: MR. D. SCOTT WATSON,
9
        Appeared on behalf of the Defendant.
10
11   ALSO PRESENT:
12   MR. JOSE ANDREU
13
14
15
16
17
18
19
20
21
22
23
24

Page 2

---

1              INDEX
2    THE WITNESS: DAVID ZILTZ
                    PAGES
3
Direct Examination By Mr. Coffey ............ 4
4    Cross Examination By Mr. Watson ............ 194
5
6
7              EXHIBITS

                    PAGES
8
Ziltz Exhibit No. 1............................ 33
9    Ziltz Exhibit No. 2............................ 35
     Ziltz Exhibit No. 3............................ 99
10   Ziltz Exhibit No. 4............................104
     Ziltz Exhibit No. 5............................146
11   Ziltz Exhibit No. 6............................167
     Ziltz Exhibit No. 7............................172
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

---

1              (Witness sworn.)
2    WHEREUPON:
3              DAVID ZILTZ
4    called as a witness herein, having been first duly
5    sworn, was examined and testified as follows:
6              DIRECT EXAMINATION
7              By Mr. Coffey
8        Q.   Could you state and spell your full
9    name, Mr. Ziltz?
10       A.   David Ziltz, Z-I-L-T-Z.
11       Q.   Have you ever given a deposition
12   before?
13       A.   No, I have not.
14       Q.   Okay. A couple of ground rules.
15   First of all, my name is Tim Coffey. I'm an
16   attorney for Mr. Andreu who I believe you recall
17   from UPS, correct?
18       A.   Yes.
19       Q.   Okay. He has filed a lawsuit and
20   we're here to take your deposition, which is going
21   to consist of me asking a series of questions and
22   you giving answers under oath. Do you understand
23   that?
24       A.   Yes, I do.

Page 4

---

1        Q.   Okay. And Tamara is going to take
2    down all of my questions verbatim and all of your
3    answers verbatim. Okay?
4        A.   Yes.
5        Q.   So if you do not understand a
6    question, please let me know and I will restate it.
7    All right?
8        A.   Okay.
9        Q.   If you don't do that, the record will
10   simply reflect my question followed directly by your
11   answer with no indication that you had any concerns.
12   Okay?
13       A.   Yes.
14       Q.   Okay. If you need to take a break at
15   any time, just let me know and we'll take a break.
16   Okay?
17       A.   Okay.
18       Q.   Have you ever given any sworn
19   testimony before?
20       A.   No.
21       Q.   Any trial testimony?
22       A.   No.
23       Q.   So you've never been in a courtroom
24   and given any testimony under oath?

Page 5

---

2 (Pages 2 to 5)

1    injury investigations. The doctor's notes go to her
2    from employees.
3        Q.    What about Christina Hofert, do you
4    know Christina?
5        A.    No.
6            MR. COFFEY:  Can we go off the record
7        for one second?
8            (Whereupon, a discussion
9            was had off the record.)
10           MR. COFFEY:  Back on the record.
11   BY MR. COFFEY:
12       Q.    Were you involved in any -- how about
13   Amy Little at Liberty Mutual?
14       A.    I don't know.
15       Q.    Ever any discussions with Amy Little?
16       A.    Don't know.
17       Q.    Any involvement with Glenna Reese in
18   May of '07 just recently concerning, I guess, an
19   injury to Ms. Hofert that you have any recollection
20   of?
21       A.    No.
22       Q.    Okay. All right. Thank you. I'll
23   show you what we'll mark as Exhibit No. 2.
24
                                    Page 34

1            (Document marked as
2            Ziltz Exhibit No. 2
3            for identification,
4            07/26/07.)
5    BY MR. COFFEY:
6        Q.    Now, I ask you to take a look at
7    Exhibit No. 2. It's called Quality Performance
8    Review and it's got your name on it, correct?
9        A.    Yes.
10       Q.    If you have a chance to look at it,
11   I'm going to ask you if this looks to be a true and
12   correct copy of your Quality Performance Review for
13   the year 2005.
14           (Witness peruses
15           document.)
16   BY THE WITNESS:
17       A.    Yes.
18   BY MR. COFFEY:
19       Q.    So it looks like in 2005 you had a
20   final score at least on this Quality Performance
21   Review of 77.31, that's accurate?
22       A.    Yes.
23       Q.    What's the highest possible score you
24   could achieve?
                                    Page 35

1        A.    100.
2        Q.    Are you certain?
3        A.    Yes.
4        Q.    Okay. It also says that this was
5    approved by Kerry Snyder; is that right?
6        A.    Correct.
7        Q.    Okay. So at the time during 2005 I'm
8    correct in saying he was the Aurora center manager,
9    right?
10       A.    Yes.
11       Q.    And you were the full-time
12   supervisor -- one of the full-time supervisors in
13   the Aurora center, right?
14       A.    Yes.
15       Q.    So he was your report? He was your
16   boss, right?
17       A.    Yes.
18       Q.    All through 2005?
19       A.    Yes.
20       Q.    At Page 5 of this Exhibit No. 2 it
21   mentions several names. One is Kerry Snyder, but
22   one is Timothy Pope and it classifies him as a
23   co-worker. Was Timothy Pope your co-worker in 2005?
24       A.    Yes.
                                    Page 36

1        Q.    Okay. What was his title during that
2    year?
3        A.    Pre-load manager, I believe.
4        Q.    Was he at a higher grade than you,
5    lower grade than you, on an equal grade?
6        A.    Higher grade.
7        Q.    He was a manager, you were a
8    supervisor?
9        A.    Yes.
10       Q.    Did you work with him side-by-side in
11   a co-worker relationship?
12       A.    Yes.
13       Q.    And what extent?
14       A.    Different operation. I would, as an
15   on-road supervisor, have dealings with him being a
16   pre-load manager; come in and assist on the pre-load
17   some mornings.
18       Q.    So he's in a whole different area,
19   correct?
20       A.    Correct.
21       Q.    Okay. What is pre-load? Describe
22   that to me.
23       A.    Pre-load is the operation that sorts
24   and loads the packages into the delivery vehicles.
                                    Page 37

10 (Pages 34 to 37)

1    Q.    And then in 2005 you're on-road, so
2  you're responsible for the drivers and the actual
3  delivery, correct?
4    A.    Correct.
5    Q.    What about Mark Suwanski, was he one
6  of your coworkers in 2005?
7    A.    Yes.
8    Q.    What was his title during that year?
9    A.    He was a pre-load supervisor.
10    Q.    So he reported to Mr. Pope?
11    A.    Yes.
12    Q.    Now, these people were your raters
13  during 2005; is that correct?
14    A.    Yes.
15    Q.    How does that work?  How were these
16  folks selected to be your raters?
17    A.    You select them with approval from
18  your manager.
19    Q.    And when do you select them to be your
20  raters?
21    A.    When this QPR process starts.  At the
22  end, when you're putting the numbers together.
23    Q.    So not until the end of the year?
24    A.    Yes.

Page 38

1    Q.    So during the year these people don't
2  know that they're going to be your raters?
3    A.    No.
4    Q.    But then all of a sudden at the end of
5  the year you select them and they've got to look
6  back throughout the year and recollect their
7  dealings with you --
8    A.    Yes.
9    Q.    -- to rate you?
10    A.    Yes.
11    Q.    Have you ever seen anything in writing
12  that covers this Quality Performance Review process
13  that gives you a time frame of when things get done,
14  when things are due, when you're going to have your
15  performance review?
16    A.    We're told, you know, when we have to
17  have it done.  So my direct manager would say we
18  need to get this done, you know, comes out via
19  e-mail the dates that they're due through the course
20  of the year.
21    Q.    And it looks like you submit a
22  self-appraisal, so to speak?
23    A.    Yes.
24    Q.    And do you do that in writing?

Page 39

1    A.    No.
2    Q.    How do you do it?
3    A.    Computer based.
4    Q.    And what we see as Exhibit 2 you
5  believe is -- all the self ratings that we have here
6  you believe are true and correct in terms of what
7  you rated yourself at the end of '05 I guess?
8    A.    Yes.
9    Q.    Or is that in early '06 when you're
10  doing that?
11    A.    I don't recall.
12    Q.    Now, looking at Page 2 of Exhibit 2,
13  it looks to me like you're measured on a series of
14  different categories; is that correct?
15    A.    Yes.
16    Q.    And some have different weightings,
17  some are worth more than others, correct?
18    A.    Correct.
19    Q.    One of them, if you look at financial,
20  is worker's comp costs?
21    A.    Yes.
22    Q.    How does that work.  How are you rated
23  on workers' comp costs?
24    A.    It's as a center on the whole.

Page 40

1    Q.    So if we --
2    A.    So I'm at --
3    Q.    If we look across, there's a column
4  that says base and it has a number 106,000.  What
5  does that number represent?
6    A.    I don't know.
7    Q.    Is it a dollar figure?
8    A.    I don't know.
9    Q.    Do you understand how this works --
10    A.    Yeah.
11    Q.    -- this workers' comp line?
12    A.    I understand how all the lines work.
13  We're given numbers we plug in.
14    Q.    Explain to me how the workers' comp
15  costs -- how were you measured?
16    A.    By costs to the center.
17    Q.    Do you know if these are costs to the
18  center, these numbers over here to the right of
19  workers' comp costs?
20    A.    I don't know.
21    Q.    Are you advised during the course of
22  2005 what the costs to the center are for workers'
23  comp?
24    A.    No.

Page 41

11 (Pages 38 to 41)

**Page 42**

1　Q.　Then how do you know if you're meeting
2　that number or not or doing good, bad?
3　A.　By the injuries we have in the center.
4　Q.　So you're aware of claimed injuries
5　during the course of the year?
6　A.　Yes.
7　Q.　Okay. How do you become aware of
8　that?
9　A.　The employees report their injuries to
10　us -- to the immediate supervisor.
11　Q.　Do you get anything during the course
12　of the year -- now, Exhibit No. 2 says "how
13　measured", and it says something called a cost
14　statement. Do you know what a cost statement is?
15　A.　Yes.
16　Q.　What is a cost statement?
17　A.　It shows the costs of, you know,
18　the -- I see more of, like, right above it, the
19　expense billed per piece. I see more of that. You
20　know, so I know the cost of the piece -- delivery
21　piece.
22　Q.　Okay. We're talking about costs of
23　workers' comp, though.
24　A.　I know.

**Page 43**

1　Q.　Do you see a cost statement in
2　connection with workers' comp?
3　A.　No.
4　Q.　Do you ever see the costs of workers'
5　comp out of the Aurora center during the year from
6　time to time?
7　A.　No.
8　Q.　You get no reports?
9　A.　No.
10　Q.　Did you ever complain to anybody that
11　you didn't think it was fair to be rated on
12　something you didn't know what was going on during
13　the year?
14　A.　No.
15　Q.　Do you think it's fair?
16　A.　Yes.
17　Q.　Why?
18　A.　It's what I'm measured on.
19　Q.　I know.
20　A.　I don't understand the question fully.
21　Q.　Okay. Part of your rating in this
22　77.31 for 2006, this is one of the things -- correct
23　me if I'm wrong, this is one of the things that is
24　considered when it comes time for your pay raise,

**Page 44**

1　correct?
2　A.　Correct.
3　Q.　Okay. And you'd like that to be a
4　high number, I assume, right?
5　A.　Yes.
6　Q.　You'd like to have the highest rating
7　that you could have, correct?
8　A.　Yes.
9　Q.　And you'd like to know all the things
10　that go into that rating so you can make it as high
11　as you can, correct?
12　A.　Yes.
13　Q.　Okay. One of the things we see is
14　something called workers' comp costs?
15　A.　Yes.
16　Q.　And my question was do you think it's
17　fair, given your testimony that you don't get any of
18　the workers' comp costs during the year, you don't
19　know where you're at in workers' comp costs, do you
20　think it's fair that you're rated on something like
21　that?
22　A.　Yes, I do.
23　Q.　And I asked why.
24　A.　Because I train drivers on safe

**Page 45**

1　driving methods and I train them on safe work
2　methods.
3　Q.　Is there anything you do day-to-day or
4　month-to-month in your position as full-time
5　supervisor to try to get yourself a better rating on
6　workers' comp costs, which I guess would mean to
7　keep workers' comp costs at a minimum?
8　A.　Yes.
9　Q.　What do you do?
10　A.　Correct unsafe behaviors. I do annual
11　rides with drivers and correct their unsafe driving
12　habits and their work habits by the safe work
13　methods we have in the five safe habits we have.
14　Q.　With Mr. Andreu, when he was a driver
15　in the Aurora center, did you have any occasion to
16　accompany him in his truck, driving and delivering
17　packages?
18　A.　No.
19　Q.　Never once?
20　A.　No.
21　Q.　Did you have any safety issues with
22　Mr. Andreu when he was a driver in the Aurora
23　center?
24　A.　No.

12 (Pages 42 to 45)

1    Q.    Did you have any issues at all with
2  Mr. Andreu when he was a driver in the Aurora
3  center? And we'll leave out the events of February
4  9th here for a second.
5    A.    No.
6    Q.    Okay. You're aware that he got hurt
7  January 24th, 2005?
8    A.    Yes.
9    Q.    He claimed he got hurt while he was
10 out on his route, right?
11   A.    Yes.
12   Q.    Okay. Did you have any involvement in
13 reporting the injury or involvement in training
14 Mr. Andreu after the injury?
15   A.    The involvement I had is I responded
16 to the injury, the investigation.
17   Q.    Okay. So you were involved in some
18 sort of investigation?
19   A.    Correct.
20   Q.    Was this the day of the injury, which,
21 again, was January 24th, '05, or sometime
22 thereafter?
23   A.    Yes. On the 24th.
24   Q.    So on the 24th you were involved in an
Page 46

1  investigation into the injury?
2    A.    Yes.
3    Q.    What did you do on the 24th to
4  investigate Mr. Andreu's injury?
5    A.    I was available, so I went to where he
6  was and had him show me what happened.
7    Q.    How did you become aware that he had
8  an injury?
9    A.    He called the office.
10   Q.    Was there any delay between the injury
11 and the time he called?
12   A.    I don't recall.
13   Q.    Do you know what time he was injured
14 during the day?
15   A.    It was morning.
16   Q.    Do you know what time you went -- you
17 physically went out to his truck then?
18   A.    Yes.
19   Q.    Do you know what time you arrived at
20 his truck?
21   A.    No.
22   Q.    Was it morning? Was it afternoon?
23   A.    Morning.
24   Q.    So within the morning he gets injured,
Page 47

1  he notifies the center?
2    A.    Yes.
3    Q.    You get notified by the center?
4    A.    Yes.
5    Q.    And then you go to his truck?
6    A.    Yes.
7    Q.    And what happens when you get to his
8  truck?
9    A.    He shows me -- I asked him what
10 happened and he showed me how a package had fallen
11 out and he tried to stop it and he showed me that.
12   Q.    Did he demonstrate the package
13 falling?
14   A.    Yeah, he demonstrated. Not exactly
15 falling, but how it happened.
16   Q.    What did he say to you?
17   A.    He said it was sliding out. The truck
18 was full, it was sliding out and he put his hands up
19 to stop it.
20   Q.    Was anybody else present?
21   A.    No.
22   Q.    Where was this at?
23   A.    I believe it was at Meijers on Route
24 59.
Page 48

1    Q.    Okay. And what did you say to him?
2    A.    I don't recall.
3    Q.    Did you indicate at all that you had
4  any doubts about the injury?
5    A.    Yes.
6    Q.    What did you say?
7    A.    I don't know.
8    Q.    Do you have a specific recollection of
9  anything else said?
10   A.    No.
11   Q.    Okay. Do you have a general
12 recollection of anything else said in this
13 conversation?
14   A.    Well, I had doubts.
15   Q.    Okay. When did you first have doubts?
16   A.    When I first was told by the office
17 that he was injured, that he was calling in that he
18 hurt himself.
19   Q.    Okay. And why did you have doubts
20 when the office first called you?
21   A.    Jose was adamant that he did not want
22 to do this route this morning -- that morning.
23   Q.    And that was the morning of the day he
24 got hurt?
Page 49

13 (Pages 46 to 49)

1    A.    Yes.
2    Q.    On January 24th?
3    A.    Yes.
4    Q.    Okay. What did he say to you then in
5  the morning?
6    A.    He did not want to do that route. Did
7  not want to.
8    Q.    Did he tell you why?
9    A.    Just it was full, the load was heavy.
10  That's it.
11    Q.    He said I don't want to do the route,
12  it is full and the load is heavy?
13    A.    Yes.
14    Q.    Did he say I'm not feeling well, I
15  don't feel very strong today, I feel an ailment
16  today, anything?
17    A.    No.
18    Q.    What did you say?
19    A.    That he needed to do the route. It
20  was the route he was on.
21    Q.    Okay. Had you ever heard anything
22  like this from Jose in the past before January 24th,
23  '05?
24    A.    No.

Page 50

1    Q.    This is the first time?
2    A.    Yes.
3    Q.    Okay. Either directly from Jose or
4  from any other employee saying, hey, Jose is saying
5  he doesn't want to do a route?
6    A.    No.
7    Q.    So no hesitancy before the morning of
8  January 24, '05, correct?
9    A.    Yes.
10    Q.    Do you know how many hours Mr. Andreu
11  had been working that January?
12    A.    That day? I don't understand the
13  question.
14    Q.    Leading up to that day.
15    A.    No.
16    Q.    This is January 24th, '05.
17    A.    No.
18    Q.    Do you know if he was working overtime
19  or no overtime?
20    A.    No.
21    Q.    I mean, you keep track of overtime for
22  the drivers you supervise, correct?
23    A.    The hours. The hours they work.
24    Q.    So you know, as we sit here today, if

Page 51

1  I give you a name of somebody you're supervising,
2  you'd be able to tell me approximately how many
3  hours he's been working a week the last month,
4  right?
5    A.    No. I couldn't tell you the exact
6  amount.
7    Q.    Do you know if Mr. Andreu was working
8  overtime going into January 24th?
9    A.    I'd say yes.
10    Q.    Were most of your drivers working
11  overtime?
12    A.    Yes.
13    Q.    Anybody present on January 24th, the
14  morning when he's telling you that he doesn't want
15  to -- the load is heavy and he doesn't want that
16  route?
17    A.    I don't recall.
18    Q.    Did you report that to anybody, his
19  hesitancy and the statements that he made to you
20  that morning?
21    A.    I don't know.
22    Q.    Was that important?
23    A.    No.
24    Q.    So you get a call from the center and

Page 52

1  it's in the morning and they tell you that he's been
2  hurt?
3    A.    Yes.
4    Q.    And you immediately have doubts?
5    A.    Yes.
6    Q.    Anything else that we haven't covered
7  that leads you to have some doubts?
8    A.    No.
9    Q.    Just things he said to you that
10  morning?
11    A.    Yes.
12    Q.    And then when you arrive at his truck,
13  do you express these doubts to him?
14    A.    Yes.
15    Q.    What do you say?
16    A.    I don't recall.
17    Q.    Did you accuse him of not being
18  sincere in the injury in some fashion?
19    A.    I don't know.
20    Q.    You may have?
21    A.    I may have.
22    Q.    Did you accuse him of lying?
23    A.    No.
24    Q.    Are you sure?

Page 53

14 (Pages 50 to 53)

1    A.    Yes.
2    Q.    How can you be so sure?
3    A.    I had my doubts, but I didn't accuse
4    him of lying. I had him demonstrate what happened.
5    Q.    Well, you're doubting --
6    A.    Part of my investigation.
7    Q.    What are you doubting? You're still
8    doubting. When you get to his truck, you still have
9    doubts, right? The doubts didn't go away, correct?
10   A.    Correct.
11   Q.    So what are you doubting when you get
12   to the truck and he's doing the example that you
13   asked him to do?
14   A.    That the incident happened.
15   Q.    Do you doubt he's in pain?
16   A.    Couldn't tell, you know.
17   Q.    Did he tell you he was in pain?
18   A.    Yeah.
19   Q.    You're just doubting that the very --
20   not just the pain level, but the whole thing?
21   A.    Yes. The incident.
22   Q.    Anything lead you to believe -- once
23   you get out to the truck, does anything support your
24   doubts, minimize your doubts?

Page 54

1    A.    No.
2    Q.    So you still have the doubts then
3    after you leave him that day?
4    A.    Yes.
5    Q.    Anything else said when you go out to
6    the truck after he has reported his injury?
7    A.    I don't recall.
8    Q.    Did you accuse him of faking? Did you
9    use that word?
10   A.    I don't recall.
11   Q.    You may have?
12   A.    Don't know.
13   Q.    So you may have used it, if you don't
14   know, that's what that means to me. Correct?
15   A.    Yes.
16   Q.    But you're sure you didn't say lying?
17   A.    Yes.
18   Q.    You're sure --
19   A.    Yes.
20   Q.    -- or you don't know? I'm sorry?
21   A.    Yes.
22   Q.    You're sure about lying, you're not
23   sure about faking, correct?
24   A.    Correct.

Page 55

1    Q.    Anything else that you can recall? I
2    know it's been a while and we're just talking about
3    it. But anything else you can recall as we are
4    going through it that was said when you were out at
5    the truck?
6    A.    No.
7    Q.    And this is January 24th?
8    A.    Yes.
9    Q.    Anything else that he said when you
10   were out at the truck on January 24th?
11   A.    I don't know.
12   Q.    What happens after you're out at the
13   truck, he demonstrates what happens? What happens
14   next that day?
15   A.    I don't remember.
16   Q.    Did he continue on his route that day?
17   A.    I don't remember.
18   Q.    Do you know if you would have called
19   an assistant to help him that day?
20   A.    I don't remember.
21   Q.    Do you know Mike Ballu?
22   A.    Yes.
23   Q.    Was he working that day?
24   A.    Yes.

Page 56

1    Q.    Do you know if Mr. Ballu was summoned
2    to help him out on delivering his packages --
3    A.    May have.
4    Q.    -- that day?
5          And whose decision is that to
6    assign Mr. Ballu to help him?
7    A.    It would have been ours, in the
8    office. Mine. Whoever is available.
9    Q.    Okay. Well, do you know if anybody
10   else was involved in assessing Jose's injury or
11   talking to Jose about his injury right when it
12   happens and you're out at the truck?
13   A.    No. Me.
14   Q.    Okay. So do you recall making a
15   decision that he would have a helper the rest of the
16   day?
17   A.    I recall now.
18   Q.    Okay.
19   A.    With Mike Ballu's name, yes.
20   Q.    So you recall now asking Mike Ballu to
21   help come over and help Mr. Andreu on his route that
22   day?
23   A.    Yes.
24   Q.    All right. Did you have any further

Page 57

15 (Pages 54 to 57)

1    conversations with Mr. Andreu that day?
2        A.    I don't know.
3        Q.    Was there any type of report that was
4    completed as a result of the injury or the
5    accident --
6        A.    Injury prevention report.
7        Q.    -- that he's claiming? What is it
8    called?
9        A.    It's called an injury prevention
10   report.
11       Q.    And is that something you completed?
12       A.    No.
13       Q.    Did you complete any type of report
14   that day on January 24th concerning the claimed
15   accident? You have your doubts, but the claimed
16   accident?
17       A.    No. I don't think so.
18       Q.    Were you involved at all in reporting
19   this accident to Liberty Mutual, the workers' comp
20   carrier?
21       A.    No.
22       Q.    When an accident such as this --
23       A.    I don't recall.
24       Q.    So you may have?

Page 58

1        Q.    Did you sit down at a computer with
2    him and type in information concerning his accident?
3        A.    I don't know.
4        Q.    So you may have, you may not have?
5        A.    I don't know.
6        Q.    Correct, sir, you may have, you may
7    not have?
8        A.    Yes.
9        Q.    Is that the usual course when one of
10   your workers is hurt or claims to be hurt that you
11   would take information and put that in a computer?
12       A.    It's based on availability. It may be
13   one of my employees or immediate reports gets hurt,
14   but another supervisor will input the information,
15   call it into Liberty Mutual. It's based on
16   availability of the supervisor and what the other
17   one is doing.
18       Q.    So in this particular case with
19   Mr. Andreu, you may have done it, you may not have?
20       A.    Yes.
21       Q.    Did you have any conversations with --
22   let's get back to these doubts. And you still have
23   them when you leave the truck with Mr. Andreu when
24   he goes on his way to deliver packages for the rest

Page 60

1        A.    May have.
2        Q.    When a driver under your supervision
3    reports an accident, is there not a form that needs
4    to be completed that details the report, at least --
5        A.    Yes.
6        Q.    -- the alleged accident?
7        A.    Yes.
8        Q.    And did that happen on this occasion?
9        A.    Yes.
10       Q.    And who did that?
11       A.    I believe Melissa. The other
12   supervisor filled that out.
13       Q.    And are you referring to the injury
14   prevention?
15       A.    Yes.
16       Q.    What is it, the injury prevention --
17       A.    Prevention report.
18       Q.    At the end of the shift on
19   January 24th, '05, did you have any conversations
20   with Mr. Andreu when he came back into the Addison
21   facility with his truck?
22       A.    I don't know.
23       Q.    Not sure if you did or not?
24       A.    No. Don't know.

Page 59

1    of the day. Do you express these doubts to anybody
2    else?
3        A.    I don't recall.
4        Q.    Did you have a conversation with Kerry
5    Snyder about the accident and/or your doubts?
6        A.    Yes.
7        Q.    The day of?
8        A.    Yes.
9        Q.    Okay. And where is that conversation
10   at?
11       A.    Probably by phone.
12       Q.    When during January 24th was this?
13       A.    Probably immediately after I met with
14   Jose.
15       Q.    Do you have a specific recollection of
16   what was said between you and Kerry?
17       A.    I do not.
18       Q.    Do you have a general recollection of
19   what the discussion was between you and Kerry?
20       A.    General would be I would be explaining
21   what happened, you know, per the investigation, that
22   we did get someone to ride with him, that we needed
23   to find someone because he says his back was
24   hurting, so...

Page 61

16 (Pages 58 to 61)

1    Q.    This is what Jose told you?
2    A.    That's probably what I would have --
3    that's what I would have covered with my manager.  I
4    would have to cover with my next level.
5    Q.    Mr. Snyder?
6    A.    Yes.
7    Q.    Okay.  What else did you tell
8    Mr. Snyder about the accident?
9    A.    I don't recall.
10   Q.    What did you tell him about your
11   doubts?
12   A.    Then I explained at the time that, you
13   know, in the morning of him not wanting to do the
14   route.
15   Q.    You told this to Mr. Snyder in your
16   conversation?
17   A.    Yes.
18   Q.    Your telephone conversation?
19   A.    Yes.
20   Q.    Right after you were out to see
21   Mr. Andreu?
22   A.    Yes.
23   Q.    You tell him about the morning --
24   A.    Yes.

Page 62

1    A.    No.  That's with the employee.
2    Q.    Did you have any part to play in any
3    training after the injury of January 24th?
4    A.    I don't recall.
5    Q.    Anything else in your investigation?
6    I keep calling it an investigation.  It seems like
7    it was you going to the truck and questioning
8    Mr. Andreu --
9    A.    Yes.
10   Q.    -- him demonstrating what happened and
11   then you getting him some help driving?
12   A.    Yes.
13   Q.    Any other parts to the investigation?
14   A.    No.
15   Q.    Any other discussions -- let me back
16   up one second.
17         Did you discuss this investigation
18   or the event of January 24th, 2005, with anybody
19   else since you got off the phone with Kerry Snyder
20   and you updated him?
21   A.    I don't know.
22   Q.    Have you discussed it recently with
23   anybody?
24   A.    No.

Page 64

1    Q.    -- statement that Mr. Andreu made?
2    A.    Yes.
3    Q.    What else did you say?
4    A.    I don't recall.  I don't know.
5    Q.    Do you use the word doubts?  How did
6    you put it to him?
7    A.    I don't remember.
8    Q.    So you may have said doubts, but you
9    indicated that there was some doubt in your mind as
10   to the legitimacy of the accident?
11   A.    Yes.
12   Q.    What did he say to that?
13   A.    I don't recall.
14   Q.    Was there any other parts of the
15   investigation into the accident or the claimed
16   injuries that you were involved in?
17   A.    I don't know.  May have.
18   Q.    Well, I'm asking you your involvement.
19   A.    I don't know.  No.  I did the initial
20   investigation on the scene and I believe Melissa
21   filled out, you know, the injury prevention report.
22   Q.    Were you involved -- did Melissa
23   contact you or did you contribute to the injury
24   investigation report?

Page 63

1    Q.    In terms of preparing for the
2    deposition, have you had any conversations with
3    anybody?  Today's deposition.
4    A.    With Scott.
5    Q.    Your attorney?
6    A.    Yes.
7    Q.    When were those conversations?
8    A.    The day before yesterday.
9    Q.    How many were there?
10   A.    Just the one.
11   Q.    How about Mr. Snyder?
12   A.    I spoke to him a couple days ago.  Or,
13   I'm sorry, last week.
14   Q.    You guys don't work in the same
15   facility anymore --
16   A.    No.
17   Q.    -- do you?
18         So, no, you don't work in the same
19   facility.  Okay.  And he's out in Rock Island, Rock
20   Falls, correct?
21   A.    Yes.
22   Q.    And so you spoke to him a couple weeks
23   ago, correct?
24   A.    Yes.

Page 65

17 (Pages 62 to 65)

**Page 70**

1    A.    I don't know. Maybe when it happened.
2    Q.    Okay. And you had your conversation
3  with him on the phone?
4    A.    Yes.
5    Q.    When you're driving away from
6  Mr. Andreu's truck, correct?
7    A.    Yes.
8    Q.    Do you recollect any other
9  conversations after that with Mr. Snyder about the
10  accident or the claimed injuries?
11    A.    No.
12    Q.    Did you ever have any conversations
13  with Liberty Mutual people about the accident or
14  claimed injuries?
15    A.    I don't recall.
16    Q.    Is that a normal part of the follow-up
17  about accidents in your Aurora center?
18    A.    I would have had involvement with them
19  if I would have called it in. So if I would have
20  called the injury in, I would have had involvement
21  in it.
22        So if Melissa called it in, she
23  would have had involvement with Liberty Mutual.
24  Outside of that, I wouldn't.

**Page 71**

1    Q.    You're not sure if you called his
2  accident in or not?
3    A.    I'm not sure.
4    Q.    Did you review any documents to
5  prepare for the deposition today?
6    A.    Yes.
7    Q.    What documents did you review?
8    A.    I reviewed several that Scott had.
9    Q.    Two, three?
10    A.    Two or three, yes.
11    Q.    Was this today, yesterday, when?
12    A.    Yes.
13    Q.    When?
14    A.    Two days ago when we met.
15    Q.    Was your quality performance review
16  marked Exhibit 2 of the documents you reviewed?
17    A.    No.
18    Q.    Anything else to prepare for your
19  deposition?
20    A.    No.
21    Q.    Did you have any discussions with
22  anybody else at UPS to prepare for the depositions?
23    A.    No.
24    Q.    Aside from expressing your doubts to

**Page 72**

1  Mr. Snyder in your conversation shortly after you
2  saw Jose on January 24th, who else have you talked
3  about or at least expressed that you had some doubts
4  about the legitimacy or the authenticity of the
5  claimed injury?
6    A.    Nobody.
7    Q.    Back to Exhibit No. 2, I understand
8  your prior testimony that you've never seen a cost
9  statement that had workers' comp costs on it; is --
10    A.    No.
11    Q.    -- that what you're saying?
12    A.    Yes.
13    Q.    Okay. It's correct, though, the way
14  this is set up that the lower the workers' comp
15  costs come in, the greater the rating you get in
16  that area, correct?
17    A.    Yes.
18    Q.    Okay. And the greater the rating you
19  get in that particular line item rolls down and
20  gives you a greater final rating, correct?
21    A.    Yes.
22    Q.    And, again, the better the final
23  rating, generally speaking, the more you're going to
24  get in a pay raise, correct?

**Page 73**

1    A.    Yes.
2    Q.    What other types of things are
3  considered in your pay raises? You've got this
4  final rating, a numerical score. What else is
5  considered when it comes time to give you a pay
6  raise or decide what pay raise you would get?
7    A.    I guess your performance -- just your
8  individual performance, you know.
9    Q.    Okay. Do you actually have a
10  face-to-face performance review with your boss?
11    A.    Yeah.
12    Q.    So your boss for the whole year of
13  2005 was Kerry Snyder, correct?
14    A.    Yes.
15    Q.    Did you have a face-to-face review
16  with him then sometime in early '06?
17    A.    No.
18    Q.    Who would you have had that with?
19    A.    Did not have one in that year.
20    Q.    You just didn't have a face-to-face at
21  all?
22    A.    No.
23    Q.    Was that the only year you haven't had
24  a face-to-face?

19 (Pages 70 to 73)

1    Q.   So more than one it sounds like.
2    A.   More than one.
3    Q.   Did you have doubts about his pain?
4    A.   No.
5    Q.   You had doubts about the accident,
6    right?
7    A.   Yes.
8    Q.   Did you think that the pain was from
9    something else?
10   A.   No.
11   Q.   So was it clear that the pain that
12   he's alleging is from the accident?  It's clear to
13   you when he's telling you that?
14   A.   I don't know.
15   Q.   Well, why are you asking him if he's
16   okay then?  I mean, you're asking him if he's okay
17   because he had the accident, right?
18   A.   Because he was an employee, he was a
19   driver, asking his condition daily.
20   Q.   And he would say he's hurting from the
21   accident, correct?
22   A.   Yes.
23   Q.   And did it click in your mind that
24   this was the accident that I have doubts about?

Page 94

1    if there was a legitimate accident or not?
2    A.   No.
3    Q.   But up to the day that he
4    misrepresented these packages, you haven't heard
5    anything from any medical people, correct?
6    A.   No.
7    Q.   That's correct, correct?
8    A.   That is correct.
9    Q.   So you're still having doubts up to
10   the day that he's supposedly misrepresenting these
11   packages, right?
12   A.   I had doubts until he sought medical
13   attention.
14   Q.   Until you found out he sought medical
15   attention?
16   A.   No.  Until the doctor -- until he was
17   on restrictions.  I had doubts until then.
18   Q.   Okay.  Which was sometime after the
19   February 9th incident, correct?
20   A.   I don't recall.
21   Q.   Whenever he went on restrictions?
22   A.   No.  I don't recall if he went right
23   after the day he reported the injury.  It's a
24   procedure whenever an employee gets hurt to call in

Page 96

1    A.   No, it didn't click.
2    Q.   But you still have the doubts about
3    the accident?
4    A.   He went to seek medical attention and
5    the doctor said he had a strain in his back, I
6    think.  I don't recall.  So at that point, you know,
7    my doubts are no longer doubts.  I mean, the doctor
8    said something was wrong.
9    Q.   You talked to a doctor?
10   A.   No, I did not talk to a doctor.
11   Q.   How do you know what the doctor says?
12   How do you know what Mr. Andreu's doctor had said at
13   any time?
14   A.   After the 9th he was on restrictions.
15   Q.   How do you know this?
16   A.   Because he didn't work.
17   Q.   So sometime after the 9th you find out
18   he's on restrictions?
19   A.   Uh-huh.
20   Q.   And are you telling me that eases your
21   doubts or changes your mind?  What happens?
22   A.   It eases my doubts.
23   Q.   Did you follow-up with any doctors or
24   Mr. Andreu to do anything else to try to figure out

Page 95

1    the injury the same day or within 24 hours, so that
2    would have been in January.
3    Q.   He called in the injury?  He reported
4    the injury?
5    A.   Yes.
6    Q.   And you may have or -- we've already
7    covered this.  You may have or may not have reported
8    this to the insurance company, right?
9    A.   Yes.
10   Q.   Okay.  So that was done right on the
11   day of the injury or the next day, correct?
12   A.   Yes.
13   Q.   Okay.  And then we covered you got
14   some information from him about a doctor and
15   restrictions and I think you said that was after
16   February 9th that you got this information?
17   A.   No.
18   Q.   Okay.  Well, when was it?
19   A.   It would have been after he sought the
20   attention the first time.
21   Q.   Okay.  Well, do you know when he
22   sought medical attention the first time?
23   A.   It would have been after we called it
24   in.

Page 97

25 (Pages 94 to 97)

1  that also -- well, strike that.
2      Looking at line number 123, you've
3  got a start at 1500, stop at 1500, the same as Line
4  24. Line 25 is 1502 to 1502. Up on 23 you've got
5  43 clicks or minutes between stops. I mean, does
6  that appear to be an erroneous length of time
7  between stops showing?
8      A.  It appears to be.
9      Q.  So this should all compute? In other
10 words, if you look from the start of the stop to the
11 completion of the stop, it should compute -- the
12 number should roll right out at time at stop, right,
13 it should be the difference between the two?
14     A.  Yeah. Time at stop, from start stop
15 to --
16     Q.  Okay. To the extent that isn't the
17 case, it's an erroneous time at stop number; is that
18 what you think?
19     A.  I can't tell.
20     Q.  But that's at least what the time at
21 stop column should reflect, correct?
22     A.  Time at stop, time between stop.
23     Q.  And the time between stop, you should
24 be able to go off the last stop complete, the
Page 114

1  Never saw that.
2      Q.  How could that happen?
3      A.  I don't know.
4      Q.  A stop just doesn't go into the DIAD
5  board; is that one way it would happen?
6      A.  I don't know. The stops have to go on
7  the DIAD board. I don't know this technology, you
8  know, the report writing that was used for this.
9      Q.  In terms of the DIAD board, had you
10 ever looked up DIAD information on a particular
11 driver, like, the next day if you had a concern or
12 question over whether that driver had made the stops
13 or had done something inappropriate?
14     A.  Yes.
15     Q.  How often do you do that at the Aurora
16 center?
17     A.  I would almost daily.
18     Q.  And how do you access that
19 information? How do you get that information the
20 following -- it's the following day for the previous
21 day?
22     A.  A similar report like this I have a
23 dispatch sup., I'll call him in the morning, you
24 know, when we have a driver with super excess hours,
Page 116

1  difference between that and the next start of the
2  stop, correct?
3      A.  Right.
4      Q.  So it should be just a mathematical
5  equation, just a difference between the two, right?
6      A.  (Witness nodding.)
7      Q.  And to the extent it's not, then the
8  time between stop column is incorrect, right?
9      A.  Correct.
10     Q.  I mean, have you often found those
11 types of errors with this report?
12     A.  This older one, yes, occasionally.
13     Q.  The ones --
14     A.  Yes.
15     Q.  -- that were in use when Mr. Andreu
16 was an employee in February of '05?
17     A.  Yes.
18     Q.  So they're not very accurate in that
19 respect anyways, correct?
20     A.  Yes.
21     Q.  Have you ever known these reports,
22 Driver Route Detail Analysis, to fail to record any
23 particular deliveries or stops?
24     A.  Never have been involved with that.
Page 115

1  things that happened, I'll ask him to print what's
2  the new report, time between stops now, so I can
3  look at it. Pick-up records. We have missed
4  pick-ups. A customer calls in saying he didn't get
5  a pick-up, we'll have a pick-up record printed and
6  we'll see if they were there and, indeed, what time
7  they were there, how many pieces they picked up.
8      Q.  So all of this information you can
9  access when you want to figure out if anything is
10 going wrong on a route on any particular day,
11 correct?
12     A.  Not the following day. The next day.
13     Q.  What about after the next day? Can
14 you get the information?
15     A.  Yes.
16     Q.  Can you still get the information?
17     A.  Yes.
18     Q.  Okay. Is there a point in time where
19 you can't get the information anymore --
20     A.  Yes.
21     Q.  -- about a particular day?
22     A.  Yes.
23     Q.  When does that come out?
24     A.  They archive it to a disk.
Page 117

30 (Pages 114 to 117)

1    Q.    Okay.
2    A.    And that's as much as I know. I'm not
3    involved with that.
4    Q.    Have you ever had to go to the archive
5    or at least have somebody going to the archive and
6    get a disk and look at older information?
7    A.    I have not.
8    Q.    But that's something you can do,
9    correct?
10    A.    I think. Yes.
11    Q.    Where are these archives at?
12    A.    Archives, I don't know. The disks are
13    in a -- right by our computer in the office, the
14    dispatch computer.
15    Q.    Okay. Did you say you go to somebody
16    and ask for these reports, ask for this information?
17    A.    Similar to reports, yes, I do.
18    Q.    Who do you go to?
19    A.    John Coker.
20    Q.    And what is Mr. Coker's position?
21    A.    He is the dispatch supervisor.
22    Q.    And how long has he been dispatch
23    supervisor?
24    A.    In my center, a year.

Page 118

1    Q.    In the Aurora center one year?
2    A.    Yes.
3    Q.    Who was in that position before him?
4    A.    Nobody. It's a new system.
5    Q.    What is the new system?
6    A.    Pre-load assist system. It's all
7    computerized.
8    Q.    What was it before?
9    A.    It didn't exist.
10    Q.    The DIAD system didn't exist before?
11    A.    The pre-load assist system.
12    Q.    What about the DIAD system, sir,
13    getting information off the DIAD board?
14    A.    Yes.
15    Q.    Yes what?
16    A.    It existed.
17    Q.    Okay. Who would you go to then prior
18    to John Coker to access that information or reports
19    from information from the DIAD system, the DIAD
20    board?
21    A.    The reports I had access to, I would
22    go to.
23    Q.    You would do it yourself?
24    A.    Yes.

Page 119

1    Q.    And at any point in time with respect
2    to February 9th, 2005, when Mr. Andreu supposedly
3    made the misrepresentation, did you go and access
4    any information off the DIAD board to try to figure
5    out the number of packages he had or anything else
6    that may have played into, you know, whether he had
7    misrepresented the packages or not?
8    A.    I don't recall.
9    Q.    You don't know if you did or didn't?
10    A.    I don't know if I did or didn't. I
11    don't think I did.
12    Q.    Okay. Do you know if anybody ever
13    did?
14    A.    I don't know.
15    Q.    Did anybody request -- were you
16    involved in any discussions where it was brought up,
17    hey, maybe we should access the DIAD system and see
18    how many packages he had or didn't have or whatever
19    other information that may help us with this issue?
20    A.    I don't recall.
21    Q.    But as far as you know, that
22    information certainly was accessible, the DIAD
23    information?
24    A.    Yes.

Page 120

1    Q.    Okay. Whether it was saved or
2    archived or put on a disk, it was accessible to you?
3    A.    Yes.
4    Q.    Now, the DIAD board, would that
5    also -- drivers can send back and forth messages, I
6    understand, through the DIAD board, text messages,
7    correct?
8    A.    Yes.
9    Q.    Okay. Is that information saved or
10    accessible once it is entered in the DIAD? Can you
11    retrieve it the following day?
12    A.    No.
13    Q.    Why not?
14    A.    I don't know.
15    Q.    How do you know you can't?
16    A.    I don't know. I don't know.
17    Q.    So you may, you're just not sure?
18    A.    Yes, I'm not sure.
19    Q.    So that information may indeed be
20    accessible, just like all the other DIAD information
21    is accessible, correct?
22    A.    Correct.
23    Q.    With respect to Mr. Andreu, did you
24    ever -- you know, there was -- you're aware there

Page 121

31 (Pages 118 to 121)

1  was a couple text messages between him and Cheryl
2  Bast on February 9th, 2005, correct?
3      A.    Yes.
4      Q.    Did you ever at any point in time go
5  to the DIAD system or try to find the times of these
6  text messages or the content of these text messages?
7      A.    No.
8      Q.    Do you know if anybody did?
9      A.    I don't know.
10     Q.    Were you involved in any discussions
11  where it came up, the possibility of looking through
12  the DIAD information to try to retrieve the text
13  messages that went back and forth between Mr. Andreu
14  and Cheryl Bast?
15     A.    No.
16     Q.    Or the timing of those messages?
17     A.    No.
18     Q.    So, on February 9th, 2005, what were
19  your duties that day?  What were you doing?  This
20  is, again, the day that there was supposedly this
21  misrepresentation.  Do you recall where you were at
22  that day?
23     A.    Yes.
24     Q.    What were you doing?

Page 122

1      A.    I was doing a delivery route that day.
2      Q.    Do you know what route you were doing
3  that day?
4      A.    Yes.
5      Q.    What route?
6      A.    It was Gary Coveny's route,
7  C-O-V-E-N-Y.
8      Q.    You remember that clearly?
9      A.    Yes.
10     Q.    Is this something that you've been
11  thinking about recently?
12     A.    No.
13     Q.    How do you remember it so clearly?
14     A.    I remember that.
15     Q.    How?  Why?
16     A.    Because I remember some things better.
17     Q.    So you are out on Gary Coveny's route.
18  Why don't you tell me what -- did you have any
19  discussions with Mr. Andreu, let's say -- I know
20  there's a point in time where you go out to his
21  truck that day, correct?
22     A.    Yes.
23     Q.    Was there only one point in time that
24  day that you went to his truck or more than one?

Page 123

1      A.    There were two times.
2      Q.    What's the first time?
3      A.    The first time I was in a package car
4  with packages in it.  It was called a meet point,
5  dividing those packages up amongst the proper
6  routes.  At that point, the driver who was doing
7  that route, Coveny's route, Matt Sanderson, reported
8  to me the he fell out of the back of the truck on
9  his knee, which he had prior surgery on outside of
10  UPS.  We went our ways.  A little while later he
11  called me and said my knee is really swelling up, I
12  need to go to the doctor, to the clinic.  So at that
13  point, I relieved him.
14     Q.    And he was doing Gary Coveny's route?
15     A.    Yes.
16     Q.    So now you're doing Gary Coveny's
17  route?
18     A.    Now I'm doing the route.
19     Q.    Was Mr. Andreu there, present?
20     A.    At the meet point, yes.
21     Q.    What was he doing there?
22     A.    Taking packages that belonged to that
23  route.  That's what the meet point was, things were
24  left -- packages were left in the building and

Page 124

1  weren't dispatched and I was meeting several
2  drivers.
3      Q.    What other drivers were there?
4      A.    I don't recall.  I know Matt and I
5  know --
6      Q.    Did you have any discussions directly
7  with Mr. Andreu at the meet point?
8      A.    No.
9      Q.    Were there any issues at that point in
10  time?
11     A.    No.
12     Q.    Was there any issues in getting him to
13  come to the meet point?
14     A.    No.
15     Q.    And he took additional packages out of
16  the meet point, correct?
17     A.    Yes.
18     Q.    So there was no problems getting him
19  to pick up these additional packages --
20     A.    No.
21     Q.    -- at the meet point?
22     A.    No.
23     Q.    What time of day was this?
24     A.    I don't recall.  1 -- 2:00 o'clock.

Page 125

32 (Pages 122 to 125)

1    Q.    And then you have a second occasion to
2  see him on the route later that day, correct?
3    A.    Yes.
4    Q.    Prior to meeting him later that day,
5  do you have communications with -- what is your
6  first indication or notification that there's some
7  issue with Mr. Andreu and this Bernina pick-up?
8    A.    As I said, I relieved Matt on the
9  route, I was doing that delivery route. The driver
10  whose pick up Bernina is on was Laura Martinez.
11  She's a very good driver. And there was someone on
12  the adjacent route that didn't know the route well,
13  was in need of help, was not going to finish the
14  day. Cheryl, you know, called me. I said, you
15  know, ask Laura to help. The particular person, I
16  don't remember who that was. And Cheryl called me
17  back and said will Laura help, but we need to cover
18  Bernina. And then at that point I say have Jose
19  pick up Bernina.
20    Q.    Did she tell you in this conversation
21  that she had already notified Jose and he was giving
22  some resistance?
23    A.    That was prior to that.
24    Q.    Okay. So you get -- is this a phone
                                                    Page 126

1  call, a text message or what?
2    A.    A phone call.
3    Q.    Is Cheryl calling you or did you call
4  Cheryl?
5    A.    She called me to let me know Laura
6  will help if we can cover the Bernina pick-up.
7    Q.    And what route is Laura on?
8    A.    It was her own route. It's adjacent.
9  There's probably five routes in the one area, South
10  Aurora.
11    Q.    So Laura was on one. You are on
12  another, Gary Coveny's?
13    A.    Yes.
14    Q.    Mr. Andreu is on one?
15    A.    Uh-huh.
16    Q.    This unknown driver is on one?
17    A.    Yes.
18    Q.    And who was on the other? Is there
19  five?
20    A.    I think there was four. I want to say
21  the route that the unknown driver was on was Tom
22  Gorski's route, but I'm not positive.
23    Q.    Wasn't Tom Gorski there that day?
24    A.    No.
                                                    Page 127

1    Q.    Do you know how many packages this
2  driver who you can't remember the name is, Tom
3  Gorski's route, do you know how many packages this
4  person delivered that day?
5    A.    No.
6    Q.    Do you know how many stops they had
7  that day?
8    A.    No.
9    Q.    In your estimation, 190 stops, is that
10  a lot of stops for a day?
11    A.    Depends on the route.
12    Q.    Well, Mr. Andreu's route on
13  February 9th, 2005.
14    A.    No.
15    Q.    Why not?
16    A.    There's not a lot -- on that
17  residential route, there's not a lot of stops.
18  That's average.
19    Q.    That's average for that route?
20    A.    Yes.
21    Q.    How is that compared to other routes?
22    A.    Compared to a route similar to that
23  route?
24    Q.    How about these other routes, Gary
                                                    Page 128

1  Coveny's?
2    A.    Gary Coveny's is 109 stop route.
3    Q.    109?
4    A.    109 to 1:0.
5    Q.    Okay. And the route that Mr. Andreu
6  was on, do you remember the route number or the
7  route loop February 9th?
8    A.    No.
9    Q.    Does 83C sound right?
10    A.    It was called I think a couple names.
11  Route 59 res. route, Route 59 excess.
12    Q.    Okay. What's the average number of
13  stops on Route 59 res. route?
14    A.    That's 170 to 200 roughly.
15    Q.    What about the route Laura Martinez
16  was on on February 9th, 2005?
17    A.    117, 130.
18    Q.    What about Tom Gorski's usual route?
19    A.    Gorski's is 160 to 210.
20    Q.    But he wasn't there that day?
21    A.    Yes. He was not there, correct.
22    Q.    So you get a phone call from Cheryl
23  Bast and she alerts you that there's this need for a
24  Bernina pick-up, correct?
                                                    Page 129

33 (Pages 126 to 129)

1   A.   Correct.
2   Q.   What time of day was this?
3   A.   Approximately 4:00.
4   Q.   Okay. And your response to her was
5   what?
6   A.   To have Jose pick it up.
7   Q.   Why Jose?
8   A.   Because it's an excess route. It has
9   no pick-ups assigned to it.
10   Q.   Didn't he have another pick-up earlier
11   that day?
12   A.   Maybe a residential pick-up. But that
13   type of route is designed to take work off the other
14   routes when they're too heavy, does not have a
15   pick-up route, so when we have to disburse it, we
16   don't have to disburse pick-ups.
17   Q.   When that route is not too heavy; is
18   that right?
19   A.   Yes.
20   Q.   Well, if it's 190 stops that he, in
21   fact, did that day, that's certainly well within the
22   average of that route, right?
23   A.   Correct.
24   Q.   Is it on the high side of the average

Page 130

1   of that route?
2   A.   Yeah. High side.
3   Q.   It's a full day, right?
4   A.   Yeah, it is a full day.
5   Q.   Okay. So you select Jose to go to
6   Bernina essentially, correct?
7   A.   Right.
8   Q.   That's your decision, correct?
9   A.   Correct.
10   Q.   Okay. And you communicate that
11   decision to Cheryl Bast?
12   A.   Yes.
13   Q.   Okay. What else is said in that
14   conversation?
15   A.   That was the end of the conversation.
16   Q.   Okay. Do you have any other
17   conversations with Cheryl after that?
18   A.   She called me back and --
19   Q.   How much time elapsed between these
20   two calls?
21   A.   Ten minutes, 15 minutes.
22   Q.   Okay. She calls you on the phone?
23   A.   Yes.
24   Q.   Is this your cell phone?

Page 131

1   A.   This is my cell phone.
2   Q.   Your personal cell phone?
3   A.   Yes.
4   Q.   Do you still have the same number
5   today?
6   A.   I believe so.
7   Q.   Do you still have the same carrier?
8   A.   Yes.
9   Q.   Who is your carrier?
10   A.   My carrier is T-Mobile. I think it
11   was Voice Stream back then. I'm not positive. They
12   switched.
13   Q.   What's your number?
14   A.   (630) 788-9478.
15   Q.   Okay. So ten, 15 minutes later Cheryl
16   calls back?
17   A.   Yes.
18   Q.   And what does she say?
19   A.   She said to me that Jose cannot get
20   the pick-up or he claims he cannot get the pick-up,
21   he has 60 stops left. And if he has to go to
22   Bernina, he won't be done and into the building
23   until 9:00 o'clock.
24   Q.   What do you say?

Page 132

1   A.   At that point and seeing his truck
2   earlier, I found that hard to believe. So I said
3   send him to the pick-up now. I was on the route
4   across the street. And she sent him there and I was
5   waiting out in front of the pick-up on the street.
6   Q.   So you had already gotten to
7   Bernina --
8   A.   Yes.
9   Q.   -- by the time he shows up?
10   A.   Oh, yes.
11   Q.   How much time elapses between your
12   call with Cheryl and the time you meet Jose?
13   A.   Ten, 15 minutes max.
14   Q.   Do you have any notes of this in terms
15   of the times of that day?
16   A.   I do not.
17   Q.   Did you write them down at all that
18   day?
19   A.   No.
20   Q.   Have you ever written them down?
21   A.   No.
22   Q.   So your ten to 15 minutes is your best
23   estimate as you sit here today?
24   A.   Yes.

Page 133

34 (Pages 130 to 133)

1    Q.    Same with the time that elapsed
2    between calls from Cheryl?
3    A.    Yes.
4    Q.    That's just your best estimate today?
5    A.    Best estimate based on our commitment
6    to that customer and what time we had to be there.
7    Q.    But you have no other notes or
8    documents, you didn't document the times of any of
9    these events this day, correct?
10    A.    No.
11    Q.    That's correct, right?
12    A.    That's correct.
13    Q.    Okay. So she calls you back, she
14    says -- I'm sorry, I'm kind of going back a little
15    bit to that last telephone conversation with Cheryl
16    Bast -- Jose can't make the pick-up, 60 stops left.
17    How does that call end? What do you say to her?
18    A.    I said send him there now.
19    Q.    Okay.
20    A.    And she must have messaged him to send
21    him there.
22    Q.    And then you meet him there?
23    A.    Yes.
24    Q.    And what do you do when you meet him

Page 134

1    there?
2    A.    I had him open up his bulkhead door,
3    which is the door behind the driver, and I counted
4    the packages in his car.
5    Q.    You physically counted each and every
6    package?
7    A.    I counted like this (indicating). I
8    looked at the shelf and counted like that.
9    Q.    Okay. So you didn't go through each
10    package, move it aside, one, two?
11    A.    Did not.
12    Q.    Your standing by the driver's seat?
13    A.    I went into the bulk area.
14    Q.    What's the bulk area?
15    A.    Went into the back of the package car.
16    Q.    And you're counting with your finger?
17    A.    Yes.
18    Q.    Okay. And what happens next?
19    A.    I counted about 20 packages. I asked
20    Jose where the 60 packages were, the 60 stops. I
21    shared my frustrations with him with everything
22    going on in the area, a person getting hurt, a
23    person needing help, we need to pitch together, this
24    and that. I don't recall my exact words at that

Page 135

1    point, if I mentioned dishonesty to him, but very
2    well could have. It was a dishonest act. It's in
3    the contract. I don't know. I don't recall words.
4    And at that point I told him to make the pick-up,
5    finish his work and get back into the building and
6    went on.
7    Q.    Okay. Let's take those one at a time.
8    So about 20 packages is what you counted?
9    A.    Yes.
10    Q.    Could have been a little more? Could
11    have been a little less actually?
12    A.    Yes.
13    Q.    Did you ask Jose at that time about
14    his -- you just heard from Cheryl this 60 package
15    thing, right? You heard that through Cheryl Bast?
16    A.    Yes.
17    Q.    Jose never told you 60 packages --
18    A.    No.
19    Q.    -- correct? Okay.
20         So did you then ask Jose -- did
21    you say something about 60 packages to Jose?
22    A.    I said where are the 60 stops you told
23    Cheryl you had?
24    Q.    What does he say?

Page 136

1    A.    I don't recall.
2    Q.    Did he ever do anything to acknowledge
3    he, in fact, told her that?
4    A.    I don't recall.
5    Q.    So you don't know if he did or didn't?
6    A.    Correct.
7    Q.    Do you recall anything he says during
8    this time that you're out there at the truck?
9    A.    No.
10    Q.    Did you mention his accident or injury
11    on February 9th when you were out there at his
12    truck?
13    A.    I don't recall.
14    Q.    Did you say anything along the lines
15    of you lied to me about the accident and injury or
16    back about the injury and now I don't believe you
17    with respect to this?
18    A.    No.
19    Q.    But you're not sure if you mentioned
20    the injury at all?
21    A.    No. I wouldn't have.
22    Q.    Well, why wouldn't you?
23    A.    It's a different issue.
24    Q.    Well, you're out at the truck, you've

Page 137

35 (Pages 134 to 137)

1　route earlier and gone home earlier?
2　　A.　Yeah. And just not done the extra
3　work.
4　　Q.　So he would have gotten out of some
5　work?
6　　A.　Correct.
7　　Q.　Now, we saw in one of the exhibits,
8　Exhibit 4, I know it has the date, but assuming that
9　this is February 9th, 2005, and this is
10　representative of what this man did in the day,
11　we've seen that he didn't clock out until 8:00. So
12　he didn't get home very early then, did he?
13　　A.　No.
14　　Q.　So what would this have saved him? He
15　ended up doing the Bernina work, right?
16　　A.　Correct.
17　　Q.　What would he have gotten out of it if
18　he didn't do the Bernina work, 15 minutes of time?
19　　MR. WATSON: Objection, asked and
20　answered.
21　BY MR. COFFEY:
22　　Q.　What would he have gained?
23　　A.　Probably over an hour of getting done
24　earlier.

Page 170

1　　Q.　So he wouldn't have been done until
2　9:00 then?
3　　A.　No. Would have been done earlier
4　without doing the work. I would assume with 20-some
5　stops left in that area, that's average on that
6　route, 19, 22 stops an hour by various drivers, that
7　would have been an hour's worth of work at 4:00,
8　so...
9　　Q.　He's getting paid for this work,
10　correct?
11　　A.　Correct.
12　　Q.　And this would have been an hour of
13　overtime, right?
14　　A.　Yes.
15　　Q.　Okay. And he's getting paid
16　time-and-a-half?
17　　A.　Uh-huh.
18　　Q.　So he's jipping himself out of that
19　money, correct?
20　　A.　Uh-huh.
21　　Q.　Had you ever, prior to February 9th,
22　2005, known Mr. Andreu to try to skimp out of work,
23　cut work early, leave work early, anything?
24　　A.　No, I have not.

Page 171

1　　Q.　Well, you say that like maybe you've
2　got some third or fourth party information. I mean,
3　do you have any information at all that this man had
4　ever done anything to avoid work?
5　　A.　No.
6　　MR. COFFEY: Let me show what we'll
7　mark as Exhibit 7.
8　　(Document marked as
9　　Ziltz Exhibit No. 7
10　　for identification,
11　　07/26/07.)
12　BY MR. COFFEY:
13　　Q.　Exhibit 7 is numerous sheets. They
14　all start with the heading Single Extension Search
15　for ILADD extension, and then the first sheet has
16　extension 2122 and then there's different extensions
17　on the rest of them. Have you seen these particular
18　documents before?
19　　A.　Yes.
20　　Q.　When have you seen these particular
21　documents?
22　　A.　Two days ago with my attorney.
23　　Q.　Okay. Prior to that, had you seen
24　these particular documents before?

Page 172

1　　A.　No.
2　　Q.　Do you know what they represent? Do
3　you know what they're supposed to show me or us?
4　　A.　It looks like the phone calls and
5　times --
6　　Q.　Do you know --
7　　A.　-- throughout the building.
8　　Q.　Do you know where extension 2122 is in
9　the Aurora center?
10　　A.　No.
11　　Q.　Do you know if it is in the Aurora
12　center?
13　　A.　I don't know.
14　　Q.　What about 2123?
15　　A.　No. I don't know.
16　　Q.　Same question: Whether it's somewhere
17　in the Aurora center, if you know --
18　　A.　No.
19　　Q.　-- or whether it's anywhere in the
20　building?
21　　A.　I don't think they are.
22　　Q.　You don't think they're Aurora center
23　extensions, correct?
24　　A.　Correct.

Page 173

44 (Pages 170 to 173)

1  Q.   And this is back on February 9th,
2  2005? That's the date, sir?
3  A.   Yes.
4  Q.   So at that date you don't think 2122
5  or 2123 were Aurora center extensions?
6  A.   Correct. They are not.
7  Q.   Including the office where Cheryl Bast
8  works?
9  A.   Including the office.
10  Q.   What about 2136?
11  A.   Yes.
12  Q.   What is 2136?
13  A.   That is one of the extensions to our
14  office.
15  Q.   Which office? The office where Cheryl
16  works?
17  A.   All of them. They all have the same
18  extension -- they have several extensions on the
19  phone, they ring and light up.
20  Q.   Okay. Where is the phone at? Where
21  does this extension come into? Which office?
22  A.   All of them.
23  Q.   How many offices do we have?
24  A.   One, two, three, four.
                                        Page 174

1  Q.   Okay. So you believe 2136 on
2  February 9th, 2005, to be a good extension that came
3  into and would ring at the Aurora center?
4  A.   I believe so.
5  Q.   Do you see anything on Page 549 --
6  that's the number on the bottom there. I mean, do
7  you recognize any of these source numbers? Do you
8  know what the source number column represents?
9  A.   Incoming phone call maybe, or a phone
10  number, I mean.
11  Q.   I don't know. Are you guessing?
12  A.   They look like phone numbers.
13  Q.   Okay. They look like phone numbers.
14  Are you guessing whether they're incoming?
15  A.   Guessing.
16  Q.   Okay. Do you have any information
17  about these documents that you think is relevant to
18  this case? Any of the pages?
19  A.   My number is on here in one spot.
20  Q.   Where is that at?
21  A.   It's 552. It's on the top line.
22  Q.   Okay. (630) 788 --
23  A.   9478.
24  Q.   At 6:40. Do you know if that's -- I
                                        Page 175

1  would guess that would be a.m., right?
2  A.   Yeah.
3  Q.   Do you have a recollection of making a
4  call in or receiving a call from extension 2488 at
5  6:40 on February 9th, 2005?
6  A.   I don't recall. 2488 is the manager's
7  office, which rings to all the offices if no one
8  answers. So that would have been at that time
9  Kerry's office, I believe.
10  Q.   Do you have any recollection of a call
11  that lasted a minute -- well, I'm not sure how to
12  read these times, but it looks like a minute and
13  five seconds?
14  A.   No.
15  Q.   Any calls?
16  A.   No, I don't recall.
17  Q.   Do you see your number anywhere else
18  on these sheets?
19  A.   Again at 6:40 down a little bit. And
20  that's the only two I do see.
21  Q.   I guess the question stands: Any
22  information or knowledge that any of the numbers
23  that we see on these sheets is relevant to this case
24  or Mr. Andreu's claim in some fashion?
                                        Page 176

1  A.   No. I don't know.
2  Q.   Did you have any discussions with
3  anybody other than your attorney concerning calls
4  into various extensions on February 9th, 2005, as it
5  relates to Mr. Andreu's claims?
6  A.   No.
7  Q.   Or the events of February 9th, 2005,
8  that we've talked about with respect to Mr. Andreu?
9  A.   No.
10  Q.   Anything else that you can see feels
11  important or relevant with respect to Exhibit No. 7?
12  A.   No.
13       (Brief pause.)
14  BY MR. COFFEY:
15  Q.   Whose decision was it to terminate
16  Mr. Andreu's employment?
17  A.   From my understanding, it was due to a
18  grievance not being presented.
19  Q.   What was due to a grievance not being
20  presented?
21  A.   They have a certain period of time,
22  15 days I believe, the union, when anybody is being
23  disciplined to present a grievance which -- to
24  reduce the discipline to what have you.
                                        Page 177

45 (Pages 174 to 177)

1  54, which is drinking, have you been involved in any
2  charges against any employee in the Aurora center
3  for drinking?
4      A.    No.
5      Q.    Or being intoxicated on the job?
6      A.    No.
7      Q.    Article C is possession of drugs.
8  Have you been involved in any situations or do you
9  know of any situations where any employee of the
10  Aurora center was charged with a violation of
11  Article 54(C), possession of drugs?
12      A.    No.
13      Q.    Subparagraph D is gross negligence.
14  Have you been involved in any situations or know of
15  any situations where any employee of the Aurora
16  center was charged with violating Subparagraph D,
17  gross negligence?
18      A.    No.
19      Q.    Subparagraph E is carrying
20  unauthorized passengers. Do you know of any
21  situations or been involved in any situations where
22  any employee of the Aurora center was accused of
23  violating Subparagraph E, carrying unauthorized
24  passengers?

Page 190

1      A.    Yes.
2      Q.    Who?
3      A.    Air driver we have currently, Dave
4  Dill.
5      Q.    Do you spell it just D-I-L-L?
6      A.    D-I-L-L.
7      Q.    What was your knowledge and/or
8  involvement in that charge against Dave Dill?
9      A.    A driver -- one of our service
10  providers reported to us that he saw this particular
11  driver driving with a female in his car. I had a
12  conversation with him on the phone that night, told
13  him if he had anybody in the car, he had to get them
14  out and then it was handled by my manager, Tim Pope,
15  after that.
16      Q.    Do you know when this was?
17      A.    A couple months. Within the last
18  three months I would say.
19      Q.    So you got notice of an allegation
20  from another driver that he saw Mr. Dill with
21  somebody unauthorized in the car?
22      A.    Correct.
23      Q.    And you called Mr. Dill on the phone?
24      A.    I had him call the office, yes.

Page 191

1      Q.    Okay. And you talked to him on the
2  phone --
3      A.    Yes.
4      Q.    -- and you say what?
5      A.    I said if he has anybody in the car,
6  you know, which he denied, I said you need to get
7  them out now. And then that was the end of the
8  conversation. I reported it to Tim Pope and then it
9  went from there.
10      Q.    What happened?
11      A.    I believe he was terminated.
12      Q.    Are you sure?
13      A.    I know he was -- I know he was out of
14  work. I think he was terminated for -- until the
15  grievance procedure went through and then he's back.
16      Q.    Now he's back?
17      A.    He's back at work.
18      Q.    Who was the driver that reported --
19  was this an eyewitness, somebody who actually saw an
20  unauthorized passenger in his car?
21      A.    Thought he saw a passenger, yes.
22      Q.    Well, I mean, did you talk to this
23  other driver?
24      A.    Yes.

Page 192

1      Q.    Did he say I think I saw or I saw?
2      A.    I saw.
3      Q.    Okay. Anybody else? Any other
4  instances of carrying unauthorized passengers in the
5  Aurora center since you've been a supervisor there?
6      A.    No.
7      Q.    Failure to report an accident. Any
8  instances that you know of or involved in about
9  failure to report an accident, charges of failure to
10  report an accident?
11      A.    Yes.
12      Q.    What?
13      A.    I believe that was Anthony Bermes.
14      Q.    Anything in addition to Anthony?
15      A.    No.
16      Q.    A runaway accident, Subparagraph G.
17  Any instances or involvement in a charge or
18  violation of Subparagraph G --
19      A.    No.
20      Q.    -- of Article 54?
21      A.    No.
22      Q.    Sex harassment is Subparagraph H.
23  Have you been involved in any charges against any of
24  your employees or any employees out of the Aurora

Page 193

49 (Pages 190 to 193)

1  center of sexual harassment?
2      A.  No.
3      Q.  Subparagraph I is fighting. Have you
4  been involved in or have knowledge of any instances
5  where an employee out of the Aurora center was
6  charged with fighting?
7      A.  No.
8      Q.  Did Mr. Snyder ever indicate to you or
9  tell you that Mr. Andreu had admitted to lying -- to
10  saying this -- to the lie that he is accused of?
11     A.  No.
12         MR. COFFEY:  I don't have anything
13  further.
14         MR. WATSON:  I have a few questions
15  but we're going to take a couple minutes.
16             (Whereupon, after a short
17               break was had, the
18               following proceedings
19               were held accordingly.)
20         MR. WATSON:  Mr. Ziltz, I have really
21  just a few questions.
22         CROSS EXAMINATION
23         By Mr. Watson
24     Q.  I thought it was a bit unclear when

Page 194

1  Mr. Coffey was asking you about your dates of
2  employment and exactly when you started in the
3  Aurora center the second time around after you had
4  been in business development and things. Do you
5  remember when that was?
6      A.  Peak 2004.
7      Q.  So --
8      A.  Christmas 2004, just before December I
9  want to say.
10     Q.  So that Christmas season, that peak
11  season?
12     A.  Yes.
13     Q.  And prior to that you were in the
14  Addison center in the Addison facility?
15     A.  Addison center in the Addison facility
16  on the pre-load.
17     Q.  You talked about there being a change
18  in how things were documented and the emphasis on
19  documentation. Do you remember when that was?
20     A.  Just recently. The last month.
21     Q.  And was this a new emphasis for you or
22  was it an emphasis for a division, a facility?
23     A.  I would say our division, the Addison
24  division, the four centers within the Addison

Page 195

1  building.
2      Q.  It wasn't directed just at you?
3      A.  No.
4      Q.  Mr. Ziltz, you were asked some
5  questions about delivery records being archived to a
6  disk. Do you recall that?
7      A.  Yes.
8      Q.  And that the disk was by the computer
9  I thought you said in the supervisor's office?
10     A.  The middle office. It's the DIAD room
11  we call it.
12     Q.  Do you know how far back those
13  archives go?
14     A.  I'm not involved with it. The same
15  disk is used over and over to basically delete the
16  information off of that computer there.
17     Q.  The disk is overridden?
18     A.  Overridden.
19     Q.  Is that what John Coker does?
20     A.  No. I believe Cheryl does that.
21     Q.  Cheryl Bast?
22     A.  Yes.
23     Q.  But there's a certain number of disks,
24  however many it is, and those disks are written over

Page 196

1  and over?
2      A.  The system can hold visually in front
3  of you I think two weeks of dates showing. Once it
4  reaches that point, some have to be wiped out to
5  make room for the current weeks you're in.
6          MR. WATSON:  I don't have anything
7  further.
8          MR. COFFEY:  Nothing further.
9          MR. WATSON:  Reserve.
10     AND FURTHER DEPONENT SAITH NAUGHT...
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 197

50 (Pages 194 to 197)

# Quality Performance Review

**David Ziltz**
**0108660**

**Management Level: FT Supervisor**

**Appraisal Period: 01/01/2005 - 12/31/2005**

**Approved By: Kerry Snyder**

| Mid-Year Review | Final Close |
|---|---|
| N/A | 02/11/2006 |

**Signatures**

---
Employee                                    Date

---
Immediate Manager                           Date

---
Next Level Manager                          Date

UPS 1113
Confidential




# Performance Goals and Results

**David Ziltz 's Goals and Results (Appraisal Period: 01/01/2005 -12/31/2005)**

### Customer (20%)

| Goals/Measures | How Measured | WGT (%) | Base | Goal | Hi/Lo | Result | UNWT Val | WT Val |
|---|---|---|---|---|---|---|---|---|
| Delivery Scan | 1/per frequency | 10 | 667 | 800 | High | 752 | 0.94 | 9.40 |
| Total Concerns | 1/per frequency | 5 | 2127 | 2300 | High | 2928 | 1.20 | 6.00 |
| Destination LDI | 1/per frequency | 5 | 3116 | 3336 | High | 3966 | 1.19 | 5.94 |
| | | | | | | | Customer Score | 21.34 |

### People, Innovation & Learning (20%)

| Goals/Measures | How Measured | WGT (%) | Base | Goal | Hi/Lo | Result | UNWT Val | WT Val |
|---|---|---|---|---|---|---|---|---|
| Employee Relations Index | ERI survey results | 10 | 77 | 78 | High | 60 | 0.00 | 0.00 |
| Auto Frequency | Frequency Rating | 5 | 19.1 | 13.2 | Low | 24.9 | 0.00 | 0.00 |
| Dart Frequency | Frequency Rating | 5 | 13.2 | 10.0 | Low | 13.1 | 0.76 | 3.82 |
| | | | | | | People, Innovation & Learning Score | | 3.82 |

### Financial (20%)

| Goals/Measures | How Measured | WGT (%) | Base | Goal | Hi/Lo | Result | UNWT Val | WT Val |
|---|---|---|---|---|---|---|---|---|
| Expense Per Billed & Delivered Piece | Cost Statement | 10 | 1.8 | 1.8 | Low | 1.6 | 1.11 | 11.06 |
| Workmans Comp Cost | Cost Statement | 10 | 106000 | 78000 | Low | 57000 | 1.20 | 12.00 |
| | | | | | | | Financial Score | 23.06 |

### Internal Business Process (20%)

| Goals/Measures | How Measured | WGT (%) | Base | Goal | Hi/Lo | Result | UNWT Val | WT Val |
|---|---|---|---|---|---|---|---|---|
| NDPPH | PKG Results | 5 | 27.6 | 27.8 | High | 27.9 | 1.00 | 5.01 |
| NPUPPH | PKG Results | 5 | 19.7 | 20.4 | High | 21.1 | 1.03 | 5.16 |
| Package Visibility | Total Frequency | 10 | 72 | 100 | High | 64 | 0.00 | 0.00 |
| | | | | | | Internal Business Process Score | | 10.17 |

| | |
|---|---|
| Weighted QPR Score (w/out Critical Skills): | 58.40 |

| | |
|---|---|
| 2005 QPR Score: | 58.40 |
| Critical Skills Score | 18.91 |
| 2005 Final Score | 77.31 |

UPS 1114
Confidential

 

# Change History

**David Ziltz 's Change History (Appraisal Period: 01/01/2005 -12/31/2005)**

| Changed By | Action | Date Changed | Change Reason | Perspective | Change Detail |
|---|---|---|---|---|---|
| *** No Change History Available *** | | | | | |

UPS 1115
Confidential



# Development Plan

**David Ziltz 's Development Plan (Appraisal Period: 01/01/2005 - 12/31/2005)**

**Critical Skills**

| Development Activity | Primary Resource | Due Date | How Measured | Progress | Done |
|---|---|---|---|---|---|
| Review critical skills with immediate manager | | 01/12/2006 | Verbal Feedback | REV ON 1/12/06 | No |

**Job Specific Skills**

| Development Activity | Primary Resource | Due Date | How Measured | Progress | Done |
|---|---|---|---|---|---|
| Attend Supervisor Leadership School | | 01/12/2006 | Course Completion | SLS IS SCHEDULED 2/13/06 | No |

**Business Acumen**

| Development Activity | Primary Resource | Due Date | How Measured | Progress | Done |
|---|---|---|---|---|---|
| *** There are no activities associated with this development area *** | | | | | |

UPS 1116
Confidential

# Critical Skills Raters

**Raters For David Ziltz**

| Name | Relationship |
|------|--------------|
| POPE, TIMOTHY | Co-Worker |
| SUWANSKI, MARC | Co-Worker |
| SNYDER, KERRY | Immediate Manager |

UPS 1117
Confidential

PR - David Ziltz - 0099078

# Critical Skills Leadership Factor Results



Legend
Co-Worker ■ Manager ▦ Self

**People Leadership**



| | Score |
|---|---|
| Relationship Skills | 3.92 |
| Developing Others | 3.87 |
| Managing Conflict | 3.71 |
| Teamwork/Cooperation | 4.09 |
| Communication | 3.97 |
| Influence | 3.71 |
| Motivating Others | 3.88 |

UPS 1118
Confidential



UPS 1119
Confidential

PR - David Ziltz - 0099078



## Self Leadership



| | Score |
|---|---|
| Self Development | 3.67 |
| Integrity | 4.42 |

UPS 1120
Confidential




**Results Leadership**



UPS 1121
Confidential

# Critical Skills Leadership Factor Results

## People Leadership

| Leadership Factor | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Relationship Skills | 3.83 | 3.50 | 4.33 | 3.92 |
| Developing Others | 3.40 | 3.60 | 4.13 | 3.87 |
| Managing Conflict | 3.25 | 3.25 | 4.17 | 3.71 |
| Teamwork/Cooperation | 4.00 | 4.00 | 4.17 | 4.09 |
| Communication | 3.60 | 3.80 | 4.13 | 3.97 |
| Influence | 3.25 | 3.25 | 4.17 | 3.71 |
| Motivating Others | 3.50 | 3.75 | 4.00 | 3.88 |
| | | | People Leadership Score | 3.88 |

## Business Leadership

| Leadership Factor | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Problem Analysis | 4.00 | 4.00 | 4.00 | 4.00 |
| Customer Focus | 3.50 | 3.75 | 4.33 | 4.04 |
| Promotes Change | 3.20 | 3.80 | 4.33 | 4.07 |
| Planning/Organizing | 3.20 | 3.60 | 4.00 | 3.80 |
| Strategic Management | 3.50 | 3.50 | 4.33 | 3.92 |
| | | | Business Leadership Score | 3.96 |

## Self Leadership

| Leadership Factor | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Self Development | 3.50 | 3.50 | 3.83 | 3.67 |
| Integrity | 4.00 | 4.00 | 4.83 | 4.42 |
| | | | Self Leadership Score | 4.04 |

## Results Leadership

| Leadership Factor | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Process/Quality Improvement | 3.50 | 3.25 | 4.00 | 3.63 |
| Initiative | 3.75 | 3.50 | 4.25 | 3.88 |
| Results Orientation | 3.25 | 4.25 | 4.08 | 4.17 |
| | | | Results Leadership Score | 3.89 |
| | | | Overall Score | 3.94 |

UPS 1122
Confidential

# Critical Skills Feedback

**Hidden Talents - skills or competencies where others rated you higher than you rated yourself.**

| Manager(s) Perspective | Leadership Factor | Self | Manager | Co-Worker | Score | Gap |
|---|---|---|---|---|---|---|
| Results Leadership | Results Orientation | 3.25 | 4.25 | 4.08 | 4.25 | 1.00 |
| Business Leadership | Promotes Change | 3.20 | 3.80 | 3.80 | 3.80 | 0.60 |
| Business Leadership | Planning/Organizing | 3.20 | 3.60 | 4.00 | 3.60 | 0.40 |
| **Co-Worker Perspective** | **Leadership Factor** | **Self** | **Manager** | **Co-Worker** | **Score** | **Gap** |
| Business Leadership | Promotes Change | 3.20 | 3.80 | 4.33 | 4.33 | 1.13 |
| People Leadership | Managing Conflict | 3.25 | 3.25 | 4.17 | 4.17 | 0.92 |
| People Leadership | Influence | 3.25 | 3.25 | 4.17 | 4.17 | 0.92 |

**Blind Spots - skills or competencies where you rated yourself higher than others rated you.**

| Manager(s) Perspective | Leadership Factor | Self | Manager | Co-Worker | Score | Gap |
|---|---|---|---|---|---|---|
| People Leadership | Relationship Skills | 3.83 | 3.50 | 4.33 | 3.50 | 0.33 |
| Results Leadership | Initiative | 3.75 | 3.50 | 4.25 | 3.50 | 0.25 |
| Results Leadership | Process/Quality Improvement | 3.50 | 3.25 | 4.00 | 3.25 | 0.25 |
| **Co-Worker Perspective** | **Leadership Factor** | **Self** | **Manager** | **Co-Worker** | **Score** | **Gap** |
| **** No Co-Worker Blind Spots **** | | | | | | |

**Strengths - skills or competencies for which you received the highest scores.**

| Manager(s) Perspective | Leadership Factor | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|---|
| Results Leadership | Results Orientation | 3.25 | 4.25 | 4.08 | 4.25 |
| People Leadership | Teamwork/Cooperation | 4.00 | 4.00 | 4.17 | 4.00 |
| Business Leadership | Problem Analysis | 4.00 | 4.00 | 4.00 | 4.00 |
| **Co-Worker Perspective** | **Leadership Factor** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Self Leadership | Integrity | 4.00 | 4.00 | 4.83 | 4.83 |
| People Leadership | Relationship Skills | 3.83 | 3.50 | 4.33 | 4.33 |
| Business Leadership | Customer Focus | 3.50 | 3.75 | 4.33 | 4.33 |

**Development Opportunities - skills or competencies for which you received the lowest scores.**

| Manager(s) Perspective | Leadership Factor | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|---|
| People Leadership | Managing Conflict | 3.25 | 3.25 | 4.17 | 3.25 |
| People Leadership | Influence | 3.25 | 3.25 | 4.17 | 3.25 |
| Results Leadership | Process/Quality Improvement | 3.50 | 3.25 | 4.00 | 3.25 |
| **Co-Worker Perspective** | **Leadership Factor** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Self Leadership | Self Development | 3.50 | 3.50 | 3.83 | 3.83 |
| People Leadership | Motivating Others | 3.50 | 3.75 | 4.00 | 4.00 |
| Business Leadership | Problem Analysis | 4.00 | 4.00 | 4.00 | 4.00 |

UPS 1123
Confidential

# Critical Skills Behavior Results

┌─ Legend ─────────────────────┐
│ ■ Co-Worker  ■ Manager  ▓ Self │
└──────────────────────────────┘

**People Leadership**



| Relationship Skills | Score |
|---|---|
| **Develops relationships across groups/functions** | 3.67 |
| **Builds valuable partnerships** | 4.17 |
| **Takes time to get to know others** | 4.17 |
| **Treats others with respect** | 3.67 |
| **Expresses concern about the impact of a decision on others** | 4.17 |
| **Values diversity and differences in people** | 3.67 |

UPS 1124
Confidential



**People Leadership**

UPS 1125
Confidential



Legend
■ Co-Worker  ■ Manager  ▮ Self

**People Leadership**



| Managing Conflict | Score |
|---|---|
| Proactively takes action to resolve conflict situations | 3.67 |
| Encourages others to express their opinions when there is disagreement | 3.50 |
| Responds constructively in conflict situations | 3.50 |
| Looks for win-win resolution to disagreements | 4.17 |

UPS 1126
Confidential



## People Leadership



UPS 1127
Confidential



## People Leadership

| Communication | Score |
| --- | --- |
| **Ensures others have the information they need to do their jobs effectively** | 3.84 |
| **Speaks with confidence** | 4.00 |
| **Listens attentively to others** | 4.17 |
| **Presents ideas clearly** | 3.67 |
| **Asks questions regularly to gather others' views** | 4.17 |

UPS 1128
Confidential

Legend
Co-Worker  Manager  Self

**People Leadership**





Legend
■ Co-Worker  ■ Manager  ⬛ Self

## People Leadership



| Motivating Others | Score |
|---|---|
| Challenges others to excel in their work | 4.00 |
| Creates a positive diverse work environment | 3.50 |
| Provides others with the authority to make decisions | 4.00 |
| Shares credit with others when appropriate | 4.00 |

UPS 1130
Confidential




**Business Leadership**



| Problem Analysis | Score |
|---|---|
| **Makes decisions that are supported by relevant information** | 4.00 |
| **Willingly makes decisions rather than delaying action** | 4.00 |
| **Involves others in the decision making process** | 4.00 |
| **Evaluates possible solutions from multiple points of view** | 4.00 |
| **Considers possible outcomes before making a decision** | 4.00 |

UPS 1131
Confidential



**Business Leadership**



UPS 1132
Confidential

PR - David Ziltz - 0099078



## Business Leadership



UPS 1133
Confidential

PR - David Ziltz - 0099078


Legend
Co-Worker ■ Manager ▓ Self

## Business Leadership



| Planning/Organizing | Score |
|---|---|
| Allocates appropriate resources to tasks | 4.17 |
| Schedules work so that deadlines are met | 4.00 |
| Monitors progress toward goals | 3.50 |
| Develops step-by-step plans | 3.34 |
| Prepares for potential problems | 4.00 |

UPS 1134
Confidential





Legend — Co-Worker ▮ Manager ▮ Self

## Business Leadership



| Strategic Management | Score |
|---|---|
| **Describes the strengths and weaknesses of the organization** | 3.84 |
| **Demonstrates a good understanding of the external factors that affect the business** | 4.17 |
| **Translates the organization's vision into clear actions that others can take** | 3.67 |
| **Identifies the long-term risks and returns associated with a course of action** | 4.00 |

UPS 1135
Confidential



## Self Leadership



| Self Development | Score |
|---|---|
| Uses feedback to develop areas needing improvement | 3.34 |
| Gets involved in a variety of experiences to maximize development | 3.50 |
| Stays current in own area of professional expertise | 3.84 |
| Acquires skills needed to meet business objectives | 4.00 |

UPS 1136
Confidential

PR - David Ziltz - 0099078



Legend
■ Co-Worker　■ Manager　▓ Self

### Self Leadership





## Results Leadership





**Results Leadership**



UPS 1139
Confidential

PR - David Ziltz - 0099078



## Results Leadership

UPS 1140
Confidential



PR - David Ziltz - 0099078

# Critical Skills Behavior Results

**People Leadership**

UPS 1141
Confidential

### Relationship Skills

| Behavior | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Develops relationships across groups/functions | 4.00 | 3.00 | 4.33 | 3.67 |
| Builds valuable partnerships | 4.00 | 4.00 | 4.33 | 4.17 |
| Takes time to get to know others | 4.00 | 4.00 | 4.33 | 4.17 |
| Treats others with respect | 4.00 | 3.00 | 4.33 | 3.67 |
| Expresses concern about the impact of a decision on others | 3.00 | 4.00 | 4.33 | 4.17 |
| Values diversity and differences in people | 4.00 | 3.00 | 4.33 | 3.67 |

### Developing Others

| Behavior | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Provides developmental opportunities for employees | 3.00 | 3.00 | 4.00 | 3.50 |
| Addresses performance concerns directly with others | 3.00 | 4.00 | 4.33 | 4.17 |
| Recommends specific solutions or strategies for improving performance | 4.00 | 4.00 | 4.33 | 4.17 |
| Gives feedback in an encouraging way | 3.00 | 3.00 | 3.67 | 3.34 |
| Clearly defines performance standards | 4.00 | 4.00 | 4.33 | 4.17 |

### Managing Conflict

| Behavior | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Proactively takes action to resolve conflict situations | 3.00 | 3.00 | 4.33 | 3.67 |
| Encourages others to express their opinions when there is disagreement | 3.00 | 3.00 | 4.00 | 3.50 |
| Responds constructively in conflict situations | 3.00 | 3.00 | 4.00 | 3.50 |
| Looks for win-win resolution to disagreements | 4.00 | 4.00 | 4.33 | 4.17 |

### Teamwork/Cooperation

| Behavior | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Promotes teamwork across groups | 4.00 | 4.00 | 4.00 | 4.00 |
| Encourages others to work cooperatively | 4.00 | 4.00 | 4.33 | 4.17 |
| Emphasizes team approaches when appropriate | 4.00 | 4.00 | 4.00 | 4.00 |
| Works cooperatively to meet organizational goals | 4.00 | 4.00 | 4.33 | 4.17 |

### Communication

| Behavior | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Ensures others have the information they need to do their jobs effectively | 3.00 | 4.00 | 3.67 | 3.84 |
| Speaks with confidence | 4.00 | 4.00 | 4.00 | 4.00 |
| Listens attentively to others | 4.00 | 4.00 | 4.33 | 4.17 |
| Presents ideas clearly | 4.00 | 3.00 | 4.33 | 3.67 |
| Asks questions regularly to gather others' views | 3.00 | 4.00 | 4.33 | 4.17 |

### Influence

| Behavior | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Provides rationale to persuade others toward a decision | 4.00 | 3.00 | 4.00 | 3.50 |
| Presents compelling reasons for ideas when challenged | 3.00 | 3.00 | 4.00 | 3.50 |
| Gains support from others for ideas | 3.00 | 4.00 | 4.33 | 4.17 |
| Relates opinions to others' needs or concerns | 3.00 | 3.00 | 4.33 | 3.67 |

### Motivating Others

| Behavior | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Challenges others to excel in their work | 4.00 | 4.00 | 4.00 | 4.00 |
| Creates a positive diverse work environment | 3.00 | 3.00 | 4.00 | 3.50 |
| Provides others with the authority to make decisions | 3.00 | 4.00 | 4.00 | 4.00 |

PR - David Ziltz - 0099078

| Shares credit with others when appropriate | 4.00 | 4.00 | 4.00 | 4.00 |

UPS 1142
Confidential



## Business Leadership

| Problem Analysis | | | | |
|---|---|---|---|---|
| **Behavior** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Makes decisions that are supported by relevant information | 4.00 | 4.00 | 4.00 | 4.00 |
| Willingly makes decisions rather than delaying action | 4.00 | 4.00 | 4.00 | 4.00 |
| Involves others in the decision making process | 4.00 | 4.00 | 4.00 | 4.00 |
| Evaluates possible solutions from multiple points of view | 4.00 | 4.00 | 4.00 | 4.00 |
| Considers possible outcomes before making a decision | 4.00 | 4.00 | 4.00 | 4.00 |
| **Customer Focus** | | | | |
| **Behavior** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Acts promptly in response to customer concerns | 4.00 | 4.00 | 4.33 | 4.17 |
| Solicits feedback from customers | 3.00 | 3.00 | 4.33 | 3.67 |
| Establishes partnerships with customers | 4.00 | 4.00 | 4.33 | 4.17 |
| Meets customer expectations | 3.00 | 4.00 | 4.33 | 4.17 |
| **Promotes Change** | | | | |
| **Behavior** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Keeps an open mind when faced with new situations | 3.00 | 4.00 | 4.67 | 4.34 |
| Responds flexibly to changing situations | 3.00 | 4.00 | 4.67 | 4.34 |
| Takes action to implement new ideas or strategies | 4.00 | 4.00 | 4.00 | 4.00 |
| Creates an open environment where employees can share new ideas | 3.00 | 4.00 | 4.33 | 4.17 |
| Helps others see new possibilities in the way we do business | 3.00 | 3.00 | 4.00 | 3.50 |
| **Planning/Organizing** | | | | |
| **Behavior** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Allocates appropriate resources to tasks | 3.00 | 4.00 | 4.33 | 4.17 |
| Schedules work so that deadlines are met | 4.00 | 4.00 | 4.00 | 4.00 |
| Monitors progress toward goals | 3.00 | 3.00 | 4.00 | 3.50 |
| Develops step-by-step plans | 3.00 | 3.00 | 3.67 | 3.34 |
| Prepares for potential problems | 3.00 | 4.00 | 4.00 | 4.00 |
| **Strategic Management** | | | | |
| **Behavior** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Describes the strengths and weaknesses of the organization | 3.00 | 3.00 | 4.67 | 3.84 |
| Demonstrates a good understanding of the external factors that affect the business | 4.00 | 4.00 | 4.33 | 4.17 |
| Translates the organization's vision into clear actions that others can take | 3.00 | 3.00 | 4.33 | 3.67 |
| Identifies the long-term risks and returns associated with a course of action | 4.00 | 4.00 | 4.00 | 4.00 |

UPS 1143
Confidential

PR - David Ziltz - 0099078  Page 32 of 34

## Self Leadership

| Self Development | | | |
|---|---|---|---|
| **Behavior** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Uses feedback to develop areas needing improvement | 3.00 | 3.00 | 3.67 | 3.34 |
| Gets involved in a variety of experiences to maximize development | 4.00 | 3.00 | 4.00 | 3.50 |
| Stays current in own area of professional expertise | 4.00 | 4.00 | 3.67 | 3.84 |
| Acquires skills needed to meet business objectives | 3.00 | 4.00 | 4.00 | 4.00 |
| **Integrity** | | | |
| **Behavior** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Is honest in interactions with others | 4.00 | 4.00 | 4.67 | 4.34 |
| Follows through with commitments | 4.00 | 4.00 | 4.67 | 4.34 |
| Maintains confidentiality of information | 4.00 | 4.00 | 4.67 | 4.34 |
| Takes full responsibility for own actions and results | 4.00 | 4.00 | 5.00 | 4.50 |
| Insists on what is fair and ethical | 4.00 | 4.00 | 5.00 | 4.50 |
| Upholds organizational values and beliefs | 4.00 | 4.00 | 5.00 | 4.50 |

UPS 1144
Confidential



## Results Leadership

| Process/Quality Improvement | | | | |
|---|---|---|---|---|
| **Behavior** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Measures progress toward quality improvement objectives | 3.00 | 3.00 | 4.00 | 3.50 |
| Sets quality standards | 3.00 | 3.00 | 3.67 | 3.34 |
| Looks for ways to make process improvements | 4.00 | 4.00 | 4.00 | 4.00 |
| Investigates causes of process breakdowns | 4.00 | 3.00 | 4.33 | 3.67 |
| **Initiative** | | | | |
| **Behavior** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Is proactive rather than reactive to situations | 4.00 | 4.00 | 4.33 | 4.17 |
| Takes action to ensure projects/tasks are successful | 4.00 | 3.00 | 4.33 | 3.67 |
| Overcomes barriers to project/tasks success | 3.00 | 3.00 | 4.33 | 3.67 |
| Anticipates potential problems before they occur | 4.00 | 4.00 | 4.00 | 4.00 |
| **Results Orientation** | | | | |
| **Behavior** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Goes beyond what is expected | 4.00 | 5.00 | 4.00 | 4.50 |
| Performs to a consistently high standard | 3.00 | 4.00 | 4.00 | 4.00 |
| Delivers results on a consistent basis | 3.00 | 4.00 | 4.00 | 4.00 |
| Gets the job done on time | 3.00 | 4.00 | 4.33 | 4.17 |

UPS 1145
Confidential

UPS 1146
Confidential