File Date:    1 - 31 - 08

Case No:    07cv 6132

ATTACHMENT # _____

EXHIBIT _____ 5 _____

TAB (DESCRIPTION)

_____

**Exhibit 5**

**Jose Andreu Deposition Excerpts**

## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF ILLINOIS
 3                EASTERN DIVISION
 4   JOSE ANDREU,                )
 5           Plaintiff,   )
 6     -vs-                ) No. 07 C 00473
 7   UNITED PARCEL SERVICE, INC.,  )
 8           Defendant.    )
 9
10        The deposition of JOSE ANDREU, called for
11   examination, taken pursuant to the Federal Rules
12   of Civil Procedure of the United States District
13   Courts pertaining to the taking of depositions,
14   taken before ZONA B. MILLER, a Notary Public
15   within and for the County of Lake, State of
16   Illinois, and a Certified Shorthand Reporter of
17   said state, at Suite 3700, 500 West Madison
18   Street, Chicago, Illinois, on the 28th day of
19   August, A.D. 2007, at 10:00 a.m.
20
21
22
23
24
```

## Page 2

```
 1   PRESENT:
 2      THE COFFEY LAW OFFICE, P.C.,
 3      (1403 East Forest Avenue,
 4      Wheaton, Illinois  60187,
 5      630-534-6300), by:
 6      MR. TIMOTHY J. COFFEY,
 7         appeared on behalf of the Plaintiff;
 8
 9      QUARLES & BRADY,
10      (Citicorp Center,
11      500 West Madison Street, Suite 3700,
12      Chicago, Illinois  60661), by:
13      MR. D. SCOTT WATSON,
14         appeared on behalf of the Defendant.
15
16
17
18
19              COPY
20
21
22
23   REPORTED BY: ZONA B. MILLER, C.S.R.
24       CERTIFICATE NO. 84-0428.
```

## Page 3

```
 1         (WHEREUPON, the witness was duly
 2          sworn.)
 3      MR. WATSON: This is the deposition of
 4   Jose Andreu taken pursuant to the Federal Rules of
 5   Civil Procedure and in accordance with the notice
 6   of deposition issued to counsel of record.
 7              JOSE ANDREU,
 8   called as a witness herein, having been first duly
 9   sworn, was examined and testified as follows:
10              EXAMINATION
11   BY MR. WATSON:
12      Q.  Mr. Andreu, we have met.  My name is
13   Scott Watson, the attorney for UPS.  I'm going to
14   be asking you some questions today.  And I always
15   like to start with some introductory questions
16   just to sort of set some ground rules for the
17   deposition.
18          Have you ever given a deposition
19   before?
20      A.  No.
21      Q.  I know you've seen several as part of
22   this case.  But just so everything is clear to
23   you, will you wait until each question is
24   completed before you give your response, okay?
```

## Page 4

```
 1      A.  Okay.
 2      Q.  And will you give your responses out
 3   loud as opposed to a nod of the head or a shrug of
 4   the shoulders or some other gesture?
 5      A.  Okay.
 6      Q.  And we'd like that because our court
 7   reporter can't write a shake of the head, a shrug
 8   of the shoulders.
 9      A.  I understand.
10      Q.  Thank you.  If your answer to a
11   question is yes or no, will you say yes or no as
12   opposed to uh-huh or uh-uh or something like that?
13      A.  Yes.
14      Q.  And again, it just makes it easier on
15   our court reporter.
16      A.  Okay.
17      Q.  If I ask a question or use words you
18   don't understand, will you let me know?
19      A.  Yes.
20      Q.  And I'll be glad to rephrase or restate
21   a question.  But you do understand if you answer a
22   question, it's going to be assumed that you
23   understood the question.  Do you understand that?
24      A.  Okay.
```

1 (Pages 1 to 4)



JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

Page 5

1    Q.    If you need to take a break, just let
2    us know.
3        A.    Okay.
4        Q.    You can take breaks basically at any
5    time except for when a question is pending.  Do
6    you understand that?
7        A.    Okay.
8        Q.    And is there any reason you can't give
9    clear and accurate testimony here today?
10       A.    I don't see why not.
11       Q.    You're not on any kind of medication
12    that makes it hard for you to remember things or
13    anything like that?
14       A.    Not now.
15       Q.    Were you previously on medication that
16    made it hard to remember things?
17       A.    In '05.
18       Q.    What medication was that, sir?
19       A.    I don't remember.
20       Q.    When in '05 were you on this
21    medication, sir?
22       A.    From March 'til about October.
23       Q.    October of '05?
24       A.    '05.

Page 6

1        Q.    You're not on that medication now?
2        A.    Not anymore.
3        Q.    Mr. Andreu, would you state your full
4    name for the record, please?
5        A.    First name Jose, J-o-s-e, last name
6    Andreu, A-n-d-r-e-u.
7        Q.    And what is your address, sir?
8        A.    7831 West Rascher, R-a-s-c-h-e-r,
9    Chicago 60656.
10       Q.    What is your telephone number there?
11       A.    Area Code 773-631-2306.
12       Q.    And your Social Security number, sir?
13       A.    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.
14       Q.    And what is your birth date?
15       A.    06/08/1963.
16       Q.    Where did you go to high school,
17    Mr. Andreu?
18       A.    In Mexico.
19       Q.    What was the name of the school?
20       A.    First name is Genaro Martires.
21       Q.    Would you spell that?
22       A.    First name is Genaro, G-e-n-a-r-o, and
23    Martires, M-a-r-t-i-r-e-s.
24       Q.    And where is that school located in

Page 7

1    Mexico; what city or town?
2        A.    It's called Tecolapa Gerrero.
3    T-e-c-o-l-a-p-a G-e-r-r-e-r-o.
4        Q.    And did you graduate from that school,
5    sir?
6        A.    Yes.
7        Q.    In what year?
8        A.    Don't remember.
9        Q.    Do you have any post-high school
10    education?
11       A.    No.
12       Q.    Did you ever serve in the military?
13       A.    No.
14       Q.    What year did you come to the United
15    States, sir?
16       A.    '81.  1981.
17       Q.    And did you immediately come to the
18    Chicagoland area?
19       A.    Yes.
20       Q.    Are you -- currently, are you a U.S.
21    citizen or Mexican citizen, sir?
22       A.    U.S. citizen.
23       Q.    Were you a naturalized citizen?
24       A.    Yes.

Page 8

1        Q.    And can you tell me what year, if you
2    know?
3        A.    Don't remember.  15 years ago.
4        Q.    So early 1990s?
5        A.    1990s.
6        Q.    Mr. Andreu, what jobs did you have
7    before or concurrently with your work at UPS?
8    Let's start with when you first came to the
9    Chicagoland area and just work our way up.
10       A.    Okay.  I work at -- my first job was
11    the Homestead Restaurant on North Avenue in
12    Maywood.
13       Q.    What did you do there?
14       A.    Busboy.
15       Q.    And can you give us an approximate from
16    when to when?
17       A.    I was there two years, then I went to
18    Salvador's Mexican Restaurant in Oak Park.
19       Q.    What did you do there?
20       A.    When I first got there, I was busboy.
21    And when I left, I was the -- I was bartender.
22       Q.    Did you have any jobs in between?
23       A.    No, that was full-time job.
24       Q.    And again, from when to when were you

2 (Pages 5 to 8)

Page 57

1    Q.   Were you standing on the ground or were
2  you standing on part of the vehicle?
3    A.   On the ground.
4    Q.   And thank you, sir. I just wanted to
5  make sure we had that information.
6        You indicated that you called in to the
7  center and were told to wait for a supervisor,
8  correct?
9    A.   They said, "Make the airs and then
10  we'll" -- "call us back. Let us know where you
11  are so you can meet the supervisor."
12    Q.   Let's, again, maybe back up just a
13  moment. If you would look at paragraph 10 of your
14  complaint. Do you see where I'm referring to,
15  sir? Paragraph 10. Paragraph 10 reads:
16        "He immediately called into UPS and
17  reported the work accident and his resulting back
18  injuries."
19        Is that correct?
20    A.   Yes.
21    Q.   I'll just kind of step back to this.
22  Did you do that? Did you call UPS immediately?
23    A.   Yes.
24    Q.   Who did you call?

Page 58

1    A.   I don't remember who I talked to.
2    Q.   Did you call a direct number or general
3  number? Strike that.
4        Did you call the Aurora Center?
5    A.   Yes.
6    Q.   And you don't remember who you spoke
7  to?
8    A.   I believe her name is Amanda.
9    Q.   Do you remember Amanda's position?
10    A.   No.
11    Q.   How did you call in, sir? Did you call
12  in from a phone booth, did you go to somebody's
13  house, a cell phone?
14    A.   A phone.
15    Q.   Excuse me, sir?
16    A.   A phone.
17    Q.   A phone?
18    A.   Yes.
19    Q.   But --
20    A.   My cell phone.
21    Q.   Your cell phone. Okay.
22    A.   Yes.
23    Q.   Do you remember what time of morning
24  this was? And I'm assuming it was morning, since

Page 59

1  it was your first stop.
2    A.   I don't remember exactly.
3    Q.   Now, I bring you back to where you were
4  a moment ago. You believe you spoke to Amanda?
5    A.   Yes.
6    Q.   And I may not have asked this. Do you
7  know what Amanda's position was with UPS?
8    A.   I don't know.
9    Q.   And I apologize. I couldn't remember
10  if I asked you.
11        What did you say to her and what did
12  she say to you?
13    A.   I told her exactly what I just said.
14    Q.   As in you described what happened as
15  you described it to us today?
16    A.   Yes.
17    Q.   And did she respond?
18    A.   Yes.
19    Q.   And how did she respond?
20    A.   She said, "Do the airs and call us back
21  so the supervisor can meet you."
22    Q.   So she told you to do the air packages?
23    A.   Yes.
24    Q.   How many air packages did you have that

Page 60

1  morning, if you remember?
2    A.   I don't remember.
3    Q.   Did you respond to her when she told
4  you to do the airs and call us back?
5    A.   I was talking to her on the phone.
6    Q.   I understand that. What did you say to
7  her?
8    A.   I did what she told me to do.
9    Q.   But did you say anything else to her
10  after she told you to do the airs and call them
11  back?
12    A.   Don't remember.
13    Q.   Do you remember anything else about the
14  conversation, either anything else you said or
15  anything else that this person Amanda may have
16  said?
17    A.   No.
18    Q.   So I think you've already indicated you
19  then went and did the airs, correct?
20    A.   Right.
21    Q.   Any idea of how long that took you?
22    A.   I don't remember exactly.
23    Q.   When you completed the airs, did you
24  call back in to the center?

15 (Pages 57 to 60)

Page 61

1    A.   Yes.
2    Q.   And who did you talk to this time?
3    A.   I believe at that time I talked to
4  Jill Schmidt.
5    Q.   Tell us about that conversation.
6    A.   She was aware of the situation. She
7  told me to sit down and wait for a supervisor.
8    Q.   Did you tell her where you were?
9    A.   Yes.
10   Q.   Is there anything else that you told
11  Miss Schmidt?
12   A.   Not that I recall. I might, I might
13  not.
14   Q.   Do you recall anything that she told
15  you?
16   A.   No.
17   Q.   So did you, in fact, sit down and wait
18  for a supervisor?
19   A.   Yes.
20   Q.   If we look at paragraph 11 of the
21  complaint, sir, at the bottom of page 3 -- excuse
22  me -- page 2 it says:
23        "Later in the day on January 24th,
24  2005, one of Jose's supervisors, Dave Ziltz, met

Page 62

1  Jose out on his route."
2        Was Dave Ziltz the supervisor that came
3  out and met you on the route --
4    A.   Yes.
5    Q.   -- as indicated in your complaint?
6        Later in the day, about how long did
7  you wait, if you recall?
8    A.   I don't recall. Maybe 45 minutes, an
9  hour.
10   Q.   Do you remember what time -- I know you
11  said 45 minutes to an hour wait. Do you remember
12  what time Mr. Ziltz arrived?
13   A.   I don't remember exactly.
14   Q.   Approximately?
15   A.   No. I can't recall.
16   Q.   Was this before noon, afternoon?
17   A.   Before noon.
18   Q.   Do you know if you delivered all the
19  next-day airs before 10:30 that day or if some
20  were late?
21   A.   Some were late.
22   Q.   What did you do while you waited for
23  Mr. Ziltz?
24   A.   I sorted out the truck.

Page 63

1    Q.   I'm sorry?
2    A.   The packages.
3    Q.   Is that what you were referring to
4  earlier as setting them up?
5    A.   Yes.
6    Q.   At some point Mr. Ziltz arrives,
7  correct?
8    A.   Yes.
9    Q.   Now, you indicate in your complaint
10  that:
11        "Upon meeting Jose out on his route,
12  Mr. Ziltz stated to Jose that he believed Jose was
13  lying about the work accident and/or related
14  injuries, and faking his pain."
15        Correct? That's what the complaint,
16  says, correct?
17   A.   Yes. He come over and he started
18  yelling at me. He said, "Mr. Andreu, you lying.
19  You don't want to work." He said, "The girls in
20  the office don't believe you, and I don't believe
21  you either." He said, "You screwed up for the
22  rest of the" -- "for the other drivers when
23  somebody else get hurts." You screw up," he said.
24   Q.   Anything else?

Page 64

1    A.   He went on and on.
2    Q.   What did he go on and on saying?
3    A.   Saying that I did not want to work,
4  that I was lazy, I didn't want to do the route and
5  that I was lying about getting hurt.
6    Q.   Anything else?
7    A.   It might be more. I can't remember
8  right now.
9    Q.   Anything that could refresh your
10  recollection?
11   A.   I can't remember.
12   Q.   How did you respond to him?
13   A.   I told him that I wasn't lying and that
14  I was hurt and that I was in pain. And he asked
15  me if I can do the route all by myself, and I told
16  him no. So he call Mike Ballu at that time. He
17  came over and he went out with me to complete the
18  route. I was driving, he was making deliveries.
19   Q.   Did you tell Mr. Ziltz that you
20  couldn't do the route at all or that you wanted to
21  go get medical treatment at that time?
22   A.   He asked me if I can drive. And I told
23  him, "Yes, I can. I can drive. I think I can
24  drive." He asked me to drive Mike Ballu because

16 (Pages 61 to 64)

Page 61

1    A.   Yes.
2    Q.   And who did you talk to this time?
3    A.   I believe at that time I talked to
4 Jill Schmidt.
5    Q.   Tell us about that conversation.
6    A.   She was aware of the situation.  She
7 told me to sit down and wait for a supervisor.
8    Q.   Did you tell her where you were?
9    A.   Yes.
10    Q.   Is there anything else that you told
11 Miss Schmidt?
12    A.   Not that I recall.  I might, I might
13 not.
14    Q.   Do you recall anything that she told
15 you?
16    A.   No.
17    Q.   So did you, in fact, sit down and wait
18 for a supervisor?
19    A.   Yes.
20    Q.   If we look at paragraph 11 of the
21 complaint, sir, at the bottom of page 3 -- excuse
22 me -- page 2 it says:
23        "Later in the day on January 24th,
24 2005, one of Jose's supervisors, Dave Ziltz, met

Page 62

1 Jose out on his route."
2        Was Dave Ziltz the supervisor that came
3 out and met you on the route --
4    A.   Yes.
5    Q.   -- as indicated in your complaint?
6        Later in the day, about how long did
7 you wait, if you recall?
8    A.   I don't recall.  Maybe 45 minutes, an
9 hour.
10    Q.   Do you remember what time -- I know you
11 said 45 minutes to an hour wait.  Do you remember
12 what time Mr. Ziltz arrived?
13    A.   I don't remember exactly.
14    Q.   Approximately?
15    A.   No, I can't recall.
16    Q.   Was this before noon, afternoon?
17    A.   Before noon.
18    Q.   Do you know if you delivered all the
19 next-day airs before 10:30 that day or if some
20 were late?
21    A.   Some were late.
22    Q.   What did you do while you waited for
23 Mr. Ziltz?
24    A.   I sorted out the truck.

Page 63

1    Q.   I'm sorry?
2    A.   The packages.
3    Q.   Is that what you were referring to
4 earlier as setting them up?
5    A.   Yes.
6    Q.   At some point Mr. Ziltz arrives,
7 correct?
8    A.   Yes.
9    Q.   Now, you indicate in your complaint
10 that:
11        "Upon meeting Jose out on his route,
12 Mr. Ziltz stated to Jose that he believed Jose was
13 lying about the work accident and/or related
14 injuries, and faking his pain."
15        Correct?  That's what the complaint,
16 says, correct?
17    A.   Yes.  He come over and he started
18 yelling at me.  He said, "Mr. Andreu, you lying.
19 You don't want to work."  He said, "The girls in
20 the office don't believe you, and I don't believe
21 you either."  He said, "You screwed up for the
22 rest of the" -- "for the other drivers when
23 somebody else get hurts."  You screw up," he said.
24    Q.   Anything else?

Page 64

1    A.   He went on and on.
2    Q.   What did he go on and on saying?
3    A.   Saying that I did not want to work,
4 that I was lazy, I didn't want to do the route and
5 that I was lying about getting hurt.
6    Q.   Anything else?
7    A.   It might be more.  I can't remember
8 right now.
9    Q.   Anything that could refresh your
10 recollection?
11    A.   I can't remember.
12    Q.   How did you respond to him?
13    A.   I told him that I wasn't lying and that
14 I was hurt and that I was in pain.  And he asked
15 me if I can do the route all by myself, and I told
16 him no.  So he call Mike Ballu at that time.  He
17 came over and he went out with me to complete the
18 route.  I was driving, he was making deliveries.
19    Q.   Did you tell Mr. Ziltz that you
20 couldn't do the route at all or that you wanted to
21 go get medical treatment at that time?
22    A.   He asked me if I can drive.  And I told
23 him, "Yes, I can.  I can drive.  I think I can
24 drive."  He asked me to drive Mike Ballu because

16 (Pages 61 to 64)



Page 65

1   he -- Mike Ballu did not know the route, to drive
2   the route, and the end of the day, come to my
3   office so we can report it to workmen's comp, and
4   tomorrow morning, first thing, you go see the
5   doctor. That's what I recall he tell me.
6       Q.   But my question was did you tell him
7   that you couldn't work or that you needed medical
8   assistance at that point in time?
9       MR. COFFEY:   Well, objection, form of the
10  question.
11      Answer if you can.
12  BY MR. WATSON:
13      Q.   Do you need me to rephrase the
14  question?
15      A.   I do what he told me to do.
16      Q.   I understand that, sir. I'll break it
17  down. Did you tell him you couldn't work?
18      A.   No, I didn't.
19      Q.   Did you tell him you needed immediate
20  medical assistance?
21      A.   No, I didn't. He asked me if I can
22  drive the route.
23      Q.   And you did complete the route that day
24  with Mr. Ballu, correct?

Page 66

1       A.   Yes.
2       Q.   You driving and Mr. Ballu doing the
3   deliveries?
4       A.   Yes.
5       Q.   You indicated a moment ago that
6   Mr. Ziltz told you to come to his office at the
7   end of the day?
8       A.   Yes, to report the accident.
9       Q.   What time did you finish up that
10  evening?
11      A.   I don't remember exactly, but it was
12  late.
13      Q.   After seven --
14      A.   Seven, because I was feeling worse, the
15  pain was worse, and I wanted to go to the clinic,
16  but it was closed.
17      Q.   Anytime during the day did you call in
18  and say I'm feeling worse, I need to go to the
19  doctor, I need to go to the clinic?
20      A.   No, I didn't.
21      Q.   We'll identify what I think you're
22  referring to as the clinic here in a few minutes,
23  I believe. But do you remember what time it
24  closed?

Page 67

1       A.   I believe it close at seven.
2       Q.   And we'll get back to what happened
3   when you went back to the facility here in a
4   second. But did you -- that night after leaving
5   UPS, did you go to an emergency room or other
6   health care provider that evening?
7       A.   No.
8       Q.   Mr. Andreu, you indicated that
9   Mr. Ziltz asked you to come to his office, is that
10  correct --
11      A.   Yes.
12      Q.   -- when you got in that evening?
13      A.   Yes.
14      Q.   Did you, in fact, do that?
15      A.   Yes.
16      Q.   Do you remember when that was?
17      A.   The 24th.
18      Q.   On January 24th, 2005?
19      A.   Yes.
20      Q.   What time of day?
21      A.   What time?
22      Q.   Yes, sir.
23      A.   After we finish the route. And it was,
24  I don't know, 7:30, 8:00.

Page 68

1       Q.   So you went to Mr. Ziltz' office. Was
2   he there?
3       A.   Yes.
4       Q.   Tell us what happened.
5       A.   Again, he ask me what happened. I told
6   him. He was on the computer typing. And he ask
7   me -- I believe he ask me my age, Social Security,
8   all those questions. And he call it in at -- oh.
9   He reported it by phone.
10      Q.   When you say he reported it by phone --
11      A.   He reported it by phone to workmen's
12  comp.
13      Q.   Would it be Liberty Mutual?
14      A.   Yes.
15      Q.   And if you know, is Liberty Mutual UPS'
16  worker's compensation carrier at the time?
17      A.   Yes. And they talked to me at the end
18  on the phone and they gave me a claim number.
19      Q.   When you say "they," who's they?
20      A.   Liberty Mutual. I can't remember the
21  person I talk to.
22      Q.   And were you given that claim number in
23  order to go to the doctor the next morning?
24      MR. COFFEY:   Object to the form of the

17 (Pages 65 to 68)

Page 69

1  question.
2  BY THE WITNESS:
3      A.  No.
4  BY MR. WATSON:
5      Q.  Do you know why you were given the
6  claim number?
7      A.  I don't remember.
8      Q.  When this is going on in Mr. Ziltz'
9  office -- strike that.  Let me rephrase that.
10     Mr. Ziltz told you to come to his
11 office, correct?  Does he share his office with
12 other individuals or did he have his own office?
13     MR. COFFEY:  Objection to the form of the
14 question.
15     Answer if you can.
16 BY THE WITNESS:
17     A.  I'm not sure.
18 BY MR. WATSON:
19     Q.  Was anyone else present?
20     A.  No.
21     Q.  Do you know what Mr. Ziltz was typing
22 into the computer?
23     A.  I believe he was typing in that -- what
24 happen.

Page 70

1      Q.  What you were telling him?
2      A.  Yes.
3      Q.  The responses to your questions?
4      A.  Yes.
5      Q.  Did you see a completed document?
6      A.  I don't remember.
7      MR. WATSON:  Let me show you what we'll mark
8  as Andreu 5.
9          (WHEREUPON, a certain document was
10         marked Andreu Deposition
11         Exhibit No. 5, for
12         identification, as of 8/28/07.)
13 BY MR. WATSON:
14     Q.  Mr. Andreu, I'm going to ask you to
15 take a look at that.  And let me know when you've
16 had a chance to do so.
17     (Short pause.)
18 BY MR. WATSON:
19     Q.  Have you had a chance to review the
20 document, sir?
21     A.  Yes.
22     Q.  Do you recognize this?
23     A.  No.
24     Q.  You haven't seen it before?

Page 71

1      A.  No.
2      Q.  Let me ask you this:  Mr. Andreu, you
3  would agree this document says Risk Management at
4  the top?
5      A.  Yes.
6      Q.  And on that first page there's a
7  section that says Facts, and says Who:
8  Jose Andreu, and a couple of lines below that it
9  says Management Conducting Investigation, and to
10 the right it has the name Melissa Del Dotto.  Do
11 you see that?
12     A.  Yes.
13     Q.  Let me ask you:  Did you ever talk to
14 her about your accident?
15     A.  No.
16     Q.  Never once?
17     A.  Not that I recall right now.
18     Q.  You don't recall seeing this and you
19 don't recall having met with Melissa Del Dotto,
20 correct?
21     A.  Correct.
22     Q.  But you don't have any doubt that your
23 injury of January 24, 2005 was reported to UPS'
24 worker's compensation carrier on that day?

Page 72

1      A.  I don't have any doubt.
2      Q.  And you did have a worker's
3  compensation claim and you eventually received
4  worker's compensation benefits, correct?
5      A.  What was the question again?
6      Q.  I apologize.  You did eventually
7  receive worker's compensation benefits that came
8  from this injury of January 24, 2005, correct, the
9  result of --
10     A.  Yes, after March 4.
11     Q.  Mr. Andreu, I'm going to show you what
12 we'll mark as Andreu Exhibit 6.
13         (WHEREUPON, a certain document was
14         marked Andreu Deposition
15         Exhibit No. 6, for
16         identification, as of 8/28/07.)
17 BY MR. WATSON:
18     Q.  I'm going to ask you to review this and
19 let me know when you've had a chance to do so.
20     (Short pause.)
21 BY MR. WATSON:
22     Q.  Did you have a chance to review it?
23     A.  Yes.
24     Q.  Do you recognize this document, sir?

18 (Pages 69 to 72)



Page 93

1  language, what's a stop?
2      A.   A stop is --
3      MR. COFFEY: I'll just object to the form of
4  the question.
5          Answer if you can.
6  BY THE WITNESS:
7      A.   Let's say I got a delivery for you.
8  This one stop I got to make and complete.
9  BY MR. WATSON:
10     Q.   So if you came to deliver to this
11 office, this would be a stop?
12     A.   Yes.
13     Q.   And it's one stop regardless of whether
14 there's one package or a hundred packages that
15 you're delivering to this particular --
16     A.   Yes.
17     Q.   -- address, correct?
18     A.   Yes.
19     Q.   On that particular day, Mr. Andreu, did
20 you receive any additional packages after you left
21 in the morning? Was there a meet point at some
22 time during the day where you received some
23 additional packages?
24     A.   Yes.

Page 94

1      Q.   Do you remember about what time that
2  was?
3      A.   After 12 -- maybe for between 12:30 and
4  1:30. I'm not sure.
5      Q.   Was your vehicle full when you left?
6      A.   In the morning, yes.
7      Q.   And when you left that morning, at the
8  time you left, did you have any scheduled pickups
9  on that particular route that day?
10     A.   About five call tags.
11     Q.   And again, what's a call tag?
12     A.   A call tag is they give you a label
13 with the address and you go pick up the package at
14 that address. And when you pick up the package
15 you put it on the package and you scan it and make
16 a stop complete.
17     Q.   And again, are call tags kind of an
18 everyday thing?
19     A.   Yes.
20     Q.   I hadn't asked you this earlier. Route
21 59, could you describe where it is geographically,
22 where it goes to?
23     A.   Is on the east side of Aurora and south
24 side.

Page 95

1      Q.   And you were contacted by UPS that day
2  to do a pickup at Bernina?
3      A.   Yes.
4      Q.   What is Bernina?
5      A.   Is the name of a company.
6      Q.   Do you know what they do there?
7      A.   I have no idea.
8      Q.   Had you ever made a pickup at Bernina
9  before?
10     A.   Yes.
11     Q.   About how many times?
12     A.   I don't remember.
13     Q.   More than five?
14     A.   I don't remember.
15     Q.   No idea, just you made it before?
16     A.   Yes.
17     Q.   It could be one, it could be 20 times
18 before?
19     A.   I don't remember exactly how many
20 times.
21     Q.   Do you remember approximately how many
22 times?
23     A.   No.
24     Q.   When were you contacted about making

Page 96

1  this pickup at Bernina?
2      A.   I believe it was around 3:00.
3      Q.   And what do you base that on?
4      A.   I'm sorry?
5      Q.   What do you base that on?
6      A.   At that time I had not taken lunch and
7  I was hungry. I was planning to go and take
8  lunch.
9      Q.   Anything else?
10     A.   Not that I can remember.
11     Q.   Excuse me, sir?
12     A.   I don't remember.
13     Q.   So you were contacted by UPS to make
14 this pickup. Do you remember who contacted you?
15     A.   No idea.
16     Q.   How were you contacted?
17     A.   Through the DIAD board.
18     Q.   What's called an ODS message?
19     A.   ODS message, yes.
20     Q.   And what did the message say?
21     A.   Break your route and go pick up Bernina
22 ASAP.
23     Q.   Break your route and go pick up Bernina
24 ASAP?

24 (Pages 93 to 96)



Page 89

1  packages come.
2     Q.  Do you remember what time of day it
3  was?
4     A.  It was early, because it was right
5  after all the trucks left.
6     Q.  Was anyone else present?
7     A.  I don't remember.
8     Q.  Did you say anything to either
9  Mr. Ziltz or Miss Del Dotto?
10    A.  No, sir.
11    Q.  Now, this other occasion you mentioned
12 that he approached you and no one was around,
13 where were you when he approached you?
14    A.  I was close to the office where they
15 have the phones.
16    Q.  Close to the office where they have the
17 forms?
18    A.  The phones.
19    Q.  Oh, the phones?
20    A.  Yes, where they answer the phones.
21    Q.  Is that the office where they had the
22 phones in the Aurora Center?
23    A.  Yes.
24    Q.  Was this in an office, a hallway?

Page 90

1     A.  Hallway.
2     Q.  What time of day was it?
3     A.  I don't remember.
4     Q.  Morning, afternoon?
5     A.  Afternoon.
6     Q.  Anyone else present?
7     A.  No.
8     Q.  Did you respond in any way?
9     A.  I said that, well, what was the
10 problem?  That if you didn't like me, what was --
11 that I was hurt pretty bad and I couldn't -- at
12 that point, I was on sitting and lifting
13 restrictions.  And sitting no more than 20 minutes
14 and lifting no more than 5 pounds.  And I asked
15 him what was the problem.  And he got mad, and he
16 turn around and left.
17    Q.  Was there anything else to that
18 conversation?
19    A.  It might be.  I don't remember.
20    Q.  Anything that would refresh your
21 recollection?
22    A.  Not right now.
23    Q.  You mentioned February 9 a second ago.
24 Let's go ahead and talk about February 9,

Page 91

1  Mr. Andreu.  Were you working for United Parcel
2  Service on that day?
3     A.  Yes.
4     Q.  And what route were you assigned to,
5  sir?
6     A.  Route 59.
7     Q.  Route 59?
8     A.  Yes.
9     Q.  Is that the same Route 59 that we
10 discussed with regard to January 24th?
11    A.  Yes.
12    Q.  And this was a route I think you
13 testified earlier you had done several times
14 previously, correct?
15    A.  Many times.
16    Q.  And who assigned you the route that
17 day?
18    A.  Mr. Ziltz.
19    Q.  You probably should clarify something.
20 When you say that Mr. Ziltz assigned you the
21 route, does that mean he told you to do that
22 route?
23    A.  Yes.
24    Q.  Do you know who actually made the

Page 92

1  decision as to who would do which route that day?
2     A.  I have no idea.
3     Q.  And that would also be the same answer
4  for previous times when I asked you about who
5  assigned routes?
6     A.  Right.
7     Q.  And you were okay to work as a package
8  car driver that day, correct?
9     A.  Yes.
10    Q.  You weren't working under any
11 restrictions at that point in time?
12    A.  I was taking Advil four times a day
13 and...
14    Q.  When you left the UPS facility that
15 day, do you remember how many packages you had on
16 your vehicle approximately?
17    A.  No idea.
18    Q.  About how many stops?
19    A.  You can't count the stops in the
20 morning.  The truck is full.  You can't even walk
21 in there.
22    Q.  Just so this is clear to other people
23 who may eventually read this transcript, I think
24 people understand how many packages.  In UPS

23 (Pages 89 to 92)



JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

Page 97

1    A.  Yes.
2    Q.  Do you remember if Bernina was a
3  time-sensitive pickup?
4    A.  I don't know.
5    Q.  What does break your route mean?
6    A.  I guess it's stop doing what you doing
7  and go and get the pickup.
8    Q.  How about ASAP?
9    A.  As soon as possible, I believe.
10   Q.  So you got that message through an ODS
11  text message, correct?
12   A.  Yes.
13   Q.  Did you respond?
14   A.  Yes.
15   Q.  And how did you respond?
16   A.  That I wanted to take lunch. That at
17  that time I hadn't taken lunch yet and I had a lot
18  of stops left.
19   Q.  Anything else?
20   A.  Then I got another text message.
21   Q.  Let's talk about this one first, your
22  response. You said you wanted to take lunch and
23  that you had a lot of stops left. Did you
24  actually say a lot of stops?

Page 98

1    A.  Yes.
2    Q.  You didn't say a number?
3    A.  Yeah.
4    Q.  Are you sure about that?
5    A.  Yes.
6    Q.  Did you testify differently in your
7  unemployment hearing?
8    A.  I got another text message saying about
9  how many stops you got.
10   Q.  So that was the next text message?
11   A.  Yeah.
12   Q.  Okay.
13   A.  And I said I got 60 stops.
14   Q.  Did your -- let me take them one at a
15  time. The message from UPS asked -- did it just
16  ask how many stops you have left?
17   A.  I don't remember exactly.
18   Q.  You're not sure if it said anything
19  else?
20   A.  No, I'm not sure.
21   Q.  Your response, did it just say about 60
22  stops left or did it say something else?
23   A.  That I wanted to take a lunch and that
24  breaking the route was going to take me -- put me

Page 99

1  behind and I was going to come back late to the
2  building.
3    Q.  And those are your recollections of the
4  exact words of your response?
5    A.  I think so.
6    Q.  So you think so. You're not positive.
7  But the best of your recollection, that's your
8  response?
9    A.  Yes.
10   Q.  Did you say late to the building or did
11  you say a time?
12   A.  I think I say around 8:00.
13   Q.  But you're not sure?
14   A.  I'm not sure.
15   Q.  Did your response say anything else?
16   A.  I don't remember.
17   Q.  Did you get any additional messages in
18  any form from UPS?
19   A.  At one point I call in.
20   Q.  Okay. Was that point the next message
21  or --
22   A.  Yes.
23   Q.  Before you had heard back from UPS?
24   A.  Yes.

Page 100

1    Q.  You call in?
2    A.  Yes.
3    Q.  When did you call in?
4    A.  In between all these messages; call in
5  and I explain.
6    Q.  But do you remember what time you
7  called in?
8    A.  No, I don't remember.
9    Q.  So you call in. Who did you talk to?
10   A.  I don't remember who I talk to. At
11  that time I got -- the person I talked to say,
12  "Forget about it. Somebody else going to pick it
13  up."
14   Q.  But you don't know who this person is?
15   A.  No.
16   Q.  Was there anything else in that
17  conversation?
18   A.  Not that I remember.
19   Q.  And you say you called -- I'm sorry.
20   A.  It might be some. I can't remember
21  right now.
22   Q.  You say you called in. Did you call in
23  on your cell phone?
24   A.  Yes.

ESQUIRE DEPOSITION SERVICES - CHICAGO

Page 101

1    Q.    Were there any additional messages,
2    either phone conversations, ODS messages?
3    A.    No, 'til much later. Said I got an ODS
4    saying that go and meet Mr. David Ziltz at
5    Bernina.
6    Q.    You said this was another ODS message?
7    A.    This was the last one.
8    Q.    You said this was not until much later.
9    How much later?
10    A.    Might be around 4:20.
11    Q.    4:20 p.m.?
12    A.    Yes.
13    Q.    Did you respond to that message?
14    A.    I don't recall.
15    Q.    About how much time are you claiming
16    was between the phone call where you called in and
17    the message you say you got at 4:20?
18    A.    I don't recall.
19    Q.    Can you approximate it?
20    A.    No. I can't remember.
21    Q.    What did you do after you called in?
22    Did you take lunch?
23    A.    No.
24    Q.    So what did you do?

Page 102

1    A.    I was making deliveries.
2    Q.    I want to make sure I understand this.
3    You had ODS'd -- you had text messaged back that
4    you wanted to take lunch when you were first asked
5    about the Bernina pickup. You called and were
6    told you don't have to make it and you didn't take
7    your lunch?
8    A.    No.
9    Q.    Why not?
10    A.    There was no place around that area
11    where I was.
12    Q.    Where were you?
13    A.    In Aurora, south Aurora.
14    Q.    Do you remember what street, what
15    addresses?
16    A.    No. I don't remember.
17    Q.    How long were you entitled to for
18    lunch?
19    A.    I believe an hour or 45 minutes' lunch,
20    half an hour. I have 15-minute breaks.
21    Q.    We've gotten three different times. Do
22    you remember which it was?
23    A.    We're entitled to an hour.
24    Q.    Is it an hour all at one time or is it

Page 103

1    an hour of breaks during the day?
2    A.    That's what I explain. I believe 15
3    minutes' break or 15-minute break and 45 minutes'
4    lunch.
5    Q.    So a total of an hour, but it could be
6    broken up into some segments?
7    A.    Yes.
8    Q.    So when you get this ODS message that
9    you claim you got at 4:20, what did you do?
10    A.    I went to Bernina and meet Mr. Ziltz.
11    Q.    You went straight there?
12    A.    Yes.
13    Q.    What time did you get there?
14    A.    I believe it was 4:45, something like
15    that.
16    Q.    So, again, just to make sure I
17    understand your testimony on this, you don't know
18    who you were getting these ODS messages from?
19    A.    No.
20    Q.    And you don't know who you talked to
21    when you called in?
22    A.    No, I don't.
23    Q.    Was that the only phone call you made
24    with regard to this series of conversations, this

Page 104

1    series of messages?
2    A.    I think so.
3    Q.    Is it possible you called in a second
4    time?
5    A.    I'm not sure.
6    Q.    When you say -- we already talked about
7    the initial messages. When you say you got the
8    last ODS message at 4:20 p.m., how do you know
9    what time it was?
10    A.    I'm not sure.
11    Q.    When you say you arrived at Bernina
12    about 4:45 or so, how do you know the time?
13    A.    I'm not sure.
14    Q.    Did you prepare any notes or memoranda
15    or any kind of diary entries or anything right
16    around February 9, 2005 that would have listed any
17    of these times?
18    A.    I don't remember.
19    Q.    Have you given all of your documents
20    that you're aware of in this case to your
21    attorney?
22    A.    I think so.
23    Q.    Is there anything that you're not sure
24    that you may not have given him?

26 (Pages 101 to 104)



Page 97

1  A.  Yes.
2  Q.  Do you remember if Bernina was a
3  time-sensitive pickup?
4  A.  I don't know.
5  Q.  What does break your route mean?
6  A.  I guess it's stop doing what you doing
7  and go and get the pickup.
8  Q.  How about ASAP?
9  A.  As soon as possible, I believe.
10  Q.  So you got that message through an ODS
11  text message, correct?
12  A.  Yes.
13  Q.  Did you respond?
14  A.  Yes.
15  Q.  And how did you respond?
16  A.  That I wanted to take lunch. That at
17  that time I hadn't taken lunch yet and I had a lot
18  of stops left.
19  Q.  Anything else?
20  A.  Then I got another text message.
21  Q.  Let's talk about this one first, your
22  response. You said you wanted to take lunch and
23  that you had a lot of stops left. Did you
24  actually say a lot of stops?

Page 98

1  A.  Yes.
2  Q.  You didn't say a number?
3  A.  Yeah.
4  Q.  Are you sure about that?
5  A.  Yes.
6  Q.  Did you testify differently in your
7  unemployment hearing?
8  A.  I got another text message saying about
9  how many stops you got.
10  Q.  So that was the next text message?
11  A.  Yeah.
12  Q.  Okay.
13  A.  And I said I got 60 stops.
14  Q.  Did your -- let me take them one at a
15  time. The message from UPS asked -- did it just
16  ask how many stops you have left?
17  A.  I don't remember exactly.
18  Q.  You're not sure if it said anything
19  else?
20  A.  No, I'm not sure.
21  Q.  Your response, did it just say about 60
22  stops left or did it say something else?
23  A.  That I wanted to take a lunch and that
24  breaking the route was going to take me -- put me

Page 99

1  behind and I was going to come back late to the
2  building.
3  Q.  And those are your recollections of the
4  exact words of your response?
5  A.  I think so.
6  Q.  So you think so. You're not positive.
7  But the best of your recollection, that's your
8  response?
9  A.  Yes.
10  Q.  Did you say late to the building or did
11  you say a time?
12  A.  I think I say around 8:00.
13  Q.  But you're not sure?
14  A.  I'm not sure.
15  Q.  Did your response say anything else?
16  A.  I don't remember.
17  Q.  Did you get any additional messages in
18  any form from UPS?
19  A.  At one point I call in.
20  Q.  Okay. Was that point the next message
21  or --
22  A.  Yes.
23  Q.  Before you had heard back from UPS?
24  A.  Yes.

Page 100

1  Q.  You call in?
2  A.  Yes.
3  Q.  When did you call in?
4  A.  In between all these messages; call in
5  and I explain.
6  Q.  But do you remember what time you
7  called in?
8  A.  No, I don't remember.
9  Q.  So you call in. Who did you talk to?
10  A.  I don't remember who I talk to. At
11  that time I got -- the person I talked to say,
12  "Forget about it. Somebody else going to pick it
13  up."
14  Q.  But you don't know who this person is?
15  A.  No.
16  Q.  Was there anything else in that
17  conversation?
18  A.  Not that I remember.
19  Q.  And you say you called -- I'm sorry.
20  A.  It might be some. I can't remember
21  right now.
22  Q.  You say you called in. Did you call in
23  on your cell phone?
24  A.  Yes.

25 (Pages 97 to 100)

Page 165

1    Q.   I think earlier you said sitting 20
2  minutes and not lifting more than 5 pounds. Do
3  you know what the lifting restrictions are or are
4  you uncertain?
5    A.   At first, it was five pounds, and later
6  it was 20 pounds.
7    Q.   Well, you gave -- whatever these
8  restrictions were, you got copies of them from the
9  doctor. And did you give those to your -- when
10 you were still working at UPS, did you give those
11 to your supervisors?
12   A.   Yes.
13   Q.   And these restrictions are right,
14 correct?
15   A.   Yes.
16   Q.   And you believe you've turned over the
17 copies of those restrictions to UPS in this case
18 as they've requested?
19   A.   Yes.
20   Q.   So whatever the restrictions are in
21 writing --
22   A.   Yes.
23   Q.   -- that's -- whatever the doctors have
24 written on those notes, those are your

Page 166

1  restrictions, right?
2    A.   Yes.
3    Q.   You were also asked about any basis for
4  your belief that it was 3:00 when these
5  communications started on February 9th of 2005.
6  Let me ask you, the DIAD board that you used for
7  delivering packages, does that have a readout of
8  what time it is?
9    A.   Yes.
10   Q.   And when you're delivering packages
11 throughout the day, particularly on February 9th,
12 2005, you record each delivery on the DIAD board,
13 right?
14   A.   Yes.
15   Q.   And when you record that on the DIAD
16 board, you're looking at the time as read out on
17 the DIAD board, right?
18   A.   Yes.
19   Q.   And when you have said in this case
20 that you believe it's about 3:00 when these
21 communications start, is that partially based on
22 your recollection of the DIAD board and the time
23 that was reflected on your DIAD board?
24   A.   Yes.

Page 167

1    Q.   Same thing with the other time you gave
2  about meeting Mr. Ziltz about 4:45. Again, during
3  the day, as you're making deliveries, you're
4  referring to the DIAD board, using the DIAD board,
5  and the DIAD board has the time on it, correct?
6    A.   Yes.
7    Q.   So every time you're making a delivery,
8  you're looking at the time.
9    A.   Yes.
10   Q.   Just as if you're looking at a watch,
11 correct?
12   A.   Yes.
13   Q.   And that experience on February 9th
14 is -- your estimations of these times in this case
15 are based on what you recollect from the DIAD
16 board readout and the time that is shown on the
17 DIAD board, correct?
18   A.   Yes.
19   Q.   You were shown copies of the two
20 handwritten notes that you have stated you gave to
21 Pam Treadwell. Let me just try to get the --
22   MR. WATSON: Exhibit 6 and 8, I think.
23   MR. COFFEY: Sounds right.
24 BY MR. COFFEY:

Page 168

1    Q.   Exhibit 6 and 8, do you recall the
2  testimony you gave on those Exhibits 6 and 8? Do
3  you recall getting some questions that asked about
4  Exhibits 6 and 8? Correct?
5    A.   Yes.
6    Q.   I think you were uncertain as to when
7  you gave these to Miss Treadwell. Would it be
8  safe to say that you gave them to her prior to you
9  being terminated?
10   A.   Yes.
11   Q.   So sometime before March 4th?
12   A.   Yes.
13   MR. COFFEY: I don't have anything else.
14   FURTHER EXAMINATION
15 BY MR. WATSON:
16   Q.   Mr. Andreu, you said that J & J Tree
17 Service Company owns equipment. What kind of
18 equipment does it own?
19   A.   Four trucks, a bucket, a chipper and a
20 stump grinder, two trailers, chain saws.
21   Q.   Anything else? I mean, is it -- other
22 than hand tools, that kind of thing? Do you have
23 any power equipment, anything like that?
24   A.   No.

42 (Pages 165 to 168)

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

Page 161

1    A.  I call my cousin Vincente.  He has a
2  couple of trucks.  And he told me that he needed
3  driver, but I didn't have the -- that CDL Class A
4  to drive one of his trucks.  And then I tried to
5  go to the State and operate my license, but I
6  need -- they told me that I need to go to school,
7  to go to school for driving the big trucks.  And I
8  went and called the school, and they wanted around
9  $4,000 for the training.  And at that time, there
10  was no money.
11    Q.  This is November '05?
12    A.  Yes.
13    Q.  Anything else during the months of
14  November, December prior to this entry here,
15  January 20, '06, that you did to try to find work?
16    A.  Same thing.  I did call the -- I did
17  call a lot of places to -- I was looking in the --
18  in that -- the paper.
19    Q.  And you were making calls based on what
20  you're finding in the paper?
21    A.  Yes.
22    Q.  How many calls would you say you made
23  in that time period, November, December and
24  January 2006, before your January 20th entry here?

Page 162

1    A.  At least three, four a day.
2    Q.  Okay.  And you were unable to find
3  work, I take it, during that time period?
4    A.  Yes.
5    Q.  I think there was a question about
6  J & J Tree Service along the lines of is there any
7  property in the name of the company.  And I'm not
8  sure -- does J & J Tree Service use equipment for
9  their jobs?
10    A.  Yes.
11    Q.  And J & J Tree Service Company owns the
12  equipment, I take it?
13    A.  Yes.
14    Q.  So that property will be in the name of
15  the company, correct?
16    A.  Yes.
17    Q.  Just there's no office, so to speak?
18    A.  No, there's no land.
19    Q.  You were asked if you had anything else
20  that supported your belief that a grievance was
21  filed on your behalf by Local 705, and then you
22  gave some testimony that you went and appeared
23  before a panel about the grievance, correct?
24    A.  Yes.

Page 163

1    Q.  That's your understanding of why you
2  appeared before that panel was because of the
3  grievance, right?
4    A.  Yes.
5    Q.  So does that appearance in March of
6  '06, does that support your belief that a
7  grievance was filed?
8    A.  Yes.
9    Q.  Way back in the start of the deposition
10  we were talking about -- the question was asked
11  whether there was any medication that affected
12  your ability to remember and whether you were
13  taking any medication in 2005 that affected your
14  ability to remember the events of 2005.  And I
15  think you started talking about -- I mean, we've
16  seen you've been on Advil.  That is what the
17  doctor at the clinic was prescribing for you,
18  correct?
19    A.  Right.
20    Q.  Let me just ask you:  Was there any
21  medication that you've taken since 2005 up to
22  today that has affected your ability to remember?
23    A.  No.
24    Q.  So as far as you know, your ability to

Page 164

1  remember the events and all the testimony that
2  you've given today is unaffected by any
3  medication, right?
4    A.  Yes.
5    Q.  You gave some testimony about a
6  supervisor by the name of Ginger.  Was that in the
7  Aurora Center or in the Air Center?
8    A.  In the Air Center.
9    Q.  With respect to medical restrictions,
10  at some point in time you were placed on work
11  restrictions by your doctor, correct?
12    A.  Yes.
13    Q.  And that was in February of '05 when
14  you came back and then you were put on light duty
15  and working light duty?
16    A.  Yes.
17    Q.  Do you know what those work
18  restrictions were?
19    A.  Lifting and sitting.
20    Q.  Do you know how long the sitting
21  duration was or the amount of lifting in terms of
22  pounds; if you know?
23    A.  Not sitting longer than 20 minutes or
24  lifting more than 20 pounds.

41 (Pages 161 to 164)

**Exhibit 6**

**Kerry Snyder Deposition Excerpts**

**Deposition Exhibit 3, Stevens' Grievance**
**Deposition Exhibit 5, Snyder 03/24/05 Memo**
**Deposition Exhibit 9, Snyder 02/02/06 E-Mail**
**Deposition Exhibit 10, Snyder 2005 Quality Performance Review**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

JOSE ANDREU,                )

                            )

        Plaintiff,     )

                            )

  vs.                 ) No. 07 C 0473

                            )

UNITED PARCEL SERVICE, INC.)

                            )

        Defendant.     )

The deposition of KERRY SNYDER called by
the Plaintiff for examination pursuant to notice and
pursuant to the Federal Rules of Civil Procedure for
the United States District Courts pertaining to the
taking of depositions, taken before Denise Andras,
Certified Shorthand Reporter and Notary Public
within and for the County of Cook and State of
Illinois at 29 South LaSalle, Illinois, on the 11th
day of July, A. D., 2007.

Page 2

```
 1   A P P E A R A N C E S:
 2
 3       THE COFFEY LAW OFFICE, INC.
 4       1403 East Forest Avenue
 5       Wheaton, Illinois  60187
 6       (630) 534-6300
 7       BY: MR. TIMOTHY J. COFFEY
 8
 9           Appearing on behalf of the Plaintiff;
10
11       QUARLES & BRADY, LLP
12       500 West Madison Street
13       Suite 3700
14       Chicago, Illinois 60661
15       (312) 715-5149
16       BY: MR. D. SCOTT WATSON
17
18           Appearing on behalf of the Defendant.
19
20
21
22
23
24
```

Page 3

```
 1           INDEX
 2
 3   WITNESS:
 4
 5   KERRY SNYDER
 6
 7     Direct Examination by MR. COFFEY......Page  4
 8     Cross-Examination by MR. WATSON.......Page 260
 9     Redirect Examination by MR. COFFEY.....Page 263
10     Recross-Examination by MR. WATSON.....Page 267
11     Further Redirect by MR. COFFEY........Page 268
12
     EXHIBITS:
13
       No. 1        Page  40
14     No. 2        Page  81
       No. 3        Page 101
15     No. 4        Page 111
       No. 5        Page 115
16     No. 6        Page 145
       No. 7        Page 157
17     No. 8        Page 171
       No. 9        Page 197
18     No. 10       Page 248
       No. 11       Page 248
19     No. 12       Page 263
20
21
22
23
24
```

Page 4

```
 1               KERRY SNYDER
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4           DIRECT EXAMINATION
 5   BY MR. COFFEY:
 6       Q.   Would you please state your full name
 7   for the record, Mr. Snyder.
 8       A.   Kerry Lee Snyder.
 9       Q.   Can you spell your last name, please?
10       A.   S-N-Y-D-E-R.
11       Q.   Mr. Snyder, my name is Tim Coffey, and
12   I represent Jose Andreu in a case that he has filed
13   against United Parcel Service.  We are here to take
14   your deposition.  You understand that?
15       A.   Yes.
16       Q.   Just a couple of -- sometimes we call
17   them ground rules, but I think they are just helpful
18   tips for both of us to understand.
19           First off, if you don't understand
20   any of my questions, please let me know immediately,
21   and I will restate them.  Okay?
22       A.   Okay.
23       Q.   If you don't indicate to me on the
24   record that you don't understand the question or
```

Page 5

```
 1   have a question about one of the words I'm using,
 2   the record is simply going to reflect your answer,
 3   not that there's any misunderstanding; do you
 4   understand that?
 5       A.   Yes.
 6       Q.   Do you understand that everything is
 7   being taken down today by Denise word for word, my
 8   question and then your answer; do you understand
 9   that that's being taken down in the transcript
10   today?
11       A.   Yes.
12       Q.   If you need to take a break, please
13   let us know and we'll take a break.  All right?
14       A.   Yes.
15       Q.   One caveat to that, there's going to
16   be no breaks while a question pending.  Okay?
17       A.   Okay.
18       Q.   So once you've given an answer, and
19   you have to go to the bathroom or whatever, we can
20   take a break?
21       A.   Okay.
22       Q.   Have you ever given your deposition
23   before?
24       A.   No.
```

Page 22

1  was just the drivers.
2      Q.    At some point you got more
3  responsibility?
4      A.    Well, rotational within the building.
5      Q.    How long were you in Peru, Illinois as
6  a full-time supervisor?
7      A.    I was there until May of 2000.
8      Q.    What happened then?
9      A.    I became the business manager of the
10  Dekalb center.
11      Q.    How long were you business manager of
12  the Dekalb center?
13      A.    One year.
14      Q.    So about May 2001?
15      A.    Business manager of Joliet center.
16      Q.    So from May 2000 to May 2001 you were
17  business manager of the Dekalb center?
18      A.    Correct.
19      Q.    And tell me briefly what that means,
20  to be the business manager of the Dekalb center; was
21  the scope of your authority; how many people did you
22  have working underneath you?
23      A.    Approximately a hundred people.
24      Q.    Drivers?

Page 23

1      A.    Yes.
2      Q.    And other employees?
3      A.    Yes.
4      Q.    Would it be correct to say that you
5  had authority over all the employees within the
6  Dekalb center?
7      A.    That would be correct, yes.
8      Q.    And there was about a hundred of
9  those?
10      A.    Yes.
11      Q.    And would that include firing
12  authority of those people?
13      A.    Yes.
14      Q.    Would you have to get approval for a
15  firing, a termination of a Dekalb center employee
16  during your year there?
17      A.    No.
18      Q.    So it was your decision?
19      A.    Yes.
20      Q.    Was that the first time that you had
21  that level of authority, May 2000, when you started?
22      A.    Yes.
23      Q.    The first time you had authority to
24  make the call on a termination all by yourself?

Page 24

1      A.    No.
2      Q.    When did you have firing authority
3  before that?
4      A.    As a supervisor in Peru.
5      Q.    So then in May 2001 you moved --
6  again, sometimes these centers, I am not that
7  familiar with, but the Dekalb center I'm assuming is
8  out in Dekalb, Illinois?
9      A.    Yes.
10      Q.    In May 2001 you became manager of the
11  Joliet center?
12      A.    Yes.
13      Q.    Is that in Joliet, Illinois?
14      A.    Yes -- I'm sorry, it's actually in
15  Rockdale.
16      Q.    How long are you there as business
17  manager?
18      A.    One year.
19      Q.    Do a lot of May moving, don't you. So
20  May '02?
21      A.    Became a -- May of '02 I was on
22  special assignment with the industrial engineering
23  group.
24      Q.    What was your title, position?

Page 25

1      A.    PAS coordinator.
2      Q.    What does PAS stand for?
3      A.    Preload assist.
4      Q.    Were you managing any employees in
5  this position?
6      A.    No.
7      Q.    How long were you in that special
8  assignment for?
9      A.    Two years.
10      Q.    Until about May '04?
11      A.    Hum?
12      Q.    About May '04 then?
13      A.    Yes. I needed a long vacation.
14      Q.    Well, it's easy to recount your
15  career, May, May, May. So back to the Joliet center
16  in Rockdale in May '02; how many employees did you
17  have under your supervision in that center?
18      A.    Approximately 140.
19      Q.    And, again, did you have firing
20  authority over those employees?
21      A.    Yes.
22      Q.    Individual, you didn't have to seek
23  approval from anyone?
24      A.    No.

7  (Pages 22 to 25)

Page 26

1    Q.    And the special assignment, you say
2  you don't have any employees under your authority,
3  correct?
4    A.    Correct.
5    Q.    What happens May '04?
6    A.    That's when I took over the Crystal
7  Lake center.
8    Q.    And I think you've said you were there
9  until the end of '04?
10   A.    Correct.
11   Q.    Exactly?
12   A.    Exactly.
13   Q.    12-31-04?
14   A.    Yes.
15   Q.    What happens then?
16   A.    I reported to the Aurora center on
17  January 2, '05.
18   Q.    Back at the Crystal Lake center for
19  the seven months you were there, how many employees
20  did you have under your authority?
21   A.    Approximately a hundred.
22   Q.    Again, full firing authority over
23  these employees?
24   A.    Yes.

Page 27

1    Q.    How many employees would you say you
2  terminated in your career at Crystal Lake center?
3    A.    I don't remember. I would say an
4  approximation of maybe two.
5    Q.    What about in your career at the
6  Joliet center, Rockdale?
7    A.    Approximation of four.
8    Q.    What about Dekalb?
9    A.    Approximately three.
10   Q.    What about full-time supervisor in
11  Peru?
12   A.    I really don't remember.
13   Q.    So you get to the Aurora center at the
14  beginning of the year '05, correct?
15   A.    Yes.
16   Q.    How long are you there for?
17   A.    Twenty-one months. I'm there until
18  October '07.
19   Q.    And where do you go at that point?
20   A.    Rock Island. I had two centers, Rock
21  Island and Rock Falls.
22   Q.    At that point in October of '07 --
23   A.    '06, I'm sorry.
24   Q.    At that point you get two centers

Page 28

1  right away or does that come later?
2    A.    No, it's two centers right away.
3    Q.    One is Rock Island?
4    A.    Correct.
5    Q.    What is the other?
6    A.    Rock Falls.
7    Q.    Where is this physically located that
8  you are business manager of both of these center?
9    A.    Rock Island is located in Milan,
10  M-I-L-A-N and Rock Falls is located in Rock Falls.
11  Both in Illinois.
12   Q.    And is it correct to say this is your
13  current position?
14   A.    Yes.
15   Q.    Business manager of both of these
16  centers?
17   A.    Yes.
18   Q.    How many employees do you currently
19  have under your authority?
20   A.    185.
21   Q.    Have you terminated any employees
22  since October '06 going to the Rock Island and Rock
23  Falls centers?
24   A.    Yes.

Page 29

1    Q.    How many?
2    A.    Two.
3    Q.    How many employees did you terminate
4  while you were business manager of the Aurora
5  center?
6    A.    Approximately four.
7    Q.    And how many employees did you have
8  under your supervision, authority while you were
9  business manager of the Aurora center?
10   A.    Approximately 90.
11   Q.    When you say four terminations, would
12  one of those be Mr. Andreu back at the Aurora
13  center?
14   A.    Yes.
15   Q.    Had you terminated any other employees
16  at the Aurora center who had sought worker's
17  compensation benefits or was it just Mr. Andreu?
18   A.    No.
19   Q.    Just Mr. Andreu?
20   A.    Yes.
21   Q.    What about since you've been at the
22  Rock Island, Rock Falls centers, any of these two
23  terminations been employees who sought worker's comp
24  benefits?

8  (Pages 26 to 29)

Page 66

1  listened?
2     A.   Yes.
3     Q.   Somebody asked him whether he did it,
4  right?
5     A.   Yes.
6     Q.   And you heard the answer?
7     A.   Yes.
8     Q.   What was the answer?
9     A.   That he confessed, yes, he did it, and
10 he took them back to his house and he gave them the
11 merchandise.
12    Q.   So it was a relatively simple decision
13 for you?
14    A.   Yes.
15    Q.   Any other instances?
16    A.   One other one in Joliet. Al Petkov.
17    Q.   P-E --
18    A.   T-K-O-V.
19    Q.   And what was Al accused of doing?
20    A.   Improper recording of information.
21    Q.   And you were the center manager?
22    A.   Correct.
23    Q.   And were you involved in any
24 investigation?

Page 67

1     A.   Yes.
2     Q.   What was your involvement?
3     A.   Conducted an audit on his vehicle,
4  verified the packages in his car that were delivered
5  and picked up.
6     Q.   And how did you go about doing that?
7     A.   Individually weighing each package
8  that went in his car.
9     Q.   Weighing?
10    A.   And each package that came out of his
11 car for pick up.
12    Q.   Did you do this personally?
13    A.   I did part of it, and the supervisor
14 did part of it.
15    Q.   What were the findings?
16    A.   The employee was taking credit for
17 picking up and delivering over 70 pound packages
18 when in fact he was not.
19    Q.   And how was he taking credit for it?
20    A.   He can put it on his, in his diet
21 board and he would put in there that he had 110 or
22 over 100 a day, and in reality we only found like
23 only two or three.
24    Q.   So it was comparing the diet board to

Page 68

1  your actual findings from the truck?
2     A.   Correct.
3     Q.   And there was no doubt from that
4  comparison that there was a discrepancy?
5     A.   Correct.
6     Q.   And he was lying about this
7  information?
8     A.   Correct.
9     Q.   What happened to Mr. Petkov?
10    A.   He was discharged.
11    Q.   Did he file a grievance?
12    A.   Yes.
13    Q.   What happened after with the
14 grievance?
15    A.   It was reduced to a suspension.
16    Q.   Do you know if he is still working?
17    A.   I don't know.
18    Q.   Was he working at the time that you
19 left Joliet center?
20    A.   Yes.
21    Q.   What was his position?
22    A.   Package car driver.
23    Q.   Did you take part in any grievance
24 meetings or arbitrations with respect to Mr. Petkov?

Page 69

1     A.   Yes.
2     Q.   How many?
3     A.   One.
4     Q.   Just a meeting?
5     A.   Yes.
6     Q.   At that point, was that the point that
7  it was reduced?
8     A.   Yes.
9     Q.   So what was your position with respect
10 to that, in that meeting, in the grievance meeting
11 with Mr. Petkov?
12    A.   I don't quite understand "my
13 position".
14    Q.   You say his termination was reduced to
15 a suspension, correct?
16    A.   Correct.
17    Q.   And that's something that you must
18 have authorized or okayed, correct?
19    A.   Actually the lead person there, the
20 lead individual there would be the labor department
21 was involved in it.
22    Q.   And who was the lead person for the
23 labor department at that point, Joliet center?
24    A.   It was I believe Tom Hefke.

Page 70

1    Q.    Is that the same Tom Hefke who was the
2    lead labor department person at the Aurora center
3    when Mr. Andreu was put on notice of termination?
4    A.    Yes.
5    Q.    So whose decision was it to reduce it
6    to a suspension for Mr. Petkov?
7    A.    It was a mutual agreement between Tom
8    Hefke and myself.
9    Q.    So you agreed to reduce it to a
10   suspension?
11   A.    Yes.
12   Q.    Why?
13   A.    Because we felt that the employee
14   could be honest and continue forthright in his job.
15   Q.    Based on what? Why did you feel that
16   way?
17   A.    Past history. He had no other
18   occurrences.
19   Q.    Anything else make you feel that this
20   employee can be honest going forward?
21   A.    No.
22   Q.    Did you talk to Mr. Petkov about the
23   situation?
24   A.    Yes.

Page 71

1    Q.    I take it you got some level of
2    comfort from your discussion with him that going
3    forward this guy can be honest?
4    A.    Yes.
5    Q.    Now, with respect to Mr. Andreu, you
6    met with him to give him the notice of suspension,
7    correct? You put Mr. Andreu on notice of suspension
8    on February 10, 2005, correct?
9         MR. WATSON: I think that's a
10   misstatement.
11   BY THE WITNESS:
12   A.    No.
13   BY MR. COFFEY:
14   Q.    Did you put him on notice of
15   termination, is that what it was? I wish it was
16   notice of suspension. You put Mr. Andreu on notice
17   of termination on February 10, 2005, correct?
18   A.    Yes.
19   Q.    You met with him and saw him in your
20   office that day?
21   A.    Yes.
22   Q.    At any point in time after that have
23   you spoken to Mr. Andreu about the notice of
24   termination or about the facts and circumstances of

Page 72

1    February 9th where he allegedly was dishonest?
2    A.    I don't remember.
3    Q.    You don't remember meeting him after
4    this February 10th meeting?
5    A.    No, I don't remember.
6    Q.    Did you ever -- you understand I'm
7    correct in saying that he didn't have any prior
8    instances of dishonesty in his record, correct?
9    A.    I'm sorry, could you restate the
10   question.
11   Q.    Did you look into his past record at
12   any time to see if he had any alleged instances,
13   other alleged instances of dishonesty?
14   A.    I don't remember.
15   Q.    Don't know if you looked or not?
16   A.    Don't remember.
17   Q.    Did it matter to you?
18   A.    I don't remember.
19   Q.    Did it matter to you that Mr. Petkov
20   didn't have any prior instances of dishonesty? That
21   mattered to you, correct?
22   A.    Yes.
23   Q.    But you don't remember if it mattered
24   to you with respect to Mr. Andreu?

Page 73

1    A.    I don't remember.
2    Q.    You don't remember if you even looked?
3    A.    I don't remember.
4    Q.    That's an important thing, though,
5    right, in a dishonesty case, if this is a perpetual,
6    habitual liar in terms of what level of discipline
7    you are going to give or in terms of whether you are
8    going to reduce a previously issued level of
9    discipline; that's important, right?
10   A.    Yes.
11   Q.    And with respect to Mr. Andreu you
12   don't even know if you looked, right?
13   A.    Correct.
14   Q.    Why did you move on from manager of
15   the Aurora center?
16   A.    To take over the responsibility of the
17   Rock Island and Rock Falls centers.
18   Q.    Was that a promotion at all?
19   A.    No, it's a lateral move.
20   Q.    Did somebody ask you to make the move?
21   A.    Yes.
22   Q.    Who?
23   A.    I mean, UPS asked me to move to Rock
24   Island, Rock Falls because they had an opening

Page 90

1   local level hearing and the employee was, the
2   discharge was reduced to suspension.
3       Q.    So that was your decision to reduce it
4   to a suspension?
5       A.    That was actually Tom Hefke, labor
6   manager's decision.
7       Q.    Did you disagree with the decision or
8   agree?
9       A.    I agreed with it.
10      Q.    What was this person's name?
11      A.    Katrina Smith.
12      Q.    K, Katrina?
13      A.    Yes, K-A-T-R-I-N-A.
14      Q.    Smith? And had Ms. Smith sought
15  worker's comp benefits at any point in time that you
16  know of?
17      A.    No.
18      Q.    She had not?
19      A.    No.
20      Q.    How about Brian Maxfield, did
21  Mr. Maxfield at any time that you know of seek
22  worker's compensation benefits?
23      A.    No.
24      Q.    Did Al Petkov at any time seek

Page 91

1   worker's compensation benefits?
2       A.    No.
3       Q.    Did Anthony Bermes at any point in
4   time seek worker's compensation benefits?
5       A.    No.
6       Q.    So any other instances of gross
7   negligence or cases you were involved in where there
8   was allegations of gross negligence?
9       A.    I don't remember any.
10      Q.    What about carrying unauthorized
11  passengers, any cases that you were involved in
12  where employees were accused of carrying
13  unauthorized passengers?
14      A.    No.
15      Q.    Failure to report an accident, we
16  talked about one case. Were there any other cases
17  that you've been involved with failure to report an
18  accident?
19      A.    I don't remember any other ones.
20      Q.    This is subparagraph G in Article 54
21  that says "runaway accident." Any instances where
22  you were involved in discipline or allegations of
23  runaway accident?
24      A.    I guess, not specifically runaway, but

Page 92

1   what also falls sometimes in that classification is
2   a rollover accident.
3       Q.    Okay. Were you involved in any
4   allegations of a rollover accident?
5       A.    Yes.
6       Q.    What would that have been?
7       A.    That would have been in January of
8   2007 and Dave Rodriguez.
9       Q.    What was his position?
10      A.    Package car driver.
11      Q.    And what was the allegation?
12      A.    He was taken out of service pending
13  investigation.
14      Q.    What was he alleged to have done?
15      A.    Rolled a package car over on its side.
16      Q.    When you say he was taken out of
17  service, is that with or without pay?
18      A.    That's without pay.
19      Q.    How long was he out of service?
20      A.    Approximately five days.
21      Q.    And there was an investigation done
22  during that period?
23      A.    Yes.
24      Q.    Who did the investigation?

Page 93

1       A.    Dennis Flusch, F-L-U-S-C-H.
2       Q.    And what position is Dennis?
3       A.    Car supervisor in Rock Falls.
4       Q.    Were you involved in the investigation
5   at all?
6       A.    No.
7       Q.    Did you have any interviews or
8   discussions with Dave Rodriguez about what happened?
9       A.    Yes, I believe we did appear at a
10  local level hearing in the center.
11      Q.    A meeting?
12      A.    A meeting in the center.
13      Q.    You met with Mr. Rodriguez?
14      A.    Yes.
15      Q.    Who else was there?
16      A.    Dennis Flusch, Paul Shore, union
17  steward, and a division manager.
18      Q.    Did Mr. Rodriguez admit to some level
19  of wrongdoing in this meeting?
20      A.    Yes.
21      Q.    What did he say?
22      A.    He was driving too fast for
23  conditions.
24      Q.    And he said he was driving too fast

Page 94

1   for conditions?
2       A.   Yes.
3       Q.   What was the result of the grievance?
4       A.   The employee was reduced to suspension
5   time served.
6       Q.   And you agreed with that decision?
7       A.   Yes.
8       Q.   Why?
9       A.   Based on the history of the employee.
10      Q.   And his history was clean, correct?
11      A.   Yes.
12      Q.   He was a good employee?
13      A.   Yes.
14      Q.   No prior incidents of driving too fast
15  for conditions, correct?
16      A.   Correct.
17      Q.   No prior incidents of serious
18  misconduct?
19      A.   Correct.
20      Q.   This is something that you determined,
21  correct?
22      A.   Yes.
23      Q.   That the record was clean?
24      A.   No, that was based off the information

Page 95

1   I believe that Dennis Flusch had given me that he
2   had no priors.
3       Q.   So you sought that information from
4   Mr. Flusch, correct?
5       A.   Yes.
6       Q.   Because that was important, right?
7       A.   Yes.
8       Q.   That was important in terms of the
9   ultimate level of discipline this guy was going to
10  receive, correct?
11      A.   Yes.
12      Q.   It mattered to you, right?
13      A.   Yes.
14      Q.   Did Mr. Rodriguez seek worker's
15  compensation benefits as far as you know?
16      A.   No.
17      Q.   Any other runaway accident or rollover
18  accident incidents or anything else that would fall
19  under that category?
20      A.   Yes. Dale Hoffert in Peru, rollover.
21      Q.   This is when you were full-time
22  supervisor?
23      A.   Uh-hum.
24      Q.   What's his name?

Page 96

1       A.   Dale Hoffert, H-O-F-F-E-R-T.
2       Q.   And what was Mr. Hoffert alleged to
3   have done?
4       A.   Rolled the package car over on its
5   side.
6       Q.   What was your involvement in this
7   case?
8       A.   Actually, I just remember being part
9   of the initial investigation, taking pictures.
10      Q.   What were you, what kind of pictures
11  were you taking in it particular case?
12      A.   Just the on-site.
13      Q.   So you went to the site of the
14  accident, correct?
15      A.   Yes.
16      Q.   And you were taking pictures as part
17  of the investigation?
18      A.   Yes.
19      Q.   All aimed at coming to a conclusion
20  about the level of discipline and level of
21  culpability of this gentlemen, correct?
22      A.   No.
23      Q.   Well, what else were you taking
24  pictures for?

Page 97

1       A.   To identify a root cause of what
2   actually happened and during these investigations
3   I'm not, you are not looking for level of
4   discipline. At that time you are looking for facts.
5       Q.   And that's the way it works as far as
6   you know at UPS, something happens and the
7   supervisors and/or managers, yourself being one of
8   them, goes out and looks for facts, right?
9       A.   Correct.
10      Q.   Because you need the facts before you
11  make the decision, right?
12      A.   Yes.
13      Q.   It's important to get all the facts,
14  right?
15      A.   Yes.
16      Q.   Sexual harassment, any -- did we
17  finish with runaway, rollover accident cases, any
18  others?
19      A.   I believe so, yes.
20      Q.   You believe we're done?
21      A.   Yes.
22      Q.   Another subparagraph under Article 54,
23  sexual harassment. Ever involved in any allegations
24  of instances of sexual harassment or alleged sexual

25 (Pages 94 to 97)

Page 118

1   Q.    Prior to what we see as Exhibit 4,
2   that you received on February 9th, did you take a
3   look at any drafts of what she was writing up?
4        MR. WATSON: Assumes facts not in
5        evidence. You can answer.
6   BY THE WITNESS:
7        A.    No.
8   BY MR. COFFEY:
9        Q.    Do you know if Mr. Ziltz reviewed the
10   document, made any corrections in the document
11   before it was turned in to what we see as
12   Exhibit No. 4?
13       A.    I don't know.
14       Q.    Did he tell you that I've looked at
15   what Ms. Bast has written and I asked her to make
16   some changes, she's going to make them and then get
17   it to you?
18       A.    No.
19       Q.    Anything like that?
20       A.    No.
21       Q.    So you don't know if there was any
22   earlier drafts of this?
23       A.    No, I don't.
24       Q.    Of Exhibit 4?

Page 119

1        A.    Correct.
2        Q.    When you received Exhibit 4, did you
3   have any questions for Ms. Bast?
4        A.    I don't remember any.
5        Q.    You don't remember talking to her
6   after you received this?
7        A.    Yes, I don't remember having any
8   questions for her.
9        Q.    Do you remember discussing at any
10   point after you received Exhibit 4 her rendition of
11   the events of February 9th, 2005, concerning
12   Mr. Andreu; did you discuss that with her after you
13   received this memo up till today?
14       A.    I don't remember.
15       Q.    Did you ever have any face-to-face
16   discussions with Ms. Bast concerning what may or may
17   not have happened on February 9, 2005, concerning
18   Mr. Andreu?
19       A.    Yes.
20       Q.    When?
21       A.    On February 9th.
22       Q.    You had a face-to-face discussion with
23   her on February 9th?
24       A.    Yes.

Page 120

1        Q.    Was that before or after receiving
2   Exhibit 4?
3        A.    Before.
4        Q.    And who was present for that
5   discussion?
6        A.    Just myself and Cheryl Bast as this
7   incident was transpiring.
8        Q.    You called her into your office?
9        A.    No.
10       Q.    Where was the discussion? Where did
11   it take place?
12       A.    In my office. She came into my
13   office.
14       Q.    Did she tell you why she came into
15   your office?
16       A.    Yes.
17       Q.    Why?
18       A.    She was having problems getting
19   Mr. Andreu to cover pickup.
20       Q.    What time was this on February 9,
21   2005?
22       A.    I don't remember.
23       Q.    What was your work hours at that point
24   in time for that day?

Page 121

1        A.    The hours that I worked?
2        Q.    Yes.
3        A.    5:30 to 6:00.
4        Q.    So you believe you showed up out in
5   Addison at 5:30 that day and your normal course was
6   to work till 6:00?
7        A.    Yes.
8        Q.    What was Ms. Bast's title at that
9   time?
10       A.    OMS, office management specialist.
11       Q.    OMS what?
12       A.    Office management specialist.
13       Q.    And what was her duties, was she one
14   of the employees under your supervision?
15       A.    Yes.
16       Q.    What were her duties in that position?
17       A.    It's a supervisor's role to answer
18   customer concerns, address dispatching issues.
19       Q.    So sometime on February 9th, 2005 she
20   came into your office?
21       A.    Yes.
22       Q.    Did she have Exhibit 4 in her hand?
23       A.    No.
24       Q.    Had you -- is this the first

Page 122

1  information you are getting with respect to some
2  problem or issue with Mr. Andreu that day?
3  　　A.　Yes.
4  　　Q.　You had no previous discussions with
5  Mr. Ziltz or Mr. Andreu or anybody else about any
6  issues or problems that day?
7  　　A.　No.
8  　　Q.　And what is said in the meeting
9  between you and Ms. Bast?
10  　　A.　She states that she's having problems
11  getting Jose Andreu to cooperate to make a pickup.
12  　　Q.　Did she tell you what the problems
13  were?
14  　　A.　Yes.
15  　　Q.　What did she say?
16  　　A.　She said that Mr. Andreu was stating
17  that he had work, he had too much work, that he
18  wouldn't go make the pickup, that he'd be out late.
19  　　Q.　What did you say?
20  　　A.　I don't recall verbatim, but basically
21  that he needed to cover pickup. He was going to
22  have to cover the pickup for us, dispatch him to the
23  pickup.
24  　　Q.　Did you know anything about this

Page 123

1  pickup? Were you told anything about it?
2  　　A.　No.
3  　　Q.　Were you told about the number of
4  packages?
5  　　A.　No.
6  　　Q.　Were you told about the weight of the
7  packages?
8  　　A.　No.
9  　　Q.　Were you told about how long it might
10  take to make the pickup?
11  　　A.　No.
12  　　Q.　Did she tell you anything in the
13  initial conversation, Ms. Bast, about the number of
14  packages Jose is at least claiming he has or why he
15  is resistant in making this pickup?
16  　　A.　No, I don't remember.
17  　　Q.　Did that matter at all?
18  　　A.　At that point, no. The timeliness of
19  it, no.
20  　　Q.　It didn't matter what his reasons
21  were? It was just that he had to make the pickup?
22  　　A.　Yes.
23  　　Q.　That's how you saw it?
24  　　A.　Yes.

Page 124

1  　　Q.　Why him? Why did he have to make the
2  pickup?
3  　　A.　We typically allocate ten percent of
4  our routes without pickups, so in order that they
5  can meet other special pickup needs or help other
6  drivers with pickups so.
7  　　Q.　So?
8  　　A.　So based off of that, he was the one
9  without pickups.
10  　　Q.　What do you mean he was without
11  pickups?
12  　　A.　He was, from what I know and what I
13  understand, he was either the closest one with
14  either without or the least amount of pickups.
15  　　Q.　How do you know that or understand
16  that at the time that Ms. Bast comes to you on
17  February 9th?
18  　　A.　Just by asking her who is the person
19  that should get the pickup. I was new to the
20  center.
21  　　Q.　Did you ask her in that conversation?
22  　　A.　Yes.
23  　　Q.　What did she say?
24  　　A.　She said that Jose Andreu is the

Page 125

1  person we need to go make the pickup.
2  　　Q.　Is that her decision?
3  　　A.　She has -- yes, she takes care of
4  dispatching issues.
5  　　Q.　Did Mr. Ziltz make that decision?
6  Was he the supervisor of Jose at this time?
7  　　A.　I don't know if he made that decision,
8  and, yes, he was the supervisor for Mr. Andreu at
9  this time.
10  　　Q.　So we are not sure who made the
11  decision that Jose needed to make the pickup, either
12  Ms. Bast or Mr. Ziltz?
13  　　A.　Yes.
14  　　Q.　One of those two?
15  　　A.　Yes.
16  　　Q.　You didn't make it?
17  　　A.　After she brought the problem to me, I
18  said you had need to have him make the pickup.
19  　　Q.　And that was based on what?
20  　　A.　That was based off of what she said
21  that he was the best candidate to make the pickup.
22  　　Q.　Did you do any checking into whether
23  he was in fact the best candidate to make the
24  pickup?

Page 126

1   A.   No.
2   Q.   You just took her at her word?
3   A.   Yes.
4   Q.   Is there some on a day to day basis
5   when you were the Aurora business manager, is there
6   a roster, so to speak of drivers who, as you were
7   saying ten percent are not making these pickups, is
8   there a schedule that you could refer to or Ms. Bast
9   may have referred to?
10  A.   Yes, route coverage lists identifies
11  the drivers that are on which routes.
12  Q.   And describe to me what you said about
13  the ten percent?
14  A.   Ten percent of the routes that we
15  typically as a rule of thumb, we try to dispatch ten
16  percent of our routes without pickups or very few
17  pickups so they have flexibility to meet a
18  customer's needs or to assist other drivers.
19  Q.   And did you check to see if for that
20  particular day Mr. Andreu was one of these ten
21  percent that had this flexibility?
22  A.   No.
23  Q.   Were you told he was one of these ten
24  percent?

Page 127

1   A.   Not specifically that he was one of
2   these ten percent, no.
3   Q.   But that would matter in terms of who
4   should get this call to make this pickup, correct?
5   A.   It would come into consideration, yes.
6   Q.   Because the ten percent should have
7   the flexibility, those drivers should have the
8   flexibility to field a call from Ms. Bast or one of
9   her coworkers and get to the place to make the
10  pickup?
11  A.   Yes.
12  Q.   The quickest, the most efficient way,
13  right?
14  A.   Yes.
15  Q.   So did you check that at all before
16  you confirmed to Ms. Bast that it's Jose that needs
17  to make the pickup?
18  A.   No.
19  Q.   Why not?
20  A.   Because as I stated I was new to the
21  center, I relied on her area knowledge being in the
22  center, the amount of time she had, that's her job.
23  Q.   Okay. So February 9th, you are there
24  for a month and nine days?

Page 128

1   A.   Yes.
2   Q.   And this ten percent flexibility and
3   the route coverage list, these things, they were
4   used in your prior center, correct, when you were
5   manager?
6   A.   That's not a standardized form for
7   each center.
8   Q.   What was the percentage, the same idea
9   was used in your previous center, correct?
10  A.   Correct.
11  Q.   There were a certain percentage of
12  drivers who needed to remain flexibility, correct?
13  A.   Correct.
14  Q.   Those are the drivers who should be
15  getting the calls or at least in the list of
16  priority because there is no perfectness there, we
17  understand that, but you in terms of priorities
18  those are the drivers who should be asked to make
19  additional stops during the day because they can do
20  it most efficiently, correct?
21  A.   Yes.
22  Q.   That didn't change, right?
23  A.   No.
24  Q.   And now February 9th when she comes

Page 129

1   into your office, you are well aware of that
2   protocol, correct?
3   A.   Yes.
4       THE WITNESS:  I'm sorry, can I take a
5   break?
6       MR. COFFEY:  You know what, it's
7   12:15.  We'll come back at 1:00 or 1:15.  It
8   doesn't matter to me.
9       MR. WATSON:  Let's make it 1:00.
10      (Lunch recess taken, after which the
11      following proceedings were had:)
12  BY MR. COFFEY:
13      Q.   We are back on the record. We might
14  still have it there, Mr. Snyder, but Exhibit No. 2,
15  we briefly looked at. It was employee history
16  profile. A nine page Exhibit. You got that back in
17  front of you?
18      A.   Yes.
19      Q.   Now, again, you could take your time
20  with this, but on page No. 2, there is a section
21  called performance appraisals and it goes through a
22  series of time periods, you know, on a year calendar
23  basis mostly with ratings. Do those appear to be
24  accurate from your recollection in terms of the

Page 150

1  discussed then shortly after his training?
2      A.   I don't remember a specific discussion
3  about it.
4      Q.   What was the point of your meeting
5  with Ms. Schmidt on a weekly or at least a weekly
6  basis?
7      A.   To review all of the safety
8  activities.  That would not only include these
9  follow-up prevention reports, it would include the
10  safety committee activities to the recognition
11  programs that we had in place.  Actually, the plans
12  we had going forward for safety.
13      Q.   Let me ask you this, would you get on
14  a weekly basis or any other time period, a recurring
15  time period, a list of the injured employees or
16  allegedly injured employees in your center from time
17  to time?
18      A.   I'm not sure what the practice back at
19  that time period in '05 was.  Currently I know now
20  we get a list, a daily list provided on e-mail.
21      Q.   What about accident reports and things
22  that are reported?  You said Liberty Mutual,
23  correct?
24      A.   Yes.

Page 151

1      Q.   And you agree with me that that's a
2  worker's compensation insurance carrier back in '05
3  when you are the Aurora center manager?
4      A.   Yes.
5      Q.   Would you get a report about, that
6  would at least have the names of employees and the
7  dates that they have reported injuries to Liberty
8  Mutual?
9      A.   Not directly, no.
10      Q.   So you wouldn't at any point in
11  time -- you are the manager of this center.  You
12  would not know who, what worker's comp benefit
13  claims are pending with Liberty Mutual?
14      A.   No.
15      Q.   You never got that information?
16      A.   I mean not sent to me, no.
17      Q.   Now, on Exhibit 6, do you know who
18  signed your name next to the manager's signature
19  line?
20      A.   I'm not a hundred percent certain, but
21  it looks like the same writing that's already on
22  there from Jill Schmidt.
23      Q.   Did she have authority to do that?
24      A.   Yes.  If I'm not available, she'll

Page 152

1  put -- sign my name and put her initials behind it.
2      Q.   Do you have any reason to believe that
3  you weren't available or otherwise at work on
4  January 27, '05?
5      A.   No, I have no idea.
6      Q.   Between January 24, '05 and February
7  10, '05, when you are meeting with Jose to put him
8  on notice of termination, are you out of the Aurora
9  center at any point in time, for a day, or any
10  extended period of time for vacation or personal
11  reasons or business or anything like that?
12      A.   I don't remember.  I don't know if I
13  was.  I don't believe I was.
14      Q.   So as far as you recall, you were
15  there every working day?
16      A.   Yes.
17      Q.   Did you work Saturdays also at that
18  time?
19      A.   No.
20      Q.   So you were just working Monday
21  through Friday?
22      A.   Yes.
23      Q.   So when you did look at Exhibit No. 6
24  shortly after it was generated, do you read it?  Did

Page 153

1  you read it at that time, the information?
2      A.   Yes.
3      Q.   And when you read it at that time --
4  let me ask you this.
5           Had you been already aware that
6  Jose had claimed to be injured on the 24th of
7  January?
8      A.   Yes.
9      Q.   When did you become first aware of
10  that claim, claimed injury?
11      A.   I don't remember the specific date.
12      Q.   Sometime before you read this
13  document, correct?
14      A.   Yes, I believe so.
15      Q.   How did you become aware initially of
16  his claimed injury on January 24, '05?
17      A.   From Melissa Delgado.
18      Q.   And who is Melissa?  What's her
19  position?
20      A.   On road supervisor in the Aurora
21  center at the time.
22      Q.   And how did she make you aware that
23  Jose had alleged that he was injured on January
24  24th?

Page 154

1    A.    I believe she just told me or called
2    me.
3    Q.    When?
4    A.    I believe it was the next day.
5    Q.    The 25th?
6    A.    I believe so.
7    Q.    And what did she say to you?
8    A.    Typical with any reporting, that we
9    had an injury, and that's -- basically telling me
10   the nature of the injury, and what the status,
11   updated status on it.
12   Q.    Do you remember the conversation
13   specifically or are you just going off what she
14   would usually, normally tell you?
15   A.    No, I don't remember the conversation
16   specifically.
17   Q.    You don't remember anything she said
18   about the conversation?
19   A.    No.
20   Q.    Or I'm sorry, about the injury?
21   A.    No.
22   Q.    Or how she characterized it?
23   A.    No.
24   Q.    Do you know as you sit here what the

Page 155

1    nature of the claimed injury was with Mr. Andreu?
2    A.    I do remember it being, the nature of
3    an injury being a strain.
4    Q.    Where at?  What part of the body?
5    A.    Like a back strain.
6    Q.    And you were aware of that then
7    upon -- let me ask you -- did Melissa Delgado make
8    you aware that that was the nature of the injury?
9    A.    You know, I'm not a hundred percent
10   sure.  I really don't remember.
11   Q.    What was the normal procedure for her?
12   A.    Normal procedure would be to contact
13   me as soon as possible or by the following day to
14   let me know of any type of injuries and what the
15   nature of it was.
16   Q.    So you believed January 25th, you
17   become aware that Jose is claiming he was hurt the
18   day before, correct?
19   A.    Yes.
20   Q.    From Melissa Delgado?
21   A.    Yes.
22   Q.    What do you do after that initial
23   notice in terms of investigating the claim?
24   Anything?

Page 156

1    A.    No.
2    Q.    Do you ask anybody else to investigate
3    the claim, and the claim is that Jose was hurt on
4    January 24th?
5    A.    No.
6    Q.    Is that in accordance with the
7    procedure, injured employee procedure?
8    A.    I guess I am not understanding your
9    question there.
10   Q.    Is there anything -- you become aware
11   that he gets hurt or claims that he gets hurt the
12   day after, January 25th.  What is the next thing
13   that's supposed to happen once you get that
14   information?
15        MR. WATSON:  That's not what you asked
16   him.  You asked him what he did.
17        MR. COFFEY:  I will strike that
18   question.
19        MR. WATSON:  If you keep the question
20   the same, I think you will get answers and we
21   can get done.  But if you change the
22   question, it will be different.
23        MR. COFFEY:  Okay, we'll move on to a
24   new question.

Page 157

1        MR. WATSON:  Just ask him what you
2    want to ask him.
3        MR. COFFEY:  That sounds like a good
4    rule.
5        MR. WATSON:  I just wish you kept with
6    it, because you confused me too.
7        MR. COFFEY:  We all have our ways.
8    BY MR. COFFEY:
9    Q.    Under the procedure as you saw it at
10   the time, once you get that notice on January 25,
11   2005, what next is to happen?
12   A.    Well, from once the first notification
13   of an injury on the 24th or the employee notifies a
14   supervisor, they should have been in the 24-hour
15   period to report it to the health and safety
16   department and report it to Liberty Mutual.  And
17   that first day that the employee is back, the first
18   day the employee is back to work, there is to be a
19   Safe Work Method and Habits conducted on the
20   employee and they are to complete an on-line
21   assessment.
22   Q.    And you had referred to Exhibit 6 as
23   the Safe Work Habits Training, the first day the
24   employee gets back, correct?

40  (Pages 154 to 157)

Page 170

1    Q.   Just so we're clear, did Ms. Delgado
2    inform you that this was reported to Liberty Mutual
3    in your conversation?
4         MR. WATSON:  I believe that was asked
5         and answered.  You can answer it again.
6    BY THE WITNESS:
7    A.   Yes, I don't remember.
8    BY MR. COFFEY:
9    Q.   But you knew sometime shortly after
10   the training that we see was taking place on January
11   27th, the first day back after the injury, you knew
12   that this had been reported to Liberty Mutual,
13   correct?
14   A.   Yes.
15   Q.   Did you get any further correspondence
16   or inquiries from anybody at Liberty Mutual
17   concerning Mr. Andreu's claimed injury?  In other
18   words, did they send you an e-mail?  Do they give
19   you a call and ask you what you know about or ask
20   you any information, report any information about
21   it?
22   A.   No.
23   Q.   Is there any procedure that would
24   require such a follow-up on an injury when you are

Page 171

1    the center manager?
2    A.   Not from business managers.
3    Q.   Does anybody do -- strike that.
4         Who does the corresponding with
5    Liberty Mutual in terms of monitoring an accident
6    and making sure the training is done and that type
7    of work?
8    A.   District health and safety department.
9    Q.   Do you ever get involved in that?
10   A.   No.
11   Q.   Let me show you what we'll mark as
12   Exhibit 8.
13        (Document marked as
14        Exhibit No. 8 for
15        identification.)
16   BY MR. COFFEY:
17   Q.   Now, you are familiar with the
18   Collective Bargaining Agreement that is in place
19   between Local 705 and UPS?
20   A.   Yes.
21   Q.   Covering which Jose was a member of?
22   A.   Yes.
23   Q.   Did you have any role or involvement
24   in negotiating the agreement?

Page 172

1    A.   No.
2    Q.   Did you sit on any panels or any
3    committees, just management alone discussing terms
4    of the agreement or language in the agreement?
5    A.   No panels or committees.
6    Q.   Well, what involvement did you have
7    with the language or discussion of the language that
8    appears in the Collective Bargaining Agreement which
9    Exhibit 8 has several pages of it?
10   A.   Could you restate the question?
11   Q.   What exact involvement did you have in
12   negotiating or discussing the Collective Bargaining
13   language?
14   A.   None.
15   Q.   Did I pick up a hesitation in a
16   previous answer?  Did you do something with respect
17   to the Collective Bargaining Agreement in
18   negotiating it?
19   A.   No, none.
20   Q.   Do you keep a record of the Collective
21   Bargaining Agreement in your office?
22   A.   Yes.
23   Q.   Have you read the Collective
24   Bargaining Agreement?

Page 173

1    A.   Yes.
2    Q.   So you are familiar with its
3    provisions?
4    A.   Yes.
5    Q.   And you were familiar with its
6    provisions back in '05 when you were center manager
7    of Aurora center?
8    A.   Yes.
9    Q.   Let me show you what's been marked as
10   Exhibit 8, and I'll ask you to refer to the second
11   page of the Exhibit which is copies of pages 84 and
12   85 out of the agreement.  Now, Article 37 is
13   entitled "Management of Employee Relations."  Do you
14   see that copy of page 85 that's in the Exhibit?
15   A.   Yes.
16   Q.   Are you familiar with this article,
17   Article 37?
18   A.   Yes.
19   Q.   One of the things in subparagraph A,
20   it says, "The employer will treat employees with
21   dignity and respect at all times which shall include
22   but not be limited to giving consideration to the
23   age and physical condition of the employee;" do you
24   see that?

Page 174

1    A.    Yes.
2    Q.    Do you have any examples of you
3  actually applying that language?
4    A.    Yes.
5    Q.    Can you give me any?
6    A.    Currently I have a driver who works
7  with me right now, he's been with the company 40
8  years. He's over 62, 63 years old. He has a
9  position that takes into consideration his age and
10  physical condition.
11    Q.    Does he have any restrictions on his
12  physical condition or other limitations on his
13  physical condition?
14    A.    No.
15    Q.    So this is just an age factor?
16    A.    No.
17    Q.    Well, what do you take into
18  conversation, his age or physical condition or both?
19    A.    Both.
20    Q.    How do you do that? What do you do to
21  consider that?
22    MR. WATSON:    Asked and answered. You
23    can answer it again.
24  BY THE WITNESS:

Page 175

1    A.    Dispatched with a different type of
2  work.
3  BY MR. COFFEY:
4    Q.    He is a driver though?
5    A.    Yes.
6    Q.    What type of work do you dispatch him?
7    A.    He's dispatched with lighter
8  deliveries, less stops, stuff that's less physical.
9    Q.    Any other examples? Did you apply
10  this language at all when you were business manager
11  of Aurora center?
12    A.    Yes.
13    Q.    Any individuals or instances that you
14  can think of?
15    A.    No, no specific ones.
16    Q.    Did you apply this language with
17  respect to Mr. Andreu at any point in time?
18    A.    I'm not sure what you are asking.
19    Q.    Well, Mr. Andreu was hurt or at least
20  claimed he hurt himself, correct?
21    A.    Yes.
22    Q.    You become aware shortly after January
23  27, 2005, correct?
24    A.    Yes.

Page 176

1    Q.    Do you at any point thereafter take
2  into consideration that he has at least a claim of
3  physical ailment, condition, in terms of assigning
4  him work?
5    A.    I do not remember.
6    Q.    Now, we talked a little bit before
7  about February 9th and Ms. Cheryl Bast coming into
8  your office; do you remember that?
9    A.    Yes.
10    Q.    And at that point in time, you were
11  fully aware when she comes into your office she
12  mentions Jose Andreu, right?
13    A.    Yes.
14    Q.    And you are a fully aware that he has
15  claimed an injury, right?
16    A.    Yes.
17    Q.    Do you take into consideration when
18  she is telling you that he is given some resistance
19  on some additional stop, do you take into any
20  consideration his physical condition at all?
21    A.    I don't remember.
22    Q.    Well, if you would have taken into
23  consideration his physical condition, would it have
24  caused you to do something other than say have Jose

Page 177

1  make the stop?
2    A.    I don't know.
3    Q.    You don't know if you took it into
4  consideration or not?
5    A.    I don't know if it would have made a
6  difference.
7    Q.    And you don't know if you took it into
8  consideration, right?
9    A.    Correct.
10    Q.    But this Article 37, subparagraph A,
11  is mandatory, wouldn't agree with me, it says you
12  are going to do this, you are going to give
13  consideration to physical condition limitations,
14  correct?
15    A.    Yes.
16    Q.    But you didn't do that on February 9th
17  anyways with respect to Mr. Andreu, right?
18    A.    I'm not sure.
19    Q.    Any other situations with any other
20  employees where you're giving them some
21  consideration because of age and/or physical
22  condition?
23    A.    No.
24    Q.    No or you just can't remember?

45 (Pages 174 to 177)

Page 198

1  Q.  This appears to be an e-mail from you
2  to a Ms. Donna -- do you know how to pronounce her
3  last name a little better than me?
4  A.  I have no idea.
5  Q.  P-I-W-O-W-A-R.  Does this appear to be
6  a true and correct copy of two e-mails, one that you
7  received from Ms. Piowar on February 2 at 11:09 and
8  then one you sent to Ms. Piowar on February 6, at
9  11:22 a.m.?
10  A.  Yes.
11  Q.  You've had time to look at this and
12  this appears to be true and correct?
13  A.  Yes.
14  Q.  Is there anything in your response,
15  and take your time to look at it, that is not
16  accurate in any respect?
17  A.  I'd say, no.  The only question I have
18  is on 2.
19  Q.  What is 2, you say?
20  A.  Question two.
21  Q.  Her question or your response?
22  A.  My response.
23  Q.  Well, your response is, "Yes, he
24  admitted to lying."  Is that what you wrote?

Page 199

1  A.  Yes.
2  Q.  Is that accurate?
3  A.  I don't remember.
4  Q.  What don't you remember?
5  A.  I don't remember Mr. Andreu admitting
6  to me that he lied.
7  Q.  Why would you say to Ms. Piowar that
8  he admitted to lying?
9  A.  Because at the time that this was
10  generated I remembered it, but at this point in time
11  I do not remember it.
12  Q.  So on February 2, 2006 you had a
13  recollection that Jose had not admitted to lying,
14  correct?
15  A.  Yes.
16  Q.  But today as you sit here, you don't
17  have that same recollection?
18  A.  No, not with the same confidence
19  level.
20  Q.  When was the last time you saw this
21  e-mail, your reply e-mail?
22  A.  When I sent it.
23  Q.  What made you believe as of February
24  2, 2006 that he admitted lying?

Page 200

1  A.  I don't know.
2  Q.  Did you pull it out of thin air, sir?
3  What made you believe he was lying or admitted
4  lying, I'm sorry?
5  A.  Well, I don't remember today as well
6  as I did yesterday, and I believe that it would have
7  been during the meeting on February 10th is where --
8  the only time that I spoke with Jose Andreu with
9  regard to the whole situation.
10  Q.  So going back to February 2, 2006, you
11  had this concept in your head, and you believed it
12  to be true, right, that he admitted lying?
13  A.  Yes.
14  Q.  And you believe that was based or
15  coming from the February 10, 2005 conversation that
16  you had with him?
17  A.  Yes.
18  Q.  What one thing did you base your
19  statement to Ms. Piowar on?
20  A.  Just during the meeting in the office,
21  I always give the employee an opportunity to tell
22  their side of the story and tell what happened.
23  Q.  That's nice of you.
24  A.  I don't have one specific thing that I

Page 201

1  can recall.
2  Q.  As you sit here right now, do you
3  recall what was said and by who at the February 10th
4  meeting where you put Jose, Mr. Andreu on notice of
5  discharge?
6  A.  No.
7  Q.  Do you remember anything that was said
8  by anybody at that meeting as you sit here right
9  now?
10  A.  I remember that I had put him on
11  notice of termination for violation of Article 54,
12  the contract referring to honesty, excuse me,
13  referring to dishonesty, and that's about the extent
14  of it.
15  Q.  And then roughly a year later you
16  tell -- when did you form this belief that he
17  admitted to lying?
18  A.  I don't remember exactly when.  I
19  would say it would have been concluding that meeting
20  on February 10th.
21  Q.  Well, what did he say, sir, that made
22  you conclude that he admitted to lying?
23  A.  At this time point in time I don't
24  remember what he had said.

L.A. REPORTING (312) 419-9292

Page 210

1  final incident," and your answer, No. 1, "Final
2  incident, Jose lied to full-time," is that right?
3  "FT, full-time, to supervisor Dave Ziltz on
4  2-9-05." That's it; that's the answer we are
5  talking about in terms of Jose, correct?
6      A.    Yes.
7      Q.    Is there anything else, any other
8  factor that played a part in your decision to put
9  him on notice of -- decision to put him on notice of
10 termination on February 9th and then to terminate
11 him on March 4, 2005; is there anything else that
12 played into that decision?
13     A.    No.
14     Q.    It was, you lied to Dave Ziltz on
15 February 9, 2005, correct?
16     A.    Yes.
17     Q.    What about you admitted lying to Dave
18 Ziltz on February 9, 2005, did that play a part in
19 your decision?
20     A.    I don't remember. I don't remember if
21 it did or not.
22     Q.    In other words, if you take away the
23 admission part, is he still getting fired on March
24 4, 2005?

Page 211

1      A.    Yes.
2      Q.    You are still firing him, right?
3      A.    Yes.
4      Q.    When did you decide to fire him on
5  March 4, 2005?
6      A.    After the 15-day grace period that
7  they have, allowed to grieve the disciplinary
8  action.
9      Q.    So 15 days would be from the 10th of
10 February, right?
11     A.    Correct.
12     Q.    So the 25th of the February, correct?
13     A.    My understanding is it's 15 working
14 days is what we allowed him.
15     Q.    Doesn't the grievance procedure say 15
16 calendar days?
17     A.    It says 15 calendar days. I allowed
18 him 15 working days.
19     Q.    Was there some hesitation -- you are
20 telling me you didn't make this decision until after
21 the 15 days past, whatever calendar, working days,
22 you didn't decide you were going to fire him?
23 Didn't you decide you were going to fire him on
24 February 10th when you put him on notice of

Page 212

1  termination?
2      A.    No, I had not.
3      Q.    What were you going to do with him?
4      A.    Well, this was a serious issue that I
5  felt could be resolved or addressed through the
6  grievance procedures.
7      Q.    How was it going to be resolved or
8  addressed?
9      A.    Just like some of the past cases that
10 employees who were put on cardinal infractions were
11 put on notice of termination or terminated and
12 brought back with a suspension or reduced charge.
13     Q.    Employees that admit to lying?
14     A.    Randy Parker, an example.
15     Q.    So the 15 days pass, you terminate him
16 pursuant to the notice of termination, correct?
17     A.    Correct.
18     Q.    But the only incident is, as you say,
19 was Jose lied to full-time supervisor Dave Ziltz on
20 February 9, 2005, right?
21     A.    Yes.
22     Q.    And you discharge him, correct?
23     A.    Yes.
24     Q.    Who else was in attendance of this

Page 213

1  meeting on February 10, 2005?
2      A.    On-car supervisor Dave Ziltz and
3  union representation was Pam Tredwell.
4      Q.    What did Ms. Tredwell say in the
5  meeting?
6      A.    I don't remember exactly what she
7  said.
8      Q.    Do you remember the meeting? Do you
9  have a recollection of meeting?
10     A.    Yes, I remember the meeting. I don't
11 remember the specific conversations.
12     Q.    Where was the meeting at?
13     A.    In my office.
14     Q.    On February 10th?
15     A.    Yes.
16     Q.    What time of day?
17     A.    Approximately 8:25, the driver's start
18 time.
19     Q.    So early, first thing in the morning?
20     A.    Yes.
21     Q.    And you had gotten your information on
22 February 9th?
23     A.    Yes.
24     Q.    About the lie that supposedly didn't

Page 214

1  happen on February 9th, correct?
2      A.    Yes.
3      Q.    So what do you do between being told
4  there was a lie at the meeting at 8:25 in the
5  morning, do you do any type of investigation into
6  the alleged lie?
7      A.    I review the incident with Dave
8  Ziltz.
9      Q.    And when did you do that?
10     A.    That same night.
11     Q.    Of the 9th?
12     A.    Correct.
13     Q.    Who was present?
14     A.    I don't remember. I believe it was
15  just Dave and myself.
16     Q.    This is after Dave, he was out
17  delivering packages that day, apparently this is
18  after he's bringing his truck back, and so it's in
19  the evening?
20     A.    Yes.
21     Q.    Did you talk to him on the phone
22  during the day at all, on the phone during the day
23  about the incident?
24     A.    I don't remember specifically.

Page 215

1      Q.    But you recall a meeting where you are
2  getting your information from Dave Ziltz where he
3  comes back with his truck on the evening of February
4  9th?
5      A.    Yes.
6      Q.    Where was that at?
7      A.    That was in my office.
8      Q.    And you and Mr. Ziltz -- nobody else
9  present?
10     A.    Yes, I don't remember anybody else.
11     Q.    What was said by Mr. Ziltz?
12     A.    He just recapped the incident.
13     Q.    Do you remember anything specific or
14  have a specific recollection with anything
15  Mr. Ziltz said in this meeting?
16     A.    Just that he went out there to look
17  into Jose -- went out there and met up with Jose
18  Andreu and he had, like, at that point in time, I
19  thought he said he had less than 20 stops left.
20     Q.    And you think that's what he said or
21  that's what he said?
22     A.    I am not a hundred percent sure.
23     Q.    So you don't specifically remember but
24  that's your belief?

Page 216

1      A.    Yes.
2      Q.    What did Mr. Ziltz say about how he
3  determined that there were less than 20 stops left?
4      A.    I don't remember.
5      Q.    Did Mr. Ziltz at any time ever tell
6  you I counted each package, each stop in that truck,
7  and there were less than 20 or more than 20 or any
8  particular number?
9      A.    I'm trying to remember the specifics
10  on that. I mean, if I remember correctly, Dave
11  Ziltz stated that he had counted like 13 or 15
12  stops in the car.
13     Q.    Did he say he counted every stop in
14  the car or did he just say I counted 13 or 15 stops
15  in the car?
16     A.    He said that's all the stops that he
17  had left.
18     Q.    Did he tell you what time it was that
19  he was counting these packages?
20     A.    I don't remember the exact time.
21     Q.    Do you remember if he told you a time
22  is the question?
23     A.    Approximate time was like 4:20.
24     Q.    Now you remember, you are remembering

Page 217

1  this come out of Mr. Ziltz's mouth? You remember
2  that time coming out of his mouth?
3      A.    No.
4      Q.    You don't remember any time coming out
5  of his mouth, do you?
6      A.    No, I don't remember the time.
7      Q.    Because if you remember that, and you
8  can't remember Jose admitting to lying the next day?
9          MR. WATSON: I am going to object to
10  the badgering, Counsel.
11         MR. COFFEY: Strike that.
12  BY MR. COFFEY:
13     Q.    So you recall Dave Ziltz saying
14  something about he counted some packages on the
15  truck; is that your recollection?
16     A.    Yes.
17         MR. WATSON: Asked and answered.
18  BY MR. COFFEY:
19     Q.    What else was said?
20     A.    I don't remember.
21     Q.    What did you say?
22     A.    I can't recall a hundred percent what
23  I said at that time.
24     Q.    Did you ask any questions?

Page 218

1     A.    I can't recall the questions that I
2  asked, but, yes, we had a discussion.
3     Q.    Did you discuss the fact that this was
4  the guy that was injured on January 24th or claimed
5  to have been injured on January 24th?
6     A.    No, not that I remember.
7     Q.    Did you have that in your mind though
8  when it came up, hey, Jose Andreu, something going
9  on with packages, this is the guy that was injured
10  on January 24th or thereabouts?
11     A.    No.
12     Q.    But you clearly knew that that was the
13  case, right, that he had an injury or alleged injury
14  on January 24th, right?
15     A.    Yes.
16     Q.    And you knew that that had been
17  reported to Liberty Mutual, that the training had
18  occurred?
19         MR. WATSON: Objection, asked and
20  answered.
21  BY MR. COFFEY:
22     Q.    You had known that for a while,
23  correct?
24     A.    Yes.

Page 219

1     Q.    What else is said in your meeting with
2  Mr. Ziltz on the evening of February 9th?
3     A.    I don't remember.
4     Q.    When do you make the decision that you
5  are going to have a meeting the following morning
6  and put him on notice of termination?
7     A.    I believe it was at this meeting.
8     Q.    When you are talking to Mr. Ziltz?
9     A.    Yes.
10     Q.    The notice of termination, that's what
11  you conclude, correct?
12     A.    Not necessarily at that -- not
13  necessarily like that.
14     Q.    Okay, I don't want to put words in
15  your mouth. How did you conclude -- you said at
16  this meeting you made your decision to put him on
17  notice of termination?
18     A.    At this meeting Dave Ziltz presents
19  the facts. I've only got one side of the story, and
20  I don't have Jose Andreu's side of the story until
21  we meet on the 10th.
22     Q.    Okay. So it's your testimony that you
23  don't decide to put him on notice of termination
24  until you meet with Jose Andreu on the 10th in the

Page 220

1  morning?
2     A.    Correct.
3     Q.    So in the meeting on the 10th you make
4  the decision to put him on notice of termination?
5     A.    Correct.
6     Q.    Not before?
7     A.    No, not before.
8     Q.    What else do you do prior to the
9  meeting on the 10th to look into the situation,
10  investigate the situation?
11     A.    I don't remember doing anything else.
12     Q.    During the day Ms. Bast had been in
13  your office, and you had your exchange with her that
14  we talked about, correct?
15     A.    Yes.
16     Q.    Then at night Mr. Ziltz comes in and
17  you have your talk with him that we've already
18  talked about, correct?
19     A.    Yes.
20     Q.    What else, if anything, any other
21  discussion, any other information, that you have
22  prior to going into your meeting on February 10th in
23  the morning?
24     A.    I don't know if there's any other -- I

Page 221

1  don't remember any other information.
2     Q.    Did Mr. Ziltz tell you about
3  communications -- let me back up.
4         What was the lie? What did Ziltz
5  tell you the lie was?
6     A.    I mean, I don't remember that
7  conversation specifically, the whole conversation
8  that night. I just know the circumstances that were
9  leading up to it.
10     Q.    So as you sit here, do you know what
11  the lie was or allegedly was?
12     A.    Yes, that Jose -- that Mr. Andreu had
13  responded that he had 60 stops left when the reality
14  was that he did not have 60 stops left.
15     Q.    And you must have known that on
16  February 10th going into the meeting, right?
17     A.    Based off of what Cheryl Bast and Dave
18  Ziltz had just informed me.
19     Q.    Maybe we are missing a piece of
20  puzzle. What did Cheryl Bast tell you about the
21  lie, the alleged lie?
22     A.    I believe she came back into the
23  office later on and said that Dave had met up with
24  him, and he didn't have 60 stops left and he was

Page 222

1   going to make the pickup.
2       Q.    And she must have told you that there
3   was this 60 stop statement by Mr. Andreu; when did
4   she tell you that?
5       A.    I don't remember specifically what she
6   told me as far as the 60 stops.
7       Q.    What did she told you?
8       A.    She told me that Jose said she had
9   stops left, that he wasn't going to have time to
10  make the pickup at Bernina. I don't clearly
11  remember if it was 60 stops.
12      Q.    Did she use a number or she just said
13  Jose said he had stops left?
14      A.    I don't remember that specific
15  conversation.
16      Q.    She may have used a number, she may
17  not have, she may have just simply said stops left?
18      A.    Yes.
19      Q.    And then Dave Ziltz comes in later on
20  and says I only counted X number?
21      A.    Yes.
22      Q.    So where is the lie?
23      A.    Between Dave and Cheryl somebody knew
24  how many stops he had reported he had left.

Page 223

1       Q.    And you are not sure who knew,
2   correct?
3       A.    I'm not sure who knew of the two, if
4   both of them knew of it or just Sharon knew of it.
5       Q.    And you make no efforts to go look at
6   the DIAD information, correct?
7       A.    I don't remember looking at the DIAD
8   information, no.
9       Q.    Do you remember going to try to look
10  at the DIAD information to investigate the stories
11  that you have?
12      A.    No.
13      Q.    Because you've got two stories or at
14  least maybe three, you've got Cheryl Bast's
15  version -- you've got Cheryl Bast's information,
16  you've got Dave Ziltz's information and then you
17  know you are going to try to get Jose Andreu's
18  information the following morning, right?
19      A.    Yes.
20      Q.    Do you make any other effort to go get
21  any other information, DIAD information, information
22  on Jose Andreu's past discipline, any other
23  information to help you?
24      A.    No, I don't remember.

Page 224

1       Q.    Don't remember if you did or didn't?
2       A.    Right.
3       Q.    And you also say you have Cheryl Bast's
4   memo, Exhibit No. 4?
5       A.    Yes.
6       Q.    And you told me you received this some
7   time on February 9, 2005, correct?
8       A.    That would have either been on the
9   9th, should have been on the 9th or 10th, but it
10  should have been on the 9th.
11      Q.    You don't have a recollection of
12  receiving this.
13      A.    No, I don't specifically know when I
14  received this.
15      Q.    I'm sorry if I'm reasking, but do you
16  receive it electronically or hard copy, Exhibit 4?
17      A.    I received it electronically because
18  originally it was sent to Dave Ziltz and then it
19  was sent to me.
20      Q.    Is it an e-mail, is that how you
21  received it?
22      A.    I think it's a Word document. I don't
23  know for sure.
24      Q.    Well, you have an e-mail, right?

Page 225

1       A.    Yes.
2       Q.    So she e-mailed you an attachment of a
3   Word document; does that sound right?
4       A.    No.
5       Q.    What happened? How did you receive
6   it, because it looks like a memo to me?
7       A.    I'm not a hundred percent sure. I
8   believe it was sent to Dave Ziltz and then I
9   received it either from Dave or Cheryl.
10      Q.    Back to Exhibit 9. I think you still
11  have it in front of you?
12      A.    Yes.
13      Q.    You have two documents attached, it
14  looks like to your e-mail, your reply e-mail to
15  Mrs. Piowar. You have one "Andreu Discharge summary
16  Dock." What is that?
17      A.    That's the one indicating that the
18  document, I believe that's the document that I
19  drafted on 3/24 with regard to his discharge.
20      Q.    Exhibit No. 5?
21      A.    Yes.
22      Q.    And then you've got "Andreu Doc",
23  D-O-C. What's that?
24      A.    I believe that's the same document

Page 226

1    that --
2        Q.    Exhibit No. 4?
3        A.    Yes, Exhibit No. 4.
4        Q.    Now, Mr. Ziltz told you that he went
5    and counted or went to Jose's truck on February 9th,
6    correct?
7        A.    Yes.
8        Q.    Who directed him to go to Jose's truck
9    on February 9th?
10       A.    Nobody to my knowledge.
11       Q.    You didn't?
12       A.    No.
13       Q.    When did you become aware, first
14   become aware that he had done this?
15       A.    I believe he called back to the
16   center -- if I remember correctly, he called back to
17   the center and informed Cheryl Bast that he had done
18   that.
19       Q.    Have you ever in your experience,
20   let's stick with the Aurora center, have you ever
21   experienced Mr. Ziltz going to anybody's car
22   unannounced and inspecting or counting packages?
23       A.    Yes.
24       Q.    Who?

Page 227

1        A.    Anna Brickley.
2        Q.    Can you spell that?
3        A.    Anna, B-R-I-C-K-L-E-Y.
4        Q.    What was that instance? What do you
5    know about that instance?
6        A.    Dave quite regularly checked up on
7    drivers and he had trained, and I know he has
8    trained and instructed Anna Brickley on several
9    occasions to keep the back of her package car
10   organized, and I know quite periodically went out
11   and checked up on her.
12       Q.    Anybody else?
13       A.    Obviously any new hired drivers that
14   we had, he was always checking up on them.
15       Q.    Any specific instances?
16       A.    No, I can't recall any.
17       Q.    Any instances of him actually counting
18   packages on employee's trucks other than Mr. Andreu?
19       A.    None that I can recall.
20       Q.    As you sit here right now, do you know
21   what method or -- let me strike that.
22             Do you know if he in fact counted
23   any packages on Mr. Andreu's truck?
24             MR. WATSON:  Objection, that calls for

Page 228

1    speculation.
2    BY MR. COFFEY:
3        Q.    Do you know if he counted any packages
4    on Mr. Andreu's truck?
5             MR. WATSON:  Same objection.
6    BY THE WITNESS:
7        A.    Yes.
8    BY MR. COFFEY:
9        Q.    How do you know?
10       A.    Because he told me.
11       Q.    Any other information that supports
12   your belief that he actually did some counting?
13       A.    No.
14       Q.    Do you know if he counted all the
15   packages on Mr. Andreu's truck?
16       A.    No.
17       Q.    Do you know what time he was there
18   counting packages on Mr. Andreu's truck on February
19   9th?
20       A.    Not exactly, no.
21       Q.    Well, the information that you have
22   sounds like it's completely and solely from
23   Mr. Ziltz; is that right?
24       A.    There was some information from Cheryl

Page 229

1    Bast. She came into the office and said that Dave
2    had met up with Jose Andreu.
3        Q.    So you got verbal information from
4    Ziltz, verbal information from Bast. Anything else
5    that indicates or supported the time that they were
6    telling you that he was out there?
7        A.    No.
8        Q.    So Exhibit 4 comes to you
9    electronically on the 9th in the evening or I guess
10   in the morning of the 10th?
11            MR. WATSON:  Objection, asked and
12            answered several times now actually.  But you
13            can answer again.
14   BY THE WITNESS:
15       A.    That's correct.
16   BY MR. COFFEY:
17       Q.    But you have it and you've read it
18   prior to meeting Jose at 8:25 in the morning,
19   correct?
20       A.    I'm not a hundred percent sure.
21       Q.    Did you do any sort of investigation
22   into the few facts that Cheryl Bast writes in
23   Exhibit 4?
24       A.    No.

Page 230

1    Q.   But at that point in time this is the
2  one piece of writing that you have in your hand that
3  supports your decision to put him on Notice of
4  Termination, right?
5    A.   I don't remember if I had this in my
6  hand at that time.
7    Q.   So you might not have even had this?
8  There's no other documents, I guess is what I'm
9  saying, there's nothing else that you have in your
10  hand that supports your notice of termination
11  decision?
12    A.   No.
13    Q.   Now, your memo, Exhibit 5, did you
14  type Exhibit 5 into the computer or with a
15  typewriter or something else?
16    A.   On a computer.
17    Q.   You typed it?
18    A.   Yes.
19    Q.   Did you have a secretary?
20    A.   No.
21    Q.   So you did all your own e-mail and
22  typing?
23    A.   Yes.
24    Q.   The other Exhibit that we saw, Exhibit

Page 231

1  9, that's your typing that you put in a reply to
2  Ms. Piowar?
3    A.   Yes.
4    Q.   Is it your testimony, sir, that you do
5  not document the occurrence, the alleged lying or
6  the meeting on March 10th until March 24, '05,
7  when you sit down and put together Exhibit 5?
8    A.   Yes, I believe that to be correct.
9    Q.   And it was your — we've covered that
10  on February 2, 2006 you had this idea that there was
11  an admission, that Jose made an admission of lying,
12  that was what you had in your head on February 2,
13  2006, right, when you wrote Ms. Piowar, right?
14    A.   Yes.
15    Q.   And can you agree with me that your
16  memo to Mr. Dunn, your boss, does not mention any
17  admission, correct?
18    A.   Correct.
19    Q.   And you agree with me that that, if in
20  fact it happened, would have been an important thing
21  to convey to your boss, right?
22    A.   No.
23    Q.   Why not?
24    A.   We had this discussion. I didn't know

Page 232

1  whether it would be a bearing on it or not. I don't
2  know whether it makes a difference.
3    Q.   That a man admitted lying, admitted to
4  violating the honesty portion of the collective
5  bargaining Agreement, you don't know if that would
6  make a difference?
7    A.   No, I don't.
8    Q.   Either way, you didn't tell Mr. Dunn
9  about it, at least not in this memo?
10    A.   Correct.
11    Q.   Did you tell anybody about this
12  admission, alleged admission other than Ms. Piowar,
13  almost a year later?
14    A.   No, not to my knowledge.
15    Q.   You kept it to yourself?
16    A.   Yes.
17    Q.   Correct?
18    A.   Yes.
19    Q.   So you start out, you say you had a
20  meeting; which is true, right?
21    A.   Yes.
22    Q.   And is the second sentence true; you
23  informed Jose? You informed Mr. Andreu he was on
24  notice of termination, right?

Page 233

1    A.   Correct.
2    Q.   Is there anything not true in this
3  Exhibit, sir?
4    A.   The first sentence of the second
5  paragraph is incorrect.
6    Q.   "The following day Jose Andreu
7  reported an on-the-job injury which would indicate
8  that he reported it on February 11, 2005." And you
9  are telling me that's not correct, right?
10    A.   Correct.
11    Q.   What's not correct about it?
12    A.   It should be stated that Jose Andreu
13  reported to his doctor and returned back to work
14  with restriction the following day.
15    Q.   Now, why did you misstate it?
16    A.   I don't know why.
17    Q.   You clearly knew on March 24th that
18  that was an incorrect statement, right? When you
19  wrote it, at that time you knew?
20    A.   I was not aware why I purposely wrote
21  that statement to the extent I would have. If I had
22  been aware of it, I would have sent in the corrected
23  statement. I realized that is was an incorrect
24  statement.

Page 234

1    Q.    When did you become aware that this
2  was an incorrect statement in this memo to your
3  boss?
4    A.    It wasn't for some time later.
5    Q.    Well, you recall you took part in an
6  unemployment hearing over the phone, right?
7    A.    Yes, I do recall.
8    Q.    That was in, you know, March,
9  February, of '06, right? Whatever it was, it was,
10 right? You recall it, right?
11   A.    Yes.
12   Q.    And I asked you these questions and at
13 that point in time, you told me, yes, it's wrong,
14 it's misstatement, right?
15   A.    I actually don't remember that.
16   Q.    You remember me questioning you about
17 this memo?
18   A.    I don't remember it was you, but I
19 remember being on an unemployment hearing call.
20   Q.    Do you remember coming to the
21 realization, whether it was the first time or not, I
22 don't know that this misstatement was in your memo?
23   A.    Actually, I don't remember. I don't
24 remember if I came to that realization at that time.

Page 235

1    Q.    When did you first come to the
2  realization?
3    A.    I don't know exact specific date when
4  I first came to the realization, I really don't.
5    Q.    2005?
6    A.    I don't know.
7    Q.    2006?
8    A.    I don't know.
9    Q.    How many months ago did you come to
10 the realization, sir?
11   A.    I don't know.
12   Q.    Yesterday?
13   A.    No.
14   Q.    When could it have been?
15   A.    I'm not sure when.
16   Q.    Have you done anything to correct this
17 misstatement as we sit here today?
18   A.    No, it's the same statement.
19   Q.    You've done nothing to correct what
20 you know is a misstatement, right?
21   A.    No, not that I remember.
22   Q.    In other words, you haven't sat down
23 and wrote a new memo to Mr. Dunn, Mr. Dunn, about my
24 March 25th memo I am --

Page 236

1         MR. WATSON: I'm going object to what
2    would be the purpose.
3         MR. COFFEY: I don't know.
4         MR. WATSON: He just told you he made
5    a mistake. I think he's done something to
6    correct his mistake.
7  BY MR. COFFEY:
8    Q.    So it's your testimony that it was an
9  honest mistake?
10   A.    Yes.
11   Q.    Do you understand the significance
12 that the injury was not reported until the following
13 day after you put him on notice of suspension?
14   A.    No.
15   Q.    Kind of takes away motive that the
16 injury was driving the suspension, doesn't it?
17        MR. WATSON: Objection, Counsel,
18   that's your closing argument.
19        MR. COFFEY: I'm asking him if he
20   understands that.
21 BY THE WITNESS:
22   A.    No, I didn't.
23 BY MR. COFFEY:
24   Q.    No, you didn't? That wasn't a

Page 237

1  consideration at this time?
2    A.    No.
3    Q.    Do you think you were dishonest with
4  this statement?
5    A.    No, not purposely, it was just
6  incorrect.
7    Q.    It was just an incorrect statement.
8  Do you think Mr. Andreu was innocently mistaken on
9  February 9, 2005, when he gave the number of
10 packages he had left?
11   A.    No.
12   Q.    Why not? Based on what?
13   A.    Just based off of what Dave Ziltz
14 reported.
15   Q.    He reported the number of packages at
16 a certain point in time, right?
17   A.    Yes.
18   Q.    Anything else?
19   A.    No.
20   Q.    Did you look at the hours this man had
21 been working?
22   A.    No.
23   Q.    Did you think at all about what the
24 heck the motivation of Jose Andreu might have been

Page 238

1  in misstating, in purposely miscounting packages;
2  what's his motivation, did you think at all, before
3  you put him on Notice of Termination or at any time
4  what he was trying to do by lying, what's he
5  achieving?
6      A.  No, I don't remember that.
7      Q.  You are a manager of many, many
8  people, right?
9      A.  Yes.
10     Q.  And you've been around the world for a
11 while; you lie for a reason, right, would you agree
12 with me?
13         MR. WATSON:  I'm going to object to
14     the characterization.  You can ask him if
15     people lie for a reason.
16         MR. COFFEY:  I don't mean you.  In
17     general.
18 BY MR. COFFEY:
19     Q.  Would you agree with me, Mr. Snyder,
20 people lie for a reason, right?
21     A.  Yes.
22     Q.  What's your theory?  Why did Jose say
23 this really, this alleged lie?
24         MR. WATSON:  I'm going to object.

Page 239

1  BY MR. COFFEY:
2      Q.  Did you think about it at all?
3         MR. WATSON:  I'm going to object.
4      A.  No.
5         MR. WATSON:  Just let me instruct my
6     client.  Please, if I'm making an objection,
7     let me get my objection in.  That way our
8     poor court reporter doesn't have to try and
9     get the three of us talking at once.  Thank
10    you.
11 BY MR. COFFEY:
12     Q.  Did you think that this lie came about
13 or was told because he wanted to get out of some
14 work; is that what you are thinking?
15     A.  No.
16     Q.  Did it matter to you at all what the
17 motivation might have been behind this lie?
18     A.  I didn't think about it.
19     Q.  Did it matter to you at all or did you
20 think about it at all whether it could have been a
21 innocent or purposeful statement by Ms. Andreu?
22     A.  No, I didn't think about it.
23     Q.  You just automatically assumed it was
24 a purposeful statement?

Page 240

1      A.  Yes.
2      Q.  And you could see then how I could do
3  the same with Exhibit No. 5, right?
4      A.  No.
5         MR. WATSON:  Objection, Counsel.
6  BY MR. COFFEY:
7      Q.  Can you see that?
8      A.  No.
9      Q.  Why?
10     A.  Because I can't see what you see.
11     Q.  I can see a glaring misstatement that
12 I can characterize one way or the other.
13         MR. WATSON:  Is that a question,
14     Counsel?
15         MR. COFFEY:  No, strike that.
16 BY MR. COFFEY:
17     Q.  So you didn't give any consideration
18 to his work record prior to putting him on Notice of
19 Termination or terminating him on March 4th; is that
20 correct?
21     A.  Correct.
22     Q.  You didn't look at the hours that he
23 worked, number of packages he delivered, how much
24 overtime he was working?

Page 241

1      A.  No, I did not.
2      Q.  Because the guy was working a lot of
3  overtime, and based on your experience -- let me
4  take a step back.
5         Your understanding is that these
6  guys get paid time and a half, some great hourly
7  rate for overtime, correct?
8      A.  Yes.
9      Q.  And that was the case for Mr. Andreu,
10 always working overtime hours in January and
11 February of '05, right?
12     A.  I don't know.  I don't recall or don't
13 know what he was working.
14     Q.  You never looked to see if he was
15 working overtime; is that correct?
16     A.  I don't recall looking to see if he
17 was working overtime.  All drivers work overtime.
18     Q.  So what sense would it make for him to
19 skirt a half hour of work and risk his job to do it?
20         MR. WATSON:  Objection, calls for
21     speculation.  We've spent enough time on
22     this.  Let me state my objection.  You can
23     restate your question.  Again, I object, it
24     calls for speculation.  I think it's

Page 242

1    irrelevant at this point. It has been asked
2    and answered.
3    BY MR. COFFEY:
4    Q.    Did you consider that what sense does
5    it make for this guy to tell a purposeful lie to get
6    out of a half hour of work when he is working till
7    8:00 o'clock or 9:00 o'clock anyways?
8    A.    No, I don't remember considering that.
9         MR. WATSON: Let's take five minutes.
10   I need to call my office.
11        (At which point a brief recess was
12        taken, after which the following
13        proceedings were had:)
14   BY MR. COFFEY:
15   Q.    Couple more questions, Mr. Snyder. At
16   the February 10th meeting, who was present at 8:25
17   in the morning?
18   A.    On-road supervisor Dave Ziltz,
19   Mr. Andreu, myself and Pam Tredwell.
20   Q.    Are you sure Mr. Ziltz was there?
21   A.    Yes.
22   Q.    Did he say anything at the meeting?
23   A.    I believe he recapped what had
24   transpired the day before.

Page 243

1    Q.    Have you ever discussed Mr. Andreu
2    with Pam Tredwell since this February 10th meeting?
3    A.    No, not that I remember.
4    Q.    Anything about Mr. Andreu, the
5    accident, the injury?
6    A.    No.
7    Q.    Now, in all your training, I would --
8    let me just ask you -- you know that it is illegal
9    to terminate an employee because that employee has
10   sought worker's compensation benefits, correct?
11   A.    Yes.
12   Q.    And you've known that at least prior
13   to arriving at the Aurora center in January '05,
14   correct?
15   A.    Yes.
16   Q.    How long have you known that?
17   A.    I don't remember a specific date. I
18   probably became aware of it as a manager in 2000.
19   Q.    Other than this lawsuit filed by
20   Mr. Andreu and his claim that that's what happened
21   in his instance, are you aware of any other claims
22   involving your employees that you managed at any
23   time at UPS where they have claimed that they were
24   terminated because they sought worker's comp

Page 244

1    benefits?
2    A.    No.
3    Q.    So this is the first one?
4    A.    Yes.
5    Q.    You sure?
6    A.    Yes.
7    Q.    Who is Steve -- strike that. Who is
8    Steve Mortensen (phonetic)?
9    A.    Former on-road supervisor with UPS.
10   Q.    He worked at the Aurora center for a
11   while?
12   A.    Yes.
13   Q.    Was he ever Mr. Andreu's supervisor?
14   A.    I'm not a hundred percent sure. He
15   was in the center for a very limited time and he
16   went on to another assignment.
17   Q.    Did you ever have any discussions with
18   Mr. Ziltz about Jose's alleged injury or accident
19   other than what we've discussed?
20   A.    No.
21   Q.    Did he ever comment to you about his
22   feelings one way or the other, whether he thought it
23   was a legitimate injury or real accident or anything
24   like that?

Page 245

1    A.    No.
2    Q.    When you had your discussion with him
3    the evening on February 9th and he had been in
4    Jose's truck and now is back at Addison, did he
5    indicate to you that he was angry with Jose?
6    A.    No.
7    Q.    Any of his voice, his emotions,
8    anything indicate to you that he was not very happy
9    with Jose?
10   A.    No.
11   Q.    Was he happy with Jose? He just
12   claimed that Jose just lied to him, right?
13   A.    No, he wasn't happy with him, and, no,
14   he wasn't angry or anything like that.
15   Q.    Did he tell you or indicate to you
16   that he had told Jose right on the truck that you
17   are going to be put on Notice of Termination
18   tomorrow?
19   A.    No, I don't recall him telling me
20   that.
21   Q.    Would that be appropriate for a
22   supervisor to make that statement right after an
23   alleged incident like that?
24   A.    I guess it would be depending on what

Page 246

1  the situation warranted, yes.
2      Q.   Well, the situation is the information
3  you have as if he comes to you on February 9th, and
4  we've covered that, was this an appropriate
5  statement if it was made?
6      A.   Yes, I believe it would be an
7  appropriate statement, yes.
8      Q.   From Mr. Ziltz to make that
9  statement, that decision, right there and then
10 without even conferring with you?
11     A.   Yes.
12     Q.   But does he have authority to
13 recommend as of -- what was his position, an on-road
14 supervisor?
15     A.   Yes.
16     Q.   Does he have authority to -- he
17 doesn't have termination authority, right?
18     A.   In some capacities supervisors have
19 termination authorities. I did as a supervisor in
20 Peru.
21     Q.   I am talking about Ziltz as a
22 supervisor underneath you at the Aurora center, did
23 he have authority to terminate under you?
24     A.   Still, yes, but out of courtesy he

Page 247

1  would, we would review it.
2      Q.   There's no mandatory review by you,
3  your supervisor at Aurora center could just
4  terminate and send you a memo a week later, this guy
5  is gone?
6          MR. WATSON: I'm going to object to
7      the characterization. You can ask him a
8      question, but memo a week later.
9      A.   Restate the question.
10 BY MR. COFFEY:
11     Q.   Does your on-road supervisors when you
12 were at the Aurora center, did they have authority
13 to on their own terminate employees?
14     A.   They have authority through their
15 position within UPS, but in the center the past
16 practice or the practice would be that all cases
17 would be reviewed with me.
18     Q.   So that's your particular rule of your
19 center?
20     A.   Yes.
21     Q.   But there is a UPS level of authority
22 that a supervisor would make a termination without a
23 manager okay?
24     A.   There's not a written policy, but it

Page 248

1  has been done.
2      Q.   What about a job description of an
3  on-road supervisor, have you ever seen one of those?
4      A.   Yes, in the past.
5      Q.   Does that convey that type of
6  authority, the termination authority?
7      A.   It's not outlined in it, no.
8      Q.   Let me show you what we'll mark as
9  Exhibit 10.
10             (Document marked as
11              Exhibit No. 10 for
12              identification.)
13 BY MR. COFFEY:
14     Q.   Let me show you what we've marked as
15 Exhibit number 10, and it is entitled Quality
16 Performance Review.
17         MR. COFFEY: I'm sorry, can you make
18     this 11 also.
19             (Document marked as
20              Exhibit No. 11 for
21              identification.)
22 BY MR. COFFEY:
23     Q.   Showing you Exhibits 10 and 11 both
24 entitled Quality Performance Review, they've got

Page 249

1  your name up there. One is for the period, Exhibit
2  11 seems to be for the appraisal period of 2006 and
3  Exhibit 10 is for the appraisal period of 2005. Do
4  you recognize those documents?
5      A.   Yes.
6      Q.   What are they?
7      A.   Quality performance reviews.
8      Q.   For you?
9      A.   Yes.
10     Q.   I know there is a lot of document, a
11 lot of pages, you can look through them. But do
12 they appear to be true and correct copies of your
13 actual performance reviews for those two different
14 periods?
15     A.   Yes, they appear to be correct and
16 accurate.
17     Q.   At least for the -- we were talking
18 really at the beginning of the deposition about a
19 survey process where employees would be able to have
20 input or rate you or rank you, and maybe I'm
21 misunderstanding, but is that the quality review,
22 quality performance review process or is that
23 something in addition to exhibits 10 and 11?
24     A.   It's a part of the quality performance

Page 250

1  reviews.
2      Q.   Because we see, if we look at the
3  quality performance reviews, there are a series of
4  identified co-employees that have contributed to
5  rating you on all of the different criteria and
6  characteristics, right?
7      A.   Correct.
8      Q.   And it's not all the employees though,
9  right? So I guess that's where my question is. Is
10  there a separate survey that involves a greater pool
11  of employees or is it, what we see in Exhibits 10
12  and 11, particularly on Exhibit 11 where we see we
13  have Mr. Dunn and the other named individuals
14  ranking you and rating you?
15      A.   No, that's the entire group. There's
16  no other.
17      Q.   So there's no survey process where
18  drivers or other front-line type employees are being
19  asked questions about your managerial skills and
20  contributing to a survey?
21      A.   Not with respect to the Quality
22  Performance Review.
23      Q.   Well, with any respect, is there any
24  type of survey like that, any type of process like

Page 251

1  that?
2      A.   As we described earlier there is an
3  employee relations survey that's done once a year.
4      Q.   So there is something in addition to
5  Quality Performance Review, correct?
6      A.   Yes.
7      Q.   And at least it appears that in both
8  of these surveys, 10 and 11, you've got Mr. Ziltz
9  as a contributing rater, critical skills rater,
10  correct?
11      A.   That's correct.
12      Q.   And he then, his input contributed to
13  what we see as the critical skills raters' numbers
14  and rankings all throughout the document, right;
15  namely these other individuals identified?
16      A.   Yes.
17      Q.   Did you know, -- strike that.
18          When did you become aware that
19  Mr. Ziltz was going to be in this rater pool; he
20  was going to be one of your raters?
21      A.   Just prior to completing this in
22  January we select our raters --
23      Q.   So you arrive --
24      A.   -- from the prior year.

Page 252

1      Q.   So you arrive at Aurora in January
2  '05, are you selecting your raters for the coming
3  year?
4      A.   No, at the end of '05 or at January of
5  '06 you select your raters -- actually it's December
6  of '05 you select your raters for the whole year,
7  for the prior year, not for the upcoming year.
8      Q.   So you were able to select these
9  individuals to rate your 2005 performance memo
10  again, your Exhibit 10?
11      A.   The process is I select them, the
12  division manager approves them.
13      Q.   Any particular reason why you selected
14  David Ziltz two years in a row?
15      A.   Yes, I selected David Ziltz because
16  he works for me, and I also selected other peers at
17  a manager's level that I worked with and select,
18  just as I selected my immediate division manager as
19  well.
20      Q.   No requirement that you select
21  Mr. Ziltz though?
22      A.   It's a requirement that I select, yes,
23  employees that work for me.
24      Q.   But you didn't have to select

Page 253

1  Mr. Ziltz? You could have selected another
2  employee, right, another supervisor, correct?
3      A.   I could have selected another
4  supervisor as in this one here I've selected Jim
5  Gells (phonetic).
6      Q.   Instead of Mr. Ziltz, sir?
7      A.   No, in addition to Mr. Ziltz, I
8  selected Jim Gells.
9      Q.   I could see who you selected, thank
10  you. The question is though, you could have not
11  selected Mr. Ziltz and selected some other
12  supervisor, correct?
13      A.   Yes.
14      Q.   It was your choice to select
15  Mr. Ziltz, correct?
16      A.   Yes.
17      Q.   Is there some procedure in writing
18  that outlines the process of the Quality Review
19  Performance Review?
20      A.   I believe there is a web based.
21      Q.   Something on the UPS Internet that
22  describes how this performance review is going to
23  take place every year; you are going to select so
24  many raters?

# TEAMSTERS LOCAL UNION 705 GRIEVANCE FORM

## GRIEVANCE No. 166415

### PLEASE USE A BALL POINT PEN (NOT GEL) AND PRESS FIRMLY

| FOR | OFFICE | USE | ONLY |
| --- | --- | --- | --- |
| YEAR | MONTH | EMPLOYER # | GRIEVANCE # |

**GRIEVANT TO COMPLETE**

CONTRACT: 705/UPS

VIOLATION OF:

PRINCIPAL ARTICLE: 54

SECTION:

**E: (Check One)**  Discharge/Discipline ☐   Past Practice ☐
Contract Issue ☑   Other ☐

**REQUIRED**

evant's Name: (Print) COURTNEY STEVENS

c. Sec. No.

dress: 4810 W. JACKSON

y, State, Zip: CHICAGO Il.

es: Home ( 773 ) 216 - 3120
Work ( 630 ) 628 - 2135

Employer and Terminal: UPS - ADDISON

Employer Contact: KERRY SNYDER

Job Title: DRIVER    Date Hired:

Steward: FELIPE RODRIGUEZ

Union Rep: KEN EMANUELSON

Date: 10-4-06

### TRUCTIONS

1. Completed grievance forms should be forwarded to and processed by the Steward or Union Rep.
2. Statement of the grievance should be clear and understandable.   (Use Additional Sheets If Necessary)

**ECK ONE**   ☑ STATEMENT OF GRIEVANCE       ☐ REBUTTAL TO A WARNING LETTER

Employer has violated Article(s) 54 _____ Section(s) _____

all relevant past practices and any and all other applicable articles of the contract when on, 10-4-06 (Date)

COURTNEY STEVENS WAS TERMINATED FOR
DISHONESTY.

**SOLUTION REQUIRED**

t the contract be enforced, all affected parties be made whole, and to be put back into
SERVICE AND MADE WHOLE.

| ievance | Date | Disposition | Union Rep. Signature | Employer Rep. Signab |
| --- | --- | --- | --- | --- |
| 01 | 10/6 | PRESENTED | | Kerry Snyder |
| 02 | | | | |
| 03 | | | | |
| 04 | | | | |
| 05 | X Courtney L. Stev | 10/9/06 | | |

### RESOLUTION OF GRIEVANCE

B.O.F.P. COURTNEY WILL RETURN TO WORK,
10-9-06 - TIME SERVED AS SUP.

the Union: Kenneth   10/9/06 (Date)
          Emanuelson

For the Employer: _____   (Date)
                           Please Print

**EXHIBIT**
Snyder #3
7/10/07   DR

P 000311




To:  Randy Dunn
Fr:  Kerry Snyder
Re:  Jose Andreu Discharge

3/24/05

On 2/10/05 at 8:25 I held a meeting in my office for the discharging of service provider Jose Andreu. I informed Andreu that he was on notice of termination for violation of article 54 of the contract referring to honesty. Present during the discharge discussion was UPS Supervisor Dave Ziltz, Service provider Jose Andreu, and Union Steward Pam Treadwell.

The following day Jose Andreu reported an on the job injury. He continued to work for us with restrictions. The union did not grieve the notice of discharge, once the time had lapsed to grieve the notice of discharge he was terminated.



EXHIBIT

## Piwowar Donna (mel1dxp)

**From:** SNYDER KERRY (mel1kls)
**Sent:** Thursday, February 02, 2006 11:33 AM
**To:** Piwowar Donna (mel1dxp)
**Subject:** RE: Unemployment Jose Andreu

Donna,

1. Final incident- Jose Andreu lied to FT supervisor Dave Ziltz on 2/9/05
2. ~~verbal admitted lying~~
3. Kerry Snyder
4. None
5. Integrity policy and article 54 of the IBT and UPS contractual agreement.

    

Andreu Discharge    andreu.doc (26 KB)
Summary.doc (...

-----Original Message-----
**From:** Piwowar Donna (mel1dxp)
**Sent:** Thursday, February 02, 2006 11:09 AM
**To:** SNYDER KERRY (mel1kls)
**Subject:** Unemployment Jose Andreu

Kerry,

Good Morning...
Jose has filed for unemployment, we have him cleared for violation of company policy. The state is asking the following questions, I need to respond back by Noon tomorrow.

1. Please explain the final incident, including the date, specific details of what occurred and how his actions were discovered.
2. Did he admit to the infractions either verbally or in writing? Was any explanation given for the incident.
3. Who discharged him.
4. List any prior warning and incidents, including the type of warning and whether it was signed.
5. What policy did he violate.
Thanks for your help
Donna



UPS 0202

# Quality Performance Review

**Kerry Snyder**
**0107710**

**Management Level: Mid Manager**

**Appraisal Period: 01/01/2005 - 12/31/2005**

**Approved By: William Dunn**

| Mid-Year Review | Final Close |
|---|---|
| N/A | 02/04/2006 |

## Signatures

_____     _____
Employee                                                        Date

_____     _____
Immediate Manager                                        Date

_____     _____
Next Level Manager                                        Date



EXHIBIT
Snyder #10
7/11/07 DA

UPS 0802

# Performance Goals and Results

Kerry Snyder 's Goals and Results (Appraisal Period: 01/01/2005 -12/31/2005)

## Customer (20%)

| Goals/Measures | How Measured | WGT (%) | Base | Goal | Hi/Lo | Result | UNWT Val | WT Val |
|---|---|---|---|---|---|---|---|---|
| Delivery Scan | 1/per frequency | 10 | 667 | 800 | High | 752 | 0.94 | 9.40 |
| Total Concerns | 1/per frequency | 5 | 2127 | 2300 | High | 2928 | 1.20 | 6.00 |
| Destination LDI | 1/per frequency | 5 | 3116 | 3336 | High | 3966 | 1.19 | 5.94 |
| | | | | | | Customer Score | | 21.34 |

## People, Innovation & Learning (20%)

| Goals/Measures | How Measured | WGT (%) | Base | Goal | Hi/Lo | Result | UNWT Val | WT Val |
|---|---|---|---|---|---|---|---|---|
| Employee Relations Index | ERI survey results | 10 | 77 | 78 | High | 60 | 0.00 | 0.00 |
| Auto Frequency | Frequency rating | 5 | 19.1 | 15.4 | Low | 24.9 | 0.00 | 0.00 |
| Dart Frequency | Frequency rating | 5 | 13.2 | 10.0 | Low | 13.1 | 0.76 | 3.82 |
| | | | | | | People, Innovation & Learning Score | | 3.82 |

## Financial (20%)

| Goals/Measures | How Measured | WGT (%) | Base | Goal | Hi/Lo | Result | UNWT Val | WT Val |
|---|---|---|---|---|---|---|---|---|
| Expense Per Billed & Delivered Piece | Cost Statement | 10 | 1.618 | 1.618 | Low | 1.560 | 1.04 | 10.37 |
| Workmans Comp Cost | Cost Statements | 10 | 106000 | 78000 | Low | 57000 | 1.20 | 12.00 |
| | | | | | | Financial Score | | 22.37 |

## Internal Business Process (20%)

| Goals/Measures | How Measured | WGT (%) | Base | Goal | Hi/Lo | Result | UNWT Val | WT Val |
|---|---|---|---|---|---|---|---|---|
| NDPPH | PKG Results | 5 | 27.59 | 27.84 | High | 27.92 | 1.00 | 5.01 |
| NPUPPH | PKG Results | 5 | 19.70 | 20.44 | High | 21.15 | 1.03 | 5.17 |
| Package Visibility | Total frequency | 10 | 72 | 100 | High | 64 | 0.00 | 0.00 |
| | | | | | | Internal Business Process Score | | 10.19 |

| | |
|---|---|
| Weighted QPR Score (w/out Critical Skills): | 57.72 |

| | |
|---|---|
| 2005 QPR Score: | 57.72 |
| Critical Skills Score | 18.67 |
| 2005 Final Score | 76.39 |

ups 0803

# Change History

**Kerry Snyder 's Change History (Appraisal Period: 01/01/2005 -12/31/2005)**

| Changed By | Action | Date Changed | Change Reason | Perspective | Change Detail | | |
|---|---|---|---|---|---|---|---|
| | | | | | **Field** | **From** | **To** |
| SNYDER, KERRY | Update | 01/24/2006 17:00:12 | Original base and goal incorrect | Financial | Decimals | 2 | 3 |
| | | | | | Base | 1.78 | 1.618 |
| | | | | | Goal | 1.77 | 1.618 |
| SNYDER, KERRY | Update | 01/24/2006 16:57:00 | Original goal incorrect | People, Innovation & Learning | **Field** | **From** | **To** |
| | | | | | Goal | 13.2 | 15.4 |

UPS 0804

# Development Plan

**Kerry Snyder 's Development Plan (Appraisal Period: 01/01/2005 – 12/31/2005)**

## Critical Skills

| Development Activity | Primary Resource | Due Date | How Measured | Progress | Done |
|---|---|---|---|---|---|
| Review critical skills with immediate manager | | 03/31/2005 | verbal feedback | Reviewed cfritical skills results with Division Manager. | Yes |

## Job Specific Skills

| Development Activity | Primary Resource | Due Date | How Measured | Progress | Done |
|---|---|---|---|---|---|
| Atten Manager Leadership School | | 08/31/2005 | Course Completion | Did not have the opportunity to attend in 2005. | No |

## Business Acumen

| Development Activity | Primary Resource | Due Date | How Measured | Progress | Done |
|---|---|---|---|---|---|
| *** There are no activities associated with this development area *** | | | | | |

UPS 0805

# Critical Skills Raters

**Raters For Kerry Snyder**

| Name | Relationship |
|---|---|
| GOELZ, JAMES | Co-Worker |
| ZILTZ, DAVID | Co-Worker |
| MOORE, WAYNE | Co-Worker |
| MCLAUGHLIN, MICHAEL | Co-Worker |
| SNIDER, KEVIN | Co-Worker |
| DUNN, WILLIAM | Immediate Manager |

UPS 0806

# Critical Skill Leadership Factor Results



**People Leadership**



| | Score |
|---|---|
| **Relationship Skills** | 3.69 |
| **Developing Others** | 3.78 |
| **Managing Conflict** | 3.80 |
| **Teamwork/Cooperation** | 3.88 |
| **Communication** | 3.94 |
| **Influence** | 3.98 |
| **Motivating Others** | 3.83 |

UPS 0807



UPS 0808



UPS 0809



UPS 0810

# Critical Ski● Leadership Facto●Results

## People Leadership

| Leadership Factor | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Relationship Skills | 4.33 | 3.50 | 3.87 | 3.69 |
| Developing Others | 4.00 | 3.60 | 3.96 | 3.78 |
| Managing Conflict | 4.50 | 3.75 | 3.85 | 3.80 |
| Teamwork/Cooperation | 4.00 | 3.75 | 4.00 | 3.88 |
| Communication | 4.00 | 3.80 | 4.08 | 3.94 |
| Influence | 3.75 | 3.75 | 4.20 | 3.98 |
| Motivating Others | 4.25 | 3.75 | 3.90 | 3.83 |
| | | | People Leadership Score | 3.84 |

## Business Leadership

| Leadership Factor | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Problem Analysis | 4.60 | 3.60 | 4.08 | 3.84 |
| Customer Focus | 5.00 | 4.00 | 4.15 | 4.08 |
| Promotes Change | 4.00 | 3.60 | 4.16 | 3.88 |
| Planning/Organizing | 3.80 | 3.40 | 3.88 | 3.64 |
| Strategic Management | 4.00 | 4.00 | 3.95 | 3.98 |
| | | | Business Leadership Score | 3.88 |

## Self Leadership

| Leadership Factor | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Self Development | 4.00 | 3.50 | 3.75 | 3.63 |
| Integrity | 5.00 | 4.67 | 4.27 | 4.47 |
| | | | Self Leadership Score | 4.05 |

## Results Leadership

| Leadership Factor | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Process/Quality Improvement | 4.00 | 3.75 | 4.20 | 3.98 |
| Initiative | 4.00 | 3.75 | 3.95 | 3.85 |
| Results Orientation | 4.75 | 3.50 | 4.20 | 3.85 |
| | | | Results Leadership Score | 3.89 |
| | | | Overall Score | 3.89 |

UPS 0811

# Critical Skills Feedback

**Hidden Talents - skills or competencies where others rated you higher than you rated yourself.**

| Manager(s) Perspective | Leadership Factor | Self | Manager | Co-Worker | Score | Gap |
|---|---|---|---|---|---|---|
| **** No Manager Hidden Talents **** | | | | | | |

| Co-Worker Perspective | Leadership Factor | Self | Manager | Co-Worker | Score | Gap |
|---|---|---|---|---|---|---|
| People Leadership | Influence | 3.75 | 3.75 | 4.20 | 4.20 | 0.45 |
| Results Leadership | Process/Quality Improvement | 4.00 | 3.75 | 4.20 | 4.20 | 0.20 |
| Business Leadership | Promotes Change | 4.00 | 3.60 | 4.16 | 4.16 | 0.16 |

**Blind Spots - skills or competencies where you rated yourself higher than others rated you.**

| Manager(s) Perspective | Leadership Factor | Self | Manager | Co-Worker | Score | Gap |
|---|---|---|---|---|---|---|
| Results Leadership | Results Orientation | 4.75 | 3.50 | 4.20 | 3.50 | 1.25 |
| Business Leadership | Problem Analysis | 4.60 | 3.60 | 4.08 | 3.60 | 1.00 |
| Business Leadership | Customer Focus | 5.00 | 4.00 | 4.15 | 4.00 | 1.00 |

| Co-Worker Perspective | Leadership Factor | Self | Manager | Co-Worker | Score | Gap |
|---|---|---|---|---|---|---|
| Business Leadership | Customer Focus | 5.00 | 4.00 | 4.15 | 4.15 | 0.85 |
| Self Leadership | Integrity | 5.00 | 4.67 | 4.27 | 4.27 | 0.73 |
| People Leadership | Managing Conflict | 4.50 | 3.75 | 3.85 | 3.85 | 0.65 |

**Strengths - skills or competencies for which you received the highest scores.**

| Manager(s) Perspective | Leadership Factor | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|---|
| Self Leadership | Integrity | 5.00 | 4.67 | 4.27 | 4.67 |
| Business Leadership | Customer Focus | 5.00 | 4.00 | 4.15 | 4.00 |
| Business Leadership | Strategic Management | 4.00 | 4.00 | 3.95 | 4.00 |

| Co-Worker Perspective | Leadership Factor | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|---|
| Self Leadership | Integrity | 5.00 | 4.67 | 4.27 | 4.27 |
| People Leadership | Influence | 3.75 | 3.75 | 4.20 | 4.20 |
| Results Leadership | Process/Quality Improvement | 4.00 | 3.75 | 4.20 | 4.20 |

**Development Opportunities - skills or competencies for which you received the lowest scores.**

| Manager(s) Perspective | Leadership Factor | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|---|
| Business Leadership | Planning/Organizing | 3.80 | 3.40 | 3.88 | 3.40 |
| People Leadership | Relationship Skills | 4.33 | 3.50 | 3.87 | 3.50 |
| Self Leadership | Self Development | 4.00 | 3.50 | 3.75 | 3.50 |

| Co-Worker Perspective | Leadership Factor | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|---|
| Self Leadership | Self Development | 4.00 | 3.50 | 3.75 | 3.75 |
| People Leadership | Managing Conflict | 4.50 | 3.75 | 3.85 | 3.85 |
| People Leadership | Relationship Skills | 4.33 | 3.50 | 3.87 | 3.87 |

LnPS 08/2

# Critical Skills Behavior Results



Legend
Co-Worker   Manager   Self

## People Leadership



| Relationship Skills | Score |
|---|---|
| Develops relationships across groups/functions | 3.70 |
| Builds valuable partnerships | 3.30 |
| Takes time to get to know others | 3.40 |
| Treats others with respect | 3.90 |
| Expresses concern about the impact of a decision on others | 3.90 |
| Values diversity and differences in people | 3.90 |



**People Leadership**

UPS 0814

Legend
▦ Co-Worker    ■ Manager    ▨ Self

## People Leadership



| Managing Conflict | Score |
|---|---|
| Proactively takes action to resolve conflict situations | 3.70 |
| Encourages others to express their opinions when there is disagreement | 3.70 |
| Responds constructively in conflict situations | 3.90 |
| Looks for win-win resolution to disagreements | 3.90 |

UPS 0815



## People Leadership

┌─ Legend ──────────────────────┐
│ ▣ Co-Worker   ■ Manager   ▨ Self │
└───────────────────────────────┘

## People Leadership



| Communication | Score |
|---|---|
| **Ensures others have the information they need to do their jobs effectively** | 3.70 |
| **Speaks with confidence** | 4.10 |
| **Listens attentively to others** | 3.90 |
| **Presents ideas clearly** | 4.10 |
| **Asks questions regularly to gather others' views** | 3.90 |

UPS 0817

**People Leadership**



LPS 0818

Legend
Co-Worker  Manager  Self

## People Leadership



| Motivating Others | Score |
|---|---|
| Challenges others to excel in their work | 3.50 |
| Creates a positive diverse work environment | 3.90 |
| Provides others with the authority to make decisions | 3.80 |
| Shares credit with others when appropriate | 4.10 |

UPS 0819

Legend
▧ Co-Worker   ■ Manager   ▨ Self

## Business Leadership



| Problem Analysis | Score |
|---|---|
| Makes decisions that are supported by relevant information | 4.10 |
| Willingly makes decisions rather than delaying action | 3.60 |
| Involves others in the decision making process | 3.90 |
| Evaluates possible solutions from multiple points of view | 3.50 |
| Considers possible outcomes before making a decision | 4.10 |

UPS 6820

**Business Leadership**



| Customer Focus | Score |
| --- | --- |
| Acts promptly in response to customer concerns | 4.30 |
| Solicits feedback from customers | 4.00 |
| Establishes partnerships with customers | 4.10 |
| Meets customer expectations | 3.90 |

Legend: Co-Worker · Manager · Self

UPS 6821

Legend
Co-Worker  Manager  Self

**Business Leadership**



Promotes Change | Score
---

Keeps an open mind when faced with new situations — 4.10

Responds flexibly to changing situations — 4.00

Takes action to implement new ideas or strategies — 3.70

Creates an open environment where employees can share new ideas — 4.10

Helps others see new possibilities in the way we do business — 3.50

UPS 0822

Legend
Co-Worker  ■ Manager  Self

## Business Leadership



| Planning/Organizing | Score |
|---|---|
| Allocates appropriate resources to tasks | 4.10 |
| Schedules work so that deadlines are met | 3.50 |
| Monitors progress toward goals | 3.40 |
| Develops step-by-step plans | 3.30 |
| Prepares for potential problems | 3.90 |

UPS 0823

Legend
Co-Worker   ■ Manager   Self

## Business Leadership



| Strategic Management | Score |
|---|---|
| Describes the strengths and weaknesses of the organization | 3.90 |
| Demonstrates a good understanding of the external factors that affect the business | 4.10 |
| Translates the organization's vision into clear actions that others can take | 3.90 |
| Identifies the long-term risks and returns associated with a course of action | 4.00 |

UPS 0824



**Self Leadership**

UPS 0825

Legend
Co-Worker    Manager    Self

## Self Leadership



| Integrity | Score |
|---|---|
| Is honest in interactions with others | 4.60 |
| Follows through with commitments | 4.20 |
| Maintains confidentiality of information | 4.70 |
| Takes full responsibility for own actions and results | 4.10 |
| Insists on what is fair and ethical | 4.60 |
| Upholds organizational values and beliefs | 4.60 |

UPS 0826

**Legend**
☰ Co-Worker    ■ Manager    ▨ Self

## Results Leadership



LuPS 0827

**Results Leadership**



uPS 0828

**Results Leadership**



UPS 08 29

# Critical Skills Behavior Results

## People Leadership

### Relationship Skills

| Behavior | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Develops relationships across groups/functions | 5.00 | 3.00 | 4.40 | 3.70 |
| Builds valuable partnerships | 4.00 | 3.00 | 3.60 | 3.30 |
| Takes time to get to know others | 4.00 | 3.00 | 3.80 | 3.40 |
| Treats others with respect | 4.00 | 4.00 | 3.80 | 3.90 |
| Expresses concern about the impact of a decision on others | 4.00 | 4.00 | 3.80 | 3.90 |
| Values diversity and differences in people | 5.00 | 4.00 | 3.80 | 3.90 |

### Developing Others

| Behavior | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Provides developmental opportunities for employees | 4.00 | 3.00 | 3.60 | 3.30 |
| Addresses performance concerns directly with others | 4.00 | 3.00 | 4.40 | 3.70 |
| Recommends specific solutions or strategies for improving performance | 4.00 | 4.00 | 4.00 | 4.00 |
| Gives feedback in an encouraging way | 4.00 | 4.00 | 3.60 | 3.80 |
| Clearly defines performance standards | 4.00 | 4.00 | 4.20 | 4.10 |

### Managing Conflict

| Behavior | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Proactively takes action to resolve conflict situations | 4.00 | 3.00 | 4.40 | 3.70 |
| Encourages others to express their opinions when there is disagreement | 4.00 | 4.00 | 3.40 | 3.70 |
| Responds constructively in conflict situations | 5.00 | 4.00 | 3.80 | 3.90 |
| Looks for win-win resolution to disagreements | 5.00 | 4.00 | 3.80 | 3.90 |

### Teamwork/Cooperation

| Behavior | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Promotes teamwork across groups | 4.00 | 3.00 | 4.00 | 3.50 |
| Encourages others to work cooperatively | 4.00 | 4.00 | 3.80 | 3.90 |
| Emphasizes team approaches when appropriate | 4.00 | 4.00 | 4.00 | 4.00 |
| Works cooperatively to meet organizational goals | 4.00 | 4.00 | 4.20 | 4.10 |

### Communication

| Behavior | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Ensures others have the information they need to do their jobs effectively | 4.00 | 3.00 | 4.40 | 3.70 |
| Speaks with confidence | 4.00 | 4.00 | 4.20 | 4.10 |
| Listens attentively to others | 4.00 | 4.00 | 3.80 | 3.90 |
| Presents ideas clearly | 4.00 | 4.00 | 4.20 | 4.10 |
| Asks questions regularly to gather others' views | 4.00 | 4.00 | 3.80 | 3.90 |

### Influence

| Behavior | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Provides rationale to persuade others toward a decision | 3.00 | 3.00 | 4.40 | 3.70 |
| Presents compelling reasons for ideas when challenged | 4.00 | 4.00 | 4.40 | 4.20 |
| Gains support from others for ideas | 4.00 | 4.00 | 4.20 | 4.10 |
| Relates opinions to others' needs or concerns | 4.00 | 4.00 | 3.80 | 3.90 |

### Motivating Others

| Behavior | Self | Manager | Co-Worker | Score |
|---|---|---|---|---|
| Challenges others to excel in their work | 4.00 | 3.00 | 4.00 | 3.50 |
| Creates a positive diverse work environment | 4.00 | 4.00 | 3.80 | 3.90 |
| Provides others with the authority to make decisions | 4.00 | 4.00 | 3.60 | 3.80 |

UPS 0830

UPS 0831

## Business Leadership

| Problem Analysis | | | | |
|---|---|---|---|---|
| **Behavior** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Makes decisions that are supported by relevant information | 4.00 | 4.00 | 4.20 | 4.10 |
| Willingly makes decisions rather than delaying action | 4.00 | 3.00 | 4.20 | 3.60 |
| Involves others in the decision making process | 5.00 | 4.00 | 3.80 | 3.90 |
| Evaluates possible solutions from multiple points of view | 5.00 | 3.00 | 4.00 | 3.50 |
| Considers possible outcomes before making a decision | 5.00 | 4.00 | 4.20 | 4.10 |
| Customer Focus | | | | |
| **Behavior** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Acts promptly in response to customer concerns | 5.00 | 4.00 | 4.60 | 4.30 |
| Solicits feedback from customers | 5.00 | 4.00 | 4.00 | 4.00 |
| Establishes partnerships with customers | 5.00 | 4.00 | 4.20 | 4.10 |
| Meets customer expectations | 5.00 | 4.00 | 3.80 | 3.90 |
| Promotes Change | | | | |
| **Behavior** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Keeps an open mind when faced with new situations | 4.00 | 4.00 | 4.20 | 4.10 |
| Responds flexibly to changing situations | 4.00 | 4.00 | 4.00 | 4.00 |
| Takes action to implement new ideas or strategies | 4.00 | 3.00 | 4.40 | 3.70 |
| Creates an open environment where employees can share new ideas | 4.00 | 4.00 | 4.20 | 4.10 |
| Helps others see new possibilities in the way we do business | 4.00 | 3.00 | 4.00 | 3.50 |
| Planning/Organizing | | | | |
| **Behavior** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Allocates appropriate resources to tasks | 4.00 | 4.00 | 4.20 | 4.10 |
| Schedules work so that deadlines are met | 4.00 | 3.00 | 4.00 | 3.50 |
| Monitors progress toward goals | 4.00 | 3.00 | 3.80 | 3.40 |
| Develops step-by-step plans | 3.00 | 3.00 | 3.60 | 3.30 |
| Prepares for potential problems | 4.00 | 4.00 | 3.80 | 3.90 |
| Strategic Management | | | | |
| **Behavior** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Describes the strengths and weaknesses of the organization | 4.00 | 4.00 | 3.80 | 3.90 |
| Demonstrates a good understanding of the external factors that affect the business | 4.00 | 4.00 | 4.20 | 4.10 |
| Translates the organization's vision into clear actions that others can take | 4.00 | 4.00 | 3.80 | 3.90 |
| Identifies the long-term risks and returns associated with a course of action | 4.00 | 4.00 | 4.00 | 4.00 |

UPS 0832

## Self Leadership

| Self Development | | | | |
|---|---|---|---|---|
| Behavior | Self | Manager | Co-Worker | Score |
| Uses feedback to develop areas needing improvement | 4.00 | 3.00 | 3.60 | 3.30 |
| Gets involved in a variety of experiences to maximize development | 4.00 | 3.00 | 3.60 | 3.30 |
| Stays current in own area of professional expertise | 4.00 | 4.00 | 4.00 | 4.00 |
| Acquires skills needed to meet business objectives | 4.00 | 4.00 | 3.80 | 3.90 |
| Integrity | | | | |
| Behavior | Self | Manager | Co-Worker | Score |
| Is honest in interactions with others | 5.00 | 5.00 | 4.20 | 4.60 |
| Follows through with commitments | 5.00 | 4.00 | 4.40 | 4.20 |
| Maintains confidentiality of information | 5.00 | 5.00 | 4.40 | 4.70 |
| Takes full responsibility for own actions and results | 5.00 | 4.00 | 4.20 | 4.10 |
| Insists on what is fair and ethical | 5.00 | 5.00 | 4.20 | 4.60 |
| Upholds organizational values and beliefs | 5.00 | 5.00 | 4.20 | 4.60 |

UPS 0833

**Results Leadership**

| Process/Quality Improvement | | | |
|---|---|---|---|
| **Behavior** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Measures progress toward quality improvement objectives | 4.00 | 3.00 | 4.20 | 3.60 |
| Sets quality standards | 4.00 | 4.00 | 4.00 | 4.00 |
| Looks for ways to make process improvements | 4.00 | 4.00 | 4.40 | 4.20 |
| Investigates causes of process breakdowns | 4.00 | 4.00 | 4.20 | 4.10 |
| **Initiative** | | | |
| **Behavior** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Is proactive rather than reactive to situations | 3.00 | 4.00 | 4.20 | 4.10 |
| Takes action to ensure projects/tasks are successful | 5.00 | 3.00 | 3.60 | 3.30 |
| Overcomes barriers to project/tasks success | 4.00 | 4.00 | 3.80 | 3.90 |
| Anticipates potential problems before they occur | 4.00 | 4.00 | 4.20 | 4.10 |
| **Results Orientation** | | | |
| **Behavior** | **Self** | **Manager** | **Co-Worker** | **Score** |
| Goes beyond what is expected | 5.00 | 4.00 | 4.40 | 4.20 |
| Performs to a consistently high standard | 4.00 | 3.00 | 4.20 | 3.60 |
| Delivers results on a consistent basis | 5.00 | 3.00 | 4.00 | 3.50 |
| Gets the job done on time | 5.00 | 4.00 | 4.20 | 4.10 |

UPS 0834

UPS 0835