File Date: _____ 1-31-08 _____

Case No: _____ 07cv6132 _____

ATTACHMENT # _____

EXHIBIT _____ 11 _____

TAB (DESCRIPTION)

_____

**Exhibit 11**

**Jill Schmidt Deposition Excerpts**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSE ANDREU,                          )
                                      )
                    Plaintiff,        )
                                      )
          vs.                         )  No. 07 C 0473
                                      )
UNITED PARCEL SERVICE, INC.,          )
                                      )
                    Defendant.        )


     The deposition of JILL SCHMIDT, called by the
Plaintiff for examination, taken pursuant to the
Federal Rules of Civil Procedure of the United States
District Courts pertaining to the taking of
depositions, taken before MARGARET R. BEDDARD, a
Notary Public within and for the County of Kane,
State of Illinois, and a Certified Shorthand Reporter
of said state, at Suite 850, 29 South LaSalle Street,
Chicago, Illinois, on the 31st day of July, A.D.
2007, at 12:14 p.m.

**Page 2**

1  PRESENT:
2     THE COFFEY LAW OFFICE, P.C.,
      (1403 East Forest Avenue,
3     Wheaton, Illinois 60187),
      BY: MR. TIMOTHY J. COFFEY,
4
        appeared on behalf of the Plaintiff;
5
      QUARLES & BRADY, LLP,
6     (500 West Madison Street, Suite 3700,
      Chicago, Illinois 60661),
7     BY: MR. D. SCOTT WATSON,
8        appeared on behalf of the Defendant.
9
10
11  REPORTED BY MARGARET R. BEDDARD, CSR.
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 3**

1            I N D E X
2   WITNESS              EXAMINATION
3   JILL SCHMIDT
4     By Mr. Coffey           4, 60
5     By Mr. Watson           59
6
7
8
9
10         E X H I B I T S
11  NUMBER            MARKED FOR ID
12  Schmidt Deposition Exhibit
13    No. 1              22
14    No. 2              31
15    No. 3              35
16    No. 4              36
17
18
19
20
21
22
23
24

**Page 4**

1       (WHEREUPON, the witness was duly
2    sworn.)
3          JILL SCHMIDT,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6          EXAMINATION
7  BY MR. COFFEY:
8     Q. Ms. Schmidt, my name is Tim Coffey. I'm an
9  attorney for Jose Andreu. He's a former employee of
10 UPS, and he's brought a lawsuit against UPS.
11     I believe you worked for UPS, correct?
12    A. That is correct.
13    Q. Have you ever given your deposition before?
14    A. No.
15    Q. Have you ever had any type of -- given any
16 type of sworn testimony? Court perhaps?
17    A. No.
18    Q. I am going to be asking you a series of
19 questions, and you are sworn under oath to give
20 honest answers.
21       Do you understand that?
22    A. Yes.
23    Q. And Peggy is going to be taking down
24 everything we say, my questions followed by your

**Page 5**

1  answers. So if you have any misunderstanding or
2  confusion with respect to any of my questions, please
3  stop me and ask me to repeat. Okay?
4     A. Okay.
5     Q. And I will try to restate till you
6  understand it. Okay?
7     A. Sure.
8     Q. If you do not do that, the record will
9  simply read the question followed by the answer with
10 no indication that you had any sense of confusion.
11 Okay?
12    A. Okay.
13    Q. If you need to for any reason take a break,
14 just let us know and we'll take a break. Okay?
15    A. Thank you.
16    Q. You're presently employed by UPS, correct?
17    A. Yes.
18    Q. And in what position are you employed now?
19    A. I'm safety supervisor.
20    Q. And how long have you been safety
21 supervisor?
22    A. Approximately four years.
23    Q. And what were you before safety supervisor?
24    A. I was an OMS.

L.A. REPORTING, INC.   (800) 419-3376

Page 14

1    A.  I have to make sure that all of our
2  employees receive their annual compliance training.
3  Some of that training I do.  Some of it I just make
4  sure that it is done, and I submit rosters to that
5  effect.
6    Q.  So every employee has to go through some
7  sort of annual training?
8    A.  Correct.
9    Q.  What does that involve, the annual
10  training?
11    A.  Every employee is required to have one hour
12  hazardous material training.  They have to have
13  annual conveyer securing training.  They have to have
14  yard control training.
15    Q.  Okay.  So that's an annual requirement, so
16  to speak?
17    A.  Annual requirements, correct.
18    Q.  And that was back in '05, correct?
19    A.  Yes.
20    Q.  Any issues, concerns, problems with respect
21  to Mr. Andreu and his training that you're aware of?
22    A.  No.
23    Q.  What about investigating accidents and
24  injuries?  You say that's part of your job as safety

Page 15

1  supervisor.  What do you do with respect to that?
2    A.  If an employee's been involved in an
3  accident or injury, I have to follow up with the
4  employee and get the information on it, the details,
5  complete an investigation report, make sure that
6  follow-up training is done, give them an online
7  assessment test, and submit all of that to HR so that
8  it's recorded.
9    Q.  An online what?
10    A.  Assessment test.
11    Q.  So those various things, that was the case
12  back in early '05 in your position as safety
13  supervisor?
14    A.  Yes.
15    Q.  Each one of those?
16    A.  Yes.
17    Q.  Okay.  In other words, there's nothing new
18  in that list since '05?
19    A.  No.
20    Q.  With respect to Mr. Andreu, did you have
21  any communications with him after he reported his
22  January 24, '05, injury?
23    A.  After he reported?
24    Q.  At the time he reported.  Whenever your

Page 16

1  conversations were.
2    A.  He called in the injury.  I spoke to him on
3  the phone.  I asked him the details of the injury,
4  what had happened, if he was, you know, okay, safe to
5  work.  And then I trained him on-road the day that he
6  returned to work.
7    Q.  So the day he -- You actually had a
8  telephone conversation with him when he calls in his
9  injury?
10    A.  Yes.
11    Q.  Do you receive that call -- Did you receive
12  that call?
13    A.  You mean, did I pick up the phone and
14  answer it?
15    Q.  Sure.
16    A.  No.  Someone told me he was on the line and
17  asked for me.
18    Q.  Do you know what day this would have been
19  that he's calling in the injury?  Is this the day the
20  injury happened?
21    A.  Yes.
22    Q.  Do you know what time -- how much time had
23  elapsed between the injury actually occurring and you
24  speaking on the phone with him?

Page 17

1    A.  I can't be certain about how much time
2  elapsed.
3    Q.  Are we talking about minutes?  Hours?
4  Days?
5    A.  Oh, no.  Minutes.  Within the hour.  He
6  called me within the hour of the time he was injured.
7    Q.  And what does he say to you and what do you
8  say to him in this telephone conversation?
9    A.  He said, "I was calling" -- "I'm calling to
10  report an injury."  I said, "What happened?"  He said
11  that he was in the back of his truck, and he opened
12  the door.  In doing so, a package fell -- a heavier
13  package fell from the top of the load.  And when he
14  opened his door, he tried -- the package was coming
15  down at him.  He tried to stop it and push it back,
16  and he felt pain in his back.
17    Q.  What did you say to him?
18    A.  I asked him, "Are you okay?  Can you
19  continue working?"  He said, "Yes."  I asked him,
20  "Are you sure?"  He said, "Yes."  And I told him, you
21  know, to let us know throughout the day how things
22  were going, if he felt that he needed help, and that
23  he would need to report the injury when he returned
24  to the building.

L.A.  REPORTING,  INC.    (800)  419-3376

Page 18

1    Q.  Okay.

2    A.  To call it in.

3    Q.  Just to call again when he gets in the

4  building?

5    A.  To call the injury in to our injury

6  reporting line.

7    Q.  He personally does that, or a supervisor

8  does that?

9    A.  A supervisor does that.

10    Q.  Did you tell him he needed to do it?

11    A.  I told him that it had to be done with a

12  supervisor.  So the injury had to be called in to our

13  hotline.

14    Q.  Any information that that didn't happen?

15    A.  That it did not happen?

16    Q.  Correct.

17    A.  No.

18    Q.  So you believe that happened?

19    A.  Yes.

20    Q.  As you instructed him, correct?

21    A.  Correct.

22    Q.  Okay.  What happens after that?  I mean, is

23  there any more -- Sorry.

24        Is there any more to this telephone

Page 19

1  conversation with Mr. Andreu?

2    A.  I asked him at the time -- Again, I

3  reiterated that I wanted to make sure he was safe to

4  finish the job.  You know, that's my main concern.

5  And then I asked him how it happened and did he see

6  the package coming.  And he said he just had opened

7  the door in the back, and it fell down.  And I said,

8  "Did you open the door partially per methods?"  And

9  he said, "No.  I just opened the door, and it came

10  down."

11    Q.  So he admits that he didn't follow methods?

12    A.  Correct.

13    Q.  Any other -- As you just stated, any other

14  admissions that he didn't follow some methods?

15    A.  No.

16    Q.  Okay.  What do you do then after the

17  conversation?  Are you preparing any reports?  Are

18  you reporting to the superiors?  What do you do with

19  the information?

20    A.  I spoke to my manager.

21    Q.  Who was?

22    A.  Kerry Snyder.

23    Q.  Okay.

24    A.  I told him that we had the conversation

Page 20

1  that Jose had been injured.  Because I only work

2  until 12:30, I made sure to remind him to have one of

3  the supervisors who would be there upon Jose's return

4  help him call that injury in.  He said he would.

5    Q.  Did Mr. Snyder have any other things to say

6  about the injury?  Any questions?  Anything else?

7    A.  No.

8    Q.  Was this conversation face to face with

9  Mr. Snyder?

10    A.  Yes.

11    Q.  Where was it at?

12    A.  In his office.

13    Q.  So you went to his office for this purpose?

14    A.  That's right.

15    Q.  Okay.  What else did you tell him?  Did you

16  tell him about this supposed admission about not

17  opening the door halfway?

18    A.  I told him I asked Jose if he could finish

19  his route and to call in, you know, if he was having

20  difficulties doing so later on, you know.  And I told

21  him that I asked Jose how it happened and that we had

22  discussed, you know, a better way to do that would be

23  per method, open the door halfway before, you know,

24  because the contents shift.

Page 21

1    Q.  So you're telling this to Mr. Snyder?

2    A.  Uh-huh.

3    Q.  Did Mr. Andreu indicate if he needed

4  help -- a help driver the rest of the day, some

5  assistance?

6    A.  No.

7    Q.  He didn't indicate that to you?

8    A.  Not to me.

9    Q.  Do you know if he ever received any

10  assistance that day, another employee?

11    A.  I don't know.

12    Q.  But you're done that day at 12:30, correct?

13    A.  That's correct.

14    Q.  So your conversation with Mr. Snyder is

15  then by 12:30 on the morning of January 24, 2005, the

16  day of the accident, correct?

17    A.  Correct.

18    Q.  Anything else said between you and

19  Mr. Snyder?

20    A.  No.

21    Q.  Do you give him any paperwork, any reports,

22  or anything in writing?

23    A.  No.

24    Q.  Do you start or initiate any type of

Page 54

1    Q.  Why wasn't it in '05? Was there anything
2  that you know of that changed?
3    A.  I don't know why somebody didn't send me a
4  document.
5    Q.  You don't know if they were in use back
6  then? You're not sure?
7    A.  I don't know.
8    Q.  When was the last time you saw a report
9  called cost statement?
10    A.  I honestly don't remember.
11    Q.  Do you know why Mr. Andreu was terminated?
12    A.  Well, what I've been told it was
13  dishonesty.
14    Q.  Who has told you that?
15    A.  Dave Ziltz and Kerry Snyder.
16    Q.  Mr. Ziltz -- When did you have discussion
17  with Mr. Ziltz when he told you that?
18    A.  I'm sorry. I didn't hear you.
19    Q.  When did you talk to Mr. Ziltz when he told
20  you that?
21    A.  Shortly after it happened after he was
22  terminated.
23    Q.  Was this a conversation just between you
24  and Mr. Ziltz?

Page 55

1    A.  Yes.
2    Q.  Face to face?
3    A.  Yes.
4    Q.  Where was it at?
5    A.  Our office.
6    Q.  Just you and him?
7    A.  Yes.
8    Q.  And what was the purpose of the
9  conversation? Was this a conversation just
10  specifically about Mr. Andreu, or was this just a
11  passing that he was mentioned?
12    A.  I asked why Jose wasn't at work, and he
13  said he had been terminated.
14    Q.  Anything else said in that conversation?
15    A.  I asked him what had happened, and he said
16  that he was terminated for dishonesty.
17    Q.  Anything else said?
18    A.  Yes. He told me that he had gone to see
19  Jose on his route and that Jose had told him earlier
20  during the day that he had more work than he really
21  did have. He went out and stopped to see him on
22  route, and, in fact, what Jose had indicated that he
23  had to do was not factual.
24    Q.  Anything else said?

Page 56

1    A.  No.
2    Q.  So this was a conversation that I assume
3  once Jose is no longer working in the building this
4  conversation occurs?
5    A.  Correct.
6    Q.  Any other conversations with Mr. Ziltz
7  concerning the facts and circumstances around this
8  supposed misrepresentation of work and/or his
9  termination?
10    A.  Not that I remember, no.
11    Q.  What about Mr. Snyder? Was there
12  conversation with Mr. Snyder also?
13    A.  Yes.
14    Q.  When was that?
15    A.  When was that?
16    Q.  Yeah.
17    A.  Probably around the same day because I was
18  asking what happened to Jose and why he wasn't --
19  hadn't reported to work.
20    Q.  And where was your conversation with
21  Mr. Snyder at?
22    A.  I believe it was in his office also.
23    Q.  And what was said by whom in that
24  conversation?

Page 57

1    A.  Again, I had asked, you know, what had
2  happened. I wanted to hear it from our manager what
3  happened to Jose, why he wasn't at work. And he said
4  that he had terminated him because he had lied.
5    Q.  That's the way Mr. Snyder put it?
6    A.  He was terminated because he misrepresented
7  how much work he had. So it was a dishonesty issue.
8    Q.  And Mr. Snyder -- This is, again, once Jose
9  is not reporting to work, correct?
10    A.  Yes.
11    Q.  Did he say -- Did either Mr. Ziltz or
12  Mr. Snyder indicate to you that Mr. Andreu is off
13  because of the injury, has not been terminated yet?
14  Anything along those lines?
15    A.  No.
16    Q.  Did either Mr. Ziltz or Mr. Snyder indicate
17  to you that there are any other reasons why
18  Mr. Andreu was no longer working for UPS?
19    A.  No.
20    Q.  Or why he was terminated?
21    A.  No.
22    Q.  Did Mr. Snyder say anything to you about a
23  grievance being filed or not being filed?
24    A.  No.

Page 58

1    Q.   Did Mr. Ziltz say anything to you about a
2    grievance being filed or not being filed with respect
3    to Mr. Andreu?
4    A.   No.
5    Q.   Any other discussions or information that
6    you have that we haven't talked about concerning the
7    facts and circumstances around the alleged
8    misrepresentation of packages by -- or stops by
9    Mr. Andreu?
10   A.   No.
11   Q.   Any other discussions or information that
12   you have about the facts and circumstances
13   surrounding Mr. Andreu's termination, why he was
14   terminated?
15   A.   No.
16   Q.   Anything else -- Any other discussions or
17   information that you have concerning Mr. Andreu's
18   injury of January 24, 2005, that we have not
19   discussed?
20   A.   I'm sorry?  Any discussions, did you say?
21   Q.   Any discussions that you have had
22   concerning -- where Mr. Andreu's January 24, 2005,
23   injury was brought up, discussed in any fashion, that
24   we have not discussed?

Page 59

1    A.   No.
2    MR. COFFEY:  I don't have anything else.
3    MR. WATSON:  I think maybe one, maybe two,
4    questions.
5            EXAMINATION
6    BY MR. WATSON:
7    Q.   These discussions you had with Mr. Snyder
8    and Mr. Ziltz about why -- about Mr. Andreu's
9    termination, do you have any idea when those were?
10   A.   Did I have any idea when those were?
11   Q.   Yes.
12   A.   Probably within the week that Jose was not
13   at work anymore because I wondered where he was.
14   Q.   When was he not at work anymore?  Do you
15   know?
16   MR. COFFEY:  Objection.  Form of the question.
17   BY MR. WATSON:
18   Q.   You can answer.
19   A.   When was he not at work?
20   Q.   Yes.
21   A.   The second week in February.  A couple
22   weeks after.
23   Q.   2005?
24   A.   Yes.

Page 60

1    MR. WATSON:  No more questions.
2    MR. COFFEY:  A couple questions.
3            FURTHER EXAMINATION
4    BY MR. COFFEY:
5    Q.   Did you -- Are you aware that he worked
6    some -- I call it light duty.  But I think there was
7    another word for it over at the Aurora Center.
8            Are you aware he was working some light
9    duty in February of 2005?
10   A.   I don't remember.
11   Q.   What's it called at Aurora Center?
12   A.   TAW.  Is that the term you're looking for?
13   Temporary alternate work.
14   Q.   Yes.
15   A.   I don't recall.
16   Q.   When you are having your discussions with
17   Mr. Ziltz and Mr. Snyder, you are instigating those
18   discussions because you noticed Mr. Andreu not at
19   work, correct?
20   A.   Right.
21   Q.   Not at work at all, right?
22   A.   Correct.  I hadn't seen him.
23   Q.   What period of time had you not seen him at
24   work that raises your motive to go talk to Mr. Ziltz

Page 61

1    and Mr. Snyder, as you said?
2    A.   I believe it was a day or two I didn't see
3    him.
4    Q.   Did you ever see him thereafter at work?
5    A.   After?
6    Q.   After these discussions with Mr. Snyder and
7    Mr. Ziltz, did you ever see him at work?
8    A.   I don't remember seeing him after that.
9    MR. COFFEY:  No questions.
10   MR. WATSON:  Nothing further.
11        We'll reserve signature.
12        FURTHER DEPONENT SAITH NOT.
13
14
15
16
17
18
19
20
21
22
23
24

16  (Pages 58 to 61)

L.A. REPORTING, INC.   (800) 419-3376

**Exhibit 12**

**UPS's Answer and Affirmative Defense to Complaint**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JOSE ANDREU,                          )
                                      )
                    Plaintiff,        )
                                      )   Case No. 07 C 06132
v.                                    )
                                      )   Judge Der-Yeghiayan
UNITED PARCEL SERVICE, INC.,          )
                                      )
                    Defendant.        )

### ANSWER AND AFFIRMATIVE DEFENSE TO COMPLAINT

Defendant United Parcel Service, Inc. ("UPS") submits its Answer and Affirmative Defenses

to the Complaint filed by Plaintiff Jose Andreu ("Andreu" or "Plaintiff") and states as follows:

### Nature of Case

1.      Plaintiff brings this action against Defendant to recover damages proximately caused
by Defendant's illegal retaliatory discharge in violation of the Illinois Worker's Compensation Act,
820 ILCS 305/1 et seq., and the common law and public policy of the State of Illinois.

**Answer:**      UPS admits that Plaintiff brings this action to recover damages allegedly and

proximately caused by UPS's alleged illegal retaliatory discharge in violation of the Illinois Worker's

Compensation Act, 820 ILCS 305/1 et seq., and the common law and public policy of the State of

Illinois, but denies that it violated any law, regulation, statute or rule with regard to Plaintiff.

### The Parties

2.      Plaintiff, Jose Andreu (hereafter "Jose"), is an individual residing at all relevant times
in Chicago, Illinois, County of Cook.

**Answer:**      UPS admits the allegations of Paragraph 2.

3.    Defendant, United Parcel Service, Inc. (hereafter "UPS"), is an Ohio corporation registered and licensed to do business in Illinois.

**Answer:**    UPS admits that it is an Ohio corporation registered and licensed to do business in

Illinois, but denies the remaining allegations of Paragraph 3. UPS further denies that it violated any

law, regulation, statute or rule with regard to Plaintiff.

4.    Venue is proper in this Court in that Defendant's illegal acts complained of herein took place within this Court's geographical jurisdictional boundaries at UPS' Addison, Illinois facility.

**Answer:**    UPS admits that venue is proper in the U.S. District Court for the Northern District of

Illinois.

### Facts Common to all Counts

5.    Jose began his employment with UPS in or around September, 1996.

**Answer:**    UPS admits the allegations of Paragraph 5.

6.    Starting in 2003, Jose began working for UPS in the position of package driver. In this position, among other duties, he reported each work day to UPS' Addison, Illinois facility and delivered parcels in UPS' vehicles, departing from and returning to the Addison facility each work day.

**Answer:**    UPS admits the allegations of Paragraph 6. Answering further, Plaintiff was a swing

or vacation package car driver which means Plaintiff did not have a regular route but rather filled in

where needed.

7.    On or about January 24, 2005, Jose injured his back at work while on his assigned route delivering packages (hereafter the "work accident").

**Answer:**    UPS is without knowledge or information sufficient to form a belief as to the truth of

the allegations of Paragraph 7 and therefore denies same. Answering further, Plaintiff contacted

UPS while on his route on or about January 24, 2005, and said he had injured himself.

8.    He immediately called into UPS and reported the work accident and his resulting back
injuries.

**Answer:**    UPS is without knowledge or information sufficient to form a belief as to the truth of

whether Plaintiff immediately called into UPS and therefore denies same.    UPS admits the

remaining allegations of Paragraph 8.

9.    Later in the day on January 24, 2005, one of Jose's superiors, Dave Ziltz, met Jose out
on his route. Upon meeting Jose out on his route, Mr. Ziltz stated to Jose that he believed Jose was
lying about the work accident and/or related injuries, and faking his pain.

**Answer:**    UPS admits that Supervisor Davie Ziltz met Plaintiff on his route on January 24, 2005

and that the meeting occurred after Plaintiff had called UPS. UPS denies the remaining allegations

of Paragraph 9.

10.    At various times subsequent to January 24, 2005, Mr. Ziltz repeated his assertions and
belief that Jose was lying about the work accident and/or related injuries, and faking his pain.

**Answer:**    UPS denies the allegations of Paragraph 10.

11.    Also on January 24, 2005, upon Jose's return to UPS' Addison facility at the end of
his work day, he sat down with Mr. Ziltz and observed Mr. Ziltz type the work accident and related
injury information into a computer. He also observed and listened as Mr. Ziltz called UPS' worked
(sic) compensation insurance carrier, Liberty Mutual, and reported the work accident and related
injuries.

**Answer:**    UPS is without knowledge or information sufficient to form a belief as to the truth of

what Plaintiff observed and/or listened to and therefore denies same. UPS admits that on or about

January 24 or 25, 2005, a work accident report was filled out and the incident was reported to Liberty

Mutual, UPS worker's compensation insurance carrier.

      12.    On January 25, 2005, Jose was examined by UPS' physician, Dr. Anthony Tesmond, in connection with the injuries he sustained from the work accident.

**Answer:**    UPS denies that a Dr. Anthony Tesmond is a "UPS physician", but admits that

Plaintiff was examined by a Dr. Tesmond on or about January 25, 2005 in connection with his

claimed injuries.

      13.    Following the work accident, Jose missed work on January 25th and 26th.

**Answer:**    UPS denies that Plaintiff did not work for UPS on January 25 or 26, 2005.

      14.    Upon returning to work on January 27, 2005, Jose advised Dave Ziltz that he was still experiencing back pain from the injuries he sustained from the work accident.

**Answer:**    UPS admits the allegations of Paragraph 14.

      15.    In January and February 2005, Jose was examined several additional times by Dr. Tesmond and/or other physicians in his office in connection with the injuries he sustained from the work accident.

**Answer:**    UPS is without knowledge or information sufficient to form a belief as to the truth of

who examined Plaintiff or whether he was examined "several times" in the stated time period and

therefore denies same. UPS admits that Plaintiff was examined during the stated time frame.

      16.    Dr. Tesmond and/or his office notified UPS and/or its workers' compensation insurer of each and every occasion that Jose received medical treatment in connection with the injuries he sustained from the work accident.

**Answer:**    UPS is without knowledge or information sufficient to form a belief as to the truth of

the allegations of Paragraph 18 and therefore denies same.

17.    In February and early March 2005, Jose sought and received additional medical treatment from his own physicians in connection with the injuries he sustained from the work accident.

**Answer:**    UPS is without knowledge or information sufficient to form a belief as to whether

Plaintiff sought and received additional medical treatment and therefore denies same.  Answering

further, it is UPS's understanding that Plaintiff returned for treatment beginning February 10, 2005

after previously being released to full duty work.

18.    In February and early March 2005, Jose's physicians notified UPS and, in some instances, Jose's direct supervisors, of Jose's ongoing treatment for the injuries he sustained from the work accident, his prognosis and/or ability to return to work.

**Answer:**    UPS admits that on occasion after February 9, 2005, it received notes from physicians

concerning Plaintiff's condition.

19.    On or about February 9, 2005, Dave Ziltz met Jose while he was on his route delivering packages. Upon his arrival at Jose's truck, Mr. Ziltz was angry and yelling at Jose. Mr. Ziltz accused Jose of lying about the number of packages and/or stops he had left for the day in an earlier communication Jose had with the Addison facility. Dave Ziltz told Jose he would be fired.

**Answer:**    UPS admits that Ziltz met Plaintiff while Plaintiff was on his route on February 9,

2005.  UPS denies the remaining allegations of Paragraph 19.  Answering further, in response to a

request for him to pick up a package, Plaintiff had contacted the UPS facility around 4:00 p.m. and

claimed he still had sixty stops to make and would not be done until 9:00 p.m.  Ziltz, who was

driving a route that day due to a shortage of drivers, arrived to assist Plaintiff at 4:42 p.m. and found

only about 20 packages on Plaintiff's vehicle.  Ziltz informed Plaintiff he was being placed on notice

of termination for dishonesty.

20.    On or about February 11, 2005, Jose informed his superiors that he could no longer perform his duties due to the pain he was experiencing from the work accident and related injuries.

He subsequently missed several days of work, and continued to receive medical treatment. He returned to work on or about February 17, 2005.

**Answer:**     UPS admits that Plaintiff informed his supervisors that he would not drive, that he

missed several days of work, and that he returned to work on or about February 17, 2005. UPS is

without knowledge or information sufficient to form a belief as to whether Plaintiff continued to

receive medical treatment and therefore denies same. UPS denies the remaining allegations of

Paragraph 20.


21.     On March 4, 2005, Jose's superior, Kerri Snyder, told Jose that his employment with UPS was terminated effective immediately for alleged (sic) being dishonest on February 9, 2005. Mr. Snyder then asked another supervisor who was present to escort Jose off of the premises.

**Answer:**     UPS admits the allegations Paragraph 21. Answering further, Plaintiff did not timely

submit a grievance pursuant to the applicable collective bargaining agreement challenging his

termination.


22.     At all relevant times, Jose's performance met or exceeded UPS' legitimate expectations. Jose was not dishonest on February 9, 2005, and did nothing to legitimately warrant the termination of his employment.

**Answer:**     UPS denies the allegations of Paragraph 22.


### UPS TERMINATED JOSE'S EMPLOYMENT IN RETALIATION FOR HIS PROTECTED ACTIVITIES IN VIOLATION OF THE ILLINOIS WORKERS' COMPENSATION ACT, COMMON LAW AND PUBLIC POLICY

23.     Jose's reporting the work accident and related injuries to UPS on January 24, 2005, and seeking medical treatment for such injuries commencing on January 25, 2006 (sic), and continuing through the day UPS terminated his employment (i.e., March 4, 2005), all as described above, are activities protected by the by the Illinois Worker's Compensation Act, 820 ILCS 305/1 *et seq.* (the "Act").

**Answer:**     The allegations of Paragraph 23 require legal conclusions and UPS therefore denies

same. UPS admits that reporting a work accident and related injuries and seeking medical treatment

for work-related injuries are activities protected by the by the Illinois Worker's Compensation Act, 820 ILCS 305/1 *et seq.*

24.    UPS was aware of Jose's protected activities under the Act as described above at the time it decided to terminate his employment.

**Answer:**    UPS was aware that Plaintiff had submitted a worker's compensation claim and was receiving treatment at the time of his termination but denies that said claim or treatment played any part in Plaintiff's termination.

25.    Jose's protected activities under the Act were a motivating factor behind UPS' decision to terminate his employment.

**Answer:**    UPS denies the allegations of Paragraph 25.

26.    As such, UPS' termination of Jose's employment on March 4, 2005, was causally related to his protected activities under the Act.

**Answer:**    UPS denies the allegations of Paragraph 26.

27.    UPS's termination of Jose was therefore an illegal retaliatory discharge in contravention of Illinois public policy as stated and set forth in the Act.

**Answer:**    UPS denies the allegations of Paragraph 27.

28.    As a direct and proximate result of UPS' illegal termination of his employment, Jose has suffered a loss of income in the form of wages and prospective retirement benefits, social security and other employment benefits, emotional pain, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, and he is expected to incur future damages.

**Answer:**    UPS denies the allegations of Paragraph 28.

29.    The above described conduct by UPS was wilful and wanton, and with reckless disregard and indifference to the law and the public policy of Illinois, and to Jose's rights. UPS should therefore be subject to punitive damages as an example to deter others from engaging in conduct of this kind.

**Answer:**     UPS denies the allegations of Paragraph 29.


## Affirmative Defense

Plaintiff is barred from recovery because he has failed to exercise reasonable efforts to

mitigate his alleged damages.


Dated: November 9, 2007                        UNITED PARCEL SERVICE, INC.

                                               By: /s/ D. Scott Watson
                                                   One of Its Attorneys

John A. Klages (ARDC #06196781)
D. Scott Watson (ARDC # 06230488)
Ellen M. Girard (ARDC #06276507)
Meghan E. Riley (ARDC #06288548)
Quarles & Brady LLP
500 West Madison, Suite 3700
Chicago, IL 60661
312/715-5000
312/715-5155 (fax)

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on November 9, 2007, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

> Timothy J. Coffey
> The Coffey Law Office, P.C.
> 1403 East Forest Avenue
> Wheaton, Illinois 60187
> Email: tcofflaw@sbcglobal.net

> /s/ D. Scott Watson

**Exhibit 13**

**Turner Pain Center Documents, P000241-47**

# Turner Pain And Wellness Center
## S.O.A.P. Notes

Jose Andreu (010871 - Initial Incident)

Jose Andreu
7831 W. Rascher
Chicago IL 60656

| Patient Information | |
|---|---|
| Patient | Jose Andreu |
| Date of Birth | 06/08/1963 |
| Patient Gender | Male |
| Social Security | |
| Marital Status | Married |
| Injury / Onset | |
| First Consult | |
| Occupation | |
| Employer | |

February 16, 2005

**Date Of Service:** Wednesday, February 16, 2005
**Provider:** MARK TURNER, DC MARK MCDOWELL, PT

## Chief Complaint

- Patient reports that he is able to stand and walk without pain, but sitting still bothers him very much. He felt some better during the day yesterday, but then was unable to sleep last night due to pain. The only comfortable position he can find is lying on his side. He is still experiencing the pain all the way down to the dorsum of his right foot.

## Examination
### Musculoskeletal:

- **Palpations.** Palpated the lumbar paravertebral muscles, the muscles of the lumbar spine, the muscles of the buttocks, the muscles of the posterior thigh, the muscles of the anterior thigh, and the muscles of the groin: pain, palpatory guarding, soreness, spastic, tenderness, and Trigger points in right gluteus medius with extreme tenderness; right QL tight and tender with palpatory guarding; bilateral hip flexor tightness with trigger points; piriformis tight and tender; spinal palpation. Loss of motion (T4, T5, T6, T7, T12, L1, L4, L5, and S1). Lumbar extension caused increase in hip and thigh pain. Lumbar flexion caused no major change.

## Diagnosis
846.1    Sacroiliac (ligament) sprain

**CONFIDENTIAL**


000241

# Turner Pain And Wellness Center
## S.O.A.P. Notes

Jose Andreu (010871 - Initial Incident)

| | |
|---|---|
| 728.85 | Spasm of muscle |
| 724.4 | Thoracic or lumbosacral neuritis or radiculitis, unspecified |
| 724.8 | Other symptoms referable to back |

## Management
### Adjustment:
- Specific adjustive procedures administered to: the upper right sacroiliac joint in flexion, the sacrum (right), L5 (right), L5 (left), L4 (left), T5 (left), T5 (right), T6 (left), T6 (right), T7 (left), T7 (right), T8 (left), and T8 (right).

### Physical Modalities:
- Interferential current and hot pack applied for 15 minutes to decreased inflammation and spasm to the: the lumbar back and the sacral region of the back.
- Soft tissue work to decrease tissue tightness and to increase healing to: the lumbar back, the sacral region of the back, the buttocks, and the hip. Passive lumbar flexion with patient supine.
- Therapeutic exercise x 15 minutes performed to stabilize: the sacral region of the back, the lumbar back, the buttocks, and the hip.
- Exercises completed consist of the following: tva marching on foam roller, 10X3, supine bridging, 10X3, supine single leg pop ups, 10X2.

### Assessment:
- Patient tolerated treatment well with no adverse reaction noted after treatment.

### Plans:
- Patient advised to return daily until notified of new treatment plan. Spoke with patient's employer yesterday, UPS supervisor Kerri Snyder, and determined that patient should wait until Thursday for return to work with restrictions.
- Prognosis guarded because patient's duties at work will irritate his back.

CONFIDENTIAL

2/15/05

5.10 pm

Kerri Snyder, patient's UPS supervisor, was called
Re: José Andreu. Mr. Snyder was informed that José
was recommended to take 1 more day off work
and return to duties Thursday, 2/17/05 with

following restrictions: no prolonged sitting/standing > 15
minutes before taking break or changing positions,
no lifting > 5 lbs. Mr. Snyder was informed that
José was sent for MRI. Mr. Snyder acknowledged

his understanding.

Alan.

CONFIDENTIAL
P000243



# Turner Pain & Wellness Center

*We can help!*   1222 North Eola Road • Aurora, IL 60504
Phone (630) 499-8804 • Fax (630) 499-9898

Dr. Mark Turner, BA, BSC, D.C.
Mark McDowell, P.T., A.C.E. Certified
Dr. Staci Aherns, B.S., D.C.
Justin Tubbs, P.T.A., C.S.C.I.

Prescription for Care:                    Date: 2·15·05

Re: Bill Andrew
Attn: Kevin Snyder

Patient may return to work Thursday, 2·17·05,
with the following restrictions: no prolonged
sitting or standing (patient may only sit or
stand for 15 minutes before resting or changing
positions; no lifting more than 5 lbs.)


Treating Physician _____

CONFIDENTIAL
P 000244



# Turner Pain And Wellness Center
*S.O.A.P. Notes*

Jose Andreu  (010871 - Initial Incident)

Jose Andreu
7831 W. Rascher
Chicago IL  60656

| Patient Overview | |
|---|---|
| Patient | Jose Andreu |
| Date of Birth | 06/08/1963 |
| Patient Gender | Male |
| Social Security | |
| Marital Status | Married |
| Injury / Onset | |
| First Consult | |
| Occupation | |
| Employer | |

February 15, 2005

**Date Of Service:** Tuesday, February 15, 2005
**Provider:** MARK TURNER, DC MARK MCDOWELL, PT

## Chief Complaint

- Patient reports that he was in much pain last night and that he was experiencing the intense pain in the same location:  posterior and anterior right hip, posterior right thigh and calf, and top of foot.  He was free of pain for 20 minutes this morning, but intense pain returned when he tried to drive to the clinic this morning.

## Examination
### Musculoskeletal:

- **Palpations.**  Palpated the lumbar paravertebral muscles, the muscles of the lumbar spine, the muscles of the buttocks, the muscles of the posterior thigh, the muscles of the anterior thigh, and the muscles of the groin:  pain, palpatory guarding, soreness, spastic, tenderness, and Trigger points in right gluteus medius with extreme tenderness;  right QL tight and tender with palpatory guarding;  bilateral hip flexor tightness with trigger points;  piriformis tight and tender;  spinal palpation.  Loss of motion (T4, T5, T6, T7, T12, L1, L4, L5, and S1).  Lumbar extension caused increase in hip and thigh pain.  Lumbar flexion caused no major change.

## Diagnosis

| | |
|---|---|
| 846.1 | Sacroiliac (ligament) sprain |
| 728.85 | Spasm of muscle |

**CONFIDENTIAL**

*MM*

P 000245

# Turner Pain And Wellness Center
*S.O.A.P. Notes*

724.4    Thoracic or lumbosacral neuritis or radiculitis, unspecified
724.8    Other symptoms referable to back

## Management
### Adjustment:
- A manipulation was performed on the foot and knee bilaterally, and the hip on the right.
- Flexion and Distraction technique 10 reps x 3 sets to the lumbar spine.

### Physical Modalities:
- Interferential current and hot pack applied for 15 minutes to decreased inflammation and spasm to the: the lumbar back and the sacral region of the back.
- Soft tissue work to decrease tissue tightness and to increase healing to: the lumbar back, the sacral region of the back, the buttocks, and the hip. Passive lumbar flexion with patient supine.
- Therapeutic exercise x 15 minutes performed to stabilize: the sacral region of the back, the lumbar back, the buttocks, and the hip.
- Exercises completed consist of the following: prone lying on swiss ball with lumbar flexion, 30 secX4, alternate knee to chest, 15X4, supine knee to chest, 30 secX4.

### Assessment:
- Patient tolerated treatment well with no adverse reaction noted after treatment.

### Plans:
- Patient advised to return daily until notified of new treatment plan. Spoke with patient's employer yesterday, UPS supervisor Kerri Snyder, and determined that patient must return to work Wednesday 2/16/04 with necessary restrictions on activity. Sent patient for MRI of lumbar region.
- Prognosis guarded because patient's duties at work will irritate his back. X-ray report was received from UPS revealing the following: degenerative disease at L5/S1 facet joint bilaterally, negative for frature; normal disc spaces maintained. He would benefit from avoiding prolonged sitting or standing, with complete avoidance of lifting. MRI of lumbar region is warranted due to intractable pain and radiation of symptoms into right leg.

CONFIDENTIAL

P 000246

Re: Jose Andr...    2/14/05

Called Kerri Snyder, patient's UPS supervisor, to discuss Jose's case. Kerri was informed of patient's status. Work conditions were discussed and it was determined that patient will return to work Wednesday 2/16/05 for up to 8 hours with restrictions on lifting, prolonged sitting, and prolonged standing. Possiblity of MRI was also discussed.

CONFIDENTIAL

P000247

**Exhibit 14**

**Jose Andreu's Supplemental Response to UPS First Interrogatories**

## THE COFFEY LAW OFFICE, P.C.

1403 EAST FOREST AVENUE
WHEATON, ILLINOIS 60187

FAX (630) 534-6400
TELEPHONE (630) 534-6300
EMAIL TCOFFLAW@SBCGLOBAL.NET

July 25, 2007

**VIA HAND DELIVERY**

D. Scott Watson
Quarles & Brady LLP
500 West Madison
Suite 3700
Chicago, IL 60661

**RE:** *Jose Andreu v. United Parcel Service, Inc.*
       **N.D.Ill. Case No. 07 C 473**

Dear Scott:

Enclosed herewith please find a copy of Plaintiff's Amended and Supplemental Responses and Objections to Defendant's First Set of Interrogatories.

Thank you for your cooperation with this matter. Please call should you have any questions.

Very Truly Yours,

Timothy J. Coffey

Enc.

cc:     Jose Andreu

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JOSE ANDREU,                          )
                                      )
            Plaintiff,                )
                                      )
                                      )   Case No. 07 C 00473
v.                                    )
                                      )   Judge Samuel Der-Yeghiayan
                                      )
UNITED PARCEL SERVICE, INC.,          )   Magistrate Judge Mason
                                      )
            Defendant.

## PLAINTIFF'S SUPPLEMENTAL ANSWERS AND OBJECTIONS TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiff, JOSE ANDREU, by and through his attorneys, THE COFFEY LAW

OFFICE, P.C., pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure,

supplements his previous answers and objections to Defendant's First Set of

Interrogatories as follows:

## INTRODUCTION and GENERAL OBJECTIONS

The responses below are made solely for the purpose of and in relation to this

action.  Each response is given subject to all appropriate objections including, but not

limited to, objections based on competency, relevancy, materiality and admissibility, which

would require the exclusion of the interrogatory and/or response, or any statements

contained herein if the interrogatory were asked of, or any statement contained herein

were made by, a witness present and testifying in court. All objections and grounds

therefore are specifically reserved by Plaintiff, and may be interposed at, or before, the

time of trial in this matter.

The following responses are based on the present state of Plaintiff's investigation, discovery, preparation, and analysis of the facts, issues and evidence pertaining to this case, which are incomplete as of the date of the responses. The responses are, therefore, given without prejudice to Plaintiff's right to amend the responses and/or produce at the time of trial and any of the following: currently known information which has been omitted from these responses as a result of good faith oversight; subsequently discovered information, evidence, and documentation relating to proof of presently known material facts; and, information, evidence, and documentation, whenever it is discovered, relating to proof of subsequently discovered material facts.

Plaintiff's responses to Defendant's interrogatories are based upon his reasonable interpretation thereof. If Defendant subsequently asserts interpretations of the interrogatories which differ from that applied by Plaintiff, then Plaintiff reserves the right to supplement his responses. Except for the explicit facts set forth in these responses, no admission of any nature whatsoever is implied, or is inferred, or should be inferred, from Plaintiff's responses, or from the fact that Plaintiff has responded. The fact that Plaintiff has responded shall not be taken as an admission, or as a concession of the existence of any facts set forth or assumed by the interrogatories.

The following general objections pertain to Defendant's First Set of Interrogatories directed to Plaintiff (its "Instructions and Definitions" as well as each Interrogatory), unless otherwise specified:

A.      Plaintiff objects to the Interrogatories to the extent they require Plaintiff to undertake any duty other than duties imposed by the Federal Rules of Civil Procedure and the local rules of this Court.

-2-

B.    Plaintiff objects to the Interrogatories to the extent they call for the production of documents, things or information protected from disclosure by the attorney-client privilege, the attorney work product privilege, or otherwise protected from disclosure under applicable privileges, laws or rules.

C.    Plaintiff objects to the Interrogatories to the extent they seek to obligate the Plaintiff to make inquires beyond the parties to this action, or to the extent they pertain to documents, things or information not in the custody of the Plaintiff.

D.    Plaintiff objects to the Interrogatories to the extent they are unduly burdensome in that they call for material which is unreasonably cumulative or duplicative of material or information already provided or already within Defendant's custody or equally accessible to Defendant as it is to Plaintiff, or to the extent they require Plaintiff to incur unreasonable burden or expense in ascertaining the information or providing the documents.

E.    Plaintiff objects to the Interrogatories to the extent they seek documents, things or information that are not relevant to the subject matter of this lawsuit, or appear not to be reasonably calculated to lead to the discovery of admissible evidence.

F.    Plaintiff objects to the Interrogatories to the extent they seek every fact, or "any and all" facts, all reasons, or "any and all reasons," the identity of every witness, or the specification of every document supportive of or related to any claim or allegation on the grounds they are overly broad and place an

-3-

undue burden on Plaintiff. *Lawrence v. First Kansas Bank & Trust Co.*, 169 F.R.D. 657, 662-63 (D.Kan. 1996).

## SUPPLEMENTAL ANSWERS AND OBJECTIONS TO INTERROGATORIES

**Interrogatory No. 6:** State the entire factual basis in support of your claim that "At various times subsequent to January 24, 2005, Mr. Ziltz repeated his assertions and belief that Jose was lying about the work accident and/or related injuries, and faking his pain" (Complaint ¶ 12) including, but not limited to, the date(s), time(s) and location(s) of each alleged incident and the identity (per Instruction 8(a) above) of all witnesses to each alleged incident.

**Answer:**   Subject to and without waiving his objections set forth in his initial response to Interrogatory No. 6, on February 9, 2005, Mr. Ziltz stated to Plaintiff that he did not believe him about the number of packages on his truck because Plaintiff had already lied to him about his January 24, 2005 work injury. Mr. Ziltz made this statement at the time he went out to Plaintiff's truck while he was on his route on February 9, 2005. No other persons were present.

Additionally, Plaintiff overheard Mr. Zilitz tell Melissa Del Dotto that he believed Plaintiff was faking his injury. Mr. Ziltz made this statement at the facility shortly after February 9, 2005. Plaintiff does not believe any other persons were present.

Plaintiff investigation and discovery into this matter continues.

**Interrogatory No. 15:** Identify (per Instruction 8(a) above) each of Plaintiff's employers since October 2001, other than UPS, and with respect to each employer, state: the name, address and telephone number of each employer, the date employment commenced, all job titles or job categories held by Plaintiff, the rate of pay received by Plaintiff for each job title or job category, the number of hours worked by Plaintiff each week or each month, the gross amount earned, the date employment was terminated, the reason for termination, and the identity (per Instruction 8(a) above) of the person(s) responsible for the termination of employment, if applicable.

**Answer:**    Subject to and without waiving his objections set forth in his initial response to Interrogatory No. 15, the business address and telephone number for J&J Tree Service Co. is 7831 W. Rascher, Chicago, IL, 60656, (773) 631-2306.

Plaintiff's investigation and discovery into this matter continues.

**Interrogatory No. 19:** Describe all sources of money received by Plaintiff since October 16, 2001, including the amount of money from each source and the dates of the payments.  Money includes, but is not limited to, compensation, salary, bonuses, retirement benefits, social security payments, disability payments, unemployment compensation benefits, workers' compensation benefits, as well as financial gifts from relatives and friends.  Your response need not include salary received from UPS or other employers identified in response to Interrogatory No.16 if you included salary information in your response.

**Answer:**  Subject to and without waiving his objections set forth in his initial response to Interrogatory No. 19, in 2006 Plaintiff received approximately $15,100 in non-employee compensation from J&J Tree Service Co.  Additionally, Plaintiff refers Defendant to copies of documents bates-stamped P000317 to P000347, and P0003786 to P000393.

Plaintiff's investigation and discovery into this matter continues.

Dated: July 24, 2007

Respectfully Submitted,
JOSE ANDREU, Plaintiff,

By:_____

Timothy J. Coffey
THE COFFEY LAW OFFICE, P.C.
Attorneys for JOSE ANDREU
1403 E. Forest Avenue
Wheaton, IL  60187
(630) 534-6300

## **VERIFICATION**

I, Jose Andreu, verify that the answers set forth above in Plaintiff's Supplemental Answers and Objections to Defendant's First Set of Interrogatories are true and correct to the best of my knowledge and belief based on the information I have available to me to date.

Jose Andreu

Date:  July 24, 2007



## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that I served a true, accurate and complete copy of the foregoing Plaintiff's Supplemental Answers and Objections to Defendant's First Set of Interrogatories to the following attorneys of record for Defendant by hand delivery on the 25th day of July, 2007.

D. Scott Watson
Quarles & Brady LLP
500 West Madison
Suite 3700
Chicago, IL 60661

Timothy J. Coffey
THE COFFEY LAW OFFICE, P.C.
Attorneys for JOSE ANDREU
1403 E. Forest Avenue
Wheaton, IL 60187
(630) 534-6300

-7-

**Exhibit 15**

**Melissa Del Dotto Deposition Excerpts**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSE ANDREU,                          )
                                      )
                    Plaintiff,        )
                                      )
          vs.                         ) No. 07 C 0473
                                      )
UNITED PARCEL SERVICE, INC.,          )
                                      )
                    Defendant.        )

The deposition of MELISSA DEL DOTTO, called by

the Plaintiff for examination, taken pursuant to the

Federal Rules of Civil Procedure of the United States

District Courts pertaining to the taking of

depositions, taken before MARGARET R. BEDDARD, a

Notary Public within and for the County of Kane,

State of Illinois, and a Certified Shorthand Reporter

of said state, at Suite 850, 29 South LaSalle Street,

Chicago, Illinois, on the 31st day of July, A.D.

2007, at 10:53 a.m.

Page 2

1  PRESENT:
2  THE COFFEY LAW OFFICE, P.C.,
   (1403 East Forest Avenue,
3  Wheaton, Illinois 60187),
   BY: MR. TIMOTHY J. COFFEY,
4
      appeared on behalf of the Plaintiff;
5
   QUARLES & BRADY, LLP,
6  (500 West Madison Street, Suite 3700,
   Chicago, Illinois 60661),
7  BY: MR. D. SCOTT WATSON,
8     appeared on behalf of the Defendant.
9
10
11 REPORTED BY MARGARET R. BEDDARD, CSR.
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1               I N D E X
2  WITNESS                EXAMINATION
3  MELISSA DEL DOTTO
4    By Mr. Coffey          4, 76
5    By Mr. Watson          70
6
7
8
9
10            E X H I B I T S
11 NUMBER              MARKED FOR ID
12 Del Dotto Deposition Exhibit
13   No. 1              29
14   No. 2              29
15
16
17
18
19
20
21
22
23
24

Page 4

1        (WHEREUPON, the witness was duly
2     sworn.)
3         MELISSA DEL DOTTO,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6         EXAMINATION
7  BY MR. COFFEY:
8     Q.  Good morning, Ms. Del Dotto.  My name is
9  Tim Coffey.  I'm an attorney for Jose Andreu, a
10 former employee of UPS, in connection with a lawsuit
11 he has filed against UPS.
12        Have you ever given your deposition before?
13    A.  No.
14    Q.  I am going to ask you questions, and you
15 are under oath to give -- sworn under oath to give
16 honest answers.
17        Do you understand that?
18    A.  Yes.
19    Q.  Peggy here is going to take down all my
20 questions and all your answers and anything else that
21 is said in the room, so please do your best to keep
22 your answers audible.  Okay?
23    A.  Yes.
24    Q.  Also, it's important that -- If you can

Page 5

1  allow me to finish my question before you start
2  answering, that will help Peggy, and it will also
3  help you make sure you understand my question.  Okay?
4     A.  Okay.
5     Q.  And I will do my best to try not to start a
6  new question until you've finished your answer.  All
7  right?
8     A.  Yes.
9     Q.  If you need a break at any time, just let
10 us know.  Okay?
11    A.  Okay.
12    Q.  Have you ever given any sworn testimony
13 before?  You said no prior deposition, right?
14    A.  Correct.
15    Q.  What about trial?
16    A.  No.
17    Q.  Any court proceedings at all where you've
18 given sworn testimony?
19    A.  No.
20    Q.  Any sworn -- written sworn statements or
21 affidavits in connection with your work at UPS?
22    A.  No.
23    Q.  Any involvement at all in any prior other
24 lawsuits that have been filed against your employer

2 (Pages 2 to 5)

L.A. REPORTING, INC.   (800) 419-3376

Page 22

```
 1     Q.  Do you still have a copy of that?
 2     A.  Yes.
 3     Q.  Where at?
 4     A.  Home.
 5     Q.  Any other work accidents or injuries that
 6   you've had while working for UPS?
 7     A.  Back when I was a driver I cut my finger on
 8   a hand cart.
 9     Q.  And when were you a driver exactly?
10     A.  From '98 to December of '99.
11     Q.  And then thereafter you started as on-car
12   supervisor, Aurora Center?
13     A.  Yes.
14     Q.  So that was a promotion?
15     A.  Yes.
16     Q.  So from '98 to '99 were you a union member?
17     A.  Yes.
18     Q.  And then what other positions did you hold
19   at UPS prior to starting as a driver in '98?
20     A.  Do you want me to go back to when I
21   started?
22     Q.  Yes.
23     A.  '92 I was a part-time loader.
24     Q.  Okay.
```

Page 23

```
 1     A.  I'm not accurate with the dates, but I'm
 2   going to say '95 -- I was a part-time supervisor from
 3   '95 to '98.
 4     Q.  And then you became a driver?
 5     A.  Yes.
 6     Q.  Why did you become a driver from part-time
 7   supervisor?
 8     A.  It was a promotion, and I wanted to go full
 9   time.
10     Q.  Were you a union member as a part-time
11   loader?
12     A.  Yes.
13     Q.  Were you a union member as a part-time
14   supervisor?
15     A.  No.
16     Q.  So you're in the union, you're out of the
17   union, and you're back in the union?
18     A.  Yes.
19     Q.  Ever been accused of dishonesty at all in
20   connection with your employment at UPS?
21     A.  No.
22     Q.  And you understand when I say accused I'm
23   not saying that there's any truth to anything.  I'm
24   just wondering if anybody's ever made that claim?
```

Page 24

```
 1     A.  No.
 2     Q.  Have you ever been charged with any crime?
 3     A.  No.
 4     Q.  Has your driver's license ever been
 5   suspended?
 6     A.  No.
 7     Q.  Now, sometimes, it sounds like, when you
 8   were Aurora Center on-road supervisor, there were
 9   times when additional pickups had to be made during
10   the day that weren't particularly on anybody's
11   schedule.  Does that sound right?
12     A.  Yes.
13     Q.  How often did that happen?
14     A.  It could happen every day.  Customers call
15   in special pickups.
16     Q.  And was it your responsibility -- As the
17   on-road supervisor, did you have any responsibility
18   in assigning which drivers would go make those
19   pickups?
20     A.  Yes.
21     Q.  Why don't you tell me what your
22   responsibility involved in those types of decisions,
23   please.
24     A.  Well, if I was in the center at the time
```

Page 25

```
 1   and not being out on the street, we would dispatch a
 2   driver to a particular pickup.  And then we would
 3   follow up with the part-time sup or the OMS, which
 4   would dispatch a message to the driver to ask them to
 5   pick it up, and then they would respond back.
 6     Q.  Well, I guess my general question is, whose
 7   job is it to make the decision as to which -- as to
 8   which driver would make the additional pickup?
 9     A.  The supervisor's.
10     Q.  The on-road supervisor's?
11     A.  Or the part-time sup that's in there.
12     Q.  What if you're out on the street with a
13   driver doing a safety ride, shuttling packages, the
14   rare times that you're actually on a route, would you
15   get a call from -- or a message from --
16         You said OMS.  That's operations management
17   specialist?
18     A.  Uh-huh.  It's, like, the part-time
19   supervisor there.
20     Q.  Would you get a call from the office
21   alerting you to the need for a pickup?
22     A.  Sometimes.
23     Q.  And then you would select a driver?
24     A.  Yes.
```

L.A. REPORTING, INC.   (800) 419-3376

Page 34

1    Q.  Okay.  When did you have discussions or
2    communications with Mr. Andreu to help you complete
3    the information we see in Exhibit Nos. 1 and 2?
4    A.  On the 24th.
5    Q.  Okay.  Now, if I tell you that Mr. Andreu's
6    lawsuit -- this particular lawsuit concerns a claim
7    that he was illegally terminated from his employment,
8    is that news to you?
9    A.  No.
10   Q.  You've heard that before?
11   A.  I would think that's what he imagined would
12   happen.
13   Q.  Why is that?
14   A.  Because I have never even had a problem
15   with him as being a driver.
16   Q.  Okay.  Based on that, you're thinking the
17   lawsuit must be about a termination?
18   A.  Yes.
19   Q.  You were aware that he was terminated,
20   correct?
21   A.  Yes.
22   Q.  How did you first become aware that he was
23   terminated?
24   A.  My manager at the time told me.

Page 35

1    Q.  And who was that?
2    A.  Kerry Snyder.
3    Q.  And what did Mr. Snyder tell you concerning
4    Mr. Andreu being terminated?
5    A.  It was held in a morning meeting saying
6    that he got terminated.  It was for not working -- as
7    an integrity issue of lying.
8    Q.  This is what Mr. Snyder's telling you in a
9    morning meeting, correct?
10   A.  Uh-huh.  Yes.
11   Q.  And who was present at the meeting?
12   A.  Myself.  David Ziltz was there.  And that's
13   all I can recall.
14   Q.  Do you know when this morning meeting
15   occurred?
16   A.  7:00 in the morning.  7:00 a.m.  I do not
17   know the date.
18   Q.  Okay.  Was it before or after your work
19   that you performed on January 24 in connection with
20   Exhibit Nos. 1 and 2?
21   A.  After.
22   Q.  Do you know how far after?
23   A.  Probably a month, I think.  In February
24   sometime.

Page 36

1    Q.  Do you know what -- Specifically do you
2    have a recollection of Mr. Snyder saying anything at
3    this meeting?
4    A.  No.
5    Q.  What about Mr. Ziltz?
6    A.  No.
7    Q.  Anything else that you do recall about this
8    meeting in terms of what was said generally?
9    A.  No, I don't recall it at all.
10   Q.  Was Mr. Andreu's injury or claim -- work
11   injury accident brought up at this meeting?
12   A.  No.
13   Q.  Are you sure?
14   A.  Yes.
15   Q.  You can be sure about that?
16   MR. WATSON:  Objection.  Asked and answered.
17   You can answer.
18   THE WITNESS:  I'm sure.  Not that I recall.
19   BY MR. COFFEY:
20   Q.  Did Mr. Ziltz say anything about -- At this
21   meeting did Mr. Ziltz say anything about termination,
22   about the injury, about Mr. Andreu?
23   A.  No.
24   Q.  Do you remember anything coming out of his

Page 37

1    mouth at this meeting?
2    A.  No, not the meeting.
3    Q.  Do you remember saying -- yourself saying
4    anything at the meeting?
5    A.  No.
6    Q.  So that's your first information that
7    Mr. Andreu has been terminated, correct?
8    A.  Yes.
9    Q.  Have you -- Since that meeting, have you
10   had any other discussions with anybody, aside from
11   meeting with your counsel, concerning Mr. Andreu's
12   termination?  Anything about why he was terminated,
13   why he was bringing this lawsuit?  Anything?
14   A.  Just with Dave just in conversation.
15   Q.  Okay.  This is Dave Ziltz?
16   A.  Yes.
17   Q.  And in what conversations was Mr. Andreu
18   brought up with Dave Ziltz?
19   A.  Just that he felt that it wasn't truthful,
20   the injury.
21   Q.  And when was this conversation?
22   A.  I don't recall.
23   Q.  In context of this morning meeting that you
24   had where you're finding out he's terminated -- a

10  (Pages 34 to 37)

Page 38

1  notice of termination, was this comment by Dave Ziltz
2  before or after the meeting?
3      A.  I don't recall.
4      Q.  It could have been either?
5      A.  Yes.
6      Q.  In context of the January 24 accident that
7  Mr. Andreu claimed he had and then the work that you
8  do with Exhibits 1 and 2, I'm assuming this comment
9  was after that, correct?
10     A.  Yes.
11     Q.  Okay.  Where were you when this comment was
12 made?
13     A.  Just out in the center.
14     Q.  And you were with Mr. Ziltz?
15     A.  Uh-huh.
16     Q.  Was anybody else present?
17     A.  No.
18     Q.  What time of day was it?
19     A.  A.m.
20     Q.  Could you tell me, to the best of your
21 recollection, what was said and by whom in this
22 conversation with Mr. Ziltz?
23     A.  Just Dave said that he wasn't believing the
24 injury basically.

Page 39

1      Q.  Mr. Andreu's injury?
2      A.  Right.
3      Q.  How did Mr. Andreu come up in this
4  conversation?
5      A.  Because we had an issue with him about
6  packages that he called and said he needed help later
7  on with, and at the time he called he said he had
8  roughly 60 stops left.  And then Dave went out there,
9  and he only had 20.  He just felt he wasn't very --
10 Jose wasn't truthful with us -- being honest saying,
11 "Do you know what?  I don't need help with the
12 stops."
13     Q.  Okay.
14     A.  He was basically not telling the truth on
15 how many he had left at the time.
16     Q.  This is all what Dave Ziltz is telling you
17 in this one conversation?
18     A.  Well, this was -- Yeah.  Yeah.
19     Q.  And in this conversation he indicates he's
20 not believing Mr. Andreu with respect to the claimed
21 injury; is that true?
22     A.  Yes.
23     Q.  What were his words?
24     A.  He just said he didn't believe that he got

Page 40

1  injured.  At the time he was out on an unfamiliar
2  area and unfamiliar route.  And that's all I recall
3  on it.
4      Q.  And then Mr. Ziltz is telling you about
5  some claim by Jose about 60 packages and Mr. Ziltz
6  going and only 20, correct?
7      A.  Yes.
8      Q.  When did that occur in connection with this
9  conversation?  Had that just recently occurred?
10     A.  No.  It was a long time ago.  In February.
11 I'm not sure of the date or anything.
12     Q.  What is a long time ago in February?
13     A.  February '05.
14     Q.  What though occurred in February '05?
15     A.  Just about the incident with the packages.
16     Q.  Okay.  And then you're saying this
17 conversation with Mr. Ziltz is far after that -- a
18 long time after that or shortly after that?
19     A.  Shortly.  I don't really recall it.  I
20 don't recall it.
21     Q.  Okay.  And you don't know if this
22 conversation with Mr. Ziltz happened before or after
23 you go to the morning meeting and you're being told
24 Mr. Andreu was terminated, correct?

Page 41

1      A.  Right.
2      Q.  Anything else said in the conversation?
3      A.  No.
4      Q.  Okay.  Any other information about this
5  supposed integrity issue, as you put it, or
6  misrepresentation by Mr. Andreu?  Did you have any
7  other involvement/conversations about what he
8  supposedly said that was supposedly untrue?
9      A.  No.
10     Q.  Did you talk to Ms. Cheryl Bast ever about
11 her communications with Mr. Andreu on this day that
12 he supposedly misrepresented packages or stops?
13     A.  No.
14     Q.  Did you ever talk to Kerry Snyder about
15 this event where Mr. Andreu supposedly misrepresented
16 packages or stops?
17     A.  Not that I recall.
18     Q.  Did you ever see any documents that had
19 anything to do with this supposed misrepresentation?
20     A.  No.
21     Q.  Have you ever seen any documents that have
22 ever had anything to do with the supposed reasons why
23 Mr. Andreu was terminated?
24     A.  No.

Page 6

1  UPS?
2  A.  No.
3  Q.  UPS is still your employer; is that
4  correct?
5  A.  Yes.
6  Q.  Have you ever been accused of treating any
7  employee illegally as far as you know?
8  A.  No.
9  Q.  Ever been accused of discrimination against
10  any employee?
11  A.  No.
12  Q.  Harassment against any employee?
13  A.  No.
14  Q.  Retaliation against any employee?
15  A.  No.
16  Q.  Have you ever been involved in any other
17  lawsuits in connection with your work at UPS alleging
18  retaliation, harassment, or discrimination?
19  A.  No.
20  Q.  How long have you been working for UPS?
21  A.  15 years and a week.
22  Q.  So it sounds like you would have started
23  somewhere in '92?
24  A.  Yes.

Page 7

1  Q.  Okay.  Do you remember your start date?
2  A.  July 24.
3  Q.  Okay.  And what position do you hold
4  presently?
5  A.  On-car supervisor in the Oak Brook Center.
6  Q.  The Oak Brook Center, would I be correct in
7  saying that is physically located out of the Addison
8  facility?
9  A.  Yes.
10  Q.  And how long have you been on-car
11  supervisor out of the Oak Brook Center?
12  A.  A year and a week.
13  Q.  So in July -- Since July '06?
14  A.  Yes.
15  Q.  Continuously since July '06?
16  A.  Yes.
17  Q.  And what was your position prior to on-car
18  supervisor, Oak Brook Center?
19  A.  On-car supervisor, Addison Center.
20  Q.  And, again, the Addison Center, is that
21  located at the Addison facility?
22  A.  Yes.
23  Q.  Okay.  And when did you start in your
24  position as on-car supervisor, Addison Center?

Page 8

1  A.  January 2005.
2  Q.  And you worked that position up until your
3  transfer, for lack of a better word, move to
4  Oak Brook Center?
5  A.  Yes.
6  Q.  Why the move from Addison Center to
7  Oak Brook Center in July 2006?
8  A.  They just transfer you where needed.  It's
9  up to the management there.
10  Q.  So was that something that you requested?
11  A.  Yes.  I wanted a change.
12  Q.  Why did you want a change?
13  A.  I was in the Aurora Center for -- from 2000
14  to 2005, and I wanted to be -- change into a
15  different position in the building.
16  Q.  Okay.  Did you go from the Aurora Center to
17  the Addison Center?
18  A.  Yes.
19  Q.  And I think you just answered why that
20  change occurred, correct?
21  A.  Yes.
22  Q.  Okay.  And why did the change from the
23  Addison Center to the Oak Brook Center occur?  That
24  was the July '06.

Page 9

1  A.  The management moves supervisors around
2  roughly every July usually or when needed into a
3  different center.
4  Q.  Okay.  So you were on-car supervisor,
5  Addison Center, from January '05 until July of '06,
6  correct?
7  A.  No.  I messed that up.
8  Q.  Okay.
9  A.  It was from January '06.  I was there in
10  January '06.
11  Q.  Addison Center?
12  A.  Yes.  I correct that.  Seven months
13  roughly -- six, seven months.  And then they moved me
14  to Oak Brook in July.
15  Q.  Of '06?
16  A.  Correct.
17  Q.  And you've been in Oak Brook for a year?
18  A.  For a whole year, yes.
19  Q.  So prior to Addison Center then in January
20  of '06, what was your position?
21  A.  On-car supervisor in Aurora.
22  Q.  And when did you start that position?
23  A.  It was roughly January maybe 2nd or 3rd.
24  I'm not positive on the date.  But it was January of

Page 10

1  2000.
2      Q.  Okay.  So you worked as Aurora Center
3  on-car supervisor from roughly January 2006, it
4  sounds like, five full years?
5      A.  Yes.
6      Q.  Okay.  Well, it would be six full years,
7  correct?  Till January '06?
8      A.  Yes.
9      Q.  Okay.  So in -- For the full year of 2005
10  your position was on-car supervisor, Aurora Center,
11  correct?
12      A.  Correct.
13      Q.  In January/February '05 that's your
14  position, correct?
15      A.  Yes.
16      Q.  Did you hold any other positions in the
17  year 2005 for UPS?
18      A.  No.
19      Q.  When you were the Aurora Center on-car
20  supervisor in 2005, did you have a particular driver
21  line or other specified authority over specific
22  drivers?
23      A.  Yes.
24      Q.  Okay.  So back in the beginning of '05 --

Page 11

1  January of '05, how many drivers did you -- were in
2  your --
3          Is driver line a correct word?
4      A.  Or they do it by towns.  It's driver line.
5      Q.  When I say driver line, what I'm talking
6  about is how many drivers are within your supervisory
7  authority -- direct supervisory authority.  Does that
8  sound right?
9      A.  Yes.
10      Q.  So driver line is a good word for that?
11      A.  Yes.
12      Q.  Or do you have another word?
13      A.  No, that's fine.
14      Q.  In January/February 2005, how many drivers
15  were in your driver line?
16      A.  Roughly 20.
17      Q.  And were you familiar with Mr. Jose Andreu?
18      A.  Yes.
19      Q.  Was he ever in your driver line?
20      A.  Not that I recall.  He was not assigned to
21  me.  Not that I can recall.
22      Q.  So you're not absolutely sure?
23      A.  I'm not absolutely positive.
24      Q.  He may have been or he may not have been,

Page 12

1  correct?
2      A.  Correct.
3      Q.  Now, back in January/February '05, you
4  have roughly 20 employees.  Are these all drivers in
5  your driver line?
6      A.  Yes.
7      Q.  Are you supervising any other employees?
8      A.  Part-time sups are under us.  We roughly
9  watch over them.  But our main is the drivers.
10      Q.  How many part-time supervisors are under
11  you -- or were under you January/February '05?
12      A.  Three.
13      Q.  So why don't you tell me -- Describe to me
14  your duties as on-car supervisor in the Aurora Center
15  in the early part of 2005 -- January/February 2005.
16      A.  My duties are to dispatch the drivers in
17  the morning, do safety rides, driver release audits.
18      Q.  Okay.  Anything else?
19      A.  Just make sure everything's just --
20  Day-to-day in and out of the driver, you know, that's
21  followed properly.
22      Q.  Do you ever perform any written type of
23  reviews or evaluations on drivers in your driver
24  line?

Page 13

1      A.  Yes.
2      Q.  What types of reviews or evaluations?
3      A.  We do most safety rides.  We hand write
4  them out.  We run the car with the driver just making
5  sure they're working to UPS's proper methods.
6      Q.  Is that a particular form that you use for
7  that?
8      A.  Yes.
9      Q.  Do you know what it's called?
10      A.  It's called space and vis and habits back
11  then.
12      Q.  Space and vis --
13      A.  Visibility.
14      Q.  -- and habits?
15      A.  Uh-huh.
16      Q.  Okay.  And that's a standard form that was
17  used in the Aurora Center for these safety rides?
18      A.  Yes.
19      Q.  And documenting how the employee --
20      A.  Performs in working safely.
21      Q.  Did you ever take any safety rides or
22  evaluate Mr. Andreu with respect to safety rides?
23      A.  Not that I can recall.
24      Q.  Do you have any information that there were

## Page 42

1   Q.  Were you involved in any other meetings or
2   discussions about Mr. Andreu being put on notice of
3   termination or, in fact, being terminated?
4   A.  No.
5   Q.  Anything else from Mr. Ziltz where he made
6   any statements about Jose's -- Mr. Andreu's
7   January 24 work accident or injury?
8   A.  No.
9   Q.  What about Mr. Snyder?  Any statements from
10  Mr. Snyder about whether he believed or did not
11  believe that Jose was, in fact, injured on the 24th
12  of January?
13  A.  No.
14  Q.  Any comments at all by Mr. Snyder about the
15  injury or claimed injury?
16  A.  No.
17  Q.  Is there anything else that you -- any
18  other information that you have about why Mr. Andreu
19  may have been terminated?
20  A.  No.
21  Q.  Did you have any discussions with any of
22  your drivers or any drivers out of the Aurora Center
23  about Mr. Andreu's termination and the facts
24  surrounding it?

## Page 43

1   A.  No.
2   Q.  How often have you as on-road supervisor --
3   in your career as on-road supervisor ever gone out
4   and actually counted packages on a truck before?
5   A.  A couple times.
6   Q.  In your whole career a couple times?
7   A.  (Nodding head.)
8   Q.  When was the most recent -- I'm sorry.
9   Was that a yes?
10  A.  Yes.
11  Q.  When was the most recent?
12  A.  Last Christmas.
13  Q.  And what caused you to count -- go out to a
14  route and count packages?
15  A.  To see how many stops a driver had left.
16  Q.  Why did you want to see how many stops this
17  driver -- particularly this driver had left?
18  A.  To make a decision if he needed help or
19  not.
20  Q.  Did you ever go -- You said a couple times.
21  I mean, have you ever gone to count packages because
22  you didn't believe a driver that had represented a
23  certain number of packages?
24  A.  No.

## Page 44

1   Q.  What about Mr. Randy Dunn?  He was the
2   division manager, correct, of Addison?
3   A.  Yes.
4   Q.  Okay.  Have you ever had any conversations
5   with him about Mr. Andreu?
6   A.  No.
7   Q.  Ever heard him saying anything about
8   Mr. Andreu, his termination, his accident/injury?
9   Anything?
10  A.  No.
11  Q.  Have you ever heard that Mr. Dunn has
12  called -- or has called various employees/drivers and
13  other employees into his office who had been hurt on
14  the job or claimed to have been hurt on the job to
15  talk to them about their injury -- or their claimed
16  injury?
17  A.  Yes.
18  Q.  Had you ever heard from anybody, any
19  drivers -- I'm not talking about direct knowledge.
20  Any knowledge at all that Mr. Dunn had in
21  any respect intimidated any drivers or told any
22  drivers that this could cost them their job, the
23  injury?
24  A.  No.

## Page 45

1   Q.  Have you heard any complaints from any
2   drivers about Mr. Dunn?
3   A.  No.
4   Q.  What about Mr. Ziltz?  Have you heard about
5   any complaints against Mr. Ziltz by drivers?
6   A.  He's known to blow a gasket here and there.
7   Q.  And where is that information from?
8   A.  Just in general.
9   Q.  Has he ever blown a gasket with you?
10  A.  No.
11  Q.  Who do you believe he's blown gaskets with?
12  A.  He just gets mad.  I don't know who.
13  Q.  Have any drivers or other employees ever
14  come to you and said, "Mr. Ziltz has blown a gasket,"
15  or, "Mr. Ziltz is mad at me"?
16  A.  No.
17  Q.  Well, where do you get your information
18  from?
19  A.  I've just seen him get mad.
20  Q.  You've seen him.  How often?
21  A.  I don't know.
22  Q.  Would you characterize him as mad when he
23  was having this conversation with you about
24  Mr. Andreu that we talked about?

Page 70

1      MR. WATSON: I have a few questions. We're
2  going to take a couple minutes break. We'll be back
3  in.
4          (WHEREUPON, a recess was had.)
5          EXAMINATION
6  BY MR. WATSON:
7      Q.  Ms. Del Dotto, you were asked some
8  questions about Exhibits 1 and 2.
9          When an injury is called in to Liberty
10  Mutual, would Exhibit 1 or 2 be filled out at the
11  same time the injury is called in?
12      A.  No.
13      MR. COFFEY: Objection. Form of the question,
14  lack of foundation.
15  BY MR. WATSON:
16      Q.  You can answer my question.
17      A.  No.
18      Q.  And you know -- You've called injuries in
19  before to Liberty Mutual, correct?
20      A.  Yes.
21      Q.  And you've filled out documents like
22  Exhibit 1 and 2 before, correct?
23      A.  Yes.
24      Q.  So when you call -- When an injury is

Page 71

1  called in, this form, either Exhibit 1 or Exhibit 2,
2  is not filled out at that time?
3      A.  Correct.
4      Q.  Why not?
5      A.  It doesn't populate in the system till the
6  next day.
7      Q.  So it's not available?
8      A.  Correct.
9      Q.  So when an injury is called in -- Strike
10  that.
11          This form, you say it's available on line?
12      A.  Yes.
13      Q.  On the computer?
14      A.  Yes.
15      Q.  You don't fill it out in hard copy form?
16      A.  No.
17      Q.  So when a person goes in to actually fill
18  out a form for an injury, the form is already there
19  and it's already identified to a particular
20  individual, a particular incident?
21      A.  Yes.
22      Q.  How long from the time it's called in
23  until -- I think you used the term "populated." How
24  long until that happens?

Page 72

1      A.  It's roughly overnight. 24 hours.
2      Q.  Well, is it overnight, or is it 24 hours?
3      A.  Overnight.
4      Q.  So if you call in an injury, say, at
5  9:00 p.m. at night, from your understanding, the next
6  morning the form would be available to be filled out?
7      A.  Yes.
8      Q.  How quickly does an injury have to be
9  called in? For UPS employees injured on the job, how
10  quickly does that have to be called in?
11      A.  That day. The same day.
12      Q.  The same day?
13      A.  Yes.
14      Q.  Is that within 24 hours?
15      A.  Yes, it can be.
16      Q.  And within -- Strike that.
17          You were asked some questions about some
18  conversations with Dave Ziltz. Do you recall those
19  questions?
20      A.  No. Can you repeat them?
21      Q.  Well, you remember Mr. Coffey asking you
22  some questions?
23      A.  Yes.
24      Q.  He asked you some questions about some

Page 73

1  conversations --
2      A.  Conversations, yes.
3      Q.  Let me get my question out.
4      A.  I'm sorry.
5      Q.  Then you can answer. Okay?
6      A.  Okay.
7      Q.  Let me go again.
8          Mr. Coffey asked you some questions about
9  some conversations with Dave Ziltz, correct?
10      A.  Yes.
11      Q.  He asked you about conversations you had
12  with Mr. Ziltz regarding Mr. Andreu's injury.
13          Do you recall that?
14      A.  Yes.
15      Q.  I think he may have asked this, but I don't
16  recall.
17          Do you remember how many conversations you
18  had with Mr. Ziltz specifically about Mr. Andreu's
19  January 24 injury?
20      A.  Just one.
21      Q.  Do you remember about when that
22  conversation happened?
23      A.  A couple days after he got injured.
24      Q.  So close to January 24?

Page 74

1    A.  Yes.
2    Q.  And I believe you indicated when answering
3  Mr. Coffey's questions that Mr. Ziltz indicated he
4  had some doubt about that injury, correct?
5    A.  Correct.
6    Q.  I believe you also talked about a
7  conversation with Mr. Ziltz with regard to this
8  integrity issue.
9      Do you recall that?
10   A.  Yes.
11   Q.  Do you remember when that conversation
12  happened?
13   A.  Sometime in February.  The second or third
14  week.  I'm not exactly sure of the date.
15   Q.  February 2005?
16   A.  Correct.
17   Q.  Was that one conversation?  Two
18  conversations?  Three conversations?
19   A.  One.
20   Q.  And that's when he told you what happened
21  with regard to this integrity issue, correct?
22   A.  Correct.
23   Q.  Did Mr. Ziltz say anything in that
24  conversation, the one in February of 2005, about

Page 75

1  Mr. Andreu's injury?
2    A.  No.
3    Q.  As I recall, you indicated that you learned
4  that Mr. Andreu was terminated from Kerry Snyder,
5  correct?
6    A.  Yes.
7    Q.  And that was part of a meeting?
8    A.  Yes.
9    Q.  Was that -- Is there a regular meeting with
10  the supervisors and the center manager?
11   A.  Yes.
12   Q.  And when does that occur?
13   A.  Usually between 7:00 and 7:30 in the
14  morning, a.m.
15   Q.  Does that happen daily?
16   A.  Yes.
17   Q.  In those meetings, would Mr. Snyder
18  typically talk about things that would happen in the
19  center, including any disciplinary action that he
20  might have felt the supervisors needed to know about?
21   A.  Yes.
22   Q.  So you didn't just learn about Mr. Andreu?
23  You would have learned in different meetings about
24  what was happening with other employees, correct?

Page 76

1    A.  Correct.
2    MR. WATSON:  I don't have anything further.
3    MR. COFFEY:  A couple follow-up questions.
4        FURTHER EXAMINATION
5  BY MR. COFFEY:
6    Q.  Ms. Del Dotto, I clearly understood you --
7  and correct me if I'm wrong.  When we were talking
8  about your conversation with Dave Ziltz where you
9  indicated that Mr. Ziltz told you he's not believing
10  the injury -- he has doubts about the injury, you
11  clearly indicated that was in February and it was
12  also part of a conversation -- in the same
13  conversation at the same time where there was
14  discussion of 60 packages being reported and this
15  issue of integrity.
16      Is that not the case now?
17   A.  No.  I got confused.  It was shortly after
18  the injury occurred.  I don't have the exact date on
19  it.
20   Q.  So make that two separate conversations is
21  what you're saying now as opposed to what you were
22  saying in my direct, correct?
23   A.  Yes.
24   Q.  Okay.

Page 77

1    A.  Regarding the injury, it was just the one.
2    Q.  And that was shortly after the injury?
3    A.  Yes.
4    Q.  And you had a second conversation about the
5  60/20?  Is that what you're saying?
6    A.  Yes.
7    Q.  And you took a break, and you had time to
8  discuss -- to have a discussion with your attorney,
9  correct?
10   A.  Yes.
11   Q.  And now you're not confused, right?
12   A.  No.  I twisted it up.  I got confused in
13  the process of the question when you asked it.
14   Q.  Any other confusion?  I mean, anything that
15  you told me earlier about what was said?  He's not
16  believing the injury -- I mean, is any of that
17  twisted up?
18   A.  No.
19   Q.  Are you sure, ma'am?  Are you sure that
20  there was two separate conversations and not just one
21  like you told me the initial time?
22   A.  Yes, I am.  I got confused on your
23  question.
24   Q.  And you don't know when this injury

**Exhibit 16**

**UPS Objections and Answers to Plaintiff's First Set of Interrogatories**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| JOSE ANDREU,<br><br>               Plaintiff,<br><br>v.<br><br>UNITED PARCEL SERVICE, INC.,<br><br>               Defendant. | )<br>)<br>)<br>)   Case No. 07 C 0473<br>)<br>)   Judge Der-Yeghiayan<br>)<br>)<br>) |

### UNITED PARCEL SERVICE'S OBJECTIONS AND ANSWERS TO
### PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT

Defendant United Parcel Service ("UPS") submits its Objections and Answers to Plaintiff Jose Andreu's ("Plaintiff" or "Andreu") First Set of Interrogatories to Defendant and states as follows:

### GENERAL OBJECTIONS

1.    UPS objects to Plaintiff's First Set of Interrogatories to the extent they seek information subject to the attorney-client and/or work product privileges.

2.    UPS objects to Plaintiff's First Set of Interrogatories to the extent they are in violation of Federal Rule of Civil Procedure 33(a) regarding the number of Interrogatories, including subparts, allowed.

### ANSWERS TO INTERROGATORIES

1.    Identify (as defined above at Section II, Par. D.) the individual or individuals answering these Interrogatories on behalf of Defendant, and each individual who was consulted or who rendered any assistance in connection with the preparation of the answers.

**ANSWER:**    UPS objects to Interrogatory No. 1 as vague, ambiguous, overbroad and unduly burdensome. Notwithstanding these objections and without waiving same, UPS North

Illinois District Human Resources Managers Jimmy Millard and Marilyn Ritchie assisted counsel with the preparation of these responses.

2.    Identify (as defined above at Section II, Par. D.) each and every individual who may have information or knowledge relevant to the subject matter of this lawsuit, the allegations of Plaintiffs Complaint or Defendant's Answer or Affirmative Defenses thereto, or that may lead to the discovery of such information, and for each such person, provide a detailed description of such information including, but not limited to, the source of such information.

**ANSWER:**    UPS objects to Interrogatory No. 2 as vague, ambiguous, overbroad, unduly burdensome, not reasonably limited in time and/or scope, irrelevant and not reasonably calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding these objections and without waiving same, see UPS's Disclosures Pursuant to Rule 26(a)(1). In addition, Kerry Snyder, United Parcel Service, 1800 1st Avenue, Milan, IL 61264, has information concerning the basis of Plaintiff's termination and Glenn Hurst, United Parcel Service, 150 S. Lombard Road, Addison, IL 60101-3020, has information concerning the facts that led to Plaintiff being placed on notice of termination.

3.    Identify (as defined above at Section II, Par. D.) the person who made the decision to terminate Plaintiff, the date such decision was made, identify each person who participated or was consulted in reaching the decision, state each and every reason for the decision, and identify every document supportive of or related to the decision to terminate Plaintiff.

**ANSWER:**    UPS objects to Interrogatory No. 3 as vague, ambiguous, overbroad, unduly burdensome, not reasonably limited in time and/or scope, irrelevant and not reasonably calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding these objections and without waiving same, Plaintiff was terminated on March 4, 2005 by Kerry Snyder after consultation with North Illinois District Labor Relations Manager Tom Haefke. Plaintiff was terminated because, after being placed on notice of termination for dishonesty on or

about Fe~~bruary 10, 2005 by Center Manager Kerry Snyder. Plaintiff failed to timely file~~ a

grievance through his Union challenging the nature of his termination. Related documents have

previously been produced.

4.   State the name of each employee of Defendant who worked under the supervision of any
     of the individuals named in response to Interrogatory No. 3, above, who while under such
     individual's supervision filed a claim for workers' compensation with Defendant's
     workers' compensation insurance company and/or with the Illinois Workers'
     Compensation Commission, or its predecessor the Illinois Industrial Commission,
     identify each such individual's supervisor or supervisors who were named in response to
     Interrogatory No. 3, above, and state the date each such individual filed his or her
     workers' compensation claim(s).

     **ANSWER:**   UPS objects to Interrogatory No. 4 as vague, ambiguous, overbroad,

unduly burdensome, irrelevant, not reasonably limited in time and/or scope, and not reasonably

calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding

these objections and without waiving same, the following individuals who work in the ~~Aurora~~

~~Center~~ filed worker's compensation claims in 2005:

| Date | First Name | Last Name | Job |
|------|-----------|-----------|-----|
| 1/6/05 | Fred | Robertson | Package Driver |
| 1/24/05 | Jose | Andreu | Package Driver |
| 7/5/05 | Daniel | Zito | Sorter- AM |
| 9/6/05 | Grzegorz | Kopanczyk | Preloader |
| 10/6/05 | Leonard | Logan | Package Driver |
| 10/13/05 | Martha | Fernandez | Preloader |
| 10/14/05 | Lequawna | Lewis | Sorter - AM |
| 10/28/05 | Frank | Ruberto | Package Driver |

5.   State the name of each employee of Defendant who worked under the supervision of any
     of the individuals named in response to Interrogatory No. 3, above, who is presently no
     longer employed by Defendant, state the date each such former employee's employment
     with Defendant ended, state the reason or reasons why each such person's employment
     ended, and, for any persons whose employment was terminated by Defendant,



a.  identify (as defined above at Section H, Par. D.) the person who made the decision to terminate Plaintiff,

b.  state the date such decision was made,

c.  identify each person who participated or was consulted in reaching the decision, and

d.  identify every document supportive of or related to the termination decision.

**ANSWER:**    UPS objects to Interrogatory No. 5 as vague, ambiguous, overbroad, unduly burdensome, not reasonably limited in time and/or scope, irrelevant, and not reasonably calculated to lead to the discovery of relevant and/or admissible evidence. UPS refers Plaintiff to its response to Interrogatory No. 3 for information concerning Plaintiff. Notwithstanding these objections and without waiving same, the following individuals are former UPS employees from the Aurora Center who left or were terminated in 2004 or 2005.

| Name | Sep Date | Reason | Job |
|------|----------|--------|-----|
| Smith, Patrick | 11/3/04 | Security Violation | Sorter - AM |
| Schroeder, Timothy | 11/29/04 | No Reason Given | Preloader Supv |
| Johnson, Derek | 12/3/04 | Walked Off Job | Preloader |
| Cuartero, Gerald | 12/3/04 | Oriented But Never Returned for Work | Preloader |
| Greco, Robert | 12/3/04 | Oriented But Never Returned for Work | Preloader |
| Criscione, Michael | 12/5/04 | Accepted Another Job-Advancement | Preloader |
| Rainey, Cory | 12/13/04 | Oriented But Never Returned for Work | Preloader |
| House, Markell | 12/16/04 | Moving Out of Area | Preloader |
| Kim, Sandy | 12/27/04 | No Call/No Show | Preloader |
| Judd, Kevin | 12/27/04 | Violation of Company Policy | Package Driver |
| Jaimez, Juan | 2/8/05 | Personal Reason - Other | Preloader |
| Bazan, Amanda | 2/20/05 | Accepted Another Job | Pkg Ctr Assoc |
| Watts, Tramel | 2/25/05 | Violation of Company Policy | Preloader |
| Hilario, Fitzgerald | 2/27/05 | No Call/No Show | Preloader |
| Klein, Robert | 3/1/05 | No Call/No Show | Preloader |
| Payne, Travis | 3/2/05 | Discharged - Other | Sorter - AM |
| Bermes, Anthony | 3/20/05 | Violation of Company Policy | Package Driver |
| Foy, David | 3/21/05 | Accepted Another Job | Preloader |

| Name | Sep Date | Reason | Job |
|------|----------|--------|-----|
| Bell, Alphaeus | 3/29/05 | Excessive Absenteeism/Tardiness | Preloader |
| Bridges, Matthew | 4/10/05 | No Call/No Show | Preloader |
| Phillips, Beth | 4/21/05 | No Call/No Show | Preloader |
| Keefer, Terrill | 4/22/05 | Accepted Another Job | Preloader |
| Young, Edgar | 5/5/05 | Personal Reason - Other | Preloader |
| Castrejon, Guillermo | 5/31/05 | No Call/No Show | HVD/LVD Sorter |
| Hein, Terry | 5/31/05 | Retirement | Package Driver |
| Vasquez, Christian | 6/8/05 | No Call/No Show | Preloader |
| Antonsen, Michael | 6/16/05 | Accepted Another Job - Military | Preloader |
| Johnson, Joel | 6/17/05 | Accepted Another Job | Preloader |
| Bradley, Shane | 6/22/05 | No Call/No Show | Hub Supervisor |
| Caviani, Joe | 6/30/05 | Accepted Another Job | Preloader |
| Heneks, Jonathan | 7/28/05 | No Call/No Show | Preloader |
| Preissler, Carl | 7/28/05 | Personal Reason - Other | Package Driver |
| Lenczowski, Paul | 7/31/05 | Discharged - Other | Casual Pkg Dvr |
| Arizmendi Jr., Wilton | 7/31/05 | Discharged - Other | Preloader |
| Hicks, Timothy | 8/1/05 | Personal Reason - Other | Preloader |
| Chillemi, Abigail | 8/8/05 | Accepted Another Job | Preloader |
| Gluecklick, Jeffrey | 8/16/05 | Oriented But Never Reported for Work | Preloader |
| Haubner, Anthony | 8/18/05 | Accepted Another Job | Preloader |
| Tasso, Vincent | 8/23/05 | Oriented But Never Reported for Work | Preloader |
| Berke, Matthew | 9/15/05 | Accepted Another Job | Preloader |
| Patrickus, James | 9/22/05 | Accepted Another Job | Preloader |
| Hemphill, Steve | 10/3/05 | No Call/No Show | Preloader |
| Hisey, Tanya | 10/4/05 | Accepted Another Job | Preloader |
| Ratliff, Liam | 10/13/05 | Dissatisfied - Not Enough Hours | Preloader |
| Andreu, Jose | 10/20/05 | Violation of Company Policy | Package Driver |
| Wells Jr., Edward | 10/24/05 | Oriented But Never Reported for Work | Preloader |

6.    Identify (as defined above at Section II, Par. D.) each and every current or former employee of Defendant who worked under the supervision of any of the individuals named in response to Interrogatory No. 3, above, who while under such individual's supervision was disciplined in any manner, up to and including termination, for alleged

dishonesty, state whether each such person is a current for (sic) former employee, state the date or dates of the alleged violations, identify the person who made the disciplinary decision, describe the nature of the alleged infraction, and the level of discipline imposed by Defendant.

**ANSWER:**    UPS objects to Interrogatory No. 6 as vague, ambiguous, overbroad,

unduly burdensome, not reasonably limited in time and/or scope, irrelevant and not reasonably

calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding

these objections and without waiving same, see response to Interrogatory No. 5.

7    State the job title, beginning and end dates, and describe all positions held by the Plaintiff during his employment with Defendant, including the name of his supervisors in each such position(s).

**ANSWER:**    UPS objects to Interrogatory No. 7 as vague, ambiguous, overbroad,

unduly burdensome, not reasonably limited in time and/or scope, irrelevant and not reasonably

calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding

these objections and without waiving same, the following individuals supervised Plaintiff while

he worked in the Aurora Center:

Addison Package Division Manager - **Randy Dunn** 1/19/04 to 6/1/07
Aurora Package Center

**Russ Loverde** - Business Manager - 1/16/01-1/4/03
        Melissa DelDotto - Supervisor
**Waring Lester** - Business Manager - 3/11/03-1/12/04
        Melissa DelDotto - Supervisor - 1/20/00-2/7/06
        Glen Thrush - Supervisor - 8/16/02-1/26/05
        Steve Morency - Supervisor - 3/22/03-11/22/05
**Joe Ranieri** - Business Manager - 2/25/04-1/26/05
        Melissa DelDotto - Supervisor - 1/20/00-2/7/06
        Glen Thrush - Supervisor - 8/16/02-1/26/05
        Steve Morency - Supervisor - 3/22/03-11/22/05
**Kerry Snyder** - Business Manager - 1/26/05-10/2006
        Melissa DelDotto - Supervisor - 1/20/00-2/7/06
        Steve Morency - Supervisor - 3/22/03-11/22/05
        Dave Ziltz - Supervisor - 1/26/05 to present

8.    Describe the job duties and all Defendant's job requirements and expectations of and upon Plaintiff in the job title he held at the time Defendant terminated his employment.

**ANSWER:**    UPS objects to Interrogatory No. 8 as vague, ambiguous, overbroad and

unduly burdensome.  Notwithstanding these objections and without waiving same, see

documents Bates-stamped UPS 0042-UPS 0111, UPS 0133-UPS 0136 produced by UPS.

Answering further, as a UPS package car driver/service provider, Plaintiff's duties included the

delivery and pick-up of parcels.

9.    State the date(s) on which any disciplinary or warning action for job performance was ever taken against Plaintiff during the course of his employment with the Defendant, and
      a.    the reason for and the form of disciplinary or warning action,
      b.    identify each person who in any way participated in the decision to issue the disciplinary action, and
      c.    identify each and every document upon which Defendant bases its answer to this Interrogatory.

**ANSWER:**    UPS objects to Interrogatory No. 9 as vague, ambiguous, overbroad,

unduly burdensome, not reasonably limited in time and/or scope, irrelevant and not reasonably

calculated to lead to the discovery of relevant and/or admissible evidence.  Notwithstanding

these objections and without waiving same, Plaintiff was disciplined on February 10, 2005 and

March 4, 2005.  See responses to Interrogatory Nos. 3 and 13.

10.    If Defendant or anyone acting on Defendants behalf has obtained statement(s) in any form from any person, including the Plaintiff, regarding any of the allegations made in the Complaint or Defendant's Answer or Affirmative Defenses thereto, identify each person from whom such statements were taken, whether such statements were written or recorded, and, the substance of each statement.

**ANSWER:**    UPS objects to Interrogatory No. 10 as vague, ambiguous, overbroad and

unduly burdensome.  Notwithstanding these objections and without waiving same, see

documents Bates-stamped UPS 0001 - UPS 0002 produced by UPS.



11. State the case name and/or number, the location of the court or administrative body, and the outcome, disposition or current status, as appropriate, of all litigation, whether administrative or judicial, from January 1, 2000 to date, which accused Defendant of retaliatory discharge or any other form of retaliation in violation of the Illinois public policy or law, or any federal law.

**ANSWER:**   UPS objects to Interrogatory No. 11 as vague, ambiguous, overbroad,

unduly burdensome, not reasonably limited in time and/or scope, irrelevant and not reasonably

calculated to lead to the discovery of relevant and/or admissible evidence.

12. Identify each and every fringe benefit including, but not limited to, health, life and disability insurance, pension plan, profit sharing, bonus plan, savings plan and stock option plan which Plaintiff was receiving at the time of his termination.

**ANSWER:**   UPS objects to Interrogatory No. 12 as vague, ambiguous, overbroad,

unduly burdensome, not reasonably limited in time and/or scope, irrelevant and not reasonably

calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding

these objections and without waiving same, see documents Bates-stamped UPS 0042 - UPS

0211, UPS 0441 - UPS 0544.

13. State each and every fact supportive of Defendant's contention in its Answer to Par. 23 of the Complaint that "Plaintiff did not timely submit a grievance pursuant to the applicable collective bargaining agreement challenging his termination (sic), and identify every document supportive of or related to such contention.

**ANSWER:**   UPS objects to Interrogatory No. 13 as vague, ambiguous, overbroad,

unduly burdensome, not reasonably limited in time and/or scope, irrelevant and not reasonably

calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding

these objections and without waiving same, Plaintiff was put on notice of termination on or

about February 9, 2005. The relevant collective bargaining agreement requires that grievances to

protest disciplinary actions must be filed within fifteen days. Plaintiff did not timely grieve

being put on notice of termination and was subsequently taken out of service on March 4, 2005.

See documents produced by UPS.

14.    In Cheryl Bast's memo to Dave Ziltz dated February 9, 2005, regarding Plaintiff (bates stamped UPS 0001), Ms. Bast refers to "a pick up at Bernina." Please state the full business or individual name and address for "Bernina."

    **ANSWER:**    UPS objects to Interrogatory No. 14 as vague, ambiguous, overbroad,

unduly burdensome, not reasonably limited in time and/or scope, irrelevant and not reasonably

calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding

these objections and without waiving same, Bernina of America, Inc., 3702 Prairie Lake Court,

Aurora, IL 60504.

15.    In Cheryl Bast's memo to Dave Ziltz dated February 9, 2005, regarding Plaintiff (bates stamped UPS 0001), Ms. Bast refers to two separate calls, one allegedly at 16:00 from Plaintiff, and the other at allegedly 16:42 from Dave Ziltz. Identify the nature of the communications system through which she received such calls, the make, model, and the name of its manufacturer, identify all persons responsible for the maintenance of such system from February 2005 to date, and state whether the same system is utilized at present by Defendant in its Addison, Illinois facility.

    **ANSWER:**    UPS objects to Interrogatory No. 15 as vague, ambiguous, overbroad,

unduly burdensome, not reasonably limited in time and/or scope, irrelevant and not reasonably

calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding

these objections and without waiving same, Ms. Best was referring to telephone calls and UPS

continues to utilize a telephone system as its Addison facility. The phone system in the Addison

hub is a Siemens 9751-80 with 9006-2-036 software. CMS is the maintenance vendor. UPS

performs some minor maintenance on the system. The local service provider is AT&T.

16.    In connection with the two calls referenced by Ms. Bast in her February 9, 2005 memo, state whether either call was taped or recorded by any means, or whether the call received times of either call was recorded or saved by any means in any medium. If so, describe the recordation means and/or medium, identify any and all systems involved in the

recordation, and state the whereabouts presently of any such recordation, or, in the alternative, if the content and/or times of the calls referenced by Ms. Bast were recorded but are no longer in existence or accessible, please state and every reason why, the date such recordation ceased to be accessible, and identify the person or persons responsible for the expiration of such recordation.

**ANSWER:**    UPS objects to Interrogatory No. 16 as vague, ambiguous, overbroad,

unduly burdensome, not reasonably limited in time and/or scope, irrelevant and not reasonably

calculated to lead to the discovery of relevant and/or admissible evidence.  Notwithstanding

these objections and without waiving same, ~~neither call was taped or recorded~~.  See also UPS

0546-UPS 0553.

DATED:    June 19, 2007                                    UNITED PARCEL SERVICE, INC.

                                                           By:_____
                                                                   One of Its Attorneys

John A. Klages (ARDC #06196781)
D. Scott Watson (ARDC # 06230488)
Ellen M. Girard (ARDC #06276507)
Quarles & Brady LLP
500 West Madison, Suite 3700
Chicago, IL 60661
312/715-5000
312/715-5155 (fax)

## VERIFICATION

I, Marilyn Ritchie, Employee Relations Manager for United Parcel Service, being duly

sworn, do hereby on oath depose and say that the answers set forth in the foregoing United

Parcel Service's Objections and Answers to Plaintiff's First Set of Interrogatories to Defendant

are true and correct to the best of my knowledge and belief.

_Marilyn Ritchie_
Marilyn Ritchie

SUBSCRIBED AND SWORN
to before me this /9ᵗʰ day
of June, 2007.

_Drema J. Weidner_
Notary Public
Drema J Weidner
Notary Public State
Commission Expir



## CERTIFICATE OF SERVICE

The undersigned attorney certifies that a true and accurate copy of the foregoing United Parcel Service's Objections and Answers to Plaintiff's First Set of Interrogatories to Defendant was served upon:

> Timothy J. Coffey
> The Coffey Law Office, P.C.
> 1403 East Forest Avenue
> Wheaton, Illinois 60187
> Email: tcofflaw@sbcglobal.net

by depositing same in the U.S. mail at 500 W. Madison Street, Chicago, Illinois 60661, at or

about 5:00 p.m., this 19th day of June, 2007.

**Exhibit 17**

**UPS Supplemental Interrogatory Answers**



500 West Madison Street
Suite 3700
Chicago, Illinois 60661-2511
312.715.5000
Fax 312.715.5155
www.quarles.com

Attorneys at Law in
Milwaukee and Madison, Wisconsin
Naples, Florida
Phoenix and Tucson, Arizona
Chicago, Illinois

D. Scott Watson
Writer's Direct Dial: 312.715.5149
E-Mail: dsw@quarles.com

July 19, 2007

**Via E-Mail and UPS Next Day Air**

Timothy Coffey
The Coffey Law Office, P.C.
1403 E. Forest Avenue
Wheaton, IL  60187

Re:   Jose Andreu v. United Parcel Service
Case No. 07 C 473

Dear Tim:

This letter is in response to your letter of July 28, 2007, requesting that UPS supplement its responses to Mr. Andreu's First Set of Interrogatories and First and Second Set of Document Requests.

UPS adopts all objections including the general objections set forth in its original responses to Plaintiff's First Set of Interrogatories, First Request to Produce Documents and Other Tangible Things, and Second Request to Produce Documents and Other Tangible Things as if fully set forth herein.

**First Set of Interrogatories**

Interrogatory No. 4 - UPS objects to interrogatory No. 4 as vague, ambiguous, overbroad, unduly burdensome, irrelevant, not reasonably limited in time and/or scope, and not reasonably calculated to lead to the discovery of relevant and/or admissible evidence.  Notwithstanding these objections and without waving same, the following additional individuals filed worker's compensation claims while under the supervision of Kerry Snyder:



| Date | First Name | Last Name | Job |
|------|-----------|-----------|-----|
| 2/3/94 | David | Hassler | Package Driver |
| 5/9/94 | George | Wood | Package Driver |
| 8/3/04 | Brian | Stull | Package Driver |
| 11/1/94 | Richard | Sobotta | Package Driver |
| 12/5/94 | Timothy | Bulak | Driver Transfer |
| 12/19/94 | Jerome | Waldron | Package Driver |
| 1/19/95 | Kenneth | Quick | Package Driver |
| 7/28/95 | Jim | Bezely | Package Driver |
| 3/7/96 | Allen | Jaross | Package Driver |
| 7/12/96 | George | Wood | Package Driver |
| 8/2/96 | George | Wood | Package Driver |
| 9/7/96 | Theresa | Urnikis | Package Driver |
| 10/31/96 | Allen | Jaross | Package Driver |
| 12/20/96 | Ronald | Marroquin | Package Driver |
| 12/23/96 | Jerome | Waldron | Package Driver |
| 1/14/97 | Randall | Turinetti | Package Driver |
| 2/21/97 | Bruce | Von Holten | Package Driver |
| 4/32/97 | Gerald | Ellerbrock | Package Driver |
| 4/25/97 | Joseph | Lance | Package Driver |
| 5/14/97 | Michael | Harlow | Package Driver |
| 9/12/97 | Noel | Zeman | Package Driver |
| 10/28/97 | Theresa | Urnikis | Package Driver |



| Date | First Name | Last Name | Job |
|------|-----------|-----------|-----|
| 2/13/98 | Michael | Harlow | Package Driver |
| 5/5/98 | Theresa | Urnikis | Package Driver |
| 8/7/98 | Noel | Zeman | Package Driver |
| 10/13/98 | Joseph | Lance | Feeder Driver |
| 10/13/98 | Kenneth | Quick | Package Driver |
| 12/14/98 | David | Weiden | Package Driver |
| 11/29/99 | Randall | Turinetti | Package Driver |
| 1/13/00 | Scott | Carruthers | Package Driver |
| 3/15/00 | Kenneth | Quick | Package Driver |
| 10/13/00 | Anthony | Torres | Package Driver |
| 5/2/01 | Ina | Maze | |
| 5/9/01 | Raul | Requena, Jr. | |
| 5/9/01 | Michael | Molloy | Package Driver |
| 5/31/01 | Michael | Molloy | Package Driver |
| 7/16/01 | Nancy | Kautz | Package Driver |
| 7/17/01 | Leo | Jordan | Package Driver |
| 7/26/01 | Michele | Smith | Package Driver |
| 8/6/01 | Thomas | Gill | Package Driver |
| 9/17/01 | Charles | Grimm | Package Driver |
| 9/18/01 | Michael | Rock | Package Driver |
| 11/26/01 | Henry | Jones | Package Driver |
| 12/4/01 | Joanne | Salazar | Package Driver |



| Date | First Name | Last Name | Job |
|------|-----------|-----------|-----|
| 12/20/01 | Brian | Ball | Package Driver |
| 12/26/01 | Jeffrey | Brauer | Package Driver |
| 1/17/02 | Ronald | Offerman | Package Driver |
| 3/4/02 | Kerry | Hartman | Package Driver |
| 3/12/02 | Leo | Jordan | Package Driver |
| 4/5/02 | Andre | McElrath | Package Driver |
| 6/15/04 | Damon | Pratt | Package Driver |
| 11/10/04 | Marty | Urban | Feeder Driver |
| 8/16/04 | Shirley | Withrow | |
| 10/29/04 | Joseph | Wazny | Package Driver |
| 1/13/05 | Michael | Hutmacher | Package Driver |
| 1/20/05 | Kenneth | Lapp | Package Driver |
| 5/13/05 | Terry | Thompson | Package Driver |
| 5/17/05 | Robert | Lake | Package Driver |
| 8/5/05 | Josh | Naleway | |
| 1/19/06 | Salomon | Adam | Package Driver |
| 1/31/06 | Anna | Brickley | Package Driver |
| 3/20/06 | Gary | Coveny | Package Driver |
| 8/24/06 | John | Lickteig | Package Driver |
| 4/24/07 | Craig | Luebbe | Package Driver |

Interrogatory 5 - UPS objects to Interrogatory No. 5 as vague, ambiguous, overbroad, unduly burdensome, not reasonably limited in time and/or scope, irrelevant, and not reasonably calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding these objections and without waiving same, the following additional individuals left or were terminated by UPS while under Kerry Snyder's supervision:

| Sep. Date | Name | Reason | Job |
| --- | --- | --- | --- |
| 8/14/98 | Xavier Jimenez | To attend school | Air Driver |
| 10/2/98 | Janet Sadewater | Accepted another job | |
| 8/10/99 | Melvin Singel | Mutual agreement | Package Driver |
| 10/31/99 | Donald Nelson | Retirement | Package Driver |
| 2/13/00 | Jonathan Burgett | To attend school | Air Handler |
| 1/4/01 | Troy Lawson | Refused to perform job | Package Driver |
| 1/18/01 | Kam Nelson | Accepted another job | |
| 7/20/01 | Matthew Borden | Accepted another job | |
| 9/16/01 | Michael Bellone | Retirement | Package Driver |
| 9/30/01 | David Finkbeiner | Retirement | Package Driver |
| 11/25/01 | Phil Luna | Moving out of area | |
| 12/2/01 | Thomas Ludgatis | Violation of company policy | Package Driver |
| 1/13/02 | Arnis Pocs | Accepted another job | Package Driver |
| 2/3/02 | Kelley Hudson | Violation of company policy | Package Driver |
| 7/28/04 | Thomas Bright | Retirement | Package Driver |
| 8/13/04 | Dominik Sit | Personal reasons | Package Driver |

| 8/22/04 | Christopher Wayman | Mutual agreement | Package Driver |
|---------|--------------------|--------------------|----------------|
| 8/25/04 | Joel Reeves | Mutual agreement | Package Driver |
| 9/26/04 | Shawn Haager | Personal reasons | Package Driver |
| 3/20/05 | Anthony Bermes | Violation of company policy/ Failure to report accident | Package Driver |
| 5/32/05 | Terry Hein | Retirement | Package Driver |
| 7/28/05 | Carl Preissler | Personal reasons | Package Driver |
| 7/31/05 | Paul Lenczowski | Discharged | Casual Pkg Driver |
| 11/16/05 | Michael Balliu | Medical leave (not job related) | Package Driver |
| 11/29/05 | Dennis Richardson | Accepted job/ Failed to report | Package Driver |
| 2/28/06 | Wm.Schuppenhauer | Retirement | Package Driver |
| 3/6/06 | Joseph Harbacek | Transportation problem | |
| 6/5/06 | Peter Gaul | Resigned | Package Driver |
| 8/20/06 | Darren Spacal | Dissatisfied with job | Package Driver |
| 9/7/06 | Charles Barnes | Voluntary quit | Package Driver |
| 9/7/06 | Brent Edwards | Dissatisfied with job | Package Driver |

Interrogatory 6 - UPS objects to Interrogatory No. 6 as vague, ambiguous, overbroad, unduly burdensome, not reasonably limited in time and/or scope, irrelevant and not reasonably calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding these objections and without waiving same, Randy Parker, Brian Maxfield, Al Petkov, Anthony Bermes and Courtney Stevens all received

disciplinary action for dishonesty or dishonesty-related matters while under Snyder's supervision.

Interrogatory No. 7 - UPS objects to Interrogatory No. 7 as vague, ambiguous, overbroad, unduly burdensome, not reasonably limited in time and/or scope, irrelevant, is information that is or should be within the Plaintiff's knowledge, and not reasonably calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding these objections and without waving same, Andreu's positions with UPS were as follows:

9/18/96 - 5/21/99 - part-time sorter

5/21/99 - 6/23/03 - air driver

6/23/03 - 3/4/05 - package car driver (Andreu worked as a summer help package car driver in the summer of 2003, returned to working as an air driver in the fall of 2003 and became a package car driver in January, 2004).

The following management personnel were assigned to the Aurora Center for the time periods indicated:

Russ Loverde - Aurora Center Business Manager - 1/16/01 - 1/4/03

Waring Lester - Aurora Center Business Manager - 3/11/03 - 1/12/04

Joe Ranieri - Aurora Center Business Manager - 2/25/04 - 1/26/05

Kerry Snyder - Aurora Center Business Manager - 1/05 - 10/2006

Melissa DelDotto - Aurora Center Supervisor - 1/20/00 - 2/7/06

Glen Thrush - Aurora Center Supervisor - 8/16/02 - 1/26/05

Steve Morency - Aurora Center Supervisor - 3/22/03 - 11/22/05

Dave Ziltz - Aurora Center Supervisor - 1/05 - present

Search continues for information prior to 2001.

Interrogatory No. 11 - UPS objects to Interrogatory No. 11 as vague, ambiguous, overbroad, unduly burdensome, not reasonably limited in time and/or scope, irrelevant and not reasonably calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding these objections and without waiving same, with the possible exception of Mr. Andreu's current claim, neither Kerry Snyder, Dave Ziltz nor Tom Haefke have been accused in any forum of retaliating against a UPS employee for filing a worker's compensation claim.

## First Request to Produce Documents

Request No. 18 - UPS objects to Request No. 18 as vague, overbroad, unduly burdensome, irrelevant, premature, not reasonably limited in time and/or scope, and not reasonably calculated to lead to the discovery of relevant and/or admissible evidence. UPS believes such a request is premature but states it will comply with this request in the event there is a finding of liability.

## Second Request to Produce Documents

Request Nos. 1-4 - UPS objects to Requests Nos. 1 - 4 as vague, overbroad, unduly burdensome, irrelevant, not reasonably limited in time and/or scope, and not reasonably calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding these objections and without waving same, see documents Bates-labeled UPS 0942 - UPS 1169.

Please contact me if you have any questions.

Very truly yours,

D. Scott Watson

Enclosures

cc:    Jimmy Millard (w/encl)



## VERIFICATION

I, Marilyn Ritchie, Employee Relations Manager for United Parcel Service, being

duly sworn, do hereby on oath depose and say that the answers set forth in the foregoing

United Parcel Service's July 19, 2007 Supplemental Responses to Plaintiff's First Set of

Interrogatories are true and correct to the best of my knowledge and belief.

*Marilyn Ritchie*
Marilyn Ritchie

SUBSCRIBED AND SWORN
to before me this 31st day
of July, 2007.

*Drema J. Widener*
Notary Public

Official Seal
Drema J Widener
Notary Public, State of Illinois
My Commission Expires 07/27/2010

**Exhibit 18**

**Randall Dunn Deposition Excerpts**

**Deposition Exhibit 7, Stevens' Grievance**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSE ANDREU,                    )
                               )
          Plaintiff,            )
                               )
     vs.                        )     No. 07 C 0473
                               )
UNITED PARCEL SERVICE,          )
                               )
          Defendant.            )

The deposition of RANDALL DUNN, taken in

the above-entitled cause before Laura Bernar, a

notary public within and for the County of Cook and

State of Illinois, taken pursuant to the Federal

Rules of Civil Procedure for the United States

District Courts, at 29 South LaSalle Street,

Chicago, Illinois, on the 25th day of July, A.D.,

2007, scheduled to commence at 10:00 o'clock a.m.

APPEARANCES:
THE COFFEY LAW OFFICE
BY: MR. TIMOTHY COFFEY
1403 East Forest Avenue
Wheaton, Illinois 60187
(630)462-3901
    Appeared on behalf of the Plaintiff;

QUARLES & BRADY
500 West Madison Street
Suite 3700
Chicago, Illinois 60661
(312)715-5000
BY: MR. SCOTT WATSON
    Appeared on behalf of the Defendant;

Page 2

## INDEX

| Examinations | Page |
|---|---|
| Examination | 4 |
| By Mr. Coffey | |
| Cross-Examination | 162 |
| By Mr. Watson | |
| Redirect Examination | 164 |
| By Mr. Coffey | |
| Recross-Examination | 167 |
| By Mr. Watson | |
| Redirect Examination | 167 |
| By Mr. Coffey | |

## EXHIBITS

| No. | Page |
|---|---|
| Exhibit No. 1 | 88 |
| Exhibit No. 2 | 89 |
| Exhibit No. 3 | 111 |
| Exhibit No. 4 | 118 |
| Exhibit No. 5 | 140 |
| Exhibit No. 6 | 156 |
| Exhibit No. 7 | 158 |

Page 3

(Witness sworn.)

RANDALL DUNN,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

Examination

By Mr. Coffey

Q.   Mr. Dunn, could you state and spell your full name for the record, please.

A.   Randy Dunn, R-A-N-D-Y, D-U-N-N.

Q.   I've seen William Dunn here and there.

A.   William Randall.

Q.   William Randall?

A.   Right.

Q.   Spell Randall, please.

A.   R-A-N-D-A-L-L.

Q.   And, Mr. Dunn, my name is Tim Coffey, and I'm an attorney for Mr. Jose Andreu in a lawsuit that he has brought against your current employer United Parcel Service. Are you aware of that?

A.   Yes.

Q.   Are you aware that he filed a lawsuit?

A.   Yes.

Q.   And you're aware that that's the reason you're here today to give a deposition?

Page 4

A.   Yes.

Q.   Okay. If you don't understand any of my questions, please let me know and I will restate them.

A.   I understand.

Q.   If you do not do that, the record will simply reflect my question followed directly by your answer with no hesitation or indication that you had a concern or question about the question, okay?

A.   Okay.

Q.   If you need to take a break at any point in time, you let me know and we'll take a break. Do you understand?

A.   Yes.

Q.   The only caveat to that is there is going to be no breaks while a question is pending, all right?

A.   (Nodding head.)

Q.   Do you understand?

A.   Yes.

Q.   Okay. And Laura here is going to be kind enough to take down all my questions and all your answers, so please do your best to keep your answers verbal. In other words, an audible yes or

Page 5

2 (Pages 2 to 5)

1 engineering function, or they bring us hard copies,
2 but mostly everything is web based.
3    Q.    So you get an e-mail on a daily basis
4 with reports or --
5    A.    Some, and some I go to a central web
6 site, a repository of information, and I'll pull up
7 things myself.
8    Q.    I'm assuming this was one of your
9 duties as the Addison division manager to keep tabs
10 of these reports on a daily basis?
11    A.    Yes.
12    Q.    And all these numbers?
13    A.    Yes.
14    Q.    Was one of the numbers workers comp
15 cost?
16    A.    Yes. That was not a daily element
17 that we tracked, but weekly we would get worker's
18 comp related reports.
19    Q.    Describe those reports for me.
20    A.    Excel spreadsheet, list of names,
21 medical-related costs, length of time the employee
22 would have been on worker's comp, general
23 information about the employee in the case.
24    Q.    And how would you receive those
                                              Page 26

1 reports?
2    A.    E-mail.
3    Q.    And you say every week?
4    A.    Yes.
5    Q.    And would these reports have a
6 comprehensive listing of all employees receiving
7 worker's comp benefits at the time?
8    A.    Yes.
9    Q.    Would it just be the new cases that
10 were filed or claims filed?
11    A.    Anyone on a worker's comp claim would
12 be on that listing.
13    Q.    And I'm assuming there would be the
14 date of the initial report of injury?
15    A.    Yes.
16    Q.    And all the costs that you've
17 mentioned?
18    A.    Yes, or the monthly charges; not the
19 total cost, but the monthly charges.
20    Q.    So on a week-to-week basis, you're
21 aware of the employees under your managerial
22 authority that are -- have filed claims for
23 benefits?
24    A.    Yes.
                                              Page 27

1    Q.    And you know their names by report,
2 correct?
3    A.    By the report. I could reference the
4 report and see the names. It's sometimes quite
5 lengthy. It's there for reference and review.
6    Q.    Was this ever one of the numbers, the
7 worker's comp cost and workers comp reports that you
8 and Mr. Shain would discuss when you were Addison
9 division manager?
10    A.    No.
11    Q.    Never discussed them?
12    A.    I can't say never, sir, but I can say
13 that it was not an element that he reviewed. I
14 reviewed it with the HR manager and sometimes the
15 finance manager at the time.
16    Q.    Did you ever review these numbers
17 reports with your center managers?
18    A.    Yes.
19    Q.    Mr. Snyder was one of them?
20    A.    I would.
21    Q.    And how often would you sit with
22 Mr. Snyder or -- Strike the sit. Doesn't happen
23 much anymore.
24         How often would you and Mr. Snyder
                                              Page 28

1 review worker's comp costs and numbers in connection
2 with his center which was the Aurora center?
3    A.    At least monthly.
4    Q.    Did you and Mr. Snyder have a standard
5 meeting schedule?
6    A.    No.
7    Q.    How did that work then?
8    A.    The report would come out, and when we
9 would meet, sometimes as a group we would review
10 those numbers. If one particular operating center
11 was higher than others, I would review the numbers,
12 the listing with that individual manager.
13    Q.    Well, what is it that you could -- So
14 Kerry Snyder, did -- When you were his boss, this
15 was one of the numbers that he was responsible for
16 within his center, correct?
17    A.    Yes.
18    Q.    Worker's comp cost?
19    A.    Directly responsible, yes.
20    Q.    And that was one of the factors in
21 terms of his getting the pay raise and him getting a
22 performance rating? That was one of -- not many,
23 but that was one of the factors that would affect
24 his performance and/or pay raise depending on the
                                              Page 29

8 (Pages 26 to 29)

1  20 stops left and he could have made the pick-ups,
2  and Mr. Snyder took action based on that.
3  　　Q.　Did Mr. Snyder give you these numbers
4  at the time he was telling you that he's putting
5  Jose, Mr. Andreu, on notice of termination?
6  　　A.　I don't remember specifically, but I'm
7  sure that he probably did tell me the detail. If
8  not I would have asked, well, what were the details
9  behind his claim versus what we found.
10 　　Q.　You say you would have. Did you?
11 　　A.　I don't recall.
12 　　Q.　So you don't know?
13 　　A.　It's two and a half years ago. I
14 don't remember.
15 　　Q.　So you don't --
16 　　A.　I don't.
17 　　Q.　Where are you getting the 60, 20,
18 these numbers, if you don't recall the conversation?
19 　　A.　When I found out I was going to be
20 deposed, I asked our labor manager about the
21 termination, because honestly I didn't even remember
22 the termination. And I also talked to Kerry Snyder.
23 　　Q.　So this was all within the last couple
24 weeks?

Page 54

1  　　A.　Yes.
2  　　Q.　And what were your conversations with
3  Mr. Snyder in the last couple weeks about
4  Mr. Andreu?
5  　　A.　The situation or circumstances
6  surrounding his termination.
7  　　Q.　Where were these conversations?
8  　　A.　Over the phone.
9  　　Q.　How many?
10 　　A.　Two.
11 　　Q.　Both over the phone?
12 　　A.　Yes.
13 　　Q.　Anybody else present on the phone?
14 　　A.　No.
15 　　Q.　When was the first conversation?
16 　　A.　I don't remember. Soon after I found
17 out I was being deposed, whatever date that was. I
18 don't really know. It's been within the past two
19 weeks.
20 　　Q.　Did you call him?
21 　　A.　Yes.
22 　　Q.　What was said and by whom in this
23 first conversation?
24 　　A.　He reminded me or told me about the

Page 55

1  situation with Mr. Andreu claiming he had a certain
2  amount of work and we found there was another amount
3  of work on the car, and he was going to be placed on
4  notice of discharge, and he let the time period
5  expire that he had to file a grievance to refute the
6  notice of discharge.
7  　　Q.　This was what Mr. Snyder is telling
8  you?
9  　　A.　Yes.
10 　　Q.　Did you have any questions for him in
11 this first conversation?
12 　　A.　Casual conversation about it. I don't
13 remember specifically questions I asked him or -- I
14 asked him why did we terminate. And he told me and
15 he reminded me of the conditions.
16 　　Q.　Did you look at any documents in the
17 last couple weeks --
18 　　A.　No, none other than Mr. Watson showed
19 me.
20 　　Q.　Do you remember what documents he
21 showed you?
22 　　A.　No.
23 　　Q.　How many documents were there?
24 　　A.　One.

Page 56

1  　　Q.　Was it the March 24, 2005 memo that
2  Mr. Snyder wrote to you?
3  　　A.　Yes.
4  　　Q.　So you just reviewed that in the last
5  couple weeks?
6  　　A.　Yes.
7  　　Q.　Before the last couple weeks, when was
8  the last time that you saw that?
9  　　A.　I don't recall ever seeing it.
10 　　Q.　Okay. Even around the time it was
11 purportedly written, March 24, 2005?
12 　　A.　I don't recall.
13 　　Q.　You don't know if you got it. You
14 don't know if you don't?
15 　　A.　I do not.
16 　　Q.　Okay. But you saw it in the last
17 couple of weeks?
18 　　A.　Yes.
19 　　Q.　As far as you know, it was the first
20 time you saw it?
21 　　A.　Yes.
22 　　Q.　In your first conversation with
23 Mr. Snyder within the last couple weeks, did you
24 talk about his deposition at all?

Page 57

15 (Pages 54 to 57)

1  situation. But if he was needed there, then I was
2  willing to let him go.
3      Q.    Why was he needed there? Why was this
4  transfer --
5      A.    We had a center manager retire in that
6  center. We had to fill the position.
7      Q.    Was it something, as far as you know,
8  Mr. Snyder wanted to do? He had just bought the
9  home in Batavia?
10     A.    He, like many of us, said if that's
11 where you need me, I'll be there tomorrow.
12     Q.    Do you recall that conversation?
13     A.    Yes.
14     Q.    Was there a promotion for him?
15     A.    No.
16     Q.    How would you describe the move for
17 him?
18     A.    Lateral move, same responsibility.
19     Q.    Did it arise or come about with any
20 issues or problems with his performance?
21     A.    Absolutely not. He was in very good
22 standing. In fact, he has more responsibility in
23 his current assignment than he did before. He has
24 two centers, Rock Falls and Rock Island, versus one.

Page 110

1      Q.    Let's show you what we'll mark as
2  Exhibit 3.
3            (Document marked as Dunn
4            Exhibit No. 3 for
5            identification.)
6  BY MR. COFFEY:
7      Q.    Now, we touched upon this briefly, but
8  does this appear to be an accurate copy of the memo
9  you've recently looked at, the March 24, '05 memo?
10     A.    Yes.
11     Q.    Take a look at it.
12     A.    I did. It's the one I saw yesterday
13 for the first time.
14     Q.    Any -- Back up for a second. Any
15 other documents that you reviewed to prepare for the
16 deposition?
17         MR. WATSON: Objection, asked and
18     answered. You can answer again.
19         THE WITNESS: No.
20 BY MR. COFFEY:
21     Q.    Okay. This was the only one that you
22 looked at, correct?
23     A.    Yes.
24         MR. WATSON: Objection, asked and

Page 111

1  answered. You need to slow down so I can get
2  my objections in. Let him get his question
3  then pause and then answer.
4  BY MR. COFFEY:
5      Q.    When you looked at it yesterday for
6  the first time, did anything strike you as being
7  inaccurate in this document?
8      A.    No.
9      Q.    Okay. And where it says -- the
10 document says the following day Jose Andreu reported
11 an on-the-job injury, and speaking about the
12 following day after February 10, '05. Does that
13 appear to square with the information you had
14 yesterday when you read it?
15     A.    Repeat the question.
16     Q.    If you look at the second paragraph of
17 Exhibit 3, it reads, the following day Jose Andreu
18 reported an on-the-job injury. When you read that
19 yesterday for the first time, did that square with
20 your understanding?
21     A.    Yes, yes.
22     Q.    Okay. And in your conversations
23 recently that you had with Mr. Snyder, did he tell
24 you that that was a misstatement by him and a

Page 112

1  mistake by him?
2      A.    No.
3      Q.    Did you talk about this memo at all in
4  your conversations with him?
5      A.    No.
6      Q.    Did you request that he put together
7  any type of documentation after Mr. Andreu --
8  concerning Mr. Andreu's notice of termination or
9  Mr. Andreu's, in fact, termination?
10     A.    No.
11     Q.    You had said earlier that sometimes
12 you do request information or documentation?
13     A.    Prior to.
14     Q.    Okay.
15     A.    After the termination typically it is
16 handed over to the labor manager.
17     Q.    And in Mr. Andreu's case, is it fair
18 to say you never requested any documentation from
19 Mr. Snyder, right?
20     A.    No.
21     Q.    That's fair to say, correct?
22     A.    Yes.
23     Q.    And you never received that?
24     A.    Not that I recall.

Page 113

29 (Pages 110 to 113)

1  Exhibit 5? You went through the numbers. What did
2  you say to Kerry?
3      A.    Talked about things he needed to
4  improve, but I don't remember specifically what
5  areas we talked about. Using this as a guide, you
6  can see some of the numbers that were off plan and
7  some of the critical skills, leadership factors,
8  things that might have scored somewhat low, we would
9  have talked about those. And I would have asked him
10  how he feels about them, and then I would give him
11  some input.
12     Q.    Any particular recollection of
13  anything said specifically at this time?
14     A.    No.
15     Q.    Did you meet with him once, more than
16  once?
17     A.    Once. About this?
18     Q.    Yes.
19     A.    Once.
20     Q.    About his performance -- well, let's
21  stick with it. About quality performance review?
22     A.    Once.
23     Q.    Anything stand out as to areas that
24  you would have conveyed to him that he needed to

Page 142

1  improve upon or you had concerns about based on his
2  '05 performance?
3      A.    Not that I specifically remember. I'm
4  sure we talked again about results that weren't
5  hitting the plan, weren't making the business plan.
6      Q.    Do you know -- recall any specific
7  results?
8      A.    No.
9      Q.    Were there any other areas in terms of
10  employee relations or anything else that you had
11  concerns about after '05 with Kerry Snyder?
12     A.    No.
13     Q.    If you look at Page 2 of the Exhibit
14  5, he, too, has a worker's comp cost goal and then
15  he's measured?
16     A.    Mm-hmm.
17     Q.    Is that similar to how it worked with
18  you in terms of worker's comp costs?
19     A.    Yes.
20     Q.    And he's measured by cost statements?
21     A.    Yes.
22     Q.    So that's something that you keep an
23  eye on during the year with respect to Kerry
24  Snyder's performance, correct?

Page 143

1      A.    Yes.
2      Q.    And if his -- I'm assuming this is for
3  only employees within his center, right?
4      A.    Yes.
5      Q.    In other words, he's not responsible
6  for worker's comp costs out of his center?
7      A.    No.
8      Q.    So when you get cost statements during
9  the year 2005, you're able to see by center where
10  the worker's costs -- worker's comp costs are at,
11  correct?
12     A.    For a total as stated before. Sum
13  total. There's no individual breakdowns in terms of
14  different types or people. It's just a line item on
15  a cost statement.
16     Q.    That's on the health and safety
17  report, right?
18     A.    Cost statement.
19     Q.    Breakdown by person?
20     A.    Right.
21     Q.    Cost statement doesn't have per
22  person, correct?
23     A.    Right.
24     Q.    The health and safety report does?

Page 144

1      A.    Right.
2      Q.    Okay. And, again, with respect to
3  Kerry Snyder, the more worker's comp cost, the lower
4  his rating would be in that particular line item,
5  correct?
6      A.    Repeat the question.
7      Q.    Okay. Same with you, with respect to
8  the worker's comp component of his annual quality
9  performance review, the higher the worker's comp
10  cost, the lower he would get rated in that
11  particular category?
12     A.    Yes.
13     Q.    And that would roll in and affect his
14  final score, correct?
15     A.    Yes.
16     Q.    And you've talked about the final
17  score -- With respect to Kerry Snyder of 2005, was
18  it your decision to give him a raise then when you
19  met with him?
20     A.    Yes, yes.
21     Q.    Do you remember how much his raise
22  was?
23     MR. WATSON:  Wait until the question
24  is completed.

Page 145

37 (Pages 142 to 145)

1        THE WITNESS: I thought he paused.
2    BY MR. COFFEY:
3        Q.    Do you remember how much his raise
4    was?
5        A.    No.
6        Q.    The 76.39 final score, how did that
7    figure into the amount of raise?
8        A.    If I'm not mistaken, he had a very
9    good increase that year. In fact, I would even
10   guess possibly close to 5 percent that year, which
11   is higher than the average.
12       Q.    And why was that?
13       A.    Effort, improvement throughout the
14   year compared to '04, results in certain areas.
15       Q.    What areas?
16       A.    Production, worker's comp cost.
17       Q.    So you believe worker's comp costs
18   improved from year to year, '04 to '05?
19       A.    It did.
20       Q.    Did you have something in front of you
21   that gave you information on '04?
22       A.    The base typically is '04 or a close
23   number to that.
24       Q.    He didn't work underneath you in '04,

Page 146

1    correct?
2        A.    No.
3        Q.    Did you talk to his prior -- look at
4    his prior quality performance review?
5        A.    No. I didn't know him at all.
6        Q.    Until he got there January of '05,
7    correct?
8        A.    Correct.
9        Q.    This is the time, though, that you're
10   looking at this document which is early '06, right?
11       A.    Yes.
12       Q.    You're putting together the numbers
13   for Exhibit 5, right?
14       A.    Yes.
15       Q.    Okay. Did you inquire as to his old
16   manager what his performance was like for '04?
17       A.    No.
18       Q.    Did you look at his quality
19   performance review for '04?
20       A.    No.
21       Q.    Or any other documents that set forth
22   what his worker's comp costs were or any of these
23   other measurements were for '04?
24       A.    No.

Page 147

1        Q.    So when you say he improved, you're
2    looking at this base number as you testified?
3        A.    Yes.
4        Q.    And assuming that that's actual '04;
5    is that right?
6        A.    Well, the '04 base would be in the
7    Aurora center. Take, for example, the very top one,
8    delivery scan, how we effectively scan packages on
9    delivery. It's one per 667. They had one error of
10   667 packages delivered. That number is what the
11   Aurora center was in 2004. It wasn't Kerry Snyder.
12       Q.    Looking at the worker's comp cost line
13   where it says base, and it has 106,000 number. What
14   does that represent?
15       A.    It should be fairly close to what the
16   result was in '04.
17       Q.    Is that a dollar figure?
18       A.    Yes.
19       Q.    Of what?
20       A.    Of the amount of worker's comp claims
21   paid out.
22       Q.    Medical expenses paid, TTD paid,
23   everything paid?
24       A.    Yeah.

Page 148

1        Q.    For employees in the Aurora center?
2        A.    Yes.
3        Q.    Okay. So I understand, even though
4    Kerry Snyder wasn't there in '04, he's being
5    measured against what had happened in '04 in that
6    center, correct?
7        A.    Mm-hmm.
8        Q.    He had a goal then to bring it down?
9        A.    Yes.
10       Q.    And he brought it down way past the
11   goal?
12       A.    Yes.
13       Q.    Okay. What did he do individually to
14   secure that result?
15       A.    He put together an employee committee
16   of around 12 people. They met monthly, had daily
17   duties and responsibilities to help support the
18   health and safety activities. This committee, it's
19   called a CHSP, comprehensive health safety process,
20   is a process throughout UPS. Kerry put in a CHSP
21   committee that rivaled none I've ever seen before.
22   The employees embraced the activities, the
23   recognition, the training, and getting the employees
24   involved peer to peer was a very big deal for that

Page 149

38 (Pages 146 to 149)

1    Q.   Did you ever see this report with
2 respect to Mr. Andreu?
3    A.   I just said I -- no. The answer is
4 no.
5    Q.   Okay. Do you know if Mr. Andreu was
6 working on February 9, 2006, the date this report
7 was --
8    A.   I don't know.
9    Q.   Did you ever use this report in
10 discussions with Kerry Snyder with regards to his
11 performance?
12   A.   No.
13   Q.   I'll show you what we'll mark as
14 Exhibit No. 7.
15          (Document marked as Dunn
16           Exhibit No. 7 for
17           identification.)
18 BY MR. COFFEY:
19   Q.   Exhibit No. 7 is a copy of a grievance
20 form, and at least the grievant's name is printed as
21 Courtney Stevens. Do you know Courtney Stevens?
22   A.   Yes.
23   Q.   Was he, in fact, a package driver in
24 the Addison facility?

Page 158

1 they were open, delivering next-day air packages
2 after our deadline of 10:30 and claiming that the
3 consumee, the customer, was not in before 10:30.
4    Q.   So these are all separate instances
5 prior to October of '06?
6    A.   I don't know how many times, but he's
7 had issues with these type of dishonest acts from a
8 delivery perspective.
9    Q.   With respect to the October '06
10 information, just so we're clear, do you have any
11 actual information about what he might have done on
12 that instance?
13   A.   No. I don't remember this particular
14 situation.
15   Q.   Were you involved with any discussions
16 with Mr. Snyder about Mr. Stevens and/or what may
17 have happened in October of '06?
18   A.   I don't recall.
19   Q.   Were you involved in this grievance at
20 all, any meetings, talked to Ken Emanuelson, any
21 discussions about Courtney Stevens' October '06
22 grievance?
23   A.   I don't recall.
24   Q.   Do you know if Mr. Stevens had ever

Page 160

1    A.   Yes.
2    Q.   What center did he work out of?
3    A.   Aurora.
4    Q.   And are you aware that he filed a
5 grievance in October '06 concerning some dishonesty
6 allegation?
7    A.   I don't remember the specific
8 grievance. I know that Courtney's been terminated a
9 couple of times for dishonest acts, but this one in
10 particular, no, I don't recall this one.
11   Q.   Well, this one, this alleged dishonest
12 act occurred -- supposedly occurred on October '06.
13 Now, you say you have information he committed other
14 alleged dishonest acts. Would that have been before
15 or after October '06?
16   A.   Both.
17   Q.   Do you know where he's working
18 presently?
19   A.   No.
20   Q.   And what is your information about his
21 dishonest acts committed prior to this alleged
22 incident?
23   A.   Saying he was at a place where he
24 wasn't at a place, sheeting packages as closed when

Page 159

1 filed a work -- a claim for workman's comp benefits?
2    A.   I think he has, but I can't say for
3 certain.
4    Q.   You're not sure?
5    A.   No. I'm not sure.
6    Q.   Do you know if he ever claimed he was
7 injured on the job?
8    A.   Yes.
9    Q.   You have information he claimed he was
10 injured on the job?
11   A.   Specifically date, time, or what type
12 of injury he had, no. But I know that -- I'm pretty
13 sure that Courtney has been injured.
14   Q.   What information do you have?
15   A.   None other than what I just said. I
16 don't know -- I'm almost certain he has been
17 injured. And, again, I don't know if it resulted in
18 lost time or if it was a back injury or arm injury
19 or whatever it might be, but I'm almost for certain
20 Courtney has been injured before.
21   Q.   But you don't have any other
22 specifics?
23   A.   No.
24   Q.   Did you ever get injured on the job?

Page 161

41 (Pages 158 to 161)

AMSTERS LOCAL UNION N. 705  GRIEVANCE FORM

**GRIEVANCE No.**
**166415**

PLEASE USE A **BALL POINT PEN** (NOT GEL) AND PRESS FIRMLY

| OR | OFFICE | USE | ONLY | | GRIEVANT TO COMPLETE |
|---|---|---|---|---|---|
| | | | | CONTRACT: | 705/CB |
| YEAR | MONTH | EMPLOYER # | GRIEVANCE # | | VIOLATION OF: |
| | | | | PRINCIPAL ARTICLE: 54 | |
| E: (Check One) | Discharge/Discipline ☐ | | Past Practice ☐ | | |
| | Contract Issue ☑ | | Other ☐ | SECTION: | |

| REQUIRED | |
|---|---|
| evant's Name: (Print) COURTNEY STEVENS | Employer and Terminal: UPS - ADDISON |
| c. Sec. No. | Employer Contact: KERRY SNYDER |
| dress: 4810 W. JACKSON | Job Title: DRIVER   Date Hired: |
| y, State, Zip CHICAGO IL | Steward: FELIPE RODRIGUEZ |
| ws: Home ( 773 ) 216 - 3120 | Union Rep: DEN EMANUELSON |
| Work (630 ) 628 - 2135 | Date: 10-4-06 |

**TRUCTIONS**
1. Completed grievance forms should be forwarded to and processed by the Steward or Union Rep.
2. Statement of the grievance should be clear and understandable.    (Use Additional Sheets If Necessary)

ECK ONE    ☑ STATEMENT OF GRIEVANCE    ☐ REBUTTAL TO A WARNING LETTER

e Employer has violated Article(s) ___54___ , Section(s) _____

all relevant past practices and any and all other applicable articles of the contract when on, ___10-4-06___ , it
(Date)

COURTNEY STEVENS WAS terminated For
Dishonesty.

SOLUTION REQUIRED
at the contract be enforced, all affected parties be made whole, and ___to be put back into___
SERVICE AND MADE WHOLE.

| rievance | Date | Disposition | Union Rep. Signature | Employer Rep. Signab |
|---|---|---|---|---|
| ep 1 | 10/6 | PRESENTED | Felipe R. | Kerry Snyder |
| ep 2 | | | | |
| ep 3 | | | | |
| ep 4 | | | | |
| ep 5 | X Courtney L. Stev | 10/9/06 | | |

**RESOLUTION OF GRIEVANCE**
B.O.F.P.  COURTNEY will Return to work,
10-9-06, - time Served As Sup.

r the Union: Bennett K __10, 9, 06__    For the Employer: _____  __09__
                   (Date)                                              (Date)
EMANUELSON
Please Print                                              Please Print

UNION REPRESENTATIVE COPY

#7

**Exhibit 19**

**Kenneth Emanuelson Declaration**

**Exhibit 1, Jose Andreu Grievance**
**Exhibit 2, Hiram Guyton Grievance**
**Exhibit 3, Anthony Blackman Grievance**



## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JOSE ANDREU, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 07 C 06132 |
| ) | |
| UNITED PARCEL SERVICE, INC., ) | Judge Samuel Der-Yeghiayan |
| ) | |
| Defendant. ) | Magistrate Judge Mason |

### DECLARATION OF KENNETH J. EMANUELSON IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1.  I, KENNETH J. EMANUELSON, am over eighteen years old, have first-hand knowledge of the following matters, and if called upon could competently testify to the following facts.

2.  I make this declaration solely to respond to specific factual allegations set forth by UPS in its Rule 56.1 Statement of Uncontested Facts in support of its Motion for Summary Judgment in the above captioned matter. This declaration is not intended to be, and is not, a complete account of my involvement with or knowledge of UPS or Jose Andreu, or the other events or matters addressed herein. Rather, it is intended to refute and object to certain facts that UPS has represented to this Court were "uncontested."

3.  I am presently employed as a Union Representative for the Teamsters Local Union No. 705. I have been employed in such position with Local 705 since January 2004.

4.    As a Representative for Local 705 part of my job responsibility has been to represent rank and file union members who work for Defendant UPS at its Addison, Illinois facility.    One such union member that I represented was Jose Andreu, Plaintiff in the above-caption matter.

5.    On Wednesday, March 2, 2005, in the normal course of my duties as Local 705 representative, I met with then UPS Aurora Center Manager Kerry Snyder in his office at the UPS Addison, Illinois facility for the purpose of submitting to him three Local 705 Grievance Forms on behalf of three Local 705 members who worked under Mr. Snyder's management authority in the Aurora Center.    One grievance concerned then employee Jose Andreu (a copy is attached as Exhibit 1), one concerned employee Hiram Guyton (Exhibit 2), and the final one concerned employee Anthony Blackman (Exhibit 3). The attached exhibits are true and correct copies of the three grievances.

6.    All three grievances concerned discipline that was imposed on February 9 or 10, 2005.    On February 10, 2005, Mr. Snyder placed Mr. Andreu on notice of termination for alleged dishonesty, and took Mr. Guyton out of service for alleges sexual harassment.  On February 9, 2005, Dave Ziltz, a supervisor who repots to Mr. Snyder, terminated Mr. Blackman for allegedly driving with a suspended license. See Exhibits 1 - 3.

7.    In all three cases, a Step 1 grievance meeting was held on February 9 or 10, 2005. Local 705 Union steward Pamela Treadwell met with Mr. Snyder about Mr. Andreu and Mr. Guyton on February 10, 2005.  Ms. Treadwell met with Mr. Ziltz about Mr.



Blackman on February 9, 2005. See Exhibits 1 - 3.

8. Under the collective bargaining agreement then in effect between UPS and Local 705, if a dispute is not settled at the Step 1 meeting, the next step is for Local 705 to submit a written grievance to the appropriate UPS manager should the union choose to continue to pursue the matter.

9. One or two weeks before our March 2, 2005 meeting, I telephoned Mr. Snyder and asked to schedule a meeting with him about the grievances of Mr. Andreu, Mr. Guyton and Mr. Blackman. In that telephone conversation, Mr. Snyder agreed to meet with me about the three grievances on March 2, 2005, which was the earliest date we were both available. He did not say anything at that time about any of the grievances being "untimely."

10. On March 2, 2005, in Mr. Snyder's office, I handed the three grievance forms to him. Mr. Snyder looked at them. He accepted the grievance forms for Mr. Guyton and Mr. Blackman, and signed off on resolutions of their grievances returning Mr. Guyton and Mr. Blackman to work. See Exhibits 2-3. He then stated that he would not accept the Jose Andreu grievance because, as he said, it was "untimely." He handed Mr. Andreu's grievance back to me. I disagreed with him, and stated that all three grievances arose on February 9 or 10, 2005, so if he believed that Mr. Andreu's grievance was untimely, he must also feel the other two which he had accepted were untimely. He responded by reiterating that Mr. Andreu's grievance was untimely, and that he would not accept it. Mr. Snyder refused to sign Mr. Andreu's grievance.

11. To date, Mr. Snyder has not given me any reason why on March 2, 2005, he accepted the grievances on behalf of Mr. Guyton and Mr. Blackman, but refused to accept Mr. Andreu's grievance.

12. Both Mr. Guyton and Mr. Blackman still presently work for UPS at its Addison, Illinois facility.

13. I have read pages 267 to 269 of Kerry Snyder's deposition transcript in this matter where he stated that I attempted to give him Mr. Andreu's grievance form after he had already terminated Mr. Andreu's employment. This is not true. As I stated above, I attempted to give Mr. Snyder Mr. Andreu's grievance on March 2, 2005. Mr. Snyder refused to accept it.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: January 25, 2008

_Kenneth J. Emanuelson_

**KENNETH J. EMANUELSON**

Ken Emanuelson Declaration Final.wpd
January 24, 2008p.

-4-

# TEAMSTERS LOCAL UNION № 705   GRIEVANCE FORM   GRIEVANCE № 114622

## PLEASE USE A BALL POINT PEN AND PRESS FIRMLY

| FOR  OFFICE  USE  ONLY | | | |
|---|---|---|---|
| Case № | | | |
| YEAR | MONTH | EMPLOYER# | GRIEVANCE# |
| | | | |
| ISSUE: (Check One)   Discharge/Discipline ☑   Past Practice ☐ | | | |
| | Contract Issue ☐ | Other ☐ | |

**GRIEVANT TO COMPLETE**

CONTRACT: UPS / 705

**VIOLATION OF:**

PRINCIPAL ARTICLE: 54/7

SECTION:

| | |
|---|---|
| Grievant's Name: (Print) JOSE Andreu | Employer and Terminal: UPS Addison (Aurora Center |
| Soc. Sec. № 1956 | Employer Contact: Kerry (~~illegible~~) |
| Address: 7831 W. Roscher | Job Title: DRIVER     Date Hired: |
| City, ST., Zip Chicago, IL 60652 | Steward: Treadwell |
| Phones:  Home: (630) 257-5862 | Union Rep: K. Emanuelson |
| Work: (773) 631-2306 (Cell) | Date: 2/10/05 |

## INSTRUCTIONS

1. Completed grievance forms should be forwarded to and processed by the Steward or Union Rep.
2. Statement of the grievance should be clear and understandable.     (Use Additional Sheets if Necessary)·

**CHECK ONE**   ☒ STATEMENT OF GRIEVANCE     ☐ REBUTTAL TO A WARNING LETTER

The Employer has violated Article(s) 54/7 _____, Section(s) _____

and all relevant past practices and any and all other applicable articles of the contract when on, 2/9/05 , it

~~Kerry~~ Kerry put Jose on Notice of termination due to his Not working as directed and being dishonest when asked about doing a pick up and how many stops he had left and what time he would be in.

## RESOLUTION REQUIRED

That the contract be enforced, all affected parties be made whole, and Jose is to be put in file as a Verble warning and Nothing in his file in writing

| Grievance | Date | Disposition | Union Rep. Signature | Employer Rep. Signature |
|---|---|---|---|---|
| Step 1 | 2/10/05 | Met with Kerry, Jose: Put on notice of termination pending Investation | headwell | |
| Step 2 | | | | |
| Step 3 | | | | |
| Step 4 | | | | |
| Step 5 | | | | |

## RESOLUTION OF GRIEVANCE

_____

_____

| For the Union _____ | | For the Employer: _____ | |
|---|---|---|---|
| (Signature) | (Date) | (Signature) | (Date) |
| Please Print | | Please Print | 000001 |

LOCAL 705 COPY

# TEAMSTERS LOCAL UNION Nº 705   GRIEVANCE FORM   GRIEVANCE Nº 114621

## PLEASE USE A BALL POINT PEN AND PRESS FIRMLY

| FOR | OFFICE | USE | ONLY |
|---|---|---|---|

**Case Nº**

| YEAR | MONTH | EMPLOYER# | GRIEVANCE# |
|---|---|---|---|
| | | | |

**ISSUE:** (Check One)   Discharge/Discipline ☐   Past Practice ☐

Contract Issue ☐   Other ☐

---

**GRIEVANT TO COMPLETE**

CONTRACT: **UPS / 705**

VIOLATION OF:

PRINCIPAL ARTICLE: **7/54**

SECTION:

---

Grievant's Name: (Print) **Hiram Guyton**

Soc. Sec. Nº **4134**

Address: **561 Gregory Ave Apt 2C**

City, ST., Zip **Glendale Hts, IL 60139**

Phones: Home: **630 858 0674**

Work: (   )

Employer and Terminal: **UPS Addison (Aurora Cent**

Employer Contact: **Kerry**

Job Title: **Driver**   Date Hired:

Steward: **Treadwell**

Union Rep: **K. Emanulson**

Date: **2/10/05**

## INSTRUCTIONS

1. Completed grievance forms should be forwarded to and processed by the Steward or Union Rep.
2. Statement of the grievance should be clear and understandable.   (Use Additional Sheets if Necessary)

CHECK ONE   ☒ **STATEMENT OF GRIEVANCE**   ☐ **REBUTTAL TO A WARNING LETTER**

The Employer has violated Article(s) **7/54**, Section(s) **2**

and all relevant past practices and any and all other applicable articles of the contract when on, **2-90-05** (Date), it

**Kerry took Hiram out of service due to a customer concern
that came in stated that He had made a sexual remark
to a customer at one of his stops at Thornapple Landscape
In Batavia. He is out of service pending the Investigation.**

## RESOLUTION REQUIRED

That the contract be enforced, all affected parties be made whole, and **Hiram be put back to work
& and Nothing put in file only Verble warning.**

| Grievance | Date | Disposition | Union Rep. Signature | Employer Rep. Signature |
|---|---|---|---|---|
| Step 1 | 2/10/05 | Met with Hiram, Kerry, Ken (Human Relations) Hiram off pending Investans. | Treadwell | |
| Step 2 | 2/11/04 | Met with Hiram, Kerry, Ken They Talked with us about Investions and their findings | | |
| Step 3 | | | | |
| Step 4 | | | | |
| Step 5 | | | | |

## RESOLUTION OF GRIEVANCE

**Hiram was put back to work and only a Verble warning was
issued.**

or the Union **Treadwell**
(Signature)   **2/11/05** (Date)

For the Employer: **Kerry Snyder**
(Signature)   **3.2.05** (Date)

UARCO BUSINESS FORMS Ra

**AMSTERS LOCAL UNION Nº 705    GRIEVANCE FORM    GRIEVANCE Nº 03483**

## PLEASE USE A BALL POINT PEN AND PRESS FIRMLY

| FOR OFFICE USE ONLY | | | |
|---|---|---|---|
| Case Nº | | | |
| YEAR | MONTH | EMPLOYER # | GRIEVANCE # |
| | | | |
| ISSUE (Check One)  Discharge/Discipline ☐   Past Practice ☐ | | | |
| Contract Issue ☐   Other ☐ | | | |

**GRIEVANT TO COMPLETE**

CONTRACT: __UPS / 705__

VIOLATION OF:

PRINCIPLE ARTICLE: __54__

SECTION:

| | |
|---|---|
| Grievant's Name: (Print) __Anthony Blackman__ | Employer: __UPS Addison (Aurora Center)__ |
| Soc. Sec. Nº __3133__ | Date Hired: |
| Address: __3713 Butterfield Rd__ | Job Title: __Driver__ |
| __Bellwood, IL 60174__ | Steward: __Treadwell__ |
| Phones: Home: ( ) | Union Rep: __Ken Emanulson__ |
| __Cell__  Work __708 473 8042__ | Date: __2/9/05__ |

## INSTRUCTIONS

1. Completed grievance forms should be forwarded to and processed by the Steward or Union Rep.
2. Statement of the grievance should be clear and understandable.    (Use Additional Sheets if Necessary)

**CHECK ONE**        ☒ **STATEMENT OF GRIEVANCE**  or    ☐ **REBUTTAL TO A WARNING LETTER**

The Employer has violated Article(s) __54__ , Section(s)

and all relevant past practices and any and all other applicable articles of the contract when on __2/9/05__ , it

(Date)

__Dave Z (Supervisor) Terminated Anthony for Driving with a__
__Suspended Licenses (For Emissions) that they found out through the__
__DOT License Audit. Anthony Had No Knowledge of his License being__
__suspended and Answered the question truthfully.__

**RESOLUTION REQUIRED**

That the contract be enforced, all affected parties be made whole, and __Anthony be put back to work and__
__The termination be dismissed and Nothing in file.__

| Grievance | Date | Disposition | Union Rep. Signature | Employer Rep. Signature |
|---|---|---|---|---|
| Step 1 | 2/9/05 | Dave was instructed to terminate Anthony because He had No valid License took ID. | Treadwell | |
| Step 2 | | | | |
| Step 3 | | | | |
| Step 4 | | | | |
| Step 5 | | | | |

**3.0.F.P.**

### RESOLUTION OF GRIEVANCE

__Blackman will Return to work 2-21-05__

For the Union __[signature]__  __3,2,05__    For the Employer: __[signature]__  __3/2/05__
(Signature)        (Date)                    (Signature)      (Date)

**Exhibit 20**

**UPS Objections and Answers to Plaintiff's Second Set of Interrogatories**



Citicorp Center
500 West Madison Street
Suite 3700
Chicago, Illinois 60661
Tel 312.715.5000
Fax 312.715.5155
www.quarles.com

**Attorneys at Law in:**
*Phoenix and Tucson, Arizona*
*Naples and Boca Raton, Florida*
*Chicago, Illinois*
*Milwaukee and Madison, Wisconsin*

**D. Scott Watson**
Direct Dial: 312-715-5149
E-Mail Address: dsw@quarles.com

**RECEIVED**
AUG 2 1 2007
BY:_____

August 20, 2007

**Via UPS Next Day Air**

Timothy J. Coffey
The Coffey Law Office, P.C.
1403 East Forest Avenue
Wheaton, IL  60187

> Re:    Jose Andreu v. United Parcel Service
> Case No. 07 C 0473

Dear Tim:

Enclosed please find UPS's Objections and Answers to Plaintiff's Second Set of Interrogatories to Defendant.

Please contact me if you have any questions.

Very truly yours,

D. Scott Watson

Enclosures

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RECEIVED
AUG 2 1 2007
BY:

| | | |
|---|---|---|
| JOSE ANDREU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07 C 0473 |
| v. | ) | |
| | ) | Judge Der-Yeghiayan |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED PARCEL SERVICE'S OBJECTIONS AND ANSWERS TO PLAINTIFF'S SECOND SET OF INTERROGATORIES TO DEFENDANT

Defendant United Parcel Service ("UPS") submits its Objections and Answers to Plaintiff

Jose Andreu's ("Plaintiff" or "Andreu") Second Set of Interrogatories to Defendant and states as

follows:

### GENERAL OBJECTIONS

1.      UPS objects to Plaintiff's Second Set of Interrogatories to the extent they seek

information subject to the attorney-client and/or work product privileges.

2.      UPS objects to Plaintiff's Second Set of Interrogatories to the extent they are in

violation of Federal Rule of Civil Procedure 33(a) regarding the number of Interrogatories,

including subparts, allowed.

### ANSWERS TO INTERROGATORIES

1.      State each and every fact supportive of Defendant's contention in its Answer to Par. 37 of
the Complaint that it is "without knowledge or information sufficient to form a belief as
to the truth of" whether the Plan issued its "COBRA Enrollment Notice" to Plaintiff on
February 23, 2006, and/or whether the Plan sent the notice to Plaintiff's home on that day.

**ANSWER:**    UPS objects to Interrogatory No. 1 as vague, ambiguous, overbroad,

unduly burdensome, not reasonably limited in time and/or scope, irrelevant and not reasonably



calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding these objections and without waiving same, UPS will not provide a response due to the pending settlement of this claim.

2. State each and every fact supportive of Defendant's contention in its Answer to Par. 39 of the complaint that it is "without knowledge or information sufficient to form a belief as to the truth of " whether the Plan's "COBRA Enrollment Notice" stated, inter alia, that "[a]s a result of your termination on October 21, 2005, your group health plan coverage ends on October 31, 2005.

**ANSWER:** UPS objects to Interrogatory No. 2 as vague, ambiguous, overbroad, unduly burdensome, not reasonably limited in time and/or scope, irrelevant and not reasonably calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding these objections and without waiving same, UPS will not provide a response due to the pending settlement of this claim.

3. Identify the "outside vendor" or vendors UPS alleged in its answer to Par. 35 of the Complaint that it used to administer its Health and Welfare Package in from October 2005 through February 2006.

**ANSWER:** UPS objects to Interrogatory No. 3 as vague, ambiguous, overbroad, unduly burdensome, not reasonably limited in time and/or scope, irrelevant and not reasonably calculated to lead to the discovery of relevant and/or admissible evidence. Notwithstanding these objections and without waiving same, UPS will not provide a response due to the pending settlement of this claim.

4. Identify all package car drivers working under the authority of Mr. Kerri (sic) Snyder and/or Mr. Dave Ziltz who, similar to Plaintiff, were asked to make one or more additional pick-ups during the time period January 1, 2005 to March 4, 2005.

**ANSWER:** UPS objects to Interrogatory No. 4 as vague, ambiguous, overbroad, unduly burdensome, not reasonably limited in time and/or scope, irrelevant and not reasonably



calculated to lead to the discovery of relevant and/or admissible evidence.  Notwithstanding these objections and without waiving same, UPS does not have information that would specifically indicate which drivers working under the authority of Kerry Snyder and/or Dave Ziltz during the requested time frame were asked to make one or more additional pick-ups. Answering further, all UPS package car drivers working under the authority of Snyder and/or Ziltz were subject to being asked to make additional pick-ups, and it is UPS's reasonable belief that all or nearly all were asked.

5.    Identify every former or current subordinate of Kerry Snyder and/or Dave Ziltz who was accused of committing any one or more of the offenses listed at Article 54, (a) through (l), of the collective bargaining agreement between Teamster Local 705 and Defendant produced in this matter by Defendant (bates-stamped UPS 0042 to UPS0111), or the predecessor agreement (bates-stamped UPS0706 to UPS 0800) and:
a.    state the date of each alleged infraction;
b.    describe each alleged infraction;
c.    state the initial level of discipline issued to each such person;
d.    Identify the person who made the decision to issue such initial discipline;
e.    state whether a grievance was filed regarding each alleged infraction, and
f.    if a grievance was filed, describe its resolution.

**ANSWER:**    UPS objects to Interrogatory No. 5 as vague, ambiguous, overbroad, unduly burdensome, not reasonably limited in time and/or scope, irrelevant and not reasonably calculated to lead to the discovery of relevant and/or admissible evidence.  Notwithstanding these objections and without waiving same:

Randy Parker was taken out of service by Dave Weber in 1998 for taking

credit for additional stops.  A grievance was filed and the termination was upheld

by the joint UPS/Local 705 grievance panel.

Brian Maxfield was taken out of service by Kerry Snyder in 2000 for

stealing from a customer.  A grievance was filed and the termination was upheld.

Alex Petkov was taken out of service by Kerry Snyder in 2002 for falsely taking credit for delivery of over 70 pound packages. A grievance was filed and the termination was reduced to a suspension pursuant to the grievance process.

Anthony Bermes was taken out of service by Kerry Snyder in 2005 for failure to report an accident. A grievance was filed and the termination was upheld by the joint UPS/Local 705 grievance panel.

Dave Rodriquez was taken out of service by Kerry Snyder in January 2007 for an accident in his package car. A grievance was filed and the termination was reduced by agreement to a suspension with time served.

Dale Hoffert was taken out of service by Dave Weber in the early 1990's for an accident/rolling a package on its side. A grievance was filed and the termination was reduced to a suspension.

Courtney Stevens was taken out of service by Kerry Snyder on or about October 4, 2006 for dishonesty/falsifying delivery records - driver releasing next day air packages. A grievance was filed and the termination was reduced to a suspension.

Anna Brickley was taken out of service by Kerry Snyder on April 21, 2006 for dishonesty/taking credit for pick-up stops she wasn't making. A grievance was filed and the termination was reduced to a one day suspension.

Bryan Slay was put on notice of termination on or about October 27, 2005 for dishonesty/alleged falsified doctor's notes. A grievance was filed and the notice of termination was reduced to a warning.

Deanna Reynolds was taken out of service on or about July 15, 2005 for failure to report an accident. A grievance was filed and the termination was reduced to a one day suspension.

Hiram Guyton was taken out of service by Kerry Snyder for alleged harassment of a customer in February 2005. Guyton was spoken to about the allegation. UPS is unaware if a grievance was filed but no disciplinary action was taken.

DATED:   August 20, 2007

UNITED PARCEL SERVICE, INC.

By:__________
    One of Its Attorneys

John A. Klages (ARDC #06196781)
D. Scott Watson (ARDC # 06230488)
Ellen M. Girard (ARDC #06276507)
Quarles & Brady LLP
500 West Madison, Suite 3700
Chicago, IL 60661
312/715-5000
312/715-5155 (fax)

## VERIFICATION

I, Marilyn Ritchie, Employee Relations Manager for United Parcel Service, being duly sworn, do hereby on oath depose and say that the answers set forth in the foregoing United Parcel Service's Objections and Answers to Plaintiff's Second Set of Interrogatories to Defendant are true and correct to the best of my knowledge and belief.

_Marilyn Ritchie_
Marilyn Ritchie

SUBSCRIBED AND SWORN
to before me this _17th_ day
of August, 2007.

_Michelle Sargis_
Notary Public

OFFICIAL SEAL
MICHELLE SARGIS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/21/09

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that a true and accurate copy of the foregoing United Parcel Service's Objections and Answers to Plaintiff's Second Set of Interrogatories to Defendant was served upon:

> Timothy J. Coffey
> The Coffey Law Office, P.C.
> 1403 East Forest Avenue
> Wheaton, Illinois  60187
> Email: tcofflaw@sbcglobal.net

Via UPS Next Day Air delivery and by depositing same in the U.S. mail at 500 W. Madison

Street, Chicago, Illinois 60661, at or about 5:00 p.m., this 20th day of August, 2007.