IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSE ANDREU, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 07 C 06132 |
| v. ) | |
| ) | Judge Der-Yeghiayan |
| UNITED PARCEL SERVICE, INC., ) | |
| ) | |
| Defendant. ) | |

**REPLY OF UNITED PARCEL SERVICE ("UPS")**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Stripped of factual inaccuracies, self-serving, misleading innuendos and wrong-headed conclusions intertwined throughout Plaintiff's Opposition Memorandum, the relevant uncontroverted facts leading up to Plaintiff Andreu's current status as a Grievant with a binding arbitration case pending under his collective bargaining agreement to determine his rights as to employment at UPS are as follows:

1.   On February 9, 2005, a UPS driver named Laura Martinez was assigned to help a new, inexperienced driver on an adjacent route, and so Martinez could not make a scheduled pick-up at a large customer on her route named "Bernina."  (UPS's Response to Plaintiff's Statement of Additional Facts, ¶ 22).

2.   On February 9, 2005, Andreu was driving the closest route to Bernina and also had only a delivery load, not a list of pick-ups as well, so he had room to pick up a large load of four or five skids, which was a normal pick-up for Bernina. (UPS's Response to Plaintiff's Statement of Additional Facts, ¶ 28).

3.   On February 9, 2005, UPS Supervisor Cheryl Bast made a decision to, and did, ask Andreu to do the Bernina pick-up, pursuant to her normal practice of notifying the driver in the

closest route ("loop") that he or she needs to make the additional stop or pick-up. (UPS's Reply to Plaintiff's Response to UPS's Statement of Unconditional Facts, ¶ 19). As Bast testified:

> "If I need help in a certain loop, I'll go to the loop that's right next to it."

(UPS's Response to Plaintiff's Statement of Additional Facts, ¶ 22).

4. Andreu testified that (he "believed" that) "around" 3:00 p.m. on February 9, 2005, Bast sent him an electronic message through his "DIAD," which was: "Break your route and go pick up Bernina ASAP." (UPS's Response to Plaintiff's Statement of Additional Facts, ¶ 31). Bast testified that this communication occurred no earlier than 3:55 p.m. (UPS's Reply to Plaintiff's Response to UPS's Statement of Additional Facts, ¶ 23).

5. Andreu's response was that he had sixty (60) stops left to deliver, would not be in until 8:00 or 9:00 p.m. as it was, hadn't taken lunch, and didn't want to – or couldn't – make the Bernina pick-up. (UPS's Statement of Uncontested Facts ¶ 26; see also, UPS's Response to Plaintiff's Statement of Additional Facts, ¶¶ 31-33).

6. On February 9, 2005, before 5:00 p.m., Bast made a memo as to these conversations with Andreu, which she testified all occurred between 3:55 p.m. and 4:42 p.m. (UPS's Statement of Uncontested Facts ¶ 33; UPS's Reply to Plaintiff's Statement of Additional Facts, ¶ 31) and summarized those conversations as follows:

> We asked Jose Andreu to make a pick-up at Bernina. He called at 16:00 to ask if we wanted him to break off his route to go get it. I told him yes. He then stated that he had sixty stops left and he would not be done until 9:00 p.m. I told him that if he were to do twenty stops an hour that he should be done by 7:00. He said he was twenty minutes from Bernina and this would take up quite a bit of time.

7. After these communications with Andreu, Bast contacted Supervisor Dave Ziltz, who told her to tell Andreu he needs to go to Bernina now, which Bast did through an electronic

text message. (UPS's Response to Plaintiff's Statement of Additional Facts, ¶¶ 20, 35). Ziltz had seen Andreu's load earlier that day and did not believe Andreu would still have sixty (60) undelivered loads that late in the day. (UPS's Response to Plaintiff's Statement of Additional Facts, ¶ 37).

8.  When Andreu arrived at Bernina at 4:42 p.m., Supervisor Ziltz met him, looked at his load, noting only about twenty (20) packages remaining undelivered. (UPS's Statement of Uncontested Facts, ¶ 20). Andreu testified he did not know even "about" how many packages were left in his truck when he got to Bernina. (UPS's Response to Plaintiff's Statement of Additional Facts, ¶ 37).

9.  Andreu testified that at the Bernina stop Ziltz accused him of lying about the size of his undelivered load, was angry, and told Andreu he would be fired because of this lie. (Plaintiff's Statement of Additional Facts, ¶ 36). Ziltz did not remember his exact words, but testified he certainly may have accused Andreu of dishonesty. (UPS's Response to Plaintiff's Statement of Additional Facts, ¶ 36).

10. On February 10, 2005, Andreu, with his Union Steward, was interviewed by Kerry Snyder, Center Manager, who was Ziltz's superior. (UPS's Statement of Uncontested Facts, ¶¶ 34, 35). Snyder had Bast's memo and Ziltz's explanation of what had happened the preceding day. (UPS's Statement of Uncontested Facts, ¶¶ 32, 33). Snyder heard Andreu's version. (UPS's Statement of Uncontested Facts, ¶ 35). Andreu did not deny he had claimed he had "about sixty" stops left, nor did he deny Ziltz had accurately counted that he had no more than twenty (20) stops left when they met at Bernina. Based on the information he had, including Supervisor Bast's memo stating Andreu claimed at about 4:00 p.m. that he had "about sixty" stops still left, Andreu's admission that he had said he had that many stops, and Ziltz's count of

only twenty (20) or so packages shortly thereafter, Snyder decided Andreu should be disciplined. But he did not discharge Andreu outright, although he could have done so because the collective bargaining agreement provides that "dishonesty" (here, lying about his load to avoid the extra work) is a "cardinal" infraction allowing for immediate discharge. (UPS's Statement of Uncontested Facts, ¶ 37). Rather, he put Andreu on Notice of Termination for lying about the number of stops he had left to avoid the inconvenience of going off-route to do the Bernina pick-up. (UPS's Statement of Uncontested Facts, ¶ 36).

11. Under provisions of the collective bargaining agreement between IBT Local 705 and UPS applicable to Andreu, an employee put on Notice of Termination continues to work while the issues as to his misconduct and any other relevant issues go through a contractual grievance procedure if the Union files a timely grievance. (UPS's Statement of Uncontested Facts, ¶ 12).

12. Depending on the severity of an employee's misbehavior problem, UPS at times issues a Notice of Termination with the expectation that, if a grievance is filed, the employee may have his termination reduced to a warning or other discipline (such as a suspension without pay for a specific period of time) through negotiations with the Union to resolve the grievance. (UPS's Statement of Uncontested Facts, ¶ 14).

13. If the Union filed a grievance, Snyder would have been willing to agree to a discipline for Andreu short of termination. (UPS's Statement of Uncontested Facts, ¶ 45).

14. The collective bargaining agreement requires grievances to contest disciplinary action to be filed within fifteen (15) days of the alleged infraction. (UPS's Statement of Uncontested Facts, ¶ 38). For reasons that are not clear or of record here, the Union failed to

submit a written grievance challenging the Notice of Termination within the allotted fifteen (15) days (UPS's Statement of Uncontested Facts, ¶ 39).

15. Union Agent Emanuelson claims he sought to present to Snyder a written grievance on March 2, 2005, more than fifteen (15) days after Andreu had been put on Notice of Termination.  (Plaintiff's Statement of Additional Facts, ¶ 41).

16. Snyder refused to accept, or acknowledge with his signature, this untimely grievance and so, pursuant to the collective bargaining agreement, Andreu was terminated on March 4, 2002. (UPS's Response to Plaintiff's Statement of Additional Facts, ¶ 40).  There is no evidence that Snyder or UPS had previously accepted or processed untimely grievances.

### UPS Agrees To Process This Untimely Grievance

17. In spite of the post-deadline submission of the grievance, after discussion with the Union, UPS agreed without prejudice that the grievance, including all issues of timeliness, would be processed by the Union and UPS under the parties' collective bargaining agreement.  (UPS's Statement of Uncontested Facts, ¶ 46).  Accordingly, the grievance, including the timeliness issue and the question of whether or not UPS has a contractual right to consider an employee on "Notice of Termination" automatically discharged upon the Union's failure to timely file a grievance over his Notice of Termination, is currently pending before Arbitrator Gerhardt for final and binding decision . (UPS's Statement of Uncontested Facts, ¶¶ 47, 48).

### Alleged Comparables Are Not Comparable

18. Grievances of employees Hiram Guyton and Anthony Blackman had been resolved by agreement prior to the expiration of the contractual fifteen (15) days for filing a written grievance.  (UPS's Response to Plaintiff's Statement of Additional Facts, ¶ 50).  Their Union grievance forms each identified a specific "RESOLUTION OF GRIEVANCE" which had

already occurred. (Ex. Plaintiff's Ex. 19). Andreu's status had not been resolved prior to the expiration of the fifteen (15) day period for filing a written grievance. (UPS's Response to Plaintiff's Statement of Additional Facts, ¶ 51).

19. Unlike Andreu, there is no evidence that their Union failed to file timely grievances over the discharges of employees Petkov, Stephens, Rodriquez, Brickley, Slay, and Reynolds. (UPS's Response to Plaintiff's Statement of Additional Facts, ¶¶ 64, 67, 70, 73, 75, 77, 79).

## ARGUMENT

### Valid Non-Pretextual Reasons Justified Putting Andreu On Notice Of Termination And His Later Discharge Was Not Caused By UPS, Nor Was It Retaliatory

There is no evidence of causal connection between Andreu's workers compensation claim and the decision to put him on "Notice of Termination." On the contrary, UPS' decision-maker, Snyder, faced with unequivocal proof that Andreu had been *at the very least* seriously reluctant to cooperate and make the extra pick-up on February 9, 2005, and, *at the very least,* had exaggerated his remaining workload to avoid the additional work, took a reasonable disciplinary step. For this effort at deception, he put Andreu on "Notice of Termination," a labor contract status that *left him in his normal job* and put the incident into negotiations between his Union and UPS as to what his eventual discipline would be. The next step in the process was for the Union to file a grievance. Snyder expected that when the grievance was filed it would be worked out so Andreu would get some kind of discipline short of discharge. (UPS's Statement of Uncontested Facts, ¶ 45). In this regard, Snyder, of course, would have no way of knowing that Andreu's Union would not file a timely grievance, so it could not be claimed that his intention from the start had been to end Andreu's employment.

### Union, Not UPS, Triggers Collective Bargaining Agreement Provision Effectuating Discharge

But the Union (for reasons – or non-reasons – not of record) failed to file a timely grievance. The collective bargaining agreement gave fifteen (15) days. The Union simply did not file within that required timeframe.

When the Union tried to file after the time limit had passed, Snyder declined to accept a late filing. There is no factual basis for concluding that Andreu's termination was caused other than by his Union's failure to timely act on his behalf. And there is no evidence that Snyder (or UPS) had any practice of accepting late filed grievances – no factual basis for claiming that in this regard Andreu was treated any differently than employees who had not made workers compensation claims.

Accordingly, UPS did not discharge Andreu – it merely began a disciplinary process expected to result in some discipline short of discharge. And this "adverse" employment action initiated by Snyder was neither punitive nor heavy-handed in light of the circumstances presented on February 10, 2005 to decision-maker Snyder – including Andreu's acknowledgement that he had claimed he had sixty (60) stops left.

This case seems to be unique. Our research has indicated no recorded case in which a court has been faced with facts in which, as here, an employer has taken a modest disciplinary step against an employee and his Union's failure to pursue his interest has resulted in a harsher result than the employer had contemplated in the first place. But surely a finding of "retaliation" against an employer under the Illinois Workers Compensation Act must be based on sterner stuff. And especially here, where UPS has voluntarily agreed to process the untimely grievance, and put all issues in the entire matter to binding decision by an arbitrator under the collective

bargaining agreement protecting Andreu's rights, unlawful, retaliatory motivation could only be imaginary, not factual or credible.

### No Waiver Of Preemption Principle

The purpose of the § 301 preemption doctrine is in the public interest to maintain the integrity of the uniform federal law in the field of labor relations. See Nat. Metalcrafters, Div. of Keystone v McNeil, 784 F. 2d 817, 826 (7th Cir. 1986). The doctrine is not a kind of discretionary, sometimes apply and sometimes not, weigh the inconvenience to plaintiffs depending on the timing of asserting the principle, etc., kind of defense. Indeed, application of the principle in opposition to a state law claim has been sanctioned by the Seventh Circuit even when not asserted until *after* proceedings in the District Court are completed, and the case is on appeal to the Circuit Court of Appeals. (Id. at 325-26). Further, the preemption defense was asserted in the motion for summary judgment and the Plaintiff had notice and a fair chance to respond. See DeValk Lincoln Mercury, Inc. v. Ford Motor Co., 811 F.2d 326, 334 (7th Cir. 1987).

Accordingly, there has not in this case been any waiver of the preemption doctrine of defense.

### Interpretation Of The Collective Bargaining Agreement Is Necessary To Determine Andreu's Status - Hence, Preemption Applies

As the Supreme Court wrote in Lingle v. Norge Division of Magic Chef, Inc., 482 U.S. 399, 405-406 (1877-1881):

> Today's decision should make clear that interpretation of collective-bargaining agreements remains firmly in the arbitral realm; judges can determine questions of state law involving labor-management relations only if such questions do not require construing collective-bargaining agreements.

This principle is just as applicable to judicial claims under the Illinois Workers Compensation Statute as to claims under other state law.  Contrary to Plaintiff's claim (Opposition Memorandum, p. 14) the Seventh Circuit in Bettis v. Oscar Mayer Foods Corp., 878 F.2d 192 (1989) did not  – *and could not* – "overrule" the application of this principle to workers compensation retaliation cases such as this case.  Here, resolution of Andreu's state law claim requires construing the collective bargaining agreement applicable to his employment relationship with UPS.  This case is indistinguishable as to the issue of preemption from the Seventh Circuit's recent decision finding preemption, Kimbro v. PepsiCo Inc., 215 F.3d 723 (7th Cir. 2002).  That Kimbro involved a state law claim other than workers compensation retaliation is of no consequence.  The preemption principle secures an arbitrator's exclusive jurisdiction over labor contract interpretation issues, period.  The nature of the potentially competing state law claim doesn't - and cannot - diminish or aggrandize the preemption principle.  The *only* question *always* is: Does resolution of the state law claim (as Lingle ruled) "require construing collective-bargaining agreements?"  And here, the answer is "yes."

As in Kimbro, where the collective bargaining agreement had to be interpreted to determine if the grievant had committed a discharge offense, here the collective bargaining agreement has to be interpreted to determine whether UPS had a right to consider Andreu terminated as a result of its claim that Andreu's Union failed to timely file a grievance over Andreu's initial discipline.  As we stated in our initial Memorandum, here the arbitrator will have to decide, *inter alia*:  Did or did not UPS have a contractual right to consider Andreu automatically terminated once the time for filing a grievance had passed *without* a grievance? Did UPS have appropriate contractual grounds for issuing the "Notice of Termination" in the first place?  Was Andreu's termination for "just cause"?  Are there mitigating circumstances

because of any implied terms under the collective bargaining agreement? Bottom line here - the Court as a trier of facts would be wading through a thicket of contract interpretation issues now before an arbitrator.

Significantly, Plaintiff's Opposition does not assert disagreement that an arbitrator would have to address these specific contract interpretation issues. It simply asserts, conclusorily, that there is "no need to construe any term" of the collective bargaining agreement. But there is. And, we submit, that need is compelling.

The web of contract interpretation issues here cries out for a "final and binding" arbitration not, in effect, judicial ouster of the arbitrator the contractual parties have chosen to interpret their contract. He should be allowed to make a "final and binding" decision on these contract interpretation issues.

Finally, it seems clear here that Andreu jumped the gun with this lawsuit. His premature judicial attack - before the arbitrator could straighten out the contractual tangle caused by his Union's failure to timely file on his behalf – should not be used to try and synthetically crystallize the factually *inchoate* situation about his job status. He asked this Court to make assumptions about his employment status - which is still open and undetermined among UPS, the Union, and Andreu – in order to decide liability under an Illinois statute which presupposes his status is clear. E.g., if he hasn't been discharged by UPS, then UPS cannot have an unlawful motive for discharging him. And all of this is now pending before an arbitrator, thanks to UPS processing his grievance despite its untimeliness – a conciliatory fact that gives the lie to any suspicion that UPS was malevolently motivated to discharge him for making a workers compensation claim.

## CONCLUSION

UPS is entitled to summary judgment as there is no evidence of causal connection between Andreu's exercising his rights under the Illinois Workers' Compensation Act and the termination of his employment upon his Union's failure to timely file a grievance on his behalf after a UPS manager had put in motion a process to resolve his status short of termination upon a timely grievance filing. Identified, undisputed, non-pretextual reasons justified Andreu's termination. Further and alternatively, before his lawsuit was filed, Andreu and his Union had appropriately put Andreu's claims over losing his job in "final and binding" arbitration under the applicable collective bargaining agreement. The resolution of those arbitration issues are critical to Andreu's claims here in Court as well, they involve several contract interpretation issues the arbitrator should decide, and, accordingly, § 301 NLRA preemption should apply.

Dated: February 11, 2008

Respectfully submitted,

UNITED PARCEL SERVICE, INC.

By: /s/ *D. Scott Watson*
    One of Its Attorneys

John A. Klages (ARDC #06196781)
D. Scott Watson (ARDC # 06230488)
Ellen M. Girard (ARDC #06276507)
Quarles & Brady LLP
500 West Madison, Suite 3700
Chicago, IL 60661
312/715-5000
312/715-5155 (fax)
dsw@quarles.com

**CERTIFICATE OF SERVICE**

  The undersigned attorney certifies that on February 11, 2008, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

      Timothy J. Coffey
      The Coffey Law Office, P.C.
      1403 East Forest Avenue
      Wheaton, Illinois  60187
      Email: tcofflaw@sbcglobal.net


        /s/ *D. Scott Watson*