**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE ANDREU, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07 C 06132 |
| | ) | |
| v. | ) | Judge Der-Yeghiayan |
| | ) | |
| UNITED PARCEL SERVICE, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT UNITED PARCEL SERVICE INC.'S REPLY TO
PLAINTIFF'S LOCAL RULE 56.1(b)(3) RESPONSE TO DEFENDANT'S
RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL FACTS
AND RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS**

Defendant United Parcel Service, Inc. ("UPS") replies to Plaintiff's Local Rule 56.1(b)(3) Response to Defendant's Rule 56.1 Statement of Uncontested Material Facts and responds to Plaintiff's Statement of Additional Facts, and states as follows:

Plaintiff has filed a Response to UPS's rule 56.1 Statement of Uncontested Material Facts in which he agrees with 35 of UPS's 60 facts and partially agrees with 9 others. With respect to the remaining paragraphs, Plaintiff attempts to controvert, either by denial or objection, Defendant's stated facts. Plaintiff has failed to raise any issues of material fact which would prevent entry of summary judgment in Defendant's favor.

9.      From 2003 until his separation from employment on March 4, 2005, Andreu worked as a swing or vacation package car driver. (Andreu Dep. pp. 12, 13, 25).

**RESPONSE:** Disagree with UPS's characterization of its termination of Mr. Andreu's employment as a "separation." Otherwise, agree.

**REPLY**:     Plaintiff's disagreement with the characterization of Andreu's "separation" or "termination" is immaterial, as it is uncontested that Plaintiff's employment with UPS ended on March 4, 2005.  (UPS's Statement of Uncontested Facts ¶ 40).


12.     For most employee offenses which may result in termination of employment, the collective bargaining agreement between UPS and Local 705 provides a procedure for an employee to continue working until his status is resolved by UPS and the Union provided through the grievance procedure (Haefke Decl. ¶ 4).

**RESPONSE:**  Plaintiff objects to this purported evidence on the grounds that neither the CBA nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr. Tom Haefke had knowledge of and that UPS may use to support its claims or defenses in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1).  See Ex. 1, UPS Amd. R26(a)(1) Discls.  This purported evidence should also be excluded as UPS disclosed no expert witnesses, and Mr. Haefke's proposed testimony is technical and/or specialized knowledge based on his experience, training and/or education, and thus is expert testimony under FRE 702.

Plaintiff also objects on the grounds that this purported fact is ambiguous and vague in its use of the term "most employee offenses."  Lastly, the purported fact is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401 and 403.  Subject to and without waiving his objections, Plaintiff responds that he is without sufficient information to either agree or disagree with the truth of this purported fact.

**REPLY**:     Haefke was identified in UPS's Amended Disclosures Pursuant to Rule 26(a)(1) as having "information regarding UPS's policies and procedures."  In addition, UPS produced a copy of the relevant Collective Bargaining Agreement between UPS and Teamsters Local 705.  Haefke's testimony is not expert testimony under FRE 702 but rather is information that is within his personal experience.  ("The difference between an expert witness and lay witness is that 'former can offer an opinion, while the latter is confined to testifying from personal knowledge.'"  Sachs v. Reef Aquaria Design, Inc., 2007 WL 3223336, *11 (N.D. IL, Oct. 25, 2007) (Slip opinion) (Copy attached as Exhibit A)).  It should also be noted that while Andreu has offered a declaration by Teamsters Local

705 Business Agent Ken Emanuelson, the declaration does not refute any facts concerning the plain language of the Collective Bargaining Agreement.

Plaintiff's objection that the fact concerning the "notice of termination" procedure is not relevant ignores the fact that Plaintiff was placed on Notice of Termination on February 10, 2005 and was allowed to continue working but was taken out of service on March 4, 2005, after the Union failed to timely file a grievance. (UPS's Statement of Uncontested Facts, ¶¶ 36, 40).

As Plaintiff fails to dispute the stated fact with admissible record evidence, it should be deemed admitted. LR 56.1(a); Cannon-Stokes v. Potter, 2005 WL 2978713, at *2 (N.D. IL 11/3/05).

13.    Usually the Union files a grievance over an employee being put on "Notice of Termination," which initiates discussions between UPS and the Union to resolve the grievance. (Haefke Decl. ¶ 5).

**RESPONSE:** Plaintiff objects to this purported fact on the grounds that neither the Union's "usual" procedures nor the CBA, or the grievance procedures thereunder were disclosed by UPS as subjects that Mr. Tom Haefke had knowledge of and that UPS may use to support its claims or defenses in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1). See Ex. 1, UPS Amd. R26(a)(1) Discls. This purported evidence should also be excluded as UPS disclosed no expert witnesses, and Mr. Haefke's proposed testimony is technical and/or specialized knowledge based on his experience, training and/or education, and thus is expert testimony under FRE 702.

Plaintiff also objects on the grounds that this purported fact is ambiguous and vague in its use of the term "usually." Lastly, the purported fact is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See FRE 401 and 403. Subject to and without waiving his objections, Plaintiff disagrees with the truth of this purported fact, and affirmatively states that discussions to resolve grievances are initiated by the Union raising the complaint verbally with the appropriate UPS supervisor or manager, not by written grievance. See Ex. 2, Local 705-UPS CBA, Art. 7, Sec 1, p. 13.

**REPLY**:     Haefke was identified in UPS's Amended Disclosures Pursuant to Rule 26(a)(1) as having "information regarding UPS's policies and procedures." In addition, UPS produced a copy of the relevant Collective Bargaining Agreement between UPS and Teamsters Local 705. Haefke's

testimony is not expert testimony under FRE 702 but rather is information that is within his personal experience.  ("The difference between an expert witness and lay witness is that 'former can offer an opinion, while the latter is confined to testifying from personal knowledge.'" <u>Sachs v. Reef Aquaria Design, Inc.</u>, 2007 WL 3223336, *11 (N.D. IL, Oct. 25, 2007) (Slip opinion) (Copy attached as Exhibit A)).  It should be noted that while Andreu has offered a declaration by Teamsters Local 705 Business Agent Ken Emanuelson, the declaration does not refute any facts concerning the plain language of the Collective Bargaining Agreement.

Plaintiff's objection that the fact claiming the initiation of the grievance procedure is not relevant ignores the fact that Plaintiff was placed on Notice of Termination on February 10, 2005 and allowed to continue working but was taken out of service on March 4, 2005 when the Union failed to timely file a grievance. (UPS's Statement of Uncontested Facts, ¶¶ 36, 40).

14.    In many instances, an employee on "Notice of Termination" is returned to work by an agreement of UPS and the Union after a grievance is filed on his/her behalf, with discipline such as a warning or an unpaid temporary suspension from work rather than a termination of employment. (Haefke Decl. ¶ 7).

**RESPONSE:** Plaintiff objects to this purported fact on the grounds that neither the CBA nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr. Tom Haefke had knowledge of and that UPS may use to support its claims or defenses in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1).  See Ex. 1, UPS Amd. R26(a)(1) Discls.  This purported evidence should also be excluded as UPS disclosed no expert witnesses, and Mr. Haefke's proposed testimony is technical and/or specialized knowledge based on his experience, training and/or education, and thus is expert testimony under FRE 702.

Plaintiff also objects on the grounds that this purported fact is ambiguous and vague in its use of the term "[i]n many instances."  Lastly, the purported fact is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401 and 403.  Subject to and without waiving his objections, Plaintiff responds that he is without sufficient information to either agree or disagree with the truth of this purported fact.

**REPLY**:          Haefke was identified in UPS's Amended Disclosures Pursuant to Rule 26(a)(1) as having "information regarding UPS's policies and procedures." In addition, UPS produced a copy of the relevant Collective Bargaining Agreement between UPS and Teamsters Local 705. Haefke's testimony is not expert testimony under FRE 702 but rather is information that is known to him within his personal experience. ("The difference between an expert witness and lay witness is that 'former can offer an opinion, while the latter is confined to testifying from personal knowledge.'" Sachs v. Reef Aquaria Design, Inc., 2007 WL 3223336, *11 (N.D. IL, Oct. 25, 2007) (Slip opinion) (Copy attached as Exhibit A)). It should be noted that while Andreu has offered a declaration by Teamsters Local 705 Business Agent Ken Emanuelson, the declaration does not refute any facts concerning the plain language of the Collective Bargaining Agreement.

Plaintiff's objection that the fact concerning the "notice of termination" procedure is not relevant ignores the fact that Plaintiff was placed on Notice of Termination on February 10, 2005 and allowed to continue working but was taken out of service on March 4, 2005 when the Union failed to timely file a grievance. (UPS's Statement of Uncontested Facts, ¶¶ 36, 40).

As Plaintiff fails to dispute the stated fact with admissible record evidence, it should be deemed admitted. LR 56.1(a); Cannon-Stokes v. Potter, 2005 WL 2978713, at *2 (N.D. IL 11/3/05).

15.     If UPS and the Union do not agree on a lesser penalty at a lower level hearing, the normal practice is for the grievance to proceed to resolution, first at the joint Union-UPS Grievance Committee meeting (the Panel), and if not resolved there, possibly to arbitration by an outside arbitrator. (Haefke Decl. ¶ 8).

**RESPONSE:** Plaintiff objects to this purported fact on the grounds that neither the CBA nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr. Tom Haefke had knowledge of and that UPS may use to support its claims or defenses in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1). See Ex. 1, UPS Amd. R26(a)(1) Discls. This purported evidence should also be excluded as UPS disclosed no expert witnesses, and Mr. Haefke's proposed testimony is technical and/or specialized knowledge based on his experience, training and/or education, and thus is expert testimony under FRE 702.

Plaintiff also objects on the grounds that this purported fact is ambiguous and vague in its use of the term "the normal practice." Lastly, the purported fact is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See FRE 401 and 403. Subject to and without waiving his objections, Plaintiff responds that he is without sufficient information to either agree or disagree with the truth of this purported fact.

**REPLY**:    Haefke was identified in UPS's Amended Disclosures Pursuant to Rule 26(a)(1) as having "information regarding UPS's policies and procedures." In addition, UPS produced a copy of the relevant Collective Bargaining Agreement between UPS and Teamsters Local 705. Haefke's testimony is not expert testimony under FRE 702 but rather is information that is within his personal experience. ("The difference between an expert witness and lay witness is that 'former can offer an opinion, while the latter is confined to testifying from personal knowledge.'" <u>Sachs v. Reef Aquaria Design, Inc.</u>, 2007 WL 3223336, *11 (N.D. IL, Oct. 25, 2007) (Slip opinion) (Copy attached as Exhibit A)). It should be noted that while Andreu has offered a declaration by Teamsters Local 705 Business Agent Ken Emanuelson, the declaration does not refute any facts concerning the plain language of the Collective Bargaining Agreement.

Plaintiff's objection that the fact concerning the "notice of termination" procedure is not relevant ignores the fact that Plaintiff was placed on Notice of Termination on February 10, 2005 and allowed to continue working but was taken out of service on March 4, 2005 when the Union failed to timely file a grievance. (UPS's Statement of Uncontested Facts, ¶¶ 36, 40).

As Plaintiff fails to dispute the stated fact with admissible record evidence, it should be deemed admitted. LR 56.1(a); <u>Cannon-Stokes v. Potter</u>, 2005 WL 2978713, at *2 (N.D. IL 11/3/05).

16.    In cases in which the Union declines to file a timely grievance, the normal procedure is for UPS to impose the discipline noticed shortly after the 15 day time limit for filing a grievance has passed. (Haefke Decl. ¶ 11).

**RESPONSE:** Plaintiff objects to this purported fact on the grounds that neither the CBA nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr. Tom Haefke had knowledge of and that UPS may use to support its claims or defenses in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1). See Ex. 1, UPS Amd. R26(a)(1) Discls. This purported evidence should also be excluded as UPS disclosed no expert witnesses, and Mr. Haefke's proposed testimony is technical and/or specialized knowledge based on his experience, training and/or education, and thus is expert testimony under FRE 702.

Plaintiff also objects on the grounds that this purported fact is ambiguous and vague in its use of the term "the normal procedure." Lastly, the purported fact is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See FRE 401 and 403. Subject to and without waiving his objections, Plaintiff responds that he is without sufficient information to either agree or disagree or deny the truth of this purported fact.

**REPLY**:        Haefke was identified in UPS's Amended Disclosures Pursuant to Rule 26(a)(1) as having "information regarding UPS's policies and procedures." In addition, UPS produced a copy of the relevant Collective Bargaining Agreement between UPS and Teamsters Local 705. Haefke's testimony is not expert testimony under FRE 702 but rather is information that is within his personal experience. ("The difference between an expert witness and lay witness is that 'former can offer an opinion, while the latter is confined to testifying from personal knowledge.'" Sachs v. Reef Aquaria Design, Inc., 2007 WL 3223336, *11 (N.D. IL, Oct. 25, 2007) (Slip opinion) (Copy attached as Exhibit A)). It should be noted that while Andreu has offered a declaration by Teamsters Local 705 Business Agent Ken Emanuelson, the declaration does not refute any facts concerning the plain language of the Collective Bargaining Agreement.

Plaintiff's objection that the fact concerning the grievance procedure is not relevant ignores the fact that Plaintiff was placed on Notice of Termination on February 10, 2005 and allowed to continue working but was taken out of service on March 4, 2005 when the Union failed to timely file a grievance. (UPS's Statement of Uncontested Facts, ¶¶ 36, 40).

As Plaintiff fails to dispute the stated fact, it should be deemed admitted.  LR 56.1(a); Cannon-Stokes v. Potter, 2005 WL 2978713, at *2 (N.D. IL 11/3/05).

17.    Prior to the circumstances involving Plaintiff Andreu, UPS had never allowed an untimely grievance over a "Notice of Termination" to go forward. (Haefke Decl. ¶ 17).

**RESPONSE:** Plaintiff objects to this purported fact on the grounds that neither the CBA nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr. Tom Haefke had knowledge of and that UPS may use to support its claims or defenses in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1). See Ex. 1, UPS Amd. R26(a)(1) Discls. This purported evidence should also be excluded as UPS disclosed no expert witnesses, and Mr. Haefke's proposed testimony is technical and/or specialized knowledge based on his experience, training and/or education, and thus is expert testimony under FRE 702.

Plaintiff also objects on the grounds that this purported fact is ambiguous and vague in its use of the term "untimely."  Lastly, the purported fact is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401 and 403.  Subject to and without waiving his objections, Plaintiff responds that he is without sufficient information to either agree or disagree with the truth of this purported fact.

**REPLY**:    Haefke was identified in UPS's Amended Disclosures Pursuant to Rule 26(a)(1) as having "information regarding UPS's policies and procedures."  In addition, UPS produced a copy of the relevant Collective Bargaining Agreement between UPS and Teamsters Local 705.  Haefke's testimony is not expert testimony under FRE 702 but rather is information that is within his personal experience. ("The difference between an expert witness and lay witness is that 'former can offer an opinion, while the latter is confined to testifying from personal knowledge.'" Sachs v. Reef Aquaria Design, Inc., 2007 WL 3223336, *11 (N.D. IL, Oct. 25, 2007) (Slip opinion) (Copy attached as Exhibit A)).  It should be noted that while Andreu has offered a declaration by Teamsters Local 705 Business Agent Ken Emanuelson, the declaration does not refute any facts concerning this proposed fact.

Plaintiff's objection that the fact concerning the "notice of termination" procedure and to the grievance procedure is not relevant ignores the fact that Plaintiff was placed on Notice of Termination on February 10, 2005 and allowed to continue working but was taken out of service on March 4, 2005 when the Union failed to timely file a grievance. (UPS's Statement of Uncontested Facts, ¶¶ 36, 40).

As Plaintiff fails to dispute the stated fact with admissible record evidence, it should be deemed admitted. LR 56.1(a); <u>Cannon-Stokes v. Potter</u>, 2005 WL 2978713, at *2 (N.D. IL 11/3/05).

19.    That afternoon, Andreu was contacted by UPS through an ODS, or text message through his DIAD (the Delivery Information Acquisition Device that is carried by all UPS package car drivers), and told to "break your route and go pick up Bernina ASAP." (Andreu Dep. pp. 95-96; Bast Dep. p. 19). Andreu understood this message meant he should "stop doing what you are doing and go and get the pick-up." (Andreu Dep. p. 97).

**RESPONSE:** Plaintiff objects to this purported fact. UPS has never taken the position that any part of the reason for its termination of Jose' employment was insubordination or refusal to obey a work order. This purported fact is therefore not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See FRE 401 and 403. Subject to and without waiving his objections, Plaintiff agrees.

**REPLY**:    Plaintiff agrees. Answering further, Plaintiff's objection based on his claim that UPS has not taken the position that any part of the reason for Plaintiff's separation was insubordination or refusal to obey a work order should be disregarded as UPS has not claimed that purported position.

20.    Because of the need to satisfy customers about priority pick-ups, it is common for drivers to be told to break off route to handle a priority pick-up. (Snyder Decl. 2; Bast Decl. ¶ 2; Ziltz Decl. ¶ 3). Drivers are expected to follow these directions like any other direct work-related instructions. (Snyder Decl. ¶ 3; Bast Decl. ¶ 3; Haefke Decl. ¶ 19; Ziltz Decl. ¶ 4).

**RESPONSE:** Plaintiff objects to this purported fact. UPS has never taken the position that any part of the reason for its termination of Jose' employment was insubordination or refusal to obey a work order. This purported fact is therefore not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the

jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See FRE 401 and 403. Subject to and without waiving his objections, Plaintiff agrees.

**REPLY**:       Plaintiff agrees. Answering further, Plaintiff's objection based on his claim that UPS has not taken the position that any part of the reason for Plaintiff's separation was insubordination or refusal to obey a work order should be disregarded as UPS has not claimed that purported position.

21.    Instead of following this specific instruction, Andreu responded through the DIAD that he wanted to take lunch and he had a lot of stops left. (Andreu Dep. p. 97).

**RESPONSE:** Plaintiff objects to this purported fact. UPS has never taken the position that any part of the reason for its termination of Jose' employment was insubordination or refusal to obey a work order. This purported fact is therefore not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See FRE 401 and 403. Subject to and without waiving his objections, Plaintiff agrees.

**REPLY**:       Plaintiff agrees. Answering further, Plaintiff's objection based on his claim that UPS has not taken the position that any part of the reason for Plaintiff's separation was insubordination or refusal to obey a work order should be disregarded as UPS has not claimed that purported position.

23.    Andreu called the Center around 4 p.m. and said he had approximately sixty (60) stops remaining on his vehicle and that breaking the route would put him behind and he would return late to the building. (Andreu Dep. pp. 98-99; Bast Dep. pp. 31, 34).

**RESPONSE:** Disagree in part. This call did not take place "around 4 p.m." as UPS contends. See ¶¶ 31-33, below.

**REPLY**:       Plaintiff contends that he told UPS OMS Cheryl Bast that he had sixty stops remaining on his vehicle at 3:00 p.m. rather than 4:00 p.m. in an attempt to create a triable issue of fact. Bast testified that this communication occurred no earlier than 3:55 p.m. (Bast Dep. p. 31). Plaintiff claims he was told to go to Bernina at 4:20 p.m. and it is unlikely that he could have delivered 40 stops in the time he claims as that route typically averaged 19-22 stops an hour. (Ziltz

Dep. p. 171).  Andreu himself claims he had 60 stops on his package car at 3:00 p.m. and didn't

think he could finish before 8:00 p.m. (Andreu Dep. pp. 98-99).

24.    The Bernina pick-up was time-sensitive and needed to be completed by 4:30 p.m.
(Bast Dep. p. 23).

**RESPONSE:** Plaintiff objects to this purported fact on the grounds that it is not relevant to this
action, and any slight relevance is substantially outweighed by the danger of unfair prejudice,
confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or
needless presentation of cumulative evidence.  See FRE 401 and 403.  Subject to and without
waiving his objections, Plaintiff responds that he is without sufficient information to either agree or
disagree with the truth of this purported fact.

**REPLY**:    Plaintiff has failed to dispute the stated fact with admissible record evidence,

therefore it should be deemed admitted.  Cannon-Stokes v. Potter, 2005 WL 2978713, at *2 (N.D. IL

11/3/05).

26.    UPS OMS Cheryl Bast informed Supervisor David Ziltz that at 4:00 p.m. Andreu
claimed he had sixty (60) stops remaining on his package car and didn't want to make the Bernina
pick-up. (Bast Dep. pp. 34-36; Ziltz Dep. pp. 131-32).

**RESPONSE:**  Disagree.  Andreu told Bast that he had about 60 stops left at about 3 p.m., not 4 p.m.
as UPS contends.  This is a material factual dispute. See ¶¶ 31-33, below.

Additionally, neither Ziltz nor Bast testified that Jose stated he "didn't want to make the
Bernina pick-up" as UPS contends.  Bast testified that Jose stated to her he "can't go to Bernina,"
(Ex. 3, Bast Dep. p. 33, line 10), "couldn't" go (p. 33, lines 22-3), and then "wouldn't be able to go
there," (p. 34, lines 1-2).  She further testified that she told Ziltz that Jose stated he "wouldn't be able
to" (p. 36, lines 7-11) make the Bernina stop.  Ziltz testified that Bast told him that Jose told her "he
cannot get the pick-up."  Ex. 4, Ziltz Dep. p. 132.  Lastly, the pages of Bast's and Ziltz's deposition
pages cited by UPS do no support the purported fact.

**REPLY**:    UPS's stated fact concerns what Bast told Ziltz.  Plaintiff has failed to provide any

basis for disagreeing that Bast informed Ziltz as stated.  Answering further, Plaintiff contends that he

told UPS OMS Cheryl Bast that he had sixty stops remaining on his vehicle at 3:00 p.m. rather than

4:00 p.m. in an attempt to create a triable issue of fact.  While UPS continues to assert that Plaintiff

made the statement at 4 p.m., it's a distinction without a difference.   Plaintiff claims he was told to

go to Bernina at 4:20 p.m. and it is unlikely that he could have delivered stops in the time he claims

as that route typically averaged 19-22 stops an hour.  (Ziltz Dep. p. 171).  Andreu himself clams he

had 60 stops on his package car at 3:00 p.m. and didn't think he could finish before 8:00 p.m.

(Andreu Dep. pp 98-99).


27.    Andreu was again told by Bast by ODS message at about 4:15 p.m. to break off his route and go to Bernina and meet with Ziltz there. This time, Andreu did as he was told. (Andreu Dep. p. 101; Bast Dep. pp. 36-37).

**RESPONSE:** Disagree in part.  It was about 4:20 when Jose received the text message to go and meet Ziltz at Bernina.  Further, while UPS's purported fact is ambiguous on this point, this is the first and only work order that Jose received directing him to meet Ziltz at Bernina. Ex. 5, Andreu Dep. P. 101.

**REPLY**:    While there is a disagreement as to whether Andreu was told to go to Bernina and

meet Ziltz there at 4:15 or 4:20 p.m., it is a distinction without a difference.  Further, Plaintiff's

assertion that "this is the first and only work order that Jose received directing him to meet Ziltz at

Bernina" is correct only with regard to the "work order" to meet Ziltz.  Andreu had previously been

told to "Break off your route and go pick up Bernina ASAP", a fact that Plaintiff does not dispute.

(Plaintiff's Response to UPS's Statement of Uncontested Facts, ¶ 19).


29.    Ziltz checked Andreu's package car and found he had only about twenty (20) stops remaining. (Ziltz Dep. p. 135).

**RESPONSE:** Disagree.  See  ¶¶ 35-37, below.  Also, the testimony of Ziltz and Snyder materially differs on this point.  Snyder testified that Ziltz told him that he counted 13 to 15 stops in Jose's truck. Ex. 6, Snyder Dep. p. 216.

**REPLY**:    Snyder originally stated that he believed Ziltz told him Plaintiff "…had less than 20

stops left."  (Snyder Dep. p. 215).  Answering further, Ziltz, not Snyder, was present at Andreu's

package car on February 9, 2005, and, most tellingly, Andreu testified he did not know how many stops he had remaining on his package car when he arrived at Berninia. (Andreu Dep. p. 106).

30.    Ziltz told Andreu that Andreu had been untruthful about the number of package deliveries Andreu had left (60 rather than 20) when he was told to "break off route" and go ASAP to Bernina and that he would be called into the office the next day and would be fired for lying about the number of packages. (Andreu Dep. p. 105; Ziltz Dep. pp. 135-36).

**RESPONSE:** Disagree in part.  See ¶¶ 35-37, below.

**REPLY**:    The nature of Plaintiff's disagreement is unclear, therefore, the stated fact should be deemed admitted.  Please see UPS's reply to ¶¶ 35-37 below.

31.    Ziltz does not have the authority to unilaterally discharge employees. (Haefke Decl. ¶ 22).

**RESPONSE:** Disagree.   Snyder testified that "in some capacities supervisors have termination authority."  With respect to Ziltz in the Aurora Center when Snyder was his manager, Snyder affirmed that Ziltz had authority to terminate, but stated that "out of courtesy he would, we would review it."  Ex. 6, Snyder Dep. pp. 246-7.

**REPLY**:    Plaintiff correctly quotes Snyder who stated that "In some capacities supervisors have termination authorities."  (Snyder Dep. p. 246).  Those "capacities" do not include unilaterally terminating package car drivers for dishonesty.  (Haefke Supp. Decl. ¶ 2).  Answering further, it is immaterial as Center Manager Snyder placed Plaintiff on notice of termination on February 10, 2005. (UPS's Statement of Uncontested Facts ¶ 36).  Ziltz testified that he has supervisory authority to discipline employees which he described as documenting talks with and verbal warnings given to employees.  (Ziltz Dep. p. 89).

34.    On the morning of February 10, 2005, Union Steward Pam Treadwell got Andreu and took him to Snyder's office where the three of them met. (Snyder Dep. p. 213; Andreu Dep. pp. 112-113).

**RESPONSE:** Disagree in part. Snyder twice testified that Ziltz was also at the February 10, 2005, meeting in his office. Ex. 6, Snyder Dep. pp. 212-13, 242. He also wrote in his March 24, 2005, memo to his boss, Randy Dunn, that Ziltz was present at this meeting. See Ex. 6, Snyder Dep. Ex. 5, Snyder 03/24/05 Memo.

**REPLY**:     While Snyder did testify that he believed Ziltz was in attendance, Plaintiff Andreu

testified that Ziltz was not present for the February 10, 2005 meeting. (Andreu Dep. pp. 115-116).

Further, whether or not Ziltz was present is immaterial as Snyder put Plaintiff on notice of

termination. (See ¶ 36 below).


35.     During the February 10, 2005 meeting, Snyder asked Andreu to explain what happened on February 9, 2005. Andreu told his story, including admitting he had claimed he had "about 60" stops remaining. (Andreu Dep. pp. 98, 116; Snyder Decl. ¶ 4).

**RESPONSE:** Plaintiff objects to the purported fact on the grounds that it is vague, ambiguous and, as written, mischaracterizes the record. As Jose stated in his deposition, on February 10, 2005, he told Snyder that at about 3 p.m. on the preceding day he stated to Cheryl Bast that he had about 60 stops remaining on his truck. Jose has never varied from this statement, whether at his deposition or elsewhere. Ex. 5, Andreu Dep. pp. 95-96, 116. There is thus no "admission"–at least not one against Jose's interest. What there is, however, is a material factual dispute with Jose saying this communication with Bast took place at about 3 p.m., on the one hand, and Bast saying it took place at about 4:10 p.m., on the other. See ¶¶ 31-33, below. Ex. 3, Bast Dep. pp. 32-4.

**REPLY**:     Plaintiff's objection is primarily to facts that do not appear in UPS's paragraph 35.

There is no dispute that Andreu told Cheryl Bast that he had about 60 stops remaining on his package

car. (Andreu Dep. p. 98).


36.     After he had heard everything, Snyder told Andreu he was on notice of termination for this untruthful attempt to avoid a work instruction. (Andreu Dep. p. 116; Snyder Dep. pp. 219-20).

**RESPONSE:** Disagree in part. Nowhere on the cited pages do either Jose or Snyder testify that the February 10, 2005, notice of termination was due to an "untruthful attempt to avoid a work instruction." See ¶¶ 58-61, below, for other shifting variations of UPS's alleged reasons for terminating Jose's employment.

**REPLY**:          There has been no "shifting" with regard to UPS's position that Plaintiff was

dishonest about the number of packages he had on his package car on February 9, 2005, and that it is

UPS's belief that Plaintiff did so to avoid making the pick-up at Bernina which he had been

instructed to make.  (See UPS's Statement of Uncontested Facts, ¶¶ 19, 21, 36).


      37.          Snyder could have terminated Andreu immediately as the CBA between UPS and
Local 705 lists "dishonesty" as a cardinal offense subject to termination on the first offense without
need for progressive discipline. (Haefke Decl. ¶ 9).

**RESPONSE:** Plaintiff objects to this purported fact on the grounds that neither the CBA nor the
grievance procedures thereunder were disclosed by UPS as subjects that Mr. Tom Haefke had
knowledge of and that UPS may use to support its claims or defenses in violation of UPS's
obligations under Fed. R. Civ. P. 26(a)(1). See Ex. 1, UPS Amd. R26(a)(1) Discls. This purported
evidence should also be excluded because UPS failed to disclose a single expert witness, and Mr.
Haefke's proposed testimony is technical and/or specialized knowledge based on his experience,
training and/or education, and thus is expert testimony under FRE 702.

      Plaintiff also objects to this purported fact on the grounds that it is not relevant to this action,
and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of
issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless
presentation of cumulative evidence. See FRE 401 and 403.  Subject to and without waiving his
objections, Plaintiff agrees.

**REPLY**:          Plaintiff admits the stated fact.

      Haefke was identified in UPS's Amended Disclosures Pursuant to Rule 26(a)(1) as having

"information regarding UPS's policies and procedures."  In addition, UPS produced a copy of the

relevant Collective Bargaining Agreement between UPS and Teamsters Local 705.  Haefke's

testimony is not expert testimony under FRE 702 but rather is information that is within his personal

experience.  ("The difference between an expert witness and lay witness is that 'former can offer an

opinion, while the latter is confined to testifying from personal knowledge.'"  Sachs v. Reef Aquaria

Design, Inc., 2007 WL 3223336, *11 (N.D. IL, Oct. 25, 2007) (Slip opinion) (Copy attached as Exhibit

A)).  It should be noted that while Andreu has offered a declaration by Teamsters Local 705 Business

Agent Ken Emanuelson, the declaration does not refute any facts concerning the plain language of the

Collective Bargaining Agreement.

Plaintiff's objection that the fact that dishonesty is a cardinal infraction subject to immediate

termination is not relevant ignores the fact that Plaintiff was placed on Notice of Termination on

February 10, 2005 and was allowed to continue working but was taken out of service on March 4,

2005 when the Union failed to timely file a grievance. (UPS's Statement of Uncontested Facts, ¶¶

36, 40).

38.     The CBA requires that grievances challenging disciplinary action be filed with the
Company within fifteen (15) days of the imposition of the disciplinary action. (Haefke Decl. ¶ 10).

**RESPONSE:** Plaintiff objects to this purported fact on the grounds that neither the CBA nor the
grievance procedures thereunder were disclosed by UPS as subjects that Mr. Tom Haefke had
knowledge of and that UPS may use to support its claims or defenses in violation of UPS's
obligations under Fed. R. Civ. P. 26(a)(1). See Ex. 1, UPS Amd. R26(a)(1) Discls. This purported
evidence should also be excluded because UPS failed to disclose a single expert witness, and Mr.
Haefke's proposed testimony is technical and/or specialized knowledge based on his experience,
training and/or education, and thus is expert testimony under FRE 702.

Plaintiff also objects to this purported fact on the grounds that it is not relevant to this action,
and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of
issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless
presentation of cumulative evidence. See FRE 401 and 403. Subject to and without waiving his
objections, Plaintiff agrees.

**REPLY**:     Plaintiff admits the stated fact.

Haefke was identified in UPS's Amended Disclosures Pursuant to Rule 26(a)(1) as having

"information regarding UPS's policies and procedures." In addition, UPS produced a copy of the

relevant Collective Bargaining Agreement between UPS and Teamsters Local 705. Haefke's

testimony is not expert testimony under FRE 702 but rather is information that is within his personal

experience. ("The difference between an expert witness and lay witness is that 'former can offer an

opinion, while the latter is confined to testifying from personal knowledge.'" <u>Sachs v. Reef Aquaria</u>

Design, Inc., 2007 WL 3223336, *11 (N.D. IL, Oct. 25, 2007) (Slip opinion) (Copy attached as Exhibit A)). It should be noted that while Andreu has offered a declaration by Teamsters Local 705 Business Agent Ken Emanuelson, the declaration does not refute any facts concerning the plain language of the Collective Bargaining Agreement.

Plaintiff's objection that the fact concerning the timing of the grievance procedure is not relevant ignores the fact that Plaintiff was placed on Notice of Termination on February 10, 2005 and was allowed to continue working but was taken out of service on March 4, 2005 when the Union failed to timely file a grievance. (UPS's Statement of Uncontested Facts, ¶¶ 36, 40).

39.    No grievance was filed with UPS within fifteen (15) days of Andreu's Notice of Termination. (Snyder Dep. pp. 265, 267).

**RESPONSE:** Plaintiff also objects to this purported fact on the grounds that it is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See FRE 401 and 403. Subject to and without waiving his objections, Plaintiff disagrees. See ¶¶ 46-53, below.

**REPLY**:    UPS continues to assert that the Union attempted to present a grievance concerning Andreu to both Center Manager Snyder and Labor Relations Manager Haefke after his termination on March 4, 2005. Answering further, a grievance submitted on March 2, 2005, as Union Business Agent Emanuelson contends, would still be late as it would be more than 15 days after the notice of termination was imposed on February 10, 2005. (UPS's Statement of Uncontested Facts, ¶ 38).

40.    When the Union had not yet filed a grievance over twenty (20) days after Andreu was placed on notice of termination, Snyder met with Andreu and Union Steward Rick Cantu on March 4, 2005 and terminated Andreu's employment. (Snyder Dep. pp. 210-11; Andreu Dep. p. 129).

**RESPONSE:** Plaintiff also objects to the "grievance" part of this purported fact on the grounds that it is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay,

waste of time, or needless presentation of cumulative evidence.  See FRE 401 and 403.  Subject to and without waiving his objections, Plaintiff disagrees in part.  See ¶¶ 46-53, below.

**REPLY**:          UPS continues to assert that the Union attempted to present a grievance concerning Andreu to both Center Manager Snyder and Labor Relations Manager Haefke after his termination on March 4, 2005.  Answering further, a grievance submitted on March 2, 2005, as Union Business Agent Emanuelson contends, would still be late as it would be more than 15 days after the notice of termination was imposed on February 10, 2005.  (See UPS's Statement of Uncontested Facts, ¶ 38).  Further, Andreu's status had not been resolved prior to the expiration of the fifteen day period. (Haefke Decl. ¶ 6).

41.     Union Business Agent Emanuelson [(sic)] tried to give Snyder a grievance after Andreu was terminated but Snyder declined to accept it. (Snyder Dep. pp. 267-69).

**RESPONSE:**  Plaintiff also objects to this purported fact on the grounds that it is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401 and 403.  Subject to and without waiving his objections, Plaintiff disagrees in part.  See ¶¶ 46-53, below.

**REPLY**:          UPS continues to assert that the Union attempted to present a grievance concerning Andreu to both Center Manager Snyder and Labor Relations Manager Haefke after his termination on March 4, 2005.  Answering further, a grievance submitted on March 2, 2005, as Union Business Agent Emanuelson contends, would still be late as it would be more than 15 days after the notice of termination was imposed on February 10, 2005.  (UPS's Statement of Uncontested Facts, ¶ 38).

42.     Union Business Agent Emanuelson [(sic)] also tried to get District Labor Relations Manager Tom Haefke to accept a late grievance on Andreu's behalf but Haefke declined to accept it. (Haefke Decl. ¶ 12).

**RESPONSE:** Plaintiff objects to this purported fact on the grounds that neither the CBA nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr. Tom Haefke had

knowledge of and that UPS may use to support its claims or defenses in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1). See Ex. 1, UPS Amd. R26(a)(1) Discls.

Plaintiff also objects to this purported fact on the grounds that it is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See FRE 401 and 403. Subject to and without waiving his objections, Plaintiff disagrees in part. As explained below, the grievance was not "late." See ¶¶ 46-53, below.

**REPLY**:        Haefke was identified in UPS's Amended Disclosures Pursuant to Rule 26(a)(1) as

having "information regarding UPS's policies and procedures." In addition, UPS produced a copy

of the relevant Collective Bargaining Agreement between UPS and Teamsters Local 705. Haefke's

testimony is not expert testimony under FRE 702 but rather is information that is within his personal

experience. ("The difference between an expert witness and lay witness is that 'former can offer an

opinion, while the latter is confined to testifying from personal knowledge.'" Sachs v. Reef Aquaria

Design, Inc., 2007 WL 3223336, *11 (N.D. IL, Oct. 25, 2007) (Slip opinion) (Copy attached as

Exhibit A)). It should be noted that while Andreu has offered a declaration by Teamsters Local 705

Business Agent Ken Emanuelson, the declaration does not refute any facts concerning the plain

language of the Collective Bargaining Agreement.

Plaintiff's objection that the fact concerning the attempt to submit an untimely procedure is

not relevant ignores the fact that Plaintiff was placed on Notice of Termination on February 10, 2005

and was allowed to continue working but was taken out of service on March 4, 2005 when the Union

failed to timely file a grievance. (UPS's Statement of Uncontested Facts, ¶¶  36, 40).

43.    Local 705's standard grievance form has a place for a UPS manager's signature signifying he/she received a timely grievance. (Haefke Decl. ¶ 20).

**RESPONSE:** Plaintiff objects to this purported fact on the grounds that neither the CBA nor the

grievance procedures thereunder were disclosed by UPS as subjects that Mr. Tom Haefke had knowledge of and that UPS may use to support its claims or defenses in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1).  See Ex. 1, UPS Amd. R26(a)(1) Discls.

Plaintiff also objects to this purported fact on the grounds that it is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  See FRE 401 and 403.  Subject to and without waiving his objections, Plaintiff agrees that the standard grievance form has a line for managers to sign, but disagrees that signatures on this line necessarily indicate that the grievance was "timely."  See ¶¶ 46-53, below.

**REPLY**:    Haefke was identified in UPS's Amended Disclosures Pursuant to Rule 26(a)(1) as

having "information regarding UPS's policies and procedures."  In addition, UPS produced a copy of

the relevant Collective Bargaining Agreement between UPS and Teamsters Local 705.  Haefke's

testimony is not expert testimony under FRE 702 but rather is information that is within his personal

experience.  ("The difference between an expert witness and lay witness is that 'former can offer an

opinion, while the latter is confined to testifying from personal knowledge.'"  Sachs v. Reef Aquaria

Design, Inc., 2007 WL 3223336, *11 (N.D. IL, Oct. 25, 2007) (Slip opinion) (Copy attached as Exhibit

A)).

Plaintiff's objection that the fact claiming that the grievance form is not relevant ignores the

fact that Plaintiff was placed on Notice of Termination on February 10, 2005 and was  allowed to

continue working but was taken out of service on March 4, 2005 when the Union failed to timely file a

grievance. (UPS's Statement of Uncontested Facts, ¶¶ 36, 40).

44.    The grievance the Union purported to submit on behalf of Andreu has no signature of a UPS manager. (Haefke Decl. ¶ 21).

**RESPONSE:**  Disagree in part.  As explained below, Union Representative Ken Emanuelson in fact submitted Jose's grievance to Manager Kerry Snyder on March 2, 2005.  See ¶ 46-53, below.

**REPLY**:         UPS's stated fact was, "The grievance the Union purported to submit on behalf of

Andreu has no signature of a UPS manager."  Plaintiff's disagreement does not address the fact

stated, therefore the fact should be deemed admitted.


45.        Snyder testified that, had a grievance been timely filed, he would have been willing to
have taken Andreu off the notice of termination and the termination reduced to a suspension. (Snyder
Dep. pp. 256-57).

**RESPONSE:** Disagree.  As explained below, Union Representative Ken Emanuelson in fact
submitted a timely grievance on Jose's behalf, but Snyder refused to accept it.
See ¶ 46-53, below.

**REPLY**:         UPS asserts that the Union attempted to present a grievance concerning Andreu to

both Center Manager Snyder and Labor Relations Manager Haefke after his termination on March 4,

2005.  Answering further, a grievance submitted on March 2, 2005, as Emanuelson contends, would

still be late as it would be more than 15 days after the notice of termination was imposed on February

10, 2005.  (UPS's Statement of Uncontested Facts, ¶ 38).


46.        After being asked by the Union on several occasions to have the matter of Andreu's
termination heard by the joint UPS/Local 705 grievance panel (regardless of no timely grievance
filing), in March 2006 UPS agreed the Union could bring the matter to the joint UPS/Local 705
grievance panel. (Haefke Decl. ¶¶ 11, 13, 14).

**RESPONSE:** Plaintiff objects to this purported fact on the grounds that neither the CBA nor the
grievance procedures thereunder were disclosed by UPS as subjects that Mr. Tom Haefke had
knowledge of and that UPS may use to support its claims or defenses in violation of UPS's
obligations under Fed. R. Civ. P. 26(a)(1).  See Ex. 1, UPS Amd. R26(a)(1) Discls.

Plaintiff also objects to this purported fact on the grounds that it is not relevant to this action,
and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of
issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless
presentation of cumulative evidence.  See FRE 401 and 403.  Subject to and without waiving his
objections, Plaintiff responds that he is without sufficient information to either agree or disagree with
the truth of this purported fact.

**REPLY**:    Haefke was identified in UPS's Amended Disclosures Pursuant to Rule 26(a)(1) as having "information regarding UPS's policies and procedures."  In addition, UPS produced a copy of the relevant Collective Bargaining Agreement between UPS and Teamsters Local 705.  Haefke's testimony is not expert testimony under FRE 702 but rather is information that is within his personal experience.  ("The difference between an expert witness and lay witness is that 'former can offer an opinion, while the latter is confined to testifying from personal knowledge.'" Sachs v. Reef Aquaria Design, Inc., 2007 WL 3223336, *11 (N.D. IL, Oct. 25, 2007) (Slip opinion) (Copy attached as Exhibit A)).  It should be noted that while Andreu has offered a declaration by Teamsters Local 705 Business Agent Ken Emanuelson, the declaration does not refute any facts concerning UPS allowing the grievance to go forward.

Plaintiff's objection that the fact concerning the grievance procedure is not relevant ignores the fact that Plaintiff was placed on Notice of Termination on February 10, 2005 and was allowed to continue working but was taken out of service on March 4, 2005 when the Union failed to timely file a grievance. (UPS's Statement of Uncontested Facts, ¶¶ 36, 40).

As Plaintiff fails to dispute the stated fact, it should be deemed admitted.  LR 56.1(a); Cannon-Stokes v. Potter, 2005 WL 2978713, at *2 (N.D. IL 11/3/05).

47.    At the March 15, 2006 grievance panel hearing under the CBA between representatives of the Union and UPS, UPS took the position that the grievance should be denied because it was not timely filed. The grievance was thereupon "deadlocked" by the grievance panel, meaning it was slated for hearing by an independent arbitrator, both as to the issue of untimely filing of the claimed grievance and, depending on how that issue was resolved, final adjudication by the arbitrator, pursuant to the parties' CBA. (Haefke Decl. ¶ 15).

**RESPONSE:** Plaintiff objects to this purported fact on the grounds that neither the CBA nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr. Tom Haefke had knowledge of and that UPS may use to support its claims or defenses in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1).  See Ex. 1, UPS Amd. R26(a)(1) Discls.

Plaintiff also objects to this purported fact on the grounds that it is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See FRE 401 and 403. Subject to and without waiving his objections, Plaintiff responds that he is without sufficient information to either agree or disagree with the truth of this purported fact.

**REPLY**:    Haefke was identified in UPS's Amended Disclosures Pursuant to Rule 26(a)(1) as having "information regarding UPS's policies and procedures." In addition, UPS produced a copy of the relevant Collective Bargaining Agreement between UPS and Teamsters Local 705. Haefke's testimony is not expert testimony under FRE 702 but rather is information that is within his personal experience. ("The difference between an expert witness and lay witness is that 'former can offer an opinion, while the latter is confined to testifying from personal knowledge.'" Sachs v. Reef Aquaria Design, Inc., 2007 WL 3223336, 11 (N.D. IL, Oct. 25, 2007) (Slip opinion) (Copy attached as Exhibit A)). It should be noted that while Andreu has offered a declaration by Teamsters Local 705 Business Agent Ken Emanuelson, the declaration does not refute any facts concerning the plain language of the Collective Bargaining Agreement.

Plaintiff's objection that the fact concerning the grievance procedure is not relevant ignores the fact that Plaintiff was placed on Notice of Termination on February 10, 2005 and was allowed to continue working but was taken out of service on March 4, 2005 when the Union failed to timely file a grievance. (UPS's Statement of Uncontested Facts, ¶¶ 36, 40).

As Plaintiff fails to dispute the stated fact, it should be deemed admitted. LR 56.1(a); Cannon-Stokes v. Potter, 2005 WL 2978713, at *2 (N.D. IL 11/3/05).

48.    An arbitration hearing to resolve the issue of UPS's grounds for terminating Andreu's employment was scheduled for June 13, 2007, before Arbitrator Paul F. Gerhart, but was delayed at Andreu's request. (Haefke Decl. ¶ 16).

**RESPONSE:** Plaintiff objects to this purported fact on the grounds that neither the CBA nor the grievance procedures thereunder were disclosed by UPS as subjects that Mr. Tom Haefke had knowledge of and that UPS may use to support its claims or defenses in violation of UPS's obligations under Fed. R. Civ. P. 26(a)(1). See Ex. 1, UPS Amd. R26(a)(1) Discls.

Plaintiff also objects to this purported fact on the grounds that it is not relevant to this action, and any slight relevance is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See FRE 401 and 403. Subject to and without waiving his objections, Plaintiff states that he first became aware of the scheduled June 13, 2007, arbitration hearing date on May 14, 2007, and that he was not consulted in advance regarding the setting of this date. He agrees that he requested to continue this date.

**REPLY**:    Haefke was identified in UPS's Amended Disclosures Pursuant to Rule 26(a)(1) as having "information regarding UPS's policies and procedures." In addition, UPS produced a copy of the relevant Collective Bargaining Agreement between UPS and Teamsters Local 705. Haefke's testimony is not expert testimony under FRE 702 but rather is information that is within his personal experience. ("The difference between an expert witness and lay witness is that 'former can offer an opinion, while the latter is confined to testifying from personal knowledge.'" Sachs v. Reef Aquaria Design, Inc., 2007 WL 3223336, 11 (N.D. IL, Oct. 25, 2007) (Slip opinion) (Copy attached as Exhibit A)). It should be noted that while Andreu has offered a declaration by Teamsters Local 705 Business Agent Ken Emanuelson, the declaration does not refute any facts concerning the scheduling of the referenced arbitration.

Plaintiff's objection that the fact concerning the arbitration hearing procedure is not relevant ignores the fact that Plaintiff was placed on Notice of Termination on February 10, 2005 and was allowed to continue working but was taken out of service on March 4, 2005 when the Union failed to timely file a grievance. (UPS's Statement of Uncontested Facts, ¶¶ 36, 40).

As Plaintiff fails to dispute the stated fact, it should be deemed admitted. LR 56.1(a); Cannon-Stokes v. Potter, 2005 WL 2978713, at *2 (N.D. IL 11/3/05).

52.     Andreu made no claim that performing these Next Day Air deliveries made him uncomfortable. (Ziltz Decl. ¶ 2).

**RESPONSE:** Plaintiff objects to Par. 2 of Ziltz's declaration on the grounds that he clearly lacks foundation to state definitely that Mr. Andreu never at any time, from the time of his injury to date, stated he felt "uncomfortable," or any other comparable adjective, when delivering the next day airs. Subject to and without waiving his objection, Plaintiff agrees.

**REPLY**:     Plaintiff admits the stated fact.

**RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS
REQUIRING DENIAL OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant United Parcel Service, Inc. ("UPS"), pursuant to Fed. R. Civ. P. 56 and Local Rule

56.1, submits this RESPONSE to Plaintiff's Statement of Additional Facts Requiring Denial of

Defendant's Motion for Summary Judgment:

1.      Prior to the alleged events of February 9, 2005, UPS did not issue any form of performance discipline, or job warnings to Jose during his entire career at UPS dating back to 1996. Ex. 8, Andreu Decl. ¶ 3; Ex. 9, Andreu UPS Pers. File, UPS 0001-0041.

**RESPONSE**:          UPS objects on the basis that it is immaterial as the relevant collective

bargaining agreement between UPS and Teamsters Local 705, of which Andreu was a member,

provides for immediate discharge for dishonesty.  (UPS's Statement of Uncontested Facts ¶ 37).

Answering further and without waiving Its objection, UPS agrees.


2.      Prior to the alleged events of February 9, 2005, Jose's supervisor Dave Ziltz had no issues with Jose's work performance.  Ex. 4, Ziltz Dep. pp. 45-6.

**RESPONSE**:          UPS objects on the basis that it is immaterial as the relevant collective

bargaining agreement between UPS and Teamsters Local 705, of which Andreu was a member,

provides for immediate discharge for dishonesty.  (UPS's Statement of Uncontested Facts ¶ 37).

Answering further and without waiving Its objection, UPS agrees.


3.      Prior to the alleged events of February 9, 2005, Ziltz had no knowledge of Jose trying to shirk his work responsibilities, skimp out of work, cut or leave work early, or any other ploy to avoid work or lessen the number of hours he worked.  Ex. 4, Ziltz Dep. p. 171-2.

**RESPONSE**:          UPS objects on the basis that it is immaterial as the relevant collective

bargaining agreement between UPS and Teamsters Local 705, of which Andreu was a member,

provides for immediate discharge for dishonesty.  (UPS's Statement of Uncontested Facts ¶ 37).

Answering further and without waiving Its objection, UPS agrees.

4.     During 2004, Jose worked overtime every week with the exception of the week he took vacation. Excluding his vacation week and another week omitted for some unknown reason by UPS's payroll report (the week ended August 28th), in 2004, Jose worked an average of 7.6 hours of overtime per week. In addition to his regular and overtime earnings, Jose also earned production bonuses in 24 of these 50 weeks. Ex. 10, Andreu UPS Payroll History Report, UPS 0674-0691.

**RESPONSE**:          UPS objects on the basis that it is immaterial as the relevant collective

bargaining agreement between UPS and Teamsters Local 705, of which Andreu was a member,

provides for immediate discharge for dishonesty. (UPS's Statement of Uncontested Facts ¶ 37).

Answering further and without waiving Its objection, UPS agrees.


5.     During January and the first week of February 2005, Jose again worked over time every week, averaging 7 overtime hours per week. Jose also earned production bonuses in 3 of these 5 weeks. Ex. 9, Andreu UPS Payroll History Report, UPS 0703-05.

**RESPONSE**:          UPS objects on the basis that it is immaterial as the relevant collective

bargaining agreement between UPS and Teamsters Local 705, of which Andreu was a member,

provides for immediate discharge for dishonesty. (UPS's Statement of Uncontested Facts ¶ 37).

Answering further and without waiving Its objection, UPS agrees.


6.     As he was requested to do when he initially reported his work accident and injuries on the morning of January 24, 2005, Jose telephoned back into the Aurora Center a short time later and spoke to Safety Supervisor Jill Schmidt. Ex. 5, Andreu Dep. pp. 60-1.

**RESPONSE**:          UPS agrees.


7.     Following this telephone conversation, Ms. Schmidt went to Aurora Center Manager Kerry Snyder's office and told him that Jose had reported the injury. Because she worked to only 12:30 p.m., Ms. Schmidt reminded Snyder to have one of the supervisors help Jose call in the injury to the worker's compensation carrier when he returned to the center after he completed his route. Snyder told Ms. Schmidt that he would. Ex. 11, Schmidt Dep. pp. 16-20.

**RESPONSE**:        UPS agrees that Schmidt testified as such but states that Snyder did not recall

the event.  UPS further states that it is immaterial as there is no dispute that Snyder knew of

Plaintiff's injury.

8.        Contrary to Ms. Schmidt's testimony, Snyder testified that he first became aware of Jose's January 24th work accident and injuries not that day from Ms. Schmidt, but the following day from Supervisor Melissa Del Dotto.  Ex. 6, Snyder Dep. pp. 153-5.

**RESPONSE**:        UPS agrees that Schmidt testified as such but states that Snyder did not recall

the event.  UPS further states that it is immaterial as there is no dispute that Snyder knew of

Plaintiff's injury.

9.        As soon as Ziltz learned that Jose reported being injured in a work accident on the morning of January 24, 2005, he immediately doubted the truthfulness of Jose's claim.  Ex. 4, Ziltz Dep. pp. 48, 52-3.  As Ziltz stated, he doubted "[t]hat the incident happened."  Id. at p. 54.

**RESPONSE**:        UPS agrees that Ziltz had doubts that the incident happened.  UPS further

states that Ziltz's doubts were based on the Plaintiff's reluctance to do his assigned route that day

because it was "heavy".  (Ziltz Dep. p. 50).

10.        Later in the day on January 24, 2005, Ziltz met Jose out on his route.  Ziltz immediately started yelling at Jose, accusing him of lying about his accident and injuries.  Ziltz stated to Jose that he was "lying about getting hurt," was "lazy,"  that "the girls in the office don't believe you, and I don't believe you either," and that he "screwed up for the rest of the drivers when somebody else gets hurt."  Ex. 11, Ans. Compl. ¶ 9; Ex. 5, Andreu Dep. pp. 63-4.

**RESPONSE**:        UPS disagrees in part.  UPS affirmatively states that Ziltz doesn't recall

everything he said to Plaintiff but disagrees that he accused Plaintiff of lying.  (Ziltz Dep. p. 53, 55).

11.        Ziltz admitted that when he arrived at Jose's truck on January 24, 2005, he expressed his doubts to Jose about the truthfulness of Jose's claimed accident and injuries.  Ex. 4, Ziltz Dep. p. 53, 55.

**RESPONSE**:        UPS agrees.

12.    While Ziltz could not recall the exact words he used to express his doubts to Jose, he admitted that he may have accused Jose of "faking" the accident and/or injuries.  Ex. 4, Ziltz Dep. p. 55.

**RESPONSE**:    UPS agrees.

13.    After meeting Jose at his truck on January 24, 2005, and questioning him about the claimed accident and injuries, Ziltz continued to doubt the truthfulness of Jose's claimed accident and injuries.  Ex. 4, Ziltz Dep. p. 55.  Ziltz admitted that his doubts in fact continued up until he first learned that a doctor had placed Jose on work restrictions.   Ex. 4, Ziltz Dep. p. 96.

**RESPONSE**:    UPS agrees.  Answering further, Ziltz originally stated that "He [Andreu] went to seek medical attention and the doctor said he had a strain in his back, I think.  I don't recall.  So at that point you know, my doubts are no longer doubts.  I mean, the doctor said something was wrong."  (Ziltz Dep. p. 95).  Plaintiff's back strain was diagnosed on January 25, 2005, and Plaintiff returned to work on January 27, 2005.  According to Plaintiff, he was told to "…take (sic) couple of days off and ice it out."  (Andreu Dep. pp. 80-82; Andreu Dep. Ex. 7; Complaint ¶¶ 12-14).

14.    Jose was not placed on medical work restrictions until he returned to work on February 17, 2005, after being out of work the preceding few days and receiving medical treatment due to the pain he was experiencing from the injuries he sustained in his January 24, 2005, work accident.   Ex. 13, Turner Pain Ctr. Docs. P000241-47; Ex. 8, Andreu Decl. ¶ 8.

**RESPONSE**:    UPS agrees that Plaintiff was not placed on restrictions that affected his ability to work until February 17, 2005.  Answering further, Plaintiff first received medical treatment and was diagnosed with a back strain on January 25, 2005, and Plaintiff returned to work on January 27, 2005.  According to Plaintiff, he was told to  "…take (sic) couple of days off and ice it out." (Andreu Dep. pp. 80-82; Andreu Dep. Ex. 7; Complaint ¶¶ 12-14).

15.    Immediately after meeting Jose out on his route on January 24, 2005, Ziltz telephoned his boss, Aurora Center Manager Kerry Snyder, and, among other things, told Snyder that he doubted the truthfulness of Jose's claimed accident and/or injuries.  Ex. 4, Ziltz Dep. pp. 61-3.

**RESPONSE**:            UPS agrees.


16.    Shortly after February 9, 2005, Jose heard Ziltz tell his co-supervisor Melissa Del Dotto that he believed Jose was faking his injury. Ex. 14, Andreu Supp'l. Resp. to UPS 1st Ints., p. 4.

**RESPONSE**:            UPS can neither agree or disagree with Plaintiff's unsubstantiated claims of

what he claims he heard, but see ¶ 17 below.


17.    Supervisor Del Dotto confirmed that Dave Ziltz told her that he did not believe Jose was in fact injured at work on January 24, 2005. Ex. 15, Del Dotto Dep. pp. 37-40. While in her direct examination at her deposition in this matter Ms. Del Dotto testified that Ziltz made this statement to her after February 9, 2005, during cross-exam by UPS's attorney, she changed her recollection, and stated Ziltz made this comment to her a couple of days after Jose claimed to have been injured on January 24, 2005. Ex. 15, Del Dotto Dep. pp. 73-4.

**RESPONSE**:            UPS agrees that Del Dotto stated that Ziltz told her that he did not believe

Plaintiff was in fact injured on January 24, 2005 and that the comment was made within a couple of

days of January 24, 2005. (Del Dotto Dep. p. 73).


18.    Dave Ziltz testified that at approximately 4:00 p.m. on February 9, 2005, he was out in a truck delivering packages when he received a call from Cheryl Bast in the Aurora Center. In that call, Bast advised him for the first time that there was a "need to cover Bernina." He then instructed Bast to "have Jose pick up Bernina." Ex. 4, Ziltz Dep. pp. 126-30.

**RESPONSE**:            UPS agrees in part and disagrees in part. Answering further, Ziltz testified

that Bast had already told him that Plaintiff had been notified about the Bernina pick-up and was

giving resistance. (Ziltz Dep. p. 126).


19.    Ziltz was very clear that in this initial call he decided that Jose should make the Bernina pick-up and that he communicated that decision to Bast. Ex. 4, Ziltz Dep. p. 131.

**RESPONSE**:            UPS disagrees and objects to the characterization that he was "very clear" but,

without waiving Its objection, otherwise agrees.

20.     Ten or fifteen minutes after this initial call from Bast, she called Ziltz again and, for the first time, stated to him that Jose told her he could not get the Bernina pick-up, and had 60 stops left.  Ex. 4, Ziltz Dep. pp. 131-32.

**RESPONSE**:          UPS disagrees that this was the first conversation in which Bast told Ziltz that

Plaintiff was resistant to making the pick-up at Bernina.  (Ziltz Dep. p. 126).

21.     In the normal course within the Aurora Center in 2005, it was the responsibility of the package car supervisors to decide which driver to send to make additional, unscheduled package pick-ups.  Ex. 15, Del Dotto Dep. pp. 24-26.

**RESPONSE**:          UPS agrees.

22.     On February 9, 2005, there were approximately 4 different routes within the South Aurora area where Bernina is located.  Ex. 4, Ziltz Dep. p. 127.  Laura Martinez was driving the route that the Bernina pick up was on.  Id. at p. 126.  Ms. Martinez's route averaged 117 to 130 stops per day.  Id. at p. 129.  Ziltz was driving another route that averaged 109 stops.  Jose was driving a third route that averaged 170 to 200 stops.  Lastly, another driver whose name Ziltz could not recall was driving Tom Gorski's usual route which averaged 160 to 210 stops.  Id. at pp. 127-8.

**RESPONSE**:          UPS agrees.  Answering further, no inference can be drawn concerning how

difficult and/or time consuming a route can be made from the number of stops alone.  Martinez was

assigned to help a new, inexperienced driver on an adjacent route and asked to be relieved of the

Bernina pick-up.  (Ziltz Dep. p. 126).  As Bast testified, "If I need help in a certain loop, I'll go to

the loop right next to it."  (Bast Dep. p. 12).  Further, Plaintiff was driving an excess route with few

or no scheduled pick-ups.  (Ziltz Dep. p. 130).  See also ¶ 27 below.

23.     Ms. Martinez did not file any workers' compensation claims while under the supervision of Snyder.  Ex. 16, UPS Ans. to 1st Ints., Int. No. 4, p. 3.; Ex. 17, UPS Suppl. Int. Ans., pp. 1-4.

**RESPONSE**:          UPS objects as whether Martinez has filed a worker's compensation claim is

immaterial.  Answering further and without waiving Its objection, UPS agrees.

24.     Earlier in the day on February 9, 2005, Jose met Ziltz at a meet point per Ziltz's request. Once there, as Mr. Ziltz requested, Jose loaded additional packages onto his truck. Ex. 4, Ziltz Dep. pp. 123-5.

**RESPONSE**:          UPS objects as whether Plaintiff met Ziltz earlier in the day of February 9,

2005, and loaded some additional packages in his vehicle is immaterial. Without waiving Its

objection, UPS agrees. Answering further, Ziltz met with and gave packages to several drivers

earlier that day. (Ziltz Dep. pp. 124-125).


25.     On February 9, 2005, Cheryl Bast entered Kerry's Snyder's office and reported to him that Jose told her he could not make the Bernina pick up because he had too much work, and would be out late. Snyder, having absolutely no knowledge about the particulars of the Bernina pick-up or the status of Jose's workload, told Bast that Jose needed to make the pick up. Ex. 6, Snyder Dep. pp. 119-23.

**RESPONSE**:          UPS disagrees with the inference that Snyder made the decision to send

Plaintiff to make the Berninia pick-up. Snyder did affirm the decision of his management team.

(Snyder Suppl. Decl. ¶ 3; see also ¶¶ 19-21 above).


26.     Prior to deciding that Jose was the driver who needed to make the Bernina pick-up and instructing Bast as such, Snyder didn't even bother to ask Bast about the details of why Jose claimed he could not make the Bernina pick-up, or about any of the details of the Bernina pick-up itself (i.e., number of packages, weight of packages, amount of time it would take, etc.). Ex. 6, Snyder Dep. pp. 122-23.

**RESPONSE**:          UPS agrees in part and disagrees in part. UPS disagrees with the

characterization that Snyder "didn't even bother" as there was no need for Snyder to do a full

investigation of the situation; he knew that his management team had identified the appropriate

person to do the Bernina pick-up and that the employee was resisting. (Snyder Supp. Decl. ¶ 2; see

also ¶¶ 19-21 above).

27.    Snyder testified that he decided Jose needed to make the Bernina pick up because Jose was driving a specially allocated route that day that had no pick-ups so he could be available to make unscheduled pick-ups such as Bernina.  Snyder stated that it was the practice in the Aurora Center to dispatch 10% of the routes  without pick-ups or with very few pick-ups so these drivers have flexibility to meet a customers' needs or to assist other drivers.  Ex. 6, Snyder Dep. pp. 124-26.

**RESPONSE**:        UPS agrees in part and disagrees in part.  UPS disagrees that Snyder decided

Plaintiff needed to make  the Bernina pick-up but he did affirm the decision of his management

team.  (Snyder Supp. Decl. ¶ 3; see also ¶¶ 19-21 above).


28.    Prior to deciding that Jose was the driver who needed to make the Bernina pick-up, however, Snyder failed to check the route coverage list or to otherwise determine if Jose was in fact driving one of the no, or light pick-up routes that day.  He admitted though that whether Jose was on such a route should have been a consideration in deciding whether he was the best driver to be assigned the Bernina pick-up.  Ex. 6, Snyder Dep. pp. 126-27.

**RESPONSE**:        UPS disagrees that Snyder decided Plaintiff was the driver to make the

Bernina pick-up but did affirm the decision of his management team and further states that UPS's

management team had taken all relevant factors into account, including that Andreu was driving the

route closest to Berninia and only had a delivery load so he had room to pick up a large load of four

or five studs, which was a normal pickup for Berninia.  (Bast Dep. pp. 25-26; Snyder Supp. Decl. ¶

2; see also ¶¶ 19-21 above).


29.    The CBA required UPS to "treat employees with dignity and respect at all times, which shall include, but not limited to, giving due consideration to the age and physical condition of the employee."  Ex. 2, CBA, Art. 37 p. 85.  Snyder is familiar with this section of the CBA.  Ex. 6, Snyder Dep. p. 173.  Snyder in fact has applied this section  with respect to an older driver to whom Snyder assigns routes with lighter deliveries, less stops, stuff that's less physical."  Id. at p. 174-5.  Though Snyder knew Jose claimed to have hurt his back at work on January 24, 2005, he does not remember taking such claimed injury into consideration in assigning Jose work.  Id. at p.175-6.

**RESPONSE**:        UPS agrees and further states that Plaintiff had been working without

restrictions since January 27, 2005.  (See UPS's Statement of Uncontested Facts ¶¶ 58-60).

Further, Plaintiff did not claim and has not claimed he couldn't make the Bernina pick-up because of any physical limitations or restrictions.

30.     The DIAD board that Jose used in his job as a package car driver displayed the time of day directly on its face.  Ex. 5, Andreu Dep. p. 166.

**RESPONSE**:          UPS agrees.

31.     On February 9, 2005, at approximately 3 p.m., Jose received a text message through his DIAD board from the Aurora Center asking him to break off his route and go make an unscheduled pick-up at Bernina.  Ex. 5, Andreu Dep. pp. 95-6.

**RESPONSE**:          UPS agrees in part and disagrees in part.  Answering further, Andreu testified, "I believe it was around 3:00".  (Andreu Dep. pp. 95-96).  UPS states that the time was closer to 4:00 p.m.  (See UPS's Statement of Uncontested Facts ¶ 23).  As Cheryl Bast testified, all communications concerning Plaintiff occurred between 3:55 p.m. and 4:42 p.m. (Bast Dep. pp. 32, 37-38).

32.     He promptly responded, received a reply, and then responded again.  In his second Response, Jose estimated that he had approximately 60 stops left.  Ex. 7, Andreu Ans. to 1st Ints., Ans. to Int. No. 7, p. 8.

**RESPONSE**:          UPS agrees.  (See UPS's Statement of Uncontested Facts ¶ 23).

33.     When he received and responded to the Bernina text messages, Jose was looking directly at the time as displayed on his DIAD board.  Ex. 5, Andreu Dep. p. 166.

**RESPONSE**:          UPS is without knowledge or information sufficient to confirm or deny that Plaintiff was looking directly at the time display on his DIAD board.  Answering further, Cheryl Bast prepared a memo on February 9, 2005, stating that this conversation occurred at approximately 4:00 p.m. on February 9, 2005 and she notified Supervisor Ziltz of the time of these conversations on February 9, 2005.  (UPS's Statement of Uncontested Facts ¶¶ 26, 33).

34.     Jose thereafter called into the Aurora Center and was told to disregard the prior text message requesting that he make the additional pick up at Bernina.  Ex. 5, Andreu Dep. p. 100.

**RESPONSE**:          UPS is unable to agree or disagree with this assertion as Plaintiff has not

identified whom he claims told him to disregard the Bernina pick-up.  (Andreu Dep. p. 100).

Further, it is immaterial as it is uncontested that Andreu was subsequently again told to go to

Berninia and he went.  (See ¶ 35 below).

35.     At approximately 4:20 p.m., Jose received another text message.  This message directed him to go meet Dave Ziltz at Bernina.  He then went straight to Bernina as instructed.  Ex. 5, Andreu Dep. pp. 101-103.

**RESPONSE**:          UPS agrees, although UPS believes the message was sent at approximately

4:15.  (See UPS's Statement of Uncontested Facts ¶ 27).  It is an immaterial distinction.

36.     Jose arrived at Bernina, and Ziltz approached his truck.  Upon stepping into Jose's truck, Ziltz was screaming and out of control saying that Jose was lying again, had lied to him before, and was going to get fired the next day .  Ex. 5, Andreu Dep. p. 105; Ex. 8, Andreu Decl. ¶ 4. He then asked Jose for the key to the inside overhead door, opened the door and entered cargo area of his truck.  He continued to accuse Jose of lying and saying that he would be fired the next day.  Ex. 8, Andreu Decl. ¶ 4.

**RESPONSE**:          UPS agrees in part and disagrees in part.  Ziltz met Plaintiff and counted the

packages in his package car.  (UPS's Statement of Uncontested Facts ¶ 29).  Ziltz states that he does

not remember if he mentioned dishonesty to Plaintiff but he could have as misrepresenting the

number of packages in his package car was a dishonest act.  (Ziltz Dep. pp. 135-36).

37.     Ziltz did not physically count each package on Jose's truck.  He admitted that there could have been more than 20 packages on Jose's truck when he met Jose at Bernina.  Ex. 4, Ziltz Dep. p. 135-6.

**RESPONSE**:          UPS agrees in part and disagrees in part.  Answering further, when asked at

his deposition if it could have been a little more than 20 packages or a little less, Ziltz answered

"yes". (Ziltz Dep. p. 136). Ziltz has seen Plaintiff's load earlier that day and did not believe he could

have 60 undelivered stops that late in the day. (Ziltz Dep. p. 133). Still further, Plaintiff had claimed

he had sixty stops remaining on his package car, not sixty packages. (See UPS's Statement of

Uncontested Facts ¶ 23). More than one package can be delivered at a single stop. (Andreu Dep. pp.

92-93). Plaintiff testified he did not know how many packages were in the package car when he

reached Berninia. (Andreu Dep. p. 106).

38.    At no point did Jose see or hear Ziltz count the packages that were in the cargo area of
his truck. At no point did Ziltz say he counted 20 packages or any other number of packages. At no
point did Ziltz mention Cheryl Bast, or anything about Jose telling her he had 60 stops or packages
left in his car. Ex. 8, Andreu Decl. ¶ 4.

**RESPONSE**:    UPS is without knowledge or information sufficient to confirm what Plaintiff

saw or heard and further objects on the basis that it is immaterial. Answering further and without

waving Its objection, Plaintiff admits he told Bast he had 60 stops on his package car. (Plaintiff's

Statement of Additional Facts ¶ 32).

39.    In her entire 6 ½ year career as an on-road package car supervisor, Melissa Del Dotto,
Ziltz's co-supervisor, only went out to a driver's truck to determine the number of stops he had
remaining on a couple of occasions, and she only did this in order to make a decision whether the
driver needed help. She has never visited a driver out on a route for the purpose of verifying whether
a driver was being truthful about the number of packages he had in his truck. Ex. 15, Del Dotto Dep.
pp. 9, 10, 43.

**RESPONSE**:    UPS agrees that Del Dotto testified as such regarding her experience. UPS

further states that whether or not Del Dotto ever had reason to check the number of stops in an

employees package car is immaterial.

40.    On March 24, 2005, Snyder decided to document the February 10, 2005, meeting
whereat he placed Jose on notice of termination in a memo to his boss, Addison Division Manager
Randall Dunn. Ex. 6, Snyder Dep. pp. 230-1, Dep. Ex. 5, Snyder 03/24/05 Memo.

**RESPONSE**:          UPS objects to Plaintiff's proposed fact as immaterial.  Answering further and

without waving Its objection, UPS agrees.

 

41.     In his memo, although he knew it was false, Snyder wrote that Jose did not report his January 24, 2005, work accident until the day after the February 10, 2005, meeting.  Snyder testified that he did not know why he made such a false statement.   Ex. 6, Snyder Dep. p. 233, Dep. Ex. 5, Snyder 03/24/05 Memo.

**RESPONSE**:          UPS objects as Plaintiff's proposed fact is immaterial.  Without waiving Its

objection, UPS disagrees.  Answering further, the memo states, "The following day Jose Andreu

reported an on the job injury."  (Plaintiff's Statement of Additional Facts  Ex. 6).  Although Plaintiff

had worked without restrictions since January 27, 2005, on February 11, 2005 he claimed he couldn't

work and returned to work with restrictions on February 17, 2005.  (Andreu Dep. pp. 80-82, 124-

126; Andreu Dep. Ex. 7; Andreu Dep. Ex. 10; Complaint ¶¶ 12-14).

 

42.     Although he has known about this false statement since sometime before his July 11, 2007, deposition in this matter, Snyder has done nothing to correct it.  Ex. 6, Snyder Dep. p. 235.

**RESPONSE**:          UPS objects as Plaintiff's proposed fact is immaterial.  Answering further and

without waving Its objection, there is nothing to correct.  See Reply to ¶ 41 above.  UPS agrees that

Snyder testified he did not correct the statement.

 

43.     Mr. Dunn did not request that Snyder write his March 24, 2005, memo, or otherwise document his version of the events surrounding Jose's termination.  Ex. 18, Dunn Dep. pp. 111-13.  Mr. Dunn in fact did not recall ever receiving Snyder's March 24, 2005, memo addressed to him.  As far as he could recall, his review of this memo the day preceding his July 25, 2007, deposition in this matter, was the first time he had ever seen it.  Ex. 18, Dunn Dep. pp. 56-7, 111.

**RESPONSE**:          UPS objects to Plaintiff's proposed fact as it is immaterial.  Answering further

and without waving Its objection, UPS agrees.

44.    On February 2, 2006, Kerry Snyder wrote an e-mail to a Ms. Donna Piwowar in connection with Jose's claim for unemployment compensation responding to several questions she had concerning Jose's termination.  In RESPONSE to Ms. Piwowar asking whether Jose admitted to the infractions either verbally or in writing, Snyder wrote, "[y]es, he admitted to lying."  Ex. 6, Snyder Dep. pp. 198-9, Dep. Ex. 9, Snyder 02/02/06 E-Mail.

**RESPONSE**:        UPS objects to Plaintiff's proposed fact as it is immaterial.  Answering further

and without waiving Its objection, UPS agrees.


45.    At his deposition, Snyder stated, "I don't remember [Jose] admitting to me that he lied."  When asked why then he would tell Ms. Piwowar that Jose did indeed admit to lying, Snyder stated, "[b]ecause at the time [the e-mail] was generated I remembered it, but at this point in time I do not remember it."  Ex. 6, Snyder Dep. p. 199.

**RESPONSE**:        UPS objects to Plaintiff's proposed fact as it is immaterial.  Answering further

and without waiving Its objection, UPS agrees.


46.    In his March 24, 2005, memo to his boss, Snyder neglected to mention his allegation that Jose "admitted to lying."  Ex. 6, Snyder Dep. Ex. 5, Snyder 03/24/05 Memo.

**RESPONSE**:        UPS objects as the document speaks for itself.  Answering further and without

waiving Its objection, UPS agrees.


47.    On Wednesday, March 2, 2005, Ken Emanuelson, Jose's Union representative, met with Kerry Snyder in his office for the purpose of submitting Jose's grievance and along with the grievances of two other employees, Mr. Guyton and Mr. Blackman, both of whom also worked under Snyder's management authority in the Aurora Center.   Ex. 19, Emanuelson Decl. ¶ 5.

**RESPONSE**:        UPS agrees in part and disagrees in part.  UPS disagrees  that Emanuelson met

with Snyder on March 2, 2005, for the purpose of submitting a grievance on behalf of Plaintiff.

Answering further, the grievance on behalf of Plaintiff would still be untimely if submitted on March

2, 2005.  (See UPS's Statement of Uncontested Facts ¶ 38).


48.    All three grievances concerned discipline that was imposed on February 9 or 10, 2005.  In all three cases, a Step 1 grievance meeting was held on February 9 or 10, 2005.  Local 705

Union steward Pamela Treadwell met with Snyder about Jose and Mr. Guyton on February 10, 2005. Treadwell met with Ziltz about Mr. Blackman on February 9, 2005. Ex. 19, Emanuelson Decl. ¶ 6.

**RESPONSE**:    Plaintiff's proposed fact is immaterial.  Notwithstanding, UPS agrees. Answering further, there was no issue regarding the time lines of the Guyton and Blackman grievances as neither Guyton nor Blackman were put on notice of termination and their penalties had been determined and finalized prior to March 2, 2005.  (Snyder Supp. Decl. ¶¶ 5, 6; Haefke Suppl. Decl. ¶ 3).

49.    One or two weeks before their March 2, 2005 meeting, Emanuelson telephoned Snyder and asked to schedule a meeting with him about all three grievances.  In that telephone conversation, Snyder agreed to meet with Emanuelson about the three grievances on March 2, 2005, which was the earliest date they were both available.  Snyder did not say anything to Emanuelson at that time about any of the grievances allegedly being "untimely."  Ex. 19, Emanuelson Decl. ¶ 9.

**RESPONSE**:    UPS agrees in part and disagrees in part.  UPS disagrees that there was a meeting scheduled  concerning any of the grievances referenced.  Answering further, there was no issue regarding the timeliness of the Guyton and Blackman grievances as their penalties had been determined and finalized prior to March 2, 2005.  (Snyder Supp. Decl. ¶ 5; Haefke Suppl. Decl. ¶ 3).

50.    On March 2, 2005, in Snyder's office, Emanuelson handed the three grievance forms to him. Snyder looked at them. He accepted the grievance forms for Guyton and  Blackman, and signed off on resolutions of their grievances returning them both to work. He  then stated that he would not accept Jose's grievance because, as he said, it was "untimely."   He handed Jose's grievance back to Emanuelson.  Emanuelson disagreed with Snyder, and stated that all three grievances arose on February 9 or 10, 2005, so if he believed that Jose's grievance was untimely, he must also feel the other two which he had accepted were also untimely.  Snyder responded by reiterating that Jose's grievance was untimely, and that he would not accept it.  Snyder refused to sign Jose's grievance. Ex. 19, Emanuelson Decl. ¶ 10.

**RESPONSE**:    UPS agrees in part and disagrees in part.  UPS disagrees that Emanuelson attempted to present Snyder with a grievance on behalf of Andreu on March 2, 2005.  (UPS's

Statement of Uncontested Facts ¶¶ 41, 42).  Answering further, Andreu's grievance would still be

untimely if submitted on March 2, 2005.  (UPS's Statement of Uncontested Facts ¶ 38).


51.    To date, Snyder has not given Emanuelson any reason why on March 2, 2005, he accepted the Guyton and Blackman grievances, but refused to accept Jose's grievance.  Ex. 19, Emanuelson Decl. ¶ 11.

**RESPONSE**:        UPS disagrees as Snyder clearly told Emanuelson that he would not accept an

untimely grievance.  (UPS's Statement of Uncontested Facts ¶ 41).  The grievances on behalf of

Blackman and Guyton had already been resolved and the disciplinary action served as of March 2,

2005.  (Snyder Decl. ¶ 5; Haefke Supp. Decl. ¶ 5).  Plaintiff's status had not been resolved prior to

the expiration of the fifteen day period for filing a grievance.  (Haefke Decl. ¶ 6).


52.    Both Guyton and Blackman still presently work for UPS at its Addison, Illinois facility.  Ex.  19, Emanuelson Decl.  ¶ 12.  Neither Guyton nor Blackman filed workers' compensation claims while under the supervision of Snyder. Ex. 16, UPS Ans. to 1st Ints., Int. No. 4, p. 3.; Ex. 17, UPS Suppl. Int. Ans., pp. 1-4.

**RESPONSE**:        UPS agrees and further states that neither Blackman nor Guyton were put on

notice of termination.  (Snyder Supp. Decl. ¶ 6; Haefke Supp. Decl. ¶ 4).


53.    UPS stated under oath in RESPONSE to interrogatories that it took "no disciplinary action" against Guyton, and that it was "unaware if a grievance was filed" by the Union on his behalf.  Ex. 20, UPS Ans. to 2nd Ints., p. 5.

**RESPONSE**:        UPS states that the grievance filed on Guyton's behalf documenting the verbal

warning given him was misplaced and unavailable at the time Plaintiff's Second Set of

Interrogatories were answered.  Guyton did receive a verbal warning.  See ¶ 54 below.


54.    On February 10, 2005, Snyder took Guyton out of service for alleged sexual harassment. Ex. 19, Emanuelson Decl. ¶ 6.

**RESPONSE**:          UPS agrees that Guyton was taken out of service for alleged "sex remarks" made by Guyton to an employee of a UPS customer allegedly made while both were off work.  After investigation, the matter was resolved and Guyton was returned to work with a verbal warning.  (Snyder Supp. Decl. ¶ 4).

55.     On the evening of February 9, 2005, Dave Ziltz met with Kerry Snyder and "recapped the [Jose] incident" of that day.  Ex. 6, Snyder Dep. pp. 214-15.  Other than meeting with Ziltz and getting his side of the story, Snyder did nothing in terms of investigating the allegation that Jose had lied about the number of packages on his truck prior to placing him on notice of termination on the morning of February 10, 2005.  Id. at p. 220.

**RESPONSE**:          UPS agrees in part and disagrees in part.  In addition to talking to Ziltz, Snyder read the memorandum prepared by Cheryl Bast.  (See ¶ 57 below).  Answering further, Plaintiff was put on notice of termination which meant he was allowed to continue working while in the normal course, the grievance procedure would go forward.  (UPS Statement of Uncontested Facts ¶¶ 12, 36).

56.     Snyder made no effort to look at the information available through Jose's DIAD Board and/or the DIAD system on order to determine the times of the various text messages between Jose and Cheryl Bast, or the number of packages delivered and/or pick-up by Jose throughout the day.  Ex. 6, Snyder Dep. p. 223.  Snyder made no effort to look into whether Jose had any past instances of alleged dishonesty or other infractions.  Id. at pp. 223-24.

**RESPONSE**:          UPS agrees.  Answering further, Plaintiff was put on notice of termination which meant he was allowed to continue working while, in the normal course, the grievance procedure would go forward.  (UPS's Statement of Uncontested Facts ¶¶ 12, 36).  Still further, Plaintiff's past instances are immaterial as the collective bargaining agreement between UPS and Teamsters Local 705, of which Andreu was a member, provides for immediate discharge for dishonesty.  (UPS's Statement of Uncontested Facts ¶ 37).

57.     While Snyder had received a copy of a short memo that Cheryl Bast allegedly wrote to Dave Ziltz on February 9, 2005, concerning her involvement with Jose that day, he does not investigate any of the allegations she stated therein.   Ex. 6, Snyder Dep. p. 229.

**RESPONSE**:       UPS disagrees.  Snyder spoke to Ziltz about the incident documented in Bast's

memorandum and also allowed the Plaintiff to tell his side of the story.  (See ¶ 55 above and UPS's

Statement of Uncontested Facts ¶¶ 35, 36).

58.     As part of his duties as a package car supervisor, Ziltz looks at information derived from the driver's DIAD boards on an almost daily basis.  Ex. 4, Ziltz Dep. p. 116.  This information is stored on computer in the DIAD room.  Id. at 196.  He does not believe, however, that he looked at Jose's DIAD board or information therefrom in an effort to determine if Jose in fact misrepresented the number of packages in his car on February 9, 2005.  He is not aware whether anyone looked, or attempted to look, at Jose's DIAD information.  Id. at p. 120.

**RESPONSE**:       UPS agrees that Ziltz did not review Plaintiff's DIAD.  Answering further,

Ziltz had been told by Bast about the communications she had with Plaintiff, and had personal

knowledge of his communications with Bast and of the number of packages remaining in Plaintiff's

package car.  (UPS's Statement of Uncontested Facts ¶¶ 26, 29).

59.     In February 2005, in a morning meeting in his office Snyder stated to package car supervisors Melissa Del Dotto and Ziltz that Jose had been terminated "for not working – as an integrity issue of lying."  Ex. 15, Del Dotto Dep. pp. 34-35.

**RESPONSE**:       UPS agrees in part and disagrees in part.  UPS disagrees that Snyder could

have stated that Plaintiff was terminated "for not working – as an integrity issue of lying" in

February, 2005, because it is uncontested that Plaintiff was on notice of termination and still working

in February, 2005.  (UPS's Statement of Uncontested Facts ¶¶ 36, 40).

60.     In February 2005, Safety Supervisor Jill Schmidt sought out both Ziltz and Snyder to ascertain why Jose was no longer at work.  Both Ziltz and Snyder told her that Mr. Andreu was terminated because he was dishonest.  Neither Ziltz nor Snyder said anything to Ms. Schmidt about a grievance being filed or not being filed as a reason why Jose was terminated.  Ex. 11, Schmidt Dep. pp. 54-59.

**RESPONSE**:          UPS agrees in part and disagrees in part.  UPS disagrees that Snyder could

have stated that Plaintiff was terminated because he was dishonest in February, 2005, because it is

uncontested that Plaintiff was on notice of termination and still working in February, 2005.  (UPS's

Statement of Uncontested Facts ¶¶ 36, 40).


61.     Ziltz stated that Jose was terminated "due to a grievance not being presented."  Ex. 4,
Ziltz Dep. p. 177.

**RESPONSE**:          UPS agrees.  Answering further, Plaintiff was terminated by Snyder, not Ziltz.

 (UPS's Statement of Uncontested Facts ¶ 40).


62.     In Ms. Donna Piwowar's February 2, 2006, e-mail to Snyder  in connection with
Jose's claim for unemployment compensation, she asked him to "[p]lease explain the final incident,
including the date, specific details if what occurred and how his actions were discovered."  Snyder
replied to Ms. Piwowar as follows: "Final incident - Jose Andreu lied to FT supervisor Dave Ziltz on
2/9/05."  No where in his reply e-mail did Snyder mention any alleged failure to file a grievance
subsequent to February 9, 2005, as an alleged reason or cause for the termination.  Ex. 6, Snyder
Dep. Ex. 9, Snyder 02/02/06 E-Mail.

**RESPONSE**:          UPS objects as the document speaks for itself.  Answering further and without

waiving Its objection, UPS agrees that the referenced document states as indicated.  See also UPS's

Statement of Uncontested Fact ¶ 40.


63.     Under Article 54 of the CBA, similar to dishonesty, drinking or under the influence,
possession or use of drugs, gross negligence, carrying unauthorized passengers, failure to report an
accident, a runaway accident sexual harassment and fighting on the job are all "cardinal infractions"
subjecting the offender to immediate termination.  Ex. 2, CBA, Art. 54, pp. 123-24.

**RESPONSE**:          UPS agrees.


64.     Within the April to June 2007 time frame, Ziltz became aware that Aurora Center air
driver Dave Dill allegedly had an unauthorized passenger in his truck.  Ziltz ordered Mr. Dill to
telephone the office.  When Mr. Dill called in, Ziltz told him that if he had anyone else in the car, he

needed to get them out now.   While Mr. Dill was out of work for some time thereafter, he was back working as of July 26, 2007.  Ex. 4, Ziltz Dep. pp. 190-2.

**RESPONSE**:          UPS objects as the fact stated is immaterial.  Answering further and without waiving Its objection, UPS agrees.  Dill was returned to work through the grievance procedure. (Ziltz Dep. p. 192).  It is uncontested that Plaintiff was placed on notice of termination and was allowed to continue working.  (UPS's Statement of Uncontested Facts ¶¶ 12, 36).

65.    When Snyder was Manager of UPS's Joliet Center from May 2001 to May 2002, a package car driver who was under his authority, Al Petkov, was accused of being dishonest in that he was allegedly taking credit for picking up 70 plus pound packages when he in fact was not.  Ex. 6, Snyder Dep. pp. 24, 66-7.

**RESPONSE**:          UPS objects as the fact stated is immaterial.  Answering further and without waiving Its objection, UPS agrees.  It is uncontested that Plaintiff was placed on notice of termination and was allowed to continue working.  (UPS's Statement of Uncontested Facts ¶¶ 12, 36).

66.    Once he was notified of the allegation, Snyder along with a supervisor, physically conducted an audit of Mr. Petkov's truck which included individually weighing each package and comparing the weights to what Mr. Petkov had recorded on his DIAD board.  Ex. 6, Snyder Dep. p 67.  Snyder determined that Mr. Petkov had actually picked up and/or delivered only 2 or 3 over 70 pound packages as opposed to the 100 plus he had recorded.  Id.

**RESPONSE**:          UPS objects as the fact stated is immaterial.  Answering further and without waiving Its objection, UPS agrees.  It is uncontested that Plaintiff was placed on notice of termination and was allowed to continue working.  (UPS's Statement of Uncontested Facts ¶¶ 12, 36).

67.    Snyder, in collaboration with Mr. Tom Haefke, agreed to reduce Mr. Petkov's termination to a suspension because of the fact that he had a clean performance history with no other instances of alleged dishonesty.  Ex. 6, Snyder Dep. pp. 69-70.  Snyder is not aware of Mr. Petkov seeking worker's compensation benefits at any point in his career with UPS.  Id. at pp. 90-1.

**RESPONSE**:          UPS objects as the fact stated is immaterial.  Answering further and without

waiving Its objection, UPS agrees that Petkov's termination was reduced through the grievance

procedure.  (Snyder Dep. pp. 68-69).  It is uncontested that Plaintiff was placed on notice of

termination and was allowed to continue working.  (UPS's Statement of Uncontested Facts  ¶¶ 12,

36).

68.     In instances of alleged dishonesty, Snyder agrees that whether an accused employee
has had one or more similar allegations against him in the past bears upon what level of discipline is
appropriate in the current instance, and/or whether he would be willing to reduce the severity of the
discipline he initially meted out.   Ex. 6, Snyder Dep. p. 73.

**RESPONSE**:          UPS agrees.  Answering further, it is uncontested that Plaintiff was placed on

notice of termination and was allowed to continue working.  (UPS's Statement of Uncontested Facts

¶¶ 12, 36).  Still further, the collective bargaining agreement between UPS and Teamsters Local 705,

of which Andreu was a member, provides for immediate discharge for dishonesty.  (UPS's Statement

of Uncontested Facts ¶ 37).

69.     Snyder could not remember whether he ever attempted to determine if Jose had any
past alleged instances of dishonesty as a UPS employee.  Ex. 6, Snyder Dep. pp. 72-3.  Snyder could
not remember whether it would have mattered to him if Jose in fact did not have any prior instances
of alleged dishonesty.  Id.

**RESPONSE**:          UPS agrees.  Answering further, it is uncontested that Plaintiff was placed on

notice of termination and was allowed to continue working.  (UPS's Statement of Uncontested Facts

¶¶ 12, 36).  Still further, the collective bargaining agreement between UPS and Teamsters Local 705,

of which Andreu was a member, provides for immediate discharge for dishonesty.  (UPS's Statement

of Uncontested Facts ¶ 37).

70.     Courtney Stevens, a package car driver working out of the Aurora center during Snyder's tenure, was terminated by Snyder on October 4, 2006, for alleged dishonesty in violation of Article 54 of the CBA.  Five days later, on October 9, 2006, UPS returned Mr. Stevens back to work. Ex. 6, Snyder Dep. pp. 101-04, Dep. Ex. 3, Stevens' Grievance.

**RESPONSE**:          UPS objects as the stated fact is immaterial.  Answering further and without waiving Its objection, UPS agrees.  It is uncontested that Plaintiff was placed on notice of termination and was allowed to continue working.  (UPS's Statement of Uncontested Facts ¶¶ 12, 36).  Stevens was returned to work through the grievance procedure after his Union timely filed a grievance.  (Plaintiff's Ex. 7).

71.     On at least two other occasions, Mr. Stevens was similarly terminated for alleged dishonest acts but then returned back to work.  His alleged dishonesty included saying he was at a particular location when he was not, sheeting packages as closed when they were open, delivering next day air parcels late and claiming the customer was not in.  Ex. 18, Dunn Dep. pp. 158-60; Dunn Dep. Ex. 7, Stevens' Grievance.

**RESPONSE**:          UPS objects as the stated fact is immaterial.  Answering further and without waiving Its objection, UPS agrees that Stevens was terminated for dishonesty and returned to work under the grievance procedure after a grievance was timely filed.  (Plaintiff's Ex. 7).  It is uncontested that Plaintiff was placed on notice of termination and was allowed to continue working.  (UPS's Statement of Uncontested Facts ¶ 12, 36).

72.     Mr. Stevens did not file any workers' compensation claims while under the supervision of Snyder.  Ex. 16, UPS Ans. to 1st Ints., Int. No. 4, p. 3.; Ex. 17, UPS Suppl. Int. Ans., pp. 1-4.  As of July 26, 2007, Mr. Stevens was still employed by UPS as a package car driver.  Ex. 4, Ziltz Dep. p. 167.

**RESPONSE**:          UPS objects as the stated fact is immaterial.  Answering further and without waiving Its objection, UPS agrees.  It is uncontested that Plaintiff was placed on notice of termination and was allowed to continue working. (UPS's Statement of Uncontested Facts ¶¶ 12, 36).

73.     In January 2007, package car driver Dave Rodriguez rolled a package car on its side. This type of accident is a "cardinal sin" under Article 54 of the CBA. Snyder, his manager at the time, terminated Mr. Rodriguez. The matter was investigated during which Mr. Rodriguez admitted to driving too fast for conditions. Approximately 5 days after the incident, Snyder agreed to reduce the termination to a suspension based on the fact that Mr. Rodriguez had a clean disciplinary history with no prior unsafe driving or serious misconduct incidents. Ex. 6, Snyder Dep. pp. 91-5.

**RESPONSE**:          UPS objects as the stated fact is immaterial. Answering further and without waiving Its objection, UPS agrees. It is uncontested that Plaintiff was placed on notice of termination and was allowed to continue working. (UPS's Statement of Uncontested Facts ¶¶ 12, 36). Rodriguez was returned to work through the grievance procedure after his Union timely filed a grievance. (Snyder Suppl. Decl. ¶ 8).

74.     In making his decision, Snyder sought out information about Mr. Rodriguez's employment history because he believed it was important. Mr. Rodriguez had not sought workers' compensation benefits as far as Snyder was aware. Ex. 6, Snyder Dep. pp. 91-5.

**RESPONSE**:          UPS objects as the stated fact is immaterial. Answering further and without waiving Its objection, UPS agrees. It is uncontested that Plaintiff was placed on notice of termination and was allowed to continue working. (UPS's Statement of Uncontested Facts ¶¶ 12, 36). Rodriguez was returned to work through the grievance procedure after his Union timely filed a grievance. (Snyder Suppl. Decl. ¶ 8).

75.     On April 21, 2006, package car driver Anna Brickley was terminated by Kerry Snyder for alleged dishonesty in violation of Article 54. She was accused of taking credit for pick-up stops she was not making. After one day, Snyder reduced the termination to a suspension. Ex. 20, UPS Ans. to 2nd Ints., p. 4.

**RESPONSE**:          UPS objects as the stated fact is immaterial. Answering further and without waiving Its objection, UPS agrees. It is uncontested that Plaintiff was placed on notice of termination and was allowed to continue working. (UPS's Statement of Uncontested Facts ¶¶ 12,

36). Brickley was returned to work through the grievance procedure after her Union timely filed a

grievance.  (Snyder Suppl. Decl. ¶ 9).

76.    Ms. Brickley did not file any workers' compensation claims while under the supervision of Snyder. Ex. 16, UPS Ans. to 1st Ints., Int. No. 4, p. 3.; Ex. 17, UPS Suppl. Int. Ans., pp. 1-4.

**RESPONSE**:        UPS objects as the stated fact is immaterial.  Answering further and without

waiving Its objection, UPS agrees.    It is uncontested that Plaintiff was placed on notice of

termination and was allowed to continue working.  (UPS's Statement of Uncontested Facts ¶¶ 12,

36). Brickley was returned to work through the grievance procedure after her Union timely filed a

grievance.  (Snyder Suppl. Decl. ¶ 9).

77.    On or about October 27, 2005, Snyder and/or Ziltz placed Brian Slay on notice of termination for alleged dishonesty ion violation of Article 54.  He was accused of falsifying doctor's notes.  Snyder and/or Ziltz subsequently reduced the termination to a warning. Ex. 20, UPS Ans. to 2nd Ints., p. 4.

**RESPONSE**:        UPS agrees that Snyder placed Slay on notice of termination.  Answering

further, a grievance was timely posted and the notice of termination was reduced to a warning.

(Snyder Supp. Decl. ¶ 7).

78.    Mr. Slay did not file any workers' compensation claims while under the supervision of Snyder.  Ex. 16, UPS Ans. to 1st Ints., Int. No. 4, p. 3.; Ex. 17, UPS Suppl. Int. Ans., pp. 1-4.

**RESPONSE**:        UPS agrees.

79.    On or about July 15, 2005, Snyder and/or Ziltz terminated Deanna Reynolds for alleged failure to report an accident.  After one day, Snyder and/or Ziltz reduced the termination to a suspension. Ex. 20, UPS Ans. to 2nd Ints., p. 5.

**RESPONSE**:          UPS objects as the stated fact is immaterial.  Answering further and without waiving Its objection, UPS agrees.   It is uncontested that Plaintiff was placed on notice of termination and was allowed to continue working.  (UPS's Statement of Uncontested Facts ¶¶ 12, 36).  Reynolds was returned to work through the grievance procedure after her Union timely filed a grievance.  (Snyder Suppl. Decl. ¶ 10).

80.    Mr. Reynolds did not file any workers' compensation claims while under the supervision of Snyder.  Ex. 16, UPS Ans. to 1st Ints., Int. No. 4, p. 3.; Ex. 17, UPS Suppl. Int. Ans., pp. 1-4.

**RESPONSE**:          UPS objects as the stated fact is immaterial.  Answering further and without waiving Its objection, UPS agrees.   It is uncontested that Plaintiff was placed on notice of termination and was allowed to continue working.  (UPS's Statement of Uncontested Facts ¶¶ 12, 36).

81.    As one of his "critical skills raters" for his 2005 "Quality Performance Review" ("QPR"), Snyder selected Ziltz.   Ex. 6, Snyder Dep. p. 252-53, Dep. Ex. 10, Snyder 2005 QPR.

**RESPONSE**:          UPS objects as the stated fact is immaterial.  Answering further and without waiving Its objection, UPS agrees.  Snyder also selected five other people to rate him.  (Plaintiff's Ex. 6).

82.    During 2005, Snyder's boss, Randall Dunn, monitored workers' compensation costs in the Aurora Center for purposes of rating Snyder's performance.  Ex. 18, Dunn Dep. pp. 143-4. Similarly, in his year-end 2005 QPR, "workmans comp cost" is one numerical rating that comprised Snyder's "2005 Final Score."  The greater the workers' comp costs in his center during the year, the lower his numerical rating for that category, and consequently the lower his final score, and ultimately his pay raise. Ex. 18, Dunn Dep. pp. 143-5.

**RESPONSE**:          UPS objects as the stated fact is immaterial.  Answering further and without waiving Its objection, UPS agrees, but regardless of Plaintiff's termination on March 4, 2005,

Plaintiff's on-going worker's compensation costs were still factored into the Aurora Center's costs.

(Snyder Supp. Decl. ¶ 11).

83.    For 2005, Snyder received a 76.39 final score, which in the words of Dunn equated to "a very good [pay] increase that year." Dunn stated that Snyder received close to a 5% pay increase for 2005, "which is higher than average." This was in part due to a decrease in workers' comp costs in his center in 2005 as compared to 2004. Ex. 18, Dunn Dep. p. 146.

**RESPONSE**:  UPS objects as the stated fact is immaterial.  Answering further and without waiving

Its objection, UPS agrees, but regardless of Plaintiff's termination on March 4, 2005, Plaintiff's on-

going worker's compensation costs were still factored into the Aurora Center's costs.  (Snyder Supp.

Decl. ¶ 11).

84.    For the year 2005, one of Snyder's performance goals was to decrease workers' compensation costs. Ex. 18, Dunn Dep. p. 149. Dunn and Snyder would review Aurora Center workers' compensation reports and costs at least monthly. Id. at pp. 28-9. One or more of these reports listed names of Aurora Center workers who had file workers' comp claims, along with medical costs, length of time on workers comp, and general information about the employee. Id. at pp. 26-7.

**RESPONSE**:  UPS objects as the stated fact is immaterial.  Answering further and without waiving

Its objection, UPS agrees, but regardless of Plaintiff's termination on March 4, 2005, Plaintiff's on-

going worker's compensation costs were still factored into the Aurora Center's costs.  (Snyder Supp.

Decl. ¶ 11).

85.    As one of his "critical skills raters" for his 2005 QPR, Ziltz selected Snyder. Snyder also approved Ziltz's 2005 QPR. Ex. 4, Ziltz Dep. p. 35-6, Dep. Ex. 2, Ziltz 2005 QPR, p. UPS 1117.

**RESPONSE**:          UPS agrees.  Answering further, Snyder was Ziltz's immediate supervisor and

UPS management personnel are directed to choose their immediate supervisor as one of their raters.

(Haefke Supp. Decl. ¶ 11).

86.    Similar to Snyder, one of the categories in which Ziltz received a numerical performance rating in 2005 was "workmans comp cost."  Ex. 4, Ziltz Dep. pp. 40-1, Dep. Ex. 2, Ziltz 2005 QPR, p. UPS 1114.  Ziltz, however, claimed that he is not kept informed of such costs during the year.  He stated that he can tell whether he is meeting his goal on workers' comp cost "[b]y the injuries we have in the center."  As a supervisor, he explained, the employees report their injuries to him.  Id. at pp. 41-2.

**RESPONSE**:    UPS objects as the stated fact is immaterial.  Answering further and without

waiving Its objection, UPS agrees, but regardless of Plaintiff's termination on March 4, 2005,

Plaintiff's on-going worker's compensation costs were still factored into the Aurora Center's costs.

(Snyder Supp. Decl. ¶ 11).

87.    Ziltz understood that the lower the workers' comp costs were in 2005 in the Aurora center, the greater his rating would be in that category, and, all else being equal, the greater his final score would be, and the greater his final score, the greater his pay raise.  Ex. 4, Ziltz Dep. pp. 72-3.

**RESPONSE**:    UPS objects as the stated fact is immaterial.  Answering further and without

waiving Its objection, UPS agrees, but regardless of Plaintiff's termination on March 4, 2005,

Plaintiff's on-going worker's compensation costs were still factored into the Aurora Center's costs.

(Snyder Supp. Decl. ¶ 11).

88.    Jose did not lie about the number of packages I had in my truck on February 9, 2005, and he has ever admitted to Kerry Snyder, or anyone for that matter that he in fact told such a lie on that day.  Ex. 8, Andreu Decl.¶ 5.

**RESPONSE**:    UPS can neither agree or disagree with the fact stated in ¶ 88 as it is

nonsensical. Answering further, Plaintiff was placed on notice of termination on February 10, 2005,

for being dishonest about the number of packages in his package car on February 9, 2005.  Plaintiff

was terminated on March 4, 2005, when his Union did not timely grieve his being put on notice of

termination.  (UPS's Statement of Uncontested Facts ¶¶ 36, 40).

Dated: February 11, 2008                    Respectfully submitted,

                                            UNITED PARCEL SERVICE, INC.

                                            By: /s/ *D. Scott Watson*
                                                         One of Its Attorneys


John A. Klages (ARDC #06196781)
D. Scott Watson (ARDC # 06230488)
Ellen M. Girard (ARDC #06276507)
Quarles & Brady LLP
500 West Madison, Suite 3700
Chicago, IL 60661
312/715-5000
312/715-5155 (fax)
DSW@quarles.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney certifies that on February 11, 2008, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Timothy J. Coffey
The Coffey Law Office, P.C.
1403 East Forest Avenue
Wheaton, Illinois  60187
Email: tcofflaw@sbcglobal.net


/s/ *D. Scott Watson*