**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE ANDREU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07 C 06132 |
| v. | ) | |
| | ) | Judge Der-Yeghiayan |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX OF EXHIBITS
TO
DEFENDANT UNITED PARCEL SERVICE INC.'S REPLY TO
PLAINTIFF'S LOCAL RULE 56.1(b)(3) RESPONSE TO DEFENDANT'S
RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL FACTS
AND RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS**

Complaint

Supplemental Declaration of Kerry Snyder

Supplemental Declaration of Tom Haefke

Andreu Deposition Excerpts (including Dep. Exs. 7 and 10)

Bast Deposition Excerpts

Del Dotto Deposition Excerpts

Snyder Deposition Excerpts

Ziltz Deposition Excerpts

DATED: February 11, 2008          UNITED PARCEL SERVICE, INC.

By:    /s/ D. Scott Watson
          One of Its Attorneys

John A. Klages, #06196781
D. Scott Watson, #06230488
Gary R. Clark, #06271092
Quarles & Brady LLP
500 West Madison Street, Suite 3700
Chicago, IL 60661-2511

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on February 11, 2008, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

> Timothy J. Coffey
> The Coffey Law Office, P.C.
> 1403 East Forest Avenue
> Wheaton, Illinois  60187
> Email: tcofflaw@sbcglobal.net

> /s/ D. Scott Watson

## **COMPLAINT**

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL DISTRICT
COUNTY OF DUPAGE

JOSE ANDREU,                          )
                                      ) 2007L001072
        Plaintiff,                    )
                                      )
        vs.                           ) NO.
                                      )
UNITED PARCEL SERVICE, INC.,          )
                                      )
        Defendant.                    )

**Status Date: 01/14/08**
**Next ____ 04/01/08**
**Assigned To: 2010**

```
FILED
Oct 15 2007 - 13:18 PM

Chris Kachiroubas

CLERK OF THE
18TH JUDICIAL CIRCUIT
DU PAGE COUNTY ILLINOIS
```

## COMPLAINT

Plaintiff, JOSE ANDREU, by and through his attorneys, THE COFFEY LAW
OFFICE, P.C., and pursuant to leave of court, complains against Defendant UNITED
PARCEL SERVICE, INC., as follows:

### Nature of Case

1.  Plaintiff brings this action against Defendant to recover damages proximately
    caused by Defendant's illegal retaliatory discharge in violation of the Illinois
    Worker's Compensation Act, 820 ILCS 305/1 *et seq.*, and the common law and
    public policy of the State of Illinois.

### Jurisdiction and Venue

2.  Plaintiff, Jose Andreu (hereafter "Jose"), is an individual residing at all relevant times
    in Chicago, Illinois, County of Cook.

3.  Defendant, United Parcel Service, Inc. (hereafter "UPS"), is an Ohio corporation
    registered and licensed to do business in Illinois.

4.   Venue is proper in this Court in that Defendants' illegal acts complained of herein took place within this Court's geographical jurisdictional boundaries at UPS' Addison, Illinois facility.

**Relevant Facts**

5.   Jose began his employment with UPS in or around September 1996.

6.   Starting in 2003, Jose began working for UPS in the position of package driver. In this position, among other duties, he reported each work day to UPS' Addison, Illinois facility and delivered parcels in UPS' vehicles, departing from and returning to the Addison facility each work day.

7.   On or about January 24, 2005, Jose injured his back at work while on his assigned route delivering packages (hereafter the "work accident").

8.   He immediately called into UPS and reported the work accident and his resulting back injuries.

9.   Later in the day on January 24, 2005, one of Jose's superiors, Dave Ziltz, met Jose out on his route. Upon meeting Jose out on his route, Mr. Ziltz stated to Jose that he believed Jose was lying about the work accident and/or related injuries, and faking his pain.

10.  At various times subsequent to January 24, 2005, Mr. Ziltz repeated his assertions and belief that Jose was lying about the work accident and/or related injuries, and faking his pain.

11.    Also on January 24, 2005, upon Jose's return to UPS' Addison facility at the end of his work day, he sat down with Mr. Ziltz and observed Mr. Ziltz type the work accident and related injury information into a computer. He also observed and listened as Mr. Ziltz called UPS' worked compensation insurance carrier, Liberty Mutual, and reported the work accident and related injuries.

12.    On January 25, 2005, Jose was examined by UPS' physician, Dr. Anthony Tesmond, in connection with the injuries he sustained from the work accident.

13.    Following the work accident, Jose missed work on January 25th and 26th.

14.    Upon returning to work on January 27, 2005, Jose advised Dave Ziltz that he was still experiencing back pain from the injuries he sustained from the work accident.

15.    In January and February 2005, Jose was examined several additional times by Dr. Tesmond and/ or other physicians in his office in connection with the injuries he sustained from the work accident.

16.    Dr. Tesmond and/or his office notified UPS and/or its workers' compensation insurer of each and every occasion that Jose received medical treatment in connection with the injuries he sustained from the work accident.

17.    In February and early March 2005, Jose sought and received additional medical treatment from his own physicians in connection with the injuries he sustained from the work accident.

18.    In February and early March 2005, Jose's physicians notified UPS and, in some instances, Jose's direct supervisors, of Jose's ongoing treatment for the injuries he sustained from the work accident, his prognosis and/or ability to return to work.

19. On or about February 9, 2005, Dave Ziltz met Jose while he was on his route delivering packages. Upon his arrival at Jose's truck, Mr. Ziltz was angry and yelling at Jose. Mr. Ziltz accused Jose of lying about the number of packages and/or stops he had left for the day in an earlier communication Jose had with the Addison facility. Dave Ziltz told Jose he would be fired.

20. On or about February 11, 2005, Jose informed his superiors that he could no longer perform his duties due to the pain he was experiencing from the work accident and related injuries. He subsequently missed several days of work, and continued to receive medical treatment. He returned to work on or about February 17, 2005.

21. On March 4, 2005, Jose's superior, Kerri Snyder, told Jose that his employment with UPS was terminated effective immediately for alleged being dishonest on February 9, 2005. Mr. Snyder then asked another supervisor who was present to escort Jose off of the premises.

22. At all relevant times, Jose's performance met or exceeded UPS' legitimate expectations. Jose was not dishonest on February 9, 2005, and did nothing to legitimately warrant the termination of his employment.

-4-

## UPS TERMINATED JOSE'S EMPLOYMENT IN RETALIATION FOR HIS PROTECTED ACTIVITIES IN VIOLATION OF THE ILLINOIS WORKERS' COMPENSATION ACT, COMMON LAW AND PUBLIC POLICY

23.   Jose's reporting the work accident and related injuries to UPS on January 24, 2005, and seeking medical treatment for such injuries commencing on January 25, 2005, and continuing through the day UPS terminated his employment (i.e., March 4, 2005), all as described above, are activities protected by the Illinois Worker's Compensation Act, 820 ILCS 305/1 et seq. (the "Act").

24.   UPS was aware of Jose's protected activities under the Act as described above at the time it decided to terminate his employment.

25.   Jose's protected activities under the Act were a motivating factor behind UPS' decision to terminate his employment.

26.   As such, UPS' termination of Jose's employment on March 4, 2005, was causally related to his protected activities under the Act.

27.   UPS' termination of Jose was therefore an illegal retaliatory discharge in contravention of Illinois public policy as stated and set forth in the Act.

28.   As a direct and proximate result of UPS' illegal termination of his employment, Jose has suffered a loss of income in the form of wages and prospective retirement benefits, social security and other employment benefits, emotional pain, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, and he is expected to incur future damages.

29.    The above described conduct by UPS was wilful and wanton, and with reckless disregard and indifference to the law and the public policy of Illinois, and to Jose's rights.  UPS should therefore be subject to punitive damages as an example to deter others from engaging in conduct of this kind.

Wherefore, Plaintiff, JOSE ANDREU, respectfully prays unto this Honorable Court as follows:

A.    Order UPS to make him whole by paying him appropriate amount of lost wages, reimbursement for lost pension, social security and other benefits and out-of-pocket expenses, plus pre-judgment interest in an amount to be shown at trial;

B.    Order UPS to immediately reinstate him to his former position; or, in the alternative, order Defendants to pay Jose an appropriate amount of front pay;

C.    Order UPS to pay him punitive and compensatory damages in the maximum amount allowable under the law;

D.    Order UPS to pay his costs incurred in bringing this action, including, but not limited to, expert witness fees;

E.    Try all issues of fact to a jury; and,

F.    Grant such other relief as the Court deems just.

Respectfully submitted,
Plaintiff, JOSE ANDREU

By:

Timothy J. Coffey, Esq.
THE COFFEY LAW OFFICE, P.C.
DuPage County Attorney No. 25571
Attorneys for JOSE ANDREU
1403 E. Forest Avenue
Wheaton, IL  60187
(630) 534-6300

**<u>SUPPLEMENTAL DECLARATION OF KERRY SNYDER</u>**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JOSE ANDREU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07 C 0473 |
| v. | ) | |
| | ) | Judge Der-Yeghiayan |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### SUPPLEMENTAL DECLARATION OF KERRY SNYDER

I, Kerry Snyder, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.    I have been employed by UPS since 1984. In 2005, I was the Business Manager for the Aurora Center in UPS's Addison, Illinois facility.

2.    There was no need for me to do a "full investigation" of whether Jose Andreu was the appropriate person to make the pick-up at Bernia on February 9, 2005. It is the job of my management team to identify the appropriate person to do the Bernina pick up and I was told that the employee was resisting working as directed.

3.    I did not decide that Andreu needed to make the Bernina pick-up but I did affirm the decision of my management team.

4.    Although Guyton was originally taken out of service for allegedly making a "sex remark", after investigation the matter was resolved with Guyton being returned to work with a verbal warning.

5.     There was no issue regarding the timeliness of the Guyton and Blackman grievances as the issues were resolved with the Union through the grievance process and the discipline imposed prior to my signing off on the grievances on March 2, 2005.

6.     Neither Blackman nor Guyton were put on notice of termination for the events that occurred in February, 2005.

7.     Brian Slay was initially put on notice of termination for dishonesty. His Union timely filed a grievance and the notice of termination was reduced to a warning through the grievance procedure.

8.     Dave Rodriguez was returned to work through the grievance procedure after his Union filed a timely grievance.

9.     Anna Brickley was returned to work through the grievance procedure after her Union filed a timely grievance.

10.    Deanna Reynolds was returned to work through the grievance procedure after her Union filed a timely grievance.

11.    Despite his termination on March 4, 2005, Andreu's ongoing workers' compensation costs were still factored into Aurora Center's costs.

FURTHER DECLARANT SAYETH NOT.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: February _5TH_, 2008

_Kerry Snyder_
Kerry Snyder

## SUPPLEMENTAL DECLARATION OF TOM HAEFKE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSE ANDREU,                              )
                                          )
                    Plaintiff,            )
                                          )    Case No. 07 C 06132
v.                                        )
                                          )    Judge Der-Yeghiayan
UNITED PARCEL SERVICE, INC.,              )
                                          )
                    Defendant.            )

## SUPPLEMENTAL DECLARATION OF TOM HAEFKE

I, Tom Haefke, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury

under the laws of the United States of America that the following is true and correct:

1.    I have been employed by UPS since October 1, 1973. Since December,

       2002, I have been the Labor Relations Manager for UPS's North Illinois

       District.

2.    While UPS supervisors do have some disciplinary authority, they do not

       have the ability to unilaterally terminate a package car driver for

       dishonesty.

3.    There was no issue regarding the timeliness of the Guyton and Blackman

       grievances of February, 2005 as they were already resolved and the

       discipline imposed prior to Snyder signing off on them on March 2, 2005.

4.    Neither Blackman nor Guyton were put on notice of termination for the

       incidents of February, 2005.

**ANDREU DEPOSITION EXCERPTS (DEP. EXS. 7 AND 10)**

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

1    IN THE UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF ILLINOIS

3    EASTERN DIVISION

4    JOSE ANDREU,                    )

5                    Plaintiff,      )

6        -vs-                        )   No. 07 C 00473

7    UNITED PARCEL SERVICE, INC.,    )

8                    Defendant.      )

9

10           The deposition of JOSE ANDREU, called for

11    examination, taken pursuant to the Federal Rules

12    of Civil Procedure of the United States District

13    Courts pertaining to the taking of depositions,

14    taken before ZONA B. MILLER, a Notary Public

15    within and for the County of Lake, State of

16    Illinois, and a Certified Shorthand Reporter of

17    said state, at Suite 3700, 500 West Madison

18    Street, Chicago, Illinois, on the 28th day of

19    August, A.D. 2007, at 10:00 a.m.

20

21

22

23

24                                              ORIGINAL

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

1    I will just go ahead and ask this.  Do you

2    remember the name of the clinic?

3         A.    I believe they call Addison Clinic.

4         Q.    Do you remember where it is?

5         A.    Not exactly address, but is on Grace

6    Street, Grace Avenue.

7         Q.    Gray?  Oh, Grace?

8         A.    Grace.

9         Q.    If you look at the top right-hand

10   corner of this document, sir, it indicates a time

11   in at 7:33.  Is that a.m.?

12        A.    Yes.

13        Q.    So you went in the morning before what

14   would be your normal work shift, correct?

15        A.    Yes.

16        Q.    Now, as I look down a little further on

17   this document, there's a section that says

18   Diagnosis.  Do you see where I'm referring to?

19   About two-thirds of the way down the page, sir.

20        MR. COFFEY:  Diagnosis, Scott?

21        MR. WATSON:  Yes.

22   BY THE WITNESS:

23        A.    Yes.

24   BY MR. WATSON:

1    Q.    And as I read this, I just want to make

2    sure we're on the same page, that diagnosis was a

3    low back strain?

4    A.    That's what they put in there.

5    Q.    And under Additional Comments -- I'll

6    read this.  And I know it's doctor's writing, so

7    it's tough for all of us.  But as I read this it

8    says, "Ice or Advil as directed."  Do you read

9    that differently?

10    A.    No.

11    Q.    And towards the top of the page,

12    actually, about a quarter of the way down where it

13    says Disability Status, the box or line for None

14    is marked, correct?

15    A.    Yes.

16    Q.    So you weren't given any work

17    restrictions upon this initial visit?

18    A.    No.

19    Q.    And did you -- you said you were given

20    a copy for you and one for Kerri Snyder.  Did you

21    give Mr. Snyder his copy?

22    A.    Yes.

23    Q.    Did you give it to him directly?

24    A.    Yes.

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

1    Q.    Now, Mr. Andreu, according to paragraph

2    15 of your complaint, it indicates that you missed

3    work on January 25 and 26; that you didn't work

4    those days; is that correct?

5    A.    I believe so.  It was recommended by

6    the doctor.

7    Q.    Is it recommended by the doctor,

8    though?  Is that recommendation anywhere on this

9    form?

10    A.    Yes, the verbal.

11    Q.    Excuse me?

12    A.    Verbal.  He said take couple of days

13    off and ice it out.

14    THE COURT REPORTER:  I'm sorry?

15    BY THE WITNESS:

16    A.    Ice it out.

17    BY MR. WATSON:

18    Q.    Take a couple of days off and ice it

19    out?

20    A.    Yes.

21    MR. COFFEY:  Was your final word "verbal"?

22    Just "verbal," is that what you said?

23    BY THE WITNESS:

24    A.    Yes.

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

1    decision as to who would do which route that day?

2        A.    I have no idea.

3        Q.    And that would also be the same answer

4    for previous times when I asked you about who

5    assigned routes?

6        A.    Right.

7        Q.    And you were okay to work as a package

8    car driver that day, correct?

9        A.    Yes.

10       Q.    You weren't working under any

11   restrictions at that point in time?

12       A.    I was taking Advil four times a day

13   and...

14       Q.    When you left the UPS facility that

15   day, do you remember how many packages you had on

16   your vehicle approximately?

17       A.    No idea.

18       Q.    About how many stops?

19       A.    You can't count the stops in the

20   morning.  The truck is full.  You can't even walk

21   in there.

22       Q.    Just so this is clear to other people

23   who may eventually read this transcript, I think

24   people understand how many packages.  In UPS

1    language, what's a stop?

2        A.    A stop is --

3        MR. COFFEY:  I'll just object to the form of

4    the question.

5                Answer if you can.

6    BY THE WITNESS:

7        A.    Let's say I got a delivery for you.

8    This one stop I got to make and complete.

9    BY MR. WATSON:

10       Q.    So if you came to deliver to this

11    office, this would be a stop?

12       A.    Yes.

13       Q.    And it's one stop regardless of whether

14    there's one package or a hundred packages that

15    you're delivering to this particular --

16       A.    Yes.

17       Q.    -- address, correct?

18       A.    Yes.

19       Q.    On that particular day, Mr. Andreu, did

20    you receive any additional packages after you left

21    in the morning?  Was there a meet point at some

22    time during the day where you received some

23    additional packages?

24       A.    Yes.

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

1        Q.    And you were contacted by UPS that day
2    to do a pickup at Bernina?
3        A.    Yes.
4        Q.    What is Bernina?
5        A.    Is the name of a company.
6        Q.    Do you know what they do there?
7        A.    I have no idea.
8        Q.    Had you ever made a pickup at Bernina
9    before?
10       A.    Yes.
11       Q.    About how many times?
12       A.    I don't remember.
13       Q.    More than five?
14       A.    I don't remember.
15       Q.    No idea, just you made it before?
16       A.    Yes.
17       Q.    It could be one, it could be 20 times
18   before?
19       A.    I don't remember exactly how many
20   times.
21       Q.    Do you remember approximately how many
22   times?
23       A.    No.
24       Q.    When were you contacted about making

1    this pickup at Bernina?

2         A.    I believe it was around 3:00.

3         Q.    And what do you base that on?

4         A.    I'm sorry?

5         Q.    What do you base that on?

6         A.    At that time I had not taken lunch and

7    I was hungry.  I was planning to go and take

8    lunch.

9         Q.    Anything else?

10        A.    Not that I can remember.

11        Q.    Excuse me, sir?

12        A.    I don't remember.

13        Q.    So you were contacted by UPS to make

14   this pickup.  Do you remember who contacted you?

15        A.    No idea.

16        Q.    How were you contacted?

17        A.    Through the DIAD board.

18        Q.    What's called an ODS message?

19        A.    ODS message, yes.

20        Q.    And what did the message say?

21        A.    Break your route and go pick up Bernina

22   ASAP.

23        Q.    Break your route and go pick up Bernina

24   ASAP?

1     A.    Yes.

2     Q.    You didn't say a number?

3     A.    Yeah.

4     Q.    Are you sure about that?

5     A.    Yes.

6     Q.    Did you testify differently in your

7  unemployment hearing?

8     A.    I got another text message saying about

9  how many stops you got.

10     Q.    So that was the next text message?

11     A.    Yeah.

12     Q.    Okay.

13     A.    And I said I got 60 stops.

14     Q.    Did your -- let me take them one at a

15  time.  The message from UPS asked -- did it just

16  ask how many stops you have left?

17     A.    I don't remember exactly.

18     Q.    You're not sure if it said anything

19  else?

20     A.    No, I'm not sure.

21     Q.    Your response, did it just say about 60

22  stops left or did it say something else?

23     A.    That I wanted to take a lunch and that

24  breaking the route was going to take me -- put me

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

1    behind and I was going to come back late to the

2    building.

3        Q.    And those are your recollections of the

4    exact words of your response?

5        A.    I think so.

6        Q.    So you think so.  You're not positive.

7    But the best of your recollection, that's your

8    response?

9        A.    Yes.

10       Q.    Did you say late to the building or did

11   you say a time?

12       A.    I think I say around 8:00.

13       Q.    But you're not sure?

14       A.    I'm not sure.

15       Q.    Did your response say anything else?

16       A.    I don't remember.

17       Q.    Did you get any additional messages in

18   any form from UPS?

19       A.    At one point I call in.

20       Q.    Okay.  Was that point the next message

21   or --

22       A.    Yes.

23       Q.    Before you had heard back from UPS?

24       A.    Yes.

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

1     Q.    You call in?

2     A.    Yes.

3     Q.    When did you call in?

4     A.    In between all these messages; call in

5 and I explain.

6     Q.    But do you remember what time you

7 called in?

8     A.    No, I don't remember.

9     Q.    So you call in.  Who did you talk to?

10    A.    I don't remember who I talk to.  At

11 that time I got -- the person I talked to say,

12 "Forget about it.  Somebody else going to pick it

13 up."

14    Q.    But you don't know who this person is?

15    A.    No.

16    Q.    Was there anything else in that

17 conversation?

18    A.    Not that I remember.

19    Q.    And you say you called -- I'm sorry.

20    A.    It might be some.  I can't remember

21 right now.

22    Q.    You say you called in.  Did you call in

23 on your cell phone?

24    A.    Yes.

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

```
1    packages...

2         A.    In the truck.

3         Q.    How many packages were in the truck at

4    the time?

5         A.    I don't know.

6         Q.    Do you know about?

7         A.    I don't know.

8         Q.    Do you know what Mr. Ziltz had been

9    told about how many packages you had claimed

10   earlier?

11        A.    I don't know what they been told.

12        Q.    You don't even know who you had

13   communicated with at UPS --

14        A.    No.

15        Q.    -- correct?

16              Where did this happen?  Where did --

17   you say in Paragraph 21 that Mr. Ziltz met you on

18   your route.  Where did he meet you, at Bernina?

19        A.    Bernina.

20        Q.    Was anybody else there?

21        A.    No.

22        Q.    When he said these things to you, how

23   did you respond?

24        A.    I didn't say anything.  I was sitting
```

1      Q.      And she says, "You need to come and see

2  Kerri Snyder"?

3      A.      Yes.  And we walk together to the

4  office.

5      Q.      Did you have any conversation with her

6  on the way -- on that trip to the office?

7      A.      Very -- I don't remember.

8      Q.      How long a walk was it from wherever

9  she met you to the office?

10      A.      I don't remember.

11      Q.      A minute?  A minute walk?

12      A.      I don't remember.

13      Q.      Is it possible it was shorter?

14      A.      I don't know.

15      Q.      Is it possible -- you just don't know?

16  It could have been any amount of time; a short

17  amount of time --

18      A.      I don't remember.

19      Q.      So you go with Miss Treadwell to

20  Mr. Snyder's office?

21      A.      Yes.

22      Q.      Who's there?

23      A.      Mr. Snyder.

24      Q.      Anyone else?

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

1       A.      No.

2       Q.      Does Miss Treadwell accompany you to

3   the meeting?

4       A.      Yes.

5       Q.      And what happens?

6       A.      Mr. Kerri Snyder ask me what happened

7   the night before, the day before.  I told him what

8   happened.  And he put me on notice of termination.

9       Q.      When you say that Mr. Snyder asked you

10  what happened the day before and you told him what

11  happened, what all did you tell him?

12      A.      I told him exactly what happens.

13      Q.      As you described it here today?

14      A.      Yes.

15      Q.      Did you feel you got the chance to tell

16  him everything?

17      A.      Yes.

18      Q.      And you told him that Dave Ziltz had

19  yelled at you and called you a liar?

20      A.      Yes.

21      Q.      And after you had a chance to tell

22  Mr. Snyder everything he told you, you were being

23  on notice of termination, correct?

24      A.      Yes.

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

1    BY MR. WATSON:

2        Q.    Mr. Andreu, I've handed you what's been

3    marked as Andreu Exhibit 10.  I'm going to ask you

4    to take a look at this document.  And do you

5    recognize this?

6        A.    Yes.

7        Q.    What is this, sir?

8        A.    This is a copy of the -- it's a copy

9    from the doctor's office.

10        Q.    Is that a copy of something from the

11    doctor's office?  Would this be a note detailing

12    your visit, for lack of a better description?

13        A.    I don't know.  Every time I went there,

14    they give me a copy, two copies; one for the

15    supervisor and one for me to give.

16        Q.    Let's just see if we can't figure out

17    maybe a couple of things from this even despite

18    that.

19              If you look on the top right-hand

20    corner on Date, it says 2/10/05, is that correct?

21        A.    Yes.

22        Q.    Do you have any reason to believe this

23    isn't from February 10th, 2005?

24        A.    No.

1    Q.    And below that it says Time In:  7:39,

2    and Time Out:  7:55.  If you recall, would that

3    have been in the morning or in the evening?

4    A.    I believe it was morning time.

5    Q.    Under Disability Status, again, as in

6    the document we looked at earlier, none is X'd, is

7    marked, is that correct?

8    A.    Yes.

9    Q.    Under Diagnosis, this gets a little

10   tougher with doctor writing, but I believe that

11   says lumbosacral strain, if you have any idea.

12   A.    No idea.

13   Q.    As you look at this doctor's note and

14   as you also recall the visit, do you recall being

15   given any restrictions on this date as with regard

16   to your ability to work?

17   A.    No, no restrictions.

18   Q.    Sir, looking back at your complaint

19   that we've been going through, would you look at

20   Paragraph 22, and this is on page 4, sir, it says

21   on or about February 11, 2005, you informed your

22   superiors you could no longer perform your duties

23   due to the pain you were experiencing.  Is that

24   what it says?  And, again, I was paraphrasing.

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

1      A.    Yes.

2      Q.    Who did you inform?

3      A.    Mr. Kerri Snyder.

4      Q.    At the time you informed Mr. Snyder,

5   did you have something from a doctor saying that

6   you couldn't work?

7      A.    No.

8      Q.    And according to the last two sentences

9   of Paragraph 22 of the complaint you missed

10  several days of work, and continued to receive

11  medical treatment, and returned to work on or

12  about February 17th, is that correct?

13     A.    Yes.

14     Q.    Now, when you returned to work on

15  February 17th, did you return as a package car

16  driver?

17     A.    I believe I was placed on light duty at

18  that time.

19     Q.    Did you hear the term "TAW" or

20  "temporary alternative work" used?

21     A.    No.

22     Q.    Have you ever heard those terms before

23  with regard to --

24     A.    I don't remember.

JOSE ANDREU, AUGUST 28, 2007
CONFIDENTIAL

1   STATE OF ILLINOIS   )

2                       )   SS:

3   COUNTY OF L A K E   )

4          I, ZONA B. MILLER, a Notary Public within

5   and for the County of Lake, State of Illinois, and

6   a Certified Shorthand Reporter of said state, do

7   hereby certify:

8          That previous to the commencement of

9   the examination of the witness, the witness was

10  duly sworn to testify the whole truth concerning

11  the matters herein;

12         That the foregoing deposition

13  transcript was reported stenographically by me,

14  was thereafter reduced to typewriting under my

15  personal direction and constitutes a true record

16  of the testimony given and the proceedings had;

17         That the said deposition was taken

18  before me at the time and place specified;

19         That I am not a relative or employee or

20  attorney or counsel, nor a relative or employee of

21  such attorney or counsel for any of the parties

22  hereto, nor interested directly or indirectly in

23  the outcome of this action.

24         IN WITNESS WHEREOF, I do hereunto set

1   my hand and affix my seal of office at Chicago,

2   Illinois, this 10th day of September, 2007.

3

4               Notary Public, Lake County,

5               Illinois.

6               My commission expires May 1, 2010.

7

8

9   C.S.R. Certificate No. 84-0428.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

EXHIBIT 7
FOR I.D. 8/26/07    1:28M

Jan 26 05 08:14a                                                    p.3

FIRST VISIT              RECHECK

PATIENT DISABILITY INFORMATION

PT NAME Andrew Jones                    DATE: 1-25-05

COMPANY NAME: UPS                       TIME IN: 7:32
                                        TIME OUT: 8:00

ADDISON MEDICAL CENTER                  ANTHONY G. TESMOND, D.O.
501 S. GRACE STREET                     ADRIENNE BAKSINSKI, D.O.
ADDISON, IL 60101                       STEVEN HEADLEY, D.O.
630-543-4040  FAX 630-543-1050          TED SUCHY, D.O.

DISABILITY STATUS:

TOTAL_____  PARTIAL_____    NONE ____  DISCHARGED_____

NO_____     LIMITED_____

___LIFTING OVER___LBS.                  _____DRIVING
___STOOPING OR BENDING                  _____WORK INVOLVING RAPID
___STRENUOUS LABOR                             ACTION OR DECISION MAKING
___OVERHEAD REACHING                    _____CLERICAL WORK ONLY
___CLIMBING STAIRS/LADDERS              _____SIT DOWN WORK ONLY
___REPETITIVE PUSHING/PULLING           _____GROUND LEVEL WORK ONLY
___PROLONGED STANDING/WALKING           _____AVOID CONTACT WITH_____
___OPERATING ON/NEAR MACHINERY          _____CONTINUE MEDICATION

NO USE OF_____      LIMITED USE OF_____

RIGHT_____          LEFT_____

HAND_____    ARM_____    FOOT_____    LEG_____

DIAGNOSIS:

Low Back Strain

_____ D.O./M.D.

ADDITIONAL COMMENTS: D/C / OTC Advil —
as direct

NEXT PHYSICIANS APPT:              PHYSICAL THERAPY APPT:
1/27/05                            DATE:_____
(OR SOONER IF NEEDED) Will call to  TIME:_____
schedule time

PLEASE RETURN THIS FORM TO YOUR SUPERVISOR

UPS 0144

*Andrew* EXHIBIT *10*
FOR I.D. *8/8/07    15*

FIRST VISIT        RECHECK

1/24

## PATIENT DISABILITY INFORMATION

PT NAME: *Andrew Jose*                    DATE: *2-10-05*

COMPANY NAME: *UPS*                        TIME IN: *239*
                                           TIME OUT: *1:55*

ADDISON MEDICAL CENTER                     ANTHONY G. TESMOND, D.O.
501 S. GRACE STREET                        ADRIENNE BAKSINSKI, D.O.
ADDISON, IL 60101                          STEVEN HEADLEY, D.O.
630-543-4040    FAX 630-543-1050           TED SUCHY, D.O.

DISABILITY STATUS:

TOTAL_____    PARTIAL_____        NONE (X)    DISCHARGED_____

NO_____    LIMITED_____

___ LIFTING OVER____ LBS.              ___ DRIVING
___ STOOPING OR BENDING                ___ WORK INVOLVING RAPID
___ STRENUOUS LABOR                        ACTION OR DECISION MAKING
___ OVERHEAD REACHING                  ___ CLERICAL WORK ONLY
___ CLIMBING STAIRS/LADDERS            ___ SIT DOWN WORK ONLY
___ REPETITIVE PUSHING/PULLING         ___ GROUND LEVEL WORK ONLY
___ PROLONGED STANDING/WALKING         ___ AVOID CONTACT WITH____
___ OPERATING ON/NEAR MACHINERY        ___ CONTINUE MEDICATION

NO USE OF____          LIMITED USE OF____

RIGHT____              LEFT____

HAND____    ARM____          FOOT____    LEG____

DIAGNOSIS: *Lumbosacral Strain*

                                       *[signature]* D.O./M.D.

ADDITIONAL COMMENTS: *1) meds 2) w/m vest*
*3) LB stretch*

NEXT PHYSICIAN APPT:                   PHYSICAL THERAPY APPT:
*2/14/05*                               DATE:

UPS 0145

**BAST DEPOSITION EXCERPTS**

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSE ANDREU,                        )
                                    )
              Plaintiff,            )
                                    )
       -vs-                         )   No.   07 C 0473
                                    )
UNITED PARCEL SERVICE, INC.,        )
                                    )
              Defendant.            )


         The deposition of CHERYL BAST, called by

the Plaintiff, for examination, taken pursuant to

notice and pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken

before Tamara Manganiello, Registered Professional

Reporter and Notary Public, at Suite 850, 29 South

LaSalle Street, Chicago, Illinois, on the 26th day

of July, A.D., 2007, commencing at 8:41 a.m.

ce008dc4-d7a7-4cf3-9bbd-1a497e88ddcf

Page 12

1          A.      Yes.

2          Q.      How do you determine which driver --

3    let me take a step back.

4                  Do you determine which driver to

5    notify?

6          A.      Yes.

7          Q.      Who do you consult in making that

8    determination?

9          A.      I will make that decision myself.

10         Q.      What do you consult?  Do you consult

11   any reports or any other information?

12         A.      I will -- we have loops.  They're

13   dispatch loops.  And I'll usually go -- if I need

14   help in a certain loop, I'll go to the loop that's

15   right next to it.

16         Q.      Is that like a route?

17         A.      So each area -- yeah, it's a route.

18   Yes.

19         Q.      So a dispatch loop is a route?

20         A.      Right.  Well, we have loop numbers.

21   Like 19B, 19C, 19D, that's all in one loop.  So if

22   19D needs help, I'll go to 19C, 19E, someone in that

23   loop who's right next to that route.

24         Q.      Okay.  If a driver needs help?

ce008dc4-d7a7-4cf3-9bbd-1a497e88ddcf

Page 25

1    Q.    The route that Jose was on that day?

2    A.    Yes.

3    Q.    Did you know anything about the extent

4    of the pick-up, like how many packages needed to be

5    picked up, how heavy the packages were?

6    A.    Normally, they're a large shipper.

7    That day, I don't know.  I don't remember if they

8    had said they had a lot or not, but they're normally

9    on a daily basis a large shipper.

10    Q.    What's that mean?

11    A.    Four, five skids.  It's not just like

12    one or two packages.

13    Q.    Okay.  At the time that you, I guess,

14    made the decision that Mr. Andreu would be -- you

15    would request this of Mr. Andreu, were you aware

16    that he had been injured January 24th of '05, just a

17    couple of weeks prior?

18    A.    No, I wasn't aware of it.

19    Q.    Were you aware that he was

20    suffering -- that he had had a back injury and was

21    suffering pain from that injury?

22    A.    No, I was not aware of it.

23    Q.    Did you -- no information from

24    Mr. Ziltz or Mr. Snyder that we had an injured

ce008dc4-d7a7-4cf3-9bbd-1a497e88ddcf

Page 26

1  driver and his name is Jose Andreu?

2       A.    No.

3       Q.    No?

4       A.    No.

5       Q.    Would that have made any difference to

6  you?

7       A.    No.

8       Q.    Even with a heavy, multiple skids type

9  of pick-up?

10      A.    No.  I would have gone to that route

11  anyway first.

12      Q.    And why is it that you went to his

13  route?

14      A.    It's the closest route.

15      Q.    And how did we know that?

16      A.    Because the route location is the

17  closest to that pick-up.  And, also, that route

18  doesn't have any other pick-ups, so I know he has

19  room to pick up that amount of skids.

20      Q.    What route doesn't have any other

21  pick-ups?

22      A.    The route that Jose was on that day,

23  the Route 59 res. route.

24      Q.    He was on a residential route?

Page 31

1    Q.    Okay.  How do you know shortly before
2    4:00?
3    A.    Because I remember I had talked to
4    Jose around 4:00 o'clock, so I had to be notified
5    that the pick-up needed to be covered in order to
6    send him a message.
7    Q.    When you say you talked to Jose, this
8    is when he calls you back?
9    A.    Correct.
10    Q.    You say it's around 4:00 o'clock?
11    A.    Yes.
12    Q.    What range are we looking at in your
13    memory?
14    A.    Maybe five to 4:00, five after 4:00.
15    Between that time.
16    Q.    So maybe 3:55 to 4:05?
17    A.    Yes.
18    Q.    And how do you know that?
19    A.    Because that's what time it was.
20    Q.    Did you write this --
21    A.    I do remember it was -- I remember
22    looking at the clock at about ten after because I
23    was thinking who am I going to get to cover this,
24    because I know the other drivers in that area at

ce008dc4-d7a7-4cf3-9bbd-1a497e88ddcf

1  that time have pick-ups, as well.  And I do remember

2  looking at the clock and it was about 4:10.

3        Q.      Other than we see as Exhibit No. 1,

4  did you make any notes of any of this, any of the

5  times that we're going to be discussing here, any of

6  the times you've already discussed?

7        A.      No.  This is it.

8        Q.      So you text messaged and Mr. Andreu

9  then calls back.  And this is a telephone call?

10        A.      Yes.

11        Q.      And you get this at your office

12  telephone?

13        A.      Yes.

14        Q.      Where do you receive this at?

15        A.      Yes.  The office phone.

16        Q.      What number is that office phone?

17        A.      There is multiple lines in there.

18  Whatever line is free, it will just go to the next

19  line.

20        Q.      If I wanted to call that number back

21  on February 9th, '05, what number would I dial?

22        A.      Well, the drivers have an 800 number

23  to call.  I don't know if he called that 800 number,

24  which would, you know, still go into the office or

Page 37

1    Q.    -- as to what time?

2    A.    No.

3    Q.    Were you ever asked to see if you can

4  get a record from the DIAD system or any other

5  system, computer system to verify what time your --

6    A.    No.

7    Q.    -- second text message would have

8  been?

9    A.    No.

10    Q.    What time was it?

11    A.    That was probably about between

12  quarter after and 20 after 4:00.

13    Q.    Probably?

14    A.    I didn't look at the clock.

15    Q.    How do we know what time it was?

16    A.    Well, I know it was between 4:00 and

17  4:30.

18    Q.    How?

19    A.    Because at 4:30 Dave called me and I

20  remember I looked at the -- well, that was about --

21  it was at 4:42 when Dave called me.

22    Q.    Was it 4:30 or 4:42?

23    A.    It was 4:42.

24    Q.    How do you know that?

ce008dc4-d7a7-4cf3-9bbd-1a497e88ddcf

1    A.    Because that I wrote down.

2    Q.    From looking at your memo, huh?

3    A.    No, I didn't.  I didn't look at it,

4    but I do remember that.

5    Q.    Well, you said 4:30, then you looked

6    at your memo, then you said 4:42, correct?

7    A.    I didn't look at the memo.  But I did

8    say 4:30 first.  But it was 4:42.

9    Q.    How did you make the move from 4:30

10    to 4:42?

11    A.    Because that's what time it was.  I do

12    remember when Dave called I looked at the clock and

13    it was at 4:42.

14    Q.    When did you write this memo, Exhibit

15    No. 1?

16    A.    Shortly before 5:00.

17    Q.    At the end of your day?

18    A.    Yes.

19    Q.    Okay.  Now, you text message back to

20    Mr. Andreu on his route.  What was the content of

21    the message?

22    A.    I need you to go to Bernina now.

23    Q.    Anything else?

24    A.    No.

1  STATE OF ILLINOIS      )
                          )   SS.
2  COUNTY OF W I L L      )

3

4          I, Tamara Manganiello, a notary public

5  within and for the County of Will and State of

6  Illinois, do hereby certify that heretofore, to-wit,

7  on the 26th day of July, A.D., 2007, personally

8  appeared before me at Suite 850, 29 South LaSalle

9  Street, in the City of Chicago, County of Cook and

10 State of Illinois, CHERYL BAST, a witness, called by

11 the Plaintiff in a certain cause now pending and

12 undetermined, wherein JOSE ANDREU is the plaintiff

13 and UNITED PARCEL SERVICE, INC., is the defendant.

14         I further certify that the said

15 witness, CHERYL BAST, was by me first duly sworn to

16 testify the truth, the whole truth and nothing but

17 the truth in the cause aforesaid; that the testimony

18 then given by her was by me reduced to writing by

19 means of shorthand in the presence of said witness

20 and afterwards transcribed upon a computer, and the

21 foregoing is a true and correct transcript of the

22 testimony so given by her as aforesaid.

23         I further certify that the reading and

24 signing of said deposition was reserved by the

ce008dc4-d7a7-4cf3-9bbd-1a497e88ddcf

Page 74

1    witness.

2            I further certify that the taking of the

3    deposition was pursuant to notice, and that there

4    were present at the taking of the deposition the

5    aforementioned parties.

6            I further certify that I am not counsel

7    for nor in any way related to any of the parties to

8    this suit, nor am I in any way interested in the

9    outcome thereof.

10           In testimony whereof I have hereunto set

11   my hand and affixed my notarial seal this 21st of

12   August, A.D., 2007.

13

14
                    _____
15                  TAMARA MANGANIELLO, RPR
                    Illinois License No. 084-004560
16

17

18

19

20

21

22

23

24

ce008dc4-d7a7-4cf3-9bbd-1a497e88ddcf

**DEL DOTTO DEPOSITION EXCERPTS**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSE ANDREU,                        )
                                    )
                  Plaintiff,        )
                                    )
          vs.                       ) No. 07 C 0473
                                    )
UNITED PARCEL SERVICE, INC.,        )
                                    )
                  Defendant.        )

    The deposition of MELISSA DEL DOTTO, called by

the Plaintiff for examination, taken pursuant to the

Federal Rules of Civil Procedure of the United States

District Courts pertaining to the taking of

depositions, taken before MARGARET R. BEDDARD, a

Notary Public within and for the County of Kane,

State of Illinois, and a Certified Shorthand Reporter

of said state, at Suite 850, 29 South LaSalle Street,

Chicago, Illinois, on the 31st day of July, A.D.

2007, at 10:53 a.m.

1    conversations --

2         A.    Conversations, yes.

3         Q.    Let me get my question out.

4         A.    I'm sorry.

5         Q.    Then you can answer.  Okay?

6         A.    Okay.

7         Q.    Let me go again.

8              Mr. Coffey asked you some questions about

9    some conversations with Dave Ziltz, correct?

10        A.    Yes.

11        Q.    He asked you about conversations you had

12   with Mr. Ziltz regarding Mr. Andreu's injury.

13             Do you recall that?

14        A.    Yes.

15        Q.    I think he may have asked this, but I don't

16   recall.

17             Do you remember how many conversations you

18   had with Mr. Ziltz specifically about Mr. Andreu's

19   January 24 injury?

20        A.    Just one.

21        Q.    Do you remember about when that

22   conversation happened?

23        A.    A couple days after he got injured.

24        Q.    So close to January 24?

1  STATE OF ILLINOIS )
                     )  SS:
2  COUNTY OF K A N E )

3       I, MARGARET R. BEDDARD, a Notary Public

4  within and for the County of Kane, State of Illinois,

5  and a Certified Shorthand Reporter of said state, do

6  hereby certify:

7       That previous to the commencement of the

8  examination of the witness, the witness was duly

9  sworn to testify the whole truth concerning the

10 matters herein;

11      That the foregoing deposition was reported

12 stenographically by me, was thereafter reduced to a

13 printed transcript by me, and constitutes a true

14 record of the testimony given and the proceedings

15 had;

16      That the said deposition was taken before me

17 at the time and place specified;

18      That the reading and signing by the witness

19 of the deposition transcript was agreed upon as

20 stated herein;

21      That I am not a relative or employee or

22 attorney or counsel, nor a relative or employee of

23 such attorney or counsel for any of the parties

24 hereto, nor interested directly or indirectly in the

Page 83

1    outcome of this action.

2              IN WITNESS WHEREOF, I do hereunto set my

3    hand and affix my seal of office at Chicago,

4    Illinois, this _____ day of August, 2007.

5

6

7

8              _____

                Notary Public, Kane County, Illinois
9              My commission expires July 29, 2007

10   CSR Certificate No. 84-3565

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**<u>SNYDER DEPOSITION EXCERPTS</u>**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


JOSE ANDREU,                    )
                               )
          Plaintiff,           )
                               )
   vs.                         ) No. 07 C 0473
                               )
UNITED PARCEL SERVICE, INC.)
                               )
          Defendant.           )


        The deposition of KERRY SNYDER called by
the Plaintiff for examination pursuant to notice and
pursuant to the Federal Rules of Civil Procedure for
the United States District Courts pertaining to the
taking of depositions, taken before Denise Andras,
Certified Shorthand Reporter and Notary Public
within and for the County of Cook and State of
Illinois at 29 South LaSalle, Illinois, on the 11th
day of July, A. D., 2007.

Page 68

1    your actual findings from the truck?

2         A.    Correct.

3         Q.    And there was no doubt from that

4    comparison that there was a discrepancy?

5         A.    Correct.

6         Q.    And he was lying about this

7    information?

8         A.    Correct.

9         Q.    What happened to Mr. Petkov?

10        A.    He was discharged.

11        Q.    Did he file a grievance?

12        A.    Yes.

13        Q.    What happened after with the

14    grievance?

15        A.    It was reduced to a suspension.

16        Q.    Do you know if he is still working?

17        A.    I don't know.

18        Q.    Was he working at the time that you

19    left Joliet center?

20        A.    Yes.

21        Q.    What was his position?

22        A.    Package car driver.

23        Q.    Did you take part in any grievance

24    meetings or arbitrations with respect to Mr. Petkov?

91bb9cf6-35dc-4cac-a300-f2feb09c3d38

Page 69

1      A.      Yes.

2      Q.      How many?

3      A.      One.

4      Q.      Just a meeting?

5      A.      Yes.

6      Q.      At that point, was that the point that

7  it was reduced?

8      A.      Yes.

9      Q.      So what was your position with respect

10 to that, in that meeting, in the grievance meeting

11 with Mr. Petkov?

12     A.      I don't quite understand "my

13 position".

14     Q.      You say his termination was reduced to

15 a suspension, correct?

16     A.      Correct.

17     Q.      And that's something that you must

18 have authorized or okayed, correct?

19     A.      Actually the lead person there, the

20 lead individual there would be the labor department

21 was involved in it.

22     Q.      And who was the lead person for the

23 labor department at that point, Joliet center?

24     A.      It was I believe Tom Hefke.

91bb9cf6-35dc-4cac-a300-f2feb09c3d38

Page 215

1    Q.    But you recall a meeting where you are

2 getting your information from Dave Ziltz where he

3 comes back with his truck on the evening of February

4 9th?

5    A.    Yes.

6    Q.    Where was that at?

7    A.    That was in my office.

8    Q.    And you and Mr. Ziltz -- nobody else

9 present?

10    A.    Yes, I don't remember anybody else.

11    Q.    What was said by Mr. Ziltz?

12    A.    He just recapped the incident.

13    Q.    Do you remember anything specific or

14 have a specific recollection with anything

15 Mr. Ziltz said in this meeting?

16    A.    Just that he went out there to look

17 into Jose -- went out there and met up with Jose

18 Andreu and he had, like at that point in time, I

19 thought he said he had less than 20 stops left.

20    Q.    And you think that's what he said or

21 that's what he said?

22    A.    I am not a hundred percent sure.

23    Q.    So you don't specifically remember but

24 that's your belief?

L.A. REPORTING (312) 419-9292

91bb9cf6-35dc-4cac-a300-f2feb09c3d38

Page 219

1          Q.          What else is said in your meeting with

2     Mr. Ziltz on the evening of February 9th?

3          A.          I don't remember.

4          Q.          When do you make the decision that you

5     are going to have a meeting the following morning

6     and put him on notice of termination?

7          A.          I believe it was at this meeting.

8          Q.          When you are talking to Mr. Ziltz?

9          A.          Yes.

10          Q.          The notice of termination, that's what

11     you conclude, correct?

12          A.          Not necessarily at that -- not

13     necessarily like that.

14          Q.          Okay, I don't want to put words in

15     your mouth.  How did you conclude -- you said at

16     this meeting you made your decision to put him on

17     notice of termination?

18          A.          At this meeting Dave Ziltz presents

19     the facts.  I've only got one side of the story, and

20     I don't have Jose Andreu's side of the story until

21     we meet on the 10th.

22          Q.          Okay.  So it's your testimony that you

23     don't decide to put him on notice of termination

24     until you meet with Jose Andreu on the 10th in the

91bb9cf6-35dc-4cac-a300-f2feb09c3d38

Page 220

1    morning?

2          A.     Correct.

3          Q.     So in the meeting on the 10th you make

4    the decision to put him on notice of termination?

5          A.     Correct.

6          Q.     Not before?

7          A.     No, not before.

8          Q.     What else do you do prior to the

9    meeting on the 10th to look into the situation,

10   investigate the situation?

11         A.     I don't remember doing anything else.

12         Q.     During the day Ms. Bast had been in

13   your office, and you had your exchange with her that

14   we talked about, correct?

15         A.     Yes.

16         Q.     Then at night Mr. Ziltz comes in and

17   you have your talk with him that we've already

18   talked about, correct?

19         A.     Yes.

20         Q.     What else, if anything, any other

21   discussion, any other information, that you have

22   prior to going into your meeting on February 10th in

23   the morning?

24         A.     I don't know if there's any other -- I

91bb9cf6-35dc-4cac-a300-f2feb09c3d38

Page 246

1    the situation warranted, yes.

2         Q.    Well, the situation is the information

3    you have as if he comes to you on February 9th, and

4    we've covered that, was this an appropriate

5    statement if it was made?

6         A.    Yes, I believe it would be an

7    appropriate statement, yes.

8         Q.    From Mr. Ziltz to make that

9    statement, that decision, right there and then

10   without even conferring with you?

11        A.    Yes.

12        Q.    But does he have authority to

13   recommend as of -- what was his position, an on-road

14   supervisor?

15        A.    Yes.

16        Q.    Does he have authority to -- he

17   doesn't have termination authority, right?

18        A.    In some capacities supervisors have

19   termination authorities.  I did as a supervisor in

20   Peru.

21        Q.    I am talking about Ziltz as a

22   supervisor underneath you at the Aurora center, did

23   he have authority to terminate under you?

24        A.    Still, yes, but out of courtesy he

91bb9cf6-35dc-4cac-a300-f2feb09c3d38

Page 277

1    STATE OF ILLINOIS    )
                          )    SS:
2    COUNTY OF C O O K    )

3             I, Denise A. Andras, a Notary Public within

4    and for the County of Cook and State of Illinois,

5    and a Certified Shorthand Reporter of said state, do

6    hereby certify that heretofore, to-wit, on the 11th

7    day of July, 2007, KERRY SNYDER personally appeared

8    before me at 29 South LaSalle Street, in the City of

9    Chicago, in the County of Cook and State of

10   Illinois, a witness in a certain cause now pending

11   and undetermined, wherein Jose Andreu is the

12   Plaintiff and UPS is the Defendant.

13            I further certify that the said witness was

14   first duly sworn to testify the truth, the whole

15   truth and nothing but the truth in the cause

16   aforesaid; that the testimony then given by said

17   witness was reported stenographically by me, in the

18   presence of said witness, and afterwards reduced to

19   typewriting by Computer-Aided Transcription, and the

20   foregoing is a true and correct transcript of the

21   testimony so given by said witness as aforesaid.

22            I further certify that the signature of the

23   witness to the foregoing deposition was not waived

24   by agreement of counsel for the respective parties;

91bb9cf6-35dc-4cac-a300-f2feb09c3d38

Page 278

1   and that I am not counsel for nor in any way related

2   to any of the parties to this suit nor am I in any

3   way interested in the outcome thereof.

4           In witness whereof, I have hereunto set my

5   hand and affixed my notarial seal this _____ day of

6   _____, 2007.

7

8

9   _____

    Notary Public, Cook County, Illinois
10  C.S.R. License No. 084-003437

11

12

13

14

15

16

17

18

19

20

21

22

23

24

91bb9cf6-35dc-4cac-a300-f2feb09c3d38

**ZILTZ DEPOSITION EXCERPTS**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


JOSE ANDREU,                    )
                               )
            Plaintiff,          )
                               )
     -vs-                       )    No.  07 C 0473
                               )
UNITED PARCEL SERVICE, INC.,    )
                               )
            Defendant.          )


        The deposition of DAVID ZILTZ, called by

the Plaintiff, for examination, taken pursuant to

notice and pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken

before Tamara Manganiello, Registered Professional

Reporter and Notary Public, at Suite 850, 29 South

LaSalle Street, Chicago, Illinois, on the 26th day

of July, A.D., 2007, commencing at 11:04 a.m.

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

1        A.       Yes.

2        Q.       On January 24th?

3        A.       Yes.

4        Q.       Okay.   What did he say to you then in

5   the morning?

6        A.       He did not want to do that route.   Did

7   not want to.

8        Q.       Did he tell you why?

9        A.       Just it was full, the load was heavy.

10  That's it.

11       Q.       He said I don't want to do the route,

12  it is full and the load is heavy?

13       A.       Yes.

14       Q.       Did he say I'm not feeling well, I

15  don't feel very strong today, I feel an ailment

16  today, anything?

17       A.       No.

18       Q.       What did you say?

19       A.       That he needed to do the route.   It

20  was the route he was on.

21       Q.       Okay.   Had you ever heard anything

22  like this from Jose in the past before January 24th,

23  '05?

24       A.       No.

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 53

1  it's in the morning and they tell you that he's been

2  hurt?

3          A.      Yes.

4          Q.      And you immediately have doubts?

5          A.      Yes.

6          Q.      Anything else that we haven't covered

7  that leads you to have some doubts?

8          A.      No.

9          Q.      Just things he said to you that

10 morning?

11         A.      Yes.

12         Q.      And then when you arrive at his truck,

13 do you express these doubts to him?

14         A.      Yes.

15         Q.      What do you say?

16         A.      I don't recall.

17         Q.      Did you accuse him of not being

18 sincere in the injury in some fashion?

19         A.      I don't know.

20         Q.      You may have?

21         A.      I may have.

22         Q.      Did you accuse him of lying?

23         A.      No.

24         Q.      Are you sure?

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

1    A.    No.

2    Q.    So you still have the doubts then

3 after you leave him that day?

4    A.    Yes.

5    Q.    Anything else said when you go out to

6 the truck after he has reported his injury?

7    A.    I don't recall.

8    Q.    Did you accuse him of faking?  Did you

9 use that word?

10    A.    I don't recall.

11    Q.    You may have?

12    A.    Don't know.

13    Q.    So you may have used it, if you don't

14 know, that's what that means to me.  Correct?

15    A.    Yes.

16    Q.    But you're sure you didn't say lying?

17    A.    Yes.

18    Q.    You're sure --

19    A.    Yes.

20    Q.    -- or you don't know?  I'm sorry?

21    A.    Yes.

22    Q.    You're sure about lying, you're not

23 sure about faking, correct?

24    A.    Correct.

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 89

1      A.      Those are my main responsibilities.

2      Q.      Do you have supervisory authority to

3  discipline employees?

4      A.      Yes.

5      Q.      Okay.  In what sorts of ways do you

6  discipline employees?

7      A.      I talk with, document.

8      Q.      How do you document?

9      A.      An employee record.  I will talk with

10  a driver who has not followed the methods, let's

11  say, miss-delivered a package.  First time, it's a

12  talk-with.  It's not written down.  The second time

13  it's a talk-with and it's documented in their

14  employee record.  The third time we give a verbal

15  warning.  It's a progressive discipline.

16      Q.      When you say document employee record,

17  what does that involve?

18      A.      Just with the employee there, if he

19  wants the union steward there, I will document my

20  name, Dave Ziltz, talked with the driver's name in

21  regards to verifying their next status before they

22  leave in the morning.

23      Q.      Is this a note that you make

24  somewhere?

1    A.    No, it didn't click.

2    Q.    But you still have the doubts about
3 the accident?

4    A.    He went to seek medical attention and
5 the doctor said he had a strain in his back, I
6 think.  I don't recall.  So at that point, you know,
7 my doubts are no longer doubts.  I mean, the doctor
8 said something was wrong.

9    Q.    You talked to a doctor?

10    A.    No, I did not talk to a doctor.

11    Q.    How do you know what the doctor says?
12 How do you know what Mr. Andreu's doctor had said at
13 any time?

14    A.    After the 9th he was on restrictions.

15    Q.    How do you know this?

16    A.    Because he didn't work.

17    Q.    So sometime after the 9th you find out
18 he's on restrictions?

19    A.    Uh-huh.

20    Q.    And are you telling me that eases your
21 doubts or changes your mind?  What happens?

22    A.    It eases my doubts.

23    Q.    Did you follow-up with any doctors or
24 Mr. Andreu to do anything else to try to figure out

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 124

1       A.     There were two times.

2       Q.     What's the first time?

3       A.     The first time I was in a package car

4 with packages in it.  It was called a meet point,

5 dividing those packages up amongst the proper

6 routes.  At that point, the driver who was doing

7 that route, Coveny's route, Matt Sanderson, reported

8 to me the he fell out of the back of the truck on

9 his knee, which he had prior surgery on outside of

10 UPS.  We went our ways.  A little while later he

11 called me and said my knee is really swelling up, I

12 need to go to the doctor, to the clinic.  So at that

13 point, I relieved him.

14       Q.     And he was doing Gary Coveny's route?

15       A.     Yes.

16       Q.     So now you're doing Gary Coveny's

17 route?

18       A.     Now I'm doing the route.

19       Q.     Was Mr. Andreu there, present?

20       A.     At the meet point, yes.

21       Q.     What was he doing there?

22       A.     Taking packages that belonged to that

23 route.  That's what the meet point was, things were

24 left -- packages were left in the building and

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 125

1  weren't dispatched and I was meeting several

2  drivers.

3        Q.    What other drivers were there?

4        A.    I don't recall.  I know Matt and I

5  know --

6        Q.    Did you have any discussions directly

7  with Mr. Andreu at the meet point?

8        A.    No.

9        Q.    Were there any issues at that point in

10  time?

11       A.    No.

12       Q.    Was there any issues in getting him to

13  come to the meet point?

14       A.    No.

15       Q.    And he took additional packages out of

16  the meet point, correct?

17       A.    Yes.

18       Q.    So there was no problems getting him

19  to pick up these additional packages --

20       A.    No.

21       Q.    -- at the meet point?

22       A.    No.

23       Q.    What time of day was this?

24       A.    I don't recall.  I -- 2:00 o'clock.

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

1    Q.    And then you have a second occasion to

2    see him on the route later that day, correct?

3    A.    Yes.

4    Q.    Prior to meeting him later that day,

5    do you have communications with -- what is your

6    first indication or notification that there's some

7    issue with Mr. Andreu and this Bernina pick-up?

8    A.    As I said, I relieved Matt on the

9    route, I was doing that delivery route.  The driver

10   whose pick up Bernina is on was Laura Martinez.

11   She's a very good driver.  And there was someone on

12   the adjacent route that didn't know the route well,

13   was in need of help, was not going to finish the

14   day.  Cheryl, you know, called me.  I said, you

15   know, ask Laura to help.  The particular person, I

16   don't remember who that was.  And Cheryl called me

17   back and said will Laura help, but we need to cover

18   Bernina.  And then at that point I say have Jose

19   pick up Bernina.

20   Q.    Did she tell you in this conversation

21   that she had already notified Jose and he was giving

22   some resistance?

23   A.    That was prior to that.

24   Q.    Okay.  So you get -- is this a phone

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 130

1      A.      Correct.

2      Q.      What time of day was this?

3      A.      Approximately 4:00.

4      Q.      Okay.  And your response to her was

5  what?

6      A.      To have Jose pick it up.

7      Q.      Why Jose?

8      A.      Because it's an excess route.  It has

9  no pick-ups assigned to it.

10     Q.      Didn't he have another pick-up earlier

11 that day?

12     A.      Maybe a residential pick-up.  But that

13 type of route is designed to take work off the other

14 routes when they're too heavy, does not have a

15 pick-up route, so when we have to disburse it, we

16 don't have to disburse pick-ups.

17     Q.      When that route is not too heavy; is

18 that right?

19     A.      Yes.

20     Q.      Well, if it's 190 stops that he, in

21 fact, did that day, that's certainly well within the

22 average of that route, right?

23     A.      Correct.

24     Q.      Is it on the high side of the average

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 133

1    A.    At that point and seeing his truck

2  earlier, I found that hard to believe.  So I said

3  send him to the pick-up now.  I was on the route

4  across the street.  And she sent him there and I was

5  waiting out in front of the pick-up on the street.

6    Q.    So you had already gotten to

7  Bernina --

8    A.    Yes.

9    Q.    -- by the time he shows up?

10   A.    Oh, yes.

11   Q.    How much time elapses between your

12  call with Cheryl and the time you meet Jose?

13   A.    Ten, 15 minutes max.

14   Q.    Do you have any notes of this in terms

15  of the times of that day?

16   A.    I do not.

17   Q.    Did you write them down at all that

18  day?

19   A.    No.

20   Q.    Have you ever written them down?

21   A.    No.

22   Q.    So your ten to 15 minutes is your best

23  estimate as you sit here today?

24   A.    Yes.

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 135

1    there?

2          A.      I had him open up his bulkhead door,

3    which is the door behind the driver, and I counted

4    the packages in his car.

5          Q.      You physically counted each and every

6    package?

7          A.      I counted like this (indicating).  I

8    looked at the shelf and counted like that.

9          Q.      Okay.  So you didn't go through each

10   package, move it aside, one, two?

11         A.      Did not.

12         Q.      Your standing by the driver's seat?

13         A.      I went into the bulk area.

14         Q.      What's the bulk area?

15         A.      Went into the back of the package car.

16         Q.      And you're counting with your finger?

17         A.      Yes.

18         Q.      Okay.  And what happens next?

19         A.      I counted about 20 packages.  I asked

20   Jose where the 60 packages were, the 60 stops.  I

21   shared my frustrations with him with everything

22   going on in the area, a person getting hurt, a

23   person needing help, we need to pitch together, this

24   and that.  I don't recall my exact words at that

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 136

1   point, if I mentioned dishonesty to him, but very

2   well could have.  It was a dishonest act.  It's in

3   the contract.  I don't know.  I don't recall words.

4   And at that point I told him to make the pick-up,

5   finish his work and get back into the building and

6   went on.

7        Q.     Okay.  Let's take those one at a time.

8   So about 20 packages is what you counted?

9        A.     Yes.

10       Q.     Could have been a little more?  Could

11  have been a little less actually?

12       A.     Yes.

13       Q.     Did you ask Jose at that time about

14  his -- you just heard from Cheryl this 60 package

15  thing, right?  You heard that through Cheryl Bast?

16       A.     Yes.

17       Q.     Jose never told you 60 packages --

18       A.     No.

19       Q.     -- correct?  Okay.

20              So did you then ask Jose -- did

21  you say something about 60 packages to Jose?

22       A.     I said where are the 60 stops you told

23  Cheryl you had?

24       Q.     What does he say?

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 171

1      Q.      So he wouldn't have been done until

2  9:00 then?

3      A.      No.   Would have been done earlier

4  without doing the work.   I would assume with 20-some

5  stops left in that area, that's average on that

6  route, 19, 22 stops an hour by various drivers, that

7  would have been an hour's worth of work at 4:00,

8  so...

9      Q.      He's getting paid for this work,

10 correct?

11     A.      Correct.

12     Q.      And this would have been an hour of

13 overtime, right?

14     A.      Yes.

15     Q.      Okay.   And he's getting paid

16 time-and-a-half?

17     A.      Uh-huh.

18     Q.      So he's jipping himself out of that

19 money, correct?

20     A.      Uh-huh.

21     Q.      Had you ever, prior to February 9th,

22 2005, known Mr. Andreu to try to skimp out of work,

23 cut work early, leave work early, anything?

24     A.      No, I have not.

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 192

1      Q.      Okay.  And you talked to him on the

2  phone --

3      A.      Yes.

4      Q.      -- and you say what?

5      A.      I said if he has anybody in the car,

6  you know, which he denied, I said you need to get

7  them out now.  And then that was the end of the

8  conversation.  I reported it to Tim Pope and then it

9  went from there.

10     Q.      What happened?

11     A.      I believe he was terminated.

12     Q.      Are you sure?

13     A.      I know he was -- I know he was out of

14  work.  I think he was terminated for -- until the

15  grievance procedure went through and then he's back.

16     Q.      Now he's back?

17     A.      He's back at work.

18     Q.      Who was the driver that reported --

19  was this an eyewitness, somebody who actually saw an

20  unauthorized passenger in his car?

21     A.      Thought he saw a passenger, yes.

22     Q.      Well, I mean, did you talk to this

23  other driver?

24     A.      Yes.

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 200

1   STATE OF ILLINOIS    )
                         )  SS.
2   COUNTY OF W I L L    )

3

4           I, Tamara Manganiello, a notary public

5   within and for the County of Will and State of

6   Illinois, do hereby certify that heretofore, to-wit,

7   on the 26th day of July, A.D., 2007, personally

8   appeared before me at Suite 850, 29 South LaSalle

9   Street, in the City of Chicago, County of Cook and

10  State of Illinois, DAVID ZILTZ, a witness, called by

11  the Plaintiff in a certain cause now pending and

12  undetermined, wherein JOSE ANDREU is the plaintiff

13  and UNITED PARCEL SERVICE, INC., is the defendant.

14          I further certify that the said witness,

15  DAVID ZILTZ, was by me first duly sworn to testify

16  the truth, the whole truth and nothing but the truth

17  in the cause aforesaid; that the testimony then

18  given by him was by me reduced to writing by means

19  of shorthand in the presence of said witness and

20  afterwards transcribed upon a computer, and the

21  foregoing is a true and correct transcript of the

22  testimony so given by him as aforesaid.

23          I further certify that the reading and

24  signing of said deposition was reserved by the

L.A. REPORTING (312) 419-9292

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa

Page 201

1    witness.

2        I further certify that the taking of the

3    deposition was pursuant to notice, and that there

4    were present at the taking of the deposition the

5    aforementioned parties.

6        I further certify that I am not counsel

7    for nor in any way related to any of the parties to

8    this suit, nor am I in any way interested in the

9    outcome thereof.

10        In testimony whereof I have hereunto set

11    my hand and affixed my notarial seal this 21st of

12    August, A.D., 2007.

13

14
                    _____

15                  TAMARA MANGANIELLO, RPR
                    Illinois License No. 084-004560

16

17

18

19

20

21

22

23

24

d5c13ca9-2ff6-4a47-8b0c-53fb8cea7aaa