## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **JOSE ANDREU,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 07 C 6132** |
| | ) | |
| | ) | |
| **UNITED PARCEL SERVICE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Plaintiff Jose Andreu's ("Andreu") partial motion for summary judgment. This matter is also before the court on Defendant United Parcel Service, Inc.'s ("UPS") motion for summary judgment. For the reasons stated below, we grant Andreu's partial motion for summary judgment. We deny UPS's motion for summary judgment in its entirety.

1

## BACKGROUND

Andreu alleges that UPS employed him beginning in 1996 and that in 2003 he started working for UPS as a package worker.  According to Andreu, in January 2005, he injured his back while on his assigned route delivering packages ("Injury").  Andreu claims that he reported the Injury in a meeting with his supervisor Dave Ziltz ("Ziltz") and that Ziltz notified UPS's workers' compensation insurance carrier regarding the Injury.  Andreu also alleges that during this meeting, Ziltz accused Andreu of lying about the Injury and faking his pain.  Andreu alleges that Ziltz continued to repeat his assertions that Andreu was lying about the Injury and Ziltz expressed hostility towards Andreu subsequent to the meeting.

Andreu states that over the next month he was examined and treated for the Injury by a physician associated with UPS as well as by his own physician.  According to Andreu, he notified UPS of his ongoing treatment and he was forced to miss several days of work due to the pain he was experiencing as a result of the Injury.

Andreu alleges that on February 9, 2005, Ziltz confronted Andreu at his truck and accused Andreu of lying about the number of packages and/or stops that Andreu had left for the day in an earlier communication.  Ziltz allegedly told Andreu that Andreu would be fired.  Andreu alleges that, two days later, he informed UPS that he

could no longer perform his present duties due to his Injury and the treatment he was receiving. According to Andreu, on March 4, 2005, his superior Kerry Snyder ("Snyder") notified him that he was terminated effective immediately for allegedly lying about the number of packages and deliveries remaining on February 9, 2005, and he was escorted off the premises by UPS personnel. Andreu alleges that he was not dishonest on February 9, 2005, and did nothing to legitimately warrant termination. Andreu claims that UPS's decision to terminate him was motivated by Andreu's act of reporting the Injury.

Andreu originally filed an action before this court alleging a federal claim under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") and a state law claim alleging retaliatory discharge under the Illinois Worker's Compensation Act, 820 ILCS 305/1 *et seq.* ("IWCA"). Subsequently, Andreu voluntarily dismissed his COBRA claim and we remanded the action to state court on the IWCA claim. On October 30, 2007, UPS removed the action back to this court based on diversity of citizenship subject matter jurisdiction, pursuant to 28 U.S.C. § 1332(a). UPS answered Andreu's complaint and asserted the affirmative defense that Andreu is barred from recovery since he failed to exercise reasonable effort to mitigate his damages. UPS filed a motion for summary judgment on Andreu's claim. Andreu filed a partial motion for summary judgment on UPS's affirmative defense.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(c).  In seeking a grant of summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)).  This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case."  *Id.* at 325.  Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a

4

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000). When there are cross motions for summary judgment, the court should "construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

## DISCUSSION

## I. Legal Standard for an Illinois Retaliatory Discharge Claim

Andreu brings his claim for retaliatory discharge under the IWCA. The Illinois Supreme Court has construed retaliatory discharge for exercising rights under the IWCA as an actionable tort. *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 357-59 (Ill. 1978). To assert the tort of retaliatory discharge under the IWCA, a plaintiff must show "(1) that he was the defendant's employee before the injury; (2) that he exercised a right granted by the Workers' Compensation Act; (3) and that he was discharged from his employment with a causal connection to his filing a workers'

5

compensation claim." *Hiatt v. Rockwell Intern. Corp.*, 26 F.3d 761, 767 (7th Cir. 1994); *see also Hartlein v. Illinois Power Co.*, 601 N.E.2d 720, 728 (Ill. 1992)(detailing elements of an IWCA claim).  In an IWCA retaliatory discharge claim, "[t]he onus is on the employee to show affirmatively that [his] termination was motivated by unlawful intent to retaliate against [him] for exercising [his] statutory right." *Feldman v. American Memorial Life Ins. Co.*, 196 F.3d 783, 792 (7th Cir. 1999).  If a plaintiff fails to present evidence of a causal connection between the plaintiff's workers' compensation claim and the termination, the action fails.  *See id.* at 793 (finding that the plaintiff could not support her retaliatory discharge claim under the IWCA since she presented "no affirmative evidence indicating any causal nexus between her worker's compensation claim and her termination").  Furthermore, "a claim that rests entirely on suspicious timing is insufficient to survive summary judgment." *Id.* at 792.  In Illinois, a plaintiff cannot satisfy the causation element of the retaliatory discharge claim if the employer has shown a valid non-pretextual basis for discharging the plaintiff.  *Hartlein*, 601 N.E.2d at 728.

The Seventh Circuit recently noted that there is some ambiguity on the issue of whether federal courts, sitting in diversity, should apply the Illinois tort standard for addressing retaliatory discharge claims, or whether federal courts should apply the burden-shifting method from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973), used in federal discrimination cases. *McCoy v. Maytag Corp.*, 495 F.3d 515, 522 (7th Cir. 2007). The Illinois Supreme Court has explicitly rejected the use of the burden-shifting analysis as applied by Illinois courts to retaliatory discharge claims. *Clemons v. Mech. Devices Co.*, 704 N.E.2d 403, 407-08 (Ill. 1998). However, the Seventh Circuit posited that under the *Erie* doctrine federal courts sitting in diversity might still be required to apply the federal burden-shifting standard, depending on whether the *McDonnell Douglas* analysis is considered substantive or procedural. *McCoy*, 495 F.3d at 522. The Seventh Circuit, in *McCoy*, concluded that the major difference between the Illinois tort analysis and the *McDonnell Douglas* analysis relates to the initial question of what constitutes a prima facie case. *Id.* However, since the issue of whether the plaintiff met a prima facie case was not before the Seventh Circuit in *McCoy*, the Court decided not to resolve the issue of which standard should apply. *Id.*

Based on the circumstances of the instant action and the precise issues that are disputed by the parties, the applicable legal standard is not determinative on the outcome of the case. As discussed below, the parties agree that Andreu has met the first and second prongs under the retaliatory discharge standard. However, the parties dispute the issue of whether Andreu was terminated by UPS and whether that termination had a causal connection to the Injury and Andreu's workers'

7

compensation claim.  The parties also dispute whether Andreu's action is preempted by a collective bargaining agreement and whether UPS can assert the affirmative defense that Andreu failed to mitigate his damages.  Whether we apply the *McDonnell Douglas* burden-shifting analysis or the Illinois tort analysis, material issues of fact remain with respect to Andreu's retaliatory discharge claim.

## II. UPS's Motion for Summary Judgment

UPS has moved for summary judgment on the IWCA claim, arguing: (1) that the instant action is preempted under § 301 of the National Labor Relations Act ("NLRA") since Andreu's claims are intertwined with a collective bargaining agreement, (2) the action taken against Andreu by UPS was not a termination and there is no causal connection between UPS's disciplinary action and Andreu's termination, and (3) the undisputed evidence demonstrates that the action taken against Andreu was not done based upon a prohibited animus.

### A. Preemption

The parties agree that the employment relationship between Andreu and UPS was governed under a collective bargaining agreement ("CBA") between UPS and Andreu's union, Teamsters Local 705 ("Union").  (DSF Par. 7)(R DSF Par. 7).  UPS

argues that it is entitled to summary judgment since Andreu's claim hinges on an

arbitrator's interpretation of the CBA in an action that is currently pending in

arbitration.  UPS's stated reason for placing Andreu on "notice of termination" was

that Andreu allegedly had been untruthful about the number of deliveries he had

remaining on February 9, 2005.  (Compl. Par. 21).  Under the terms of the CBA,

when there is a dispute relating to discharge, the Union may file a grievance within

fifteen days of the notice of termination.  (D. SJ Mot. APX 15).  Also, under the

CBA, when a grievance is submitted, the matter is referred to a committee consisting

of an equal number of members selected by the Union and UPS ("Grievance

Committee"). (D. SJ Mot. APX 15).  Finally, under the CBA, if the Grievance

Committee fails to reach a resolution, the matter is submitted to an arbitrator.  (D. SJ

Mot. APX 15).  The parties agree that at some point in this case the Union submitted

a grievance on behalf of Andreu to UPS.  (R DSF Par. 48).  UPS alleges that the

grievance was filed untimely and Andreu disputes this fact.  (DSF Par. 39)(R DSF

Par. 46-53).  According to UPS, the matter proceeded to the Grievance Committee

which became "deadlocked" on the issue of whether the grievance was valid as

timely filed.  (DSF Par. 47).  The case was then submitted to an arbitrator for

resolution of the issue of whether the grievance was timely filed and for resolution of

the merits of the grievance.  (DSF Par. 48).  The parties agree that the arbitration

action is still pending. (R DSF Par. 48).

UPS cites to *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S 399 (1988), for the proposition that when a state law claim is dependent upon the interpretation of a collective bargaining agreement, the state law claim is preempted and federal labor law applies. (D. Mot. SJ Mem. 11). UPS argues that one of the issues pending before the arbitrator is whether UPS's discharge of Andreu was for "just cause" and that such issue intertwines Andreu's state law claims with an interpretation of the CBA. (D. Mot. SJ Mem. 11). UPS argues that if the arbitrator did find that the termination was for "just cause" it would automatically constitute a "valid, non-pretextual" reason for discharge that would, by necessity, defeat Andreu's state law claim. (D. Mot. SJ Mem. 11-12). However, the Supreme Court in *Lingle* rejected a similar argument. *Lingle*, 486 U.S at 408. In *Lingle*, the plaintiff also filed a claim for retaliatory discharge under Illinois law. *Id.* at 402. The Seventh Circuit ruled that the action was "inexorably intertwined" with the collective bargaining agreement, and thus preempted, since the retaliatory discharge implicated the same factual issues to be considered by the arbitrator in deciding whether there was "just cause" for the termination. *Id.* However, the Supreme Court disagreed and found that a typical claim for retaliatory discharge is sufficiently independent from the interpretation of the CBA, to avoid preemption. *Id.* at 407. The Supreme Court

noted that each of the elements of an Illinois retaliatory discharge claim requires a "purely factual inquiry" and "does not turn on the meaning of any provision in a collective-bargaining agreement." *Id.*

The Seventh Circuit, in *Bettis v. Oscar Mayer Foods Corp.*, followed up on the Supreme Court's decision in *Lingle*, by reaffirming that an Illinois retaliatory discharge claim is not preempted by federal labor law even when the defendant counters with an allegation that relates to a collective bargaining agreement. 878 F.2d 192, 196-97 (7th Cir. 1989). The Seventh Circuit reiterated that the substantive rights at issue in a retaliatory discharge claim are "independent of the collective bargaining relationship." *Id.* The Seventh Circuit reached that conclusion, notwithstanding the fact that the employer in *Bettis* asserted a defense to the claim that related to a provision in the collective bargaining agreement. *Id.* at 196. The Seventh Circuit noted, "[t]he mere fact that the state-law analysis might require the state court to focus on the same facts that would control resolution of an employee's contractual remedy is not enough to require preemption of the state law claim." *Id.* The instant action is directly on point with the Seventh Circuit precedent in *Bettis* and the Supreme Court precedent in *Lingle.* While Andreu's claim might implicate the same facts that are pending before an arbitrator, the claim in this case, as in *Lingle* and *Bettis*, does not require the interpretation of the CBA. Thus, this action is

11

not preempted by federal labor law.

Furthermore, even if UPS had presented a meritorious argument for why Andreu's action should be preempted by federal labor laws, this defense would have been waived. If a party unnecessarily delays in asserting an affirmative defense and that delay causes harm to the opposing party, that affirmative defense is waived, pursuant to Federal Rule of Civil Procedure 8(c). *Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005)(stating that a party waives an affirmative defense in instances where the plaintiff has been "harmed" by the failure to assert it). Andreu argues that UPS never asserted the defense of preemption in its answer and waited until discovery closed and UPS filed its motion for summary judgment to bring up the issue. (Ans. D. Mot. SJ 13). Andrew points out that if UPS had asserted the preemption defense in a timely manner, Andreu could have conducted discovery in an effort to combat that defense. (Ans. D. Mot. SJ 13). However, UPS's failure to timely assert that defense unfairly deprived Andreu of the opportunity to respond to it. Therefore, Andreu has pointed to harm resulting from UPS's delay in asserting the defense of preemption and that defense, had it been meritorious, would be waived. *Curtis*, 436 F.3d at 711.


B. Cause of UPS's Termination of Andreu

UPS argues that it is entitled to summary judgment since UPS was not the actual cause of Andreu's termination. To prevail on an Illinois retaliatory discharge claim, a plaintiff must establish that he "was discharged from his employment with a causal connection to his filing a workers' compensation claim." *Hiatt*, 26 F.3d at 767; *Hartlein*, 601 N.E.2d at 728. UPS argues that it never actually terminated Andreu, but merely placed him on "notice of termination." (D. Mot. SJ Mem. 9). UPS states "it is not at all clear that [Andreu] would have lost his job over his untruthfulness incident." (D. Mot. SJ Mem. 10). UPS argues that Andreu never became actually discharged until the Union failed to file a timely grievance on Andreu's behalf. (D. Mot. SJ Mem. 9-10). Thus, UPS argues that it was the Union that actually terminated Andreu from his employment with UPS and that Andreu cannot establish that there was a causal connection between his discharge and his workers' compensation claim.

UPS's theory that there is no causal connection between its actions and Andreu's termination is not persuasive. UPS acknowledges that Andreu was employed by UPS, not the Union. (DSF Par. 5). UPS also acknowledges that Andreu's direct supervisor, an employee of UPS, told Andreu on February 9, 2005, that Andreu would be fired. (DSF Par. 30). UPS states that Snyder, a manager at UPS, notified Andreu that he was on "notice of termination" on February 10, 2005.

(DSF Par. 36). Finally, UPS acknowledges that it was actually Snyder who terminated Andreu's employment after meeting with a steward of the Union. (DSF Par. 40). The mere fact that there were provisions, under the CBA, for the Union to appeal Andreu's termination does not change the fact that UPS was the party that took the adverse employment action against Andreu. UPS has pointed to no law or facts that would support its theory that it did not terminate Andreu's employment.

Furthermore, UPS's contention that Andreu's termination would not have occurred if not for the Union's failure to file an appeal is purely speculative and unpersuasive. In arguing that UPS did not actually terminate Andreu, UPS relies on a declaration from UPS's Labor Relations Manager, Tom Haefke ("Haefke"). (D. SJ Mot. APX 8-11). In Haefke's declaration, he describes the ordinary course of disciplinary procedures at UPS. For example, Haefke states that "[i]n many instances, an employee on 'Notice of Termination' is returned to work by an agreement of UPS and the Union after a grievance is filed on his/her behalf, with discipline such as a warning or an unpaid temporary suspension from work rather than a termination from employment." (DSF Par. 14). UPS basically acknowledges that it has the power to terminate an employee and also to undo the termination when UPS states that after giving a notice of termination, UPS may decide that the employee is "returned" to work. UPS's contentions and arguments do no support a

14

conclusion that UPS did not actually terminate Andreu's employment.

UPS also tries to support its contention that it did not terminate Andreu's employment by pointing to the deposition testimony of Snyder that "this would likely have been one of those cases" where a notice of termination would have been converted to a lesser penalty.  (D Mot. SJ Mem. 10)(DSF Par. 45).  However, once again, such a contention is speculative.  The fact remains that it was UPS that discharged Andreu.  Based upon the foregoing, no reasonable trier of fact could conclude other than that Andreu was terminated by UPS, not the Union.  UPS has failed to present sufficient evidence to conclude as a matter of law that it did not cause Andreu's termination.

### C. Motive for Andreu's Termination

Andreu claims that his termination by UPS was causally related to his filing of a workers' compensation claim.  UPS, however, claims that it terminated Andreu for a legitimate reason and the termination was not retaliatory.  As stated above, regardless of whether the court applies the federal burden-shifting analysis or a state tort law analysis, when a defendant has raised a legitimate and non-discriminatory or non-retaliatory explanation for the plaintiff's termination, the plaintiff must then point to evidence to show that the defendant's explanation is actually a pretext for

unlawful discrimination or retaliation. *See McCoy*, 495 F.3d at 522 (stating that aside from differences with respect to the prima facie analysis, the state and federal standards are the same).

In this case, UPS argues that Andreu committed a terminable offense by lying in a communication with his supervisors. Andreu argues that UPS's explanation is actually a pretext for what was, in fact, a termination in retaliation for Andreu's filing of a workers' compensation claim.

### 1. UPS's Explanation for Andreu's Termination

UPS argues that the undisputed facts establish that the sole reason for Andreu's termination was that he misrepresented to his supervisor the number of packages he had left to deliver on February 9, 2005 ("pick-up incident"). (D Mot. SJ Mem 7). According to UPS's version of the pick-up incident, Andreu was on his daily delivery route when he was contacted with a request to make an off-route pick-up. (DSF Par. 19). UPS alleges that Andreu initially protested, stating that he had "about sixty" packages remaining to deliver. (DSF Par. 23). According to UPS, shortly after making this representation, Andreu was required to meet up with Ziltz, Andreu's supervisor, who allegedly found that Andreu had only twenty more deliveries remaining. (DSF Par. 28-30). UPS states that it was Andreu's dishonesty

alone that was the reason for his termination.  (DSF Par. 30).

2. Andreu's Claim of Pretext

Andreu argues that UPS's explanation for his termination is a pretext for unlawful retaliatory discharge.  In support, Andreu points to the following circumstantial evidence: (1) the facts of the incident on which UPS relies for its alleged legitimate explanation for Andreu's termination actually indicate that Andreu was not dishonest and that UPS supervisors "set [him] up," (2) the very supervisor who initiated Andreu's termination had been openly hostile to Andreu for filing his workers' compensation claim and had repeatedly and openly accused Andreu of lying about his injuries, (3) the supervisor responsible for the final decision to terminate him has offered contradictory statements regarding when he first learned about Andreu's injury and whether Andreu actually admitted to being dishonest, (4) Andreu has worked for UPS for nearly ten years and was never before disciplined or reprimanded until shortly after he filed a workers' compensation claim, (5) that other employees who had not filed workers' compensation claims committed "cardinal infractions" and were not terminated, and (6) UPS's termination of Andreu came shortly after Andreu filed his workers' compensation claim.

17

a. Evidence Regarding the Pick-Up Incident

Andreu argues that the evidence supports the conclusion that he was not

dishonest during the pick-up incident and that the entire event was a scheme by his

supervisors to concoct a reason for terminating him.  First, Andreu alleges that he

was initially contacted with the request to make the off-route pick-up one hour earlier

than is alleged by UPS.  (P SAF Par. 31).  Andreu alleges that it was 3:00 P.M. when

he made the representation that he had approximately sixty stops left, not 4:00 P.M.

as UPS alleges.  (P SAF Par. 31).  According to Andreu, his "estimation" that he had

"about sixty" stops remaining was more accurate than is claimed by UPS since he

made that estimation earlier in the day when he had more stops remaining.  (P SAF

Par. 31-32).  Andreu alleges that it was nearly an hour and a half after he made the

representation that Ziltz discovered he had approximately twenty deliveries

remaining.  (P SAF Par. 35).  Second, Andreu points to evidence that Ziltz never, in

fact, counted the number of packages remaining in Andreu's truck when Ziltz alleged

to have discovered that Andreu had been dishonest.  (P SAF Par. 37).  UPS

acknowledges that Ziltz has testified that he does not know exactly how many

packages were in Andreu's truck and that "there could have been a little more than

20 packages or a little less. . . ."  (P SAF Par. 37).  Third, Andreu has pointed to

evidence that indicates that other drivers may have been better suited to make the

unscheduled pick-up than Andreu, but that Ziltz personally insisted Andreu make the

off-route pick-up.  (P SAF Par. 22).   Andreu argues that these facts evince an intent

on the part of Ziltz to "set [Andreu] up," allegedly in retaliation for asserting a

workers' compensation claim.  (P Ans. Mot. SJ 5).


### b. Evidence Regarding Ziltz's Hostility Toward Andreu

Andreu alleges that his supervisor at UPS was openly hostile towards him for

filing his workers' compensation claim.  UPS has admitted that Andreu's supervisor,

Ziltz, treated Andreu with some hostility during the period between Andreu's report

of his Injury and Ziltz's allegation that Andreu lied about his deliveries.  (R PSAF

Par. 9-17).  UPS admits that Ziltz doubted the validity of the Injury and expressed

these doubts openly and regularly.  (R PSAF Par. 9-17).  Andreu testified that Ziltz

told him after his Injury, that Andreu was "lazy" and that Andreu had "screwed up

for the rest of the drivers. . . ."  (P SAF Par. 10).  UPS has not denied that Ziltz made

such comments to Andreu.  (R PSAF Par. 10).  Furthermore, UPS admits that Ziltz

accused Andreu of "faking" the accident.  (R PSAF Par. 12).  Andreu argues that the

evidence that Andreu has presented of hostility by his direct supervisor resulting

from his workers' compensation claim, constitutes circumstantial evidence of a

retaliatory animus on the part of UPS in terminating Andreu.  Andreu states that this

evidence is particularly relevant in light of the fact that Ziltz, the supervisor who

openly doubted and disparaged Andreu, was the same supervisor involved in the

pick-up incident that resulted in Andreu's termination. (DSF Par. 28-30).


### c. Contradictory Statements By the Terminating Supervisor

Andreu has also pointed to evidence that Snyder, the UPS manager who

ultimately officially terminated Andreu's employment offered contradictory accounts

regarding the timing of his knowledge of Andreu's workers' compensation claim and

his decision to place Andreu on notice of termination.  (P SAF Par. 41-46).  UPS

acknowledges that in March 2005, Snyder wrote an internal memorandum in which

he represented to his superiors that Andreu had not reported his Injury until after the

pick-up incident and after Andreu was placed on notice of termination.  (R PSAF

Par. 41).  However, in a deposition associated with the instant case, Snyder testified

that, in fact, he was informed of Andreu's Injury on January 25, 2005, well before

the pick-up incident and before Snyder's decision to place Andreu on notice of

termination.  (R PSAF Par. 8).  Snyder has also offered differing statements

regarding whether or not Andreu admitted to him that he had lied about the number

of deliveries he had remaining on February 9, 2005.  (P SAF Par. 44-46).  Andreu

states that Snyder's inconsistencies with respect to relevant facts constitute further

circumstantial evidence that Andreu was terminated due to an unlawful retaliatory animus, since a reasonable fact finder could conclude that these inconsistencies evince an intent on the part of UPS to cover up an unlawful retaliatory motive for Andreu's termination. *Jackson*, 20 F.3d at 242.

#### d. Treatment of Other Employees

Andreu alleges that UPS treated him differently than other employees who had committed "cardinal infractions" due to the fact that he had filed a workers' compensation claim. Andreu points to evidence that another UPS driver allowed an unauthorized passenger into his truck, which was a cardinal infraction. (P SAF Par. 63-64). Andreu also points to evidence that another UPS driver was found to have been dishonest to his supervisors by misrepresenting the weight of his packages. (P SAF Par. 65-66). Andreu states that neither of these employees were terminated despite the fact that they had committed similar infractions. (P SAF Par. 63-66) UPS acknowledged that these employees committed such infractions but argues that these employees were returned to work via the grievance procedure. (R PSAF Par. 63-66). Andreu argues that the disparate treatment constitutes further circumstantial evidence that UPS's explanation for his termination is a pretext for retaliation in violation of Illinois law.

e. Andreu's Prior Work Performance and Suspicious Timing

UPS admits that in the nearly ten years that Andreu had been working for UPS, Andreu had never been reprimanded or disciplined for any reason and that his supervisor never had any cause to complain about Andreu's work performance. (R PSAF Par. 1-2). Andreu also points out that in the years prior to Andreu's termination, UPS admits that Andreu regularly worked considerable overtime hours and was generally regarded as a valuable employee. (R PSAF Par. 3-5). While at the same time acknowledging Andreu's impressive work history, UPS argues that Andreu's prior work performance is irrelevant since "dishonesty" is a terminable offense under the CBA. (R PSAF Par. 3-5). UPS argues that since it had a right to terminate Andreu for any act of dishonesty, it is irrelevant that Andreu had been a stellar employee in the past. (R PSAF Par. 3-5).

Andreu also points to the fact that the pick-up incident and Andreu's subsequent termination occurred very shortly after Andreu filed his workers' compensation claim. Suspicious timing cannot be the sole support for a retaliatory discharge claim and a plaintiff must point to more than mere suspicious timing to support a retaliatory discharge claim under the IWCA. *Feldman*, 196 F.3d at 792. Andreu argues that he has pointed to more than just suspicious timing and that the

suspicious timing of his termination is simply further supporting evidence of his claim, and not the sole basis.

Based on the foregoing, Andreu has pointed to sufficient evidence to defeat UPS's motion for summary judgment. Therefore, we deny UPS's motion for summary judgment.

III. Andreu's Motion for Partial Summary Judgment

In its answer to Andreu's complaint, UPS asserts a single affirmative defense that "Plaintiff is barred from recovery because he failed to exercise reasonable efforts to mitigate his alleged damages." (Ans. 8). Andreu has moved for summary judgment on UPS's affirmative defense arguing that the undisputed facts in the record establish that Andreu did in fact make efforts to mitigate his damages by attempting to secure other employment after his termination by UPS. In his motion for summary judgment, Andreu lays out substantial evidence evincing efforts on Andreu's part to obtain other employment after his termination from UPS. (P SF Par. 17-33). UPS, in its answer to Andreu's motion for summary judgment, has not disputed that Andreu made efforts to mitigate his damages by seeking other employment after his termination from UPS. (D Ans. Mot. PSJ 1). However, UPS has clarified that when it stated that Andreu has failed to mitigate his alleged

damages in its affirmative defense UPS was solely contending that Andreu failed to mitigate his damages because the Union never filed a timely grievance on Andreu's behalf.  UPS alleges that had the Union filed a timely grievance it may have reversed Andreu's termination.

UPS has acknowledged that its affirmative defense is not a mitigation of damages defense based on Andreu's efforts to find employment after termination, but is rather premised on the argument that it did not in fact terminate Andreu, and that the termination of Andreu was caused by the Union's failure to attempt to persuade UPS to undo the notice of termination.  We have already addressed this issue above and concluded that it was UPS that terminated Andreu's employment and not any action or inaction by the Union.  Therefore, based on the foregoing, we grant Andreu's partial motion for summary judgment relating to UPS's affirmative defense.

## CONCLUSION

Based on the foregoing analysis, we deny UPS's motion for summary

judgment.  We grant Andreu's motion for partial summary judgment.


_Samuel Der-Yeghiayan_
Samuel Der-Yeghiayan
United States District Court Judge


Dated:   April 17, 2008